## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

HISPANIC NATIONAL LAW
ENFORCEMENT ASSOCIATION NCR
P.O. Box 766
Cheltenham, MD  20623

UNITED BLACK POLICE
OFFICERS ASSOCIATION
P.O. Box 766
Cheltenham, MD  20623

MICHAEL ANIS
7600 Barlowe Rd
Landover, MD  20785

MICHAEL BROWN
P.O. Box 1434
Bowie, MD  20717

THOMAS BOONE
601 Crain Hwy.
Upper Marlboro, MD 20774

DANITA INGRAM
7600 Barlowe Rd
Landover, MD  20785

PAUL MACK
7600 Barlowe Rd[1]
Landover, MD  20785

JOSEPH PEREZ
7600 Barlowe Rd
Landover, MD  20785

TASHA OATIS
PO Box 8532
Oakridge, MD  21075

**CIVIL ACTION NO.: 18-cv-03821**

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND
DAMAGES**

**DEMAND FOR JURY TRIAL**

---

[1] This caption lists the professional addresses or post office boxes of the police officer Plaintiffs and Defendants because of the sensitivity of publicly disclosing home addresses of law enforcement professionals.

CLARENCE RUCKER
401 Capitol Heights Blvd.
Capitol Heights, MD  20743

CHRIS SMITH
7600 Barlowe Rd
Landover, MD  20785

RICHARD TORRES
7600 Barlowe Rd
Landover, MD  20785

THOMAS WALL
7600 Barlowe Rd
Landover, MD  20785

and SONYA L. ZOLLICOFFER[2]
11108 Fort Washington, Rd.
Fort Washington, MD  20744

                    Plaintiffs,

PRINCE GEORGE'S COUNTY
14741 Governor Oden Bowie Drive
Upper Marlboro, MD  20772

HENRY P. STAWINSKI, III, individually
and in his official capacity as Chief of Police
7600 Barlowe Rd
Landover, MD  20785

MARK A. MAGAW, individually and in his
official capacity as Deputy Chief
Administrative Officer for Public Safety
1301 McCormick Drive, Suite 4000
Largo, MD  20774

CHRISTOPHER MURTHA, individually and
in his official capacity as
Deputy Chief of Police
7600 Barlowe Rd
Landover, MD  20785

---

[2] Lt. Zollicoffer has recently changed her legal last name form Lancaster.

2

and MAJOR KATHLEEN MILLS,
individually and in her official capacity as
Commander, Internal Affairs Division,
7600 Barlowe Rd
Landover, MD  20785,

                        Defendants.

## INTRODUCTION

1.      Plaintiffs Hispanic National Law Enforcement Association NCR ("HNLEA"),

United Black Police Officers Association ("UBPOA"), Police Officers Michael Anis, Thomas

Boone, Michael Brown, Danita Ingram, Paul Mack, Tasha Oatis, Joseph Perez, Clarence Rucker,

Chris Smith, Richard Torres, Thomas Wall, and Sonya Zollicoffer (collectively "Plaintiffs"),

allege the following upon information and belief against Prince George's County, Maryland (the

"County"), Chief Henry P. Stawinski, III ("Chief Stawinski"), Deputy Chief Administrative

Officer for Public Safety and former Chief of Police Mark Magaw, Deputy Chief Christopher

Murtha ("Deputy Chief Murtha") and Internal Affairs Division Commander Major Kathleen

Mills ("Major Mills") (collectively "Defendants").

2.      The Prince George's County Police Department ("PGPD" or the "Department") is

charged with protecting and serving the population of Prince George's County, one of the

wealthiest majority African-American counties in the United States.  The majority of PGPD

officers and the overwhelming majority of senior officers are White, and the Department has

long had a persistent problem of officers who engage in racist conduct (including abusive

police practices), both towards Officers and Civilians of Color.

3.     The PGPD has engaged in patterns of retaliation against Officers of Color who file complaints or otherwise cooperate with efforts to investigate White officers who engage in misconduct.  Among other things, these White officers:

- Commit vicious racist acts, including using racist slurs to refer to other officers or civilians such as "nxxxxr," "spic," or "baboon," and circulating offensive racist images depicting People of Color,

- Abuse their power against civilians, including using force to intimidate and brutalize civilians, and

- Engage in other misconduct, including theft of Departmental funds or property.

Chief Stawinski and Mr. Magaw are and have long been aware of all of this conduct.  Indeed, the Plaintiff Organizations have repeatedly brought complaints directly to their attention, only to have their leadership targeted for retaliation.

4.     And worse, Chief Stawinski has effectively condoned this behavior by failing to discipline appropriately the perpetrators, fostering an environment where racist conduct unacceptable in today's society is allowed to persist. Indeed, Chief Stawinski's actions and inactions have caused racism on the force to thrive: with the assistance of his co-Defendants Mr. McGaw, Major Mills (who heads the Internal Affairs Division) and Deputy Chief Murtha (who heads the Bureau of Patrol), Chief Stawinski has overseen an outrageous pattern of retaliation against Officers of Color, including many of the Individual Plaintiffs, because they have complained about racism and other unprofessional conduct.  The Individual Defendants' efforts include institution of investigative proceedings against complaining officers, imposition of transfers to unfavorable assignments, denial of promotions and favorable transfers, and other adverse changes in work conditions.  Chief Stawinski and the other Individual Defendants have

also caused the Department to engage in a pervasive pattern of discriminatory discipline against Officers of Color, who have been treated far more harshly for the same misconduct as White officers. And Chief Stawinski, Mr. Magaw, Major Mills, and Deputy Chief Murtha have presided over the PGPD at a time when Officers of Color are denied professional opportunities (both promotions and desirable assignments) without justification; Major Mills has personally made derogatory statements about a number of the Individual Plaintiffs and has driven them out of or barred them from working in Internal Affairs.

5.      The message sent by Defendants Chief Stawinski, Mr. Magaw, Major Mills, and Deputy Chief Murtha to the PGPD and the community is clear: racist and other unprofessional behavior by White officers will be condoned, Officers of Color who complain about the conduct will be punished, and Officers of Color who engage in any infraction will be severely disciplined and/or driven from the force. Because the Individual Defendants' tolerance of racist conduct as well as the continuing dominance of White officers among the top ranks of leadership are well-known within the PGPD and the community, the Individual Defendants have undermined the effectiveness of the PGPD to serve a community whose residents are 85 percent People of Color. The direct involvement of the senior leadership of the PGPD in these acts of discrimination is unacceptable in the 21st century. Chief Stawinski's failure of leadership to address the discrimination and retaliation rampant within the department damages the ability of the PGPD and its officers to meet their obligations to the community they have pledged to serve and protect.

## NATURE OF THE ACTION

6.      This is an action brought to remedy egregious racial discrimination and retaliation in employment in violation of the First and Fourteenth Amendments to the U.S. Constitution and the disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 701 et seq.

The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiffs and their members (collectively, the "Plaintiffs") under federal law.  Plaintiffs bring this action under and 42 U.S.C. § 1983 and the Rehabilitation Act. [3]

7.     Defendants have engaged in or perpetuated a long-standing pattern and practice of discrimination against Officers of Color on the basis of color and race by, *inter alia*:

(a)     maintaining and allowing a hostile work environment, including, but not limited to, subjecting Officers of Color to severe and pervasive racially and ethnically derogatory remarks and actions; commencing unwarranted and unfounded investigatory/disciplinary proceedings against Officers of Color; imposing overly severe disciplinary penalties; transferring the officers to less favorable and/or more dangerous assignments and shifts; and denying promotions to Officers of Color who have opposed discriminatory practices or participated in investigatory proceedings;

(b)     engaging in a pattern of retaliatory actions against Officers of Color who complain about or otherwise oppose racially hostile acts or other misconduct by White police officers.  This retaliation extends to Officers of Color who assist or participate in any manner in investigations or proceedings related to claims of discrimination;

(c)     maintaining centralized disciplinary policies and procedures that disparately treat Officers of Color by facilitating the imposition of unfounded, unwarranted and overly severe and disparate penalties, such as: (i) suspension from the force and/or of police powers, (ii) assignment to undesirable and/or particularly dangerous tasks, (iii) termination, upon Officers of Color for offenses or alleged offenses for which White officers are not similarly or comparably disciplined or not disciplined at all, and (iv) blackballing terminated Officers of Color from obtaining or retaining employment by other law enforcement agencies; and

(d)     intentionally discriminating against Officers of Color through disparate treatment of these officers through denial of promotions and other employment opportunities.

---

[3] Many Plaintiffs have filed charges of discrimination with the United States Equal Employment Opportunity Commission (the "EEOC").  Pending the conclusion of the EEOC's administrative process, Plaintiffs intend to amend this Complaint to include claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

8.      Plaintiffs seek declaratory and injunctive relief and damages, including but not

limited to:

     (a)      issuance of a judgment declaring that the policies, practices and/or
customs described herein violate federal, state, and/or local laws;

     (b)      appointment of an independent monitor to ensure disciplinary fairness and
compliance with orders of the Court;

     (c)      reinstatement of African-American and Hispanic members of the PGPD
who were wrongfully terminated;

     (d)      expungement of all disciplinary records of PGPD Officers of Color who
have been subject to disparate discipline as a result of the Defendants'
discriminatory policies and practices;

     (e)      payment of lost wages to make whole PGPD Officers of Color who were
suspended without pay or terminated due to Defendants' discrimination
and retaliation;

     (f)      payment of compensatory damages and punitive damages for the harm
suffered by PGPD Officers of Color as a result of these unlawful acts; and

     (g)      any other relief the court deems just and proper, including injunctive and
declaratory relief as may be required in the interest of justice.

## JURISDICTION AND VENUE

9.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and

1343(3), because the Plaintiffs assert violations of their constitutional rights.

10.      Venue is proper in the District of Maryland under 28 U.S.C. § 1391(b)) because

the central offices of Defendants are within this district, a substantial part of the events giving

rise to this claim arose in this district, and records relevant to the practices complained of

herein are located in this district.

## PARTIES

Plaintiffs

11.    The HISPANIC NATIONAL LAW ENFORCEMENT ASSOCIATION

NATIONAL CAPITAL REGION ("HNLEA") is a 501(c)(3) non-profit membership

association incorporated in Virginia.

12.    HNLEA's mission is "to unify Hispanic (Latino) and minority law enforcement

employees in all communities throughout the United States by serving as positive liaisons

between the Hispanic (Latino) and minority officers and the community."  HNLEA currently

has only one chapter with membership that resides in the District of Columbia, Maryland, and

Virginia.

13.    HNLEA works with both the PGPD and the Prince George's County community

to engage in public education and charitable initiatives, especially those that support youth of

color.  It advocates for legislation that will strengthen policing and community relations.

14.    It also advocates for a more diverse and inclusive police force and more equitable

employment practices within the PGPD.

15.    HNLEA is open to all employees of the PGPD.  It has approximately 100

members including several of the individual Plaintiffs.

16.    HNLEA (with UBPOA) filed a letter of complaint concerning certain of the

Defendants' actions described below with the United States Department of Justice on March 1,

2016, and filed amended complaints on October 31, 2016. HNLEA (with UBPOA) submitted

additional information for the complaint on January 24, 2017; February 10, 2017; February 22,

2017; April 12, 2017; July 25, 2017; and October 15, 2017.  Since filing the complaint, the

leadership and many active members of HNLEA have experienced acts of retaliation.

17.    HNLEA brings this action in order to seek injunctive relief that would provide a more equitable working environment for its members.

18.    HNLEA's mission includes the improvement of the department and the betterment of the circumstances of its members.

19.    Defendants' persistent discrimination and retaliation against HNLEA's members have forced HNLEA to shift its attention and resources from serving the Prince George's Community to combatting the PGPD's illegal employment practices.  For example, HNLEA has been unable to conduct its usual fundraising activities for local children because it has had to focus on helping its members pursue their claims against the PGPD.

20.    HNLEA brings this action on itself and its members.

21.    UNITED BLACK POLICE OFFICERS ASSOCIATION ("UBPOA"), is a non-profit membership association.

22.    UBPOA's mission is "to create a meaningful organization that will help with the relationship between law enforcement, and the culturally diverse minority communities it serves. To help bridge the divide or perceived divide between law enforcement and its minority communities.  To mentor and establish a relationship with minority youth who are interested in careers within the law enforcement profession."

