# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

HISPANIC NATIONAL LAW
ENFORCEMENT ASSOCIATION NCR,
UNITED BLACK POLICE OFFICERS
ASSOCIATION,
MICHAEL ANIS,
MICHAEL BROWN,
THOMAS BOONE,
DANITA INGRAM,
PAUL MACK,
JOSEPH PEREZ,
TASHA OATIS,
CLARENCE RUCKER,
CHRIS SMITH,
RICHARD TORRES,
THOMAS WALL, and
SONYA L. ZOLLICOFFER,

     Plaintiffs,

     v.

PRINCE GEORGE'S COUNTY,
HENRY P. STAWINSKI, III, *Individually and
in His Official Capacity as Chief of Police*,
MARK A. MAGAW, *Individually and in His
Official Capacity as Deputy Chief
Administrative Officer for Public Safety*,
CHRISTOPHER MURTHA, *Individually and
in His Official Capacity as Deputy Chief of
Police*, and
MAJOR KATHLEEN MILLS, *Individually
and in Her Official Capacity as Commander*,

     Defendants.

Civil Action No. TDC-18-3821

## MEMORANDUM OPINION

Plaintiffs Hispanic National Law Enforcement Association NCR ("HNLEA") and United

Black Police Officers Association ("UBPOA"), along with 12 of their members who are or were

employed by the Prince George's County Police Department ("PGCPD"), have brought this civil rights action against Prince George's County, Maryland and four PGCPD officials, alleging a custom and practice of discrimination and retaliation against officers of color by the PGCPD and certain high-ranking PGCPD officials. Plaintiffs assert causes of action pursuant to 42 U.S.C. § 1983 for discrimination on the basis of race and color, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and retaliation, in violation of the First Amendment. Plaintiff Lieutenant Sonya Zollicoffer has also asserted a cause of action for discrimination on the basis of disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796 (2012) ("the Rehabilitation Act"). Now pending before the Court is Defendants' First Motion to Dismiss, which seeks dismissal of HNLEA and UBPOA ("the Organizational Plaintiffs") as Plaintiffs; all claims against Defendant Deputy Chief Christopher Murtha and all individual defendants in their official capacities; and certain individual claims of discrimination or retaliation contained within the asserted causes of action. The Court held a hearing on the Motion on June 7, 2019. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The facts described below are presented in the light most favorable to Plaintiffs, the non-moving parties. The PGCPD, led in part by Defendants Chief Henry P. Stawinski, III, Deputy Chief Administrative Officer for Public Safety Mark Magaw, Deputy Chief Christopher Murtha, and Internal Affairs Division Commander Major Kathleen Mills (collectively, the "Individual Defendants"), is charged with protecting and serving the population of Prince George's County, Maryland, a county in which the majority of residents are African American. According to the Complaint, the PGCPD has long had a problem with officers who engage in racist conduct,

2

including abusive police practices, towards both officers and civilians of color. Specifically, Plaintiffs allege a broad and pervasive custom of retaliation against officers of color who file complaints or otherwise cooperate with efforts to investigate white officers who engage in misconduct, as well as a practice of discrimination against officers of color, including institution of investigative proceedings against complaining officers, imposition of transfers to unfavorable assignments, denial of promotions and favorable transfers, and harsher discipline for officers of color.

According to the Complaint, Chief Stawinski, supported by his co-Defendants, has effectively condoned this behavior by failing to discipline the perpetrators appropriately and thus fostered a hostile work environment in which racist conduct is allowed to persist. Plaintiffs allege that white PGCPD officers used racial slurs to refer to their fellow officers as well as people of color within the community, referred to communities of color policed by white officers as "shitholes" or "ghettos," circulated pictures of a Hispanic commander dressed up as a voodoo doll with derogatory comments, gave a training dummy a black face and Afro wig, and circulated other racist images, pictures, emails, and text messages. Compl. ¶¶ 50-53, ECF No. 1. When Plaintiffs have complained about their work environment and specific instances of misconduct, rather than enforcing PGCPD General Order 12, which bars discrimination and retaliation in the workplace, the PGCPD has engaged in retaliation against them. In March 2016, HNLEA and UBPOA filed a letter of complaint with the United States Department of Justice ("DOJ") regarding this course of conduct and have submitted additional information in support of that complaint on several occasions from October 2016 to October 2017.

The instant Complaint also details specific instances of discrimination and retaliation experienced by Plaintiffs Michael Anis, Michael Brown, Thomas Boone, Danita Ingram, Paul

Mack, Joseph Perez, Tasha Oatis, Clarence Rucker, Chris Smith, Richard Torres, Thomas Wall, and Sonya Zollicoffer (collectively, the "Individual Plaintiffs"), all of whom are officers of color who currently serve or at one time served in the PGCPD. Brown, Boone, Ingram, Mack, Oatis, Rucker, Smith, Wall, and Zollicoffer identify as African American; Perez and Torres identify as Hispanic and Latino respectively; and Anis is of Middle Eastern descent.

Although the Complaint contains a variety of distinct allegations of discrimination and retaliation, it asserts just three counts: (I) discrimination on the basis of race and color, in violation of the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; (II) retaliation in violation of the First Amendment, also pursuant to § 1983; and (III) discrimination on the basis of disability, in violation of the Rehabilitation Act, brought by Zollicoffer only. In their Motion, Defendants seek dismissal of only parts of Counts I and II. Notably, Defendants do not challenge Plaintiffs' claim of a custom or policy of discrimination and retaliation against the County pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978); the claim of race discrimination based on a hostile work environment; or many of the individual claims of discrimination or retaliation asserted by Individual Plaintiffs. Accordingly, the Court will describe, as set forth within the analysis below, only those specific allegations relevant to resolving Defendants' Motion.

Since the filing of the Motion, the Court has granted Plaintiffs leave to file an Amended Complaint, which adds three additional plaintiffs and several additional causes of action. Because the Amended Complaint does not alter any of the original allegations, by agreement of the parties, the Court will resolve the First Motion to Dismiss without addressing the new allegations in the Amended Complaint.

## DISCUSSION

In their Motion, Defendants assert that: (1) all claims by Plaintiffs HNLEA and UBPOA should be dismissed because these organizations lack associational standing to seek certain forms of relief on behalf of their members and do not have standing in their own right under the doctrine of organizational standing; and (2) all claims against Murtha should be dismissed for failure to state a claim because the Complaint fails to allege personal involvement or supervisory liability as required under 42 U.S.C. § 1983. Although Plaintiffs have not explicitly enumerated separate claims on these issues, Defendants also argue for dismissal for failure to state a claim of certain specific individual claims of discrimination or retaliation brought by Individual Plaintiffs based on the statute of limitations or the lack of sufficient allegations to state a plausible claim for relief. Finally, Defendants contend that Plaintiffs' official capacity claims against the Individual Defendants should be dismissed as duplicative of their claims against Prince George's County.

## I.    Legal Standards

Defendants move to dismiss Plaintiffs HNLEA and UBPOA for lack of standing pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because standing is required to establish subject matter jurisdiction. The plaintiff has the burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal when it believes that the plaintiff has failed to make that showing. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter

jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192. The court should grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

Defendants' other arguments for dismissal are governed by Rule 12(b)(6) of the Federal Rules of Civil Procedure. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II. Standing

Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. To invoke this power, a litigant must have standing. *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013). A plaintiff establishes standing by demonstrating (1) a "concrete and particularized" injury that is "actual or imminent"; (2) "fairly traceable to the challenged conduct"; and (3) "likely to be redressed by a favorable

6

judicial decision." *Id.*; *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007). Standing must be established for each claim. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The presence of one plaintiff with standing renders a claim justiciable. *Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014).

