**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

HISPANIC NATIONAL LAW
ENFORCEMENT ASSOCIATION NCR,
UNITED BLACK POLICE OFFICERS
ASSOCIATION,
MICHAEL ANIS,
MICHAEL BROWN,
THOMAS BOONE,
DANITA INGRAM,
PAUL MACK,
JOSEPH PEREZ,
TASHA OATIS,
CLARENCE RUCKER,
CHRIS SMITH,
RICHARD TORRES,
SONYA L. ZOLLICOFFER,
PATRICK MCCLAM,
SHARON CHAMBERS and
ADRIAN CRUDUP,

      Plaintiffs,

      v.

PRINCE GEORGE'S COUNTY,
HENRY P. STAWINSKI, III, *individually*,
MARK A. MAGAW, *individually*,
CHRISTOPHER MURTHA, *individually*, and
MAJOR KATHLEEN MILLS, *individually*,

      Defendants.

Civil Action No. TDC-18-3821

**MEMORANDUM OPINION**

Plaintiffs Hispanic National Law Enforcement Association NCR ("HNLEA") and United

Black Police Officers Association ("UBPOA"), along with 14 of their members ("the Individual

Plaintiffs") who are or were employed by the Prince George's County Police Department

("PGCPD"), have brought this civil rights action against Prince George's County, Maryland ("the County") and four PGCPD officials in their individual capacity, alleging a custom and practice of discrimination and retaliation against officers of color. Pending before the Court is Defendants' Motion for Partial Dismissal of Plaintiffs' Amended Complaint, which is now fully briefed. Having reviewed the Amended Complaint and the submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In the original Complaint, Plaintiffs asserted causes of action pursuant to 42 U.S.C. § 1983 for discrimination on the basis of race and color, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and retaliation, in violation of the First Amendment. One Plaintiff, Lieutenant Sonya Zollicoffer also asserted causes of action for discrimination on the basis of disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796 (2018), and the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (2018). After Defendants filed a Motion to Dismiss ("the First Motion") seeking dismissal of certain Plaintiffs and causes of action, this Court issued a memorandum opinion on July 8, 2019, by which the First Motion was granted in part and denied in part. That opinion, and particularly its discussion of the general factual background of this case, is incorporated by reference. *See Hispanic Nat'l Law Enf't Ass'n NCR v. Prince George's Cty.*, No. TDC-18-3821, 2019 WL 2929025, at *1-2 (D. Md. July 8, 2019).

While the First Motion was pending, Plaintiffs filed an Amended Complaint in which they added causes of action, based on the same facts underlying the § 1983 claims, on behalf of five of the Individual Plaintiffs for discrimination on the basis of race and color, in violation of Title VII

2

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018), and on behalf of four Individual Plaintiffs for retaliation under Title VII.  The Amended Complaint also added three new individual Plaintiffs, Lieutenant Patrick McClam, Corporal Adrian Crudup, and Officer Sharon Chambers (collectively, the "New Plaintiffs"), all of whom are African American PGCPD police officers who assert discrimination and retaliation claims under § 1983. Lt. McClam alleges that he experienced a retaliatory transfer to a less favorable unit after cooperating with two civilian employees who filed Equal Employment Opportunity ("EEO") complaints, as well as discrimination and retaliation in the form of disparate discipline, delay of promotion, and denial of multiple requests to transfer to more desirable positions.  Officer Chambers alleges that, after reporting her service weapon stolen in 2017, she was discriminated and retaliated against by being disciplined more harshly than other white officers for the same conduct, including being involuntarily transferred to a less desirable position and forced to pay a fine and provide a DNA sample.  Cpl. Crudup alleges that after he complained about a white supervisor's racist remarks, the supervisor filed a retaliatory charge against him that resulted in a criminal investigation during which Crudup was suspended without pay.  Although Cpl. Crudup was found not guilty, PGCPD continues to pursue internal charges and termination as punishment.

Finally, the Amended Complaint added, in Count VII, a common law claim of tortious interference with business relations on behalf of 11 Individual Plaintiffs against Defendants PGCPD Chief Henry P. Stawinski, III, PGCPD Deputy Chief Christopher Murtha, and PGCPD Internal Affairs Division Commander Major Kathleen Mills (collectively "the Individual Defendants"), for interfering with their employment opportunities inside and outside of PGCPD by causing them to be transferred to less desirable positions, preventing them from being transferred to desirable positions or to be promoted, and causing other law enforcement agencies

3

to decline to hire them.  Relatedly, the Amended Complaint added, in Count VIII, a common law claim of civil conspiracy on behalf of all Plaintiffs against Chief Stawinski and Major Mills, for entering into an agreement with each other to engage in such interference with certain Individual Plaintiffs' employment opportunities both inside and outside the PGCPD.

## DISCUSSION

In their Motion for Partial Dismissal of Plaintiffs' Amended Complaint ("the Second Motion"), Defendants seek dismissal of certain individual claims of discrimination and retaliation brought by the New Plaintiffs and dismissal in their entirety of the tortious interference with business relations and civil conspiracy claims in Counts VII and VIII.  As to the common law tortious interference and conspiracy counts, Defendants assert that:  (1) they should be dismissed for failure to both plead and actually comply with the statutory notice requirement of the Maryland Local Government Tort Claims Act ("LGTCA"), Md. Code Ann. Cts. & Jud. Proc. §§ 5–301 to 5–304 (Supp. 2019); (2) the tortious interference with business relations count should be dismissed because Maryland law does not recognize tortious interference with business relations where the defendants are personnel of the employing entity, and the Amended Complaint has failed to allege sufficient facts to establish the elements of the tort; and (3) the civil conspiracy count should be dismissed because Maryland law does not recognize such an action absent a valid underlying common law tort claim.

