IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| **HISPANIC NATIONAL LAW ENFORCEMENT ASSOCIATION NCR,** *et al.*, <br>          Plaintiff, <br>     v. <br>**PRINCE GEORGE'S COUNTY, MARYLAND**, *et al.* <br><br>          Defendant. | Case No. 18-cv-03821 TDC |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
***IN LIMINE* AND FOR APPROPRIATE RELIEF**

Kurt J. Fischer, Bar No. 03300
Matthew R. Alsip, Bar No. 28002
Christine C. Carey, Bar No. 29428
Venable LLP
210 W. Pennsylvania Avenue, Suite 500
Towson, Maryland 21204
Tel: (410) 494-6200
Fax: (410) 821-0147
kjfischer@venable.com
mralsip@venable.com
cccarey@venable.com

Robert G. Ames, Bar No. 03372
Courtney Sullivan (admitted *pro hac vice*)
Vincent Verrocchio, Bar No. 460429
Lauren Stocks-Smith, Bar No. 20784
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel.: (202) 344-4000
Fax: (202) 344-8300
rgames@venable.com
casullivan@venable.com
veverrocchio@vehable.com
lrstocks-smith@venable.com

Todd J. Horn, Bar No. 06849
Craig A. Thompson, Bar No. 26201
Christine E. White, Bar No. 19185
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel.: (410) 244-7400
Fax: (410) 244-7742
tjhorn@venable.com
cathompson@venable.com
cewhite@venable.com

*Attorneys for Defendants,*
*Prince George's County, Maryland et al.*

**TABLE OF CONTENTS**

INTRODUCTION AND FACTUAL BACKGROUND ................................................................1

    1.    Plaintiffs' Claims ...........................................................................................1

    2.    Untethered Acts Alleged by Plaintiffs ..........................................................2

ARGUMENT .....................................................................................................................5

    1.    The Analytical Bases on Which Plaintiffs May Seek to Introduce Alleged Untethered Acts ...........................................................................................8

        A.    *Monell* Evidence ...............................................................................8

        B.    "Me-Too" or "Other Employee" Evidence .................................13

        C.    Evidence to Prove Associational Standing Claims ....................14

    2.    This Court Should Limit the Number of Untethered Acts on Which Plaintiffs Can Rely to 20 .......................................................................17

        A.    *Monell* Evidence and "Me-Too" Evidence .................................17

        B.    Evidence Offered to Prove Associational Standing Claims .....................23

        C.    The Present Motion Is Not Premature ......................................27

CONCLUSION.................................................................................................................27

Defendants (collectively, the "County"), pursuant to the Court's Case Management Order (ECF. 4), Federal Rule of Civil Procedure 7(b), and Federal Rules of Evidence 403 and 404(b), move this Court *in limine* and for appropriate relief.  The County requests that the Court issue an order:

(1)    restricting Plaintiffs to introducing no more than 20 alleged bad acts that are untethered to Plaintiffs' individual claims into evidence at trial;

(2)    requiring Plaintiffs to identify the alleged untethered acts that they will seek to introduce at trial; and

(3)    granting Plaintiffs and the County each three additional hours of deposition time and three additional interrogatories and requests for production of documents in connection with each alleged untethered act identified by Plaintiffs.

## INTRODUCTION AND FACTUAL BACKGROUND

### 1.    Plaintiffs' Claims

In their Amended Complaint, Plaintiffs assert discrimination and retaliation claims that allegedly arise out of their service as police officers with the Prince George's County Police Department ("PGPD").  Am. Compl. (ECF No. 54) ¶¶ 1-2.  Plaintiffs occupied different positions in different divisions at PGPD at different times.  *Id*. ¶¶ 32-46.  For some, their employment dates back to the late 1990s; others joined PGPD within the last five to ten years.  *Id.* ¶¶ 32-34, 38, 46.  Plaintiffs assert discrimination claims under the Equal Protection Clause and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-17, based on multiple protected categories (African-American, Hispanic, and Middle Eastern).  *Id*. ¶¶ 32-46.  They do so under various theories of recovery including: failure to promote, failure to accommodate, discriminatory transfers, discriminatory discharge, hostile work environment, and disparate discipline, among other forms of disparate treatment.  *See, e.g.*, *id.*  ¶¶ 32-46, 95, 109,

120, 146, 180, 186.  Plaintiffs also bring First Amendment and Title VII claims for retaliation after they allegedly complained of discrimination or engaged in some other protected speech. *See, e.g.*, *id.* ¶¶ 32-46, 115, 120, 128, 146, 163, 170, 222.

Plaintiffs rarely identify the final decision-makers of the unlawful acts alleged in the Amended Complaint.  Rather, each Plaintiff charges that (1) the County, (2) Chief of Police Henry Stawinski, (3) Deputy Chief Administrative Officer for Public Safety (and former Chief of Police) Mark Magaw, and (4) former Commander of Internal Affairs Major Kathleen Mills, violated his or her rights under the Equal Protection Clause, the First Amendment, or Title VII. *See id.* ¶¶ 3-5, 48-52, 259-70.  Plaintiff Zollicoffer also contends that the County violated her rights under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.  See id.* ¶¶ 271-75.

On December 6, 2019, Defendants filed a notice stating their intention to file the present motion in limine and for appropriate relief.  (ECF No. 107).  On December 18, 2019, the Court held a pre-motion conference.  (ECF No. 113).  On January 7, 2020, the Court granted the County leave to file this motion.  *Id.*

2.      **Untethered Acts Alleged By Plaintiffs**

In their Amended Complaint and answers to the County's interrogatories (the "Answers to Interrogatories"), Plaintiffs allege a host of conduct by PGPD employees that they themselves purportedly experienced in support of their individual discrimination and retaliation claims, which conduct alone involves over 100 individuals and approximately 80 incidents.  Putting aside this already wide universe of Plaintiff-specific incidents, the Amended Complaint and Answers to Interrogatories also identify 121 alleged acts involving 153 PGPD employees that are

wholly untethered to Plaintiffs themselves.[1]  By "untethered" the County means such acts that the named Plaintiffs did not experience during their employment with PGPD.  The County has compiled a chart of the untethered acts that describes the nature of the incident alleged, identifies the alleged perpetrators, and cites to the paper where the act is described, which chart is attached hereto as Exhibit B.[2]

