## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

| | |
|---|---|
| HISPANIC NATIONAL LAW ENFORCEMENT ASSOCIATION NCR, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> PRINCE GEORGE'S COUNTY, MARYLAND, *et al.* <br><br> Defendants. | Case No. 18-cv-03821 TDC |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO LIMIT THE NUMBER OF DISCRIMINATORY ACTS THAT MAY BE CONSIDERED AT TRIAL

Dennis A. Corkery (D. Md. Bar No. 19076)
Joanna K. Wasik (D. Md. Bar No. 21063)
WASHINGTON LAWYERS'
  COMMITTEE FOR CIVIL RIGHTS
  AND URBAN AFFAIRS
700 14th St., N.W., Suite 400
Washington, DC  20005
(202) 319-1000
dennis_corkery@washlaw.org
Joanna_wasik@washlaw.org

Deborah A. Jeon (D. Md. Bar No. 06905)
ACLU OF MARYLAND
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
(410) 889-8555
jeon@aclu-md.org

John A. Freedman (D. Md. Bar No. 20276)
Adam M. Pergament (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
John.Freedman@arnoldporter.com
Adam.Pergament@arnoldporter.com

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND ........................................4

    A.   The Complaint and Scope of Claims ...........................................................4

    B.   The Court's Prior Determination Regarding Organizational Claims ...........................5

    C.   Defendants' Efforts to Limit Discovery Into Their Disciplinary System.....................5

    D.   Defendants' Complaints About the Responses to Their Discovery...............................6

    E.   Defendants' Premature Request to Limit Proof at Trial .................................7

    F.   Defendants' List of So-Called "Untethered" Acts Mischaracterizes, as "Comparator" or "Me Too" Evidence, Events Which Are Actually Directly Relevant to the Claims ..................................................................9

III.  ARGUMENT.......................................................................................10

    A.   Under the Controlling Decisions of the Supreme Court, Fourth Circuit and This Court, All of the Allegedly "Untethered" Acts Are Relevant to Both the Claims of the Individual Plaintiffs and the Claims for Injunctive and Corrective Relief of the Organizational Plaintiffs. ........................................10

        1.   Under *Monell*, Evidence of "Persistent and Widespread" Discrimination Against Individuals Represented by the Organizational Plaintiffs Is Relevant to Show Practices, Policies, or Customs...............................................10

        2.   The Organizational Plaintiffs' Proof of Their Complaints of Discrimination Are Plainly Relevant to Their Separate Claims for Injunctive Relief for All Their Members ..................................................................14

    B.   The So-Called "Untethered Acts" Will Be Part of One Comprehensive Presentation of the Discriminatory Policies, Practices and Customs of PGPD...........16

    C.   Evidence That The Department Fails to Handle Complaints of Racial Harassment and Discrimination in an Appropriate Manner ........................................19

    D.   Evidence That the Department Discriminates Against Black and Latinx Officers in Its Disciplinary Process ...........................................................23

    E.   Evidence That PGPD Retaliates Against Officers Who Complain About Racial Harassment and Discrimination.....................................................25

F.    Defendants' Demand That the Court Prohibit Any Proof on Discriminatory
      Acts Beyond An Arbitrary Number Is Not Supported by Any Case Law..................26

G.    There Is No Need to Grant Defendants Additional Deposition Time,
      Beyond The Total of 125 Hours The Parties Previously Agreed Upon .....................30

CONCLUSION..................................................................................................................31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abasiekong v. City of Shelby*,
  744 F.2d 1055 (4th Cir. 1984) ........................................................................................16, 23

*Ability Center of Greater Toledo v. Lumpkin*,
  808 F. Supp. 2d 1003 (N.D. Ohio 2011)....................................................................................2

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)....................................................................................................................1

*Assoc. for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*,
  2012 WL 12995641 (C.D. Cal. Dec. 7, 2012) ..........................................................................2

*Barclay v. Mercy Health Service*,
  No. C 07-4074-MWB, 2009 WL 2462296 (N.D. Iowa Aug. 12, 2009)...........................29, 30

*Bordanaro v. McLeod*,
  871 F.2d 1151 (1st Cir. 1989) ..................................................................................................16

*Calobrisi v. Booz Allen Hamilton, Inc.*
  660 F. App'x 207 (4th Cir. 2016) (cited at Mot. 13) ...........................................16, 27, 28, 32

*Cox v. District of Columbia*,
  821 F. Supp. 1 (D.D.C. 1993) ..................................................................................................23

*Crowley v. Prince George's County*,
  890 F.2d 683 (4th Cir. 1989) ..............................................................................................12, 13

*EEOC v. Am. Nat. Bank*,
  652 F.2d 1176 (4th Cir. 1981) ............................................................................................16, 23

*Evans v. The Port Authority of New York*,
  2005 WL 2211309 (S.D.N.Y. Sept. 13, 2005)....................................................................13, 14

*Gay-Straight Alliance of Okeechobee High School v. School Bd. of Okeechobee*,
  477 F. Supp. 2d 1246 (S.D. Fla. 2007) .....................................................................................2

*Godwin v. Wellstar Health Systems, Inc.*,
  2015 WL 7313399, at *4 (N.D. Ga. Nov. 18, 2015) ................................................................13

*Griffin v. City of Opa-Locka*,
  261 F.3d 1295 (11th Cir. 2001) ...............................................................................................11

*Jornaleros de Las Palmas v. City of League City*,
   945 F. Supp. 2d 779 (S.D. Tex. 2013) ................................................................2

*Latino Officers Association, Inc. v. City of New York*,
   No. 99-CIV. 9568, 2003 WL 22300158 (S.D.N.Y. Oct. 8, 2003)..........................29

*Monell v. Dept. of Social Services of the City of New York*,
   436 U.S. 658 (1978)............................................................................ *passim*

*Neighborhood Action Coalition v. City of Canton*,
   882 F.2d 1012 (6th Cir. 1989) ......................................................................14

*Owens v. Baltimore City State's Attorneys Office*,
   767 F.3d 379 (4th Cir. 2014) ...................................................................11, 21

*Spell v. McDaniel*,
   824 F.2d 1380 (4th Cir. 1987) ............................................................. *passim*

*Sprint/United Management v. Mendelsohn*,
   552 U.S. 379 (2008)...............................................................................13, 28

*Vanguard Justice Society, Inc. v. Hughes*,
   471 F. Supp. 670 (D. Md. 1979) ...................................................................23

*Virginia Hospital Association v. Baliles*,
   868 F.2d 653 (4th Cir. 1989), *aff'd* 496 U.S. 498 (1990) ....................................15

## Statutes

ADEA ...........................................................................................................13

Title VII .......................................................................................................16

## Other Authorities

Fed. R.Civ. P. 26(b)(1).......................................................................................1

Fed. R. Civ. P. 30(b)(6)......................................................................................8

Fed. R. Evid. 401(a) ..........................................................................................1

Fed. R. Evid. 403 ...............................................................................13, 28, 29

*The New York Times* ........................................................................................20

*Washington Post* .............................................................................................20

## I.     INTRODUCTION

Faced with an array of racist and discriminatory conduct, the breakdown of any system to investigate and punish such acts, a widespread custom of using disciplinary process to further racial discrimination, and the systemic retaliation against officers who complained about such conduct, Defendants' motion represents nothing more than an attempt to avoid accountability for their misconduct.  At root, Defendants' motion is both an implicit acknowledgement that there are simply too many acts evidencing their discriminatory policies, practices and customs, coupled to a meritless plea to set an arbitrary limit on the number that can be presented at trial. The motion is fatally flawed for four independent reasons:

**1**.     **Defendants' motion flies in the face of the controlling law of the Supreme Court and the Fourth Circuit, which recognize that a plaintiff may establish a "policy, custom, or practice" under *Monell* by presenting the "failure by municipal policymakers to put a stop to or correct a widespread pattern" of discriminatory acts**.  *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).  The courts have repeatedly held that "practices" which are "sufficiently widespread . . . assume the quality of custom or usage, which per Section 1983, has the force of state law."  *Id*. at 1390 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).  Conversely, Defendants do not cite a single case—not one—where a plaintiff was barred from presenting such a "widespread pattern" at trial.  Indeed, to do so would violate both the Federal Rules of Civil Procedure (*e.g.*, Rule 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claims . . .")) and Evidence (*e.g.*, Rule 401(a) "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without . . .").  And, throughout their motion, Defendants concede that the acts in question are relevant to that *Monell* claim.  Defendants' Memorandum of Law in Support of Motion In Limine ("Mot.") – ECF No. 134-1 at 12, 14, 20.

