# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| HISPANIC NATIONAL LAW ENFORCEMENT ASSOCIATION NCR, *et al*.,<br><br>        Plaintiffs,<br><br>    v.<br><br>PRINCE GEORGE'S COUNTY, MARYLAND, *et al.*<br><br>        Defendants. | Case No. 18-cv-03821 TDC |

**APPENDIX VOLUME I**

**REVISED REDACTED VERSION (JULY 16, 2020)**

Dennis A. Corkery (D. Md. Bar No. 19076)
Joanna K. Wasik (D. Md. Bar No. 21063)
WASHINGTON LAWYERS'
  COMMITTEE FOR CIVIL RIGHTS
  AND URBAN AFFAIRS
700 14th St., N.W., Suite 400
Washington, DC  20005
(202) 319-1000
dennis_corkery@washlaw.org
Joanna_wasik@washlaw.org

Deborah A. Jeon (D. Md. Bar No. 06905)
ACLU OF MARYLAND
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
(410) 889-8555
jeon@aclu-md.org

John A. Freedman (D. Md. Bar No. 20276)
Adam M. Pergament (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
John.Freedman@arnoldporter.com
Adam.Pergament@arnoldporter.com

# APPENDIX
## TABLE OF CONTENTS

| Date/Exhibit No. | Document | Page |
|---|---|---|
| 6/18/2020 | Expert Report of Michael Graham | A.1 |
| | Declaration of Michael Anis | A.128 |
| | Declaration of Sanghamitra Baral | A.130 |
| | Declaration of Eric Beale | A.136 |
| | Declaration of Winston D. Chatman | A.144 |
| | Declaration of John Doe #1 | A.146 |
| | Declaration of Arvester Horner | A.150 |
| | Declaration of Sean Miller | A.154 |
| | Declaration of Lynett Redhead | A.159 |
| | Declaration of Earl Sharpe | A.165 |
| | Declaration of Chris Smith | A.170 |
| | Declaration of Marc Snoddy | A.173 |
| 6/18/2020 | Declaration of John A. Freedman | A.179 |

**EXPERT REPORT OF**

**MICHAEL E. GRAHAM**

In

*Hispanic National Law Enforcement Association NCR et al. v.*

*Prince George's County et al.*,

District of Maryland No. 18-cv-3821

**REVISED REDACTED VERSION**

July 16, 2020

## I.     QUALIFICATIONS

1.  For 33 years, I was employed by the Los Angeles County Sheriff's Department (LASD), rising from the rank of Deputy to the position of Assistant Sheriff, the third-highest ranking position in the Department.  The LASD is the largest Sheriff's Department in the United States with approximately 18,000 employees.  The Department serves as the primary police agency for more than 2.9 million residents.  As the Assistant Sheriff for five years, I was responsible for the policing and detective functions, and as part of my duties I reviewed all serious force cases, approved appropriate discipline, and implemented policy and training to reduce inappropriate use of force.  I previously served as the Chief of the Professional Standards and Training Division, where, among other things, I had responsibility over Department training and internal affairs.

2.  I was a member of the International Association of Chiefs of Police (IACP) National Law Enforcement Policy Center for over two decades.  The Center is made up of nationally recognized police executives, current and retired, who identify leading practices and provide sound guidance to the law enforcement profession to assist in developing policies for individual departments. I am also a member of the Board of Directors for the Police Assessment Resource Center (PARC).  PARC provides independent, evidence-based counsel and research on

<div align="center">1</div>

<div align="center">A.2</div>

effective, respectful, and publicly accountable policing to law enforcement agencies, government entities, and community groups.  PARC was founded in 2001 by the Vera Institute of Justice with the support of the Ford Foundation.

3.  I have served as an expert or consultant for the Department of Justice in over a dozen matters concerning police practices, including matters concerning the police departments of Chicago, Detroit, Los Angeles, New Orleans, Newark, Seattle, and Washington, D.C.  I have also been retained as a consultant by a number of jurisdictions.

4.  I have served as an instructor and lecturer on various law enforcement and management subjects at California State University.  My undergraduate degree is from California State University, and I have a masters from the University of Southern California.

5.  My curriculum vitae is attached as Appendix A.  I have not had any publications in the last ten years.  I have not testified in any matters in the last four years.  A list of materials I have considered in preparing this report is included as Appendix B.

6.  My work on this matter is ongoing, and I reserve the right to supplement, update, refine, or revise my conclusions or opinions should any additional

2

A.3

information be provided to me in the future and to supplement or amend them to address any additional expert opinions offered in this litigation.

7.     I am being compensated in this matter at a rate of $175 per hour, including any testimony.  My compensation is not contingent upon the substance of my opinions or the outcome of this case.

## II.     SCOPE OF ASSIGNMENT

8.     I have been retained by Arnold & Porter Kaye Scholer LLP, the Washington Lawyers' Committee for Civil Rights and Urban Affairs, and the American Civil Liberties Union of Maryland, counsel for Plaintiffs in the matter of *Hispanic National Law Enforcement Officers et al. v. Prince George's County, Maryland et al.*, District of Maryland Case No. 18-3821.  I have been asked to evaluate the facts and circumstances involving police practices used at the Prince George's County Police Department ("PGPD" or the "Department"), including assessment of Departmental policies, practices, and customs.  This assessment has included evaluation of PGPD's policies, practices, and customs when presented with complaints of racial discrimination, racial harassment, and retaliation, the PGPD's training concerning such issues, the PGPD's methods of evaluating, investigating, and disciplining such complaints, its Internal Affairs function, and its disciplinary function.

3

A.4

### III.   SUMMARY OF OPINIONS

9.      Based on my professional experience and my analysis to date, I have reached the following conclusions:

a. The Department's policies for handling complaints about racial harassment and discrimination are inadequate.

b. There are practices within the Department that result in complaints by civilians and minority officers about racial harassment or discrimination that are not being treated appropriately, in that they are either not investigated, not investigated appropriately, or not disciplined appropriately.  The current leadership of the Department appears to have made a deliberate choice not to track or monitor its performance concerning these matters.

c. There are practices within the Department that result in serious allegations of misconduct being treated differently when the charges are made against white officers as opposed to officers of color.  In addition, the current leadership of the Department appears to have made a deliberate choice not to track or monitor its performance concerning these matters.

4

    d.  There is a practice or custom in the Department that when officers of color complain about any of the foregoing conduct, they experience retaliation, in that they are transferred out of their jobs and sometimes face counter-charges.  The pattern of retaliation is indicative that leadership of the Department condones retaliation, and, in certain cases, evidence reflects direct participation of leadership of the Department in retaliatory acts.

## IV.    ANALYSIS

### A.    The Department's Policies for Handling Complaints About Racial Harassment and Discrimination Are Inadequate

10.      It is the responsibility of Police Departments operating in a diverse, multicultural society to treat allegations of racial discrimination and harassment seriously.  When allegations of discriminatory conduct by a law enforcement officer are presented, they should be investigated and violations should be disciplined appropriately.

11.      I have reviewed Prince George's County Police Department General Order Manual, in particular Volume I, Chapter 12 on Discrimination & Sexual Harassment ("Discrimination & Sexual Harassment Policies"),[1] which is the

---

[1] Prince George's County Police Department General Order Manual ("General Order"), Vol. I, Ch. 12 (Discrimination & Sexual Harassment), available at

Department's primary policy concerning racial discrimination and harassment, as well as Volume I, Chapter 4 on Complaints, which also gives direction to employees regarding filing complaints and promises them protection from retaliation ("Complaints Policy")[2] (collectively, "PGPD Policies" or "Policies").  I have concluded that these policies are flawed in a number of respects, as set forth below.

12.     First, PGPD's Policies have flawed reporting requirements.  The reporting process required by PGPD's Policies is deficient in a number of ways. Most notably, the Policies state that "[w]hen employees, other than victims, become aware of conduct believed to be sexual harassment or discrimination . . . they shall report the incident to their supervisor or Commander/Manager."  Vol. I. Ch. 12 § V[3] (Procedures).  And, even if an employee is uncomfortable with this directive and instead makes a complaint directly to the EEO Coordinator, the Coordinator is authorized to "[r]efer [the complaint back] to the employee's Commander/Manager for mediation."  *Id*. § V.3 (Complaint Procedures).

---

https://www.princegeorgescountymd.gov/DocumentCenter/View/16570/Volume-I-Administration-PDF.  Unless otherwise specified, citations to the General Order reference the version available at the link in this footnote.

[2] General Order, Vol. I, Ch. 4 (Complaints).

[3] General Order, Vol. I, Ch. 12 § V (Discrimination & Sexual Harassment: Procedures).

13.     The reporting procedure for "victims" is more daunting as it states that as the first step, "Attempts will be made to settle discrimination complaints at the employee/supervisory level by dialogue between the parties concerned.  When a solution cannot be reached at this level, employees are urged to seek the assistance of either the Equal Employment Opportunity Coordinator or the Assistant Coordinator."  *Id*. § V.2.  Once again, if the "victim" employee is uncomfortable with this directive and instead makes a complaint directly to the EEO Coordinator, the Coordinator is authorized to "[r]efer [the complaint back] to the employee's Commander/Manager for mediation."  *Id*. § V.3 (Complaint Procedures).

14.     If the victim complains to the EEO Coordinator, the procedure provides the victim "shall complete Part I of the Equal Employment Opportunity Complaint Form …" and "shall either mail the form (marked confidential) or take it directly to the Deputy Chief, BOAHS," the assigned EEO Coordinator.  *Id*.  This is flawed.  In contrast, the U.S. EEOC states, "When an employee complains to management about alleged harassment, the employer is obligated to investigate the

7

A.8

allegation regardless of whether it conforms to a particular format or is made in writing."[4]

15.     Similarly, the Complaints Policy requires all employees who become aware of "unlawful conduct" or "violation of written directives" of any kind to report it to their Commander.  Vol. I, Ch. 4 § V.6 (Internal Complaints).[5]

16.     Read in tandem, these provisions restrict all employees' options such that it is difficult, if not impossible, to break out of the chain of command.  Policies like PGPD's that require employees to report within the chain of command are ineffective because a supervisor may be the alleged offender, or may have a relationship with the alleged offender, thereby compromising the potential for objective and impartial investigation and determination of complaints.

17.     The Equal Employment Opportunity Commission also recommends that an employer "provide accessible points of contact for the initial complaint" and designate officials "outside an employee's chain of command" as the recipient of complaints, in order to ensure that complaints are handled in an impartial manner.[6]  Consistent with this guidance, the Model Policy on Harassment,

---

[4] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

[5] General Order, Vol. I, Ch. 4 § V.6 (Complaints: Internal Complaints).

[6] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

Discrimination, and Unprofessional Conduct put forth by the IACP ("IACP Model Policy") provides that complainants may report either to a supervisor or to the Office of Professional Responsibility.[7]  Following this guidance, the Chicago Police Department's Equal Employment Opportunity Policy specifically excludes discrimination or harassment complaints from up the chain of command.[8]  The Maricopa County Sherriff's Department[9] policy advises employees who do not feel comfortable reporting to the chain of command that they have a duty to report directly to other parties, including Human Resources, the Compliance Bureau Chief, or the Professional Standards Bureau.[10]

18.  Second, PGPD's Policies contain an ineffective investigation and resolution process.  The PGPD Policies do not provide for a mechanism for effective and timely investigation of discrimination and harassment complaints.

---

[7] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy, Harassment, Discrimination, and Unprofessional Conduct § V.C (2) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

[8] Chicago Police Department, Equal Employment Opportunity Policy (August 22, 2017) at IV (B)(1)(a) http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

[9] The Maricopa County Sheriff's Office has been the subject of multiple discrimination lawsuits and Department of Justice consent decrees. This policy was adopted over three years after the consent decree.

[10] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), pages 5-6, §§ 5(c )(1), 5(c )(2), 5(c )(5), https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

EEOC guidance requires employers to engage in a "prompt, thorough and impartial investigation" into an alleged complaint, including, if necessary, a detailed fact-finding.  In cases in which the harasser does not deny the accusations, the EEOC recommends the immediate determination of appropriate corrective action.[11]

19.     The PGPD Discrimination & Harassment Policy provides for no investigative process if a report is made up the chain of command.  The Policy is silent on what, if anything, a Commander must do upon receipt of a complaint.

20.     The PGPD Discrimination & Harassment Policy provides that if the Department's EEO Coordinator, the Deputy Chief of Bureau Administration and Homeland Security, receives a complaint, the Coordinator may "handle informally" the complaint, issue a "final determination," or simply refer it back to the chain of command for "mediation."  Vol. I, Ch. 12 § V.3 (Complaint Procedures).[12]  None of these options contemplates a thorough investigation. While the EEO Coordinator may also choose to "assign for investigation" the complaint, the Discrimination & Harassment Policy is silent on who will conduct

---

[11] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

[12] General Order, Vol. I, Ch. 12 § V.3 (Discrimination & Sexual Harassment: Complaint Procedures).

that investigation, how, in what time frame, and how the investigation will be documented. *Id.* Although the Complaint Policy separately states that "abusive language" and "harassment" must be investigated by the Internal Affairs Department (IAD) of PGPD, Vol. I, Ch.4 § V.7 (Complaint Assignment),[13] and the EEO Coordinator could presumably use this provision to refer harassment complaints for investigation to IAD, the Policies contain no provisions stating that IAD is also responsible for investigation of discrimination complaints. Indeed, there is evidence that the actual practice is that when internal complaints are discovered to be associated with an EEOC charge, the investigations are terminated and the cases closed. This action occurs whether a complaint is made internally or externally. Several examples are discussed below.[14]

21.     The IACP Model Policy, in contrast, directs that the Office of Professional Standards has responsibility for investigation of harassment and discrimination complaints.[15] Similarly, the Maricopa County Sheriff's Office Policy and Procedures directs that discrimination and harassment complaints be

---

[13] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).

[14]  See Paragraph 50.

[15] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy Harassment, Discrimination, and Unprofessional Conduct § V.C (6) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

"immediately" taken to the Professional Standards Bureau, which documents them in IAPro and conducts an investigation.[16]  The Chicago Police Department also states that the Bureau of Internal Affairs has "primary responsibility for conducting a prompt and thorough investigation of complaints of employment discrimination."[17]

22.     In lieu of an effective investigation process by IAD, the PGPD Policies place a heavy, and inappropriate, emphasis on direct confrontation between complainants and alleged offenders.  The Policies encourage employees "to confront the offender and make it clear the offensive behavior must stop."  Vol. I. Ch. 12 § V.2 (Internal Complaints).[18]  Similarly, the Policies state that "[a]ttempts will be made" to address discrimination complaints in the first instance "by dialogue between the parties concerned."  *Id*.

23.     These provisions undermine an effective investigative process and may deter victims from coming forward.  Employees should feel no compulsion to

---

[16] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), pages 5-7, https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

[17] Chicago Police Department, Equal Employment Opportunity Policy (August 22, 2017) at § IV(B)(4)(a), http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

[18] General Order, Vol. I, Ch. 12 § V.2 (Discrimination & Sexual Harassment: Internal Complaints).

resolve discrimination or harassment by themselves.  The Maricopa County Sheriff's Office Policy and Procedures, for example, explicitly states that "[a]n employee is not required to directly confront the offender who is alleged to have engaged in unlawful or wrongful conduct."[19]

24.    Third, PGPD's Policies lack appropriate confidentiality protections. According to the EEOC, an anti-harassment policy should contain, at bare minimum, an "[a]ssurance that the employer will protect the confidentiality of harassment complaints to the extent possible."[20]  The IACP Model Policy provides for such confidentiality.[21]  The PGPD Policies, however, fail to provide any assurance of confidentiality to would-be complainants.  At minimum, the lack of such fundamental protections can result in a chilling effect on would-be complainants; at worst, it can expose complainants to open hostility and retaliation.

25.    Fourth, PGPD's Policies fail to protect complainants from contacts with the suspected offender.  The EEOC provides that an employer may need to

---

[19] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), page 5, § 5(C )(1), https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

[20] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

[21] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy Harassment, Discrimination, and Unprofessional Conduct § V.C (7) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

take intermediate measures pending the completion of an investigation, such as "scheduling changes so as to avoid contact between the parties; transferring the alleged harasser; or placing the alleged harasser on non-disciplinary leave with pay pending the conclusion of the investigation."[22]  The PGPD Policies contain no provisions allowing PGPD to take appropriate measures to protect complainants from contact with alleged offenders during the investigation of a harassment or discrimination claim.  As a result, complainants may be forced to continue working alongside offenders, or worse, if the offenders are the complainants' supervisors, and potentially endure ongoing discrimination, hostility, or reprisal, while their complaint is adjudicated.

26.     Fifth, PGPD's Policies do not prohibit all unlawful forms of harassment and discrimination.  In particular, PGPD Policies do not protect employees from the full range of conduct that is unlawful under applicable law.  An effective anti-harassment and anti-discrimination policy should prohibit discrimination and harassment based on sex, race, color, religion, national origin, age, disability, and protected activity.[23]

---

[22] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

[23] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

27.     The scope of PGPD's policies falls short in a number of ways. Notably, although PGPD prohibits sexual harassment, it does not prohibit harassment based on other protected characteristics, including racial harassment.[24] Relatedly, PGPD's policies do not contain clear anti-discrimination provisions. The Discrimination & Harassment Policy lacks a clear statement that the Department as a whole prohibits unlawful discrimination and harassment by all employees.

28.     The Discrimination & Sexual Harassment Policy also lacks a plain, easily comprehensible prohibition on different treatment in the terms, conditions, and privileges of employment because of an individual's protected characteristic. Instead, the definition section of the Policy is hard to follow.  It differentiates between "arbitrary discrimination" and "personal discrimination,"[25] which are not terms used in either guidance by the EEOC or the policies of other Police Departments that I have reviewed.  "Arbitrary discrimination" is defined in part by reference to other defined terms, while "personal discrimination" is defined as deprivation of "a right," without explanation of what rights may be applicable in the context of employment.  The other terms in the definition section, including

---

[24] EEOC Compliance Manual, Section 15: Race and Color Discrimination, § 15-VII (A)(racial harassment) (April 19, 2006), https://www.eeoc.gov/policy/docs/race-color.html.

[25] General Order, Vol. I, Ch. 12 § III (Discrimination & Sexual Harassment: Definitions).