23.    UBPOA works with both the PGPD and members of the Prince George's County community to engage in public education and charitable initiatives, especially those that support minority youth.

24.    UBPOA also advocates for a more diverse and inclusive police force and more equitable employment practices within the PGPD.

25.   UBPOA is open to all employees of the PGPD.  It has approximately 200 members including several of the individual named Plaintiffs.

26.   UBPOA (with HNLEA) filed a letter of complaint concerning certain of the Defendants' actions described below with the United States Department of Justice on March 1, 2016, and filed amended complaints on October 31, 2016. UBPOA (with HNLEA) submitted additional information for the complaint on January 24, 2017; February 10, 2017; February 22, 2017; April 12, 2017; July 25, 2017; and October 15, 2017.  Since filing the complaint, the leadership and many active members of UBPOA have experienced acts of retaliation.

27.   UBPOA brings this action in order to seek injunctive relief that would provide a more equitable working environment for its members.

28.   UBPOA works in tandem with HNLEA on advocacy and charitable projects.

29.   UBPOA's mission includes the improvement of the department and the betterment of the circumstances of its members.

30.   Defendants' persistent discrimination and retaliation against UBPOA's members have forced UBPOA to shift its attention and resources from serving the Prince George's Community to combatting the PGPD's illegal employment practices.  For example, UBPOA has been unable to conduct its usual fundraising activities for local children because it has had to focus on helping its members pursue their claims against the PGPD.

31.   UBPOA brings this action on behalf of itself and its members.

32.   Captain JOSEPH PEREZ, a Hispanic male, is the President of HNLEA and joined the PGPD in 1998.  Before that he was a police officer in Takoma Park, Maryland.  He has a B.A. and Master's Degree from John's Hopkins University in Management.  He served six and one half years with the Internal Affairs Division of the PGPD and saw firsthand the disparities

in discipline between White officers and Officers of Color.  As HNLEA's leader, Capt. Perez has been an outspoken critic of discrimination and retaliation within the PGPD.  Because of Capt. Perez's national origin and advocacy, the PGPD has launched an investigation into bogus charges and has continually refused to promote him to Major, while promoting less qualified White Captains to that position.

33.    Sergeant THOMAS BOONE, an African-American male, joined the PGPD in 1998. Sgt. Boone graduated from Bowie State University with a degree in History and Criminal Justice in 1994.  Prior to being employed by the PGPD, he served in the United States Army reserves and worked for United States Capitol Police from 1996 to 1998. Sgt. Boone is the President of UBPOA. Throughout his time with the PGPD, Sgt. Boone has worked in Community Oriented Policing, a Special Assignment Team, Violent Crimes Division, Criminal Investigation Division, Sex Offender Registry, and the Background Investigation Unit. In 2018, Sgt. Boone was transferred to the Bureau of Patrol in retaliation for his involvement in filing the complaint with the United States Department of Justice described above.

34.    Sergeant PAUL MACK, an African-American male, joined the PGPD in February 1997. He is the Vice President of UBPOA. After ten years on Patrol, Sgt. Mack has worked in the Criminal Investigation Division, Internal Affairs Special Investigation Response Team, and Internal Affairs Audit and Inspection Unit. In 2013, Sgt. Mack was involuntarily transferred after filing an Internal Affairs complaint against a White Lieutenant who cursed at him. From 2016 to 2018, after he helped found the PGPD chapter of UBPOA, Sgt. Mack was denied promotion in favor of White officers, even thought he was equally as eligible for promotion.

35.    Corporal DANITA INGRAM, an African-American female, joined the PGPD in 2008.  She is a member of UBPOA. She spent the majority of her time at the PGPD in the

Narcotics Enforcement Division. Cpl. Ingram is currently serves in the Narcotics Enforcement Division, but is being considered for promotion to Sergeant.  Following her complaint about unprofessional conduct by a White officer, Major Mills directed Internal Affairs to file a retaliatory charge against her without basis.  The pendency of the charge made Cpl. Ingram ineligible for promotion.

36.     Lieutenant SONYA ZOLLICOFFER, an African-American female, joined the PGPD in 2001.  She recently legally changed her last name from Lancaster to Zollicoffer.  She received a Bachelor of Science from Strayer University in 1999.  She is a member of UBPOA. She has received several awards during her career and acted as PGPD's Media Relations spokesperson. Earlier in her career, Lt. Zollicoffer filed an EEOC sexual harassment claim against a White officer who was a friend of Major Mills, and she subsequently filed a complaint against Major Mills and other White officers for failing to provide timely backup during service calls. Since that time, Major Mills has used her position of authority to pursue a vendetta against Lt. Zollicoffer.  Lt. Zollicoffer was subsequently transferred to Internal Affairs.  While working in Internal Affairs, she complained internally about a White Lieutenant who made derogatory comments about Captain Perez.  After Major Mills became commander of the unit, she brought back the White Lieutenant and placed him in charge of supervising Lt. Zollicoffer's cases, making her work situation significantly more difficult. Major Mills later ordered Lt. Zollicoffer to charge Cpl. Ingram without basis, and Lt. Zollicoffer complained again.  Shortly after, PGPD transferred Lt. Zollicoffer involuntarily from her position in Internal Affairs to a less desirable position in the Patrol Bureau where she will supervise individuals who were close friends with the White officer who harassed her in

2001, and who were aware of the harassment.  Lt. Zollicoffer is a qualified individual with a disability pursuant to 29 U.S.C. § 705(20).

37.    Corporal RICHARD TORRES, a Latino male, joined the PGPD in 2003. He is a member of HNLEA. Cpl. Torres started out in Patrol, then served on the ATF Gang Task Force for two years, Narcotics for eight months, and then worked in Investigations. After complaining that his White supervisor engaged in racist conduct, Cpl. Torres was involuntarily transferred to the Patrol Bureau in January 2017. Complaints were made on his behalf directly to Chief Stawinski, and Cpl. Torres filed a charge with the EEOC, but the PGPD let his transfer stand.

38.    Officer THOMAS WALL, an African-American male, joined the PGPD in 2013. He is a member of UBPOA. Prior to joining the PGPD, Officer Wall served in the United States Army for two years and joined the United States Army Reserve in college. After college, Officer Wall served as a Police Officer in the Charlotte-Mecklenburg Police Department in Charlotte, North Carolina for a year and a half, and then served as an FBI Agent for 16 and a half years. Officer Wall received his law degree in 1999.  His current rank with PGPD is Police Officer First Class. Officer Wall complained to Internal Affairs about his White supervisor's having ignored a derogatory statement about an African-American civilian made by a White officer.  In 2015, Officer Wall confronted a White officer about his physical mistreatment of African-American female suspects, and subsequently reported a complaint to his White supervisor.  In retaliation, that supervisor filed a false charge against Officer Wall, and thereafter, Officer Wall was involuntarily transferred to another station.

39.    Corporal MICHAEL ANIS, a male of Middle Eastern descent, joined the PGPD in 2005. Prior to joining the PGPD, Cpl. Anis graduated from Purdue University and worked

for the Hyattsville City Police Department. Cpl. Anis has consistently earned the rating of

Exceeds Satisfactory on his performance evaluations and has not committed any major

infractions during his time at PGPD.  Since he joined PGPD, Cpl. Anis has amassed

qualifications including but not limited to:  obtaining a United States Coast Guard Master's

100 Ton Captain License; becoming a Tow Boat Captain; completing hundreds of maritime

hours in the Potomac River; becoming an Advanced Scuba Diver with a concentration in deep

water diving, wreck diving, and search and recovery; completing sunken boat recoveries; and

completing specialty search and rescue trainings with the United States Coast Guard.  Cpl.

Anis is an active and prominent member of HNLEA.  Following HNLEA's complaint to the

Department of Justice (and because of his ethnic background)—and despite his qualifications

and excellent performances in different tests— Cpl. Anis has been unfairly denied multiple

promotional transfers and professional development opportunities, including being denied

transfer to the Marine Unit on at least five separate occasions.

40.     Corporal CHRIS SMITH, an African-American male, joined PGPD in 2012. He is

a member UBPOA. Prior to joining PGPD, Cpl. Smith worked for the federal government.

During his time with PGPD, Cpl. Smith has received Letters of Commendation and Letters of

Appreciation.  Shortly after joining the Department, he witnessed White officers making racist

comments about African-American civilians.  When he worked in the Special Assignment

Team (SAT), which was predominantly White, he was subjected to a racially hostile

environment.  He was involuntarily transferred out of his Special Assignment Team to the

Patrol Bureau.  Since then, he has put in for a transfer every three months, and each request has

been unfairly denied.

41.    Corporal MICHAEL BROWN, an African-American male, joined the PGPD in
2001. He is a member of HNLEA.  Prior to joining PGPD, Cpl. Brown served in the United
States Army for nine years and as a police officer in the Office of Naval Intelligence for two
years.  He also worked for the Howard University Police Department for two years.  Cpl.
Brown spent the majority of his time at PGPD on the SWAT team, and he was in charge of the
PGPD Honor Guard and was featured in that capacity on billboards to promote the Department
across the County.  PGPD terminated Cpl. Brown after Brown was arrested for coming to a
civilian's defense in a confrontation in the District of Columbia, despite the fact that all
charges against Cpl. Brown were dropped.  White officers charged with far more egregious
conduct were not disciplined in a comparable manner.

42.    Officer TASHA OATIS, an African-American female, joined PGPD in 2011.  She
is a member of UBPOA. Prior to joining PGPD, Officer Oatis served as a Police Officer in the
Savannah Police Department (then named Savannah-Chatham Metro Police Department), in
Savannah, Georgia, where she reached the rank of Detective.  During her time with the
Savannah Police Department and PGPD, Officer Oatis has consistently earned good
performance ratings.  Officer Oatis was terminated by PGPD in 2016 for alleged "double
dipping."  White officers charged with more egregious conduct of this nature were not
disciplined in a comparable matter.

43.    Officer CLARENCE RUCKER, an African-American male, joined PGPD in
2008. He is a member of UBPOA. Prior to joining PGPD, he attended Coppin State University
and worked for Prince George's County Fire Department for three years.  During his time at
PGPD, he worked primarily as an investigator within the Criminal Investigations Division
including:  the Domestic Violence Unit, the Sex Offender Registry Unit, and, most recently,

15

the Tow Coordination Unit.  In 2015, Officer Rucker was suspended and transferred to

Records for three days after being falsely accused of having an inappropriate relationship with

a woman who was a victim in a domestic violence case that he was investigating.  White

officers charged with more egregious conduct of this nature were not disciplined in a

comparable matter.  Officer Rucker was not given the process to which he was due, and was

hounded out of the PGPD, causing him to resign in November 2017.  Following the decision of

the Capitol Heights Police Department to hire him, the PGPD improperly placed a flag on his

file, causing the CHPD to reassign him to desk duties.

44.    Each individual Plaintiff is a person within the meaning of the Constitution of the

United States.  Plaintiffs have been injured by Defendants' acts and omissions in the manner

set forth herein.

Defendants

45.    Defendant Prince George's County is a municipal corporation duly organized and

existing under the laws of the State of Maryland.  Defendant County is a "person" under 42

U.S.C. § 1983 for purposes of enforcement of the rights guaranteed under the U.S.

Constitution.  Defendant County receives federal funds for the purposes of its law enforcement

activities.  Defendant County is or was the employer of all the individual Plaintiffs and

members of the Plaintiff organizations and all individual Defendants herein, and, at all times

relevant to this action, condoned, ratified, authorized and/or engaged in the discriminatory

customs, practices, policies and wrongful acts described in this Complaint through its agents

and/or employees.

46.    Defendant Henry Stawinski, a White male, has served as the Chief of Police for

the County since February 2016.  Prior to that time, he served as the Deputy Chief in charge of

the Bureau of Patrol.  At times relevant to this action, Chief Stawinski was an employee of the

County and the principal administrator of the PGPD.  He is responsible for the institution and application of the PGPD's employment policies, including its internal investigatory and disciplinary process.  He is also responsible for ensuring that the actions of the PGPD do not deprive any individual of the rights secured by the Constitution and laws of the United States as well as the Constitution and laws of the State of Maryland and the County.  Chief Stawinski is the final authority in all disciplinary matters, responsible for the hiring, screening, training, retention, supervision, discipline and counseling of the police officers under his command. Chief Stawinski knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described herein, and he condoned, ratified, authorized and/or engaged in such conduct.  He is sued in both his official and individual capacities.