As a threshold matter, Defendants concede that all of the Individual Plaintiffs have standing to seek the declaratory and injunctive relief requested in the Complaint. However, they argue that the Court should dismiss HNLEA and UBPOA "because they would be entitled to no greater declaratory or injunctive relief than the Individual Plaintiffs." Mot. Dismiss at 12-13, ECF No. 30-1. This argument misinterprets the purpose underlying the constitutional standing requirement: to ensure that at least one party has such a "personal stake in the outcome of the controversy as to . . . justify the exercise of the court's remedial powers on [their] behalf. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (alteration in original). Accordingly, a finding that one party has standing to assert a claim allows the court to forgo further inquiry into the standing of the other plaintiffs that assert the same claim, but it does not mandate dismissal of those other plaintiffs from the case. *See, e.g., Horne v. Flores*, 557 U.S. 433, 446-47 (2009) (holding that where the superintendent of a school district had standing to challenge court decisions, there was no need to consider whether legislators also had standing to do so); *Bostic*, 760 F.3d at 371 (finding that where one couple had standing to challenge a marriage license renewal, the court was not required to determine whether another couple had standing for the same claim).

In line with this reasoning, Plaintiffs argue that because Defendants concede that the Individual Plaintiffs have standing to pursue all claims asserted in the Complaint, the Court need not reach the question of the standing of HNLEA and UBPOA. However, the United States

Supreme Court has held that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Town of Chester*, 137 S. Ct. at 1650, and Plaintiffs' Prayer for Relief, at least in some respects, appears to seek broader declaratory and injunctive relief on behalf of HNLEA and UBPOA than that available to the Individual Plaintiffs. Indeed, Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss ("Opposition") clarifies this point, acknowledging that because both HNLEA and UBPOA have non-plaintiff members who have experienced adverse actions resulting from PGCPD's custom and policy of discrimination and retaliation, "HNLEA and UBPOA *are* entitled to broader declaratory and injunctive relief than the Individual Plaintiffs." Opp'n at 14, ECF No. 31. Thus, to the extent that HNLEA and UBPOA seek certain forms of relief distinct from or beyond that requested by the Individual Plaintiffs, their standing must be assessed.

HNLEA and UBPOA assert organizational standing in their own right and associational on behalf of their members. The Court addresses associational standing first because if HNLEA and UBPOA can establish associational standing, the Court need not address whether they also have standing to sue for injuries inflicted directly to their organizational interests. *See Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991) (holding that, as a constitutional matter, there are two distinct theories by which an association can allege standing: "in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy" or "as the representative of its members who have been harmed"); *cf. Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 29 n.2 (D.C. Cir. 1990) ("Because we conclude that the organizations have standing on their own behalf, we do not need to decide whether individual plaintiff Spann or organizations as representatives of their members possess standing."). Moreover, if HNLEA and UBPOA can assert standing on behalf of their

members, they do not need satisfy the third-party standing exception to the prudential rule against asserting the rights of others, which Defendants argue they cannot meet. *See A Helping Hand v. Baltimore Cty.*, 515 F.3d 356, 363 n.3 (4th Cir. 2008) (distinguishing between the third-party standing doctrine and the associational standing doctrine and noting that both allow a plaintiff to "bring suit based not on injury to itself but on injury to another"); *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 392 (D. Md. 2018) (holding that the third-party standing inquiry was not required where the plaintiff had established standing to sue on behalf of its members); *cf. Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004) (in the absence of associational standing, requiring plaintiffs to demonstrate both a close relationship with the parties whose rights they sought to assert and the inability of those individuals to protect their own interests).

To establish associational standing, an organization must demonstrate that (1) its members would have standing to sue in their own right; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992) (stating that a single member with standing in his or her own right is sufficient to establish that an organization has standing). The first two requirements are mandated by Article III, while the third is prudential in nature and serves to promote "administrative convenience and efficiency," such as by "guard[ing] against the hazard of litigating a case to the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556-57 (1996).

Here, Defendants concede that HNLEA and UBPOA have alleged sufficient facts to meet the first two associational standing requirements mandated by Article III, but they argue that the participation of individual members of both organizations is required for certain forms of individualized relief requested in the Complaint, specifically damages, reinstatement, and expungement of disciplinary records for HNLEA and UBPOA members who are not parties to the lawsuit. Although "a suit for money damages . . . would require examination of each member's unique injury," *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007), Plaintiffs have clarified both in their Opposition and at the hearing that HNLEA and UBPOA are not seeking damages in their own right or on behalf of their members who are not parties to the case. For this reason, Defendants' reliance on *Equal Rights Center v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510 (D. Md. 2010), for the principle that HNLEA and UBPOA lack standing to seek certain forms of injunctive relief is misplaced, as there the court distinguished between associational standing to assert a claim for damages, which it did not find, and associational standing to seek injunctive relief, which it did find as to claims of disability discrimination by stores that were visited but could not be properly accessed by one or more members of the association. *See id.* at 525, 527-529. Thus, the question before the Court is whether HNLEA and UBPOA have standing to seek specific forms of injunctive relief, not whether they have standing to seek damages. *See Town of Chester*, 137 S. Ct. at 1650.

In the context of suits seeking injunctive relief, courts have employed a flexible approach to the third *Hunt* element, finding associational standing when the organization can satisfy the functional concerns that might point to a need for individual participation. *See* 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.9.5 (3d ed. 1998). The United States Courts of Appeals for the Third, Fifth, and Seventh Circuits have interpreted

*Hunt*'s third prong as precluding associational standing only when the participation of *every* member of the organization is necessary to the proper resolution of the case, noting that the participation of some members of the organization is permissible and almost always necessary. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552-53 (5th Cir. 2010) (holding that where proof of "misdeeds could establish a pattern" with "evidence from a small but significant sample of [association members]," a constitutional violation could be established and equitable relief granted); *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 601-02 (7th Cir. 1993) (finding "no indication" from any of the Supreme Court cases to address associational standing that the Court "intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association"); *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89-90 (3d Cir. 1991) (holding that "an association may assert a claim that requires participation by *some* members"); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975) (holding that "so long as the nature of the claim and relief sought does not make the individual participation of *each* injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction") (emphasis added). Here, based on the pleadings, it appears that Plaintiffs' claims, including that there is a custom and policy of discrimination and retaliation at PGCPD, and their requested declaratory and injunctive relief, can be established without evidence from all members of the Plaintiff associations with valid claims.