## I.      Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   Legal

conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II.    New Plaintiffs

As to the New Plaintiffs' claims, Defendants assert that to the extent that certain discrete instances of alleged discrimination or retaliation could be construed as individual causes of action, they must be dismissed as either time-barred by the statute of limitations or as failing to allege sufficient facts to state a plausible claim for relief.

Fourteenth Amendment employment discrimination claims brought pursuant to § 1983 are evaluated under Title VII standards. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). To establish a *prima facie* case of race, color, or national origin discrimination based on disparate treatment, a plaintiff must present facts demonstrating:   (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., Inc.*, 375 F.3d 288, 295 (4th Cir. 2004).   Under the third prong, an adverse employment action is "a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Washington Homes*, 487 F.3d 208, 219 (4th Cir. 2007) (internal citations omitted). It may consist of discharge, demotion, a decrease in pay or benefits, a loss of job title or supervisory responsibility, reduced opportunities for promotion, or a reassignment resulting in one or more these consequences. *See Boone v. Goldin*, 178 F.3d 252, 255-57 (4th Cir. 1999) (allowing for the

possibility that a reassignment with a significant detrimental effect could constitute an adverse employment action).

For claims of discriminatory non-promotion, a plaintiff must allege: (1) membership in a protected class; (2) that the plaintiff applied for the position in question; (3) that the plaintiff was qualified for the position; and (4) that the plaintiff was rejected for the position "under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Courts typically find "circumstances giving rise to an inference of discrimination" if the plaintiff can show that the position remained open or was filled by a similarly qualified applicant outside the protected class. *See Page v. Bolger*, 645 F.2d 227, 229-30 (4th Cir. 1981). Although it is not strictly necessary for a plaintiff to establish all elements of a *prima facie* case in the complaint, a plaintiff must allege sufficient facts to support a plausible inference of discrimination and thereby raise a right to relief above the speculative level. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

To state a claim for retaliation under the First Amendment, a plaintiff must allege: (1) "that [the] speech is protected"; (2) "that the defendant's alleged retaliatory conduct adversely affected the plaintiff's constitutionally protected speech"; and (3) "a causal relationship between [the] speech and the defendant's retaliatory action." *Blankenship v. Manchin*, 471 F.3d 523, 528 (4th Cir. 2006). In the context of a claim by a public employee against a public employer, the requirement of protected speech is met if the plaintiff was speaking as a citizen on a matter of public concern rather than as an employee on a matter of personal interest, and if the employee's interest in speaking on that matter outweighed the government's interest in providing effective and efficient services to the public. *See Ridpath v. Bd. of Governors*, 447 F.3d 292, 316 (4th Cir.

6

2006); *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998). On the second prong, whether the retaliatory conduct adversely affected the speech, the "nature of the retaliatory acts committed by a public employer" must "be more than *de minimis* or trivial." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). To state a claim for First Amendment retaliation, a plaintiff must allege facts supporting the conclusion that "the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

The third prong, in the context of a retaliation claim by a public employee against a public employer, requires that the protected speech be "a substantial factor in the decision to take the allegedly retaliatory action" and that it was a "but for" cause of the adverse action. *Love-Lane*, 355 F.3d at 776 (citation omitted); *Ridpath*, 447 F.3d at 318. The causation prong involves questions of fact that generally should be resolved on summary judgment and "only in those instances when there are no causal facts in dispute." *Love-Lane*, 355 F.3d at 776; *see Tobey v. Jones*, 706 F.3d 379, 390-91 (4th Cir. 2013) (holding that courts can infer causation at the motion to dismiss stage from the facts alleged in the complaint); *Ridpath*, 447 F.3d at 318-19 (holding that a complaint that simply alleged that the employer's conduct was in retaliation for protected speech sufficiently stated a causal connection for purposes of a motion to dismiss).

### A.     Statute of Limitations

Defendants argue that the Court should dismiss certain claims brought by Lt. McClam and Cpl. Crudup in Count I (§ 1983 discrimination) and Count II (§ 1983 retaliation) as time-barred. Specifically, Defendants seek dismissal of any discrete discrimination or retaliation claim arising from Lt. McClam's allegation that in 2015, he was involuntarily transferred to the Patrol Bureau ("Patrol") after PGCPD Deputy Chief George Nader discovered that Lt. McClam witnessed discriminatory statements made to two civilian employees of color who then filed EEO complaints

7

about the incident.  They also seek dismissal of any discrete claim by Cpl. Crudup arising from his allegation that in June 2012, after responding to a robbery call with three white officers and intervening to stop their beating of the African American father of the victim, he was forced to sign paperwork supporting the arrest of the father for assault on the white officers and was then involuntary transferred.

Although the Court has previously found that Maryland's three-year statute of limitations for civil actions applies to Plaintiffs' discrimination and retaliation claims, *Hispanic Nat'l Law Enf't Ass'n NCR*, 2019 WL 2929025, at *8, Plaintiffs have clarified in their memorandum in opposition to the Second Motion ("Opposition") that these specific allegations are not intended to assert independent causes of action against Defendants.  Therefore, the Second Motion will be denied as moot as to these claims.  These incidents, however, remain as background facts relevant to the assessment of the timely discrimination and retaliation claims of Lt. McClam and Cpl. Crudup.