While already voluminous, this universe of alleged untethered acts and individuals involved is not exhaustive because Plaintiffs assert that their "investigation is ongoing," and reserve their rights to supplement this list as the case progresses.  *See, e.g.*, Ex. A, Response 1, at p. 25.  Notably, this current tally also does not include unspecified actors involved in decisions alleged to have been made by PGPD generally.  For example, to the extent that Plaintiffs also take issue with PGPD's investigation of particular incidents, such investigations necessarily involved additional unspecified persons, further expanding the universe of potential witnesses (and therefore deponents and trial witnesses) to well beyond 153.  Nor does the current figure count the unnamed "officers of color," "white officers," and "African-American officers" to whom Plaintiffs vaguely reference throughout their Amended Complaint and Answers to

---

[1]  To apprise the Court of Plaintiffs' voluminous allegations at this juncture, the County has attached Plaintiff Michael Anis's Responses and Objections to Defendants' First Set of Interrogatories (the "Anis Responses") as Exhibit A. When comparing the Anis Responses and the responses from any other Plaintiff in this action, there are no significant variations in the untethered acts alleged; as such, the County attaches the Anis Responses as a representative example.

[2]  For purposes of this Motion, the County aggregated into a single incident: (1) the complained-of conduct, (2) the County's purportedly insufficient investigation or disciplinary action in connection with this conduct, and (3) any alleged retaliatory act that emanated from any complaints about such conduct.  If these three separate aspects were instead treated as distinct, the total number of incidents purportedly at issue in this action would be well over 200.

Interrogatories, whose identities and number are impossible to determine and quantify from the Amended Complaint and answers.[3]  *See*, *e.g.*, Ex. A, Response 1, at p. 13 (where unnamed "officers of color" were alleged to have been subjected to retaliation), p. 16 (where unnamed "white officers who engaged in comparable conduct" were alleged to have been disciplined more leniently).

The 121 untethered acts bear no relation to the individual Plaintiffs or to the treatment they purportedly endured, which treatment necessarily undergirds their discrimination and retaliation claims.  Many allegations also refer to a proffered white officer who purportedly engaged in unchecked misconduct, but those allegations are conspicuously untethered to any allegation sufficient to suggest that a particular similarly-situated minority officer was treated in a discriminatory or disparate fashion by comparison.  For example, Plaintiffs assert – without further elaboration – that:

(1)     PGPD inadequately disciplined a particular male officer who was "involved in a sexual relationship with a subordinate;"

(2)     PGPD inadequately investigated and/or disciplined another male officer, and continues to employ him, despite the fact that he was the "[s]ubject of [a] complaint for child pornography;"

---

[3] In the intervening period since the County sought leave to file the instant motion, Plaintiffs have supplemented their Answers to Interrogatories to identify some of the previously-unnamed individuals referenced in the Amended Complaint.  However, their supplemental responses do not identify the vast majority of unnamed individuals alleged to have been involved in the untethered acts.  Therefore, the County and the Court are still left to speculate regarding the total number of individuals implicated in the untethered acts for discovery and trial purposes.

(3)     PGPD inadequately investigated or disciplined a particular female officer, and continues to employ her, despite the fact that she was the "[s]ubject of complaints for unethical behavior (cheating on the last promotional exam);"

(4)     PGPD inadequately disciplined a particular male officer, and continues to employ him, despite the fact that he was "criminally charged for abuse of his step-child;" and

(5)     PGPD failed to adequately investigate or discipline the unnamed "other officers" that allegedly engaged in unspecified "inappropriate and unethical conduct."

Ex. A, Response 1, at pp. 11, 13, 15, 23.

In short, Plaintiffs' Amended Complaint and Answers to Interrogatories are replete with numerous, vaguely-alleged acts that are untethered to the work experiences of the individual Plaintiffs.  The alleged incidents are cumulative and have little or no probative value for Plaintiffs' individual discrimination or retaliation claims.

## ARGUMENT

In this Motion, the County requests that the Court issue an order (1) restricting the number of alleged untethered acts on which Plaintiffs may rely at trial to 20, (2) requiring Plaintiffs to identify the untethered acts that they will seek to introduce at trial, and (3) granting the parties additional interrogatories and requests for production of documents to discover information relating to the untethered acts identified by Plaintiffs.

The order requested by the County would make discovery and trial manageable for the Court and the parties without unduly limiting Plaintiffs' ability to present their case.  A limitation on evidence relating to alleged untethered acts would make discovery and trial manageable by requiring Plaintiffs at this time to eliminate (1) cumulative, repetitive evidence, and (2) alleged acts that have little or no relevance to Plaintiffs' claims in this case.  In the absence of such an order, discovery and pretrial motions in this case will require the detailed analysis of 121 alleged

untethered acts to determine if they are admissible.  The trial of this action could, therefore, include as many as 121 "mini-trials" of incidents that have no relation to the conduct that the individual Plaintiffs purportedly experienced.  Assuming that each side takes three hours to present evidence and cross-examine witnesses on each untethered act (an optimistic assumption), it would take 726 hours of trial time to present evidence on untethered acts alone.  Assuming that the Court is able to provide 35 hours of trial time per week, it would take over 20 weeks for the parties to present evidence solely on the untethered acts.

As described above, Plaintiffs have alleged vague and incomplete information regarding the untethered acts on which they seek to rely, failing in many cases to disclose the perpetrator of the act, when it occurred and the persons with knowledge of it.  Assuming that Plaintiffs will be required to provide this information at some point, discovery related to the untethered acts will require at least the same amount of time as is necessary to present evidence of those untethered acts at trial.  Accordingly, discovery in connection with the 121 alleged untethered acts could be overwhelming for the parties.  If the parties collectively used a total of six hours of deposition time for each untethered act, 726 total deposition hours would be required.  Further, the parties should also be entitled to pursue interrogatories and requests for production of documents as to each alleged untethered act on which Plaintiffs could rely.