**2.      Defendants' motion is contrary to this Court's prior ruling on the scope of the claims that may be pursued by the two plaintiff organizations.  As the Court held, "HNLEA and UBPOA may assert the constitutional rights of their members" and may pursue injunctive relief**.  Memorandum Opinion ("Mem. Op.") —ECF No. 73 at 12-14.  Yet, many of Defendants' so-called "untethered" acts are the very events the organizational Plaintiffs raised with Defendants on behalf of their members and in their related complaints to the Department of Justice.  Those acts thus directly establish that the discriminatory practices of the PGPD are "pervasive and widespread"; are known to Defendants; and are, in fact, the type of discrimination the organizations seek to enjoin.  Again, the courts consistently allow such organizational plaintiffs to bring municipal liability *Monell* claims on behalf of themselves and their members.  *See*, *e.g.*, *Assoc. for Los Angeles Deputy Sheriffs v. Cnty. of Los Angeles*, 2012 WL 12995641 (C.D. Cal. Dec. 7, 2012); *Jornaleros de Las Palmas v. City of League City*, 945 F. Supp. 2d 779, 795 (S.D. Tex. 2013); *Gay-Straight Alliance of Okeechobee High School v. School Bd. of Okeechobee*, 477 F. Supp. 2d 1246, 1252 (S.D. Fla. 2007); *Ability Center of Greater Toledo v. Lumpkin*, 808 F. Supp. 2d 1003, 1026 (N.D. Ohio 2011).

**3.      Defendants' motion is not supported by a single decision that has ever granted the relief they seek in this type of case**.  Throughout their brief, Defendants make demands without citing to any decision of any court that has ever set such an arbitrary limit on the number of discriminatory acts that can be presented in a *Monell* case—not at trial, and certainly not in the throes of discovery, months before a trial date has been set.

**4.      Defendants' motion is woefully premature**.  Last, but not least, the limits Defendants demand are not required by any practical consideration that cannot be addressed through an appropriate trial plan.  Plainly, Defendants' fanciful time "calculations," which are

not supported by any rational trial plan, are a wholly inadequate reason to jump the gun in such an arbitrary manner.

In contrast to all these defects in Defendants' motion, it is clear that the courts have heard "policy, custom, or practice" discrimination claims, without such limits or hypothetical problems. In this Response, we show that:

- The discriminatory acts at issue against Latinx and Black officers, or in favor of white officers, establish PGPD's discriminatory customs under *Monell* and the seminal decisions of the Fourth Circuit. Those customs injured the individual Plaintiffs.

- Those acts are even more relevant to the claims for injunctive relief by the two organizational Plaintiffs; they are the very acts those organizations seek to enjoin.

- Most of the incidents involve acts or statements which Defendants already investigated (or made a deliberate decision not to investigate) – and hence will not require the "from scratch" inquiry Defendants purportedly fear.

- The presentation of those facts at trial—primarily through the testimony of a police practices expert, relying on PGPD's own records—will thus not require the many "mini-trials" Defendants predict.

For all these reasons—and as shown in the Fourth Circuit decisions cited by Defendants themselves—an order now arbitrarily limiting the number of such discriminatory acts would be clear error. *Calobrisi v. Booz Allen Hamilton, Inc*. 660 F. App'x 207, 209-10 (4th Cir. 2016) (cited at Mot. 13). Indeed, it is telling that Defendants never suggest anywhere in their motion that if Plaintiffs prove a certain number of those discriminatory acts, Defendants would admit that Plaintiffs have established their *Monell* and other claims. **Unless and until Defendants are prepared to stipulate that proof by Plaintiffs of any of the 20 "untethered" acts Defendants**

would permit would be sufficient to establish their liability, they are in no position to ask this Court to commit error by looking away from the wide array of additional evidence of racial animus and discrimination that now exists and bolsters Plaintiffs' *Monell* claim.

## II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A.    The Complaint and Scope of Claims

This action is brought by the Latinx and Black police officers associations and 13 individual officers alleging that the Defendants have maintained policies, practices, or customs that violate the law by (i) failing to adequately investigate or discipline racist and discriminatory conduct; (ii) discriminating in the disciplinary processes; (iii) discriminating in the promotions process; and (iv) retaliating against officers who complain of such discrimination.  The Complaint outlines many specific instances of each of those practices.[1]  The Complaint also notes the series of complaints the two organizational Plaintiffs made to senior County officials and filed against Defendants with the U.S. Department of Justice.  And it illustrates Defendants' escalation of retaliatory conduct against the leadership and prominent members of those organizations once they learned of those complaints.  Plaintiffs then provided extensive elaboration of these claims in the discovery responses.

From the outset of this case, Plaintiffs have made clear that they will follow the approach mandated by *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978) and

---

[1] *See*, *e.g.*, Amended Complaint ("Compl."), ECF No. 54 at ¶¶ 61(a)-61(i), 164, 173-74, 188-190, 242-243 (detailing instances of racism); ¶¶ 32, 35, 41-46, 75-90, 110-116, 121-126, 136-138, 194-203, 204-209, 210-221, 227-230,  231-37, 240-41 (discrimination against minority officers in investigative and disciplinary processes); ¶¶  34-35, 39, 44, 67, 72, 91-93, 107, 114, 116, 131, 139, 220, 225 (discrimination against minority officers in promotions); and ¶¶ 32-38, 40, 44, 46, 62-69, 104-118, 120-126, 136-140,  144-160, 164-169, 222-230, 238-241 (retaliation against individual officers).

subsequent Fourth Circuit decisions to establish that the "policies, practices and customs" of the PGPD disciplinary process discriminate on the basis of race, in part by proving specific instances of such discrimination.  The Complaint sets forth a number of such incidents and alleges that all of them were pursuant to the discriminatory policy and custom of the Department.

### B.    The Court's Prior Determination Regarding Organizational Claims

Defendants initially responded to the Complaint by seeking to dismiss, *inter alia*, the allegations by the two Plaintiff organizations insisting that they lacked standing.  As detailed below, this Court, however, squarely rejected that contention, holding that the two organizations have standing to pursue those claims.  Mem. Op. 6-14.  The specific events alleged as to any minority officer are direct proof of those organizational claims.

### C.    Defendants' Efforts to Limit Discovery Into Their Disciplinary System

In Spring 2019, the parties served reciprocal document requests.  In one of them, Plaintiffs sought the files of the PGPD Internal Affairs Division concerning discipline imposed on the named individual Plaintiffs and also similar cases involving approximately 160 other officers.  Ex. A to Notice of Intent to File Motion—ECF No. 45-1.  Plaintiffs based that request on information concerning Latinx and Black officers who had been discriminated against and white officers with comparable cases who had been given little or no punishment.

Defendants initially opposed that request, arguing that it would be unduly burdensome for PGPD to provide these documents with respect to so many officers and disciplinary cases. *Id.*, Ex. B, C.  The dispute was referred to Magistrate Judge Day.  At a conference with Judge Day on June 26, 2019, Defendants disclosed that PGPD utilized a standard software package known as IAPro to track all of the Department's disciplinary proceedings.  Defendants proposed that Plaintiffs use the IAPro data to identify disciplinary cases of relevance involving officers other than the individual Plaintiffs.

5

The parties then negotiated the extent of the IAPro data that Defendants would produce. In August, the parties agreed that PGPD would produce the IAPro data for disciplinary cases where the investigation had been completed.  *See* Declaration of John A. Freedman ("Freedman Decl.") ¶¶ 7 & 8 & Exs.  6 & 7 (A.247-257).[2]  Consistent with the standard IAPro program, that data showed the race of each officer who had been the subject of an investigation.  After reviewing the IAPro data, the parties negotiated the production of additional IAPro data and the underlying investigative file.

The bulk of that production occurred in November and December 2019.  Specifically, PGPD produced certain investigative files maintained by its Internal Affairs Division.  Those files detail the charges investigated, the facts found, notes and transcripts of interviews, other evidence, the recommended outcome, and the final disposition of each case.

### D.      Defendants' Complaints About the Responses to Their Discovery

Over the same timeframe, Plaintiffs likewise produced many documents and answered over 350 interrogatories.  Most notably here, Plaintiffs responded to one interrogatory which demanded that they "identify all persons who are likely to have personal knowledge of any fact relating to the allegations set forth in your lawsuit, and state the specific facts within the knowledge of that person."  Ex. F to Notice of Intent to File Motion—ECF No. 45-1.

Defendants now cite Plaintiffs' responses to that catch-all interrogatory as if they were all "untethered acts."  Mot. 3 & n.1  In reality, as discussed below, the "acts" which Defendants now seek to exclude are all direct evidence of the discriminatory policies, practices and customs of the Defendants – the core allegation to the two claims which this Court has held the organizational Plaintiffs have standing to pursue.

---

[2] Exhibits are attached to the Declaration of John A. Freedman ("Freedman Decl.").