15

"prejudice," "racism," "disparaging terms," and "stereotyping," do little to clarify what kind of activity is prohibited.

29.     The policies of other police departments contain clearer and more effective prohibitions on harassment and discrimination.  The IACP Model Policy defines discrimination as "[u]nfair or unequal treatment of an individual or group based on protected class status."[26]  The Chicago Police Department clearly states that "City and Department policies prohibit discrimination against employees" on various bases.[27]  The 2019 Maricopa County Sheriff's Office Policy and Procedures "prohibits unlawful discrimination and harassment based on an individual's membership in a category protected by federal or state law."[28]  It further defines discrimination as different treatment in the terms and conditions of

---

[26] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy Harassment, Discrimination, and Unprofessional Conduct § III (definitions) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

[27] Chicago Police Department, Equal Employment Opportunity Policy (August 22, 2017) at II, http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

[28] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), page 1, https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

employment based on a protected characteristic, and proscribes all unlawful forms of harassment, not just sexual harassment.[29]

30.    Finally, PGPD's policies are deficient in their protections for officers who raise complaints of misconduct by other officers.  Vol. I, Ch. 4 § V.6[30] states that "Any employee who becomes aware of unlawful conduct or a violation of written directives shall report it to the involved employee's Commander/Manager. In confidential matters, reports may be made directly to the Commander, IAD." This policy does not define what a "confidential matter" is.  Nor does it provide any direction for employees who have reason not to report up the chain of command, such as EEO issues or complaints against a supervisor.  In addition, nothing in the policies imposes any requirement that the IAD Commander investigate the complaint or honor the confidentiality request.  The policy should give the option for all officers to report misconduct to the Internal Affairs Division, with the assurances that the complaint be thoroughly investigated and its confidentiality maintained.

---

[29] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), page 2, https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

[30] General Order, Vol. I, Ch. 4 § V.6 (Complaints: Internal Complaints).

17

A.18

31.     The anti-retaliation provisions contained in Vol. I. Ch. 4 § V.9[31] also do not do enough to protect officers who report misconduct.  The policy states that retaliation is prohibited, that the officer against whom allegations were made shall not have contact with the complainant and witness, and that "[t]he same standards of conduct shall apply when officers are witnesses or complainants."  The Policy then focuses on the need to call supervisors to the scene when a citizen complainant interacts with an officer under investigation.  The protection for officer complainants should be placed in a separate section of the policy to emphasize the importance of protecting officers who make good faith complainants about misconduct.  Similar to the anti-discrimination policy, there is no mechanism for complainants to be removed from working with or under the supervision about whom they have complained.  There is also no mechanism to report retaliation or investigate allegations that retaliation has occurred.

32.     I have also reviewed a printed copy "Prince George's County Police Department Supervisors and Managers Equal Employment Opportunity (EEO) Training," which is a Power Point that appears to be primarily presented through a DVD presentation.[32]  I understand that this was the only training materials

---

[31] General Order, Vol. I, Ch. 4 § V.9 (Complaints: Retaliatory Acts Against Complainants Prohibited).

[32] PG0000000348-394; PG0000000395-441.

18

submitted by PGPD to the Department of Justice in response to a request for

training materials regarding discrimination or harassment, and that Defendants

have not produced different anti-discrimination training materials in discovery in

this matter.

33.     PGPD's training on employment discrimination is deficient.  For

example:

- While the training provides examples of sexual harassment, it does not explain that a hostile work environment is unlawful when based on any protected category, including race.  It would be important to have modules on how racial slurs and jokes are harmful and unlawful.

- The training contains minimal discussion of retaliation, and no discussion of steps supervisors should take to discourage, prevent, or report retaliation.[33]

- The policy also fails to accurately advise recipients on a number of critical issues.  For example, it is misleading as to the deadlines for filing a charge of discrimination, in that it does not make clear that

---

[33] PG0000000348-394 at 363.

internal reporting of discrimination does not toll deadlines to file an external complaint or charge.[34]

- The training also ignores key protections under Maryland state law, including accommodation for pregnant employees and prohibitions on discrimination on the basis of sexual orientation, gender identity, and marital status.  Md. Code State. Gov. § 20-606.

34.    Based on the materials produced by Defendants, I have other significant questions about PGPD's anti-discrimination training:

- Who receives the training?  The presentation title indicates that the intended audience is limited to supervisors (which is consistent with internal emails and the only training sign-in sheet Defendants have produced).[35]  Is training given to new recruits?  Is training given to rank-and-file officers?  PGPD has produced no records indicating that rank-and-file officers receive this training, which is consistent with internal emails indicating the training is limited to

---

[34] PG0000000348-394 at 383.

[35] PG0000154901-902; PG0000966820-966830.

supervisors.[36]  All members of the force should receive anti-discrimination training.  Indeed, the Power Point includes language that supervisors should "Ensure that all employees have attended the mandatory Workplace Harassment Training (WHAT) during New Employee Orientation."[37]

- How often is training given?  When asked that question, former Deputy Chief Raphael Grant, the former EEO Coordinator, could not say.[38]  The Defendants have produced no records indicating how often training was given.  Anti-discrimination training should be given at least annually.

- Is an instructor present for the training?  In at least one instance, supervisors were directed to the clerk's office to check out a DVD by signing it out.[39]  How did the Department confirm that these individuals actually viewed the DVD?  The Power Point contains several hypothetical questions that present scenarios and ask the viewer to determine whether the conduct constitutes harassment;

---

[36] PG0000154901-902; PG0000658090-658091.

[37] PG0000000348-394 at 370.

[38] Grant Dep. Tr. 76:25-77-19, 81:18-81:24.

[39] PG0000154901-154902.

but the written answer is given immediately following the question.  If there is no instructor present, how is the viewer supposed to discuss the scenario or ask any questions?  The DVD is a training aid, designed as a support for a subject matter expert's presentation, not a substitution.  A qualified instructor should present this information live in a format that allows interaction.

- Does the Department do anything to ensure that viewers actually and accurately understand the training?  The Power Point presentation is not interactive and does not test to ensure the viewer understands the information.  The Department has recently produced a draft "quiz" in discovery, but the questions are limited to questions about sexual harassment (i.e., they do not test comprehension about other types of discrimination or retaliation) and contain questions about North Carolina rather than Maryland law; the Department has produced no evidence the quiz was ever administered.[40]  Testing is important because it confirms the viewer understands the information, and would allow the Department to identify supervisors who score poorly for remedial

---

[40] PG0000967475-967476.

training.  ==The Department does not appear to do anything beyond confirming officers signed a sign-in sheet.==

35.     In sum, while my investigation is ongoing, there appear to be significant flaws in PGPD's anti-discrimination and anti-retaliation policies and training related to such policies.

### B.     The Department Does Not Treat Complaints About Racial Harassment or Discrimination Appropriately

36.      It is the responsibility of the Prince George's County Police Department to treat allegations of racial discrimination and harassment seriously. When allegations of discriminatory conduct by a law enforcement officer are presented, they should be investigated and violations should be disciplined appropriately.

37.     The Department has certain policies that speak to issues of racial discrimination and harassment.  As noted above, the Department has General Order Volume I, Chapter 12,[41] which is its general policy that addresses racial discrimination and harassment.

38.     In addition, the Department has certain specific policies regarding the investigation and discipline of racial discrimination and harassment.  For example:

---

[41] General Order, Vol. I, Ch. 12 (Discrimination & Sexual Harassment).

23

a. General Order Volume I, Chapter 4 concerns "complaints," and covers both internal and external complaints.  Chapter 4 Paragraph V.7 states that certain types of serious complaints, including "use of force, abusive language, harassment . . . must be investigated by IAD." [42]

b. General Order Volume I, Chapter 4 Paragraph V.10[43] concerns complaints of "bias-based profiling" and states that "Officers are prohibited from using bias-based profiling."  That section also provides that there is to be "annual training" and "re-training on profiling," and that the "Commander, IAD, shall submit a monthly report to the Chief of Police that summarizes all complaints of profiling against Departmental employees" and "the Commander, IAD, shall conduct an annual analysis of complaints and investigations, and submit a report to the Chief of Police."  *Id.*

c. General Order Volume I, Chapter 11[44] concerns "Discipline."  The Department has policies that treat certain types of serious

---

[42] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).

[43] General Order, Vol. I, Ch. 4 § V.10 (Complaints: Bias-Based Profiling).

[44] General Order, Vol. I, Ch.11 (Discipline).

complaints, such as use of "discriminatory language" or "excessive force" warrant the most severe "Category IV" discipline, which include reduction of rank, removal from the promotional cycle, suspensions exceeding 40 hours, and termination.

39.     There is also a significant inconsistency in Department policy concerning investigation of complaints of racial harassment and discrimination. While General Order Volume I, Chapter 4, Paragraph V.7[45] states that serious complaints (including harassment and abusive language) "must be investigated" by the Internal Affairs Division, another policy directs such complaints in the first instance to be addressed by the employee's supervisor and through direct confrontation:

> **2.  Internal Complaints:**  Attempts will be made to settle discrimination complaints at the employee/supervisory level by dialogue between the Parties concerned . . .  When an employee observes behavior or finds a casual remark to be offensive, the employee is encouraged to confront the offender and make it clear that the offensive behavior must stop.  General Order, Vol. I, Ch. 12, § V.2.[46]

---

[45] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).

[46] General Order, Vol. I, Ch. 12 § V.2 (Discrimination & Sexual Harassment: Internal Complaints).

40.     Contrary to the Department's policies, based on my review of the available evidence, complaints of racial discrimination and harassment are usually not investigated at all.  As discussed below in paragraphs 44 and 50(a)-50(g), the few instances that Defendants have identified that were formally investigated have not been adequately investigated.[47]  Moreover, there is evidence that the Department's practice is that when complaints of discrimination are discovered to be associated with an EEO charge, they will not be investigated, and if an investigation was underway, the investigation is terminated and the cases closed.[48] These matters are discussed below.

41.     The lack of investigation into complaints of racial discrimination and harassment is confirmed by the (i) examination of the Department's response to the Department of Justice, (ii) examination of the Department's response to formal charges of discrimination filed with the U.S. Equal Employment Opportunity Commission (EEOC), (iii) review of the Department's IAPro database, and (iv) specific incidents identified in the Complaint and by the Plaintiffs.

---

[47] The Defendants identified such a list of cases at PG0000001362-63.  In addition to these matters, I have independently reviewed to see whether the matters the Defendants have identified where EEOC charges were filed were also investigated by the Department.  These matters are discussed in paragraph 50 below.

[48] Grant Dep. Tr. 76:16-77:2; IA2015-092 (PG0000042371-42436 at 42391).

26

**A.27**

42.     In conjunction with responding to requests by the Department of
Justice investigation to identify "[a]ny and all Internal Affairs investigative case
files . . . involving employment-related allegations including . . . discrimination,
unfair treatment, disparate treatment, bias, harassment, race . . . retaliation, [and]
hostile work environment," the Defendants identified a handful of investigations
between 2013 and 2019 which involved a complaint that a white (or unknown)
officer engaged in racist conduct.[49]

43.     As discussed below, the evidence indicates that these investigations
represent a small number of the incidents that were brought to the Department's
attention.

44.     For example, in response to discovery requests, the Defendants have
identified approximately 57 matters where a PGPD officer or employee filed a
formal charge with the EEOC.[50]  Of these 57 charges, there is no record in the
materials produced of any investigation (by Internal Affairs or by field command)

---

[49] PG0000001362-63; PG0000852473.  The Defendants' lists of such incidents also included
several matters where a white officer filed a complaint, and three matters where a minority
complainant does not appear to be alleging racist conduct.  IAQ2015-021 (███████████);
IA2014-017 (███████████; IA2018-012 (███████████].

[50] PG0000001364-1372; PG0000936765-93769.

for 49 of these.[51]  In other words, over 85 percent of complaints of discrimination or harassment did not result in a formal investigation.

45.     The Department's discrimination and harassment policy provides that in the event the supervisor cannot resolve the matter, employees have recourse to the Department's Equal Employment Opportunity Coordinator or Assistant Coordinator.  General Order, Vol. I, Ch. 12 § V.2-3.[52]  The same policy states that the EEO Coordinator and Assistant Coordinator are required to meet and discuss "a method of resolution with the employee," which methods of resolution include "investigation" and making a "final determination."  *Id.*  In response to discovery requests, I understand the Defendants have not identified any investigations or final determinations made by the EEO Coordinator or Assistant Coordinator, nor have they produced any document indicating that any such investigations or determinations were made.[53]  At his deposition, Deputy Chief Grant, who served as the EEO Coordinator, stated that he did not meet with the complainants or conduct an investigation if the complainant had filed an EEO charge, and that he only

---

[51] There is overlap between these cases and the cases the Department identified for the Department of Justice.  IA2015-092, IA2016-008, and IA2013-075 are on both lists.

[52] General Order, Vol. I, Ch. 12 § V.2-3 (Discrimination & Sexual Harassment: Internal Complaints, Complaint Procedures).

[53] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No 2; Prince George's County's Objections and Answers to Plaintiffs' Fourth Set of Interrogatories Nos. 10 & 11.

interviewed only a single complainant.[54]  I also understand that in response to

discovery requests, the Defendants have neither identified nor produced any

instances where the EEO Coordinator or Assistant Coordinator referred an

allegation of discrimination or harassment to IAD.[55]

46.     The IAPro database, as described below, also confirms that contrary

to Department policy under General Order Volume I, Chapter 4, § V.7,[56] which

states that certain types of serious complaints "must be investigated by IAD," there

are a number of cases involving allegations of racial harassment, abusive language,

use of force, and criminal misconduct that were left to the field command to

investigate or were treated as "inquiries" and closed without investigation.  I have

attached a schedule of these matters as Exhibit A.

47.     This policy violation and relegation of serious allegations of racist

conduct to the field for investigation is consistent with what I have observed in the

record, as well as information the plaintiffs have provided.  For example, the

record indicates that in May 2017, IAD Commander Kathleen Mills was presented

with two separate allegations of racial harassment by Sergeant ███████ made

---

[54] Grant Dep. Tr. 76:25-77-19, 81:18-24.

[55] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories
No 3.

[56] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).

29

by officers under his direct supervision, Police Officer ████████████ and
Corporal ████████████.[57] These allegations followed several other complaints
against Sgt. ████ for engaging in racist behavior (one of which was sustained),[58]
and HNLEA and UBPOA specifically brought to Chief Stawinski's attention on
May 8, 2017.[59] Adhering to the Department's Complaint Policy regarding
harassment, these matters were ████████████████████████████
████████████████████████████████ On May 16, 2017, in a
breach of Policy regarding Internal Complaints and confidentiality, ████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████[61] There are several notable
aspects of this episode:

---

[57] PG0000156074-156106 at 156075-077 and 156089-156101.

[58] Compl. ¶ 61(b); IA2016-008 (PG0000043186-43284) and IA2016-034 (PG0000025286-25415).

[59] PG00000155747.

[60] PG0000156074-156106 at 156078 and 156102.

[61] PG0000162779-162780.

30

- ███████████████████████████████████████

  ████████████████████████████████████████████

  ███████████████████

- Commander Mills knew the complaints ███████████████████

  ██████████████████████████████████████

  ████████████████████████████████████████████████

  █████████[62]

- ████████████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████████████

  ████████████████████████████████████████

  ████████████████████████████████████████████████

  ███████████████████████████████████[63]

- In violation of the Department's Discrimination and Sexual

  Harassment Policy, Commander Mills ██████████████████████

  ████████████████████████████████████████████████

  ████████████████████████████████████████

---

[62] PG0000156074-156106 at 156078 and 156103.

[63] PG0000000595-598 at 597.

31

**A.32**

- 

- There is no evidence in IAPro or the Internal Affairs investigative files produced by the Department that there was any investigation into Sgt. ███ conduct concerning these complaints.

-

---

[64] IAD Standard Operating Procedures C1-C3, C5 & C8 (PG0000000497-530).



[REDACTED][65]

- There is no evidence that Sgt. ▮▮▮ was separated from the complainants or that he or other supervisors were admonished not to retaliate.  Rather, as discussed below in paragraph 87, both Officers ▮▮▮ and ▮▮▮ experienced retaliatory transfers after filing their complaints.

48.    It is not clear how many other such complaints came to Commander Mills' attention and were dealt with in a similar fashion.  It is notable, however, that several of the incidents identified by the Department to the Department of Justice were handled at the field level.[66]

49.     The Plaintiffs have identified a number of other incidents in their complaint and discovery responses where no investigation appears to have been conducted.  For each of the following matters, there is no indication in the IAPro database or the Internal Affairs files produced by Defendants that there has been any investigation into the following matters:

    a.  A complaint was filed against officers Police Officer First Class (POFC) Nathaniel Bauer, Sergeant James Hoo and Sergeant Daniel

---

[65] PG0000168875-168876 at 168875; PG000180150 ( [REDACTED] ).

[66] PG0000001362-1363.

==Smith== for exchanging racist text messages and saying things like "we should bring back public hangings," and making misogynistic comments about female Black officers.[67]  There is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated or these officers were disciplined.

b. During a recruiting meeting in December 2016 to discuss new applicants, Major ████████ made a derogatory comment about Nigerian-Americans.  Although Lieutenant Thomas Boone complained to several senior members of the Department,[68]  there is no indication in IAPro or the Defendants' discovery responses that this matter was investigated or Major ████ was disciplined.  As noted below in Section D, following the lodging of his complaint, Lt. Boone was transferred.

c. In April 2016, a complaint was made regarding an offensive personalized license plate by a Sergeant assigned to IAD (Lieutenant Brian Selway), which was an acronym for "Go F*** Yourself Obama."  Although a complaint was made about this matter,[69] there is no indication in IAPro or the Defendants' discovery responses that this matter was investigated, ████████████ Lt. Selway ██████████████ Lt. Selway ████████████████████████████████ Lt. Selway ████████████████, and Chief Stawinski indicated he was aware about the incident during a press

---

[67] Compl. ¶ 61(e); PGPD-PER-0067207-67240 at 67219, PGPDPLS0000310-347 at 343-347.

[68] PG0000334331; Compl. ¶ 122.

[69] Compl. ¶ 61(d); PG0000020673-20697 at 20676; PG0000169720-169725.