47.    Defendant Mark Magaw, a White male, has served as the Deputy Chief Administrative Officer for Public Safety for Prince George's County since February 2016. Prior to that he served as Chief of Police for the County since 2010.  In his current position, Mr. Magaw directly supervises Chief Stawinski.  Mr. Magaw was made directly aware of the complaints of discrimination that HNLEA and UBPOA made to the Department of Justice.  He has been present at meetings with Plaintiffs when these complaints were discussed.  At times relevant to this action, Mr. Magaw was an employee of the County.  When he was Chief of Police and principal administrator of the PGPD he was responsible for the institution and application of the PGPD's employment policies, including its internal investigatory and disciplinary process.  He was also responsible for ensuring that the actions of the PGPD do not deprive any individual of the rights secured by the Constitution and laws of the United States as well as the Constitution and laws of the State of Maryland and the County.  As Chief of Police, Mr. Magaw was the final authority in all disciplinary matters, responsible for the hiring,

screening, training, retention, supervision, discipline and counseling of the police officers under his command.  Mr. Magaw knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described herein, and he condoned, ratified, authorized and/or engaged in such conduct.  He is sued in both his official and individual capacities.

48.     Defendant Christopher Murtha has served as Deputy Commissioner Chief in charge of the Bureau of Patrol—to which approximately 1,100 of the PGPD's 1,684 officers are assigned—since February 2016.  In his role as Deputy Chief, Murtha evaluates each investigation and disciplinary investigation involving the Bureau of Patrol.  Deputy Chief Murtha knew or should have known of the discriminatory customs, practices, policies and wrongful acts of the Defendants described herein, and he condoned, ratified, authorized and/or engaged in such conduct.  He is sued in both his official and individual capacities.

49.     Defendant Kathleen Mills, a White female, served as the Commander of the Special Investigation Response Team of Internal Affairs from January 2014 to June 2014 and Commander of Internal Affairs since August 2016. At times relevant to this action, Major Mills has set disciplinary policy, supervised and directed the institution and conduct of investigations, and made recommendations as to penalties regarding disciplinary matters within the PGPD.  As an advisor to the Police Chief, she advises the Chief and the Assistant Chief on disciplinary matters and has the discretion to initiate investigations, influence the outcomes of investigations, influence the institution of disciplinary proceedings, and determine whether certain charges should ultimately be prosecuted or dismissed.  She has engaged in the disproportionate discipline of Officers of Color within the PGPD upon her own initiative and at the direction and authority of other Defendants.  At all relevant times, Major Mills knew or should have known of the

discriminatory customs, practices, policies and wrongful acts described herein, and she condoned, ratified, authorized and/or engaged in such conduct. She is sued in both her official and individual capacities.

## ALLEGATIONS OF FACT

I.  <u>Hostile Work Environment</u>

50.  Defendants have engaged in a pattern and practice of discrimination against Officers of Color by, *inter alia*, maintaining and allowing a work environment, described herein, that is hostile on the basis of color and race, including but not limited to derogatory remarks, and disparate treatment in the general work environment and the terms and conditions of employment.

51.  White officers, in the presence of Plaintiffs and other Officers of Color, have engaged in racist conduct, including:

- referring to People of Color within the community as "nxxxxs," "coons," "African mother f-ers," and "whores."

- referring to PGPD officers and employees as "nxxxxxs and spics," "baboon," "ape," and "African Queen";

- circulating pictures of a Hispanic commander dressed up as a voodoo doll with derogatory comments;

- giving a training dummy a black face and Afro wig;

- sending an African-American officer a package with racist emails;

- circulating text messages expressing the desire to reinstitute lynching;

- circulating racist images and racially insensitive pictures.

52.     The communities of color policed by White officers are referred to as "shitholes" or "ghettoes" by those officers.  African-Americans are referred to by code references such as "1As" or "Signal 7s" even though these are not official police codes.

53.     PGPD General Order 12.V requires supervisors, including the individual Defendants, to "ensure the workplace has an environment free from discrimination." Defendants fail adhere to this requirement as described below.

54.     PGPD General Order 12.V requires supervisors, including the individual Defendants, to "take prompt and appropriate corrective action when they observe or are made aware of conduct that may be interpreted as discrimination."  Defendants fail to adhere to this requirement as described below.

55.     PGPD General Order 12.V charges Department leadership, including the individual Defendants, for "ensuring their commands are free from sexual harassment and discrimination and that supervisors strictly enforce the sexual harassment and discrimination policy promptly and appropriately."  Defendants fail to adhere to this requirement as described below.

56.     PGPD General Order 12.V.4 provides that "there shall be no retaliation against any employee or citizen for filing a discrimination or harassment complaint or for assisting, testifying, or participating in an inquiry or investigation of such a complaint."  Defendants routinely violate this provision as described below.

57.     The Defendants, including the Individual Defendants, fail to enforce PGPD General Order 12.  Rather than ensuring the PGPD has a workplace "free from discrimination," White officers have continued to engage in egregious acts of racial hostility, including the incidents described above.

58.    The Individual Defendants condone these acts of racial hostility by (i) failing to adequately investigate such incidents, (ii) when investigations have occurred, failing to adequately discipline the offending officers, (iii) when investigations have resulted in disciplinary recommendations, reducing the discipline, and (iv) repeatedly allowing White officers who engaged in acts of racial hostility to be promoted.  For example:

a.    In 2013 Officer Thomas Denault referred to his African-American commanding officer as a "baboon" and a senior African-American civilian employee as an "African Queen." Internal Affairs recommended termination, but then-Police Chief Mark McGaw and then-Deputy Chief Stawinski overruled this recommendation, and Officer Denault was merely demoted.  In 2015, following a separate incident, Officer Denault was charged with conduct unbecoming a police officer and making a false statement for lying in court and during the Internal Affairs review; PGPD leadership downgraded these offenses to "misrepresentation of the facts" and Officer Denault was given a 10-hour suspension.  Less than a year after this, Officer Denault was promoted, and has subsequently been promoted to Lieutenant.

b.    Officer Darrin Rush has repeatedly used the slur "nxxxa," has asked African-American officers if they "were hungry for chicken," has circulated a racist video, and has made misogynistic comments about the appearance of African-American women and sexual activities of Latina women.  He has been the subject of multiple complaints for these derogatory comments.  Following an Internal Affairs investigation that recommended discipline, Chief Stawinski lowered the recommended discipline to a $250 fine.  Officer Rush has had other disciplinary infractions, including a DWI incident while driving a police vehicle and he has been investigated for overtime fraud.  Nonetheless, he continues to be employed by the PGPD.

c.  Sergeant Kerry W. Jennigan circulated pictures of a senior Latino officer with racist comments.  Although a complaint was made to Chief Stawinski, on information and belief, no investigation was conducted, nor was any discipline imposed.  Sgt. Jennigan has since retired from the PGPD.

d.  Sergeant Brian Selway obtained customized license plates for a personal vehicle with the acronym for "Go F*** Yourself Obama," and routinely parked the vehicle in front of a PGPD station house.  Although a complaint was made to Chief Stawinski and then-Deputy Chief Raphael Grant, on information and belief, no investigation was conducted, nor was any discipline imposed.  Sgt. Selway has since been promoted to Lieutenant and continues to be employed by the PGPD.  Officers of Color believed that the license plate was in response to President Obama's race because other White officers had made comments regarding the then-President such as "well I guess we can sit out from of the station drink Hennessy and eat chicken wings now" following his re-election.

e.  Sergeant Daniel Smith and two other White officers engaged in repeated racist texts, including referencing African-Americans with comments such as "we should bring back public hangings" and "we should get rid of the black animals," and made misogynistic comments about African-American female officers.  Although a complaint was made, on information and belief, no investigation was conducted, nor was any discipline imposed.  All three officers continue to be employed by the PGPD.

f.  Corporal Steven Jones made comments such as "poor white people had it worse than slaves" and "at least slaves had food and a place to sleep." Although these incidents were reported, no disciplinary action was pursued.

g.  Lieutenant Scott Finn made derogatory comments in July 2016 about the "Black Lives Matter" movement and the area he patrols. He was the subject of several prior investigations for excessive force against African-American suspects and civilian complaints.  Prior investigations found no infractions, and on information and belief, Lt. Finn was not investigated or disciplined for the derogatory statements.  He continues to be employed by PGPD.

h.   During a training session, unknown staff put a picture of an African-American face and an Afro wig on a training dummy used to demonstrate baton strikes. The Police Personnel Director, Jewel Graves, provided photos of the dummy to then-Deputy Chief Grant in November 2016. Capt. Perez provided copies of the photos directly to Chief Stawinski in February 2017. Chief Stawinski subsequently denied seeing the photos prior to a later press conference.

i.   In February 2016, an unknown individual vandalized a locker in the Special Operations Division labeled "Color Guard" relabeling it "Colored Guard." The PGPD Color Guard, led by Plaintiff Michael Brown, was comprised of mostly African-American officers. Officers Perez and Boone sent pictures of the vandalism to Chief Stawinski. An investigation was launched, but no disciplinary action was taken.

II.     Retaliation Against Officers of Color Who Complain Against White Officers

59.    The Defendants routinely fail to enforce PGPD General Order 12.V.  Rather than enforcing its anti-discrimination policy, as detailed below, the PGPD regularly and routinely engages in retaliation against Officers of Color who file complaints against White officers for violation of General Order 12.  The Officers of Color who complained about Officers Denault, Rush, Jennigan, Selway, D. Smith and Michael Rushlow were all subjected to retaliatory conduct, including, in many cases, the institution of retaliatory internal investigations of the complainants by Major Mills.

60.     Defendants have created a hostile environment for even the most dedicated and decorated Officers of Color, including Plaintiffs, by, *inter alia,* assigning them to low level duties in order to limit their ability to advance within the PGPD; limiting their ability to become involved in high profile cases; limiting the resources provided to units headed by supervisors of color; and  failing to take action to curb insubordination by White officers who are under the command of higher ranking Officers of Color.

61.     Officers of Color acting in any supervisory capacity, including Plaintiffs, have had their authority undermined by their White supervisors.  For example, Plaintiffs attempting to seek discipline for White officers for infractions of departmental policies have been repeatedly discouraged from filing any formal disciplinary proceedings, have been told to "work out" the problems individually and/or have themselves been subject to disciplinary proceedings.  Plaintiffs have had their supervisory roles limited and undermined with regard to White officers who report to them.

62.     Plaintiffs have suffered harassment and retaliation by Defendants after complaining of discrimination in the PGPD.  Plaintiffs have endured, *inter alia*, White officers commencing unwarranted and unfounded investigatory/disciplinary proceedings against the complaining officers; imposing overly severe disciplinary penalties; transferring the officers to less preferred and/or more dangerous assignments and shifts; denying promotional opportunities to complaining officers; giving negative performance reviews to officers who file complaints and officers who have opposed discriminatory practices or participated in investigatory proceedings; and blackballing Officers of Color who have been terminated from the Department from obtaining work as police officers elsewhere.

63.    Upon information and belief, when White officers make statements in support of discrimination claims, they too are retaliated against by fellow White officers.

64.    The PGPD has retaliated against Officers of Color who speak out against racism within the PGPD or complain about disparate discipline, retaliation and/or a hostile work environment by initiating investigations against Officers of Color and opening IAD files on the officers.  These open cases are maintained by IAD and included in the personnel files of the Officers of Color, limiting their ability for promotion within the PGPD.

65.    This retaliation reaches the top levels of the PGPD.  For example, Chief Stawinski personally intervened to reduce the recommended discipline for Officers Rush and Denault, and Chief Stawinski and Major Mills, upon information and belief, were personally involved in the decisions not to investigate and/or discipline Officers Jennigan, Selway, or Rushlow.

66.    Officers of Color are routinely subject to retaliation for reporting racist threats and remarks, reporting disciplinary infractions by White PGPD officers, and attempting to exercise their rights as a protected class.  For example, Plaintiffs Ingram, Perez, Wall, and others were all subjected to retaliatory investigations following their complaints about White officers, and Officers, Ingram, Zollicoffer, Perez, Smith, Torres, Wall, and others were all transferred following their complaints about White officers.