Moreover, courts have also determined that when there is no immediately apparent need to have individual members participate in the lawsuit at the pleading stage, an associational plaintiff can remain in the case unless and until, at a later stage, individualized participation

11

reveals itself to be necessary. *See, e.g., Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 662-63 (4th Cir. 1989), *aff'd* 496 U.S. 498, 504 n.4 (1990); *Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 282-87 (3d Cir. 2002). For instance, in *Virginia Hospital Association*, the plaintiff Virginia Hospital Association ("VHA") claimed associational standing on behalf of its member hospitals to challenge the Commonwealth of Virginia's procedures for reimbursing hospitals for the cost of treating Medicaid patients. 868 F.2d at 656, 662. Virginia argued that the court would have to examine data and make findings for each VHA member hospital in order to resolve VHA's claims, and if appropriate, grant the requested relief, but VHA claimed to be challenging factors common to all of the hospitals which would be remedied by an amended state Medicaid reimbursement plan. *Id.* at 663. The United States Court of Appeals for the Fourth Circuit credited VHA's assertion, noted that the pleadings did not establish that an order in favor of VHA would necessarily require findings specific to its individual members, and concluded that any challenge to VHA's associational standing was at best, premature. *Id.*

The injunctive relief requested here by HNLEA and UBPOA is analogous to that requested by VHA. Plaintiffs request a permanent injunction ordering Prince George's County to abolish discrimination on the basis of race within and among the PGCPD through the implementation of policy changes and a plan to review allegedly discriminatory terminations and disciplinary proceedings and reinstate wrongfully terminated officers or otherwise remedy those prior acts of discrimination and retaliation. Although if this relief were granted, at some point PGCPD would have to engage in individualized inquiries to determine which officers of color deserve reinstatement or expungement of their disciplinary records, granting the relief itself— that is, a court order that PGCPD must remedy any prior discriminatory termination and disciplinary decisions—can be accomplished upon consideration of evidence from only certain

individual members of HNLEA and UBPOA in order to assess whether there is a custom and practice of discrimination and retaliation at PGCPD under *Monell*, and whether such custom and practice caused the harms cited in the Complaint. *See Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987) (holding that to prove a *Monell* claim, a plaintiff must "(1) identify[] the specific 'policy' or 'custom'; (2) fairly attribute[e] the policy and fault for its creation to the municipality; and (3) find[] the necessary "affirmative link" between identified policy or custom and specific violation").

Although Defendants argue that, as a general principle, *Monell* claims require individualized proof, they have not identified legal authority or a factual basis to support the assertion that every member of HNLEA and UBPOA would have to participate in this lawsuit in order to prove that the disciplinary processes, bureau and division assignments, and promotion decisions of the PGCPD are part of a custom and practice of race discrimination and retaliation that causes officers of color to experience the adverse actions cited in the Complaint. Indeed, the United States Court of Appeals for the Sixth Circuit explicitly rejected this notion in *Neighborhood Action Coalition v. City of Canton*, 882 F.2d 1012 (6th Cir. 1989), holding that the organizational plaintiff had associational standing for its *Monell* claim to the extent it sought injunctive relief, because "any injunctive relief granted would inure to the benefit of all members of the association actually injured." *Id.* at 1016-17. In *Neighborhood Action Coalition*, as here, the injunctive relief requested was not simply invalidating a law or executive order, but the entry of a court order prohibiting the municipality from providing services in a racially discriminatory manner and requiring the municipality to provide police protection to members of the association living in Canton's northeast region equivalent to the protection it provided to residents of other Canton neighborhoods. *Id.* at 1014. The court did not find it necessary, in assessing a motion to

dismiss, to delve into the minute details of the relief requested and determine exactly what sort of future individualized inquiries might be required to determine the equivalence between police protection provided to certain association members and other residents after the court ordered such relief. *Neighborhood Action Coal.*, 882 F.2d at 1017.

Nor is such a nuanced inquiry required here, where sample testimony from members of HNLEA and UBPOA may be sufficient to prove the right of the members of the Organizational Plaintiffs to the relief requested in the Complaint. *See Penn. Psychiatric Soc'y*, 280 F.3d at 286 (finding that, for purposes of associational standing at the pleading stage, a challenge to "systemic policy violations" could be supported by "sample testimony"). Where, at this stage of the case, the Court concludes that the injunctive relief requested by HNLEA and UBPOA does not necessarily require the participation of all their respective members who are not parties to the case, the Court finds that all three prongs of the *Hunt* test for associational standing have been satisfied and that HNLEA and UBPOA may assert the constitutional rights of their members. Accordingly, the Court need not assess HNLEA and UBPOA's organizational standing to seek relief in their own right. *See Md. Highways*, 933 F.2d at 1250; *Spann*, 899 F.2d at 29 n.2.

## III. Supervisor Liability

Defendants next argue that all claims against Defendant Murtha must be dismissed because Plaintiffs have failed to allege that Murtha acted personally in the deprivation of Plaintiffs' rights. A state official may not be held liable under 42 U.S.C. § 1983 unless it is "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th. Cir. 1977); *see also Monell*, 436 U.S. at 690-92. There is no vicarious liability pursuant to the doctrine of *respondeat superior* in § 1983 cases against government officials for the acts of their subordinates. *Wright v. Collins*,

766 F.2d 841, 850 (4th Cir. 1985); *Vinnedge*, 550 F.2d at 928. In order for a supervising official to be held liable under § 1983, a plaintiff must establish that: (1) the supervisor knew that the subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) the supervisor's "response showed deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there was "an affirmative causal link" between the supervisor's "inaction and the constitutional injury." *King v. Rubenstein*, 825 F.3d 206, 224 (4th Cir. 2016) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions, and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).

Here, Plaintiffs assert that they have alleged sufficient facts to state a claim of direct liability by Murtha for discrimination and retaliation or, alternatively, to establish supervisory liability against Murtha. The Complaint generally alleges that Murtha "knew or should have known of the discriminatory customs, practices, and wrongful acts" of Defendants and that "he condoned, ratified, authorized and/or engaged in such conduct." Compl. ¶ 48. The Complaint also generally references Murtha as one of several PGCPD officials who have assisted Chief Stawinski in overseeing "an outrageous pattern of retaliation" against officers of color, including "the institution of investigative proceedings against complaining officers, imposition of transfers to unfavorable assignments, denial of promotions and favorable transfers, and other adverse changes in work conditions," and having "caused the Department to engage in a pervasive pattern of discriminatory discipline." Compl. ¶ 4. However, the Complaint is virtually devoid of

allegations describing acts or omissions by Murtha. The only specific fact offered as to Murtha in support of these conclusory allegations is the assertion that he served as Deputy Chief in charge of the Bureau of Patrol ("Patrol") since February 2016, and that in that role, he "evaluates every investigation and disciplinary proceeding involving the Patrol." Compl. ¶ 48. There are no allegations that Murtha personally reviewed or was aware of any of the specific investigations or disciplinary proceedings relating to the Individual Plaintiffs that are described elsewhere in the Complaint.

Although Plaintiffs have asserted that the general allegations about Murtha's role support the inference that he participated in or was at least aware of the investigations and disciplinary proceedings involving specific instances of discrimination or retaliation, the Complaint does not describe any particular investigations or disciplinary proceedings relating to officers while they were in Patrol, which would then have necessarily been overseen by Murtha. The Complaint does allege that, as a result of discrimination or retaliation, several of the Individual Plaintiffs were transferred *into* Patrol against their will during Murtha's tenure, including Plaintiffs Torres, Boone, Zollicoffer, and Smith. For example, Torres was transferred out of Investigations into Patrol immediately following a disciplinary investigation initiated by his former supervisor in Investigations who, according to Torres, had used racial slurs to describe African American civilians. Likewise, after Smith complained about racially derogatory comments while on the Special Assignments Team, he was transferred to Patrol in March 2017 as a form of retaliation. But these allegations identify officials other than Murtha, from outside Patrol, as having participated in those decisions, and there are no allegations describing what role, if any, the leadership of Patrol in general, or Murtha in particular, played in approving the transfer of an officer into Patrol or assessing the history and circumstances that led to that transfer.