### B.    Lt. McClam

Defendants challenge a discrete allegation among Lt. McClam's claims of hostile work environment, retaliation, and discriminatory delay of promotion.  They seek to dismiss any discrimination or retaliation claim arising from the allegation that "[i]n October 2017," McClam "put in numerous requests for positions with vacancies but was never transferred." Am. Compl. ¶ 226, ECF No. 54.  Defendants argue that this statement fails to adequately plead a discrimination or retaliation claim because it does not provide sufficient details about these unspecified transfer denials to allow for a finding that there were open positions, that he was qualified for those positions, or that the denials were causally linked to any protected activity.

The Court does not read this sentence as asserting a freestanding discrimination or retaliation claim; rather it provides facts supporting other unchallenged claims.  First, the Amended

Complaint alleges that in August 2017, just two months prior to the transfer denials, Lt. McClam was slated to become a supervisor on the Special Assignment Team but was instead transferred by Deputy Chief Murtha to a less desirable position within Patrol because he was "outspoken" and had signed the complaint presented by HNLEA and UBPOA to the United States Department of Justice ("DOJ") regarding alleged discriminatory and retaliatory practices at PGCPD. *Id.* ¶ 225. Second, Plaintiffs allege that in 2018, Chief Stawinski did not permit Lt. McClam to serve as an acting commander, even though there was a vacancy, in contrast to the way that white officers were permitted to transfer. Defendants do not contest that Plaintiffs have stated plausible claims for discriminatory or retaliatory transfer or denial of transfer based on these incidents. The more general statement, that in between those events Lt. McClam was unable to secure a transfer out of Patrol, provides relevant context to show that the transfer into Patrol and the denial of a transfer to an acting commander position were motivated by discriminatory or retaliatory animus.

Nevertheless, where Plaintiffs appear to continue to insist that this single line in the Amended Complaint asserts discrete causes of action for an unspecified number of discriminatory or retaliatory denials of transfers to unnamed positions, the Court agrees with Defendants that there are insufficient facts alleged to support such claims separate and apart from the two allegedly discriminatory or retaliatory transfer or denial of transfer claims described above. Even if the allegation that Lt. McClam sought "positions with vacancies," *id.* ¶ 226, could be construed as asserting that he applied for open positions, there are no facts asserting that Lt. McClam was qualified for each of these positions. Where the positions are completely unidentified, the allegation that McClam was "slated" to be promoted in 2017 to a specific Special Assignment Team position does not answer this question. *Id.* ¶ 225. Moreover, the Complaint does not state whether the positions were filled by white officers or any other circumstances giving rise to an

inference of unlawful discrimination or retaliation. The vague allegation that white officers "are able to obtain transfers through reasonable request and negotiation," *id.* ¶ 58, does not alter this result. It does not state that white officers received transfers under similar circumstances, that Lt. McClam's transfer requests were reasonable, or whether and to what extent there was negotiation comparable to that conducted for white officers. As to retaliation specifically, even assuming that Lt. McClam engaged in protected activity in a time frame reasonably proximate to these alleged transfer denials, the Amended Complaint provides no facts to support the conclusion that he would have received those specific transfers but for retaliation. Accordingly, the Court will grant the Motion as to any discrete discrimination or retaliation claim based on the unspecified denials of transfer in October 2017. This ruling does not preclude the use of evidence relating to any such incidents in support of Lt. McClam's specific discrimination and retaliation claims.

### C.      Officer Chambers

Defendants argue that Officer Chambers has not stated a plausible discrimination or retaliation claim arising from her allegations that after reporting her service weapon stolen in May 2017, she was involuntarily transferred to Patrol.

As to discrimination, Officer Chambers alleges that she was subjected to disparate disciplinary treatment because when she reported her service weapon stolen in May 2017, only to later find it in her car, she was involuntarily transferred to Patrol, forced to submit a DNA sample, and charged with unattended or careless handling of her firearm and failure to properly store her firearm, which resulted in a $500 fine. After writing a letter questioning why she was forced to give a DNA sample, she was "subjected to additional charges and suspended" and currently faces the possibility of termination. *Id.* ¶ 236. Defendants argue that Officer Chambers has failed to allege sufficient facts demonstrating that the transfer was an adverse employment action that carried with it tangible, adverse effects, and that the transfer was effected with discriminatory

intent. Plaintiffs have alleged in the Amended Complaint not only that a transfer to Patrol is viewed as a demotion at PGCPD, but also that other divisions have greater opportunities for overtime and callback pay. *Id.* ¶¶ 96, 125; *see Hispanic Nat'l Law Enf't Ass'n NCR*, 2019 WL 2929025, at *11. Accordingly, a transfer to Patrol may result in "a decrease in pay or benefits" such that it constitutes an adverse employment action. *See Boone*, 178 F.3d at 255-56. It is also reasonable to infer that the fine reduced Officer Chambers' earnings as she presumably paid the monetary penalty from income earned at PGCPD. *See Fordyce v. Prince George's Cty.*, 43 F. Supp. 3d 537, 549 (D. Md. 2014) (concluding that a fine reduced the plaintiff's compensation and was therefore an adverse employment action). Finally, there is no dispute that a suspension is an adverse employment action. *See* Reply at 19, ECF No. 75. Although Defendants argue that the suspension occurred later and was not the direct result of the loss of her firearm, viewing the allegations in the light most favorable to Plaintiffs, the Court finds that the facts support an inference that the suspension, though immediately triggered by Officer Chambers' complaint about the DNA sample, was sufficiently causally linked to the lost firearm to constitute an adverse employment action resulting from the allegedly disparate discipline.