Plaintiffs have suggested that some of the 121 acts are not untethered because they intend to assert claims on behalf of certain members of two Plaintiff associations, the Hispanic National Law Enforcement Association NCR ("HNLEA") and the United Black Police Officers Association ("UBPOA").  By way of example, Plaintiffs variously allege in the Answers to Interrogatories—absent further specificity—that particular minority officers (1) were members of HNLEA or UBPOA, and (2) were involuntarily transferred, denied favorable transfer

opportunities, or disciplined more severely than their white counterparts, without confirming *whether Plaintiffs in fact intend to bring claims on behalf of such members. See, e.g.*, Ex. A, Response 1, at pp. 16-18, 20.  When the County requested that HNLEA and UBPOA state the factual basis for the representational claims, including the alleged perpetrator of the acts relied upon, Plaintiffs refused to do so.  *See* HNLEA Answers to Second Set of Interrogatories from Defendant Mills (attached hereto as Exhibit C), Ans. to Interrogatory No. 23 at pp. 5-6; UBPOA Answers to Second Set of Interrogatories from Defendant Mills (attached hereto as Exhibit D), Ans. to Interrogatory No. 23 at pp. 5-6.  Plaintiffs' refusal to provide the basis for the representational claims makes it difficult for the County to analyze with specificity whether the organizations are entitled to assert the individual claims on behalf of their members.  It appears that Plaintiffs are improperly attempting to use representational (or associational) standing to effectively assert a pattern or practice class action without pleading such a class action or satisfying the requirements for pursuing one.

The alleged untethered acts are also repetitive and cumulative.  For example, Plaintiffs cite to seventeen separate white officers who were purportedly the subject of use of force complaints by civilians and inadequately disciplined.  If permitted to survive the present motion, such allegations would necessarily require investigation into and testimony regarding each purported incident, including whether the complaint was unfounded and whether discipline was warranted, in seventeen situations wholly unrelated to the individual Plaintiffs.  Under the current scheduling order, the sheer volume of the alleged incidents prevents the County from taking discovery as to each one, and could unfairly prejudice the jury at trial.

As will be explained below, the Court has great authority to control the length and scope of the trial. The County requests that the Court exercise that authority at this stage of the case so that the parties can adequately take discovery and so that the case can be manageable for trial.

In this Motion, the County does not request that the Court address whether Plaintiffs may introduce evidence of the 80 alleged tethered acts, that is, alleged acts offered to establish that a named Plaintiff personally experienced a hostile work environment.

### 1. The Analytical Bases On Which Plaintiffs May Seek To Introduce Alleged Untethered Acts

There are three conceivable analytical bases on which Plaintiffs may seek to offer evidence of untethered acts. Each of these bases requires a detailed examination of the circumstances of the alleged act to determine whether it is admissible and has any probative value. The three bases are: (1) to attempt to establish a County "policy or custom" of racial discrimination or retaliation that proximately caused a Plaintiff's individual injury and thus hold the County liable for the acts of a County official under *Monell v. Dept. of Social Services of the City of N.Y.*, 436 U.S. 658 (1978); (2) "me-too" or "other employee" evidence of discriminatory or retaliatory acts on the part of County officers against others for the purpose of establishing discriminatory intent on the part of the County in its actions toward an individual Plaintiff; and (3) evidence to support a claim of a non-party member of HNLEA or UBPOA, which claims these organizations seek to assert on behalf of certain members based on representational standing. The County will review below the three conceivable bases for the admissibility of the alleged untethered acts.

### A. *Monell* Evidence

Plaintiffs seek to impose liability on the County under the Supreme Court's decision in *Monell* for acts by County officials on grounds that the acts were proximately caused by a

"policy or custom" of racial discrimination or retaliation adopted by the County.  436 U.S. at 694.  The Supreme Court has ruled that, in a claim brought pursuant to 42 U.S.C. § 1983 for discrimination or retaliation in violation of the laws or Constitution of the United States, a municipality cannot be held liable for the acts of its employees under *respondeat superior*, but can be held liable only if the actions represent the official policy or custom of the municipality.  *Id.* at 691, 694.  In *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987), the Fourth Circuit explained that, under *Monell*, "[w]hile municipal 'policy' is found most obviously in municipal ordinances, regulations and the like which directly command or authorize constitutional violations, . . . it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy."  *Id.* at 1385.  The court stated that a "policy" means "a 'course of action consciously chosen among various alternatives' respecting basic governmental functions as opposed to episodic exercises of discretion in the operational details of government."  *Id.*  at 1386.  Further, the Fourth Circuit has ruled that policy can only be established by the final policymaking authority.  *Crowley v. Prince George's County, Md.*, 890 F.2d 683, 685 (1989) (citing *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989)).  *Crowley* involved a discrimination claim brought under 42 U.S.C. § 1981 against Prince George's County.  The Fourth Circuit held that only the County Council and County Executive, and not the Chief of Police, have final authority to make policy on police personnel matters:

> Similarly, the Prince George's County police chief is responsible for personnel decisions within the police department, but he does not possess final policymaking authority.   Article IX of the Prince George's County Charter unambiguously vests the authority to establish and administer a personnel system in the County Council and the County Executive   The Charter states that "the Council shall provide by law for a personnel system governing the appointment and removal of employees, and other personnel procedures for employees in the County government."   Prince George's County Charter, Art. IX, § 901.   In

9

addition, it dictates that all personnel decisions be based on merit and fitness. *Id.*
The County Executive, through the Office of Personnel, administers the system.
Charter, Art. IX, § 905. Nothing in the Charter bestows on the police chief any
type of policymaking authority concerning personnel matters.

*Id.* at 686.

Furthermore, the Fourth Circuit has held that a "custom or usage" sufficient to impose liability on a municipality for the unconstitutional acts of its officials "may be found in 'persistent and widespread . . . practices of [municipal] officials [which] [a]lthough not authorized by written law [are] so permanent and well-settled to [have] the force of law.'" *Spell*, 824 F.2d at 1386 (quoting *Monell*, 436 U.S. at 691) (alterations in original). In order to impose liability on the municipality under *Monell*, there must be a "causal connection" between the policy or custom and the illegal or unconstitutional act of the official, such that the causal connection is "proximate" in tort principle terms, "not merely 'but for' causation in fact." *Id.* at 1387-88. Accordingly, a "policy or custom" claim against a municipality is not a stand-alone claim. Under 42 U.S.C. § 1983, municipal officers are liable for unconstitutional or illegal acts, and municipalities are not liable under *respondeat superior*. *Monell*, 436 U.S. at 692-94. Rather, a municipality is liable only if a policy or custom of the municipality proximately caused the officer's illegal or unconstitutional act. *Id*.