Defendants also complain that Plaintiffs' responses include "unnamed officers" and suggest that Plaintiffs make "vague reference[s]" in the Complaint and discovery responses to additional individuals "whose identities and number are impossible to determine." *Id.* at 3-5. But, again, Defendants fail to acknowledge that Plaintiffs have provided extensive responses to other interrogatories providing that information. For example, in response to a request from Defendants on January 21, 2020 for Plaintiffs to identify unnamed persons referenced in the Complaint, Plaintiffs have served supplemental interrogatory responses providing such information. Freedman Decl. ¶ 25 & Ex. 24 (A.480-672). Defendants have not since complained about the sufficiency of that response.

### E.     Defendants' Premature Request to Limit Proof at Trial

On December 7, 2019, Defendants wrote the Court seeking leave to file a motion to limit, to no more than 20, any acts or other evidence not directly involving one of the named *individual* Plaintiffs. Notice of Intent to File Motion – ECF No. 107. Defendants did not argue that such incidents beyond 20 would not be relevant evidence at trial under the controlling law of the Supreme Court and the Fourth Circuit. Instead, Defendants baldly asserted—as they do now in their motion—that even plainly relevant acts (beyond 20) should simply be ignored, no matter how egregious, and without the slightest review by this Court of their similarities to the discrimination against the individual Plaintiffs and members of the two Plaintiff organizations.

On December 18, the Court held a teleconference to consider various matters including Defendants' proposed motion. 12/18/19 Tr. (ECF No. 122). During that conference, Plaintiffs' counsel noted that none of the decisions cited by Defendants in their December 7 letter had imposed, or even approved, any such arbitrary limit on the number of discriminatory acts involving individuals other than the named plaintiffs – and that certainly none of them had imposed such a limit well before a trial date. *Id.* at 24. At the conference, the Court noted that

that such relief seemed at least premature, commenting that the appropriate time for considering such *in limine* motions and formulating an overall trial plan was well off into the future. *Id*. at 20. ("I mean, it seems to me that a motion in limine for trial purposes is way too early.")

The Court then turned to the question of further discovery prior to the filing of such a motion. Both the parties and the Court expressed the hope that, after Plaintiffs had had an opportunity to review the recently produced and forthcoming production of PGPD files, the parties might be able to agree to some limit on the deposition time necessary to review such incidents (as well as all the other issues in the case) which would satisfy Defendants' professed concern that unlimited deposition discovery would be unduly burdensome. *Id*. at 39.

Plaintiffs worked to reach such an agreement limiting deposition time to a reasonable amount. Specifically, on January 24, Plaintiffs proposed to limit their depositions on *all* topics—the policies of the PGPD, the discriminatory conduct by the Defendants and their agents, and any so-called "untethered" acts—to 100 hours. Freedman Decl. ¶ 16 & Ex. 15 (A.429-432). Defendants rejected that proposal, and insisted that any hours limitation exclude depositions concerning "untethered" acts. Freedman Decl. ¶ 17 & Ex. 16 (A.433-438).

On February 7, the parties conferred and agreed that there should be a cap on depositions of 125 hours. Thereafter, the parties submitted competing proposals to the Court on scheduling and deposition time. ECF Nos. 125 & 127. Plaintiffs' position was, and still is, that the 125 hours per side is more than sufficient time for the parties to complete fact discovery.

Also on January 24, Plaintiffs requested dates for 10 defense witnesses and identified specific subject areas for the deposition of Prince George's County under Rule 30(b)(6). Freedman Decl. ¶ 16 & Ex. 15 (A.429-432). One purpose of that deposition was to demonstrate, beyond any doubt, that the events which Defendants now seek to exclude from consideration by

8

the factfinder are—just as they appear in the PGPD files—acts of discrimination against minority officers, and relevant to core factual allegations in this case.

Despite that early notice, Defendants effectively postponed those depositions.  At first they ignored and then refused Plaintiffs' requests to set deposition dates, then advised they did not represent requested witnesses, and then quibbled over 30(b)(6) topics.  Freedman Decl. ¶¶ 18-22, 24, 28-31 &  Exs. 17-21, 23, 27-30 (A.439-464, 471-479, 689-710).  Ultimately the 30(b)(6) depositions were set for March 25, two days before the date then set for the filing of this Response.  Freedman Decl. ¶¶  32 & Ex. 31 (A.711-713).  At that point, however, Chief Judge Bredar entered the first of his emergency COVID orders, prompting Defendants to cancel all of the depositions.  The 30(b)(6) depositions thus did not commence until a few days ago (June 15).

### F.    Defendants' List of So-Called "Untethered" Acts Mischaracterizes, as "Comparator" or "Me Too" Evidence, Events Which Are Actually Directly Relevant to the Claims

Defendants' motion is predicated on a "list" of acts that are purportedly "wholly untethered to Plaintiffs."  Mot. Ex. B (ECF No. 134-4).  But those acts are not "untethered" at all.  Rather, they directly concern the organizational Plaintiffs' complaints, concern organizational Plaintiff members, are disciplinary "comparators" to the individual Plaintiffs or organizational Plaintiff members, or are "me too" evidence of the sort that is routinely allowed in proving discrimination claims.

As shown in the attached annotated version of Defendants' list (Freedman Decl. ¶¶  2 & Ex. 1 (A.197-212), of the 122 incidents which Defendants culled from various pleadings in the initial round of discovery in the Fall of 2019 (which was before any significant document discovery), 72 are in fact specific proof of discriminatory conduct against minority members of the two plaintiff organizations and hence are completely "tethered" to the claims of those organizations—claims this Court has held may be pursued in this lawsuit—three more are

relevant to the claims of individual plaintiffs, and two are fact witnesses to the plaintiff

organization allegations.  Six may be fairly characterized as "me too" complaints by minority

officers who are not members of the associations.  77 are cases of white officers who were

accused of having committed the same type of offenses as alleged against individual Plaintiffs or

members of the Plaintiff organizations, but who were either not disciplined at all or were the

recipients of far more lenient treatment by their white superiors.  Those last 77 are thus the type

of "comparator" evidence the Fourth Circuit and other courts have consistently considered in

race discrimination cases.  Again, unless or until Defendants concede that such evidence is not

necessary to resolve the claims of the named Plaintiffs here, those acts too are entirely relevant

and must be considered.

Moreover, as shown below, those acts, pulled by Defendants from interrogatory answers

provided almost a year ago, can now be viewed in the unifying context of the attached

preliminary Report of Plaintiffs' police practices expert.  (A.1-127).  That Report shows how

Plaintiffs will establish the persistent and widespread discriminatory practices of the Defendants,

as well as their knowledge or deliberate indifference to them.  So viewed, it is clear that those

acts are all proper evidence of Defendants' discriminatory "policy, customs or practice."

## III.   ARGUMENT

### A.   Under the Controlling Decisions of the Supreme Court, Fourth Circuit and This Court, All of the Allegedly "Untethered" Acts Are Relevant to Both the Claims of the Individual Plaintiffs and the Claims for Injunctive and Corrective Relief of the Organizational Plaintiffs.

1.   Under *Monell*, Evidence of "Persistent and Widespread" Discrimination Against Individuals Represented by the Organizational Plaintiffs Is Relevant to Show Practices, Policies, or Customs

Defendants cannot dispute that evidence of discriminatory acts against Latinx or Black

officers, or evidence that white officers were spared discipline for similar alleged misconduct, is

highly relevant to Plaintiffs' *Monell* claims.  Courts trying discrimination claims routinely consider such evidence of a defendant's conduct as to persons other than the named plaintiff integral to assessing whether there is an illegal policy, custom, or practice.[3]  Indeed, Defendants cite the Fourth Circuit's decision in *Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987), which illustrates how such evidence **must** be considered in a *Monell* case.  *See* Mot. 9, 10, 13.

In *Spell*, a single plaintiff filed a *Monell* claim against a municipality and its police department for a single excessive use of force.  As Defendants concede in their motion, the Fourth Circuit, quoting *Monell*, held that even an individual plaintiff could prove the existence of a "custom or usage" by presenting evidence of "persistent and widespread…practices of [municipal] officials [which] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law."  *Id.* at 1386 (quoting *Monell*, 436 U.S. at 691).