[70] PG000020673-20697 at 20694.

conference.[71]  There is no evidence that Lt. ████ was investigated or disciplined over this matter.[72]

d. During June 2018, a group of predominantly white officers walked out of an in-service "implicit bias" training workshop being conducted by the University of Maryland.[73] <mark>Although there was a complaint to the County,</mark>[74] and the Chief's office was notified along with other command staff,[75] there is no indication in IAPro or the Defendants' discovery responses that the matter was investigated or that any of the officers were disciplined.[76]

e. During a community K-9 demonstration to a group of students, a white corporal (████) said "if a black bad guy is running and he drops a cell phone or he drops this piece of leather that may have evidence or DNA on it, or he fired a gun and it may have that shell there."[77]  Although there were civilian complaints, the incident was captured on video, Chief Stawinski publicly apologized for the incident, and the incident was broadcast on local news, there is no indication in IAPro or the Defendants' discovery responses that Corporal ████ was investigated or disciplined.[78]

---

[71] *See* https://pgpolice.blogspot.com/2017/02/todays-full-length-press-conference.html (at 07:06).

[72] *See* Defendant Prince George County's Objections and Answers to Plaintiff United Black Police Officers Association's First Set of Interrogatories No. 7.

[73] PG0000162500-162502; Declaration of Michael Anis ¶ 6.

[74] PGPD-PER-0122769-122770.

[75] Declaration of Michael Anis ¶ 7.

[76] *See* Declaration of Michael Anis ¶¶ 8-9 ("PGPD never conducted an investigation into the details of the walk out, nor did it contact me or the other officer who stayed for the training to learn more about the incident. . . . To the best of my knowledge, no officers were disciplined for walking out of the implicit bias training.").

[77] PG00000171860-171867; Compl. ¶ 253.

[78]  PG00000084440-84446 at 84441 and 84446; PG0000431462-431463; Defendant Prince George County's Objections and Answers to Plaintiff United Black Police Officers Association's First Set of Interrogatories No. 7; Lorenzo Hall, *Chief apologizes after 'bad black guy' example used by Md. Officer teaching kids about K-9s* (Aug. 18, 2018),

35

f.  A white officer circulated derogatory images of Major , a senior Hispanic officer in the Department, including images where he was given "googly" eyes and another where he was depicted as a voodoo doll, and accompanied by captions making light of his ethnicity (██████████████████████████ ████).[79] Although Plaintiffs complained about the incident, and identified Sergeant Kerry Jernigan as the individual who circulated the image, there is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated that Sgt. Jernigan was disciplined, or that any other officer was investigated or disciplined for failing to report the images; rather, it appears that senior IAD officers concluded it was sufficient ████████████████████████████████████████████[80]

g.  In 2016, Lieutenant Scott Finn made a derisive comment about "Black lives matter" activists and was quoted in the Washington Post and New York Times.[81] Although this statement was the subject of a complaint and Lt. Finn was the subject of other complaints for ████████████,[82] there is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated or Lt. Finn was disciplined.

---

https://www.wusa9.com/article/news/local/maryland/chief-apologizes-after-black-bad-guy-example-used-by-md-officer-teaching-kids-about-k-9s/65-588570746.

[79] Compl. ¶ 61(c); Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 1, at 21, 27; PG0000166349-166350; PG0000166322-166323.

[80] *See* Defendant Prince George County's Objections and Answers to Plaintiff United Black Police Officers Association's First Set of Interrogatories No. 7; PG00000166349-166350; PG00000166362-166363.

[81] Compl. ¶ 61(g); *see also* Radley Balko, Washington Post, *Scott Finn, model cop for a model police department* (July 27, 2016), https://www.washingtonpost.com/news/the-watch/wp/2016/07/27/scott-finn-model-cop-for-a-model-police-department/; The New York Times, *One Police Shift: Patrolling an Anxious America* (July 23, 2016), https://www.nytimes.com/2016/07/24/us/police-ridealongs.html.

[82] IA2004-017 (PG0000783482-783871); IA2014-069 (PG0000113804-113898).  Lt. Finn also had recent complaints for ████████. IA2014-006 (PG0000045906-46095); IA2014-100 (PG0000046241-46302).

h. Corporal Steven Jones made a series of negative comments about Black people, including that "at least slaves had food and a place to live" and referring to President Obama as a "coon."[83]  Cpl. Jones also defended the Ku Klux Klan and equated the Black Lives Matter Movement with the Ku Klux Klan.[84]  Although Cpl. Jones was the subject of a complaint made to the EEO Coordinator,[85] there is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated or Cpl. Jones was disciplined.

i. In response to a communication to the Department announcing the establishment of the United Black Police Officers Association in August 2016, numerous senior white officers sent derogatory responses, including Lt. Finn and Major Crandall Weaver.[86] There is no indication in IAPro that any of these officers were ever investigated.[87]

50.     The Plaintiffs have also identified a number of other instances where, although an investigation was opened, the investigation was inadequate. This  includes the few cases where an EEOC charge was filed that were investigated by IAD.  Notably, four of these cases were administratively closed, one was handled as a field inquiry, and the remaining two failed to consider the pendency of other related charges against the respondent.  Specifically:

---

[83] Declaration of Chris Smith ¶ 9.

[84] Declaration of Chris Smith ¶ 8.

[85] Compl. ¶ 61(f); Declaration of Chris Smith ¶ 16; PG0000254415-254416.

[86] *See, e.g.*, PG0000111973 and  PG0000111979.

[87] Defendant PG County's Plaintiff UBPOA's First Set of Interrogatories No. 7.

a. **Miller/**█████: Corporal Sean G. Miller filed an EEO charge alleging █████████ ██████████████████████ ) from Sgt. ██████ (EEO Charge No. 531-2016-01761).[88]  There was a related IA investigation (IA2016-034) of Sgt. ██████ based on the complaint filed by Cpl. Miller alleging that Sgt. ██████ (1) used the word "nigga" multiple times in reading a text message that was part of an evidence of investigation, (2) asked to see a picture of Cpl. Miller's fiancée and upon finding out that she was Mexican-American, commenting she was cheating "cuz that's what they [Latinos] do" and that "████████████████," and (3) said in March 2016 "██████████████"[89]  Sgt. ██████ was exonerated of a █████████, and his ██████████ charges were non-sustained. From my review of the file, the investigator did not appear to consider that other similar charges had been brought against Sgt. ████, nor was there inquiry into whether Sgt. ████ engaged in other discriminatory conduct.

██████████: Sergeant ██████████ filed an EEO charge alleging retaliation and discrimination based on race from Sergeant ██████████ (EEO Charge No. 531-2012-02186C).[90]  IAPro indicates there was a related IA investigation (IA2012-063)[91] based on the complaint filed by Sgt. ██████ alleging that (1) ██████ █████████████████████████████████████, (2) █████████████████████████████. Specifically, Sgt. ████ complained that Sgt. ████████████████████████████████████[92]  The IAD Investigation was administratively closed without finding.[93]



---

[88] Compl. ¶ 61(b); PG0000002232-2270.

[89] IA2016-034 (PG0000042437-42543) at 42453, 42479, 42483; PG00000104392.

[90] PG0000001968-2028 at 1968.

[91] IAPro Entry for IA2012-063 (file not produced).

[92] PG0000001968-2028 at 1968.

[93] IAPro Entry for IA2012-063 (file not produced).

38

A.39

████████████████████████████████████████[94].
I understand the Department has not produced this file in
discovery.

████████████████████: Corporal ██████████████ filed an EEO
complaint alleging disparate treatment from Sgt. ███████
(discussed above) relating to disciplinary action (EEO Charge No.
531-2014-00065C).[95] Cpl. ████████ also filed an IA complaint
(IA2013-075)[96] against Sgt. ████████ alleging that Sgt. ██████
███████████████████ Sgt. ████ ████████████████████████
████████████████████████████████████████████████████
█████████████; IAD should have taken into account that Sgt.
████████ was the subject of a prior complaint. ████████████
████████████████████████████████████████████████████[97]
████████████████████████ the file does not reflect that there was any consideration
that Sgt. ████████ had been accused of discriminatory conduct in
another matter.[98]

d. **Sharpe/**████████████████████████████████
████████████████████ (IA2015-092):  POFC Earl E. Sharpe, Jr.
filed two separate EEO charges regarding the conditions at the
████████████ unit.  POFC Sharpe alleged race discrimination and
retaliation in the first charge (531-2016-00712), and alleged race
discrimination in the second charge (531-2017-01180).[99]  There
was a related IA investigation (IA2015-092), which commenced
after IAD received an anonymous complaint about pervasive
racially hostile environment in the ████ unit, which was under the
command of Lieutenant ████████████, and concerned allegations

---

[94] PG000001968-2028 at 1970-73.

[95] PG0000002223-2270 at 2223-2230.

[96] IA2013-075 (PG0000041479-41834).

[97] PG0000002223-2270 at 2226-2228.

[98] PG0000002223-2270 at 2223-2230.

[99] PG0000157216 and PG0000657800.

about discriminatory conduct by Sgt. ██████ and Detective Corporal ██████████.[100]  The IAD investigator interviewed ████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████[101], IAD administratively closed the matter.[102]  Materials produced in discovery reflect that POFC Sharpe ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████[103].

e.  ██████████████:  ████████████████████████████████ ██████████████, filed an EEO chare alleging harassment and intimidation from Sergeant ██████████████ based on national origin (EEO Charge No. 531-2013-01057).  IAPro indicates there was a related IA investigation (IA2013-029)[104] of Sgt. ██████████ based on a complaint filed by Cpl. ██████ alleging that Sgt. ████████████████████████████████████████████████████ ████████████ (IA2013-029).  Sgt. ██████████ was charged with ████████████████████, which was found to be unfounded.  I understand the Department has not produced this file in discovery.

f.  ████████████:  Civilian Employee ████████████████ filed an EEO charge alleging ████████████████████████████████████ ██████████████(EEO Charge No. 531-2017-00157).  There was a related IA investigation (IA2016-071)[105] of ██████ based on a

---

[100] Compl. ¶ 61(b); IA2015-092 (PG0000042371-42436 at 42378).

[101] IA2015-092 (PG0000042371-42436 at 42418-20).

[102] IA2015-092 (PG0000042371-42436 at 42391).

[103] PG0000658128-658130.

[104] PG0000001798-1802; IAPro Entry for IA2013-029 (file not produced).

[105] PG0000158497; IA2016-071 (PGIAD0000088985-89011).

complaint alleging ███████████████████████████ ███████████████ (IA2016-071).  The investigation was administratively closed.

g.  **Chambers/**██████: Police Officer Sharon L. Chambers filed an EEO charge alleging discrimination from Sergeant ██████ ██████ (EEO Charge No. 531-2019-00277).[106]  PO Chambers alleged that Sgt. ██████ (1) called her a "Sig 7," which is a Department code for a suspicious person and a derogatory term when used to question an officer's integrity, (2) called her a disgrace to the police department, and (3) singled her out for discipline.  PO Chambers specifically noted that Lieutenant ██ ██████ and others in the station were notified of Sgt. ██████'s conduct, and apparently did nothing.  Although this matter was subsequently brought to the attention of IAD during the course of another investigation,[107] Commander Mills



; rather, Lt. ██████ closed the inquiry without any action taken against Sgt. ██████[109]

51.   From my review, there are several other matters (in addition to those listed above) where the investigation was inadequate because the investigators did

---

[106] PGPD-CHA-0001334-1352 at 1352.

[107] FCIQ2018-068 (PG0000121755-121799 at 121782).

[108] FCIQ2018-068 (PG0000121755-121799).

[109] FCIQ2018-068 (PG0000121755-121799 at 121756).

41

not pursue leads, did not make basic inquiries, and failed to conduct fair and

complete investigations.  These are some examples of such matters:

■ **"Color Guard" Incident: (SI2017-008)**:  In February 2017, an
unknown individual vandalized a locker in the Special Operations
Division "Color Guard" by crossing out the word "Color" and
writing "African-American."[110]  In his Administrative Closure
Memo, the assigned IAD investigator ███████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████[111]█████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████████████████████
██[112]████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████  The matter was
administratively closed, and no one was disciplined, in spite of
clear policy violations of failing to report discrimination and the
failure of managers to keep their commands free from harassment
and discrimination. ███████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████

---

[110] Compl. ¶ 61(i); SI2017-008 (PG0000024868-25099 at 24869).

[111] SI2017-008 (PG0000024868-25099 at 24869).

[112] SI2017-008 (PG0000024868-25099 at 24905).



b. **"Training dummy" Incident (SI-2017-067)**:  An unknown individual placed a picture of an African-American face and an Afro wig on a training dummy used to practice baton strikes. Pictures of the training dummy with hand-written words "black face" and "afro wig" were circulated within the Department.[114] The assigned investigator (



---

[113] PG00000183132; PG0000183205.

[114] Compl. ¶ 61(h); SI2017-067 (PG0000020698-21052 at 20705).

[115] SI2017-067 (PG0000020698-21052 at 20776).

[116] SI2017-067 (PG0000020698-21052 at 20776).



---

[117] SI2017-067 (PG0000020698-21052 at 20768-20769).

[118] SI2017-067 (PG0000020698-21052 at 20745, 20753); PG0000166342-166344.

[119] SI2017-067 (PG0000020698-21052).

[120] SI2017-067 (PG0000020698-21052 at 20738-20740).

44

**A.45**

No one was charged or disc█████████████████████████

[122]

   c. **Sergeant ███████████ (IA2016-034)**:  Cpl. ███████ alleged that, among others, (i) during a robbery investigation on May 7, 2016, Sgt. █████ead a suspect's text message putting emphasis on the suspect's use of the word "nigga" four times,[123] (ii) Sgt. ██ asked to see a picture of Cpl. ████'s fiancée on May 8, 2016, asked her nationality, and when he told Sgt. ███she was from Mexico, Sgt. ███said she was cheating on him "cuz that's what they [Latinos] do," that "████████████████████████." and [124] (iii) Sgt. ████ said in March 2016 "████████████████████████████,"[125] (iv) noted that Sgt. ██████had a history of similar statements,[126] and (v) complained that Sgt. ████ had arranged for Cpl. ██████'s transfer after he filed his complaint.[127]  The assigned investigator (Sergeant ██████████████████████████████████████████████████████████████████████████████████

---

[121] SI2017-067 (PG0000020698-21052 at 20738).

[122] PG0000000595-598.

[123] IA2016-034 (PG0000042437-42543 at 42458-42459).

[124] IA2016-034 (PG0000042437-42543 at 42458-42459, 42479).

[125] IA2016-034 (PG0000042437-42543 at 42453, 42459, 42483).

[126] IA2016-034 (PG0000042437-42543 at 42475, 42485 and 42490).

[127] IA2016-034 (PG0000042437-42543 at 42453 and 42491).

[128] IA2016-034 (PG000042437-42543 at 42533-34 and 42512).

██████████████ Sgt. ████ was exonerated of the ██████ charge and his ████ charges of ███████████ were found to be non-sustained.[129] No one was disciplined in the matter, in spite of clear policy violations of the Department's policies against discrimination and retaliation.[130]

**Corporal** ████████████: Cpl. ██████ was the subject of ██ ████████████ that Cpl. ████ ██████████ [131] ████████████████████ ████████████████

████████████ [132] In none of these matters did the investigator consider the pattern of allegations against Cpl. ████ by ████████████; Cpl. ██████ had no similar complaints from white civilians. None of these matters was sustained, and Cpl. ██████ was not disciplined in any way. Cpl. ██████ has also been the subject of at least ███████ complaints (all by minority civilians),[133] was frequently identified on the Department's Early Warning System reports,[134] and was the



---

[129] IA2016-034 (PG0000042437-42543 at 42440).

[130] IA2016-034 (PG0000042437-42543).

[131] *See* FC2013-031 ("████████████") (PG0000134164-134179 at 13176); IA2014-037 ("████████████████") (PG0000134984-135105 at 135033); IA2014-078 ("████████████") (PG0000132332-132549 at 132372); IA2015-039 ("████████████") (PG0000123411-123533 at 123438); IA2015-067 ("████████████") (PG0000134180-134270 at 134207); IA2017-008 (████████████") (PG0000133939-134162 at 133973).

[132] FC2013-031 (PG0000134164-134179 at 134167).

[133] IA2016-006 (PG0000134704-134964); SI2015-030 (PG0000133390-133529); SI2015-054 (PG0000096102-96444); PS2015-237 (PG0000132747-132804).

[134] Cpl. ██████ appeared on the reports (████████████) in September 2014 (PG0000609518-609569), January 2015 (PG00000609764-609809), March 2015 (PG0000609853-609897), May 2015 (PG0000609969-610015), June 2015 (PG00000610016-610081), August 2015 (PG0000610139-61204), and January 2016 (PG0000610611-610652).

46

subject of several complaints for ██████████, none of which considered his other alleged infractions or imposed any discipline.[135]

e. **Sergeant Joseph Bunce (IA2017-003)**:  Plaintiff Richard Torres alleged that Sgt. Bunce used profanity and racial slurs ("NECA") in a text message and made a statement that a suspect was "



."  The assigned investigator (

The investigator also did not assess why Cpl. Torres's superior officers (██████████████████████████████████████) failed to alert IAD when Cpl. Torres raised Sgt. ████████'s text message with them.[139]

---

[135] IA2014-078 (PG0000132332-132549); IA2016-004 (PG0000132633-132726).

[136] IA2017-003 (PG0000020498-20525 at 20501-04, 20510).

[137] IA2017-003 (PG000020526-20554 at 20549, 20552); IA2017-003 (PG000020498-20525 at 20501-20504).

[138] IA2017-003 (PG000020332-20351 at 20343-20348).

[139] PG0000103530, PG0000103567.

47



f.  Police Officer ████████ (IA2017-054):  In October 2017, PO ████ told a Black officer that he was " ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [143]  Although the IA investigator ( ████ ) interviewed several witnesses, she did not inquire whether PO ████ had a history of similar statements ████████████████████████████████████[144] ████████████████████████████████████████████████████████████████████████████████████████████████████████[145] ████████████████████████████████████[146]

52.    From my review, there are also several incidents where charges of racism were sustained, but the discipline was inadequate.  These are some examples of such incidents:

a.  **Sgt. ████ (IA2016-008)**: As noted above, Sgt. ████ has been the subject of a number of complaints by minority officers for racist

---

[140] IA2017-003 (PG0000020498-20525 at 20514-20516).

[141] PG0000656569-656571.