III.    Discriminatory Use of the Disciplinary System in the PGPD

67.    Employee discipline at PGPD is administered in a grossly discriminatory manner. Officers of Color—especially those who will not keep silent about race discrimination at the Department—are subjected to discipline for trivial infractions and alleged infractions, whereas White officers are permitted to breach the rules with near impunity.  Frequently the command staff refuses even to investigate complaints—especially race discrimination complaints— brought by Officers of Color against White officers.  On the other hand, disciplinary charges

brought by White officers against Officers of Color are pursued vigorously by the Department even when the charges are unfounded.

68.     With rare exception, Officers of Color who challenge disciplinary actions against them ultimately have been successful in proving the charges and allegations to be unjustified. However, these employees have been forced to incur significant costs and expenses in refuting bogus disciplinary charges brought against them.

69.     In addition to causing employees to expend time, energy and resources in challenging discriminatory charges, charges have been lodged against particular Officers of Color to adversely impact their eligibility for promotion, because the pendency of charges against an employee disqualifies an officer for promotion.  Thus, one effect of PGPD's discrimination in pursuit of disciplinary charges against Officers of Color is discrimination in the promotions process.

70.     As a contrasting example, in November 2017, Officer George Merkel, a White man, was convicted of second degree Assault and Misconduct in Office for assaulting a homeless woman. He was sentenced to a concurrent period of six months for two counts followed by six months of probation. Following his conviction, PGPD did not schedule a trial board to be held until January 2019 and has allowed Officer Merkel to continue to work in the Community Services Division while he appeals his conviction. This failure to appropriately pursue discipline against Officer Merkel comes against a backdrop of Officer Merkel's history of racist conduct. For example, in June 2015, Officer Merkel responded to a 911 call where the complainant, a Black woman, had locked her keys in her car. The complainant alleged that Officer Merkel told her he would not assist her because his job was "not to assist Black people, only to arrest them" and that he would leave her "at the mercy of other Black criminals."

Officer Merkel left the scene without providing the complainant any assistance. Additionally, in December of 2017, following his conviction, multiple members of an African-American sorority filed complaints about Officer Merkel's conduct at a volunteering event at police headquarters. The complainants allege that Officer Merkel treated them roughly compared to other volunteers and tried to spread rumors that they were intoxicated at the event.

71.    Upon information and belief, for approximately 13 years, the primary policy governing the PGPD disciplinary system was contained in General Orders 4 and 22.

72.    General Order 4 established PGPD policy and rules for the handling and assignment of complaints.  General Order 4.V.7 specifically tasks the Commander of Internal Affairs with screening all complaints to determine investigative responsibility – specifically, whether the complaint will be investigated by commanders in each of the PGPD police districts, by Internal Affairs, and if by Internal Affairs, who within Internal Affairs will conduct the investigation.

73.    General Order 4's standards for assignment of complaints are vague and give almost unfettered discretion to the Internal Affairs Commander in deciding how matters will be investigated.  Upon information and belief, the custom or practice of implementing the vague directives contained within General Order 4 result in most infractions being charged and considered for punishment by commanders in each PGPD police district, while infractions viewed as more serious are reviewed by Internal Affairs.

74.    Upon information and belief, complaints about discriminatory conduct or civilian complaints about police misconduct (that do not involve use of force) perpetrated by White officers are routinely viewed as not serious by the Internal Affairs Commander and referred to district commanders for investigation.

75.    General Order 12 established PGPD policy and procedures for the conduct of internal investigations of complaints.  General Order provides that the line investigator (either at the police district or within Internal Affairs) is charged with preparing the Report of Investigation (ROI) which shall include a "recommendations" section regarding each allegation, including a determination of guilt or innocence.

76.    General Orders 4 and 12 do not specify how investigations should be conducted, when or if charges should be sustained, or the appropriate punishment to impose relative to the type of violation at issue.  Upon information and belief, the PGPD has no written investigatory standards, policy or training for members of Internal Affairs or within each police district.

77.    Upon information and belief, the lack of clear investigatory standards results in Officers of Color more frequently having charges sustained against them than similarly situated White officers charged with equal or greater offenses.

78.    Upon information and belief, this lack of standards, guidance and training, despite clear knowledge by the Defendants of historical racial discrimination within the PGPD, shows a deliberate indifference to ongoing racial discrimination within the PGPD.

79.    As a result of the vague and ambiguous directives contained in General Order 12, IAD and District Commanders are given excessive discretion to determine whether infractions occurred and to mete out punishment.  This policy of unbridled discretion in the disciplinary system leads to a clear disparity in the disciplinary process.

80.    General Order 12 provides that investigations are to be complete within 90 days of assignment, and then sent through the chain of command to the Chief of Police.  Upon information and belief, the Chief of Police routinely consults with the Assistant Chief, Deputy Chief and IAD Commander regarding the sufficiency of investigative efforts and discipline.

81.     The lack of specificity in General Orders 4 and 12 gives the Internal Affairs Commander and the Chief of Police unbridled discretion to reduce, vacate, or sustain charges and to reduce or increase discipline.  As detailed herein, the Chief of Police and the Internal Affairs Commander routinely reduce or vacate charges and reduce discipline against White officers, while increasing discipline against Officers of Color.

82.     As a result of the broad discretion provided under the policies and procedures governing discipline within PGPD, and the limited effectiveness of any efforts to eliminate such broad discretion, the same violations allegedly committed by Officers of Color of the PGPD routinely result in harsher penalties than their White counterparts for the same violations.

83.     White members of the PGPD often receive no discipline or minor discipline for the same offenses for which Officers of Color within the PGPD receive harsh discipline.

84.     PGPD Officers of Color are terminated at a much higher rate than White members of the PGPD and are routinely terminated for the same violations for which their White counterparts receive lesser discipline or no discipline at all.  A comparison of the discipline imposed upon Plaintiffs to the discipline imposed upon White members of the PGPD will show substantial disparity in treatment.  For example, the discipline imposed on Officers Brown, Oatis, and Rucker was far harsher than discipline imposed on White officers for similar conduct.

85.     Upon information and belief, Officers of Color within the PGPD have been, or are being, terminated or subjected to harsher discipline at a statistically significant higher rate than White members of the PGPD.

86.    Defendants routinely use the disciplinary system to retaliate against Officers of Color who speak out against discrimination in the PGPD, and thus the disciplinary system is part and parcel of the pattern and practice of discrimination and the preservation of that pattern and practice within the PGPD.

87.    The entire investigation and disciplinary system within the PGPD is a centralized mechanism (in the person of the IAD Commander and the Chief of Police) through which discrimination based on color and race is perpetuated through excessively subjective decision-making rather than exposed and eradicated through fair and balanced, objective procedures.

IV.    Discrimination in the Promotions Process

88.    Prince George's County is approximately 67 percent African-American, 17 percent Hispanic, and 14 percent non-Hispanic White.

89.    The composition of the PGPD does not reflect the diversity of Prince George's County.  Although the County is only 14 percent White, 47 percent of PGPD officers are White.  In contrast, although the County is 67 percent African-American and 17 percent Hispanic, only 42.5 percent of PGPD officers are African-American and 8.9 percent are Hispanic.

90.    The disparity between the demographics of Prince George's County and the PGPD is even more pronounced in the leadership of PGPD.  64 percent of PGPD Majors and 72 percent of PGPD Captains Are White, while only 28 percent of Majors and 25 percent of Captains Are African-American.  There is currently a single Hispanic Major and a single Hispanic Captain (Capt. Perez) in the PGPD, out of 1684 sworn officers,

V.    Discrimination in Job Assignments

91.    Currently, most of the Officers of Color employed by PGPD are employed in the Patrol Division.

92.     Several divisions within PGPD such as the Criminal Investigation Division (CID), the Special Operations Division (SOD), Regional Investigation Division (RID), the Narcotic Enforcement Division (NED) and the Internal Affairs Division (IAD), have a smaller percentage of Officers of Color than the force overall.

93.     These divisions are highly-coveted, not only because they are prestigious, but because Officers who work in them have a greater chance of being eligible for overtime and call-back pay (off duty pay).

94.     Divisions that are less desirable often have a higher percentage of Officers of Color than the force overall.  For example, 73 % of the officers that work in the District VII (Fort Washington) station are Officers of Color.  As an even starker statistic, 89 % of officers with the rank of corporal or lower are Officers Color in that station.

VI.     <u>DISCRIMINATION AGAINST NAMED PLAINTIFFS</u>

<b><u>CAPTAIN JOSEPH PEREZ</u></b>

95.     Capt. Joseph Perez, who serves as President of HNLEA, has been subjected to a hostile work environment, disparate discipline, retaliation and discriminatory non-promotion by the PGPD.

96.     Capt. Perez has been subjected to discriminatory treatment on the basis of his race during his employment with the PGPD, treatment which was sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment.

97.     In April 2010, Capt. Perez was assigned to the Internal Affairs Division. In January 2014, Major Mills became his supervisor for five months.

98.     During 2015 and 2016, Capt. Perez filed a series of complaints with the PGPD Inspector General about discrimination against Officers of Color with respect to promotions, in Internal Affairs investigations, in discipline, and for assignment to specialty units.  He also

complained to PGPD management specifically about racially hostile conduct by White officers in June 2015, April 2016, and May 2016, and about unethical conduct by White officers, including Deputy Chief Murtha and another Internal Affairs officer, Major William Alexander.

99.    In March 2016, Capt. Perez, in his capacity as President of the HNLEA, and other officers filed a complaint with the U.S. Department of Justice raising many of these same issues.

100.   In August, 2016, Capt. Perez expressed interest in being promoted to Major.  He was not promoted and instead, White Captain David Renner was promoted despite not having the necessary qualifications (he had only had eight months of command experience and had experienced disciplinary issues).

101.   In October 2016, Capt. Perez filed an EEOC complaint.  Shortly after filing the complaint, he advised Chief Stawinski that he had done so.

102.   Within 45 minutes of informing Chief Stawinski that he had filed an EEOC complaint, Capt. Perez was advised that he was being transferred out of Internal Affairs to Planning & Research, where he would be reporting directly to Major Alexander, who was the subject of one of his prior complaints about unethical conduct.

103.   Later in October 2016, Capt. Perez and other PGPD Officers of Color filed a supplemental complaint with the Department of Justice.

104.   The discrimination continued for Capt. Perez as he continued to speak out.  He was deployed to an undesirable shift of 6:00 PM to 6:00 AM, even though other White Captains were frequently allowed flexibility with their shifts.

105.   In August of 2017, Capt. Perez was again denied the opportunity to compete for a promotion to Major, while four White and two African-American Captains were allowed this

opportunity.  All four of the White Captains had less training, education, and experience as a

Captain than did Plaintiff.

106.    Capt. Perez again filed a supplemental EEOC charge of discrimination on October

10, 2017.  A few months later, on January 10, 2018, PGPD notified Capt. Perez that there was

an Internal Affairs investigation into an incident that occurred months earlier, on April 10, 2017.

PGPD alleged that Capt. Perez tried to use his position within PGPD to secure leave for his son,

who is an officer in a different police force.  Capt. Perez did not attempt to use his position in

any way for the benefit of his son.

107.    In addition to being meritless, there are significant procedural irregularities in the

PGPD's investigation of Captain Perez that confirm it is retaliatory.  For example,. PGPD

policies require Internal Affairs investigations to be completed within ninety days of the

incident in question.  PGPD regularly completes investigations into misconduct by White

officers within this timeframe.   However, it held the investigation open into Capt. Perez's

alleged misconduct for months so that he would be ineligible for promotion to Major in

February 2018.  Further, internal policy requires providing a case number to subjects of an

investigation within ten days of the investigation being opened, and PGPD failed to do so for

Capt. Perez.

## SERGEANT THOMAS BOONE

108.  Sgt. Boone, who serves as President of UBPOA, has been subjected to a hostile

work environment, disparate discipline, retaliation and discriminatory non-promotion by the

PGPD.

109.  In March 2016, Sgt. Boone submitted a complaint to the United States Department of Justice in his capacity as President of the United Black Police Officers' Association.

110.  Since December 2016, Sgt. Boone reported inappropriate language, unfair transfers, unequal discipline, unfair hiring practices, racially insensitive and offensive pictures, retaliation for reporting wrongdoing and other racially motivated incidents to superiors.  He also met with Chief Stawinski several times to address these issues.  The Chief never acted on any of these concerns.