Although Plaintiffs offer additional facts relating to Murtha in their Opposition, on a motion to dismiss, the Court may not consider facts offered in a brief but not contained in the Complaint. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) ("[The plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). Moreover, the proffered facts describe alleged misconduct by Murtha relating to the falsification of time sheets in favor of a white officer and efforts to thwart an internal investigation into the misconduct, but they do not allege that Murtha engaged in discrimination against officers of color or misconduct or retaliation against officers for complaining of discrimination. Rather, they identify Chief Stawinski, not Murtha, as the PGCPD official who was made aware of a complaint to be filed by Plaintiff Perez before Perez was transferred out of Internal Affairs.

Thus, even construed in the light most favorable to Plaintiffs, the Complaint contains only general allegations that Murtha was involved in a broad custom and policy of discrimination and retaliation without any example of his direct involvement in any particular act of discrimination or retaliation, or his awareness as a supervisor and failure to address any such acts occurring in Patrol. Under these circumstances, the Complaint fails to state a claim for relief against Murtha. *See, e.g., Staten v. Batts*, No. CCB-15-599, 2015 WL 4984858, at *3 (D. Md. Aug. 17, 2015) (granting a motion to dismiss where the incarcerated *pro se* plaintiff's only allegation of supervisory liability was that "[n]othing done in reference to the Baltimore City Police Department is done without approval by Commissioner Batts"); *Coleman v. Comm'r of Div. of Corr.*, No. ELH-13-474, 2014 WL 2547787, at *4 (D. Md. June 4, 2014) (granting summary judgment to defendants because the plaintiff had not introduced any facts beyond conclusory statements in the pleadings to support supervisory liability, but noting that summary

17

judgment would be entered anyway on the merits); *Chen v. Baker*, No. PWG-13-2564, 2014 WL 6835732, at *6 (D. Md. Dec. 2, 2014) (granting a motion to dismiss on a claim of supervisory liability because the plaintiff had not pleaded any facts to allow the court to draw a reasonable inference that the defendant was involved in administering the plaintiff's medication).[1]

In so ruling, the Court does not find that Murtha, based on his role at PGCPD, is not an appropriate subject for discovery. Rather, the allegations in the Complaint make clear that discovery may appropriately address his acts or omissions relating to alleged discrimination and retaliation. If, during discovery, Plaintiffs obtain additional facts that would support a claim against Murtha in his individual capacity, the Court will consider granting leave to file an Amended Complaint to add such a claim.

## IV. Statute of Limitations

Defendants argue that the Court should dismiss certain claims as time-barred, specifically, Anis's claim that he was subjected to disparate treatment when he was unable to attend classes at Investigator School, to which he was accepted in 2014, and Rucker's claim that he was subjected to a discriminatory suspension in October 2015. Section 1983 does not contain its own statute of limitations, so courts must import the statute of limitations from the most analogous state law cause of action. *Owens v. Baltimore City State's Atty's Off.*, 767 F.3d 379, 388 (4th Cir. 2014). All of the events in this case occurred in Maryland. Consequently, Maryland's three-year statute of limitations for civil actions, Md. Code Ann., Cts. & Jud. Proc.

---

[1] The Court does not rely on *Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012), cited by Defendants in their brief and at the hearing, because the language for which it was cited was from a concurring opinion, not the majority opinion. *See Evans v. Chalmers*, 703 F.3d 636, 661-62 (4th Cir. 2012) (Wilkinson, J., concurring). The Court cautions Defendants that failing to identify that distinction to the Court is misleading and, if intentional, a basis for sanctions.

§ 5–101 (West 2013), applies to these claims. *Owens*, 767 F.3d at 388. Although state law provides the limitations period for such claims, federal law controls when those claims accrue. *Nasim v. Warden, Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995). Under federal law, a "cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice—e.g., by the knowledge of the fact of injury and who caused it—to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Id.*

Ordinarily, "a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Thus, a motion to dismissed filed pursuant to Federal Rule of Civil Procedure 12(b)(6) may challenge a claim as time-barred only in the "relatively rare circumstances" where "all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).

### A.    Corporal Anis

Corporal Michael Anis has asserted that after he was accepted into Investigator School in 2014, he was not allowed to attend because he was then assigned to the midnight shift. He claims that his inability to attend was discriminatory because white officers were not subject to the same restriction, including Jessica Johnson, who was allowed to attend Investigator School five months after Anis was barred from attending even though she was working on the midnight shift. Defendants assert that this discrimination claim is time-barred because the Complaint was not filed until December 12, 2018, more than three years after the end of 2014. However, although the Complaint states that Anis was accepted into Investigator School in 2014, it does

not state when that program was supposed to begin or when he was informed he would not be allowed to attend. Moreover, it does not establish when Anis became aware that Johnson, who did not attend Investigator School until five months after Anis was barred, had received more favorable treatment on this issue and thus when Anis had an actionable disparate treatment claim. *See Nasim,* 64 F.3d at 955. It may prove to be the case that Anis's claim accrued more than three years before the filing of the Complaint, but where the face of the Complaint does not provide the operative date that Anis's discrimination claim relating to Investigator School accrued, Defendants' argument that it is time-barred is premature. The Motion will be denied as to this issue. *See Goodman,* 494 F.3d at 464.

### B.    Officer Rucker

Officer Clarence Rucker has alleged claims of discrimination and retaliation related to his suspension, which followed an Internal Affairs investigation in December 2014.    The investigation revealed that Rucker had a pre-existing relationship with a woman who was involved in a case he was investigating and that in a different case, a woman attempted to initiate a relationship with Rucker, which he declined because of his involvement in her case. According to Rucker, his conduct was not improper and neither woman ever complained to the PGCPD.    Nevertheless, he was suspended in October 2015, ordered to sign a confidentiality agreement, and threatened with insubordination and possible termination if he released any information about the investigation.

Defendants argue that Rucker's discrimination and retaliation claims based on the October 2015 suspension are time-barred because even the last day of October 2015 occurred more than three years before the filing of the Complaint on December 12, 2018.  Because the suspension was imposed in October 2015, the decision to impose the suspension occurred more

than three years before the filing of the Complaint and is thus time-barred. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (holding that discrimination claims based on certain acts were time-barred because "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" and thus "each incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice'").

However, at the hearing, Plaintiffs noted that even if Rucker's claim for discriminatory or retaliatory suspension is time-barred, he asserts other actionable claims within the statute of limitations. First, they argue that Rucker's suspension was unnecessarily prolonged, for over two years before he accepted a job at the Capitol Heights Police Department in November 2017, and that he was not allowed to apply for or test for promotions, while white officers under suspension were permitted to do so. Second, Plaintiffs argue that once Rucker left PGCPD, unlike similarly situated white officers, he was "red-flagged" by the PGCPD in December 2017, which caused him to be confined to desk duty at the Capitol Heights Police Department. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (stating that blacklisting a former employee can constitute an adverse employment action). To the extent that Rucker's claim is based on disparate treatment in not being permitted to test for promotion while on suspension, or in being red-flagged with other employers, such claims are not time-barred based on the allegations on the face of the Complaint. Accordingly, although the Court will grant Defendants' Motion to Dismiss as it relates to the discrete act of Rucker's October 2015 suspension, the Motion will be denied as to these other two aspects of his claim. The Court also notes that the facts surrounding Rucker's 2015 suspension remain relevant for purposes of proving Rucker's other claims that are not time-barred.