As for whether there are sufficient allegations of discriminatory intent, Officer Chambers has alleged that white comparators, specifically, Officers Matt Staucer and Charles Seward, similarly lost and later retrieved their service weapons but were not required to provide a DNA sample and were not subjected to charges or suspended as a result. For a similar infraction, they were neither fined nor transferred to Patrol or otherwise effectively demoted. These allegations that white officers are afforded more favorable treatment as to the nature and severity of the discipline meted out for the same conduct are sufficient to give rise to an inference of discrimination based on disparate treatment. The Motion will be denied as to this issue.

As for retaliation, Defendants argue that Officer Chambers has failed to plead facts showing that she engaged in protected activity at a time or in a manner that would support an inference of causation.   The Court agrees that Officer Chambers has not pleaded facts demonstrating that she engaged in protected activity prior to the transfer to Patrol.  Although in their Opposition, Plaintiffs state that Officer Chambers engaged in protected speech because she is a member of HNLEA and UBPOA, her membership in these organizations without more does not provide sufficient facts demonstrating an expression of constitutionally protected speech. Plaintiffs also assert that Officer Chambers signed onto the 2016 complaint filed by DOJ relating to alleged discrimination and retaliation at PGCPD ("the DOJ Complaint").  That fact, however, appears nowhere in the Amended Complaint.  On a motion to dismiss, the Court may not consider facts offered in a brief but not contained in the complaint itself. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) ("[The plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).  Even if that proffered fact could be considered, the Amended Complaint does not provide any allegations linking Officer Chambers' involuntary transfer in 2017 to signing onto the DOJ Complaint in 2016.  Although the Amended Complaint alleges that Chief Stawinski learned of the DOJ Complaint in October 2016, it contains no allegations supporting the conclusion that the unnamed PGCPD officials who transferred Officer Chambers to Patrol were aware of her involvement with the DOJ Complaint.  Where the Amended Complaint as presently drafted lacks allegations of protected speech by Officer Chambers, the Court will grant the Motion as to her retaliation claim regarding the May 2017 involuntary transfer and dismiss this claim without prejudice.

### III.  LGTCA

Defendants argue that Plaintiffs' common law tort claims for tortious interference with business relations (Count VII) and civil conspiracy (Count VIII) should be dismissed because Plaintiffs have failed both to plead compliance with the LGTCA's notice requirement and to actually satisfy those requirements. Under the LGTCA, a local government in Maryland is liable "for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." Md. Code Ann., Cts. & Jud. Proc. § 5–303(b)(1).  The LGTCA conditions such tort liability on compliance with a notice requirement, which provides that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 1 year after the injury." *Id.* § 5–304(b)(1).  Written notice must be provided "in person or by certified mail, return receipt requested," and state the "time, place, and cause of the injury." *Id.* § 5–304(b)(2), (c)(1).  When the defendant local government is Prince George's County, "notice shall be given to the county solicitor or county attorney." *Id.* § 5–304(c)(3)(iii).  The notice requirement of the LGTCA is a condition precedent to maintaining a tort action for damages, such that a suit under the LGTCA is "fatally flawed if the condition is not satisfied." *Rios v. Montgomery County*, 872 A.2d 1, 14 (Md. 2005).  As a result, a plaintiff is required, in the complaint, to plead compliance with the notice provision of the LGTCA. *Hansen v. City of Laurel*, 25 A.3d 122, 137 (Md. 2011).  Failure to so plead subjects a plaintiff's claims to dismissal. *Id.* at 131.

Plaintiffs do not dispute that the Amended Complaint contains no allegations addressing the LGTCA or asserting that they complied with its notice requirement.  On that basis alone, the tort claims should be dismissed for failure to plead compliance with the LGTCA notice requirement. *See id.* at 135 n.14, 137.  They argue, however, that: (1) notice is not required where

the Amended Complaint seeks primarily injunctive or declaratory relief; (2) they satisfied an exception to the LGTCA's notice requirement, which excuses formal compliance where defendants received actual or constructive notice of the claims, because Defendants received actual notice of Plaintiffs' claims either in October 2016, when some Plaintiffs filed charges with the United States Equal Employment Opportunity Commission ("EEOC"), or by October 31, 2016, when Chief Stawinski publicly acknowledged having learned about the 2016 DOJ Complaint; (3) Plaintiffs have demonstrated good cause to excuse non-compliance; and (4) notice is not required because the LGTCA is not applicable where the tort claims are against individual defendants based on actions outside the scope of employment with a local government.

## A.     Applicability to Equitable Claims

Plaintiffs argue that where the heading of the LGTCA is "Actions for unliquidated damages," Md. Code Ann., Cts. & Jud. Proc. § 5-304, the LGTCA's notice requirement is not applicable as the relief they seek is "primarily injunctive in nature." Opp'n at 1, 9, ECF No. 66. This argument is unpersuasive where the Amended Complaint explicitly alleges that Plaintiffs have suffered "actual damage and loss" due to the Individual Defendants' tortious conduct, Am. Compl. ¶¶ 295, 300, and specifically seeks compensatory and punitive damages in addition to injunctive relief. Indeed, based on this language, the Court disagrees that the tort claims primarily seek injunctive relief. Even if that were the case, the United States Court of Appeals for the Fourth Circuit has found that the LGTCA notice requirement is not excused where the complaint asserts claims for equitable relief and damages. *See Abdus-Shahid v. Mayor and City Council of Balt.,* 674 F. App'x 267, 273 (4th Cir. 2017) (concluding that the plaintiff's claims were subject to the LGTCA's notice requirement for actions for unliquidated damages where he sought both declaratory relief and compensatory damages in the form of reimbursement of out-of-pocket

medical expenses and subsidized health care premiums). The Court rejects this basis to excuse Plaintiffs' non-compliance with the LGTCA's notice requirement.