A *Monell*, "policy or custom" claim seeking to impose liability on a municipality for the unconstitutional acts of its officers is analytically distinct from a class action claim seeking to establish a "pattern or practice" of racial discrimination or retaliation. In a pattern or practice class action, the class must establish in the first phase of the case through statistical and other evidence that racial discrimination or retaliation was the government's "standard operating procedure." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336-39 (1977). If a pattern or practice is shown, the court must conduct a second or "remedy" phase in which individual

10

class members seek damages or specific injunctive relief, such as reinstatement.  In the remedy phase, individual class members are entitled to a presumption that they were the victim of the pattern or practice of discrimination or retaliation, and the burden is on the employer to prove that an adverse employment action was taken for a nondiscriminatory reason.  *Id*. at 359 & n.45. A *Monell* "policy or custom" claim is distinct from a class action procedurally and substantively. To assert a *Monell* claim to impose liability on a municipality for a discrimination or retaliation by an officer, a municipal employee must first demonstrate that a municipal officer discriminated or retaliated against the employee in violation of the laws or Constitution of the United States. *Monell*, 436 U.S. at 691-93.  If the employee successfully proves his or her discrimination or retaliation claim, the employee may then seek to establish that the municipal government had a "policy or custom" in place that proximately caused the discrimination or retaliation against the plaintiff.  *Monell*, 436 U.S. at 691, 694-95.

In *Evans v. Port Authority of New York and New Jersey*, No. 02 CIV.3482 LAK, 2005 WL 2211309 (S.D.N.Y. Sept. 13, 2005), for example, Evans brought an action against the Port Authority and certain of its officers alleging, among other things, that he was retaliated against for making complaints about discrimination by being (1) placed on AWOL status, and (2) excluded from four job assignments.  *Id.* at *1.  The Port Authority moved the district court to exclude evidence proffered by Evans of specific bad acts to demonstrate a "custom and practice" of retaliation against African-American employees who complained of racial discrimination on grounds that the evidence was prejudicial, would confuse the jury, and would needlessly prolong the trial.  The district court ruled that under *Monell* a government may be held liable for the illegal and unconstitutional acts of its employees if the plaintiff can "'plead and prove that the injury complained of was the consequence of a government's policy or custom, whether made by

11

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"
*Id.* (quoting *Blasetti v. Pietropolo*, 213 F. Supp. 2d 425, 430 (S.D.N.Y. 2002)).  The district court
further explained that the *Monell* "policy or custom" requirement may be satisfied "by
demonstrating official indifference to repeated similar discriminatory acts."  *Id.*  To address
potential prejudice from the introduction of other alleged bad acts that were untethered to Evans'
claim, the district court bifurcated the trial and required Evans to demonstrate that he was a
victim of retaliation before he could present evidence of other acts.  *Id.* at *2.  If Evans could
prove this claim, the Court would hold a second phase in which it considered evidence of other
acts offered in an attempt to prove a policy or custom of discrimination:

> Accordingly, the Court will further divide the trial.  It will try the retaliation and
> HWE [Hostile Work Environment] claims, together with any factual issues
> bearing on whether the responsible actors were policy making officials, first.
> During the proceeding, evidence of any alleged custom and practice will not be
> received  In the event plaintiff succeeds in proving retaliation or HWE, but fails
> to prove that the responsible actors were policy makers, it will proceed to try the
> circumstantial *Monell* issue and damages separately in an order yet to be
> determined.  The Court reserves any ruling on the scope of the circumstantial
> proof on the *Monell* issue.

*Id.* (internal footnote omitted).

In short, unlike a pattern or practice class action claim, a *Monell* claim to impose liability
on a municipality for an action of an officer may be asserted only if the employee first
establishes a claim against a municipal officer for discrimination or retaliation.  *See Anderson v.
Caldwell Cty. Sheriff's Office*, 524 F. App'x 854, 862 (4th Cir. 2013) ("No actionable claim
against supervisors or local governments can exist without a constitutional violation committed
by an employee. (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, (1986) (per curiam)));
*Giancola v. State of W.Va. Dep't of Pub. Safety*, 830 F.2d 547, 550 (4th Cir. 1987) ("[T]o
establish liability on behalf of the entity, it must be shown that the actions of the officers were
unconstitutional and were taken pursuant to a custom or policy of the entity. *Monell v.*

*Department of Social Services of New York,* 436 U.S. 658, 690–92, 98 S. Ct. 2018, 2035–37, 56 L.Ed.2d 611 (1978). If the officers' actions were in compliance with constitutional standards, there is no liability on the part of the officers or the employing entities."). Moreover, in a *Monell* claim, unlike a class action, no presumption of discrimination is created against the government and in favor of the plaintiff on his or her individual claim. *Monell*, 436 U.S. at 691-93.

### B.   "Me-Too" or "Other Employee" Evidence

Evidence of an employer's alleged past discriminatory or retaliatory acts toward other employees may in certain circumstances be offered to establish that the employer intended to discriminate or retaliate in the case before the court. This evidence is commonly referred to as "me-too" or "other employee" evidence. *Calobrisi v. Booz Allen Hamilton, Inc.,* 660 F. App'x 207, 209 & n.3 (4th Cir. 2016); *Barclay v. Mercy Health Serv.*, *Barclay v. Mercy Health Servs.-Iowa Corp.*, No. C 07-4074-MWB, 2009 WL 2462296 at *4 (N.D. Iowa Aug. 12, 2009). In *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 386-88 (2008), the Supreme Court ruled that such evidence is neither per se admissible nor inadmissible under Federal Rule of Evidence 404(b), but rather, that its admissibility depends on the facts of a given case, "including how closely related the evidence is to the plaintiff's circumstances and theory of the case." The factors that a court must consider, pursuant to Federal Rules of Evidence 403 and 404(b), in determining the admissibility of such evidence include: (1) whether past discriminatory or retaliatory behavior "'is close in time to the events at issue in the case;'" (2) "'whether the same decisionmakers were involved;'" (3) "'whether the witness and the plaintiff were treated in a similar manner;'" and (4) "'whether the witness and the plaintiff were otherwise similarly situated.'" *Calobrisi*, 660 F. App'x at 209-10 (citation omitted). Similarly, when analyzing whether an alleged racially discriminatory remark is relevant to a case, the courts consider:

(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker), (2) when the remark was made in relation to the employment decision at issue, (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory), and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

## C. <u>Evidence to Prove Associational Standing Claims</u>

Two Plaintiffs, HNLEA and UBPOA, seek to assert representational claims on behalf of non-plaintiff members who claim to have been victims of discrimination or retaliation resulting from PGPD's alleged policy or custom of racial discrimination and retaliation. In the Amended Complaint, HNLEA and UBPOA seek the following relief on behalf of their unnamed members:

> (v)    Immediately rescind and expunge any and all discipline issued to Plaintiffs **and their members** from any and all files and records of the PGPD;

> (vi)    Immediately reinstate any and all Plaintiffs **and their members** who were wrongfully terminated from employment due to the discriminatory acts complained of herein….