Defendants' concession that *Spell* is the controlling law is fatal to their premature attempt to limit proof of discriminatory acts other than those involving the individual plaintiffs.  A few pages after a pointed reminder that such acts are properly admissible to support a "condoned custom" theory of liability, the Fourth Circuit discussed the extent of such evidence outside the specific plaintiff's claim in that case:

> To establish the existence of such a municipal policy or custom as the effective cause of Spell's injury, plaintiff relied principally upon the testimony of seven lay citizens of the city, eight present or former officers of the city Police Department, an assistant state district attorney, the former legal advisor to the police department, and upon internal records of the city police department.  This evidence was essentially concentrated upon a time of three years preceding McDaniel's assault on Spell.  **The lay witnesses testified to a number of observed or directly**

---

[3] *See*, *e.g.*, *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 403-04 (4th Cir. 2014) (the "volume of other cases documenting" illegal conduct "lent credence to the claim that policy makers encouraged or at least tolerated an impermissible practice");  *Calobrisi*, 660 F. App'x. at 208 (reversing because of District Court's exclusion of evidence concerning other employees);  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1315 (11th Cir. 2001) ("evidence of other acts of harassment was also admissible to demonstrate the City's custom or policy").

**experienced acts of brutality by city police officers of the type charged to McDaniel.**  They further testified that in each instance they filed complaints with the department which resulted in no corrective or punitive action.  *Id.* at 1392-93 (emphasis added).

The Fourth Circuit then described the many different acts which those 17 different witnesses presented in *Spell*.  Of particular relevance here, the Fourth Circuit affirmed the use of the defendant police department's own records to present many instances of excessive force in order to establish a "policy, practice or custom" with respect to that claim:

> Finally, the plaintiff introduced into evidence police department records that graphically corroborated the testimonial evidence that specific instances of police brutality during the relevant time period were frequent but the complaints about them were consistently dismissed or disregarded, frequently with but cursory investigation.  *Id.* at 1394.

As this Court can see from the attached preliminary report of the Plaintiffs' expert (A.1-127), such a combination of summary testimony and records documenting other incidents of discrimination is how Plaintiffs here will similarly support the "policy, practice and custom" of discrimination by PGPD.  That alone is enough to deny Defendants' demand for an arbitrary limit on the number of such acts that may be introduced at trial.[4]

---

[4]  In addition to the Fourth Circuit decisions discussed above, which defendants concede are controlling, defendants quote a portion of *Crowley v. Prince George's County*, 890 F.2d 683 (4th Cir. 1989), which discusses the extent to which a municipality can be held for the acts of employees who were not so authorized to act in a discriminatory manner.  That decision, however, has no application here where the Defendants include the members of the PGPD hierarchy who directly discriminated and retaliated against the minority officers – as shown in the very evidence defendants ask to exclude.  *See* Report of Michael Graham ("Graham Rep.") ¶¶ 47, 49(a)-(i), 50(g), 51(a)-(b), 51(d)-(f), 52(a)-(b), 52(d), 56, 60(a)-(c), 60(e), 80, 81(c), 81(e), 81(g), 86(a), 86(d), 87(b), 87(c) (A.30-57, 59-62, 73-74, 76-85, 90-91).

Indeed, the Court in *Crowley* stated that it was ruling in favor of the county precisely because the plaintiff there did not allege – and certainly did not prove – that there was any such custom or practice impacting any minority employee other than the single act of a single PGPD official against that single plaintiff:  "Crowley does not contend that Prince George's County has or has ever had a policy of retaliating against its employees for bringing to light instances of racial harassment.  There exists not one hint of evidence either that policymaking authorities

Against this clear case law, Defendants offer no decision that supports an arbitrary

numerical limit on the racially-charged acts and statements that may be introduced to support this

or any other employment discrimination or retaliation action.  Not one of the cases cited by

Defendants endorsed such an uninformed approach.  *See* Mot. 20-25.  To the contrary, the cases

offered by Defendants which do concern such acts re-affirmed the need for a specific, fact-based

determination of the relevance of every such act offered by a plaintiff – precisely what

Defendants' motion seeks to prevent.[5]

---

over personnel matters were delegated to the police chief, or that the county had a custom of
harassing persons who publicized racial harassment."  *Id.* at 686.

Here, there is an allegation (and evidence) of a broad practice of discriminatory conduct by
the PGPD Chief who, in turn, is expressly authorized to be the ultimate authority on all matters
of police department discipline.  *See, e.g.*, PGPD Internal Investigations Guide at 6
(PG0000094930) ███████████████████.  Here, that practice and custom of discriminatory discipline is
"evidenced" by precisely the many such acts of such discrimination and retaliation against
officers of color that the defendants' motion seeks to exclude from trial.  And here there is ample
evidence that the Plaintiffs brought these discriminatory acts to the attention of senior County
officials, including the County Executive, who ignored those complaints.

[5] In *Sprint/United Management v. Mendelsohn*, cited in Defendants' Motion at pages 15 and 20,
the Supreme Court cautioned that, "The question whether evidence of discrimination by other
supervisors is relevant to an individual ADEA [age discrimination] case is fact based and
depends upon many factors, including how closely related the evidence is to the plaintiff's
circumstances and theory of the case.  Applying Rule 403 to determine if evidence is prejudicial
also requires a fact-intensive context specific inquiry."  552 U.S. 379, 388 (2008)  The Court
remanded that case to the district court to make just such a review of each such incident.  *Id.*

Similarly, in *Godwin v. Wellstar Health Systems, Inc*., cited in Defendants' Motion at pages
20-21, the district court discussed the consistent case law holding that, **"wide evidentiary
latitude must be granted to those attempting to prove discriminatory intent and that the
'trier of fact should consider all the evidence,"** noting that those decisions "approv[ed] the use
of 'me too' evidence in discrimination cases, particularly where the evidence is used to
demonstrate the discriminatory intent of a common decisionmaker."  2015 WL 7313399, at *4
(N.D. Ga. Nov. 18, 2015) (emphasis added).  The *Godwin* court **denied** defendant's motion to
exclude such "me too" evidence, ruling instead that the incidents and statements should be
admitted to demonstrate the defendant's "discriminatory animus" so long as the non-party
employees would not testify that they themselves were improperly terminated.  *Id*. at *5.

Finally, in *Evans v. The Port Authority of New York*, cited in Defendants' Motion 11-12 and
16, the district court bifurcated a trial to postpone, not exclude, certain evidence of "custom and

2.      The Organizational Plaintiffs' Proof of Their Complaints of
Discrimination Are Plainly Relevant to Their Separate Claims for
Injunctive Relief for All Their Members

There is a second, independent reason to admit (and perforce not limit) the incidents and

statements that defendants misleadingly label "untethered."  The acts and comments Defendants

seek to exclude constitute direct proof of incidents that the two Plaintiff organizations challenged

or directly impacted their members.  Taken together, those acts establish that the practices were

"persistent and widespread."  Additionally, because the organizations complained directly to

Defendants' policymakers, the incidents demonstrate Defendants' ratification of such polices,

customs or practices through "actual or constructive knowledge" or "intent or deliberate

indifference."  *Spell*, 824 F.3d at 1391.  All of that evidence is likewise directly relevant to the

organizations' claims for injunctive relief, which this Court has noted, can "inure to the benefit

of all members of the association actually injured."  Mem. Op. 13-14 (quoting *Neighborhood*

*Action Coalition v. City of Canton*, 882 F.2d 1012, 1016-17 (6th Cir. 1989)).

Defendants effectively concede that this independent basis to admit such evidence dooms

their motion.  Mot. 14.  They therefore devote three pages of their motion to an attack on this

Court's prior decision expressly upholding the organizational Plaintiffs' standing.  *Id.* at 15-17.

To be sure, Defendants grudgingly admit that the Court denied their motion to dismiss for an

alleged lack of standing.  *Id.* at 16-17.  But they then insist that the Court's Memorandum

Opinion needs "clarification."  Defendants claim they "understand" the Court's prior ruling "to

---

practice" until the plaintiff first established that he had in fact been the victim of an alleged
retaliation.  2005 WL 2211309 (S.D.N.Y. Sept. 13, 2005).  In language omitted by Defendants,
the *Evans* court explained that it was so ruling only because, in a prior phase of that case, the
court had decided the instant retaliation claim was "weak."  *Id*. at *2.  This Court, of course, has
made no such ruling; and, as the Graham Report shows, the claims of both the individual and
organizational Plaintiffs most definitely are not "weak."

14

authorize the associations to seek a declaratory judgment that the County has a 'policy or custom' of racial discrimination and broad injunctive relief against the continuation of the policy or custom, but not to seek individualized determinations of liability of remedy on behalf of the association members." *Id.* at 25.

Tellingly, Defendants quote nothing from the Court's opinion to support that misconstruction. Nor can they. To the contrary, the Court made clear, in its full discussion of Defendants' objection to the standing of the organizations, that the two groups of officers were entitled – consistent with the Fourth Circuit's decision in *Virginia Hospital Association v. Baliles*, 868 F.2d 653, 662-63 (4th Cir. 1989), *aff'd* 496 U.S. 498, 504 n.4 (1990) – to seek both injunctive and corrective relief for each of their affected members.