[142] IA2016-008 (PGIAD00000041940-42075 at 42014 and 42020); PG0000656569-656571.

[143] IA2016-008 (PGIAD0000041940-42075 at 42004).

[144] IA2017-054 (PGIAD0000041940-42075).

[145] IA2017-054 (PGIAD0000041940-42075 at 42004).

[146] PG0000656568; PG0000656569-656571.

48

conduct.  On April 25, 2015, Sgt. ███ sent a text message to his subordinate officers ███████████████████████ which contained a video clip with racist language, ███████████████████[147]  Two recipients of the video, POFC ██████ and Corporal █████████, were both minority officers.[148]  Sgt. █████ was charged with "████████████," which was ████████.  IAD does not appear to have considered the repeated complaints about Sgt. ███'s racist conduct (including ████████████████) discussed elsewhere in this report and failed to charge him with discriminatory language, which is a Category IV offense under the Department's disciplinary policy and has been the basis for termination of minority officers.[149]  In his discovery responses, Chief Stawinski acknowledges he personally interceded to lower IAD's recommended discipline to a $██ fine.[150]  Notably, the Department did not require Sgt. ████ to complete any racial sensitivity training.

b. **Corporal ████████ (IA2016-038 and IA2017-019**: During a Police and Citizen Interaction Class, an African-American training instructor showed a slide depicting a white police officer pointing his gun at a Black man while a citizen recorded the incident. When the instructor asked the officers what the slide depicted, Cpl. ████ responded "Oh, that's that Black Lives Matter crap."[151] Plaintiff ███████████ took offense to this comment, and stated, "You don't know me!"  Lt. ██████ was ordered to leave the classroom, and he complied.[152]  Following this, Cpl. ████

---

[147] IA2016-008 (PG0000043186-43284 at 43202-43211).

[148] IA2016-008 (PG0000043186-43284 at 43211).

[149] IAPro IA2015-052, IA2014-087; PG0000174351-174495 at 174352-53; PG0000174649; PG0000174650.

[150] Henry Stawinski's Responses and Objections to HNLEA NCR's First Set of Interrogatories No. 2.

[151] IA2016-038 (PG0000023826-24386 at 23859).  During her interview, Cpl. ████ stated that ███████████████████████████ PG000023826-24386 at 23868.

[152] IA2016-038 (PG0000023826-24386 at 23859).

49

contacted her superior officers with false statements about the incident and filed a charge alleging that Lt. ██████ charged towards her, yelled he was "████████ █ ." ███, and had to be physically restrained and ███████████████.[153] None of the ██ eye witnesses interviewed by IAD confirmed Cpl. ██████'s account. ████████████████████████████████████████████████████████████ ████████████ Cpl. ███████ was charged with a ██████████████ violation and an ████████ violation, both of which were sustained.  They were considered ████████████████████████████. She received two █████ fines.[154]  The Department notably did not require Cpl. █████ to complete any racial sensitivity training, nor did the Department charge her with using discriminatory language or repeating the same false statement to other members of the department including her Captain, both of which are Category IV offenses (Highest level violations) under the Department's disciplinary policy,[155] and have been the basis for terminating numerous minority officers.[156]

The record also reflects that Commander Mills directed that ████ ████████████████████████████████[57] ████████████████████████████████[58] The Citizen Complaint Oversight Panel expressed ████████████

[153] IA2016-038 (PG0000023826-24386 at 23884-23892).

[154] IA2016-038 (PG0000023826-24386 at 23832).

[155] General Order, Vol. I, Ch. 11 § V.5 (Discipline: Disciplinary Action Recommendations Guide).

[156] IAPro SI2014-052 (████████████████████████████████████████); SI2015-015 (██████████████████████████████); SI2016-006 (███████████ ████), SI2016-011 (████████████████████); SI2016-031 (█████ ██████); SI2017-006 (██████████████); SI2017-049 (████████████████████);  IA2014-087 (████████ ██████████████████); IA2015-052 (███████████ ████).

[157] PG0000171193; PGPD000171207-171208.

[158] IA2016-038 (PG0000023826-24386 at 23827).

50



[159]

While this investigation was ongoing, Cpl. ███ was charged with a second incident of ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [160] ███████████████████████████████████████████████████████████████ [61]  Notwithstanding this, the charge was found to be "unfounded."  Notably, IAD did not charge or investigate Cpl. ████ for ███████████████████████████████████████████████████.

    c.  **Lieutenant Thomas Denault (IA2011-042)**:  Thomas Denault at the time of this event was a sergeant.  He was identified as an officer who ████████████████████████████████████████████ [162]  Among other things, Sgt. Denault

---

[159] IA2016-038 (PG0000023826-24386 at 23840).

[160] IA2017-019 (PG0000080458-80538).

[161] IA2017-019 (PG000080458-80538 at 80507, 80513).

[162] IA2011-042 (PG0000002503-2724 at 2614).

 (i) referring to members of the  command staff as "baboons."[163] (ii) stated, "

and (iv)

[165] During the course of the investigation concerning these posts, the Department learned that Sgt. Denault had previously made "

[168]

Sgt. Denault's discipline was downgraded by the Chief of Police to                   , and $

---

[163] Compl. ¶ 61(a).

[164] IA2011-042 (PG0000002503-2724 at 2614).

[165] IA2011-042 (PG000002503-2724 at 2615).

[166] IA2011-042 (PG0000002503-2724 at 2616).

[167] IA2011-042 (PG0000002503-2724 at 2616-17).

[168] IA2011-042 (PG0000002503-2724 at 2580, 2619).

in fines.[169]

█████████████████████████████████████████

███████████████████████████████████████████

███████████.[170]  He was retained by the Department and in February 2018 was promoted to the rank of Lieutenant.[171]



---

[169] IA2011-042 (PG000002503-2724 at 2509).

[170] IA2011-042 (PG000002503-2724 at 2506).

[171] Compl. ¶ 61(a); PG000080720-80806 at 80783.

[172] SI2017-073 (PG0000937466-937606 at 937513, 937534-937594).

[173] SI2017-073 PG0000937466-937606 at 937522-937530).

[174] SI2017-073 (PG0000937466-937606 at 937467-937468.  Capt. ██████████████
████████████████████████████. (PG00000928065)



---

[175] IAPro IA2015-052; IA2014-087.

[176] SI2017-073 (PG0000937466-937606 at 937467-937468).

[177] IA2016-044 (PG0000096907-97031 at 96935).

[178] PG00000104349.

[179] IA2016-044 (PG0000096907-97031 at 96910).

[180] IA2016-044 PG0000096907-97031 at 96935-96937).

[181]

[182]

53.     The Department's failure to investigate (adequately or at all) or impose discipline for complaints of racial discrimination and harassment, is consistent with the Department's failure to investigate adequately or discipline civilian complaints of racist conduct by officers.

54.     As noted above, the Department has policies concerning civilian complaints, most notably General Order Volume I, Chapter 4.  This requires investigation by IAD of certain types of civilian complaints.  And it also requires training and monthly and annual reporting of "bias-based profiling."  General Order Vol. I, Ch. 4, § V.7 & V.10.[183]

55.     Under the current leadership of the Department, the available evidence indicates the Department is not in compliance with its policies.  Rather,

---

[181] IAPro SI2014-052 (                                                      ); SI2015-015 (                                        ), SI2016-006 (                      ); SI2016-011 (                ), SI2016-031 (                              ); SI2017-006                          ; SI2017-006                          ); SI2017-049 (                                  ; IA2015-052 (                                              ).

[182] IA2016-044 (PG0000096907-97031 at 96910).

[183] General Order, Vol. I, Ch. 4 § V.7, V.10 (Complaints: Internal Complaints).

under Defendants Chief Stawinski and Commander Mills, the Department has a

practice or custom of ignoring its own policies regarding civilian complaints.

56.     For example, the record indicates that until 2015, the Internal Affairs

Division prepared an annual report to the Chief of Police regarding its activities,

including the Section V.10 report on allegations of bias-based profiling by police

officers.[184]  Discovery responses provided by Defendants have confirmed that no

subsequent reports, or any of the other Section V.10 bias-based profiling reports,

have been produced.[185]  I note that this timing coincides with the appointment of

Defendant Stawinski as Chief of Police and Defendant Mills as Commander of the

IAD Division.[186]

57.     Similarly, Defendants have not provided in discovery any training

materials (also called for in Section V.10) to instruct officers on bias-based

---

[184] *See, e.g.*, PGPD-PER-0079789-804 at 79799-80, PGPD-PER-0096185-96199 at 96195, PGPD-PER-0079789-804, PG0000113615-629 at 113625, PG0000104641-656 at 651-52, PG0000149836-850 at 149846.

[185] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6; Feb. 20, 2020 Alsip Response to Pergament Feb. 10 Letter, Page 3; Prince George's County's Supplemental Response to UBPOA First Set of Interrogatories No. 6 ("Defendant is not presently aware of any regular, monthly reports addressing bias-based profiling.").

[186] Chief Stawinski became Chief on February 16, 2016, after servicing as interim Chief since December 11, 2015.  *See* Lynn Bui, *Lifelong resident and officer's son confirmed to lead Prince George's police department* (Feb. 16, 2016), https://www.washingtonpost.com/local/public-safety/lifelong-resident-and-son-of-a-cop-set-to-lead-pr-georges-police-department/2016/02/16/3042ea76-d3fd-11e5-b195-2e29a4e13425_story.html.  Commander Mills became Commander of IAD in August 2016.  PG0000103608.

profiling. While I understand from press reports that PGPD has publicized such training,[187] it is far from clear that the program has the support of Department leadership. For example, as noted above, there appear to have been no investigation of or disciplinary consequences for officers who walked out of an implicit bias training session.

58.     The Internal Affairs Department also appears not to adequately investigate civilian complaints about racial profiling. According to the IAPro data Defendants produced, the Internal Affairs Department has not sustained racial profiling charges.[188] Not one. And according to the IAPro data Defendants produced, no officer has been disciplined for racial profiling. In my experience, that is indicative of a lack of commitment by Department leadership to address a significant issue of community tension.[189]

---

[187] NBC Washington, *Prince George's County Police Work to Prevent Bias* (Feb. 3, 2018), https://www.nbcwashington.com/news/local/Prince-Georges-County-Police-Work-to-Prevent-Bias_Washington-DC-472436063.html.

[188] *See* Exhibit B.

[189] *See,e.g.,* Nick Dutton, *Md. Officers suspended over 'driving while black' YouTube vids* (Nov. 17, 2012), https://wtvr.com/2012/11/17/md-officers-suspended-over-racist-youtube-vids/; Ebony, *Black Cop Says He Was Unfairly Detained by Police* (Oct. 27, 2016), https://www.ebony.com/news/black-cop-unfairly-detained/; Jonathan W. Hutto, Sr. & Rodney D. Green, *Social Movements Against Racist Police Brutality and Department of Justice Intervention in Prince George's County, Maryland*, 93 J. Urban Health 89 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4824689/.

59.     This lack of attention to civilian complaints is also confirmed by the discovery responses the Defendants have provided.  For example, in November 2015, the Department received a complaint from an African-American ███████ ████████████████████████████████████████████████████[190] I understand that Defendants have not produced this investigative file, but according to IAPro and Defendants' discovery responses, after opening a matter, IAD closed the file, concluding that the complaint was unfounded.[191]  Similarly, in October 2015, Defendants received an email from the civil rights organization ██████ ██████████████████████████████████████ █████████████████████████████████████ ██████.[192]  Defendants' discovery responses confirm that no investigation into this matter was conducted.[193]

60.     It is also apparent from the discovery produced by Defendants that Defendants did not thoroughly investigate external complaints of discrimination or

---

[190] PG0000108655-57.

[191] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6.

[192] PG0000153441-153444.

[193] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6.

58

A.59

abusive conduct from civilians.  For example, materials produced in discovery had

identified the following situations:

    a.    In January 2016, Chief Stawinski received a complaint by email
           from the Prince Georges County State's Attorney Office



[194]  The
officer who allegedly made this statement is Cpl.
IAD

[195]

    b.    In July 2016, Chief Stawinski received a complaint forwarded by
           State Representative



[196]  Notwithstanding
the complaint of harassment,

[197]  The IAPro data and the IA log
indicate no investigation was opened into this matter.

    c.    In October 2018, Chief Stawinski received a complaint forwarded
           by Prince George's Councilmember

---

[194] IA2016-004 (PG0000132633-132726); PG0000113485-87.

[195] IA2016-004 (PG0000132633-132726 at 132635).

[196] PG0000155665.

[197] PG0000154333.



the IAPro data and the IA log indicate no investigation was opened into this matter. Rather,

d. In May 2015, the Department received a complaint from the Prince George's County Fire Department there is no indication in IAPro or Defendants' discovery response that reflects that the Department conducted any investigation into this matter.[202]

e. In April 2016, Chief Stawinski received a complaint forwarded by Councilmember from a member of the New Carrollton City Council that

---

[198] PG0000172194-172197 at 172196.

[199] PG0000870882-870887 at 870886.

[200] FCIQ2018-048 (PGIAD0000031514-31530) ( ); FCIQ2018-079 (PGIAD0000032322-32361) ( ).

[201] PG0000864287-864288; PG0000864289; PG0000864290-864291.

[202] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6.

60

███████████████████████████████████

██████████████████████████ it was closed with no discipline imposed.[204] Less than five months later, the officer who made these statements —Corporal ███████████—was criminally charged for ████████ ████████████████ [205]

61.     In conclusion, there is extensive evidence that the Department has persistently and systemically failed to investigate or discipline adequately allegations of discrimination.  This failure was known at the senior most ranks of the Department who either directly authorized or condoned it.

### C.     The Department's Internal Investigative and Disciplinary Mechanisms Treat Officers Differently Based on Their Race

62.     The Department states in its General Order that its policy is to "accept all complaints of employee misconduct at all levels of the Department . . . investigate complaints in a fair and impartial manner, and to impose disciplinary action, if necessary, in a uniform and timely fashion."  General Order Vol. I, Ch. 4, § I.[206]  The Department further states that the Department policy is "to ensure that

---

[203] PG0000893933-893944 at 893939-893940.

[204] PG0000893933-893944 at 893934.

[205] SI2016-059 (PG0000084795-85168); Circuit Court for Prince George's County CT170241X; Drew Gerber, *Prince George's County officer found guilty of assaulting a homeless woman to roust her* (Nov. 14, 2017), https://www.washingtonpost.com/local/prince-georges-county-officer-found-guilty-of-assaulting-a-homeless-woman-to-roust-her/2017/11/14/b70f9ad6-c8bb-11e7-8321-481fd63f174d_story.html.

[206] General Order, Vol. I, Ch. 4 § I (Complaints: Policy).

all investigations arising from a complaint are conducted fairly and openly." General Order Vol. I, Ch. 22, § I.[207]  And the Department further states that its policy is that "[t]he Commander, IAD, will confer with the Chief of Police to ensure discipline is consistent throughout the agency."  General Order Vol. I, Ch. 11, § V.2.[208]

63.     Based on my experience overseeing the internal affairs and disciplinary functions of one of the largest police departments in the country (LASD), as well as my expertise evaluating numerous other police departments, a hallmark of a "fair and impartial" system of investigation and a "uniform" system of discipline is that one would not expect that there would be disparities in investigative outcomes or disciplinary consequences according to race.

64.     I have reviewed the data from the IAPro system that Defendants produced in this matter.  This data covers a six-year period starting in mid-2013.

65.     I am familiar with IAPro, which was developed by former internal affairs officials and is used throughout the United States.  One of the features of the software is that it allows police departments to analyze investigative and disciplinary trends, including trends by race.  This analysis can be useful in

---

[207] General Order, Vol. I, Ch. 22 § I (Internal Investigative Procedures: Policy).

[208] General Order, Vol. I, Ch. 11 § V.2 (Discipline: Procedures).

assisting a department in determining whether there are issues of discrimination within its investigative or disciplinary functions.  As discussed below, members of the "Equality for Promotions, Discipline and Practices Panel" and the Department convened in 2017 and discussed a proposal that Internal Affairs use this feature to allow the Department to track whether its processes were fair; Defendant Commander Mills refused to do so.[209]

66.     The IAPro data produced by the Defendants demonstrates significant disparities in the PGPD system of investigation which, in turn, demonstrates that the Department is not adhering to its policy that investigations should be conducted in a "fair and impartial" manner or that investigations are being "conducted fairly."

67.     The data indicates significant disparities by race in whether the Department (i) opened formal investigations, (ii) sustained charges, (iii) imposed discipline at all, (iv) imposed severe discipline, and (v) resulted in resignations and/or terminations.

68.     The IAPro data produced by the Defendants demonstrates significant disparities in the PGPD system of discipline that demonstrate that the Department

---

[209] PG0000157312 (Video of July 26, 2017 Equality for Promotions, Discipline and Practices Panel); PG0000161480-161482.

63

is not adhering to its policy that discipline should be should be imposed in a "uniform" manner.   Among other things, the IAPro data demonstrates:

- A minority officer is more likely than a white officer to be charged with an offense;

- Minority officers are then more likely to face a formal disciplinary proceeding than white officers, whose misconduct is more often dismissed through one of the mere "inquiry" proceedings, which do not result in punishment.

- When charges are evaluated in a formal disciplinary process, a minority officer is more likely than a white officer to be found guilty—that is, the charge is "sustained."

- Minority officers are then much more likely to be subject to the more severe forms of punishment (reduction in rank, removal from the normal promotion cycle, and termination) than lesser forms such as a reprimand.

69.    Analysis of the disparities in the PGPD investigative and disciplinary processes begin with documenting the racial composition of the sworn officers subject to that process.  Although Prince George's County is approximately 67% African-American, 17% Hispanic, and 14% non-Hispanic white, the sworn officer force is substantially skewed towards white officers.  Specifically, in December

64

2017—the midpoint of the six-year period reviewed in this analysis—42.8% of the sworn officers were Black, 9.1% Hispanic, and 44.5% non-Hispanic white.[210]

70.     It is likewise important to recognize that the senior management of the PGPD—and specifically the commanders responsible for the disciplinary process—are even more skewed in favor of whites.  Specifically, the percentage of the three senior ranks (Major, Captain and Lieutenant) was 65.4% white in 2015— significantly more than the approximately 45% of the overall force which was white—shortly before Chief Stawinski became Chief.  In 2017 the percentage of the three senior ranks was 68.8% white and in 2019 remained 68.6% white.  Over the same period, the percentage of senior officers who were Black or Hispanic went down from 31.4% in 2015 (already well below the 53% of the overall force in those two racial groups) to 29.2% in 2017 and 28.2% in 2019.[211]

71.     The IAPro dataset initially produced by the Defendants in September 2019 was provided in Excel format, which allowed computation of the impact of particular practices by race, including: (1) charges initially filed, (2) charges

---

[210] PG0000000291-335 at 335.  The 3.6% of the force that was categorized as Asian is not reflected on the summary charts below as they are not at issue in this case.  In addition, the small sample size does not permit meaningful comparisons of the disciplinary results with that group and the other three racial groups.