111.  From October 2017 to January 2018, Sgt. Boone expressed concerns about the disparities in performance in psychological evaluations between White applicants and applicants of color to his supervisors. In January 2018, one of his supervisors asked Sgt. Boone to cease efforts to obtain such information. A week following, the same supervisor gave Sgt. Boone a Performance Assessment form for conduct. The form was inappropriately included in Sgt. Boone's annual performance review. He filed a grievance, and his performance results were ultimately adjusted from "exceeded satisfactory" to "outstanding."

112.  On October 1, 2018, Major Renner informed Sgt. Boone that he would be transferred. Major Renner requested Sgt. Boone consider transferring to the Property Division. Despite agreement from Sgt. Boone as well as both Deputy Chiefs, Deputy Chief Melvin Powell informed Sgt. Boone on October 24 that he would be transferred to the Bureau of Patrol District II.  Upon information and belief, only the Chief of Police (i.e., Chief Stawinski) can override the concurrence of two Deputy Chiefs.  Deputy Chief Powell indicated to Sgt. Boone that if he did not file a complaint about this transfer, he could have a "soft landing."

113.  A transfer to Patrol is viewed as a demotion with the PGPD.

114.  Sgt. Boone has not been provided with a reason for his transfer such as discipline or poor performance. Rather, Deputy Chief Powell informed Sgt. Boone that Chief Stawinski decided to transfer him because he was under the impression that Sgt. Boone had filed too many complaints.  Major Renner confirmed to Sgt. Boone that Chief Stawinski was the one who decided on Sgt. Boone's transfer.

## SERGEANT PAUL MACK

115.  Sgt. Paul Mack, an African-American man, has suffered and continues to suffer discrimination by PGPD in the form of retaliation and non-promotion.

116.  In 2013, a White female, Sergeant Lisa Seger (now Lieutenant Lisa Arscott), cursed at Sgt. Mack. He filed a complaint about the incident with Internal Affairs. Sgt. Seger was initially charged with abusive language, but the charge was later reduced to inappropriate language. Shortly after, Sgt. Mack was transferred.

117.  In 2014, Sgt. Mack helped establish UBPOA.  In that capacity, he was actively involved in preparing the complaints to the Department of Justice described herein.

118.  In 2016, Sgt. Mack tested to be promoted to Lieutenant. He received a high ranking, within the promotional range of openings but he was not promoted.

119.  In 2018, Sgt. Mack again tested to be promoted to Lieutenant.  Three White male officers—Steven Cobb, James Rogers, and William Gleason—who ranked lower than Sgt. Mack and another Officer of Color, were promoted to the position of Lieutenant.  Instead of promoting Sgt. Mack, PGPD allowed the remaining Lieutenant position to stay vacant.

## CORPORAL DANITA INGRAM

120.  Cpl. Ingram, an African-American woman, has been and continues to be subjected to discriminatory treatment on the basis of her race during her employment with the

PGPD in the form of retaliation and disparate discipline that inhibited her from receiving a promotion.

121.   In 2012, while off-duty, Cpl. Ingram received a call from her son that Laurel police were at his door responding to a call about drug possession. Cpl. Ingram arrived at her son's residence and identified herself as a police officer. She did not have her badge with her, but did have her ID and MPCT card, which authorizes possession of a service weapon. The police officers responding to the call accused Cpl. Ingram of marijuana use. A Laurel PD Sergeant claimed to have seen Cpl. Ingram smoking marijuana. Upon a search of persons and property, the Laurel PD officers found no drugs or evidence of drug use. Cpl. Ingram submitted to a drug test, which was negative.

122.   Following this incident, Cpl. Ingram was charged for not having identification and was assigned to desk duty for over ten months, despite having disproven all accusations of drug use or drug possession.

123.   In February 2017, Cpl. Ingram attended court while undercover for the Narcotics Enforcement Division. Though she was in civilian seating, uniformed officer Rushlow, who is White, demanded Cpl. Ingram give up her seat for him. When she declined, he continued to verbally harass her. Cpl. Ingram reported the incident to the court liaison and filed an internal written complaint against Officer Rushlow.

124.   Although initially Officer Rushlow was going to be charged with Conduct Unbecoming an Officer, Major Mills reduced the charge to a courtesy violation and he received only a written reprimand.

125.   Upon information and belief, Officer Rushlow, encouraged by other White officers, filed a baseless counter-complaint against Cpl. Ingram concerning the same incident. Major Mills was affirmatively aware of this charge.

126.   During the pendency of the case, which took well over a year, Cpl. Ingram was ineligible for a promotion.

127.   In June 2018, Cpl. Ingram was found not guilty by a trial board.

## LIEUTENANT SONYA ZOLLICOFFER

128.   Lt. Sonya Zollicoffer, an African-American woman, suffered discrimination by the PGPD in the form of a hostile work environment and retaliation during her employment. In March 2018, PGPD transferred Lt. Zollicoffer involuntarily to a less desirable position in patrol and refused to provide her reasonable accommodations.

129.   In 2001, Lt. Zollicoffer was sexually harassed by Officer Glen Caradori, her Field Training Officer. The extent of his harassment included exposure, inappropriate touching, sexual innuendos, threats, and asking Lt. Zollicoffer if she had ever had relations with a White man before. She reported his behavior to PGPD and filed a complaint with the EEOC. Lt. Zollicoffer eventually settled her complaint, but never received the entire monetary damages she was owed under the settlement agreement. PGPD falsely assured Lt. Zollicoffer that Officer Caradori would be terminated, however he was only given $1500 fine and other minor disciplinary measures.   Officer Caradori was transferred and still remains employed with PGPD.

130.   Major Mills, who is a friend of Officer Caradori, retaliated against Lt. Zollicoffer for her complaint against Officer Caradori.  In 2002, Major Mills responded to a burglary call, which require two officers on scene, as Lt. Zollicoffer's back-up.  After Major Mills arrived,

she made no contact with Lt. Zollicoffer, checked the house, returned to her car and sped away. Lt. Zollicoffer made a complaint that as a result of this incident, she did not feel safe working with Major Mills and that White officers are slow to back her up on calls in general. Lt. Zollicoffer was transferred thereafter for her safety, along with another African-American female who White officers were slow to support.

131. In June 2015, Lt. Zollicoffer transferred to Internal Affairs. In August 2016, Major Mills transferred to a supervisory role in IA, despite protest from Lt. Zollicoffer. Both Major Mills and another supervisor, White Lieutenant Robert Black, heavily scrutinized Lt. Zollicoffer's work. Lt. Black advised officers that they should not ask Lt. Zollicoffer for help, and Major Mills asked Lt. Zollicoffer to do things that were unethical with regard to her investigative responsibilities. While in Internal Affairs, Lt. Zollicoffer witnessed PGPD's disparate discipline against Officers of Color. She spoke out against inequitable treatment, including a case in which Major Mills requested that the complainant (Cpl. Ingram) be charged with a violation.

132. Another time, Lt. Zollicoffer was part of a conference call with Major Mills and other members of the Internal Affairs team. Lt. Zollicoffer believes that she heard another participant of the conference call say that Major Mills had told him not to charge the White officer involved in the incident in question. Lt. Zollicoffer included that in her statement about the call. A few days later, Major Mills called her into her office and told her to rewrite the statement even though that was what Lt. Zollicoffer had heard.

133. Lt. Zollicoffer earned her promotion to Lieutenant in February 2018, and expressed interest in staying in Internal Affairs as there were two open Lieutenant positions. PGPD had allowed White officers who received promotions while working in Internal Affairs

to advance within Internal Affairs.  Lt. Zollicoffer was transferred involuntarily out of Internal Affairs to the Patrol Bureau to work on an overnight shift beginning April 2018. Another White Lieutenant, Glenn Long, told Lt. Zollicoffer that PGPD "will never have two Black female [Lieutenants] in Internal Affairs," as there was another Black female Lieutenant in the unit.  Lt. Zollicoffer objected to the transfer and requested reasonable accommodation, as it was the furthest station from her house, was the same area where she had been sexually assaulted by her Field Training Officer, and medication she took for a disability made it unsafe for her to work at night.

134.  This transfer was an act of retaliation because of Lt. Zollicoffer's prior complaints.

135.  Lt. Zollicoffer also suffers from Major depressive disorder and Post Traumatic Stress Disorder.  On doctor's orders, Lt. Zollicoffer began two weeks of disability leave on March 23, 2018. Lt. Zollicoffer filed an EEOC complaint on March 26, 2018. On March 29, 2018, she was ordered back to work by the medical review board although she had not concluded her disability leave.

136.  She ultimately was able to continue her leave but on October 5, 2018, Lt. Zollicoffer was ordered to return from disability leave to the Patrol Bureau.  In that position she would be supervising officers who are friends with Officer Caradori and were aware of his sexual harassment of her and did nothing to stop it.   Officer Caradori is known to have harassed other women both inside and outside of PGPD.

137.  PGPD policy allows two 90-day extensions for disability leave. PGPD has refused to grant an extension to Lt. Zollicoffer even though such extensions are regularly granted for White Officers.  Indeed, it is extremely rare for PGPD to deny such a request.

138.  As an accommodation for her depression and posttraumatic stress disorder, Lt. Zollicoffer has requested that she not be placed on Patrol where she will be working with Officers who have expressed open hostility toward her for speaking up.

139.  Lt. Zollicoffer is a breast cancer survivor.  As part of her breast cancer treatment, she had surgery to remove lymph nodes.  The scar tissue from that surgery makes it very painful for her to wear her police vest.

140.  She has requested a reasonable accommodation of being allowed to wear the police vest for eight hours, which is less than the required-ten, or to wear an outer-vest.

141.  Those accommodations have been denied.  PGPD has not offered any alternative accommodations.  Indeed, PGPD has indicated to Lt. Zollicoffer that she will need to take a fitness for duty exam or she risks being terminated.

142.  These accommodations would not be necessary if Lt. Zollicoffer had not been transferred out of Internal Affairs.

143.  Upon information and belief, PGPD has not provided training on obligations to accommodate employees with a disability to those who work in Risk Management, the Division responsible for determining accommodations.  It is a common practice in that Division to start termination proceedings without engaging in the required interactive process.

144.  When PGPD does provide accommodations, it provides more favorable accommodations for White officers.

145.  For example, a White officer, L.P.,[4] had only been part of the PGPD for seven months when she started experiencing symptoms of depression and post-traumatic stress disorder that were caused by the job she held prior to joining PGPD.  She was granted an

---

[4] Initials are being used for this Officer because her health information is being included here.

accommodation of being allowed to be on sick leave for over a year and one half to recover. She was even allowed to carry a negative sick leave balance, which is not generally allowed. When an employee in Risk Management, Sgt. Farana Abdul, questioned why she was being given an accommodation that was not provided to others in similar situations, Sgt. Abdul was transferred.

## CORPORAL RICHARD TORRES

146.  Cpl. Richard Torres, a Latino man, suffered discrimination in the form of retaliation following a complaint he submitted against his White supervisor, Sergeant Joseph Bunce, who used a racial slur to describe an African-American civilian. Cpl. Torres was also subjected to four write-ups in retaliation for his complaint.

147.  On May 2016, Cpl. Torres received a text message from Sgt. Bunce referring to a Black citizen using the n-word, but it was autocorrected to "NECA." Following the incident, Cpl. Torres complained to then-Captain Powell about this incident.

148.  During an investigation, Sgt. Bunce criticized Cpl. Torres for being unable to find information on an African-American suspect with a Bladensburg address (who had given a false name), saying that all Black people who live in Bladensburg are criminals.

149.  In an informal discussion, Cpl. Torres told then-Capt. Powell that Sgt. Bunce is a racist, and Plaintiff expressed his desire to no longer work with Sgt. Bunce.  Cpl. Torres made it clear that he still wanted to stay in Investigations. Cpl. Torres also showed Capt. Powell the text message, but Capt. Powell responded by saying it was "nothing" and that Internal Affairs would not be involved.

150.  On November 2016, Cpl. Torres was written up, allegedly for not performing his job up to the standards of his supervisor, Sgt. Bunce; the complaint concerned four incidents.

Prior to filing this charge, Sgt. Bunce had given Cpl. Torres a positive evaluation in August 2016.