## V.    Retaliation

Defendants seek dismissal of certain retaliation claims alleged by Plaintiffs Boone, Ingram, Wall, Anis, Brown, and Oatis for failure to state a claim upon which relief may be granted. To state a claim for retaliation under the First Amendment, a plaintiff must allege: (1) "that [the] speech is protected"; (2) "that the defendant's alleged retaliatory conduct adversely affected the plaintiff's constitutionally protected speech"; and (3) "a causal relationship between [the] speech and the defendant's retaliatory action." *Blankenship v. Manchin*, 471 F.3d 523, 528 (4th Cir. 2006). In the context of a claim by a public employee against a public employer, the requirement of protected speech is met if the plaintiff was speaking as a citizen on a matter of public concern rather than as an employee on a matter of personal interest, and if the employee's interest in speaking on that matter outweighed the government's interest in providing effective and efficient services to the public. *See Ridpath v. Bd. of Governors*, 447 F.3d 292, 316 (4th Cir. 2006); *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998). Even if a public employee's speech relates to the employee's job or communicates information learned on the job, the speech is still protected under the First Amendment when it is made outside the scope of the employee's duties. *See Lane v. Anderson*, 660 F. App'x 185, 191 (4th Cir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), and *Hunter v. Town of Mocksville*, 789 F.3d 389, 396-97 (4th Cir. 2015)). In the Motion, Defendants do not contest the protected nature of any of the Plaintiffs' speech.

On the second prong, whether the retaliatory conduct adversely affected the speech, the "nature of the retaliatory acts committed by a public employer" must "be more than *de minimis* or trivial." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). To state a claim for First Amendment retaliation, a plaintiff must allege facts supporting the conclusion that "the

defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Although such actions can include decisions relating to promotion, transfer, recall, and hiring, they do not necessarily include mere criticism, false accusations, or verbal reprimands. *Suarez*, 202 F.3d at 686.

Importantly, this inquiry does not specifically require that the adverse action taken against the employee be an "adverse employment action," as previously required and defined by the Fourth Circuit for a retaliation claim under Title VII of the Civil Rights Act of 1964 before the United States Supreme Court's ruling in *Burlington Northern & Santa Fe Railway*, 548 U.S. 53, 68 (2006). *Compare Boone v. Goldin*, 178 F.3d 252, 256-57 (4th Cir. 1999) (holding that for a retaliation claim to be actionable under Title VII, the employee must allege a "decrease in compensation, job title, level of responsibility, or opportunity for promotion") *with Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (holding that to constitute retaliatory action for purposes of a Title VII claim, the employer's action must be materially adverse in that it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination"). Recently, the Fourth Circuit has noted that "[t]he standard for proving a materially adverse action in the Title VII retaliation context . . . is similar to the standard for demonstrating an adverse action in the First Amendment retaliation context." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 n.12 (4th Cir. 2018) (comparing the standards set forth in *Burlington Northern* and *Constantine*). In some circumstances, certain forms of speech can constitute a materially adverse action for purposes of a First Amendment retaliation claim where a government official's speech is "threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow" or where that official

makes retaliatory statements that are damaging based on their likelihood of causing embarrassment, humiliation, or emotional distress. *Suarez*, 202 F.3d at 688-89; *see also Blankenship*, 471 F.3d at 528.

The third prong, in the context of a retaliation claim by a public employee against a public employer, requires that the protected speech be "a substantial factor in the decision to take the allegedly retaliatory action" and that it was a "but for" cause of the adverse action. *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004) (citation omitted); *Ridpath*, 447 F.3d at 318. The causation prong involves questions of fact that generally should be resolved on summary judgment and "only in those instances when there are no causal facts in dispute." *Love-Lane*, 355 F.3d at 776; *see Tobey v. Jones*, 706 F.3d 379, 390-91 (4th Cir. 2013) (holding that courts can infer causation at the motion to dismiss stage from the facts alleged in the complaint); *Ridpath*, 447 F.3d at 318-19 (holding that a complaint that simply alleged that the employer's conduct was in retaliation for protected speech sufficiently stated a causal connection for purposes of a motion to dismiss).

## A.    Sergeant Boone

Sergeant Thomas Boone, the President of UBPOA, has alleged claims of a hostile work environment, disparate discipline, discriminatory non-promotion, and retaliation. Boone asserts that after he submitted a complaint to DOJ in March 2016, he suffered retaliation, including unfair transfers, unequal discipline, and unfair hiring practices, up to and including his transfer to Patrol in October 2018. Defendants argue that Boone has failed to state a claim of retaliation based on the inappropriate inclusion in his annual performance review of a performance assessment form which apparently resulted in lower ratings. Although Defendants argue that a lower performance evaluation is insufficient to constitute a materially adverse action to support a

retaliation claim because Boone did not allege that the evaluation affected "his pay, benefits, terms of employment, or employment status," Mot. Dismiss at 15, this argument fails because it misconstrues the standard for a retaliatory action, which requires only that the action "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500; *Feminist Majority Found.*, 911 F.3d at 697 n.12. In any event, Plaintiffs have clarified that the focus of Boone's retaliation claim is that that he faced a broad course of retaliatory conduct, including the performance evaluations, which culminated in his transfer to Patrol, which is viewed as a demotion within the PGCPD in part because it offers fewer opportunities for overtime and call-back pay. Particularly where transfer to the Patrol Bureau can have adverse financial consequences, such an action is more than "*de minimis* or trivial." *Suarez*, 202 F.3d at 686 (stating that transfer can be a materially adverse action underlying a First Amendment retaliation claim). Indeed, Plaintiffs have even alleged that Boone was told that Chief Stawinski decided to transfer him because he had filed too many complaints. Accordingly, the Motion will be denied as to Boone's First Amendment retaliation claim.

### B. Corporal Ingram

Corporal Danita Ingram has alleged discrimination and retaliation in the form of disparate discipline that has prevented her from receiving a promotion. As relevant here, Ingram alleges that in February 2017, while she was attending court while undercover for the Narcotics Enforcement Division, Officer Michael Rushlow, a uniformed PGCPD officer who is white, demanded that she give up her seat to him and, when she declined, verbally harassed her. After Ingram filed an internal complaint about the incident, Rushlow, encouraged by other white officers, filed a baseless counter-complaint against Ingram, and Major Mills ordered that charges

be filed against Ingram. While the case was under investigation, Ingram was ineligible for a promotion, and at some point, Ingram was also transferred in retaliation for her complaint.