### B.    Actual or Constructive Notice

Plaintiffs next argue that even though they did not strictly comply with the LGTCA notice requirement, such failure may be excused because Defendants received actual or constructive notice of their tort claims by October 2016 when they received:  (1) the DOJ Complaint filed in March 2016, which Chief Stawinski acknowledged he had received by the end of October 2016; and (2) notices of charges of discrimination filed by individual Plaintiffs with the EEOC in October 2016.  Plaintiffs rely on a statutory exception to the notice requirement within the LGTCA, which states that the notice requirement "does not apply if, within 1 year after the injury, the defendant local government has actual or constructive notice of:  (1) The claimant's injury; or (2) The defect or circumstances giving rise to the claimant's injury."  Md. Code Ann., Cts. & Jud. Proc. § 5–304(e).

This argument fails for several reasons.  First, where Plaintiffs have asserted such notice was provided no later than October 2016, the Court considers the LGTCA provisions in effect as of October 1, 2016. Md. Code Ann., Cts. & Jud. Proc. § 5–304(b)(1) (Supp. 2016).  As Defendants have noted, the statutory exception contained in section 5–304(e) on which Plaintiffs rely is not applicable to claims accruing prior to October 1, 2016.  The legislation enacting section 5–304(e), the "Local Government Tort Claims Act—Notice Requirement—Exception," 2016 Md. Laws 6940 (Vol. III, Ch. 624, H.B. 637), provides that the exception applies "only prospectively and may not be applied or interpreted to have any effect on or application to any cause of action arising before the effective date of this Act." *Id.* The effective date of the Act is October 1, 2016. *Id.* at 6942. Here, the injuries giving rise to the claims for which the DOJ Complaint and EEOC charges arguably provided constructive notice necessarily accrued prior to October 2016.  Therefore,

15

section 5–304(e) is not applicable to Plaintiffs' claims. *See Weeden v. Prince George's Cty.*, No. GJH-17-2013, 2018 WL 2694441, at *3 (D. Md. June 4, 2018) (dismissing a plaintiff's tort claims based on alleged police misconduct for failure to comply with the LGTCA's notice requirement and finding section 5–304(e) inapplicable where the claims accrued before promulgation of that exception).

Second, under the LGTCA as it stood as of October 2016, the DOJ Complaint and EEOC charges would not have provided a basis to excuse the failure to strictly comply with the notice requirement. At that time, courts had held that the notice requirement of the LGTCA could be deemed satisfied upon "substantial compliance," "where the purpose of the notice requirement is fulfilled." *See Moore v. Norouzi*, 807 A.2d 632, 640-41 (Md. 2002). This exception is a "narrow" one. *Huggins v. Prince George's Cty.*, 683 F.3d 525, 538 (4th Cir. 2012). In order to establish substantial compliance, there must have been "some effort to provide the requisite notice," and, "in fact, it must be provided albeit not in strict compliance with the statutory provision." *Moore*, 807 A.2d at 643. That notice must meet the LGTCA's purpose of having "the claimant furnish the municipal body with sufficient information to permit it to make an investigation in due time, sufficient to ascertain the character and extent of the injury and its responsibility in connection with it." *Id.* (quoting *Jackson v. Bd. of Cty. Comm'rs*, 195 A.2d 693, 695 (Md. 1963)).

Here, even assuming a substantial compliance analysis were appropriate where Plaintiffs made no actual effort to provide notice of its tort claims to the County, the Court is unpersuaded that providing notice to PGCPD officials of the DOJ Complaint, or filing EEOC charges, fulfills the purpose of the LGTCA. As alleged, in the DOJ Complaint, PGCPD officers called for a "compliance review," which then prompted a pattern and practice investigation by DOJ. Am. Compl. ¶¶ 101, 256 & n.24. The DOJ Complaint was not, at that stage, a threat that any Individual

Plaintiffs would file a lawsuit asserting tort claims.  Where there has been no notice to those in the local government responsible for investigating potential tort claims that a plaintiff intends to file a private tort lawsuit, rather than seek a general compliance investigation, substantial compliance has not been achieved.  *See White v. Prince George's Cty.*, 877 A.2d 1129, 1139 (Md. Ct. Spec. App. 2005) (finding no substantial compliance where the plaintiff filed a complaint of police brutality with the police department's Internal Affairs Division and did not "provide notice to an entity with responsibility for investigating tort claims lodged against the [c]ounty").  Likewise, the EEOC charges notified Defendants that certain Individual Plaintiffs were pursuing complaints of discriminatory and retaliatory conduct in violation of federal statutes in an administrative proceeding, but they did not notify the County that it may be subject to indemnifying its employees based on common law tort claims filed in court.  Notably, the Fourth Circuit declined to find substantial compliance based on the filing of an EEOC charge referencing the possibility of claims under Title VII where the charge did not inform the local government of the potential for state law claims under the Maryland Constitution.  *See Abdus-Shahid*, 674 F. App'x at 267.  Accordingly, the Court does not find substantial compliance.