Am. Compl. at pp. 77-78 (emphasis added).

HNLEA and UBPOA, however, cannot utilize associational standing to seek individual determinations of discrimination or retaliation or remedies on behalf of non-party members because such determinations require each member's individual participation in the case. As the Second Circuit ruled in *Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004):

> This does not mean, however, that an association automatically satisfies the third prong of the *Hunt* test simply by requesting equitable relief rather than damages. The organization lacks standing to assert claims of injunctive relief on behalf of its members where "the fact and extent" of the injury that gives rise to the claims for injunctive relief "would require individualized proof," *Warth v. Seldin*, 422 U.S. at 515-16, 95 S. Ct. 2197, or where "the relief requested [would] require [ ] the participation of individual members in the lawsuit," *Hunt*, 432 U.S. at 343, 97 S. Ct. 2434.

*Id.* at 714 (alterations in original). Both the merits and remedies of individual claims require individual determinations. Remedies that would require a member's individual participation

include damages or an injunction requiring rescission of discipline, reinstatement, or expungement of disciplinary records.

Indeed, courts routinely rule that associations lack standing to pursue injunctive relief on behalf of their members when that relief would require individual participation of each injured party. That is, when the individualized assessment would require an undertaking by the court, rather than by the defendant, courts have found that an association does not have standing to seek such relief on behalf of its members without the members' individual participation in the lawsuit. For example, in *Parent/Prof'l Advocacy League v. City of Springfield, Mass.*, 934 F.3d 13 (1st Cir. 2019), the First Circuit ruled that the plaintiff organization, which advocated on behalf of students with disabilities, lacked standing to sue the defendant school district on behalf of students in part because the plaintiff sought injunctive relief ordering the school district to provide the students with "'school-based behavior services in neighborhood schools to afford them an equal educational opportunity and enable them to be educated in neighborhood schools.'" *Id.* at 17-18, 35. The court reasoned:

> adjudication of the claims here would turn on facts specific to each student, including unique features of each student's unique disability, needs, services, and placement. Efficient and successful judicial resolution of the claims would thus require participation and cooperation by numerous students and parents. And, as we stated, representative standing is inappropriate where such participation is necessary.

*Id.* at 35; *see also Bd. of Managers of Mason Fisk Condo. v. 72 Berry St., LLC*, 801 F. Supp. 2d 30, 35–36 (E.D.N.Y. 2011) ("[A]ssociational standing cannot be maintained here because proving the claims in the complaint would require the participation of each individual purchaser. . . . The requested injunctive relief features specific performance in the way of finished construction, which presumably includes construction of common areas as well as individual units.").

HNLEA and UBPOA have sought to finesse this limitation on associational standing by departing from the relief expressly sought in their Amended Complaint and claiming that they seek (1) a declaratory judgment that PGPD has a policy or custom of racial discrimination and retaliation, (2) an injunction ordering the PGPD to abolish discrimination on the basis of race through the implementation of policy changes, and (3) an injunction establishing a plan for the PGPD to review allegedly discriminatory terminations and disciplinary proceedings and reinstate wrongfully terminated officers or otherwise remedy those prior acts of discrimination and retaliation. *See* Memorandum Opinion (ECF No. 73) at 12.

In the final prayer for relief listed above, Plaintiffs are incorrectly attempting to utilize a *Monell* claim and associational standing to assert individual claims of their members requiring individual determinations and effectively to pursue a pattern or practice class action without pleading such a claim and satisfying the requirements for class certification. As discussed above, a *Monell* claim is analytically distinct – substantively and procedurally – from a class action pattern or practice claim. *Monell* provides a vehicle to impose liability pursuant to 42 U.S.C. § 1983 on a municipality for a federal law or constitutional violation by one of its officers. In order to impose *Monell* liability on a municipality for an action of one of its officers, however, a plaintiff must first prove that the municipal officer engaged in discrimination or retaliation. *See Anderson*, 524 F. App'x at 862 (4th Cir. 2013); *Giancola*, 830 F.2d at 550; *Evans*, 2005 WL 2211309, at *2. If such a claim is proven, the plaintiff may then seek to establish that the action was proximately caused by a "policy or custom" of the municipality and impose liability on the municipality. *Monell*, 436 U.S. at 691; *Giancola*, 830 F.2d at 550 ("If the officers' actions were in compliance with constitutional standards, there is no liability on the part of the officers or the employing entities."); *Spell*, 824 F.2d at 1386-88. Accordingly, a *Monell* claim is dependent on

16

the plaintiff first proving an underlying illegal or unconstitutional act of a municipal officer. Only if such a violation is proven, can the employee seek to impose liability on the municipality because the violation was proximately caused by a policy or custom of the municipality. The adjudication of the underlying discrimination claim and whether a policy or custom proximately caused the officer's act of discrimination or retaliation is a fact intensive analysis of a plaintiff's individual. Likewise, an adjudication of the appropriate remedy, including damages or an injunction requiring reinstatement, rescission, or expungement requires an individual determination. *Parent/Prof'l Advocacy League*, 934 F.3d at 35; *Bano*, 361 F.3d at 714; *Bd. of Managers of Mason Fisk Condo*, 801 F. Supp. 2d at 35-36. The adjudication requires a plaintiff's participation in the absence of a class action certification. Further, the adjudication should be given preclusive effect against the plaintiff.

A pattern or practice class action, on the other hand, requires the class to first demonstrate a pattern or practice of racial discrimination in the liability phase. If the class is successful, individual class members may seek to obtain an injunction or damages in a remedy phase in which the individual member enjoys a presumption that the adverse action taken against him or her was the product of discrimination. *See Teamsters*, 431 U.S. at 359 & n.45, 361. Plaintiffs have not sought to pursue a class action.