In upholding the HNLEA and UBPOA's standing to obtain such relief, the Court explained precisely how that would occur – in a manner which leaves no room for the contrary "understanding" now urged by Defendants:

> The injunctive relief requested here by HNLEA and UBPOA is analogous to that requested in VHA. Plaintiffs request a permanent injunction ordering Prince George's County to abolish discrimination on the basis of race within and among the PGCPD through the implementation of policy changes and a plan to review allegedly discriminatory terminations and disciplinary proceedings and reinstate wrongfully terminated officer or otherwise remedy those prior acts of discrimination and retaliation. Although if this relief were granted, at some point PGCPD would have to engage in individualized inquiries to determine which officers of color deserve reinstatement or expungement of their disciplinary records, **granting the relief itself – that is, a court order that PGCPD must remedy any prior discriminatory termination and disciplinary decisions – can be accomplished upon consideration of evidence from only certain individual members of HNLEA and UBPOA in order to assess whether there is a custom and practice of discrimination and retaliation at PGCPD under *Monell*, and whether such custom and practice caused the harms cited in the Complaint.**

Mem. Op. 12-13 (emphasis added).

This passage shows that evidence (most often from PGPD's own files) which shows that Latinx and Black officers beyond the individually named Plaintiffs were also unfairly

investigated and disciplined, inappropriately transferred, or unjustifiably terminated is not "untethered" at all.  Rather, such acts of discrimination, harassment and retaliation are *direct* proof of HNLEA and UBPOA's claims for declaratory and injunctive relief and, as the Court took pains to explain, are the predicate for subsequent individual orders as well.  For that reason alone, such evidence cannot be limited on the specious claim it is somehow "untethered."

**B.      The So-Called "Untethered Acts" Will Be Part of One Comprehensive Presentation of the Discriminatory Policies, Practices and Customs of PGPD**

Throughout their motion, Defendants contend that presentation of Plaintiffs' case will be unmanageable – that it will involve a huge number of trial witnesses, require five months of testimony, and 121 separate "mini-trials."  Mot. 3-4, 6-7, 17-18.  That is nonsense. Discrimination cases alleging practices or customs are eminently triable, and examples abound in the Fourth Circuit case law.  *See*, *e.g.*, *Spell*, 824 F.2d at 1392 (discussing proof of municipal policy, practice or custom established through 17 fact witnesses and internal records of the City police department); *Abasiekong v. City of Shelby*, 744 F.2d 1055 (4th Cir. 1984); *EEOC v. Am. Nat. Bank*, 652 F.2d 1176 (4th Cir. 1981); *Bordanaro v. McLeod*, 871 F.2d 1151, 1161 (1st Cir. 1989).  This Court is perfectly capable of setting a fair and reasonable trial schedule at an appropriate juncture, while heeding the advice of the Fourth Circuit not to place "too much emphasis on … concern with mini-trials."  *Calobrisi*, 660 F. App'x. at 211.

Defendants speculate, without any basis, that Plaintiffs will ask the Court to depart from an established *Monell* trial framework and to import Title VII class action standards, including conducting *Teamster* remedy phase mini-trials. Mot. 10-13, 24-25.  That too is incorrect.  As Plaintiffs made clear in prior briefing and at the June 7, 2019 hearing on the motion to dismiss, Plaintiffs are not seeking damages for the organizational Plaintiffs or their members, and thus there will be no need for the Court to conduct post-liability *Teamsters* hearings.  *See* Opp. to

16

Mot. to Dismiss – ECF No. 31 at 14; 6/7/19 Tr. 35 (ECF No. 69).  And the fact that Plaintiffs are

not pursuing a class action is neither relevant to the scope of discovery in this case, nor the

evidence to be presented at trial.  As the Fourth Circuit has made clear, one individual plaintiff

pursuing a *Monell* claim can present evidence that Defendants' widespread and persistent

misconduct is relevant to establishing Defendants' policies, practices and customs.  *Spell*, 824

F.2d at 1389.

To give the Court a better sense as to how Plaintiffs intend to present their case, we will

present (i) direct evidence of constitutional violations of the rights of individual Plaintiffs, (ii)

direct evidence of retaliation and discrimination against officers who are members of the

organizational Plaintiffs, (iii) direct evidence of the Department's failure to adequately

investigate or discipline racist conduct, and (iv) direct and statistical evidence of discrimination

in PGPD's  investigative, disciplinary, and promotional processes.  That will be a comprehensive

presentation which establishes multiple constitutional violations and policies, practices and

customs causing the violations, just as the Fourth Circuit endorsed in *Spell*.

One significant element of Plaintiffs' proof will be expert testimony, including the

testimony of Plaintiffs' police practices expert, Michael Graham.  To allay any concerns caused

by Defendants' speculative predictions, Plaintiffs are attaching a preliminary report from

Mr. Graham ("Graham Rep.") (A.1-127).  Although his investigation is ongoing, Mr. Graham's

report shows how Plaintiffs will establish the widespread discriminatory practices by the

Defendants, as well as the evidence concerning Defendants' knowledge of, or indifference to,

them.  The preliminary report outlines a presentation that will likely take a day or two to present

at trial and demonstrates that Defendants' dire prediction of many "mini-trials" is a Chimera this

Court need not chase.

As detailed in his Report, Mr. Graham is the former Assistant Sheriff of Los Angeles County Sheriff's Department – the third-highest-ranking position in that department, which is the largest Sheriff's Department in the United States and the primary police agency for 2.9 million residents.  In his 33 years on that force, Mr. Graham served in an array of roles, including significant work in his department's investigative and disciplinary functions.  He also had a long association with the International Association of Chiefs of Police and its National Law Enforcement Policy Center, and has served as an expert or consultant in many matters, including extensive work for the U.S. Department of Justice evaluating the practices of police departments in Chicago, Detroit, New Orleans, Newark, Seattle, and Washington, D.C.

Mr. Graham has reviewed numerous documents produced by PGPD, including its relevant general orders, policies and procedures, as well as extensive files maintained by its Internal Affairs Division, EEO office, and other units.  He also compared the PGPD policies and practices to those of other departments and to IACP guidance.  That review is the basis for his opinions that:

- PGPD's policies for handling complaints about racial harassment and discrimination are inadequate.  These practices result in such complaints not being treated appropriately, in that they are either not investigated at all, not investigated appropriately, or not do not give rise to appropriate discipline.
- As a general Department practice and custom, serious allegations of misconduct are treated differently when the charges are made against white officers as opposed to minority officers, and the current leadership of the Department does not monitor that problem.
- There is a practice and custom in the Department that when officers of color complain about such conduct, they experience retaliation, in that they are transferred out of their jobs or face countercharges.

*See* Graham Report ¶¶ 9-88 (A.5-94).

A review of the evidence marshalled by Mr. Graham to support these core conclusions shows that each is founded on his detailed review of the "official" policies of PGPD in light of

18

contrary facts established by the Department's *own* records—direct, documentary evidence that even Defendants cannot reasonably seek to exclude.  And, in some cases, Mr. Graham's analysis of the records and data is buttressed—just as the plaintiffs' claims were in *Monell* and *Spell*—by specific instances where other Latinx and Black officers suffered the same type of discrimination and retaliation as the named Plaintiffs, or where white officers who committed offenses (including acts of discrimination and harassment) were not appropriately investigated or disciplined—just as was presented, without any artificial limit, in *Spell*.

### C.    Evidence That The Department Fails to Handle Complaints of Racial Harassment and Discrimination in an Appropriate Manner

Mr. Graham's analysis of the PGPD's failure to take complaints of racial harassment and discrimination seriously—and to act in a proper manner to punish white offenders – starts with a detailed review of the facial inadequacies of PGPD's General Orders concerning racism and discrimination.  *See* Freedman Decl. ¶¶ 3-6 & Ex. 2-5 (A.213-246).  Mr. Graham compared PGPD's General Orders to the standards recommended by the IACP, the Equal Employment Opportunity Commission ("EEOC"), and other police departments.  He found that PGPD procedures fall woefully short in a number of critical respects:

- PGPD policies do not provide proper procedures for reporting harassment or discrimination outside the ordinary chain of command (which may well be a cause of the complaints themselves). Graham Rep. ¶¶ 12-17 (A.7-10).

- PGPD policies fail to mandate that a commander take action when he or she receives such a complaint, and do not provide for timely investigation of complaints. Graham Rep. ¶¶ 18-21 (A.10-13).

- PGPD policies encourage direct confrontations between the complaining officer and those involved in the harassment or discrimination.  Graham Rep. ¶¶ 22-23 (A.13-14).

- PGPD policies do not provide for appropriate confidential treatment of such complaints. Graham Rep. ¶ 24 (A.14).

- PGPD policies fail to protect complainants from further contact with the offending officer. Graham Rep. ¶ 25 (A.14-15).