[211] PG0000173546; PG0000085344; PG0000085430.

formally processed (rather than treated as inquiry), (3) charges sustained against the respondent officer, and then (4) punishments imposed.

72.     The following chart summarizes the racial disparities throughout the PGPD's entire system of investigation and discipline.



73.     This chart—and the tabulated counts and percentages in the Appendix to this report—shows that, as compared to the racial composition of the overall force (42.8% Black, 9.1% Hispanic, and 44.5% non-Hispanic white), the breakdown of:

<center>66</center>

a. The percentage of all charges against all officers was 46.2% Black, 10.2% Hispanic, and 40.7% white;

b. The number of charges handled as "inquiries" (FCIQ, IAQ, and SIQ) was slightly skewed in favor of white officers, but the charges handled through formal processes, which can lead to a punishment, was disproportionately directed against minority officers (47.4% Black, 10.6% Hispanic, only 39.2% white);

c. The composition of "sustained" charges was 50.8% Black, 12.3% Hispanic versus only 33.8% white; and

d. Of officers punished in any way 54.0% were Black, 10.5% Hispanic, and only 33.2% white.

74. Where discipline was imposed, Table 2 shows the disparity increases as the level of severity of the discipline increases.

75. As compared to the racial composition of the overall force (42.8% Black, 9.1% Hispanic, and 44.5% non-Hispanic white), the IAPro data indicates the following the disciplinary trends:

a. Starting with the least severe form of discipline -- a reprimand -- the breakdown of the races is somewhat closer to the composition

67

A.68

of the force as a whole -- 49.1 % Black, 12.2% Hispanic, and 35.0% white;

b.   Moving on to fines, one finds a greater disparity against officers of color: 52.7% of all fines were levied against Black officers, 11.1% Hispanic, and 34.0% white;

c.   For suspensions and leave without pay, the breakdown is 65.5% Black, 3.5% Hispanic, and only 29.3% white;

d.   For reduction in rank and removal from the promotion cycle, the breakdown is 57.1% were Black, 14.3% Hispanic, and only 28.6% white; and

e.   For officers who either resigned rather than face discipline or who were actually terminated, 71.4% were Black, 4.8% were Hispanic, and 21.4% were white.

76.   I have also reviewed IAPro data that suggests that specific investigators display significant disparities in their investigations based on race.  In particular, the IAPro data produced by Defendants finds dramatically different rates at which the following officers "sustain" cases against white officers as opposed to minority officers.  For example, the analysis shows:

68

A.69

a. Corporal ███████████: White respondents sustained—9 of 52 (17.31%); Black and Hispanic respondents sustained—35 of 76 (46.05%).

b. Corporal ██████████:  White respondents sustained—4 of 52 (7.69%); Black and Hispanic respondents sustained—27 of 97 (21.84%).

c. Corporal ████████████: White respondents sustained—4 of 48 (8.33%); Black and Hispanic respondents sustained—42 of 88 (47.73%).

d. Sergeant ██████████ White respondents sustained—1 of 10 (10%); Black and Hispanic respondents sustained—15 of 36 (41.67%).

e. Sergeant █████████████:  White respondents sustained—10 of 39 (25.64%); Black and Hispanic respondents sustained—33 of 98 (33.67%).

f. Sgt. ████████████:  White respondents sustained—8 of 64 (12.50%); Black and Hispanic respondents sustained—19 of 83 (22.89%).

g. Sergeant ███████████:  White respondents sustained—7 of 33 (21.21%); Black and Hispanic respondents sustained—23 of 71 (32.39%).

h. Sgt. ██████████:  White respondents sustained—6 of 17 (35.29%); Black and Hispanic respondents sustained—18 of 40 (45%).

i. Sergeant ████████████:  White respondents sustained—1 of 38 (2.63%); Black and Hispanic respondents sustained—9 of 40 (22.5%).

69

**A.70**

Troublingly, these disparities are evident among several senior white officers in the

Internal Affairs Department when they conducted investigations:

    j.   Major ██████████: White respondents sustained—3 of 22 (13.64%); Black and Hispanic respondents sustained—21 of 38 (55.26%).

    k.   Captain ██████████: White respondents sustained—4 of 25 (16%), Black and Hispanic respondents sustained—6 of 18 (33.33%).

By contrast, there are several Internal Affairs Department investigators who

"sustain" cases more equally among racial groups:

    a.   Sergeant ██████████: White respondents sustained—4 of 26 (15.38%), Black and Hispanic respondents sustained—9 of 59 (15.25%).

    b.   Sergeant ██████████: White respondents sustained—4 of 35 (11.43%), Black and Hispanic respondents sustained—4 of 27 (14.81%).

    c.   Sergeant ██████████: White respondents sustained—5 of 24 (20.83%), Black and Hispanic respondents sustained—4 of 22 (18.18%).

    d.   Sergeant ██████████: White respondents sustained—20 of 74 (27.03%), Black and Hispanic respondents sustained—30 of 109 (27.52%).

77.    I have seen evidence that the senior leadership of the Department

made a conscious decision not to track, monitor, or analyze race in its investigative

or disciplinary function, although it would have been easy for them to do so.  In

particular, I have reviewed an email send by IAD Commander Mills in which she

70

A.71

rejects a proposal raised at the Equality for Promotions, Discipline, and Practices Panel that IAD use IAPro to track race and sex.  Specifically, Commander Mills received an email from Capt. Ghattas reporting that a panel member proposed that "we need to track race and sex . . . so we can make sure that [discipline] is being fairly imposed . . . If we can ever get IAPro set up correctly, we would be able to do it both ways very easily."  In response, Commander Mills wrote:

> We do not currently track this through IAPro, however it has been discussed.  I believe this is a slippery slope as that may present a tendency to try to make things fair based on race/sex, when in actuality it needs to be on a case by case basis and never focus on what an officer of one race/sex got for a punishment as opposed to another . . . At the end of the day, it is about ensuring that the investigation is complete and thorough and that the officer is treated fairly, regardless of race/sex.  Having said that, the most important thing to keep in mind is that if the focus is on race/sex, then cases are examined with that consideration, thereby negating the very core of what this is all about, which is treating officers fairly based on their actions and not their race/sex, therefore enabling us to be impartial.[212]

Commander Mills vetted this answer with the Assistant Chief.[213]

78.    Commander Mills noted in her email that the proposal for IAD to track by race had "been discussed" before and rejected.  *Id.*  As discussed above,

---

[212] PG0000161480-161482, PG0000875393-875493 at 875465; *see* also Ghattas Dep. Tr. 201-218.

[213] PG0000182196-182199.

there is significant evidence that IAD has neither "treat[ed] officers fairly," nor has it been "impartial"; rather, the data shows a significant, troublesome disparity that disadvantages minority officers and advantages white officers at every stage of PGPD's investigative and disciplinary processes. In addition, the Department deliberately blinds itself to this information by not monitoring or analyzing race in its investigative or disciplinary function by switching off the part of their internal investigations and discipline system that could track such discrimination.

79.     I have also reviewed the deposition testimony of the IAD "Statistical Coordinator," Linda Washington. In her testimony, she confirmed that the Department does not prepare analysis of its investigations or discipline by race.[214] I am aware the Defendants have subsequently confirmed in writing that the Department does not have or prepare any such statistical reports.[215]

80.     I have seen another series of emails from Commander Mills in which she expresses conduct inconsistent with Department policy to "investigate complaints in a fair and impartial manner."[216] Notably, in conjunction with her efforts to work with the President of the local Fraternal Order of Police to

---

[214] Washington Dep. Tr. 43-48.

[215] Dec. 18, 2019 Alsip Response to Pergament Dec. 9 Letter at 5, item b; Feb. 14, 2020 Alsip Response to Pergament Feb. 1 Letter at 5.

[216] General Order, Vol. I, Ch. 4 § I (Complaints: Policy).

encourage officers to seek expungement of their files, on July 20, 2017

Commander Mills wrote in a series of emails:[217]

> First of all, you are not a good Catholic… I know better…. I'll pray for your soul….

> Please note the show of good faith from the Commander of IAD… I cannot always set your people free but I can certainly cross the aisle.  I look out for them whenever I can.  You can buy me a beer anytime… I would actually prefer it brought to my office today so I can alleviate some of the stress that your people are causing me of late… ☺[218]

In my opinion, this is completely inappropriate conduct for a law enforcement

professional.  They are certainly inappropriate for the individual charged by the

Department with responsibility for ensuring that complaints be investigated in a

"fair and impartial manner."

81.    These statistical trends are consistent with what the Plaintiffs alleged

in the complaint regarding disparate discipline for similar infractions.  Based on

my review, the Department has a practice of diverging from its stated policy of

"uniform" discipline in light of the following cases:

a. **POFC** ███████████ **and Police Officer** ███████████ **v. Police Officer** ███████████████ **nd POFC** ███████████ :  POFC

---

[217] Compl. ¶ 103(a); Pippin Dep. Tr. 79:8-86:14.

[218] PG0000182444-182445; PG0000182462-182463.  Three days after sending this email, Commander Mills personally reviewed Sgt. Rush's request for expungement.  PG0000855439; PG0000855440-855445 at 855541.  Commander Mills subordinates reported that they were "inundated with requests."  PG000903780.



███████ is a Black officer.  After a domestic violence incident alleged ████████████████████ (███████████████████), POFC ███████ was investigated and subsequently terminated.[219] ████████ is a Hispanic officer.  After being criminally charged with harassment arising out of a domestic violence incident █████████████, he was charged with █████████, and █████████████████████, and █████████[220], ████████████████████ and terminated him.[221]  PO ████████ is a white officer.  PO ████████ had ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. PO ████████ was investigated and disciplined ████████████████████████████████████████[222]  He remains on the force.  POFC ████████ is a white officer.  He was involved in a domestic dispute.  The ████████████████████████████████████████████████████████████████████████████ POFC ████████ was charged with ████████████████, which was not sustained, and with a ████████████, which was sustained.  He was fined ██████[223]

[219] SI2016-004 (PG0000160486-160570; PGIAD0000099257-99459).

[220] PG000000819-825 at 824.

[221] PG000000826-830 at 826-827.

[222] SI2017-069 (PG0000875704-875707).

[223] IAPro entry for SI2014-005 (file not produced); District for Prince George's County Case No. 0501SP005312014.

74

**POFC Eric Beale v. Lt.** ███████████:  POFC Beale is a Black officer.  He was terminated after being investigated for ███████████to an investigator attempting to track down a civilian accused of impersonating a police officer.[224] Lt. ███████ s a white officer.  He was investigated for "misrepresentation of facts," ███████████████████ ██████████████ Lt. ████████ was suspended for ████████████.[225]  He was subsequently promoted twice.

c.  **Corporal Michael Brown v. Corporals** ███████ **,** ███████████ **(IA 2015-006), and** ███████ ████████:  Cpl. M. Brown is a Black officer.  After he was investigated for "use of language" and "unbecoming conduct" violations following an off-duty confrontation in the District of Columbia where he drew a weapon, and was arrested; Cpl. M. Brown was suspended and subsequently threatened with termination, and resigned the day before the termination was to occur.[226]  Cpl. ███████████ is a white officer.  He was involved in an altercation ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████[227] according to the materials produced in discovery, he was not suspended and there is no indication in IAPro or other discovery materials that he was investigated for this incident.  Cpl. ███████is a white officer.  He was accused ████████████████ ████████████████████  According to IAPro, he received a ██████████ fine.[228] Cpl. ████████is a white officer.  He was involved in a ██████████

---

[224] SI2016-011 (PGIAD0000113736-113978 at 113743).

[225] Compl. ¶ 61(a); SI2015-037 (PG0000021848-22037 at 21856).

[226] SI2014-039 (PG0000012123-12429 at 12130).

[227] NBC Washington, *Prince George's SWAT Officers Investigated After Bar Fight* (Dec. 19, 2018), https://www.nbcwashington.com/news/local/prince-georges-swat-officers-investigated-after-bar-fight_washington-dc/166364/; PG0000854965-854966.

[228]  IAPro Entry for IA2015-006 (file not produced).



, there is no indication in IAPro or other discovery materials that he was investigated for the incident:

[229]

d. **Police Officer Arvester Horner v. Police Officer ████████, Corporal ████████ and Sgt. ████**: PO Arvester Horner is a Black officer. In North Carolina, he was charged with driving under the influence, he was investigated and disciplined with a suspension without pay for 120 hours and reduction of two ranks and removed from the promotional cycle for one year.[230] PO is a white officer. After being stopped and arrested for driving under the influence, he was investigated

.[231] Cpl. is a white officer. After being stopped and arrested for driving under the influence ████████, he was investigated

.[232] Sgt. is a white officer. and charged with driving under the influence, he was investigated.

.[233] and imposed fines.[234]

e. **Police Officer Tasha Oatis v. Sergeant ████████ (SIQ2016-012, SI2017-001), Lieutenant ████████ (SIQ2017-006)**: PO

---

[229] PG0000104622-104623.

[230] SI2014-055 (PG0000786754-786878 at 786761).

[231] SI2017-072 (PGIAD000075164-75309 at 75168).

[232] SI2014-045 (PG0000001248-1251 at 1249).

[233] SI2010-003 (PG0000022038-22322 at 22095).

[234] SI2010-003 (PG0000022038-22322 at 22039).

76

Oatis is a Black officer. She was accused of "double dipping" (leaving early to go to her part-time security job). Her matter was formally investigated by Internal Affairs. She was suspended nine months after her investigation started, and she was terminated in 2016.[235] Sgt. ████████ is a white officer accused of "double dipping." ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [236] Lt. ████████ is a white officer accused of double dipping b████████████████████████████████████████████████████████████████████ [237]

f.  **POFC Clarence Rucker v. Corporal** ████████**, POFC** ████████ **and Corporal** <mark>**Matthew Inzeo**</mark>: POFC Rucker is a Black officer. He was suspended in October 2015 for allegedly initiating an inappropriate relationship with a woman involved in a domestic violence investigation to which POFC Rucker was assigned. After being threatened with termination, POFC Rucker resigned from PGPD in November 2017.[238] Cpl. ████ is a white officer; ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Cpl. ████ was not terminated, and remains on the force.[239] POFC ████ is a white officer. He was the subject of

---

[235] IA2014-130 (PG0000013412-13524 at 13431).

[236] IAPro Entry for SIQ2016-012 (file not produced); SI2017-001 (file not produced); PG0000939411-939412; PG0000086663; PG0000080569.

[237] IAPro entry for SIQ2017-006 (file not produced).

[238] IA2015-040 (PG00000070885-71312 at 70890, 70901).

[239] SI2015-055 (PG0000021367-21541 at 21372, 21535).

77



a civilian complaint where he was accused of ███████████████ ███████████████ He was not terminated, and remains on the force.[240]  Cpl. ==Inzeo== is a Hispanic officer who was the subject of a civilian complaint and press reports ==that he sent sexually explicit text messages to a 19-year-old woman whose criminal complaint he was investigating==.  PGPD did not terminate Cpl. ==Inzeo==, and he remains on the force.[241]



g.  **Plaintiff Sharon Chambers and Corporal** ████████████ **v. Corporal** ██████████████ **, Lieutenant** ███████████ **, Lieutenant** ████████████ **, Sergeant** ██████████ **, Corporal** ████████████ **, and Corporal** ████████████: PO Chambers is a Black female officer who retired in 2019. While on duty, she returned to her vehicle and found that her firearm had been stolen. She was suspended pending investigation, fined $500 and received a written reprimand.[242] Cpl. ██████, a Black male officer, also had his firearm stolen from his vehicle; he was suspended for ████████████████.[243] The discipline records produced by PGPD contain several instances in which white male officers reported their firearms lost under similar or worse circumstances—none of them were disciplined as severely as PO Chambers or Cpl. ██████ nd none of the white officers were suspended pending investigation. ███████████████████ ████████████████████████████[244] ████████████████████████████ ████████████████████████[245] ████████████████████████████ ████████████████████████████

---

[240] SI2015-022 (PG0000323169-323170), IAPro entry.

[241] Matt Zapotosky and Mary Pat Flaherty, Washington Post, *Pr. George's officers transferred* (Jan. 28, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/01/27/AR2011012707491.html.

[242] PS2017-090 (PG0000023408-23457 at 23410-23411).

[243] PS2017-084 (PG0000016450-16531 at 16450-16452).

[244] PS2016-083 (PGIAD0000092647-92687 at 92650-92651).

[245] PS2016-185 (PGIAD0000096744-96759 at 96747).



82.     In sum, there is extensive evidence that the Department discriminates against minority officers relative to white officers in its investigative and disciplinary decisions, and that senior leaders of the Department were deliberately indifferent to such discrimination.

### D.     The Department's Culture of Retaliation

83.     There is a practice and custom in the department that when minority officers complain, and particularly when they complain about racial discrimination or harassment by white officers, they experience retaliation.  From my review, the two most prevalent forms of retaliation are (i) transfers of complainants, and (ii) institution of retaliatory investigations of the complainants.

---

[246] PS2013-541 (PG0000080388-80436 at 80391-80392).

[247] PS2014-290 (PG0000157689-157741 at 157692).

[248] PS2016-111 (PGIAD0000093557-93597 at 93560-93561).

[249] IAPro Entry for IA2014-058 (file not produced).

79

84.     Although the Department has policies concerning retaliation,[250] I have seen no evidence in IAPro or the Defendants' response to discovery that these policies are enforced.  In particular, a search of the IAPro data produced by Defendants for "retaliation" finds several complaints from civilians, but no matters where an officer alleges they were subjected to retaliation.  As discussed in this section, numerous minority officers have claimed retaliation and there is no evidence that these charges were investigated by either IAD or the EEO Coordinator.