151.  Prior to filing of charges against him by Sgt. Bunce, Cpl. Torres was not given the opportunity to address the incidents—which included a charge that Cpl. Torres failed to ask for photo identification from someone he knew, for failing to obtain a search warrant to seize the phone of a witness when the PGPD already had sufficient evidence to justify the seizure, for a matter where he was not the lead detective where the victim provided a false name and it was subsequently learned that he was wanted for attempted murder, and an instance where he relied on incorrect information provided by a Patrol Bureau officer.

152.  In December 2016, Plaintiffs' HNLEA and UBPOA had a meeting with Chief Stawinski and then-Capt. Powell about Sgt. Bunce's racist behavior, including Cpl. Torres' allegations. Capt. Powell said that Cpl. Torres was "slacking." Shortly after the meeting, Cpl. Torres was transferred from Investigations to a position in Patrol Bureau not comparable to his prior position. Prior to the transfer, Cpl. Torres was asked by then-Major Grant if he wanted to transfer to Internal Affairs, to which he said yes, but only if he was not transferred to Automated Enforcement Division. Notwithstanding this, Cpl. Torres was transferred to Patrol Bureau.

## CORPORAL THOMAS WALL

153.  Officer Thomas Wall, an African-American man, suffered discrimination in the form of retaliation during his employment by the PGPD.  In 2015, Officer Wall confronted a fellow officer about his rough handling of a female citizen. The other officer asked Officer Wall what he would do if he put his hands on Officer Wall. Officer Wall said that he would

"Fxxk him up."  Officer Wall was written up and transferred to another district within a matter of weeks. The other officer did not get written up.

154.  As context for uneven imposition of discipline, Officer Wall explained that in another instance, a White Sergeant, Mark Rumbarger, failed to discipline a White officer (Tiffany Johnson) for referring to African-Americans as "nxxxxs."

155.  Officer Wall also suffered discrimination in the form of hostile work environment during his employment by the PGPD. He said trainers often tell new officers that Prince George's County is a "ghetto" and many officers refer to citizens of color as "Signal 7's" which is code for suspicious person.

## CORPORAL MICHAEL ANIS

156.  Cpl. Michael Anis, a man of Middle-Eastern descent, is an active and prominent member of HNLEA.  Because of his race and his association with the organization, he has suffered discrimination in failing to receive promotional transfers to specialty units.  Cpl. Anis has applied to specialty units many times, but has never been accepted, and PGPD has never provided a reason why he was not selected.

157.  To qualify for the Marine Specialty Unit, applicants must complete a rope/agility course, a strenuous swim test and an interview. Cpl. Anis has consistently finished as a top applicant for the swim and physical tests but has never been selected for the Marine Specialty Unit.  The commander and supervisor of the unit are White.

158.  PGPD has not provided a reason for not selecting Cpl. Anis for the Marine Unit. Cpl. Anis has significantly more experience and qualifications for the Marine Unit than the White officers who have been selected.  For example, a White officer named Taylor Krauss

was transferred into the Marine Specialty Unit despite having never applied, and despite being involved in a controversial departmental shooting.

159.  Following the selection of White officers to positions he was better qualified for, Cpl. Anis complained to the Fraternal Order of Police and Lieutenant Brian Durm, who was the Sergeant in charge of the Marine unit at the time. Lt. Durm refused to discuss with Cpl. Anis why he was not selected, stating that Cpl. Anis should have spoken with Durm before going to the FOP.

160.  Cpl. Anis has applied to be a Hostage Negotiator twice, an Instructor at the Academy twice, and a Detective three times. He has been denied each time, and PGPD has never provided a reason for any of these denials.  For the Instructor position, a White officer named Beau Jarvis was selected instead of Cpl. Anis, even though Cpl. Jarvis had never applied and Cpl. Anis was on a list to be selected for that position.

161.  Cpl. Anis recently applied to be assigned to the Special Operations Division at National Harbor but was told by multiple supervisors that he would not be selected because of his beard. Cpl. Anis has a beard for medical reasons and complies with department policy to provide a doctor's note every four months.  On information and belief, there is an unwritten policy in the Special Operations Division that officers may not have facial hair.  Four White officers were selected instead for this assignment.

162.  In 2014, Cpl. Anis was accepted into Investigator School.  However, he was not allowed to attend classes because he worked midnight shifts.  This contrasts with treatment afforded White officers.  Five months after Cpl. Anis was barred from attending classes because he worked midnight shifts, a White officer named Jessica Johnson was permitted to

attend classes even though she too worked midnight shifts—other officers were allowed overtime to cover her shifts.

## **CORPORAL CHRIS SMITH**

163.  Cpl. Chris Smith, an African-American man, suffered and continues to suffer discrimination in the form of hostile work environment.

164.  Cpl. Smith was assigned to patrol in District 2 in 2013. Members of his squad referred to African-American civilians as "1As" (the "A" stands for Africans), which is not an official police term.

165.  In June 2015, Cpl. Smith was the only Officer of Color serving on the Special Assignments Team. He was also the only member of the squad who had grown up in Prince George County.  While serving on the team, he was subjected to racial hostility by White members of the team.  Members of his squad referred to African-American civilians as "Signal 7s" (code for a suspicious individual) and "mother f-ers" and referred to their patrol area as a "shithole." On multiple occasions, a member of his squad told Cpl. Smith that he looked like a Signal 7 on days that he wore plain clothes. Cpl. Smith complained about these incidents to Lieutenant Vondell Smith in October 2015 and again in December 2015, but nothing was done.

166.  Shortly after the protests in Baltimore in April 2015, another member of his squad defended the Ku Klux Klan, and stated that the Black Panthers and Black Lives Matter Movement are the same as the Klan.  Others tried to instigate racially charged conversations where they referred to President Obama as a "coon" and said "at least slaves had food and a place to live."

167.  In November 2016, Cpl. Smith call Lt. Vondell Smith to request to be transferred. His request was denied.

168.   In December 2016, Lt. Vondell Smith, Cpl. Smith's supervisor, was transferred out of his Special Assignment Team.  Following this, in March 2017 Cpl. Smith was involuntarily transferred to the Patrol Bureau. This transfer followed his prior complaints, and Cpl. Smith believes this was retaliatory. Following the announcement of his transfer, Cpl. Smith requested to meet with his supervisors Captain Mistinette Mints and Lieutenant Thomas Calmon several times with no success. In March of 2017, after he was transferred, Cpl. Smith sent an email to EEOC Coordinator, Deputy Chief Nader in an attempt to file an EEOC complaint. Cpl. Smith followed Deputy Chief Nader's instructions and delivered evidence to the appropriate office. Deputy Chief Nader was then transferred, and no one followed up with Cpl. Smith about his complaint.

169.   Cpl. Smith has also been repeatedly denied transfers to a Community Oriented Policing position, and continues to work in patrol.

### CORPORAL MICHAEL BROWN

170.   Cpl. Michael Brown, an African-American man, suffered discrimination by the PGPD in the form of disparate discipline, which resulted in his termination in 2016.

171.   Cpl. Brown's termination was triggered by his provision of assistance to a civilian in the District of Columbia during a physical confrontation in July 2014.  The perpetrator of the crime falsely accused Cpl. Brown of assault and he was arrested.  The criminal charges brought against Cpl. Brown were baseless and were later dropped in their entirety.

172.   Following his arrest, the PGPD suspended Cpl. Brown without pay.  On information and belief, then-Deputy Chief Stawinski and then-Chief Magaw made the recommendation to suspend Cpl. Brown.

173.   Despite all charges against Cpl. Brown being dropped, he was subsequently charged internally with six violations by the PGPD for conduct unbecoming an officer.  Cpl. Brown's expert witness, Paul Mazzei, who wrote the PGPD Use of Force guidelines, testified on Cpl. Brown's behalf at his Trial Board. He said that Cpl. Brown actually would have been justified in using more force than he did, and PGPD's own use of force expert—William Gleason—refused to testify against Cpl. Brown at the Trial Board.  Nevertheless, the Trial Board deliberated for three days before finding Cpl. Brown guilty of the charges and terminating him nine days before his 15th anniversary with the PGPD.

174.   The trial board is comprised of three members, and needs a vote of two to make a finding of guilty.  Two members of the trial board are permanent appointees of Chief Stawinski.  Because they are appointees of the Chief, they function as a rubber stamp for his will.  The PGPD trial board is the only one in the State of Maryland where the Chief of Police has two permanent appointees as opposed to members chosen at random.

175.   After Cpl. Brown's termination, he was hired by Fairmont Heights Police Department, and was recommended to be Deputy Chief.

176.   PGPD and Chief Stawinski tried to impede Cpl. Brown's success at the FHPD (i) by contesting his certification from the Maryland State Police Commission through misrepresentation of evidence from his Trial Board, and (ii) Chief Stawinski threatened the Fairmont Heights Police Department Police with a loss of resources if it retained Cpl. Brown.  Following Chief Stawinski's threat, the Fairmont Heights Police Department requested Cpl. Brown resign.

177.  Cpl. Brown recently received an offer to work for the United States Capitol Police.  On information and belief, after Cpl. Brown received the offer, PGPD also interfered with that opportunity and caused Cpl. Brown's offer to be revoked.

178.  Cpl. Brown has been unable to find subsequent employment as a police officer.

179.  On information and belief, the PGPD has not terminated White officers for similar conduct.  For example, the PGPD permitted a White officer who was indicted for improper use of force after putting a gun in to the head of a 13-year-old child to retire from PGPD.  The White officer subsequently accepted a job at the Fairmont Heights Police Department.  Neither the PGPD nor Chief Stawinski made any attempt to deny the White officer employment at Fairmont Heights.

## OFFICER TASHA OATIS

180.  Officer Tasha Oatis, an African-American woman, suffered discrimination by the PGPD in the form of disparate discipline, which resulted in her termination in 2016.  Prior to her termination, Officer Oatis was employed by PGPD for just over four years.

181.  Officer Oatis's termination arose after she was investigated by Internal Affairs for alleged "double dipping" (leaving early to go to her part-time security job) in December 2014. Officer Oatis did not know that she was required to take leave while traveling to her part-time job and once she found out then she followed protocol.  She ended up owing the County for the less than ten hours for days when she had left early.  At her unemployment hearing, Major Mills confirmed that policy within the unit was that the prior shift could leave once the next shift comes on the street, as occurred in Officer Oatis's case.

182.   Many other officers on Officer Oatis' shift (including White officers) engage in the same practice of commuting to their part-time security jobs during their shifts, once a replacement arrives.

183.   Officer Oatis was instructed by two supervising officers not to say anything about anyone else double dipping at her Trial Board. The Trial Board voted to terminate her in 2016.

184.   The PGPD has caused Officer Oatis to be red-flagged by the Maryland State Police Commission.  She has been denied employment by approximately 15 other police departments in the state as a result of this flag.

185.   A White female officer, Sergeant Lisa Garland, who worked at the same part time job as Officer Oatis had engaged in the same practice for years, as opposed to Officer Oatis having only engaged in it several times, was allowed to retain her job with PGPD.  Although Sgt. Garland was charged, the Trial Board voted not to terminate her, notwithstanding her long-standing practice of so-called "double dipping."

## OFFICER CLARENCE RUCKER

186.   Officer Clarence Rucker, an African-American man, suffered discrimination by PGPD in the form of disparate discipline, which resulted in his suspension in October 2015 right before the administration of a promotional test.

187.   Prior to his suspension, Officer Rucker had been employed by PGPD for seven years.

188.   In December 2014, Officer Rucker arrested a man for domestic violence. The man's girlfriend gave a statement and the man himself confessed to physically attacking her and breaking her ribs. However, six months later, the man claimed Officer Rucker only arrested him because Officer Rucker was dating the man's girlfriend. Officer Rucker had text

messages to prove this was false and that he was only in communication with her to investigate the case. This still triggered an Internal Affairs investigation that same month and an audit of all of his cases. Internal Affairs found these issues: a situation in which Officer Rucker had a pre-existing relationship with a woman involved in a case he was investigating, and another case where a woman tried to initiate a relationship with Officer Rucker but he declined, stating that he could not do so because he was in charge of her case.

189.  With regard to the first case, Officer Rucker had a pre-existing relationship with the woman long before she became involved in the case; they had lost touch until they reconnected when she was the victim of the attack. The woman never complained to PGPD but they reached out to her anyway.