As with Boone, Defendants seek to isolate one aspect of Ingram's retaliation claim from her allegations of a course of retaliatory conduct by the PGCPD. Defendants do not dispute that Ingram has stated a retaliation claim based on her allegations of a baseless counter-complaint which rendered her ineligible for promotion for over a year and unsupported charges against her ordered by Defendant Mills. Unsubstantiated disciplinary proceedings, especially when coupled with concrete consequences such as ineligibility for promotions, constitute actions that would "likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500; *see Kirby v. City of Elizabeth City, N. Carolina*, 388 F.3d 440, 450 & n.8 (4th Cir. 2004) (holding that even a minor oral reprimand, under certain circumstances, is sufficiently adverse for purposes of a First Amendment retaliation claim if it chills speech); *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003) (stating that "instigating unwarranted criminal investigations or disciplinary actions" is sufficiently severe for purposes of a First Amendment retaliation claim). Rather, Defendants argue that Ingram has failed to state a claim for retaliation because she has failed to allege details to show that her transfer was sufficiently adverse or that there was a causal connection between her protected speech and the transfer. Although Defendants are correct that the Complaint contains almost no allegations detailing the nature of Ingram's transfer, the transfer must be viewed in the context of the broader allegations. Where Plaintiffs have alleged sufficient facts to show that Ingram was subjected to retaliation for complaining about a white officer in the form of a baseless counter-complaint and false charges, it is reasonable to infer that her involuntary transfer in the same time frame was also retaliatory. *See Suarez*, 202 F.3d at 686 (noting that a transfer can be a

sufficiently adverse action to support a First Amendment retaliation claim). The Motion will be denied as to Ingram's retaliation claim.

### C.    Officer Wall

Officer Thomas Wall has asserted a claim of retaliation based on a 2015 incident in which he confronted a fellow officer about his rough handling of a female citizen. During the confrontation, the other officer asked Wall what he would do if he put his hands on Wall, and Wall responded by saying that he would "Fxxx him up." Compl. ¶ 153. Within weeks, he was "written up" and transferred to another district, while the other officer was not cited. *Id.* In arguing that the adverse actions, a written reprimand and transfer without any stated impact on pay, title, or benefits, cannot form the basis of a retaliation claim, Defendants seek to apply the wrong legal standard to a retaliation claim by citing case law involving a discrimination claim. *See Bowen v. Maryland*, No. RDB-17-1571, 2018 WL 1784463, at *7-8 (D. Md. Apr. 12, 2018). Both a written reprimand and a transfer are the types of adverse actions that would "likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500; *see Kirby*, 388 F.3d at 450 & n.8 (reprimand); *Suarez*, 202 F.3d at 686 (transfer). Moreover, as alleged in the Complaint, the written reprimand and transfer cannot fairly be separated and, because both occurred following the same incident, are appropriately viewed as reinforcing the inferences that both were materially adverse actions that would deter the exercise of First Amendment rights. The Motion will be denied as to Wall's retaliation claim.

### D.    Corporal Smith

Corporal Chris Smith has alleged discrimination in the form of a hostile work environment as well as retaliation for complaining about racially derogatory statements made by fellow officers while he was the only African American officer assigned to the Special Assignments Team. Specifically, Smith alleged that his involuntary transfer to Patrol and

subsequent denials of requests to be transferred out of Patrol were retaliatory. Defendants argue that Smith has failed to state a causal connection between his protected speech and these transfer decisions. As discussed above, issues of causation are fact-based and not typically resolved at this early stage of the case. *See Love-Lane*, 355 F.3d at 776. Considering the allegations in the Complaint as a whole, including allegations of retaliatory transfers against other officers under similar circumstances, the Court finds that Smith's allegations are sufficient to state a retaliation claim. This conclusion is bolstered by Smith's allegations that his prior transfer requests, presumably to more favorable units, had been repeatedly denied, and that his supervisors would not meet with him and ignored his attempts to file an EEO complaint regarding the matter. The Motion will be denied as to Smith's retaliation claim.

### E.    Anis, Brown, and Oatis

The Complaint contains sections providing allegations of specific instances of discrimination, but not retaliation, against Corporal Michael Anis, Corporal Michael Brown, and Officer Tasha Oatis. Specifically, Anis has alleged that he applied for and was denied promotions to specialty units for which he was qualified on 13 separate occasions; Brown has alleged that he was wrongfully terminated after a Trial Board found him guilty of conduct unbecoming an officer based on an incident involving a civilian who falsely accused Brown of assault; and Oatis has alleged that she was terminated for failing to take leave while traveling to her part-time security job at the end of her shifts even though Major Mills confirmed that was the generally accepted practice in the unit and a white officer who engaged in the same practice was not terminated. Brown and Oatis have also both asserted that they were red-flagged or otherwise stymied by the PGCPD in their attempts to obtain other police officer positions after being terminated from the PGCPD. Because the Complaint generally alleges that all Plaintiffs are

asserting claims of retaliation, Compl. at 60, Defendants argue that Anis, Brown, and Oatis have failed to state individual claims for retaliation. The Court agrees. The Complaint does not explicitly claim that the facts relating to these Plaintiffs amount to retaliation. More specifically, the Complaint is devoid of any allegations of protected speech by any of these Plaintiffs. Although in their Opposition, Plaintiffs state that Brown and Oatis engaged in protected speech by signing the 2016 DOJ complaint relating to discrimination and retaliation by PGCPD against officers of color, that fact appears nowhere in the Complaint and cannot be considered. *See Zachair*, 965 F. Supp. at 748 n.4. Even if that proffered fact could be considered, the Complaint does not provide any allegations linking any adverse actions against Brown or Oatis to the filing of the DOJ complaint.

Although the Complaint alleges that Anis was denied promotional transfers after the DOJ complaint was filed, Plaintiffs do not allege that Anis signed that complaint or otherwise made a complaint of discrimination, formal or informal, that resulted in the denials of his transfer requests. Where the Complaint as presently drafted lacks allegations of protected speech by these Plaintiffs, the Court will grant the Motion as to their retaliation claims and dismiss those claims without prejudice.

## VI. Discrimination

Defendants also seek dismissal of certain Individual Plaintiffs' discrimination claims for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). Fourteenth Amendment employment discrimination claims brought pursuant to § 1983 are evaluated under Title VII standards. *See Love-Lane*, 355 F.3d 766 at 786. To establish a *prima facie* case of race, color, or national origin discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class;

(2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., Inc.*, 375 F.3d 288, 295 (4th Cir. 2004). Under the third prong, an adverse employment action is "a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Washington Homes*, 487 F.3d 208, 219 (4th Cir. 2007) (internal citations omitted). It may consist of discharge, demotion, a decrease in pay or benefits, a loss of job title or supervisory responsibility, reduced opportunities for promotion, or a reassignment resulting in one or more these consequences. *See Boone*, 178 F.3d at 255-57 (allowing for the possibility that a reassignment to a significantly more stressful position could constitute an adverse employment action). For those Plaintiffs alleging claims of discriminatory non-promotion, the elements are altered slightly, and each Plaintiff must allege: (1) membership in a protected class; (2) that the Plaintiff applied for the position in question; (3) that the Plaintiff was qualified for the position; and (4) that the Plaintiff was rejected for the position "under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Courts typically find "circumstances giving rise to an inference of discrimination" if the plaintiff can show that the position remained open or was filled by a similarly qualified applicant outside the protected class. *See Page v. Bolger*, 645 F.2d 227, 229-30 (4th Cir. 1981). Although it is not strictly necessary for a plaintiff to establish all elements of a *prima facie* case in the complaint, a plaintiff must allege sufficient facts to support a plausible inference of discrimination and thereby raise a right to relief above the speculative level. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