### C.     Good Cause

Separate from section 5–304(e), the LGTCA, both in October 2016 and today, has included a provision allowing for a "[w]aiver of the notice requirement," which states that "unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and good cause shown the court may entertain the suit even though the required notice was not given." Md. Code Ann., Cts. & Jud. Proc. § 5–304(d). "The question of whether there is good cause to waive the notice requirement is within the discretion of the trial court." *Moore*, 807 A.2d at 641. The test for whether good cause exists is whether the plaintiff pursued the claim "with that degree of diligence that an ordinarily prudent person would have exercised under the

same or similar circumstances." *Heron v. Strader*, 761 A.2d 56, 63 (Md. 2000). Good cause can include excusable neglect or mistake, serious physical or mental injury, the plaintiff's location out of state, the inability to retain counsel in a complex case, ignorance of the statutory requirement, or misleading representations by government representatives. *Rios*, 872 A.2d at 22-23. Here, the Court finds no good cause for waiving the notice requirement. Even construing Plaintiffs' arguments relating to actual and constructive notice as a motion for a waiver of the notice requirement for good cause under section 5–303(d), they do not show that the notice requirement remained unfulfilled for any of the reasons outlined in *Rios*. Plaintiffs are represented by at least eight counsel of record who have been vigorously asserting their rights on their behalf, such that Plaintiffs cannot convincingly argue excusable neglect or that they were merely ignorant of the LGTCA's requirements. Although acts and conduct that demonstrate that the purpose of the LGTCA has been satisfied can provide a basis to permit a waiver of the notice requirement, *see Moore*, 807 A.2d at 648, as discussed above, the Court does not find that the DOJ Complaint and EEOC charges did so. Thus, the Court finds neither substantial compliance with, nor good cause to waive, the LGTCA's notice requirement.

### D. Scope of Employment

Finally, Plaintiffs argue that they were not required to provide notice to Prince George's County because they are suing the Individual Defendants for acts of tortious interference with business relations and civil conspiracy performed in their individual capacities, outside the scope of their employment. Under Maryland law, whether an employee was acting within the scope of employment requires consideration of whether: (1) the act is "of the kind the [employee] is employed to perform; (2) it occurred during a period not unreasonably disconnected from the authorized period of employment; (3) in a locality not unreasonably distant from the authorized

area; and (4) was actuated at least in part by a purpose to serve the [employer]." *Sawyer v. Humphries*, 587 A.2d 467, 471 (Md. 1991). An act need not be intended or consciously authorized by the employer. *Id.* at 470. Rather it is within the scope of employment if it is "of the same general nature as that authorized, or incidental to the conduct authorized." *Id.* at 471. Whether an act is incidental to authorized conduct depends on factors including whether it is outside the enterprise of the employer, whether the employer has reason to expect that the act will be done, the extent of departure from the normal method of accomplishing an authorized result, and whether the act is seriously criminal. *Id.* An "important factor" is whether the employee's conduct was "expectable" or "foreseeable." *Id.*

With respect to intentional torts committed by an employee, conduct is deemed outside the scope of employment when the employee's actions "are personal" and "represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests." *Id.* "Unprovoked, highly unusual, and quite outrageous" conduct is generally held to reflect a personal motive placing the conduct outside the scope of employment. *Id.* at 471-72.

In *Ennis v. Crenca*, 587 A.2d 485 (Md. 1991), the Maryland Court of Appeals ruled in a libel and slander action against a county council member that notice to the local government "is not required where an action is based on alleged conduct outside of the employee's scope of employment." *Id.* at 489. Defendants argue, however, that this holding is no longer good law in light of the more recent decision in *Chappelle v. McCarter*, 873 A.2d 458 (Md. Ct. Spec. App. 2005), which held that the notice requirement is "not limited to actions in which the employee was acting within the scope of employment, although the local government's obligation to indemnify is so limited." *Id.* at 462. In so ruling, the court relied on the fact that the plain language of the notice requirement mandates notice of any action "brought against a local government or its

employees," not actions against employees acting in "the scope of employment," a term that is used in the related but separate statutory provisions limiting indemnification of local government employees to claims based on acts "within the scope of employment." *Id.* (citing Md. Code Ann., Cts. & Jud. Proc. §§ 5–302(a) and 5–303(b)(1)). Although the Court agrees that the reasoning of *Chappelle* is persuasive, *Ennis* remains controlling authority that a decision of the Court of Special Appeals cannot alter. The Court therefore grants the Motion as to the tort claims in Counts VII and VIII only to the extent that they assert claims of misconduct within the scope of employment. The Court next considers whether the Amended Complaint plausibly alleges causes of action for tortious interference with business relations and civil conspiracy based on conduct outside the scope of employment.

## IV.    Tortious Interference with Business Relations

In Plaintiffs' tortious interference with business relations count (Count VII), 11 of the Individual Plaintiffs assert that Chief Stawinski, Deputy Chief Murtha, and Major Mills professionally demeaned them and subjected them to worse working conditions, lost compensation, and lost employment opportunities by intentionally and willfully causing: (1) their involuntary transfer to less desirable positions within PGCPD; (2) their requests for transfer to more desirable positions to be denied; (3) their ineligibility for promotion within PGCPD; and (4) their requests for promotion to be denied. *See, e.g.*, *Hispanic Nat'l Law Enf't Ass'n*, 2019 WL 2929025, at \*11, \*14, \*17 (setting forth examples of such conduct). They also allege that the Individual Defendants caused other employers to decline to hire them.

To state a claim for the common law tort of tortious interference with business relations, also known as intentional interference with contractual or economic relations, Plaintiffs must allege:  (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right

or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage

and resulting loss. *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003).