2.     **This Court Should Limit The Number Of Untethered Acts On Which Plaintiffs Can Rely To 20**

A.     ***Monell* Evidence and "Me-Too" Evidence**

In order for the County to determine the admissibility of Plaintiffs' alleged untethered acts and to prepare to address them at trial, the County must discover the nature and scope of the alleged acts, when they occurred, and the identity of the decision-maker or perpetrator. Further, the introduction of untethered acts results in "mini-trials" to determine whether the acts occurred

17

and have any relevance to the individual claims of the Plaintiffs.  *See, e.g.*, *Godwin v. Wellstar Health Sys., Inc.*, No. 1:12-CV-3752-WSD, 2015 WL 7313399, at *4 (N.D. Ga. Nov. 19, 2015) ("The admission of this kind of speculative evidence would effectively require a mini-trial to litigate whether the witnesses were, in fact, 'discriminated' against."); *Mendelsohn v. Sprint/United Mgmt. Co.*, 587 F. Supp. 2d 1201, 1218 (D. Kan. 2008) ("Testimony that Vorhies, Kennedy, Stock, Mathus or Reynolds or other unnamed supervisors discriminated against the five witnesses would have resulted in mini-trials that would have created confusion and waste of time.").  The Supreme Court has ruled that "me-too" evidence that is untethered to the plaintiff's work experience, is by its very nature collateral to the proceeding, may have little or no relevance, and is potentially very prejudicial.  *See Sprint*, 552 U.S. at 387-88.  Accordingly, as will be explained below, district courts have exercised their authority under Federal Rules of Evidence 403 and 404(b) to limit the extent of such evidence.  For example, courts have ruled that the number of "me-too" incidents introduced should not be more extensive than the substantive evidence at issue in the underlying case.  *See, e.g.*, *Barclay*, 2009 WL 2462296 at *6 (citing *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 755 (8th Cir. 2000)).

These same considerations militate in favor of limiting the volume of *Monell* evidence. Plaintiffs' attempts to introduce "me-too" evidence and evidence to establish a "policy or custom" of racial discrimination and retaliation are conceptually and analytically similar. Plaintiffs have not suggested that the County Council and Executive have ever adopted a policy of discrimination or retaliation.  Rather, Plaintiffs seek to establish that such discrimination or retaliation has occurred persistently and not been corrected and, therefore, is a "custom" of the County.  The attempt to prove a custom of discrimination or retaliation is conceptually similar to "me-too" evidence in that they both seek to introduce prior acts that are unrelated to the

18

Plaintiffs' personal experience and may have little or no relevance to it.  The introduction of a voluminous amount of alleged prior acts that are unrelated to the individual Plaintiffs' experience creates a great danger of unfair prejudice, particularly where the overwhelming number of vague allegations prevents the County from discovering and investigating what actually happened.  The evidence is also cumulative and repetitive, and courts exclude such evidence.  *Godwin*, 2015 WL 7313399, at *4; *Mendelsohn*, 587 F. Supp. 2d at 1218.  Finally, Plaintiffs should not be permitted to introduce evidence of alleged discriminatory conduct where no perpetrator or victim is identified, or where the circumstances are not described in sufficient detail to permit the County to investigate them.

The district courts have limited the extent of untethered acts to prevent the introduction of cumulative and unfairly prejudicial evidence.  In *Latino Officers Ass'n, Inc. v. City of New York*, No. 99 CIV. 9568, 2003 WL 22300158 (S.D.N.Y. Oct. 8, 2003), for example, the district court certified a class action composed of all African-American and Latino officers of the New York City Police Department ("NYPD").  The class asserted that it had been subjected to racial discrimination in a pattern or practice of disparate disciplinary decisions and unlawful retaliation. *Id.* at *1.  The district court divided the trial of the class action into two phases:  the liability phase and the remedy phase.  *Id.* at *3.  The district court ruled that in the liability phase, the plaintiffs would bear the burden of proving that the NYPD engaged in a pattern or practice of racial discrimination or retaliation against the class.  *Id.*  If the plaintiffs succeeded in meeting this burden, the district court ruled that it would convene a further phase – the remedial phase – to determine whether any individual plaintiff was entitled to individualized relief, such as reinstatement, back pay or damages.  *Id.*

The plaintiffs estimated that they intended to call over 250 witnesses in the liability portion of the trial to establish a pattern or practice of racial discrimination and retaliation. *Id.* at *1. The district court determined that this number of witnesses would necessitate a trial of at least 10 to 16 weeks. *Id.* at *2. As a result, the district court on its own motion ordered the parties to show cause why the liability phase of the trial should not be limited to 110 hours divided equally between the two sides. *Id.* at *1. The plaintiffs resisted, contending that no time limit should be imposed. Their fallback position was that they be given 150 hours to present their direct case. *Id.* Furthermore, the plaintiffs argued that if the district court limited their trial time: (1) the NYPD should be precluded from arguing that the instances are too few to demonstrate a pattern or practice, and (2) the jury should be instructed that the plaintiffs' presentation time was limited, and therefore, the jury should be instructed either to take into account the fact that the plaintiffs' time was limited or to find a pattern or practice of discrimination if the limited number of incidents presented by the plaintiffs were true. *Id.*

The district court rejected the plaintiffs' arguments and decided to limit the trial of the liability phase to no more than 190 hours, equally divided between the parties. First, the district court explained:

> It goes without saying that both sides are entitled to a fair trial and to an adequate opportunity to present evidence in their respective efforts to persuade the trier of fact to find in their favor. This is true in every case, and it certainly is true here, where plaintiffs raise serious issues about whether the law enforcement agency immediately relied upon by citizens of our City conducts itself in an appropriate manner toward all of its officers. By the same token, neither this nor any other court has infinite resources. This is one of many hundreds of cases on the docket of the undersigned, and care must be taken to ensure that zealous advocacy, however commendable, does not deprive other litigants of the attention that their cases too deserve.
>
> Considerations such as these have resulted in a long line of cases making clear the authority of district judges to impose reasonable time limitations on trials.

*Id.* at *2.