- PGPD policies do not contain clear anti-discrimination policies, and do not expressly prohibit harassment based on race or other protected characteristics.  Graham Rep. ¶¶ 26-29 (A.15-18).

Mr. Graham also assessed PGPD's policies and practices concerning complaints of racial

harassment and discrimination with his review of the evidence produced by PGPD in this case.

Among other things, he found:

- Defendants failed to investigate the overwhelming majority of cases when an allegation of discrimination or harassment is brought their attention.  Of 57 complaints of employment-related discrimination or harassment made by PGPD officers to the EEOC from 2013 to 2017, there is no record in 49 of any investigation by any unit of the PGPD. Graham Rep. ¶¶ 40-44 (A.27-29).

- In the handful of cases where an EEOC charge was filed and PGPD made any "investigation" at all, four were "administratively closed" without any further action or punishment; one was handled as a "field inquiry" (with no sanction of the offending officer); and the final two were inadequately investigated in that they failed to consider that the specific complaint had been preceded by similar complaints against the same officer. Graham Rep. ¶¶ 50(a)-(g) (A.38-42).

- Another ten examples of racist conduct were not investigated at all, including use of racially offensive language and the circulation of racially derogatory images.  Many of these incidents were the subject of internal complaints by the organizational Plaintiffs.  For example, there is no evidence that a lieutenant quoted in the *Washington Post* and *The New York Times* as having made derisive comments about "Black lives matter," was even investigated, much less ever disciplined. Graham Rep. ¶¶ 47, 49(a)-(i) (A.30-38).

- In 14 other incidents of racist conduct where Defendants made a token effort to respond, the investigative or disciplinary response was inadequate.  One public example was the circulation of pictures of a training dummy used for baton practice adorned with an afro wig and black face which was "administratively closed" without any further charges or discipline of any kind.  Graham Rep. ¶¶ 50(a), 50(d), 50(g), 51(a)-(f), 52(a)-(e) (A.38-56).[6]

- Defendants treated external complaints of racism similarly.  For example, according to the IAPro data, the PGPD has sustained zero claims of racial profiling, failed to investigate a bias complaint made by ███, and closed as unfounded a complaint

---

[6] In addition to Mr. Graham's analysis, Plaintiffs are submitting declarations from several Plaintiffs and other PGPD officers and employees who were victims of discrimination or harassment, or witnessed this conduct to illustrate that each episode is discrete and can be efficiently presented.  *See* Declarations of Michael Anis (A.128-129), Sanghamitra Baral (A.130-135), John Doe # 1 (A.146-149), Sean Miller (A.154-158), Lynett Redhead (A.159-164), Earl Sharpe (A.165-169), Chris Smith (A.170-172) and Marc Snoddy (A.173-178).

from ██████████████ that he/she had been profiled.  Graham Rep. ¶¶ 55-59 (A.56-59) (discussing Freedman Decl. Exs. 78 & 93 (A.1120-23, A.1162-66)).

These incidents provide compelling evidence that Defendants maintain "persistent and widespread" practices of ignoring or condoning racist behavior—a "theory of custom by condonation." *Owens*, 767 F.3d at 402.  The same evidence demonstrates that Defendants had "actual or constructive knowledge" of these practices and acted with "intent or deliberative indifference." *Spell*, 824 F.2d at 1391.  As detailed in Mr. Graham's report, much of this conduct was brought to Defendants' attention through complaints lodged by the organizational Plaintiffs with the Department, the County Executive, and other senior County officials.

There is likewise ample additional evidence that Defendants condoned significant misconduct, including the use of racially derogatory language by senior white officers.  For example, Defendant Commander Mills has been the subject of several complaints of racial discrimination regarding her use of derogatory language in comments about certain Black officers, which Defendants have not investigated adequately.  Ex. 1 to Notice of Intent to File Motion – ECF No. 55-1 at 14, 25, 33; *see also* Chatman Decl. (A.144-145).[7]  The record further indicates that Commander Mills personally interceded in the investigations of a number of white officers, who like Commander Mills, had been accused of engaging in racist conduct by directing

---

[7] For example, a complaint filed by former Officer Chatman and two civilians against Commander Mills in 2010 for harassment and use of derogatory language was treated as an inquiry rather than a formal investigation ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████.  See Freedman Decl. ¶¶ 56-61 & Exs. 55-60 (A.964-983).  Similarly, the Department summarily closed Plaintiff Perez's discrimination complaint against Defendants Mills, Chief Stawinski, and a third officer 17 days after it was filed, despite the investigator's testimony that it would be improper for him to investigate allegations against the Chief of Police.  Freedman Decl. ¶¶ 33 & 141 & Exs. 32 (Grant Tr. 171-72) & 140 &  (A.758, 1323-1325).

their matters not be investigated by IAD; that charges be downgraded; that charges be non-sustained; that victims be charged with reciprocal conduct; and that investigative files be purged. *See* Graham Rep. ¶¶ 47, 49(a)-49(i), 50(g), 51(a)-51(b), 51(d)-51(f), 52(b), 52(d), 56, 60(b), 80, 81(e), 81(g), 86(a), 86(d), 87(b) (A.30-38, 42-55, 57, 60, 73-74, 77-80, 82-85, 90-91).  Much of this conduct by Commander Mills was specifically reported to, and condoned by, Chief Stawinski.  *See* Graham Rep. ¶¶ 47, 49(c), 49(e), 50(g), 51(a), 51(b), 51(f), 52(a), 52(b), 56, 60(a)-(c), 60(e), 81(c), 86(d), 87(c) (A.30-36, 42-46, 48-52, 57, 59-62, 76-77, 84-85, 89, 91).

Beyond these charged matters, Commander Mills also has relevant uncharged conduct—most notably, making a derogatory comment about the Black Lives Matters movement, referring ██████████████████████████████████████████████████████████████” and suggesting the officer needed ██████████████; referring to an African-American suspect as a "█████"; and  referring to an African-American officer as "█████████."  Freedman Decl. ¶¶ 96 & 117 & Exs. 95 & 116 (A.1171-73, 1248-50).  Discovery to date reflects that other senior white officers used similarly derogatory language to refer to minorities.  Freedman Decl. ¶¶ 80-82, 125-127, 129-130 & Exs. 79-81, 124-126, 128-129 (A.1124-1129, 1278-1284, 1287-1291).  And Commander Mills and Chief Stawinski condoned all of this: as Defendant Mills wrote ████ ████████████████████████████████████████████████████████; "████████████████████████████████████████████████████████████ ████████████████████████████████████████████."  Freedman Decl. ¶¶ 133, 145-147 & Exs. 131, 132, 144-146 (A.1297-1302, 1333-1343).

Plaintiffs will present this evidence through the testimony of Mr. Graham and the organizational Plaintiffs' members, who include former high ranking officers in the Internal Affairs Department who witnessed or experienced discrimination.  All of this evidence is

relevant to, and highly probative of, the Plaintiffs' claims that their complaints of discriminatory and racist conduct were not adequately addressed *and* the request for injunctive action to remedy that misconduct.  That evidence is thus not at all "untethered" to either set of claims, but rather, intricately linked.

### D.    Evidence That the Department Discriminates Against Black and Latinx Officers in Its Disciplinary Process

Mr. Graham also concludes that PGPD's investigative and disciplinary processes treat officers differently based on their race. Graham Rep. ¶¶ 66-75 (A.64-69).  That analysis begins with the IAPro database which is **direct** proof, maintained by PGPD itself, of how its investigative and disciplinary systems work—or fail to work.  And such proof is often a cornerstone of a discrimination case.[8]  The IAPro database shows:

- Black and Latinx officers are more likely than white officers to be charged with an offense.  Graham Rep. ¶ 73(a) (A.68).

- Black and Latinx officers are more likely to face formal investigative proceedings (which can result in punishment) than white officers, and white officers are more often put into a mere "inquiry" process (which does not result in discipline).  Graham Rep. ¶ 73(b) (A.68).

- Black and Latinx officers are more likely than white officers to have the charge "sustained" – in PGPD parlance, to be found "guilty." Graham Rep. ¶ 73(c) (A.68).

- Black and Latinx officers are more likely than white officers to be subject to one of the more severe forms of punishment (such as demotion, removal from the normal promotion cycle, and termination) than lesser forms such as a "reprimand." Graham Rep. ¶¶ 74-75(a)-75(e) (A.68-69).