85.     This lack of investigation and enforcement of the Department's anti-retaliation policies is consistent with the materials I have reviewed concerning the Department's training for supervisors and managers concerning retaliation, which is inadequate.  The Department's 46-slide EEO training for supervisors and managers only discusses retaliation on 2 pages.[251]  In my opinion, this training provided is inadequate, particularly given the culture of retaliation in the PGPD.

86.     From my review, I noted the following incidents where minority officers who complained of conduct (including racist and other unprofessional

---

[250] *See* General Orders Vol. I, Ch. 4, § V.9; *id.* at Vol. I, Ch. 12, § V.4.

[251] PG0000000348-394 at 362-363; PG0000000395-441 at 409-410.

conduct) by white officers experienced reciprocal charges that were brought in response to or proximate in time to the minority officer's complaint.

    a. **<u>Plaintiff Danita Ingram</u>**:  While Cpl. Ingram (a Black officer) was sitting (undercover) in a courtroom, she was confronted by a white officer, POFC Michael Rushlow.[252] POFC Rushlow demanded that she surrender her seat to him and proceeded to verbally harass and disparage her.  Cpl. Ingram reported the incident to the court liaison and filed an internal written complaint against POFC Rushlow, in which she accused him of discrimination and racial bias.[253] ███████████████ ███████████████████████████[254] When POFC Rushlow learned about Cpl. Ingram's complaint, he filed a counter-complaint against Cpl. Ingram concerning the same incident.[255]  During his investigation interview, POFC Rushlow stated that he filed a complaint against Cpl. Ingram only ███████████████████████████████ ███████████████████████████████ ███████████████████████████████[256] Nonetheless, IAD did not charge POFC Rushlow for violating the Department's anti-retaliation provisions. ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████[257] Instead, Commander Mills directed both officers be

---

[252] Compl. ¶ 136; IA2017-007 (PG0000025416-25896 at 25468).

[253] Compl. ¶ 136; IA2017-007 (PG0000025416-25896 at 25468).

[254] IA2017-007 (PG0000025416-25896 at 25588, 25598, 25573).

[255] Compl. ¶ 138; IA2017-007 (PG0000025416-25896 at 25678).

[256] IA2017-007 (PG0000025416-25896 at 25513-25515).

[257] PG00000939321 (points 5 and 6); Kathleen Mills's Response to HNLEA's First Set of Interrogatories No. 1.

given the sustained charge of discourtesy."[258]  POFC Rushlow
accepted the punishment; Cpl. Ingram took this charge to an
administrative hearing and won.[259]  In their report to the Chief, the
Administrative Hearing Board not only found Cpl. Ingram "Not
Guilty" but detailed numerous conduct violations committed by
POFC Rushlow that were not charged, noting that Cpl. Ingram had
tried to end his abuse at several points in the confrontation.[260] Still,
during the pendency of the case, which lasted over a year, Cpl.
Ingram was ineligible for a promotion.[261]

**Captain** ███████████:  Capt. ████████(a Hispanic officer) filed
a complaint against Lieutenant ████████ following the
████████████████████, during which Lt. ████████
instigated a public argument with Capt. ████████ (
████████ and ████████ (████████████).[262] Police
department witnesses ████████████████████████████████
████████████████████████████[263]  Several civilian witnesses also filed
complaints against Lt. ████████ stemming out of this incident.[264]
After Capt. ████████ filed the complaint, Lt. ████████ subsequently
filed one against Capt. ████████.[265]  IAD concluded that the
allegations as to Lt. ████████ were unfounded (████████████████)
and non-sustained (████████████), despite the ample
corroboration of Capt. ████████'s allegation and the civilian

---

[258] Kathleen Mills's Responses and Objections to HNLEA's First Set of Interrogatories No. 1.

[259] Compl. ¶ 140; IA2017-007 (PG0000025416-25896 at 25449).

[260] IA2017-007 (PG0000025416-25896 at 25449).

[261] Compl. ¶ 139; IA2017-007 (PG0000025416-25896 at 25441).

[262] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of
Interrogatories No. 1, at 9-10; IA2017-069 (PG0000025100-25285 at 25116).

[263] IA2017-069 (PG0000025100-25285 at 25111-25112).

[264] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of
Interrogatories No. 1, at 9-10; PG0000162177-79.

[265] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of
Interrogatories No. 1, at 9-10; IA2017-069 (PG0000025100-25285 at 25269).

complaints.[266]  IAD also concluded that Lt. ███████'s ████████
██████llegation against Capt. █████████ was unfounded.[267]  IAD
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████.[268]

c.  **Plaintiff Patrick McClam**:  Lt. McClam witnessed William
██████████, the white Director of the Forensic Lab, make racist and
sexist statements concerning minority female employees of the
lab.[269]  With Lt. McClam's encouragement, two female civilian
employees of color filed EEOC charges concerning the
██████████.[270]  After learning that Lt. McClam was a witness to the
EEOC charges and was cooperating in the EEOC investigation, the
Department  transferred Lt. McClam involuntarily to the Patrol
Bureau.[271] ██████████████████████████████████████████
████████████████████████████████.[272]  In August 2017,
when Lt. McClam was on track to be promoted to supervisor for a
Special Assignment Team, he was again involuntarily transferred
to a less desirable assignment in the Patrol Bureau.[273] Since
cooperating in the EEO investigation, the Department has pursued
four individual meritless investigations into Lt. McClam.[274]

d.  **POFC Earl Sharpe**:  Four days after POFC Sharpe's cooperation
in an investigation during which he reported Sgt. Rush's racist

---

[266] IA2017-069 (PG0000025100-25285 at 25107- 25108).

[267] IA2017-069 (PG0000025100-25285 at 25107-25108).

[268] IA2017-069 (PG0000025100-25285 at 25269).

[269] Compl. ¶ 222.

[270] PG0000158501 and PG0000158507.

[271] Compl. ¶¶ 222, 227; Patrick McClam's Third Supplemental Responses and Objections to
Defendant's First Set of Interrogatories No. 6; PG0000162400-162402

[272] PG0000162391-162392.

[273] *Id.*

[274] *Id.*; IA2016-038 (PG0000023826-24386); IAQ2018-014 (PG0000027646-27747);
FCIQ2017-067 (PGIAD0000028915-28922); FCIQ2018-105 (PGIAD0000032967-33006).

83

conduct and other racist conduct in the RID/RST division (discussed above, IA2015-092), POFC Sharpe was transferred out of the Investigations Bureau to the Patrol Bureau without explanation.[275]  Approximately one month later, IAD reopened a stale investigation (started in 2014) into POFC Sharpe relating to a worker's compensation claim.[276]  POFC Sharpe was charged with a Category IV offense, and he was told by the investigator ███████ ███████████████████████████████████████████████.

e.  **Plaintiff Joe Perez**:  During 2015 and 2016, Capt. Perez filed a number of complaints with the PGPD Inspector General regarding discrimination against officers of color related to promotions, discipline in Internal Affairs investigations, and assignments to specialty units.[277] Additionally, Capt. Perez complained about racially hostile conduct and unethical conduct by white officers.[278] In March 2016, Capt. Perez, as President of HNLEA and along with other officers filed a complaint with the U.S. Department of Justice raising the same issues. After Defendant Commander Mills was transferred to IAD in August 2016, Capt. Perez witnessed her make a number of discriminatory comments about minority officers and engage in discriminatory practices regarding investigation and disciplinary issues.[279]  In October 2016, Capt. Perez was denied promotion to Major.[280]  In a meeting following this to discuss his complaints against Defendant Commander Mills, Capt. Perez informed Chief Stawinski that he would be filing an EEOC complaint and a supplement to the DOJ Complaint.[281] Within 45 minutes, Capt. Perez was informed he was being

---

[275] EEO Charge 531-2016-00712 (PG0000157216), PG0000908213-908214; Sharpe Decl. ¶ 11..

[276] SI2014-015 (PG0000137899-138649).

[277] Compl. ¶ 107.

[278] Compl. ¶ 107.

[279] PGPD-PER-0069987-69992.

[280] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[281] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

84

transferred from Internal Affairs to Planning & Research.[282]  His direct supervisor in Planning & Research was Major ███████ ███████, who was the subject of one of his prior complaints about unethical conduct.[283]  Moreover, around this time, <mark>Defendant Commander Mills and her subordinates engaged in retaliatory efforts against Capt. Perez for raising concerns about himself and other minority officers.</mark>[284]  For example, Major ███████ ███████████████████████ and Defendant Commander Mills <mark>contemplated suspending Capt. Perez for "insubordinate behavior."</mark>[285]

In ████████████, Defendants Chief Stawinski and Commander Mills learned ████████



[287]  Following this, Chief Stawinski had a series of contentious meetings with Capt. Perez and UBPOA leadership ███████████████████ <mark>and complaints about discriminatory treatment of minority officers</mark>[288]  Around the same time as these meetings, Commander Mills and Chief Stawinski engaged in a series of actions against Capt. Perez,

---

[282] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; PG0000147518; PG0000147519-147522.

[283] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; PG0000300016-300018.

[284] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6, at 48 ("[T]he manner in which Chief Stawinski and Major Kathleen Mills handled the investigation was retaliatory and incongruent with PGPD's disciplinary policies.").

[285] PG0000785918-19; PG0000785910; PG0000956075.

[286] PG0000144137-144138.

[287] PG0000162691-162711 at 162698-162699; PG0000181256-181257; PG0000787555-787693 at 787569-787570.

[288] PG0000162169-162171; PG0000162510-162511.

including Commander Mills 

[289] Around the same time, Commander Mills had her subordinates <mark>conduct research into potential grounds to terminate an unspecified officer.</mark>[290] And Chief Stawinski had Commander Mills

[291] <mark>This is the same timeframe that the Seat Pleasant Chief complained that Capt. Perez had attempted to use his position within PGPD to obtain leave for his son.</mark>[292]

Capt. Perez filed a supplemental EEOC charge on October 10, 2017 after he was denied the opportunity to compete for a promotion to Major.[293] Two months later, on January 10, 2018, PGPD informed Capt. Perez that there was an Internal Affairs investigation [294]

.[295]

---

[289] PG0000150850; PG0000171078-171079; PG0000929099-929102.

[290] PG0000169211-169213; PG0000169310-169311; PG0000165790.

[291] PG0000155548-155549.

[292] Compl. ¶¶ 115-116 & 118.

[293] Compl. ¶ 114-115.

[294] PGIAD0000097141; Compl.¶ 115; Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[295] Compl. ¶ 116; Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; PGPD IAD Standard Operating Procedures at 10 (PG0000000497-530 at 506) ("<mark>Upon receipt at Internal Affairs, each complaint will be assigned a unique</mark>

86

On February 13, 2019, the EEOC issued a determination that Defendants had "subjected [Capt. Perez] to unequal terms and conditions of employment concerning involuntary transfer and internal affair processing, denied promotional opportunities, reassigned, disciplined, demoted, and retaliated against for engaging in protected activity due to his national origin."[296]

f. **Plaintiff Adrian Crudup**:  In 2015, Cpl. Crudup filed several complaints against his supervisor, Lt. <mark>Hampson</mark>. One such complaint alleged that Lt. <mark>Hampson</mark> had called a civilian a "project n****."[297]  In October 2016, Cpl. Crudup was suspended with pay and transferred from the Special Investigations Division to the Financial Crimes Division without any explanation.[298]  His request for a hearing was denied.[299]  Cpl. Crudup subsequently learned that his transfer was a result of Lt. <mark>Hampson</mark> filing an IAD complaint against him for allegedly interfering with an investigation dating back to May 2015.[300]  The Complaint was referred to the State's Attorney and all charges were dismissed as of April 2018.[301]  IAD does not appear to have investigated Lt. <mark>Hampson</mark> for retaliation, and there is no evidence Defendants opened an investigation into Cpl. Crudup's complaints about Lt. <mark>Hampson</mark>'s racist conduct.

g. **Lt. ▮▮▮▮▮▮▮▮**:  Lt. ▮▮▮▮▮▮▮, a prominent member of HNLEA, reported Sgt. ▮▮▮▮▮▮▮ and Sgt. ▮▮▮▮▮▮ for

---

<mark>identified (case number), which will be provided to the complainant within ten (10) business days. . . . IAD investigations must be completed within 90 days absent extenuating circumstances.</mark>").

[296] EEOC_Perez_00001-355 at 00007.

[297] Compl. ¶ 240, Adrian Crudup's Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[298] Compl. ¶ 240; PG0000202216; PG000150392; PG0000171445.

[299] Compl. ¶ 240.

[300] Adrian Crudup's Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; SI2016-008 (PG0000198478-198479).

[301] PG00000171445.



87.     Several of these incidents (Lt. McClam, POFC Sharpe, and Capt. Perez) involved transfers after the minority officer filed a complaint or cooperated in an investigation against a white officer.  From my review, I noted other incidents where minority officers who complained of conduct (including racist and other unprofessional conduct) by white officers were transferred promptly after lodging their complaint.  These include:

    a.  **Plaintiff Richard Torres**: As discussed above, in May 2016, Cpl. Torres received a text message from Sgt. Bunce, his white supervisor.  In the text message, Sgt. Bunce used the word "NECA" to describe an African-American civilian and made a derogatory reference to a suspect.[305]  Cpl. Torres complained to then-Captain <mark>Powell</mark> about the text message.[306]  Cpl. Torres subsequently told Capt. <mark>Powell</mark> that Sgt. Bunce was a racist with

---

[302] IA2015-087 (PG0000041835-42055 at 41881 and 41967-68).

[303] IA2015-087 (PG0000041835-42055 at 41869, 41877-41882).

[304] IA2016-031 (PG0000043028-43150).

[305] PG0000150665-150693 at 150669-150670; Richard Torres's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[306] Richard Torres's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

whom he no longer wanted to work.[307]  Despite hearing Cpl. Torres's allegations and reading the text message, Capt. Powell declined to notify Internal Affairs or the EEO Coordinator.[308] Further, there is no indication that Capt. Powell either tried to remove Cpl. Torres from under Sgt. Bunce's supervision or warn Sgt. Bunce not to retaliate.  In November 2016, Sgt. Bunce issued a performance evaluation of Cpl. Torres alleging that he had failed to perform his duties satisfactorily.[309]

[310]

Shortly thereafter, Cpl. Torres was transferred from Investigations to the Patrol Bureau.[311]

b.  **Plaintiff Sonya Zollicoffer**: While assigned to IAD, Lt. Zollicoffer had a number of disagreements with Defendant Commander Mills, including a disagreement where Commander Mills ordered Lt. Zollicoffer to charge Plaintiff Cpl. Ingram after she filed a charge against POFC Rushlow.[312]  Lt. Zollicoffer was promoted to Lieutenant in February 2018.[313]  She expressed interest in remaining in the Internal Affairs Division because there were two open Lieutenant positions. Despite that, Lt. Zollicoffer was involuntarily transferred from Internal Affairs to the Patrol Bureau to work the overnight shift starting in April 2018.[314]

---

[307] Richard Torres's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[308] Compl. ¶ 166.

[309] PG0000150665-150693 at 150669-150670.

[310] PG0000103511.

[311] PG0000179546; PG00000446894-446898 at 446897; PG0000144565-144566.

[312] Compl. ¶¶ 36, 144.

[313] Sonya Zollicoffer Supplemental Interrogatory Responses and Objections to Defendants' First Set of Interrogatories No. 6; PG0000007180-7396 at 7186.

[314] Sonya Zollicoffer Supplemental Interrogatory Responses and Objections to Defendants' First Set of Interrogatories No. 6; PG0000446894-446898 at 446897.

89



."[315]  Notwithstanding this, the Department reassigned her to the District where she was assaulted.[316]

c.  **Plaintiff Thomas Boone**:  Since December 2016, Lt. Boone has repeatedly complained to his supervisors of the incidence of racially motivated wrongdoing in the work environment, including complaints about inappropriate language, unfair transfers, disparate discipline, unfair hiring practice, racially insensitive and offensive pictures, retaliation for reporting wrongdoing and other racially motivated behaviors.[317]  Additionally, Lt. Boone met with Chief Stawinski on a number of occasions to complain about these problems.[318]  On October 1, 2018, Major <mark>David Renner</mark> informed Lt. Boone that he was being transferred.[319]  After agreeing to be transferred to the Property Division, Lt. Boone was transferred to Patrol.[320]

d.  **Plaintiff Chris Smith**:  In October and December 2015, Cpl. Smith complained to Lt. <mark>Vondell Smith</mark> that Cpl. Smith's colleagues had created a racially hostile environment by disparaging African-

---

[315] PG0000162977.

[316] Compl. ¶ 146.

[317] *See, e.g.*, PG0000155770; PG0000155786; Thomas Boone Supplemental Responses and Objections to Defendants' First Set of Interrogatories No. 6.

[318] Thomas Boone Supplemental Responses and Objections to Defendants' First Set of Interrogatories No. 6.

[319] Thomas Boone Supplemental Responses and Objections to Defendants' First Set of Interrogatories No. 6.

[320] Thomas Boone Supplemental Responses and Objections to Defendants' First Set of Interrogatories No. 6; PG0000080807-80969 at 80943; PG0000446894-446898; PGPD-BOO-0000134.

90

A.91

American civilians.[321] Lt. ==Smith== took no action.[322] In March 2017, Cpl. Smith was involuntarily transferred to the Patrol Bureau, a transfer that Cpl. Smith believes was retaliatory in response to his prior complaints.[323]



---

[321] Compl. ¶ 189.

[322] Compl. ¶ 189.

[323] Chris Smith's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[324] PG0000001713-1802 at 1715, 1755.

[325] PG0000905763-905765.

[326] PG0000905763-905765.

91

**A.92**



---

[327] EEO Charge No. 531-2017-0161 (PG0000001550-1642 at 1550).

[328] EEO Charge No. 531-2017-01616 (PG0000001550-1642 at 1550).

[329] PG0000001265-1351 at 1336; PG0000154090-154091.

[330] EEO Charge No. 531-2017-01487 (PG0000001375-1457 at 1382).

[331] PG0000154090-154091.

[332] IA2015-092 (PG0000042371-42436 at 42386).

[333] IA2015-092 (PG0000042371-42436 at 42399-42404); PG0000446894-446898 at 446896.

[334] IA2015-092 (PG0000042371-42436 at 42375-42375).