190.  The woman in the second case also never complained.  The man involved in the first case also did not file an official complaint.

191.  Officer Rucker was suspended in October 2015.  Officer Rucker was ordered to sign a confidentiality agreement and was threatened with insubordination and possible termination if he released any information about the case from the case file. Officer Rucker believed that this was racial discrimination but he was afraid to raise the issue or file an EEOC complaint because of the threat of insubordination.

192.  Although Internal Affairs was supposed to issue findings before May 2016, Officer Rucker was not presented with findings until April 2017. His trial board was set for August 2017 but postponed for unknown reasons.

193.  Officer Rucker accepted a job at the Capitol Heights Police Department in November 2017, having never received any Trial Board hearing despite his suspension dating back to October 2015.

194.   Even though Officer Rucker never had a Trial Board hearing and was never officially found guilty of any wrongdoing, PGPD red-flagged him in the Maryland State Police System in December 2017. Chief Stawinski has never responded to repeated calls from Officer Rucker, Rucker's attorney or the Capitol Heights Police Chief. After thoroughly reviewing the case file, and contacting PGPD Internal Affairs, the Capitol Heights Police Chief decided to retain Officer Rucker.  However, because of the unjustified red-flag, Officer Rucker is confined to desk duty.

195.   Upon information and belief, PGPD has removed red-flags from several White officers who left PGPD with proven offenses that were similar or worse. Furthermore, the PGPD has not terminated a number of White officers who were found guilty of targeting women involved in their own investigations. This includes Officer Michael Inezo who received a victim's contact information after responding to a service call for identity fraud and later sent her sexually explicit text messages. The victim complained, but Officer Inezo was not terminated. A second White officer, William Reed, responded to a domestic violence service call by separating the man and the woman, taking the woman to a hotel room and coercing her into having sex with him. Shortly afterward, the woman filed a complaint but the officer was not terminated.

196.   Between the two-year period of Officer Rucker's suspension and his resignation, he was not allowed to apply or test for promotion. Meanwhile, PGPD allowed a White officer under suspension to test for promotion.

197.    Officer Rucker also witnessed several PGPD officers making disparaging statements about people of color.  For example, occasions Sergeant Chris Nalesnik would state on at rollcall on the midnight shift that "any blacks moving outside after 1:00 AM need to be

stopped because they're up to no good and are suspects."  He would also call arresting African-Americans as a "good quality of life arrest" saying "one less black I have to worry about robbing me when I'm off duty".

VII.   Pattern of Racism and Retaliation

198.  The incidents of racism and retaliation that the Plaintiffs experienced are a part of a long historical pattern of mistreatment directed at People of Color both within PGPD and the broader community.

199.  These incidents have occurred following long standing issues with the failure of PGPD management to address persistent, institutional racism.  The PGPD's institutional racism is manifest both in its failure to reign in acts of violence against People of Color within the Prince George's community, and the failure to address such conduct within the Department. Plaintiffs have complained to supervisory personnel regarding the discriminatory treatment they and their members have experienced, and have filed complaints within PGPD, with the EEOC and with the U.S. Department of Justice.  The complaints made within the PGPD were and are routinely ignored, and confidentiality is and has been constantly violated.  Officers are discouraged explicitly and implicitly from filing complaints of discrimination.

200.  Prior to 1927, Prince George's County had no organized police force.[5]  Over the course of the 20th century, the PGPD grew and adapted in response to the changing demographics within the community.  More importantly, from the 1950s to the 1970s, the Department grew in number of officers, modernized its stations and created special units, establishing "vice, fraud, and juvenile officers and a new uniform patrol service that included a K-9 unit, a Tactical Squad, and a Traffic Safety Unit."[6]  All of these increases in police

---

[5] PRINCE GEORGE'S COUNTY, MARYLAND, POLICE, HISTORY, https://www.princegeorgescountymd.gov/354/History.
[6] Id.

presence and practices coincided with the increase in the African-American population in

Prince George's County following federally mandated desegregation. "In the second half of the

century, a combination of African-American migration out of the District [of Columbia] and

white flight gave the County an African-American majority."[7] Today, the Prince George's

County Police Department serves over 900,000 residents,[8] 63 percent of whom are African-

American.[9]

201.  Since the 1990s, Prince George's County has been known as one of the wealthiest

majority-Black counties in the United States.[10]  In 2014, its median household income was

about $74,000 annually, with "77 percent of the workforce holding white-collar jobs."[11] Given

this social and economic mobility, many believed that Prince George's County would serve as

a shining example distancing itself from the violent history of police misconduct that plagued

the force during the 1970s and 1980s.[12] Despite this affluence, race relations in the County

remain notorious, largely due to the police department's pervasive and systemic use of

---

[7] DW Rowlands, *Here's the primer you need to understand Price George's extraordinary diversity*, GREATER GREATER WASHINGTON, May 17, 2018. https://ggwash.org/view/67566/prince-georges-county-demographics-vary-a-lot-by-region.

[8] PRINCE GEORGE'S COUNTY, MARYLAND, POLICE, HISTORY, https://www.princegeorgescountymd.gov/354/History.

[9] DW Rowlands, *Here's the primer you need to understand Price George's extraordinary diversity*, GREATER GREATER WASHINGTON, May 17, 2018. https://ggwash.org/view/67566/prince-georges-county-demographics-vary-a-lot-by-region.

[10] *Id*.

[11] Ruben Castaneda, *Washington's Ferguson Next Door:  Lessons from Prince George's County's history of police brutality*, POLITICO, Sept. 8, 2014. https://www.politico.com/magazine/story/2014/09/washingtons-ferguson-next-door-110707.

[12] In discussion of pro bono work, law firm Hogan & Lovell details its involvement with Prince George's County Police Department during the 1972 federal court lawsuit alleging racial discrimination and police brutality by the County police department: "Because of an alleged pattern and practice of discrimination, over 900 files concerning complaints of police misconduct were made available for [Hogan & Lovell's] review and analysis"…From that litigation, the "county agreed to settle the litigation…New procedures were formally adopted for handling complaints of police brutality, which made the process more accessible and open to public scrutiny, and ensured a hearing before the  Human Relations Commission if a complainant was not satisfied with the police department's response.  Additionally, police officers were required to be trained and to wear nameplates so members of the public could better identify them.  The settlement did not end the struggle, however, so Hogan & Hartson (now Hogan & Lovells) returned to court on several occasions to seek assurance that settlement would be fully implemented."… "Eight years later, the court required the county's full compliance."  *See* HOGAN & LOVELLS, *The Road Ahead: Celebrating 40 years 1970-2010*, https://www.hoganlovells.com/files/upload/40th_Anniversary_FINAL.pdf.

excessive force and acts of brutality against its residents of color.  The Prince George's Police

Department's culture of racism and police brutality is multifaceted and widespread within its

department.  The documented history of both internal and external police misconduct directed

towards Officers of Color and civilians demonstrates that the Department's practices are part of

a culture that is hostile to reform.

202.  Over the past 30 years, there have been multiple investigations by federal

agencies, local governments and news reporters examining excessive force through police

shootings and the Prince George's Police Department canine unit.  In 2001, the Washington

Post produced a significant analysis[13] of the use of force among County police dating back to

1990 and found that during that time period Prince George officers had shot 122 people and

killed 47, giving Prince George's County a higher rate of fatal shootings per officer than any

other major city or county police force at the time.[14]  "The vast majority of those shot were

Black; many had committed no crime… and 45 percent were unarmed."[15] The fact that Prince

George's County Police Department increasingly faced reports, investigations and allegations

surrounding police brutality despite an increase in African-Americans in County leadership[16]

solidifies how the Police Department has maintained a systemic, aggressive, and racist

approach to policing its community, and that its call to serve and protect is reserved primarily

for White residents.  Because aggression towards residents of color is engrained in its culture,

PGPD's Officers of Color have also occasionally been involved in cases of police brutality.[17]

---

[13] *Police Shootings: A Washington Post Investigation*, WASHINGTON POST, http://www.washingtonpost.com/wp-srv/content/nation/investigative/policeshootings.html.
[14] *Id.*
[15] *Id.*
[16] In 1994, Wayne Curry was elected as the first African-American county executive in the 300-year history of Prince George's County.  *Id.*
[17] "[B]etween 1992 and 2002…Cpl. Charles Ramseur, a Black officer, shot and wounded four people who were Black and Latino, respectively. "Neither men were armed, yet Ramseur was cleared in each of the four shootings." *Id.*

203.  In 1999, the Department of Justice launched an investigation into allegations of misconduct by the Canine Section of the police department finding that almost all of residents attacked were nonviolent and the vast majority of those attacked were Black.[18]   At this time, there were 18 civil lawsuits filed which accused officers in the canine unit of excessive force.[19] Within months of the investigation, "almost every officer in the 23-member canine unit had been replaced or left the unit on their own accord, rather than adapt to the new policies" requiring retraining of dogs and handlers.[20]

204.  Despite reforms in the canine unit practices, police brutality against residents of color remains a common practice by Prince George Police officers.  In September 2000, Officer Cartlon Jones fatally shot Prince Jones, a Howard University student, after following the young man from Maryland, through the District and into Fairfax, Virginia, while allegedly conducting surveillance for a gun theft case.[21]

205.  As a result, the Department of Justice initiated an investigation of an alleged pattern or practice of excessive force throughout PGPD,[22] and in January 2004, the DOJ filed a complaint following its investigation of PGPD and the Canine Section, resulting in a Consent Decree regarding, among other things, the Department's use of canines and force, including revisions to use of force policies and training protocol, including documentation and review of all use of force incidents; creation of a board to review all firearm discharges; changes to the

---

[18] *See* Prince George Memorandum of Agreement, DEPARTMENT OF JUSTICE, https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/Prince George_memo_agree.pdf.; Ruben Castaneda, FBI Investigating PR. George's Canine Unit, Washington Post, April 4, 1999. http://www.washingtonpost.com/wp-srv/local/daily/april99/dogs4pp.htm.
[19] *Id*.
[20] *Id*.
[21] Ruben Castaneda, *Officer Liable in Student's Killing*, WASHINGTON POST, January 20, 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/01/19/AR2006011902346.html.; *See* also, Ta-Nehisi Coates, *Between the World and Me, Part II* (2015).
[22] *See* Prince George Memorandum of Agreement, DEPARTMENT OF JUSTICE, https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/Prince George_memo_agree.pdf.

department's receipt, investigation and review of citizen complaints; implementation of a

guard and bark methodology for canines; monitoring and review of all canine deployments and

biting incidents; appoint of an independent monitor to oversee compliance with the

Memorandum.[23]

206.  While many had hoped that police practices had improved based on the

termination of the Consent Decree in 2007 and the election of County Executive Rushern

Baker in 2010, the diversity PGPD's make-up never resembled the County demographics.

Further, despite claims of an increase in the transparency and accessibility of the department to

improve police-community relations, with the appointment of Chief Stawinski, there has been

a clear resurgence of the violent patterns documented above and the lack of discipline to create

real change in this department's culture.

207.  Examples of negative attitudes towards People of Color persist to this today.  For

example, this summer a canine officer was giving a presentation about how the canine unit

operates to 75 to 100 members of the community, including many children.  He proceeded to

explain what a dog does "if a black bad guy is running and drops his cellphone."   Chief

Stawinski was present at this presentation and was forced to publicly apologize after there was

a public outcry in response to a video of the incident posted online.

208.  Further, the canine unit continues to use abusive practices toward the unit.

Although there is a recorded message that canine officers supposed to use to alter the public to

the presence of the police dogs, the message is so garbled that there is no way for anyone to

---

[23] Andrew Steiger, CIVIL RIGHTS LITIGATION CLEARINGHOUSE, CASE PROFILE: U.S. V. PRINCE GEORGE'S COUNTY, MARYLAND, https://www.clearinghouse.net/detail.php?id=5540.  ("On February 12, 2007, the Court granted the motion [to terminate] stating that Prince George Police Department had a) complied fully with the consent decree, and b) eliminated the last vestiges of unlawful behavior and had thus satisfied the decree.").

understand what it says.  Many officers joke about how useless it is but make no attempts to fix it.

209.  Along with this storied history of racist violence towards civilians, PGPD's discrimination against Officers of Color is not new.