## A.    Sergeant Boone

In addition to his retaliation claim, Sergeant Boone asserts a claim that he was subjected to race discrimination in the form of a hostile work environment, disparate discipline, and discriminatory non-promotion, apparently relying on the same allegations underlying his retaliation claim. *See supra* part V.A. Defendants argue that Boone has failed to state claim of discrimination based on his performance review because the results of that review, even if less favorable than expected, do not constitute an adverse employment action for purposes of discrimination. Plaintiffs do not respond to this argument, and the Court does not read the paragraph of the Complaint referencing the performance review as asserting a claim of discrimination in addition to the retaliation claim. Even if an adverse performance review can be deemed an adverse employment action, Plaintiffs have not asserted in the Complaint that he was treated unfavorably as compared to white officers in the performance review process. Accordingly, to the extent that Plaintiffs intended to assert a discrimination claim on behalf of Boone based on the performance review, it will be dismissed without prejudice, based on the allegations of the Complaint as presently drafted.

Defendants also argue that Boone has failed to state a claim for discriminatory non-promotion. Beyond the cursory statement that Brown was subjected to "discriminatory non-promotion," Compl. ¶ 108, the Complaint is devoid of any facts referencing a position to which Brown could be promoted, whether he applied for that position, and the result of his application. Defendants therefore seek dismissal of the non-promotion claim because Brown has identified no open position to which he should have been promoted; he does not allege that he was qualified for the position; and he alleges no facts to create a plausible inference of discrimination. In response, Plaintiffs point to the allegation, within the discussion of Boone's retaliation claim,

that on October 1, 2018, Major Renner informed Boone that he would be transferred, that he requested that Boone consider a transfer to the Property Division, and that although two Deputy Chiefs and Boone agreed on the transfer, Brown was instead transferred to Patrol, which was considered a demotion.

Even construed in the light most favorable to Plaintiffs, these allegations do not state a claim for discriminatory non-promotion. Although these allegations, as discussed above, support a plausible retaliation claim, *see supra* part V.A, nowhere does the Complaint state that the position in the Property Division was a promotion for Boone. The Complaint also does not state that Boone ever applied for that position, as opposed to merely agreeing that such a transfer would be appropriate, or that he sought any promotion at all. Although Boone is not required to establish all elements of a *prima facie* case in the Complaint, he must allege sufficient facts to support a plausible inference that he was not promoted because of discrimination. *See Swierkiewicz*, 534 U.S. at 510-11; *Coleman*, 626 F.3d at 190. Yet the Complaint does not even state whether the position in the Property Division was given to an officer outside the protected class. Where the Complaint as presently drafted lacks facts discussing in any way Boone's efforts to secure a promotion, much less evidence that he was denied a particular promotion for discriminatory reasons, the Court will dismiss without prejudice Boone's claim for discriminatory non-promotion for failure to state a claim.

### B.  Sergeant Mack

Sergeant Paul Mack has asserted claims of retaliation and discriminatory non-promotion to lieutenant in 2016 and 2018. Although Defendants do not seek dismissal of Mack's 2018 discriminatory non-promotion claim, for which he has identified three white officers who allegedly were less qualified and yet were promoted ahead of him, they argue that his 2016

discriminatory non-promotion claim should be dismissed because his general statement that from 2016 to 2018, he was "denied promotion in favor of White officers, even though[] he was equally as eligible for promotion" is inadequate to state a non-promotion claim. Compl. ¶ 34. At this stage of the proceedings, however, Mack is not required to identify a specific white comparator if he has alleged other circumstantial evidence of discrimination. *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003). Unlike the plaintiff in *McCleary-Evans v. Maryland Department of Transportation*, 780 F.3d 582 (4th Cir. 2015), cited by Defendants, Mack has alleged that he was not merely qualified for the promotion, but highly ranked based on his examination, and that he was equally qualified for the promotion as the white officers who received the promotion, even though he does not specifically name them. *Id.* at 583-84, 586. Moreover, the unchallenged allegations that Mack experienced identical discriminatory treatment when he applied to be a lieutenant in 2018 provides circumstance evidence in favor of a reasonable inference of similar discrimination in 2016. Finally, Mack's allegations must be viewed in the context of the broader pattern of alleged discriminatory non-promotion of officers of color described throughout the Complaint.

While Defendants may ultimately be able to show that Mack's comparators were not similarly situated, or that the supervisors who denied his request for promotion did not have discriminatory intent, these questions are inherently fact-based and should not be resolved at the pleadings stage where Mack has alleged enough facts to permit a plausible inference that his non-promotion in 2016 was the product of discrimination. *See Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (holding that "the question whether two employees are similarly situated is a question of fact for the jury"). Accordingly, the Court finds that Mack has pleaded sufficient allegations to state a claim for non-promotion in 2016.

## C.    Officer Wall

Officer Wall has alleged that the episode underlying his retaliation claim, *see supra* part V.C, also supports a claim of race discrimination.  In their Opposition, Plaintiffs have clarified that this discrimination claim is based on a theory of disparate discipline, which is supported in the Complaint by the allegation that a white comparator, Officer Tiffany Johnson, received no discipline after referring to African Americans as "nxxxxxs."  Compl. ¶ 154.  Defendants argue that Wall's disparate discipline claim should be dismissed because the write-up and transfer he received do not constitute adverse employment actions for purposes of a Fourteenth Amendment employment discrimination claim.  In discussing Wall's retaliation claim, Plaintiffs assert that the two acts cannot be considered in isolation and collectively amount to adverse action that can support a retaliation claim.  Plaintiffs make no argument that these events constitute adverse employment actions for purposes of a discrimination claim.

A written reprimand that adversely affects the terms or conditions of employment can constitute an adverse employment action.  *See Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (noting that whether a reprimand constitutes an adverse employment action is "necessarily dependent on the circumstances").  In this case, Wall's reprimand resulted in a concrete employment action:  his transfer to another district.  Thus, Wall's subsequent transfer is directly relevant to the inquiry into whether the reprimand carried adverse employment consequences.  If the reprimand resulted in a transfer to a significantly more stressful position, or was accompanied by a "decrease in compensation, level of responsibility, or opportunity for promotion," together the reprimand and transfer, or the transfer on its own, might constitute an adverse employment action.  *See Boone*, 178 F.3d at 255-57.

However, there are no allegations in the Complaint specifying if or how the transfer itself negatively impacted the terms or conditions of Wall's employment. Unlike other Plaintiffs who allege that they were transferred to Patrol, which is viewed as a demotion in the PGCPD and offers fewer opportunities for overtime and call-back pay, Wall does not specify where he was transferred and how such a transfer affected him. Accordingly, the Court concludes that as presently drafted, the Complaint fails to state a claim for disparate discipline based upon Wall's write-up and transfer. Wall's discriminatory discipline claim will be dismissed without prejudice.

### D.    Corporal Anis

Corporal Anis, who is a member of HNLEA, has alleged that on 13 occasions, he applied for promotions but was denied, including two applications to be a Hostage Negotiator, two applications to be an Instructor at the Academy, three applications to be a Detective, one application to the Special Operations Division at National Harbor, and five applications to the Marine Specialty Unit. Defendants argue that Anis has failed to allege sufficient facts to state a claim as to all of these claims of discriminatory non-promotion except Anis's claim of discriminatory non-promotion to the Special Operations Division at National Harbor.