The Court of Appeals of Maryland has stated:

> [T]he two general types of tort actions for interference with business relationships are inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation.

*Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984).   A claim for tortious interference

with business relations must include "conduct that is independently wrongful or unlawful, quite

apart from its effect on the plaintiff's business relationships." *Alexander & Alexander Inc. v. B.

Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994).  Such wrongful or unlawful acts

include "common law torts and violence or intimidation, defamation, injurious falsehood or other

fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal

prosecutions in bad faith." *Id.* (quoting *K & K Mgmt. v. Lee*, 557 A.2d 965, 979 (Md. 1989)).  "In

addition, 'actual malice,' in the sense of ill will, hatred or spite, may be sufficient to make an act

of interference wrongful where the defendant's malice is the primary factor that motivates the

interference," and where the malice was not "incidental" to the "pursuit of legitimate commercial

goals." *Alexander*, 650 A.2d at 271.

Defendants allege that Plaintiffs have failed to sufficiently plead the elements of the tort of

tortious interference with business relations.  Specifically, Defendants assert that where the

Individual Defendants are employees of PGCPD whose alleged actions to undermine the

Individual Plaintiffs' business relations with PGCPD consisted entirely of actions within the scope

of their job duties and responsibilities, there can be no tortious interference with business relations

claim. Defendants further assert that Plaintiffs failed to allege that the Individual Defendants used improper means to interfere with their employment relationships.

"It is widely recognized that one cannot be liable for tortious interference with his own contract." *Pope v. Bd. of Sch. Comm'rs of Balt. City*, 665 A.2d 713, 719 (Md. App. 1995). "Thus, when an employee acts within the scope of . . . employment, or as an agent of [the] employer, [the employee] cannot be held liable for interfering with the contract, business relationships, or economic relationships, between the employer and another." *Id.* Rather, "to sustain such a claim, there must be an allegation that the employee[s] in question somehow acted maliciously for [their] own motives and beyond the scope of [their] authority without the intent to further the interests of the employer." *Id.* Thus, where the Amended Complaint alleges that the Individual Defendants are PGCPD supervisors and the Individual Plaintiffs were PGCPD employees at the relevant times, and the alleged tortious interference consists of actions in which the Individual Defendants exercised their authority as supervisors, the Individual Defendants ordinarily could not be liable for tortious interference in the Individual Plaintiffs' employment and business relations with PGCPD. *See Pope*, 665 A.2d at 719; *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 981 n.14 (Md. 1989) ("reject[ing] an analysis under which corporate officers, agents or employees, acting on behalf of a corporation within the scope of their authority, are viewed as actors . . . separate from their corporation" who could maliciously interfere with business relations between the corporation and the plaintiff).

Although Plaintiffs argue that they are alleging that the Individual Defendants' interference consisted of conduct outside the scope of employment, even viewing the facts in the light most favorable to Plaintiffs, such a claim is not plausible as to the allegations that the interference consisted of the Individual Defendants taking actions to determine whether the Individual

Plaintiffs could be or would be transferred or promoted.  As a general matter, Plaintiffs challenge the means and motivation behind the Individual Defendants' promotion, transfer, and disciplinary decisions, but the specific conduct of making such decisions is of "the same general nature" as the Individual Defendants' job duties, *see Sawyer*, 587 A.2d at 471, particularly where Deputy Chief Murtha and Major Mills have authority and oversight over disciplinary matters and investigations, and Chief Stawinski's responsibilities include discipline, hiring, screening, training, retention, and supervision of other police officers under his command.  While the Individual Defendants may have acted in a manner violative of PGCPD policies and, if proven true, in contravention of federal law, these decisions were made while the Individual Defendants were employed by PGCPD, working at their usual locality of employment, and involved carrying out duties in at least partial furtherance of PGCPD's business of managing personnel at a police department. *See id.*  This conduct is distinguishable from cases where unforeseeable, highly unusual, and outrageous behavior advancing a purely personal purpose demonstrated a total deviation from the employer's business. *See, e.g., Jordan v. W. Distrib. Co.*, 135 F. App'x 582, 584, 586 (4th Cir. 2005) (finding that security guards transporting currency in their employer's armored vehicle acted outside the scope of their employment in attempting to drive the plaintiff off the road while brandishing a sawed-off shotgun and making verbal death threats).  Because even viewed in the light most favorable to Plaintiffs, the Individual Defendants' acts of decision-making relating to promotions, transfer, and discipline were foreseeable and do not reflect such a stark departure from their supervisory duties, they cannot be deemed to have been outside the scope of employment. *See Sawyer*, 587 A.2d at 471.  Plaintiffs have therefore failed to state a viable claim of tortious interference with business relations at PGCPD. *See K & K Mgmt.*, 557 A.2d at 981 n.14.