In limiting the trial hours plaintiffs could use, the district court focused on proffered anecdotal evidence to establish a pattern or practice of racial discrimination.  The district court ruled that anecdotal evidence of discrimination or retaliation that did not relate to a specific plaintiff would be limited to 11 hours in order to make the trial "manageable."  *Id.* at *3-4 (citing *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 168 (2d Cir. 2001)).  The district court cited the following authorities for the proposition that there is "a long line of cases making clear the authority of district judges to impose reasonable time limitations on trials."  *Id.* at 2 (quoting *Life Plus Int'l v. Brown*, 317 F.3d 799, 807 (8th Cir. 2003) ("Trial courts are permitted to impose reasonable time limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence."); *Sparshott v. Feld Entm't, Inc.*, 311 F.3d 425, 433 (D.C. Cir. 2002); *Amarel v. Connell*, 102 F.3d 1494, 1513-15 (9th Cir. 1996); *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 520 (5th Cir. 1994) ("In the management of its docket, the court has an inherent right to place reasonable limitations on the time allotted to any given trial."); *Borges v. Our Lady of the Sea Corp.*, 935 F.2d 436, 442-43 (1st Cir. 1991) ("District courts may impose reasonable time limits on the presentation of evidence."); *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 473 (7th Cir. 1984)).

Likewise, in *Barclay v. Mercy Health Serv.*, 2009 WL 2462296 (N.D. Iowa 2009), three nurses in a specialized care unit at Mercy Medical Center – Sioux City brought an action against the medical center and others alleging sexual harassment by a male charge nurse, Richter, and others and retaliation for complaining about the harassment.  *Id.* at *1.  The plaintiffs sought to introduce evidence of alleged harassment that was perpetrated in other departments of the medical center and by persons other than Richter.  *Id.* at *3-4.  The district court ruled that, while such evidence was not *per se* inadmissible, "the court will likely exclude at trial evidence of

alleged harassment of others, if it becomes more extensive than the evidence of the harassment of plaintiffs themselves."  *Id.* at *6.

In the present case, as in *Latino Officers Ass'n, Inc.*, it is unreasonable for Plaintiffs to seek to present evidence of 121 untethered acts, which presentation could consume 20 weeks of trial time.  Indeed, the amount of time required to address these incidents with diligence in discovery, pretrial motions, and trial would overwhelm the parties' and the Court's resources. Further, evidence of untethered acts is always of questionable relevance to a plaintiff's claim. Proof of 121 alleged incidents would be cumulative, repetitive, and unfairly prejudicial. Accordingly, the County requests that the Plaintiffs be limited to introducing evidence of 20 untethered alleged acts.  Further, the County requests this Court to require Plaintiffs to identify the untethered acts on which they will rely at trial and grant the parties additional deposition time, interrogatories, and requests for production of documents to address those untethered acts.

In *Latino Officers Ass'n, Inc.*, the district court limited the parties' presentations to a certain number of hours based on the number of anecdotal incidents proffered and the number of hours that would be required for the parties to address the alleged incidents at trial.  In the present case, the County respectfully submits that the Court should limit the number of acts on which Plaintiffs can rely and require them to identify those acts.  A limitation on the number of acts will not only limit the length of the trial, but also will give the County a meaningful opportunity to investigate and discover the circumstances involved.  Requiring the Plaintiffs to identify the acts prior to trial is consistent with this Court's requirement that parties identify witnesses prior to trial.  *See* Local R. 106.2.i.  Identification at this juncture has the added advantage of making discovery possible.

### B.   <u>Evidence Offered to Prove Associational Standing Claims</u>

HNLEA and UBPOA have suggested that certain alleged (but as yet unidentified) untethered acts are not actually untethered because HNLEA and UBPOA seek to rely on those acts to assert claims on behalf of their members.   As previously indicated, HNLEA and UBPOA seek a declaratory judgment that PGPD has a "policy or custom" of racial discrimination or retaliation and an injunction (1) ordering the PGPD to abolish its "policy or custom" of discrimination and retaliation through the implementation of policy changes, and (2) establishing a plan for the PGPD to review allegedly discriminatory terminations and disciplinary proceedings and reinstate or otherwise remedy those prior acts of discrimination through reinstatement, back pay, etc.   This purported attempt to utilize a *Monell* claim in the context of associational standing effectively constitutes an impermissible attempt to pursue a pattern or practice class action without establishing the prerequisites for a class action.

Representational, or associational, standing is not appropriate where the claim requires the individual participation of a member.   *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977).   A *Monell* claim is a vehicle to impose liability on a municipality pursuant to § 1983 for the illegal or unconstitutional acts of one of its officers.   *Monell*, 436 U.S. at 491-93.   To establish a *Monell* claim, a plaintiff must prove: (1) first, that the municipal officer discriminated or retaliated against the plaintiff, and (2) if so, a "policy or custom" of the municipality **proximately caused** the action of the officer.   Both phases of a *Monell* claim require the individual participation of the member of the association in order to prove the facts and circumstances of the member's individual claim of discrimination.   If the member is successful, the member's individual participation is necessary to determine damages, back pay, reinstatement, rescission or expungement.   *Cf. Parent/Prof'l Advocacy League*, 934 F.3d at 35;

23

*Bano*, 361 F.3d at 714; *Bd. of Managers of Mason Fisk Condo*, 801 F. Supp. 2d at 35-36. Further, the determination as to whether the member was a victim of discrimination or retaliation could be given preclusive effect by the Court and, therefore, requires the individual participation of the member.  Likewise, the determination as to whether a "policy or custom" caused an association member's harm also could be given preclusive effect.

On the other hand, pattern or practice class actions are divided into two phases.  In the first phase, known as the liability phase, the class seeks to establish through statistical and other evidence that the municipality engaged in a pattern or practice of discrimination and retaliation. *Teamsters*, 431 U.S. at 336.  If the class is able to demonstrate such a pattern and practice, the case proceeds to the remedy phase in which the court awards remedies to specific plaintiffs.  In the remedy phase, there is a presumption that the adverse employment action was the product of discrimination or retaliation.  *Id.* at 359 & n.45, 361.

In the present case, Plaintiffs attempt to assert a *Monell* claim in the context of associational standing in a way that makes this case the functional equivalent of a pattern or practice class action.  To create this class action claim without satisfying the prerequisites for a class action, Plaintiffs have flipped the required *Monell* analysis on its head.  Plaintiffs ask the Court to first determine the existence of a "policy or custom" of retaliation and then (1) determine whether an act of discrimination or retaliation occurred in the case of each association member and (2) determine the appropriate remedy for the violation, including damages, expungement, rescission or reinstatement.  Presumably, Plaintiffs would have this Court apply a presumption of discrimination in determining whether the rights of individual members have been violated and what remedy is appropriate.  This analysis is not *Monell* analysis.  It is pattern or practice class action analysis.  Plaintiffs should not be permitted to pursue a class action

24

without satisfying the requirements for one.  Plaintiffs may contend that this Court authorized this procedure in its Memorandum Opinion (ECF No. 73) at pages 11-14 when it ruled that HNLEA and UBPOA have associational standing to assert claims on behalf of their members. The County understands Court's Memorandum Opinion to authorize the associations to seek a declaratory judgment that the County has a "policy or custom" of racial discrimination and broad injunctive relief against the continuation of the policy or custom, but not to seek individualized determinations of liability or remedy on behalf of association members.