---

[8] *See*, *e.g.*, *Am. Nat. Bank*, 652 F.2d at 1188 ("a prima facie case of discrimination. . . may in a proper case be made out by statistics alone . . . or by a cumulation of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination"); *see generally Abasiekong*, 744 F.2d at 1058 (Section 1983 claims "may be reviewed under *McDonnell Douglas* three-step format");  *Vanguard Justice Society, Inc. v. Hughes*, 471 F. Supp. 670, 698 (D. Md. 1979) ("a statistical showing of a significant discrepancy . . . is sufficient to establish a prima facia case of discrimination"); *Cox v. District of Columbia*, 821 F. Supp. 1, 13 (D.D.C. 1993) (crediting plaintiffs use of statistics to demonstrate a "patently inadequate system of investigation of excessive force complaints").

- Certain officers assigned to Internal Affairs are far more likely to "sustain" charges against Black and Latinx officers than against white officers, and that includes some of the senior officers in the Division.  Graham Rep. ¶¶ 76(a)-76(k) (A.69-71).

These statistics demonstrate that the discrimination inherent in Defendants' investigative and disciplinary practices is persistent and widespread.  Mr. Graham will supplement these statistics with comparisons of specific cases where the only real distinction was the race of the officer charged.  Graham Rep. ¶¶ 81(a)-81(g) (A.74-A80).[9]  As indicated by his citation to Internal Affairs case numbers, the facts of these proceedings, and their disparate results, will be proven primarily through the records of PGPD itself.

As discussed above, the use of such  cases involving other victims was a large part of the Fourth Circuit's decision in *Spell* and is likewise not only authorized, but endorsed, by both that decision and by *Monell*.  Moreover, unlike lawsuits where only a single claim of a single plaintiff was involved, here the two organizational Plaintiffs are seeking injunctive and remedial relief for their members who have suffered that discrimination, including the members in each of the comparison pairs reviewed by Mr. Graham.

Finally, there is documented evidence that Defendants were deliberately indifferent to these events.  For example, when presented with a suggestion made at a meeting of PGPD's the Advisory Panel on Equity and Fairness that the IAPro data system could be configured to track



_____," Defendant Commander Mills rejected that proposal stating it "_____ _____" and the Defendants should "_____ _____" Freedman Decl. ¶ 105 & Ex. 104 (A.1208-1211).  Again,

_____

[9] In addition to Mr. Graham's analysis, Plaintiffs are submitting declarations from several individuals who experienced discriminatory discipline to demonstrate that evidence concerning these incidents is discrete and can be efficiently presented.  *See* Declarations of Eric Beale (A.136-143) & Arvester Horner (A.150-153).

Mr. Graham will put all these acts –and refusals to act – in an overall context.  Graham Rep. ¶¶ 77-79 (A.71-73).

### E.  Evidence That PGPD Retaliates Against Officers Who Complain About Racial Harassment and Discrimination

Mr. Graham bases his final overall conclusion – that PGPD has a practice and custom of retaliation against officers who complain of racial harassment or discrimination—first on the weakness of PGPD's anti-retaliation policy and on lack of evidence in either IAPro data or Defendants' interrogatory responses that they have enforced their policies against retaliation. Graham Rep. ¶¶ 30-31, 83-88  (A.18-19, 80-94).  He then analyzes instances where an officer who complained or cooperated with an investigation against a white officer was quickly accused with charges investigated by PGPD.  Graham Rep. ¶¶ 86(a)-86(g) (A.81-89).  As Mr. Graham notes, in none of those cases did the PGPD investigator evaluate whether the complainant had violated the Department's anti-retaliation policies, despite admissions from several of them that they had filed their charges in response to learning they had been charged.  Mr. Graham also identifies instances where a Black or Latinx officer was promptly transferred after complaining or cooperating in an investigation of a white officer.  Graham Rep ¶¶ 87(a)-87(i) (A.89-94).

It is important to note that of the 16 officers subject to retaliation whom Graham analyzes, eight are individual Plaintiffs.  Presumably, the Defendants concede that the evidence as to those eight officers must be heard in full.  As to the other eight officers who Mr. Graham found were also subjected to retaliation, but who are not individually-named Plaintiffs, such proof – again primarily in the form of PGPD records – is directly relevant to the organizational Plaintiffs' claim for injunctive and remedial relief, because the organizational Plaintiffs complained to Defendants about such retaliation and most of these individuals were members of the organizational Plaintiffs.  Again, the Fourth Circuit has warned that each piece of such

evidence must be thoughtfully considered in a case such as this, even where there was only one

plaintiff seeking only personal relief—and thus certainly here where HNLEA and UBPOA are

pursing claims based on the Defendants' custom of retaliation that will be discussed by

Mr. Graham.[10]  *Spell*, 824 F.2d at 1389.

Finally, there is strong evidence that the Defendants had actual knowledge of, and were

indifferent to, retaliation.  Plaintiffs HNLEA and UPBOA brought a number of these incidents to

County Executive Baker's attention and even more incidents to Chief Stawinski's attention.  And

Commander Mills oversaw the Internal Affairs investigations of hundreds of officers.  But in

*none* of those cases did investigators evaluate whether the investigation was launched for

retaliatory reasons, even where the respondent claimed retaliation.  Indeed, the evidence

indicates that Defendants Stawinski and Mills personally interceded in a number of these

investigations and directly committed retaliatory acts themselves. *See* Graham  Rep.  ¶¶ 86(a),

86(e), & 87(b) (discussing Defendants Mills or Stawinski's personal involvement in retaliation

against individual Plaintiffs Ingram, Zollicoffer, and Perez) (A.82-83, 85-88, 90-91).

### F.    Defendants' Demand That the Court Prohibit Any Proof on Discriminatory Acts Beyond An Arbitrary Number Is Not Supported by Any Case Law

On the final page of their memorandum, Defendants turn to the threshold issue cited by

the Court in December – that Defendants' demand for an arbitrary limit on the number of

discriminatory acts that can be presented at trial is, to say the least, "premature."  Mot.26.  In six

---

[10]  In addition to the internal PGPD records set forth by Mr. Graham, it is possible that some of these incidents may also be presented through testimony of the individual Plaintiffs, testimony of the organizational Plaintiffs' members, and the testimony of the PGPD hierarchy responsible for the Department's defective policies and individual investigations.  The amount of trial time devoted to that testimony can, of course, be decided far closer to trial.

The point here is that Mr. Graham's presentation, and PGPD own internal documents on which it is based, will be an efficient means of adding these cases to the record, just as summary testimony and records of the defendant were used to establish such facts in *Spell*.

short lines—**which do not cite a single case from any court anywhere**—Defendants insist that all acts beyond their arbitrary limit of 20 must be excluded simply because Defendants feel that now, months before trial, is the appropriate time to do so.

That *ipse dixit* by Defendants would be an insufficient basis for their demands in *any* case.  But their failure to cite any case approving such a numerical limit is especially telling given that, at the December 18 teleconference, Plaintiffs' counsel noted that the few cases Defendants had cited in their letter did not support such relief.  *See* 12/18/19 Tr. 24 (ECF No. 122).  In the 10 weeks following the hearing, during which Defendants had ample time to research their motion, Defendants were still unable to find a single case in which any court has ever ruled that there should be a numerical limit on the admission of even truly "untethered" acts—acts which both *Monell* and *Spell* held are highly probative.

Indeed, one need look no farther than the cases on which Defendants themselves rely for the general authority of a court to manage its trials to show that such an arbitrary numerical limit would be contrary to law, including the law of the Fourth Circuit.  Specifically, Defendants quote from the Fourth Circuit's decision in *Calobrisi*, 660 F. App'x at 209-10, for the general rule that a court, called upon to admit or exclude "me-too" evidence, must review the facts of *each* such incident to determine whether the discriminatory or retaliatory conduct was "close in time to the events at issue in the case," "whether the same decision-makers were involved," "whether the witness and the plaintiff were treated in a similar manner," and "whether the witness and the plaintiff were otherwise similarly situated."  Mot. 13.

That is all quite correct – and further reason why a court cannot make an arbitrary decision that a discriminatory act should be excluded from trial, *even if it meets all of these considerations*, simply because it is the twenty-first in the line of such plainly relevant evidence.

27

Moreover, Defendants then ignore the actual *holding* in *Calobrisi* which is at odds with the numerical limit they now demand.  In *Calobrisi*, the plaintiff sought to prove her claim that she had been the victim of employment discrimination in part through the "me too" testimony of seven other employees.  660 F. App'x at 209.  The district court ruled that such "me too" incidents should be excluded from consideration and granted summary judgment to the defendant.  *Id.* at 208.

**The Fourth Circuit, however, reversed**.  The Court of Appeals, relying on the Supreme Court's decision in *Sprint/United*, warned that the relevance of such "me too" evidence must be assessed through a careful examination of the individual facts of each incident, before it can be determined whether it is admissible or might be excluded under Rule 403.  *Id.* at 209-10.  The Fourth Circuit concluded that the district court had erred because it "did not individually analyze each piece of other employee evidence pursuant to factors like those listed on," but rather focused only on the fact that those former employees had held different jobs under different managers which was an insufficient basis to exclude them.  *Id*. at 210.