92



88.     In conclusion, there is abundant evidence that the Department did

not have adequate anti-retaliation policies or training, and that there is a

widespread and persistent issue of retaliation against minority officers who

complain about white officers, and that senior Department leaders directly

participated in or condoned such actions.

---

[335] EEO Charge No. 12F-2016-00639 (PG0000002029-2055 at 2030).

[336] EEO Charge No. 12F-2016-00639 (PG0000002029-2055 at 2029).

[337] EEO Charge No. 12F-2016-00639 (PG0000002029-2055 at 2030); PG0000446894-446898 at 446897.

_____
Michael D. Graham

94

# EXHIBIT  A

Exhibit A



| File # | Respondent Name | Respondent Race | Respondent Gender | Allegation/Accusation Type | Allegation/Accusation Sub-Type | Finding | Discipline/Punishment | Date Rec'ed in IAD/Entered in IAPrs | Investigator(s) | Investigative Unit(s) | Date Investigation Completed/Charges Sustained | Complainant(s) | Respondent(s) & Allegation(s) & Finding(s) & Discipline/Punishment(s) | Summary/Narrative | Discipline Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SIQ2011-058 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2011-062 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2012-022 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2012-022 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2012-022 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2012-033 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2013-013 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2013-015 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2013-018 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2013-025 | | | | Criminal Misconduct | | Inquiry completed | | | | | | | | | |
| SIQ2011-055 | | | | Criminal Misconduct Inquiry | | | | | | | | | | | |
| SIQ2013-003 | | | | Criminal Misconduct Inquiry | | Inquiry completed | | | | | | | | | |
| SIQ2013-007 | | | | Criminal Misconduct Inquiry | | Inquiry completed | | | | | | | | | |
| SIQ2015-009 | | | | Excessive/Unnecessary Force | | Inquiry completed | | | | | | | | | |
| SIQ2015-013 | | | | Excessive/Unnecessary Force | | Inquiry completed | | | | | | | | | |
| SIQ2015-016 | | | | Excessive/Unnecessary Force | | Inquiry completed | | | | | | | | | |
| SIQ2015-019 | | | | Excessive/Unnecessary Force | | Inquiry completed | | | | | | | | | |

1



| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SIQ2016-001 | [redacted] | [redacted] | [redacted] | Excessive/Unnecessary Force | [redacted] | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| SIQ2017-003 | [redacted] | [redacted] | [redacted] | Excessive/Unnecessary Force | [redacted] | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| SIQ2017-008 | [redacted] | [redacted] | [redacted] | Excessive/Unnecessary Force | [redacted] | Inquiry Completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| SIQ2018-009 | [redacted] | [redacted] | [redacted] | Excessive/Unnecessary Force | [redacted] | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| FC2012-035 | [redacted] | [redacted] | [redacted] | Harassment | | Non-Sustained | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| IAQ2014-044 | [redacted] | [redacted] | [redacted] | Harassment | | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| IAQ2014-047 | [redacted] | [redacted] | [redacted] | Harassment | | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| IAQ2014-047 | [redacted] | [redacted] | [redacted] | Harassment | | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| IAQ2014-047 | [redacted] | [redacted] | [redacted] | Harassment | | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| SIQ2015-015 | [redacted] | [redacted] | [redacted] | Harassment | | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | [redacted] |
| IAQ2014-011 | [redacted] | | [redacted] | Use of Force | | Inquiry completed | [redacted] | [redacted] | [redacted] | [redacted] | | [redacted] | [redacted] | |

| SIQ2013-008 | | | | Use of Force | | | Inquiry completed | | | | | | | | | | | | |
| SIQ2013-008 | | | | Use of Force | | | Inquiry completed | | | | | | | | | | | | |
| SIQ2013-008 | | | | Use of Force | | | Inquiry completed | | | | | | | | | | | | |
| SIQ2013-021 | | | | Use of Force | | | Inquiry completed | | | | | | | | | | | | |
| SIQ2017-004 | | | | Use of Force | | | Unfounded | | | | | | | | | | | | |

# EXHIBIT  B



| File # | Respondent Name | Respondent Race | Respondent Gender | Allegation/Accusation Type | Allegation/Accusation Sub-Type | Finding | Discipline/Punishment | Date Rec'v'd in IAD/Entered in IAPro | Investigator(s) | Investigative Units) | Date Investigation Completed/Charges Sustained | Complainant(s) | Respondent(s) & Allegation(s) & Finding(s) & Discipline/Punishment) | Summary/Narrative | Discipline Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IA2014-099 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2016-050 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2014-031 | | | | Bias | | Unfounded | | | | | | | | | |
| IA2015-062 | | | | Bias | | Unfounded | | | | | | | | | |
| IA2017-014 | | | | Bias | | Unfounded | | | | | | | | | |
| IAQ2014-039 | | | | Bias | | Inquiry completed | | | | | | | | | |
| IA2014-048 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2014-107 | | | | Bias | | Unfounded | | | | | | | | | |
| IA2014-118 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2015-073 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2015-084 | | | | Bias | | Unfounded | | | | | | | | | |

1

A.101

Exhibit B





# EXHIBIT  C

**Exhibit C**

*(All Figures in Percent)*

| | Black | Hispanic | White |
|---|---|---|---|
| **Overall Sworn Force** | **42.8** | **9.1** | **44.5** |
| All Charges Processed | 46.2 | 10.2 | 40.7 |
| Charges Dismissed - Inquiry Only (FCIQ, IAQ, SIQ) | 41.0 | 8.4 | 47.0 |
| External Charges Pursued (IA & SI) | 44.9 | 8.3 | 44.3 |
| Internal Charges Pursued (PS) | 51.2 | 14.2 | 31.2 |
| All Charges Sustained | 50.8 | 12.3 | 33.8 |
| All Actions/Punishments | 54.0 | 10.5 | 33.2 |
| Reprimands | 49.1 | 12.2 | 35.0 |
| Fines | 52.7 | 11.1 | 34.1 |
| Suspensions/Leave without Pay | 65.5 | 3.5 | 29.3 |
| Rank Reduction | 57.1 | 14.3 | 28.6 |
| Removal from Promotion Cycle | | | |
| Resigned to Avoid Discipline | 73.9 | 0 | 21.7 |
| Terminated | 71.4 | 9.5 | 19.1 |

A.105

# EXHIBIT  D

**Exhibit D: Disciplinary Acts By Race of Officers**

| | | Asian | Black | Hispanic | White | Total |
|---|---|---|---|---|---|---|
| (Excludes Cases Where Race Not Shown) | | | | | | |
| **All Charges** | | **203** | **3222** | **712** | **2836** | **6973** |
| | | | | | | |
| | | | | | | |
| **INQUIRY ONLY** | | | | | | |
| FCIQ | | 36 | 399 | 86 | 439 | |
| IAQ | | 7 | 92 | 16 | 109 | |
| SIQ | | 3 | 36 | 6 | 56 | |
| **TOTAL** | | **46** | **527** | **108** | **604** | **1285** |
| | | | | | | |
| | | | | | | |
| **FORMAL PROCESS** | | | | | | |
| IA | | 58 | 966 | 222 | 1043 | |
| PS | | 70 | 1158 | 318 | 708 | |
| SI | | 29 | 579 | 64 | 481 | |
| **TOTAL** | | **157** | **2695** | **604** | **2232** | **5688** |
| | | | | | | |
| | | | | | | |
| **SUSTAINED** | | **93** | **1530** | **370** | **1016** | **3009** |
| | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **TOTAL PUNISHMENT** | | **20** | **459** | **89** | **282** | **850** |
| | | | | | |
| **REPRIMAND** | | 11 | 185 | 46 | 132 | 377 |
| | | | | | |
| **FINES** | | 6 | 147 | 31 | 95 | 279 |
| | | | | | |
| **SUSP./LEAVE WITHOUT PAY** | | 2 | 76 | 4 | 34 | 116 |
| | | | | | |
| **RANK ACTIONS** | | 0 | 24 | 6 | 12 | 42 |
| | | | | | |
| **RESIGN/TERMINATION** | | (1)(0) 1 | (17)(13) 30 | (0)(2) 2 | (5 )(4) 9 | 42 |

# EXHIBIT  E

**Exhibit E: Percentages of Disciplinary Acts**

**By Race of Officers**

| | | Asian | Black | Hispanic | White |
|---|---|---|---|---|---|
| ALL CHARGES | | 2.9 | 46.2 | 10.2 | 40.7 |
| INQUIRY ONLY | | 3.6 | 41.0 | 8.4 | 47.0 |
| FORMAL PROCESS | | 2.8 | 47.4 | 10.6 | 39.2 |
| SUSTAINED | | 3.1 | 50.8 | 12.3 | 33.8 |
| | | | | | |
| | | | | | |
| TOTAL PUNISHMENTS | | 2.4 | 54.0 | 10.5 | 33.2 |
| | | | | | |
| REPRIMANDS | | 2.9 | 49.1 | 12.2 | 35.0 |
| FINES | | 2.2 | 52.7 | 11.1 | 34.0 |
| SUSPENSION/LEAVE WITHOUT PAY | | 1.8 | 65.5 | 3.5 | 29.3 |
| RANK ACTIONS | | 0 | 57.1 | 14.3 | 28.6 |
| RESIGN/TERMINATE | | 2.4 | 71.4 | 4.8 | 21.4 |

# APPENDIX  A

# MICHAEL E. GRAHAM

<u>Background Information</u>:

California State University at Los Angeles (B.S. 1970)
University of Southern California (M.A. 1974)
Instructor and lecturer in various law enforcement and management subjects for:
       California Peace Officers Standards and Training
       California State University, L.A.
       Rio Hondo College

<u>Professional Organizations and Associations</u>:

International Association of Chiefs of Police
       National Law Enforcement Policy Center, Member - 1993 to 2017
       Contractor for the review of the Miami Beach Police Department regarding use of force, internal affairs and citizen complaints - 2003
       Contractor for policy development for the Pentagon Police Department – 2007-8
U.S. Department of Justice, Community Oriented Policing Consultant - 2000
U.S. Department of Justice, Special Litigation Section, Police Practices Consultant regarding use of force, internal affairs and citizen complaints - 2000 to Present:
       Chicago, Illinois
       Columbus, Ohio
       Detroit, Michigan
       Escambia County, Florida
       Los Angeles, CA.
       New Orleans, Louisiana
       Newark, New Jersey
       Orange County, Florida
       Portland, Maine
       Prince George County, Maryland
       Riverside, CA.
       Seattle, Washington
       Washington, D.C.
Police Accountability Resource Center (PARC), Board of Directors - Present
       Consultant for the Portland, Oregon Police Bureau regarding use of force – 2004-8
County of Los Angeles – 2001 to 2016:
       Consultant for the Department of Probation
       Monitor for the Agreement between the DOJ and the County regarding the conditions in the juvenile halls.
       Monitor for the Agreement between the DOJ and the County regarding the conditions in the Probation Camps.

California Police and Fire Games, President, - 1987 to 2018
World Police and Fire Games, President - 1987 to the Present

<u>Employment</u>:

Michael Graham was employed by the Los Angeles Sheriff's Department for over 33 years rising through the ranks from Deputy the position of Assistant Sheriff (A/S). As the third ranking member of the largest Sheriff's Department in the Nation, A/S Graham was responsible for the policing and detective functions for the three million residents in the unincorporated areas and 40 contract cities in Los Angeles County. As part of his duties he was required to review all serious force cases, approve appropriate discipline and implement policy and training to reduce inappropriate use of force.

From January 1993 until his promotion to A/S in March 1995, he was the Chief of the Professional Standards and Training Division where he oversaw the implementation of the Kolts Commission recommendations. He had responsibility for Department training, inspections, civil litigation, internal affairs and internal criminal investigations. During this period, he established and implemented the Department's risk management unit and early warning system. As part of his duties, he created and supervised the Department's Shooting and Serious Force Rollout Teams. He reviewed and had settlement responsibility for all claims and civil suits, including suits alleging excessive force.

<u>Sheriff's Department Accomplishments</u>:

<u>Accountability</u>: Starting in 1993, he initiated a series of accountability policies, training and review mechanisms to strengthen management and individual accountability:

-Policy: comprehensive delineation of responsibilities by rank and assignment; prioritization of critical issues; audits of key accountability areas

-Complaints: open public complaint system; written resolution and tracking of all complaints; appeal process to an ombudsman for dissatisfied complainants; integrity testing

-Force: complete reporting and tracking of all force; force training; less lethal weapon's options

-Performance Tracking: track all force, complaints, claims and lawsuits, etc., via an early warning system; lifetime tracking, intervention and periodic performance review of individual problem employees

-Risk Management: created the bureau in 1993; made all unit commanders accountable to reduce the risk factors that lead to claims and lawsuits through annual risk reduction plans

-Critical Issues Forum: every unit commander required to account for crime rate, budget and internal integrity and administrative controls of his/her unit each month in an open forum with Department executives

2

A.113

<u>Community Policing</u>: Beginning in 1996, he initiated and oversaw several community policing strategies:

> -High Impact Community Oriented Policing: characterized by door-to door surveys of residents; identify community concerns about crime and neighborhood deterioration; organize and mobilize the community and other governmental service providers; follow community plan for neighborhood revitalization.

> -Hate Crimes: organize stakeholders; contract among stakeholders to help and support each other; training for patrol officers and detectives

> -Gangs: chief components include alternatives to arrest; vertical prosecution where necessary; probation and parole sweeps; parent accountability

> -Family Violence: the focus includes spouse, child and elder abuse; intervention with a unique "predictor of family violence" computer program

> -Regional Community Policing Institute: a major feature is the emphasis on domestic violence

<u>Jail Reform Project</u>: In November 1997, at the conclusion of the U.S. Department of Justice, Civil Rights Division's investigation, he was assigned the additional responsibility to reorganize and improve the delivery of medical and mental health services to the inmates in the Department's nine jail facilities. This project was expanded to reform all services provided to prisoners.

# APPENDIX  B

**Appendix B**
**Documents Considered for Report**

1. Prince George's County Police Department General Order Manual

2. Defendants' Discovery Responses

3. Plaintiffs' Discovery Reponses

4. Amended Complaint (ECF 54)

5. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss (ECF 31)

6. Agreement Made by and Between Prince Georges County, Maryland and Fraternal Order of Police Price Georges County Lodge 89, Inc. (July 1, 2016 through June 30, 2018)

7. Raphael Grant Deposition (March 16, 2020)

8. Joseph Ghattas Deposition (October 6, 2019)

9. Linda Washington Deposition (October 6, 2019)

10. PGPD Promotion lists

11. PGPD Rosters

12. PGPD Transfer Lists

13. Plaintiffs' Personnel Files

14. Early Warning System reports

15. PGPD EEO Training documents, including but not limited to PG0000000343, PG0000000348, PG0000000395, PG0000000627, PG0000152721, PG0000179336, PG0000432822, PG0000658090, PG0000783353, PG0000154901, PG0000966820, PG0000967475

16. IAPro spreadsheet (4 versions)

17. Internal Affairs files, including but not limited to:
   - DA2014-120
   - DA2015-050
   - DA2015-059
   - DA2015-117
   - DA2015-166

- DA2016-015
- DA2016-017
- DA2016-020
- DA2016-073
- DA2016-103
- DA2016-105
- DA2017-110
- DA2016-111
- DA2017-035
- DA2017-085
- DA2017-138
- DA2018-018
- DA2018-071
- DA2018-077
- DA2018-088
- DA2018-138
- DA2019-010
- DA2019-033
- FC2013-024
- FC2013-029
- FC2013-031
- FCIQ2013-153
- FCIQ2015-017
- FCIQ2015-086
- FCIQ2016-007
- FCIQ2016-009
- FCIQ2016-053
- FCIQ2016-055
- FCIQ2016-075
- FCIQ2016-076
- FCIQ2016-086
- FCIQ2017-035
- FCIQ2017-052
- FCIQ2017-067
- FCIQ2017-071
- FCIQ2017-072
- FCIQ2017-076
- FCIQ2017-082
- FCIQ2017-103
- FCIQ2017-105
- FCIQ2018-002
- FCIQ2018-011
- FCIQ2018-034
- FCIQ2018-040

- FCIQ2018-068
- FCIQ2018-089
- FCIQ2018-105
- FCIQ2019-052
- FIQ2015-094
- FQI2016-053
- IA2004-017
- IA2006-027
- IA2009-068
- IA2011-042
- IA2011-054
- IA2013-049
- IA2013-071
- IA2013-075
- IA2013-084
- IA2014-006
- IA2014-017
- IA2014-037
- IA2014-053
- IA2014-062
- IA2014-065
- IA2014-068
- IA2014-069
- IA2014-072
- IA2014-078
- IA2014-079
- IA2014-099
- IA2014-100
- IA2014-106
- IA2014-111
- IA2014-114
- IA2014-130
- IA2015-010
- IA2015-016
- IA2015-028
- IA2015-031
- IA2015-032
- IA2015-035
- IA2015-038
- IA2015-039
- IA2015-040
- IA2015-056
- IA2015-063
- IA2015-067

- IA2015-072
- IA2015-083
- IA2015-086
- IA2015-087
- IA2015-088
- IA2015-092
- IA2016-004
- IA2016-006
- IA2016-007
- IA2016-008
- IA2016-013
- IA2016-027
- IA2016-030
- IA2016-031
- IA2016-034
- IA2016-035
- IA2016-038
- IA2016-044
- IA2016-046
- IA2016-050
- IA2016-054
- IA2016-067
- IA2016-071
- IA2016-075
- IA2017-001
- IA2017-003
- IA2017-007
- IA2017-008
- IA2017-013
- IA2017-014
- IA2017-019
- IA2017-020
- IA2017-022
- IA2017-031
- IA2017-034
- IA2017-036
- IA2017-037
- IA2017-038
- IA2017-042
- IA2017-048
- IA2017-053
- IA2017-054
- IA2017-055
- IA2017-056

- IA2017-058
- IA2017-060
- IA2017-069
- IA2017-070
- IA2018-002
- IA2018-009
- IA2018-012
- IA2018-020
- IA2018-027
- IA2018-032
- IA2018-034
- IAQ2014-046
- IAQ2014-047
- IAQ2015-004
- IAQ2015-018
- IAQ2015-019
- IAQ2015-021
- IAQ2015-024
- IAQ2016-009
- IAQ2016-023
- IAQ2018-006
- IAQ2018-014
- IAQ2019-002
- PS2013-541
- PS2014-154
- PS2014-290
- PS2014-385
- PS2015-034
- PS2015-039
- PS2015-050
- PS2015-066
- PS2015-125
- PS2015-198
- PS2015-220
- PS2015-237
- PS2015-287
- PS2015-369
- PS2016-052
- PS2016-053
- PS2016-068
- PS2016-083
- PS2016-111
- PS2016-131
- PS2016-185