210.  In 1997, HNLEA filed a complaint with the DOJ regarding rampant racism against Officers of Color in the Department.  This systemic conduct had also continued for decades leading up to the letter written in October 2016 wherein more than 70 PGPD officers signed onto a complaint describing disparities in discipline compared to their White counterparts[24], leading ultimately to this litigation.  In addition to claims about discrimination causing Officers of Color to be passed over for promotions and favorable assignments there are widespread allegations of retaliation for exposing wrongdoing.[25]

211.  The wrongdoing continues to this day.  Racist language is used with impunity. White officers easily rise through the ranks, while Officers of Color face an uphill battle. White officers face little discipline while Officers of Color are regularly and severely punished.

212.  Indeed, the racism and retaliation is cavalier in that there are little to no attempts to even hide behind it.  For example, Sgt. Boone was told that the Chief of Police was transferring him expressly because he had complained about race discrimination by PGPD.

---

[24] Mike Murillo, *Justice Dept. complaint claims discrimination within Pr. George's police*, WTOP, Feb. 2, 2017, https://wtop.com/prince-georges-county/2017/02/justice-dept-complaint-claims-discrimination-within-pr-georges-police/.
[25] *Id*.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF (42 U.S.C. SECTION 1983)**
**(EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT)**
**(All Plaintiffs Against All Defendants)**

213.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 212 above with the same force and effect as if fully set forth herein.

214.  By the acts and omissions described above, Defendants, while acting under color of state law, have engaged in a longstanding pattern and practice of discriminating against Officers of Color by, inter alia, maintaining and allowing a hostile work environment, subjecting said officers to disparate discipline including but not limited to discrimination in the investigatory/disciplinary process, the imposition of disciplinary penalties, the institution of retaliation against officers complaining of discrimination suffered by themselves or others and denying promotion to Officers of Color based on race and/or color.

215.  The County violated the equal protection guarantees of the Fourteenth Amendment by discriminatorily denying Plaintiffs training opportunities and overtime for which the Plaintiffs were qualified and which similarly situated White officers were routinely granted, giving rise to their claims for relief under 42 U.S.C. § 1983.

216.  The Defendants have, by the actions described herein, acted under the color of state law to discriminate against Plaintiffs and their members on the basis of race and/or national origin, thereby depriving them of rights, privileges, and immunities secured to them by the Constitution and laws of the United States and the State of Maryland, and in direct violation of the Fourteenth Amendment to the United States Constitution.  Such injury has been and will continue to be irreparable.

217.  As a direct and proximate result of these acts, Plaintiffs and their members have been and continue to be deprived of their civil rights, suffered and continue to suffer loss of employment, loss of income, race-based discrimination in job advancement, loss of other employment benefits, and have suffered and continue to suffer distress, humiliation, great expense, embarrassment, and damage to their reputations.

218.  The actions of Defendants, in depriving Plaintiffs and their members of their constitutional and civil rights, were willful and malicious and constitute a continuing violation of the Fourteenth Amendment.

219.  At all times herein mentioned, the Defendant Prince George's County maintained a series of customs, policies and practices that proximately caused and continue to cause and that were likely to lead and continue to lead to the violation of Plaintiffs' and their members' constitutional and civil rights.  These acts, omissions, customs, policies and practices included, among others, the following:

  a.  Defendants' continuing failure to stop, correct, prevent and eliminate discriminatory disciplinary practices and other discriminatory conditions of employment related thereto.  This discrimination was known to or should have been known to the Defendants, the County, the PGPD and its policy-making leaders at all times mentioned herein;

  b.  The continuing refusal and/or failure on the part of the Defendants, the County, the PGPD and its policy-making leaders, to fully and adequately stop, correct, or discipline White officers who have engaged in acts of racism, including excessive force and police brutality against Prince George's residents, and racism against other officers and employees of the PGPD as well as against members of the community;

  c.  Defendants have engaged in and continue to engage in acts of retaliation against police officers who complain of discrimination and racism within and by the PGPD and/or support officers who complain of discrimination and racism within and by the PGPD;

  d.  Defendants maintain, facilitate and condone a severe and pervasive hostile work environment that is so hostile as to alter the terms and conditions of employment for Officers of Color; and

e.      Defendants facilitate an environment where Officers of Color who speak out against racism and/or complain about discrimination within the PGPD are denied promotions and other positions to enhance their careers in the PGPD.  Instead, Officers of Color who complain about discrimination are marginalized and given less prestigious positions within the PGPD.

## COUNT II (42 U.S.C. SECTION 1983)
### (First Amendment Retaliation)
### (All Plaintiffs Against All Defendants)

220.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 219 above with the same force and effect as if fully set forth herein.

221.    By the acts and omissions described above, Defendants, while acting under color of state law, have maintained and continue to maintain an employment policy and continuing practice of willful and intentional retaliation against those employees, Plaintiffs included, who raise objections to the department's racially discriminatory employment and policing practices, thereby depriving Plaintiffs of their rights to petition the government for redress of grievances, as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

222.    Such retaliatory acts and omissions include, but are not limited to, the facts that Defendants regularly instigate bogus disciplinary charges against; harass; disqualify from eligibility for promotion; refuse to promote; demote; transfer to undesirable positions; and otherwise engage in adverse employment actions toward individuals who petition the government to address and remedy racial discrimination within PGPD and the PGPD's racially motivated misconduct against civilians.

223.    Such petition and complaints by Plaintiffs include, but are not limited to, informal complaints to supervisors regarding racists comments of co-workers or racist and abusive treatment of civilians, complaints to the EEOC, and complaints to the DOJ.

224.    As a direct and proximate result of the policy and continuing practice of retaliation intentionally maintained by Defendants, Plaintiffs have been and continue to be

deprived of their civil rights, they have suffered and continue to suffer retaliation for exercise of First Amendment rights, harassment, and losses of work and wages, which collectively have caused them severe emotional distress, pain, and humiliation, in addition to actual wage losses.

## COUNT III (29 U.S.C. § 704)
### (Rehabilitation Act: Disability Discrimination)
### (Plaintiff Sonya Zollicoffer vs. Prince George's County)

225.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 224 above with the same force and effect as if fully set forth herein.

226.    Defendant Prince George's County, as a recipient of federal funding, may not discriminate on the basis of disability.

227.    Lt. Zollicoffer requested reasonable accommodations for her to work while recovering from breast cancer.  Lt. Zollicoffer also requested reasonable accommodations because of her mental health status.

228.    Prince George's County denied those accommodations without engaging in an interactive process making it impossible for Lt. Zollicoffer to do her job. She would be able to perform her essential work functions if she were provided the accommodation.

229.    As a direct and proximate result of the policy and continuing practice of disability discrimination intentionally maintained by the County, Lt. Zollicoffer has been and continues suffer severe emotional distress, pain, and humiliation, in addition to actual wage losses.

## PRAYER FOR RELIEF

WHEREFORE, as relief for the causes of action set forth in Counts I, II, and III hereof, Plaintiffs pray that this court:

a.      Enter an order declaring that the acts and practices of Defendants violate the laws of the United States, including:

(i) pursuant to 28 U.S.C. Section 2201, that through their acts and omissions, Defendants have maintained and continue to maintain a policy and continuing practice of willful and intentional race discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States;

(ii) pursuant to 28 U.S.C. Section 2201, that by their acts and omissions, Defendants have maintained and continue to maintain a policy and continuing practice of retaliation against individuals who exercise their constitutional rights to petition the government for redress of grievances, in violation of the First Amendment to the Constitution of the United States;

c.      Enter a permanent injunction requiring Prince George's County to:

(i)      Abolish discrimination on the basis of race within and among the PGPD;

(ii)      Treat Officers of Color the same as White officers in all aspects of their employment including, but not limited to, work environment, terms and conditions of employment, the investigation of alleged infractions, the discipline process related to such infractions, and the penalties associated with such infractions;

(iii)      Refrain from retaliating against Plaintiffs or any of their members or any other employees for making complaints about discriminatory treatment and conduct by Defendants;

(iv)      Appoint an independent monitor to ensure fairness and compliance with the orders of this Court;

(v)      Immediately rescind and expunge any and all discipline issued to Plaintiffs and their members from any and all files and records of the PGPD;

(vi)      Immediately reinstate any and all Plaintiffs and their members who were wrongfully terminated from employment due to the discriminatory acts complained of herein; and

(vii)      Immediately offer promotions to all Plaintiffs who they have failed to promote due to retaliation and the creation and maintenance of a severe and hostile work environment.

(viii)      Give priority to Officers of Color in assignment to specialty units whose previous transfers were denied due to retaliation and the creation and maintenance of a severe and hostile work environment.

(ix)      Provide a reasonable accommodation for Lt. Zollicoffer to work as a person with a disability.

d.      Grant such additional equitable relief as is proper and just, including but not limited to, requiring Defendants to immediately enter into a plan to eliminate the practices noted in this Complaint at PGPD, including:

(i) Enhancing and making known to Department employees and potential employees, PGPD policies prohibiting racial discrimination, retaliation for opposition to discrimination, and racial harassment, and statements that these practices will not be tolerated by PGPD;

(ii) Requiring the training of all police officers on the force in human relations and racial sensitivity;

(iii) Requiring a specialized grievance procedure for discrimination complaints which does not require the complaining party to bring his complaint to the supervisory employee being charged with discrimination;

(iv) Requiring the County and the PGPD to enter into a plan to move the processing of administrative charges outside the control of the PGPD to a separate County office administered by a body monitored by the EEOC;

(v) requiring the County to take appropriate disciplinary action against Defendants and other PGPD officers for their discriminatory actions;

(vi) order that Defendants provide Individual Plaintiffs with the positions they would now hold, but for Defendants' actions;

(vii) order that the Defendants provide Individual Plaintiffs [and members of their class] with back pay with interest.

(viii) requiring the removal from Plaintiffs' files any derogatory performance evaluations or reprimands which are grounded upon Plaintiffs' refusals to remain silent about the racially discriminatory practices of the Department;

(ix) Refrain from retaliating against the Plaintiffs in any way for their complaints and pursuit of claims against the Defendants for matters concerning racial harassment, discrimination, and retaliation in the workplace;

e.      Order that Defendants immediately reimburse, and make whole any and all Individual Plaintiffs for any and all the benefits they would have received had it not been for Defendants' illegal actions including, but not limited to: benefits and seniority from the time of the Defendants' illegal actions taken against them;

f.      Award compensatory damages to Plaintiffs in amounts that are fair, just and reasonable, to be determined at trial;

g.      Award punitive damages to Plaintiffs against the Chief Stawinski, Mr. Magaw, Major Mills, and Deputy Chief Murtha in an amount to be determined at trial; and

h       Award Plaintiffs all costs of this action and reasonable attorneys' fees, as provided for in 42 USC § 1988; and

i.      Grant further as the Court deems just and proper, including injunctive and declaratory relief as may be required in the interest of justice.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues in this action that are so triable.


Dated: December 12, 2018                          Respectfully submitted,


__/s/ Dennis A. Corkery_____

| | |
|---|---|
| Dennis A. Corkery (D. Md. Bar No. 19076) | John A. Freedman (D. Md. Bar No. 20276) |
| WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS | Peter T. Grossi, Jr. (*pro hac vice* forthcoming) |
| 11 Dupont Circle, Suite 400 | Adam M. Pergament (*pro hac vice* forthcoming) |
| Washington, DC 20036 | Matthew Lanahan (*pro hac vice* forthcoming) |
| (202) 319-1000 | Titalayo S. Rasaki (*pro hac vice* forthcoming) |
| dennis_corkery@washlaw.org | Matthew H. Horton (*pro hac vice* forthcoming) |
| | ARNOLD & PORTER KAYE SCHOLER LLP |
| Deborah A. Jeon (D. Md. Bar No. 06905) | 601 Massachusetts Ave., NW |
| ACLU OF MARYLAND | Washington, DC  20001-3743 |
| 3600 Clipper Mill Road, Suite 350 | John.Freedman@arnoldporter.com |
| Baltimore, MD 21211 | Peter.Grossi@arnoldporter.com |
| (410) 889-8555 | Adam.Pergament@arnoldporter.com |
| jeon@aclu-md.org | Matthew.Lanahan@arnoldporter.com |
| | Titalayo.Rasaki@arnoldporter.com |
| | Matthew.Horton@arnoldporter.com |


*Counsel for Plaintiffs*