Defendants are correct that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" and thus "each incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice.'" *See Morgan*, 536 U.S. at 114. Because Plaintiffs have clarified that they are seeking individual relief on all 13 incidents, the Court must assess each discriminatory non-promotion claim individually.

On the claim of discriminatory non-promotion to the Instructor position, Anis has alleged sufficient facts to state a *prima facie* case and support a plausible inference of discrimination so

35

as to raise his right to relief above the speculative level. *See Swierkiewicz*, 534 U.S. at 510-11; *Coleman*, 626 F.3d at 190. Anis alleges that as a man of Middle-Eastern descent, he is a member of a protected class. He also specifically states that he applied for the Instructor position and was not selected, while a white officer named Beau Jarvis who never even applied was selected instead. Although he does not specifically state that he was qualified for the Instructor position, he states that he was "on a list to be selected for that position," which permits the reasonable inference that he must have been sufficiently qualified for the position to appear on such a list. Compl. ¶ 160. These allegations suffice to state a *prima facie* case of discriminatory non-promotion to the Instructor position. *See Brown*, 159 F.3d at 902.

Anis also alleges a *prima facie* case of discriminatory non-promotion to the Marine Unit positions. He states that he has "consistently finished as a top applicant for the swim and physical tests" required for promotion to the Marine Unit yet has never been selected. Compl. ¶ 157. He also asserts that he has been significantly more experienced and qualified than the white officers selected for those positions and points to a specific white officer who was promoted to the Marine Unit despite never applying and being involved in a controversial departmental shooting. These allegations support the conclusion that he was qualified for the position but that officers outside the protected class were selected instead. Where qualifying for the Marine Unit specifically requires a strenuous swim test, interview, and completion of a rope/agility course, yet a white officer who never applied was promoted over Anis who finished these tests with top marks, Anis has alleged sufficient facts to give rise to an inference of unlawful discrimination as to his applications to the Marine Unit.

As for Anis's applications to be a Hostage Negotiator and Detective, the Complaint completely lacks any allegations stating Anis's qualifications for those positions or whether the

positions were filled by an individual outside of Anis's protected class. Although the circumstances surrounding Anis's other promotion denials may suggest that Anis is an accomplished officer who was passed over for promotions because of his race, his failure to allege any details whatsoever relating to these particular promotion denials requires dismissal of these specific claims at this time. The Court will grant the Motion as to the non-promotion claims relating to the applications to be a Hostage Negotiator and a Detective and deny it as to the other non-promotion claims. As presently drafted, the allegations relating to the non-promotion claims based on Anis's applications to be a Hostage Negotiator and a Detective, though relevant for purposes of proving Anis's other non-promotion claims, are insufficient, such that these claims will be dismissed without prejudice.

### E. Corporal Smith

Corporal Smith alleges that in November 2016, he was denied a transfer out of the Special Assignments Team after he endured racial harassment there and was instead involuntarily transferred to Patrol. He also states that he was repeatedly denied transfers to a Community Oriented Policing position at unspecified times. Defendants argue that he has failed to allege sufficient facts to state of claim for discriminatory transfer denial. Such a claim is evaluated under a similar standard as a claim for discriminatory non-promotion. *See Burgess v. Bowen*, 466 F. App'x 272, 280-81 (4th Cir. 2012) (citing a non-promotion case for the requirements for a *prima facie* case of discriminatory transfer denial). Thus, to state a *prima facie* case, Smith must allege: (1) membership in a protected class; (2) that he applied for the transfer; (3) that he was qualified for the position; and (4) that he was rejected for the transfer "under circumstances giving rise to an inference of unlawful discrimination." *Id.*; *cf. Brown*, 159 F.3d at 902.

As to Smith's transfer request in November 2016, although he alleges membership in a protected class and that he requested a transfer, he does not specifically identify the position to which he sought to be transferred or whether he was qualified for that position. He does, however, state that he made the request after he was subjected to racially derogatory comments in the Special Assignments Team, including a statement defending the Ku Klux Klan and racially charged conversations in which fellow officers referred to President Obama as a "coon" and stated that "at least slaves had food and a place to live." Compl. ¶ 166. These allegations are sufficient to give rise to an inference of discrimination, in that by denying Smith's transfer request, his supervisors effectively forced him to remain in a racially hostile environment. Moreover, the facts that soon after Smith's transfer request was denied, he was involuntarily transferred to Patrol, considered a demotion within PGCPD, and his efforts to complain about the transfer and file a complaint were effectively rebuffed, provide further support for an inference of discrimination in the original denial of a transfer. Where Smith is not strictly required to establish all elements of a *prima facie* case in the complaint, the Court finds that he has alleged sufficient facts to support a plausible inference of discrimination as to his November 2016 transfer denial. *See Swierkiewicz*, 534 U.S. at 510-11; *Coleman*, 626 F.3d at 190.

As for Smith's repeated transfer requests to a Community Oriented Policing position, he has failed to allege any facts suggesting that the denials occurred under circumstances suggesting discrimination. Indeed, he provides no details about the position, when he applied, his qualifications for it, who received the position instead of him, or why such denials might be discriminatory. Thus, to the extent Smith is actually asserting a claim of discriminatory transfer denial based on his requests to be transferred to a Community Oriented Policing position, the Motion will be granted and this claim will be dismissed without prejudice.

### F.    Officer Rucker

As discussed above, Officer Rucker has alleged discrimination based on disparate discipline when he was suspended for two years without resolution, was denied the ability to apply for and test for promotions while on suspension, and then was "red-flagged" with the Maryland State Police, while white officers with similar offenses were not treated as harshly, were allowed to apply for promotions while on suspension, and were not red-flagged to the same degree. Although Defendants argue for dismissal of any discriminatory non-promotion claim based on Rucker's allegation that he was not allowed to apply or test for promotion during his suspension, in their Opposition, Plaintiffs do not assert that Rucker is pursuing a freestanding discriminatory non-promotion claim; rather, they allege that Rucker is asserting a claim of discriminatory discipline based in part on the theory that by not letting him apply for a promotion during the time that he was suspended, Defendants subjected him to disparate discipline because the PGCPD allowed a white officer under suspension to test for promotion. Where Rucker does not seek to pursue a claim of discriminatory non-promotion, the Motion will be denied as to that claim as moot. Rucker's discriminatory discipline claim, not challenged in the Motion, remains.

## VII.   Official Capacity Claims

Finally, Defendants argue for dismissal of all official capacity claims alleged against the Individual Defendants as duplicative of Plaintiffs' claims against Prince George's County. In *Love-Lane*, the Fourth Circuit explicitly held that a § 1983 claim against a supervisor of a municipal entity is duplicative of claims brought against the entity itself and is appropriately dismissed. 355 F.3d at 783. Plaintiffs do not dispute this point and, in a footnote, request that the Court deem those official capacity claims withdrawn without prejudice. Opp'n at 3 n.3.

Accordingly, the Court will dismiss the official capacity claims against the Individual Defendants without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. A separate Order shall issue.

Date: July 8, 2019

THEODORE D. CHUANG
United States District Judge