However, the Court reaches a different conclusion as to certain allegations of tortious interference with certain Individual Plaintiffs' efforts to obtain employment outside of PGCPD. The Amended Complaint alleges sufficient facts to support a plausible claim that Chief Stawinski intentionally interfered with the ability of Plaintiffs Corporal Michael Brown and Officer Clarence Rucker to secure employment at law enforcement agencies other than PGCPD. For example, Cpl. Brown alleges that Chief Stawinski tried to impede his success at his new employer, Fairmont Heights Police Department ("FHPD"), following his retaliatory termination by misrepresenting evidence from the PGCPD Trial Board, contesting Cpl. Brown's certification from the Maryland State Police Commission, and threatening FHPD with a loss of resources if it retained Cpl. Brown. Officer Rucker alleges that after he was compelled to resign from PGCPD and was hired by the Capitol Heights Police Department ("CHPD"), a "red flag" placed in the Maryland State Police System caused CHPD to assign him to desk duties, and Chief Stawinski was unwilling to remove it even though PGCPD has removed red flags from white officers' files who have engaged in proven misconduct. In the context of the other allegations across the entire Amended Complaint, such interference could fairly be construed as reflecting the use of injurious falsehoods and actual malice necessary to sustain a tortious interference with business relations claim. *See Alexander*, 650 A.2d at 271. Viewed in the light most favorable to Plaintiffs, these allegations state sufficient facts to support tortious interference with business relations claims because they allege interference with business relationships outside of PGCPD.

Notably, because Plaintiffs failed to provide LGTCA notice, *see supra* part III., these claims can succeed only if Plaintiffs can establish that Chief Stawinski's conduct in interfering with the outside law enforcement agencies was also outside the scope of his employment. *See Ennis*, 587 A.2d at 489. At this stage, where there is at least a reasonable argument that such

interference did not further PGCPD's interests, the Court finds that the allegations could plausibly assert that the acts of interference were outside the scope employment such that these claims may go forward. *See Sawyer*, 587 A.2d at 471-72 (stating that "highly unusual" behavior that is "a departure from the purpose of furthering the employer's business" could be deemed outside the scope of employment). Whether the actions were, in fact, outside of the scope of employment will be decided at a later stage. *See Barclay v. Briscoe*, 47 A.3d 560, 568 (Md. 2012).

By contrast, although Officer Tasha Oatis alleges that she has been improperly red-flagged by the Maryland State Police Commission and has therefore been denied employment by approximately 15 other police departments in Maryland, she makes no allegation that any of the Individual Defendants personally engaged in any specific interference relating to those departments. Thus, the Court finds that the allegations are insufficient to support a tortious interference claim both because there is no allegation of personal interference by the Individual Defendants and because, as a result, there is no plausible claim that any interference was outside the scope of employment. To the extent that Plaintiffs are able to develop facts showing that Chief Stawinski personally interfered with Officer Oatis's third-party employment relationships, or that Deputy Chief Murtha or Major Mills did so as to Cpl. Brown, Officer Rucker, or Officer Oatis, Plaintiffs may then seek leave to amend the complaint to re-allege such claims.

Accordingly, the Court finds that Cpl. Brown and Officer Rucker have stated plausible tortious interference with business relations claims to the extent they allege that Chief Stawinski tortiously interfered with their third-party business relationships outside of PGCPD. The Court will therefore deny the Motion as to those claims only and will otherwise grant the Motion to Dismiss Count VII.

## V.    Civil Conspiracy

As to civil conspiracy (Count VIII), all Plaintiffs assert that Chief Stawinski and Major Mills, "acting with and through other [PGCPD] officers, had an agreement or understanding to engage in unlawful discrimination and retaliation against Plaintiffs to intentionally interfere with their employment within and outside PGCPD," causing "actual damage and loss." Am. Compl. ¶¶ 297, 300.  The alleged unlawful acts in furtherance of the conspiracy consist of commencing investigations of certain Individual Plaintiffs and all of the same acts asserted in the tortious interference with business relations count.  Plaintiffs allege that, in furtherance of the conspiracy, Major Mills also engaged in knowing or reckless destruction of Internal Affairs Division records after investigation into Plaintiffs' claims had commenced.

Defendants argue that under Maryland law, a civil conspiracy claim cannot stand unless it is based upon some other well-pleaded tort claim. Under Maryland law, civil conspiracy requires: "(1) A confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damage resulting to the plaintiff." *Lloyd v. General Motors Corp.*, 916 A.2d 257, 284 (Md. 2007).  Civil conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Id.*  Therefore, the only viable civil conspiracy claim would be one that relates to the viable claim against Chief Stawinski for tortious interference with business relations outside the PGCPD, based on acts outside the scope of his employment. A claim of civil conspiracy cannot be based on the federal statutory claims of discrimination and retaliation. *See Francis v. Perez*, 256 F. Supp. 3d 1, 5-6 (D.D.C. 2017) ("The deprivation of a right created by Title VII . . . cannot be the basis for a civil conspiracy cause of action."); *cf. Great Am. Fed. Sav. & Loan Ass'n v.*

*Novotny*, 442 U.S. 366, 376-78 (1979) (holding that claims under Title VII cannot be the causes of action underlying a federal statutory conspiracy claim).

Here, however, the Amended Complaint does not allege facts showing that Major Mills or another PGCPD official assisted Chief Stawinski, or otherwise conspired with him, to engage in personal acts of interference, outside the scope of his employment, with the relevant Individual Plaintiffs' business relations with outside law enforcement agencies. The Court will therefore grant the Motion and dismiss the civil conspiracy claim in Count VIII.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted in that any discrete discrimination or retaliation claims based on Lt. McClam's unspecified denials of transfer in October 2017, Officer Chambers' retaliation claim based on her involuntary transfer in May 2017, and Count VIII of the Amended Complaint will be dismissed. The Motion will be granted as to Count VII, with the exception that it will be denied as to claims by Cpl. Brown and Officer Rucker against Chief Stawinski for tortious interference with business relations, based on actions outside the scope of employment, and relating to their business relationships with law enforcement agencies outside of PGCPD. A separate Order shall issue.

Date: February 25, 2020

THEODORE D. CHUANG
United States District Judge

27