Accordingly, the County requests this Court to make it clear that HNLEA and UBPOA cannot pursue individual claims of their members for determination of discrimination or retaliation and remedies for such violations.  In *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955 (11th Cir. 2008), *abrogated on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) *and Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Eleventh Circuit noted that a pattern or practice discrimination claim "must be litigated either as a class action or not at all."  *Id.* at 967.  There, African-American employees of Coca-Cola brought a class action against the company arguing that it had a pattern and practice of racial discrimination as to pay raises, benefits, and promotions.  *Id.* at 961-62.  The district "court dismissed plaintiffs' pattern or practice claims on the ground that a pattern or practice claim is available only as a class action and plaintiffs had not sought class certification."  *Id.* at 962.  The employees appealed, arguing, among other things, that they should be permitted to prosecute a pattern or practice claim for declaratory or injunctive relief as individuals without being certified as class representatives.  *Id.* at 967.  The Eleventh Circuit rejected this contention, explaining:

> A Rule 23(b)(2) class certification would give the named plaintiffs standing to represent the claims of the unnamed class members for declaratory and injunctive

relief.  Without Rule 23(b)(2) certification, however, the named plaintiffs lack standing to pursue such relief for themselves because the complaint did not allege a likelihood that they will be denied a supervisory position in the future.

*Id.* at 968.  Further, the court stated:

Most important, perhaps, are the potential *res judicata* and collateral estoppel issues that would arise if the law permitted an individual to prosecute a pattern or practice claim without formally representing all similarly situated employees.  As it stands, if a class is certified and the employer prevails on the pattern or practice issue, unnamed class members would be barred by *res judicata* from asserting the pattern or practice claim in a separate proceeding, even though they might retain their individual disparate treatment actions against the employer.  If a class is not certified and the employee prevails, however, whether the unnamed class members would be barred by the doctrine of issue preclusion from proceeding against the employer would be problematical.

*Id.* at 968-69.

The Eleventh Circuit's reasoning is persuasive.  Plaintiffs cannot pursue a pattern or practice claim, including individual discrimination claims and individual remedies unless they establish the elements of a class action.  If Plaintiffs wish to pursue a class action, they should seek to certify a class action.  Similarly, if members of HNLEA and UBPOA want to assert individual claims requiring individual determinations, they should become plaintiffs.  Plaintiffs' attempt to use *Monell* and associational standing to manufacture a class action turns *Monell* analysis on its head and is impermissible.  *Monell* requires that an individual plaintiff first prove that he or she was a victim of discrimination by a government officer before proceeding to attempt to impose liability on the municipal government for the acts of its officers.

Finally, if the Court were to allow HNLEA and UBPOA to pursue individual claims for members, the Court should issue an order requiring Plaintiffs to identify the nature and scope of claims that HNLEA and UBPOA seek to assert on behalf of their members, including the identity of the alleged perpetrator.  The County requested this information in discovery and Plaintiffs have categorically refused to supply the information.  *See* Exs. 3 and 4.  It is

26

inconceivable that HNLEA and UBPOA can pursue claims on behalf of their members in this lawsuit and then refuse to state the basis for the claims as they would be required to do in a complaint.  Plaintiffs appear to seek to structure the case so that the County learns of the claims of these members – who are not Plaintiffs – for the first time at trial.

<strong>C.    The Present Motion Is Not Premature</strong>

Plaintiffs have suggested that this Motion is premature, and the Court should not make a decision limiting the scope of this trial until after discovery has been completed.  This suggestion is without merit.  Plaintiffs have been investigating and pursuing this action for more than a year.  They have specifically alleged 121 untethered acts, and Plaintiffs' counsel have represented that they have made a reasonable and good faith investigation of the underlying facts of these alleged untethered acts.  Now is an appropriate time to limit the scope of the case to make both discovery and trial manageable and to eliminate cumulative, repetitive, and unfairly prejudicial evidence.

<strong>CONCLUSION</strong>

For the reasons stated, the County requests this Court to:

(1)    Limit to 20 the number of alleged untethered acts (identified in Ex. 1) on which Plaintiffs may rely at trial;

(2)    Require Plaintiffs to identify the untethered acts on which they intend to rely at trial; and

(3)    Grant the parties three additional hours of deposition and three interrogatories and requests for production of documents in each untethered act on which Plaintiffs rely.

Respectfully submitted,

_____ /s/ *Kurt J. Fischer*_____

Kurt J. Fischer

Kurt J. Fischer, Bar No. 03300
Matthew R. Alsip, Bar No. 28002
Christine C. Carey, Bar No. 29428
Venable LLP
210 W. Pennsylvania Avenue, Suite 500
Towson, Maryland 21204
Tel: (410) 494-6200
Fax: (410) 821-0147
kjfischer@venable.com
mralsip@venable.com
cccarey@venable.com

Todd J. Horn, Bar No. 06849
Craig A. Thompson, Bar No. 26201
Christine E. White, Bar No. 19185
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel.: (410) 244-7400
Fax: (410) 244-7742
tjhorn@venable.com
cathompson@venable.com
cewhite@venable.com

Robert G. Ames, Bar No. 03372
Courtney Sullivan (admitted *pro hac vice*)
Vincent Verrocchio, Bar No. 460429
Lauren Stocks-Smith, Bar No. 20784
Venable LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Tel.: (202) 344-4000
Fax: (202) 344-8300
rgames@venable.com
casullivan@venable.com
veverrocchio@vehable.com
lrstocks-smith@venable.com

*Counsel for Defendants,*
*Prince George's County, Maryland et al.*

28

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 28th day of February 2020, a copy of the foregoing Memorandum of Law in Support of Defendants' Motion *In Limine* and for Appropriate Relief was served via the Court's CM/ECF system on all counsel of record.

 */s/ Kurt J. Fischer*
Kurt J. Fischer