In a critical passage omitted by Defendants, the Fourth Circuit cautioned against an undue concern over the specter of "minitrials."

> The District Court also placed too much emphasis on its concern with 'minitrials.'  While this concern 'is legitimate', accommodating it in every case 'would tend to exclude any "other acts" evidence, regardless of how closely related it is to the plaintiff's circumstances.'  Rather a court should analyze whether the probative value of the other employee evidence outweighs the potential for distraction."  *Id*.

That is precisely the type of specific analysis that would be preempted by Defendants' demand for an arbitrary numerical limit on such "other employee" evidence.  And it would be just as wrong here as the Fourth Circuit held it was wrong in *Calobrisi*.

The other decisions on which Defendants rely do not support numerical limit on "untethered acts" – much less one imposed well in advance of trial.  Defendants spend two full

pages discussing *Latino Officers Association, Inc. v. City of New York*, No. 99-CIV. 9568, 2003 WL 22300158 (S.D.N.Y. Oct. 8, 2003).  Defendants note that, in that case, the district judge, *sua sponte*, formulated a trial plan that allotted a certain number of hours for the presentation of different types of evidence, including "me too" evidence.  But Defendants' account of the decision omits several important facts which undermine their "magic number" limit here.

First and foremost, the court in *Latino Officers* did not impose any arbitrary limit on the number of acts that might be presented, but rather only the amount of trial time.  *See id.* at *4. Nor was there any suggestion such acts could not be efficiently presented through summary or expert witnesses, just as it was in *Spell*.  *See id.*

Moreover, the amount of time allotted in *Latino Officers* for the presentation of the type of evidence at issue here was substantially more than "11 hours" as misstated in Defendants' motion.  Specifically, the court in *Latino Officer* ruled  that, of the 90 hours that the court allotted for the presentation of the Plaintiffs' entire case, 11 could be devoted to "anecdotal witnesses – discipline," 21 *more* hours for "comparator evidence," and 22 still *more* hours for "anecdotal evidence-hostile work environment."  *Id*.  The court thus allotted some 54 of the 90 hours in the Plaintiffs' case to the various types of evidence Defendants now want to limit in this case. Plaintiffs, of course, have no objection to reasonable time allocations as part of an overall trial plan determined at a time closer to trial

Finally, Defendants spend significant time discussing another district court decision, *Barclay v. Mercy Health Service*, No. C 07-4074-MWB, 2009 WL 2462296 (N.D. Iowa Aug. 12, 2009).  Defendants quote that decision for the unremarkable proposition that a court retains the right to limit testimony on any subject at trial.  But Defendants fail to note that, in that case, the court *denied* a motion *in limine* filed under Rule 403 to limit "me too" testimony, even though it

involved employees in other departments of the defendant hospital who were allegedly harassed by superiors who were not directly involved in the harassment claim by the plaintiff in that case. *Id.* at *7. It is telling that Defendants would rely on such a decision to support an arbitrary, pretrial exclusion of far closer evidence in in this case of discriminatory acts perpetrated by the *same* leaders of the *same* Internal Affairs Division of the *same* PGPD.

In sum, even after being challenged at the pretrial conference to cite a single case in which discriminatory act evidence was excluded on a pretrial basis through some numerical limit, Defendants have failed to do so. To the contrary, the cases they cite establish that in the Fourth Circuit, as elsewhere, a court must make an individualized assessment of each act or other evidence so offered to determine the extent to which it is or is not sufficiently similar to the acts against the named Plaintiffs; that the "general rule" is that such evidence should be admitted and carefully assessed by the court; and that such evidence can be accommodated in a rational trial plan – especially where, as here, it, for the most part, will be presented through an expert who can testify in an efficient and thoughtful manner.

### G. There Is No Need to Grant Defendants Additional Deposition Time, Beyond The Total of 125 Hours The Parties Previously Agreed Upon

In an attempt to delay still further the discovery in this case (which was originally scheduled to end last October), Defendants demand that their time to take depositions on these incidents be expanded from the 125 hours they have (by virtue of a prior agreement of the Plaintiffs which the parties have asked the Court to endorse) by 3 hours for each incident (as they like to count them). Mot. 8. That demand, however, ignores the critical fact that Defendants have already had a full opportunity to investigate all these matters and have completed their review of virtually all of these events. It likewise ignores the fact that, in those investigations, the Defendants were free to use whatever resources they wished. That one-sided advantage in

favor of the Defendants included the use of their own trained investigators, the power to compel interviews under oath of anyone with any information, and as much review by PGPD's Internal Affairs Division and Office of the Chief as they wished.

   As noted above (and as referenced in the Graham Report), the investigation by PGPD of those incidents generated substantial investigative files which have now been reviewed over the past 10 months by a team of attorneys from its outside counsel (no less than 11 of whose names appear on the instant motion), as well as the County's own attorneys and other investigative staff who have been defending this lawsuit. That defense team has been free to discuss these incidents with the individuals originally involved – all without any formal depositions.

   Given that, the County's team should be able to defend the Department's prior decisions and disciplinary actions following what was supposed to be, according to Defendant Mills, a "█████████████" investigative process. Freedman Decl. ¶ 105 & Ex. 104 (A.1208-1211). The Defendants' demand for still more time to depose participants on these prior disciplinary cases, documented in their own files, would be like a party to a completed trial demanding to take additional depositions on the merits from their own witnesses before presenting its position on appeal.

   In short, any additional factual development the Department needs at this stage can be accomplished during their 125 hours of deposition time (not one of which has yet been used by the defense). They may use as much or as little time as they wish on each of these already **completed** investigations.

## CONCLUSION

   For all of their "lists," Defendants have not identified a single "untethered" act which is not relevant and which should not be presented at trial. Instead they simply assert that because PGPD and its officials have committed so many acts of discrimination and retaliation, every one

31

of them, beyond the 20 they are prepared to admit, should automatically be tossed into a judicial trash can.

Such an arbitrary numerical limit would violate the express rulings of the Fourth Circuit in *Spell* and *Calobrisi* that each such piece of evidence in a case such as this must be individually evaluated to assess its similarities to the claims of the named Plaintiffs.  And that rule is especially applicable here where each of the incidents at issue is direct proof of the independent claim for injunctive and corrective relief this Court has already ruled HNLEA and UBPOA have standing to assert, including on behalf of all of their members, some of whom were victimized by the discriminatory acts Defendants hope to exclude.

The proper response to Defendants' demand is to allow the parties to complete the discovery which will further put the acts at issue into an overall context; order each side to set forth their proposed presentation of those events in traditional expert reports (such as the preliminary report Plaintiffs have now provided) or other witness statements; identify the supporting documents in exhibit lists; and engage in the other pretrial procedures that this Court normally ordains.  At the conclusion of those normal pretrial processes, the Court will be able to make the informed decisions the Fourth Circuit requires on whether any of those acts may properly be excluded or whether, as the Fourth Circuit has also announced to be the general rule, they should all be considered in a trial managed as the Court sees fit.

Defendants' motion should be denied.

Dated: June 18, 2020

Respectfully submitted,

 

 

Dennis A. Corkery (D. Md. Bar No. 19076)
Joanna Wasik (D. Md. Bar No. 21063)
WASHINGTON LAWYERS'
  COMMITTEE FOR CIVIL RIGHTS AND
  URBAN AFFAIRS
700 14th St., Suite 400
Washington, DC 20036
(202) 319-1000
dennis_corkery@washlaw.org
joanna_wasik@washlaw.org

Deborah A. Jeon (D. Md. Bar No. 06905)
ACLU OF MARYLAND
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
(410) 889-8555
jeon@aclu-md.org

   /s/ John A. Freedman
John A. Freedman (D. Md. Bar No.
20276)
Peter T. Grossi, Jr. (admitted *pro hac vice*)
Adam M. Pergament (admitted *pro hac vice*)
Mei-Wah Lee (admitted *pro hac vice*)
Danait Mengist (admitted *pro hac vice*)
Preston Smith (D. Md. Bar No. 21232)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW Washington, DC
20001-3743
John.Freedman@arnoldporter.com
Peter.Grossi@arnoldporter.com
Adam.Pergament@arnoldporter.com
Mei-Wah.Lee@arnoldporter.com
Danait.Mengist@arnoldporter.com
Preston.Smith@arnoldporter.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2020, a copy of the foregoing was served via the Court's

CM/ECF system on all counsel of record and by hand delivery to the following counsel:

Robert G. Ames
Lauren Stocks-Smith
Venable LLP
600 Massachusetts Ave., N.W.
Washington, D.C. 20001


*/s/ John A. Freedman*
John A. Freedman