5

- PS2016-190
- PS2016-194
- PS2017-013
- PS2017-075
- PS2017-084
- PS2017-090
- PS2017-110
- PS2017-124
- PS2017-172
- PS2017-192
- PS2017-194
- PS2018-038
- PS2018-068
- PS2018-072
- PS2018-137
- PS2019-036
- SI2010-003
- SI2010-006
- SI2011-075
- SI2014-003
- SI2014-016
- SI2014-017
- SI2014-039
- SI2014-055
- SI2015-009
- SI2015-015
- SI2015-022
- SI2015-030
- SI2015-037
- SI2015-045
- SI2015-052
- SI2015-053
- SI2015-054
- SI2015-055
- SI2016-004
- SI2016-008
- SI2016-011
- SI2016-013
- SI2016-033
- SI2016-039
- SI2016-042
- SI2016-053
- SI2016-059
- SI2016-068

- SI2017-008
- SI2017-043
- SI2017-048
- SI2017-060
- SI2017-062
- SI2017-066
- SI2017-067
- SI2017-069
- SI2017-072
- SI2017-073
- SI2017-077
- SI2019-077
- SIQ2015-002
- SIQ2015-013
- SIQ2016-003
- SIQ2017-006
- SIQ2019-007

18. Internal Affairs Division Standard Operating Procedures (PG0000000497, PG0000853984)

19. Internal Affairs Division Standard Operating Procedure, IAP SOP March 2014 draft (PG0000875393)

20. Internal Affairs Log Books (PG0000787213, PG0000787352, PG0000787555, PG0000787694, PG0000787873)

21. Internal Affairs 2013 Annual Report (PG0000149836)

22. Internal Affairs 2014 Annual Report (PG0000113615)

23. Internal Affairs 2015 Annual Report (PG0000104641)

24. PGPD Internal Investigations Guide (PG0000310607-310664)

25. Like Discipline documents analyses, including but not limited to PG0000174650, PG0000651606, PG0000651608, PG0000651609, PG0000651612, PG0000651614, PG0000651617, PG0000651619, PG0000651622, PG0000651624, PG0000651627, PG0000651629, PG0000651633, PG0000651638, PG0000651641, PG0000651644, PG0000651647, PG0000651649, PG0000651651, PG0000651652, PG0000651659, PG0000651661, PG0000651665, PG0000651668, PG0000651670, PG0000651674, PG0000651678, PG0000651681, PG0000651684, PG0000651687, PG0000651690, PG0000651694, PG0000651698, PG0000651700, PG0000651703,  PG0000651705, PG0000651708, PG0000651713, PG0000651715, PG0000651719, PG0000651720, PG0000651722, PG0000651724, PG0000651729, PG0000651734, PG0000651736,

PG0000651737, PG0000651741, PG0000651749, PG0000651752, PG0000651755,
PG0000651757, PG0000651762, PG0000651764, PG0000651768, PG0000651772,
PG0000651775, PG0000651777, PG0000651779, PG0000651780, PG0000651785,
PG0000651791, PG0000651795, PG0000651798, PG0000651801, PG0000651804,
PG0000651807, PG0000651810, PG0000651814, PG0000651819, PG0000651822,
PG0000651827, PG0000651830, PG0000651835, PG0000651837, PG0000651842,
PG0000651847, PG0000651852, PG0000651857, PG0000651863, PG0000651866,
PG0000651870, PG0000651875, PG0000651876, PG0000651882, PG0000651884,
PG0000651887, PG0000651895, PG0000651896, PG0000651899, PG0000651902,
PG0000651906, PG0000651908, PG0000651913, PG0000651917, PG0000651920,
PG0000651922, PG0000651924, PG0000651927, PG0000651933, PG0000651935,
PG0000651940, PG0000651943, PG0000651945, PG0000651949, PG0000651952,
PG0000651955, PG0000651962, PG0000651967, PG0000651969, PG0000651972,
PG0000651975, PG0000651978, PG0000651980, PG0000651986, PG0000651992,
PG0000651994, PG0000651997, PG0000652005, PG0000652010, PG0000652015,
PG0000652019, PG0000652023, PG0000652027, PG0000652030, PG0000652033,
PG0000652036, PG0000652039, PG0000652042, PG0000652046, PG0000652049,
PG0000652053, PG0000652055, PG0000652060, PG0000652065, PG0000652070,
G0000652076, PG0000652082, PG0000652086, PG0000652090, PG0000652093,
PG0000652096, PG0000652100, PG0000652104, PG0000652107, PG0000652110,
PG0000652113, PG0000652118, PG0000652121, PG0000652125, PG0000652130,
PG0000652136, PG0000652139, PG0000652141, PG0000652146, PG0000652150,
PG0000652152, PG0000652154, PG0000652159, PG0000652162, PG0000652166,
PG0000652169, PG0000652172, PG0000652182, PG0000652186, PG0000652193,
PG0000652197, PG0000652204, PG0000652206, PG0000652210, PG0000652213,
PG0000652216, PG0000652218, PG0000652222, PG0000652225, PG0000652229,
PG0000652233, PG0000652235, PG0000652239, PG0000652242, PG0000652247,
PG0000652250, PG0000652255, PG0000652259, PG0000652263, PG0000652266,
PG0000652272, PG0000652275, PG0000652278, PG0000652282, PG0000652286,
PG0000652291, PG0000652295, PG0000652298, PG0000652303, PG0000652308,
PG0000652316, PG0000652323,  PG0000652327, PG0000652332, PG0000652335,
PG0000652342, PG0000652346, PG0000652349, PG0000652354, PG0000652360,
PG0000652365, PG0000652370, PG0000652372, PG0000652377, PG0000652380,
PG0000652383, PG0000652387, PG0000652390, PG0000652393, PG0000652397,
PG0000652402, PG0000652405, PG0000652408, PG0000652411, PG0000652414,
PG0000652419, PG0000652422, PG0000652425, PG0000652428, PG0000652432,
PG0000652441, PG0000652442, PG0000652446, PG0000652449, PG0000652454,
PG0000652458, PG0000652463, PG0000652466, PG0000652471, PG0000652474,
PG0000652477, PG0000652479, PG0000652484, PG0000652487, PG0000652490,
PG0000652493, PG0000652496, PG0000652500, PG0000652504, PG0000652507,
PG0000652511, PG0000652513, PG0000652515, PG0000652521, PG0000652525,
PG0000652528, PG0000652533, PG0000652537, PG0000652538, PG0000652540,
PG0000652544, PG0000652549, PG0000652552, PG0000652557,  PG0000652562,
PG0000652566, PG0000652569, PG0000652572, PG0000652577, PG0000652580,
PG0000652582, PG0000652585, PG0000652588, PG0000652596, PG0000652598,

PG0000652603, PG0000652608, PG0000652614, PG0000652619, PG0000652623, PG0000652627, PG0000652630, PG0000652635, PG0000652637.

26. EEO files (EEOC_Perez_000001, PG0000001364, PG0000001375, PG0000001379, PG0000001417, PG0000001458, PG0000001501, PG0000001550, PG0000001584, PG0000001624, PG0000001643, PG0000001671, PG0000001676, PG0000001710, PG0000001713, PG0000001759, PG0000001790, PG0000001798, PG0000001803, PG0000001968, PG0000001975, PG0000001984, PG0000002015, PG0000002029, PG0000002056, PG0000002097, PG0000002122, PG0000002128, PG0000002146, PG0000002167, PG0000002170, PG0000002223, PG0000002232, PG0000011201, PG0000011319, PG0000071313, PG0000071485, PG0000071525, PG0000071563, PG0000071611,PG0000071664, PG0000080229, PG0000080231, PG0000095591, PG0000103668, PG0000103669, PG0000103670, PG0000103739, PG0000103788, PG0000103791, PG0000103792, PG0000103793, PG0000103794, PG0000104194, PG0000104208, PG0000150184, PG0000155487, PG0000156112, PG0000156238, PG0000157026, PG0000446823, PG0000157200, PG0000157210, PG0000157216, PG0000446826, PG0000157263,PG0000446844, PG0000158494, PG0000158495, PG0000158497, PG0000158498, PG0000158500, PG0000158501, PG0000158502, PG0000158503, PG0000158504, PG0000158506, PG0000158507, PG0000158508, PG0000158509, PG0000158512, PG0000158514, PG0000158515, PG0000158516, PG0000158517, PG0000158520, PG0000158521, PG0000158522, PG0000158523, PG0000161290, PG0000161295, PG0000161299, PG0000161945, PG0000171506, PG0000171706, PG0000171766, PG0000178403, PG0000178409, PG0000178428, PG0000178447, PG0000178510, PG0000178512, PG0000178627, PG0000178631, PG0000178784, PG0000178873, PG0000179292, PG0000179436, PG0000179635, PG0000179756, PG0000179768, PG0000179770, PG0000179777, PG0000179881, PG0000181838, PG0000184313, PG0000289570, PG0000313412, PG0000319749, PG0000324006, PG0000324021, PG0000340815, PG0000350133, PG0000350134, PG0000426840, PG0000432182, PG0000432247, PG0000432507, PG0000613562, PG0000613563, PG0000613814, PG0000613823, PG0000656580, PG0000656714, PG0000656768, PG0000656803, PG0000657585, PG0000657661, PG0000657734, PG0000657735, PG0000657800, PG0000657862, PG0000657867, PG0000657909, PG0000657911, PG0000657914, PG0000657954, PG0000658050, PG0000658082, PG0000658184, PG0000658189, PG0000658217, PG0000658298, PG0000658495, PG0000658790, PG0000658803, PG0000658828, PG0000658880, PG0000658905, PG0000659020, PG0000659099, PG0000659148, PG0000659173, PG0000659212, PG0000659214, PG0000659322, PG0000659380, PG0000659548, PG0000659563, PG0000659940, PG0000660008, PG0000660017, PG0000660019, PG0000660098, PG0000660173, PG0000660252, PG0000660438, PG0000660463, PG0000672268, PG0000755034, PG0000785662, PG0000785700, PG0000856903, PG0000857064, PG0000857102, PG0000857105, PG0000857152, PG0000857183, PG0000857261, PG0000857276, PG0000860399, PG0000860563, PG0000860617, PG0000860778, PG0000860982, PG0000861105, PG0000861261, PG0000861307, PG0000861390, PG0000861418, PG0000861588, PG0000861596, PG0000861624, PG0000861786, PG0000861880, PG0000861968, PG0000862208, PG0000862714, PG0000862720, PG0000862791, PG0000863042, PG0000863132, PG0000863244, PG0000863259,

PG0000863751, PG0000863770, PG0000863773, PG0000863844, PG0000863945,
PG0000863996, PG0000864000, PG0000864031, PG0000864090, PG0000864345,
PG0000865066, PG0000865983, PG0000866006, PG0000866060, PG0000866066,
PG0000866534, PG0000866619, PG0000866862, PG0000866865, PG0000866973,
PG0000867003, PG0000867096, PG0000867121, PG0000867174, PG0000868089,
PG0000870537, PG0000905504, PG0000905774, PG0000905776, PG0000907893,
PG0000908065, PG0000908115, PG0000908182, PG0000908185, PG0000908298,
PG0000908299, PG0000909161, PG0000909164, PG0000909743, PG0000909755,
PG0000909816, PG0000909902, PG0000909903, PG0000909926, PG0000914063,
PG0000917366, PG0000920198, PG0000923033, PG0000925264, PG0000928742,
PG0000934569, PG0000934570, PG0000934685, PG0000934776, PG0000935030,
PG0000935034, PG0000935062, PG0000935164, PG0000935191, PG0000936765,
PGX0000000443, PGX0000001031, PGPD-PER-0067207, PGPD-PER-0069987,
PGPDPLS0000310)

27. List of Suspensions (PG0000080569-80719)

28. Various materials produced by PGPD to DOJ

29. Adrian Crudups' Circuit Court for Prince George's County Case files (No. 17-273X)

30. Robert Folchetti Circuit Court Docket (Case No. 0501SP005312014)

31. George Merkel Circuit Court Docket (Case No. CT170241X)

32. Other PGPD produced documents (PG0000853378, PG0000855170, PG0000875249,
PG0000875251, PG0000147519, PG0000150850, PG0000929099, PG0000929100,
PG0000020673, PG0000166288, PG0000169922, PG0000170011, PG0000292231,
PG0000772690, PG0000155747, PG0000156074, PG0000162779, PG0000168875,
PG0000180150, PG0000334331, PG0000169720, PG0000162500, PG0000084440,
PG0000431462, PG0000166322, PG0000166349, PG0000166362, PG0000254415,
PG0000111973, PG0000111979, PG0000104392, PG0000103530, PG0000103567,
PG0000180223, PG0000656568, PG0000656569, PG0000174649, PG0000171193,
PG0000853346, PG0000928065, PG0000108655, PG0000153441, PG0000154333,
PG0000155665, PG0000172194, PG0000870882, PGIAD0000031514,
PGIAD0000032322, PG0000864287, PG0000864289, PG0000864290, PG0000864292,
PG0000893933, PG0000161480, PG0000082873, PG0000104182, PG0000182196,
PG0000182444, PG0000182462, PG0000855439, PG0000855440, PG0000903780,
PG0000104622, PG0000162728, PG0000164312, PG0000854965, PG0000939321,
PG0000162177, PG0000162391, PG0000162400, PG0000908213, PG0000150850,
PG0000155548, PG0000162169, PG0000162510, PG0000162667, PG0000165717,
PG0000165790, PG0000169211, PG0000169310, PG0000171078, PG0000181256,
PG0000300016, PG0000785910, PG0000785918, PG0000956075, PG0000103511,
PG0000144565, PG0000150665, PG0000179546, PG0000446894, PG0000162977,
PG0000144647, PG0000155770, PG0000155786, PG0000905763, PG0000154090)

10

33. Other Plaintiff produced documents (PGPD-CHA-0001334, PGPD-PER-0122769, PGPD-BOO-0000134)

34. EEOC, *Enforcement Guidance on Vicarious Employer Liability for Unlawful harassment by Supervisors* (Jun. 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

35. EEOC Compliance Manual, *Section 15: Race & Color Discrimination*, § 15-VII (A)(racial harassment) (Apr. 19, 2006), https://www.eeoc.gov/policy/docs/race-color.html

36. Matt Zapotosky & Mary Pat Flaherty, *Pr. George's officers transferred*, The Washington Post (Jan. 28, 2011) http://www.washingtonpost.com/wp-dyn/content/article/2011/01/27/AR2011012707491.html

37. Nick Dutton, *Md. Officers suspended over 'driving while back' YouTube vids* (Nov. 17, 2012), https://wtvr.com/2012/11/17/md-officers-suspended-over-racist-youtube-vids/

38. Jonathan W. Hutto, Sr. & Rodney D. Green, *Social Movements Against Racist Police Brutality and Department of Justice Intervention in Prince George's County, Maryland*, 93 J. Urban Health 89 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4824689/

39. Lynh Bui, *Lifelong resident and officer's son confirmed to lead Prince George's police department*, The Washington Post (Feb. 16, 2016) https://www.washingtonpost.com/local/public-safety/lifelong-resident-and-son-of-a-cop-set-to-lead-pr-georges-police-department/2016/02/16/3042ea76-d3fd-11e5-b195-2e29a4e13425_story.html

40. *One Police Shift: Patrolling an Anxious America*, The New York Times (Jul. 23, 2016) (https://www.nytimes.com/2016/07/24/us/police-ridealongs.html

41. Radley Balko, *Scott Finn, model cop for a model police department*, The Washington Post (Jul. 27, 2016) https://www.washingtonpost.com/news/the-watch/wp/2016/07/27/scott-finn-model-cop-for-a-model-police-department/

42. Ebony, *Black Cop Says He Was Unfairly Detained by Police* (Oct. 27, 2016), https://www.ebony.com/news/black-cop-unfairly-detained/

43. PGPD News, *Full-Length Press Conference With Police Chief Hank Stawinski* (Feb. 9, 2017) https://pgpolice.blogspot.com/2017/02/todays-full-length-press-conference.html

44. Chicago Police Department, *Equal Employment Opportunity Policy* (August 22, 2017) at IV (B)(a) http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

45. Drew Gerber, *Prince George's County officer found guilty of assaulting a homeless woman to roust her*, The Washington Post (Nov. 14, 2017)

https://www.washingtonpost.com/local/prince-georges-county-officer-found-guilty-of-assaulting-a-homeless-woman-to-roust-her/2017/11/14/b70f9ad6-c8bb-11e7-8321-481fd63f174d_story.html

46. Jim Handley, *Prince George's County Police Work to Prevent Bias*, NBC4 Washington DC news report (Feb. 3, 2018) https://www.nbcwashington.com/news/local/Prince-Georges-County-Police-Work-to-Prevent-Bias_Washington-DC-472436063.html

47. Lorenzo Hall, *Chief apologizes after 'black bad guy' example used by Md. Officer teaching kids about K-9s*, WUSA9 (Aug. 28, 2018) (https://www.wusa9.com/article/news/local/maryland/chief-apologizes-after-black-bad-guy-example-used-by-md-officer-teaching-kids-about-k-9s/65-588570746

48. *Prince George's SWAT Officers Investigated After Bar Fight*, NBC4 Washington DC news report (Dec. 19, 2018) https://www.nbcwashington.com/news/local/prince-georges-swat-officers-investigated-after-bar-fight_washington-dc/166364/

49. Maricopa County Sheriff's Office Policy and Procedures, *Workplace Professionalism: Discrimination and Harassment* (Jan 24, 2019), pages 5-6, §§ 5(c )(1), 5(c )(2), 5(c )(5), https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

50. International Association of Chiefs of Police Law Enforcement Policy Center, *Model Policy, Harassment, Discrimination, and Unprofessional Conduct* § V.C (2) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

51. December 18, 2019 Alsip Response to Pergament December 9 Letter

52. February 14, 2020 Alsip Response to Pergament February 1 Letter

53. February 20, 2020 Alsip response to February 10 letter

12