# Exhibit 168

**EXPERT REPORT OF**

**MICHAEL E. GRAHAM**

In

*Hispanic National Law Enforcement Association NCR et al. v.*

*Prince George's County et al.*,

District of Maryland No. 18-cv-3821

August 28, 2020

## I.      QUALIFICATIONS

1.  For 33 years, I was employed by the Los Angeles County Sheriff's Department (LASD), rising from the rank of Deputy to the position of Assistant Sheriff, the third-highest ranking position in the Department.  The LASD is the largest Sheriff's Department in the United States with approximately 18,000 employees.  The Department serves as the primary police agency for more than 2.9 million residents.  As the Assistant Sheriff for five years, I was responsible for the policing and detective functions, and as part of my duties I reviewed all serious force cases, approved appropriate discipline, and implemented policy and training to reduce inappropriate use of force.  I previously served as the Chief of the Professional Standards and Training Division, where, among other things, I had responsibility over Department training and internal affairs.

2.  I was a member of the International Association of Chiefs of Police (IACP) National Law Enforcement Policy Center for over two decades.  The Center is made up of nationally recognized police executives, current and retired, who identify leading practices and provide sound guidance to the law enforcement profession to assist in developing policies for individual departments. I am also a member of the Board of Directors for the Police Assessment Resource Center (PARC).  PARC provides independent, evidence-based counsel and research on

1

effective, respectful, and publicly accountable policing to law enforcement agencies, government entities, and community groups. PARC was founded in 2001 by the Vera Institute of Justice with the support of the Ford Foundation.

3. I have served as an expert or consultant for the Department of Justice in over a dozen matters concerning police practices, including matters concerning the police departments of Chicago, Detroit, Los Angeles, New Orleans, Newark, Seattle, and Washington, D.C. I have also been retained as a consultant by a number of jurisdictions.

4. I have served as an instructor and lecturer on various law enforcement and management subjects at California State University. My undergraduate degree is from California State University, and I have a masters from the University of Southern California.

5. My curriculum vitae is attached as Appendix A. I have not had any publications in the last ten years. I have not testified in any matters in the last four years. A list of materials I have considered in preparing this report is included as Appendix B.

6. My work on this matter is ongoing, and I reserve the right to supplement, update, refine, or revise my conclusions or opinions should any additional

2

information be provided to me in the future and to supplement or amend them to address any additional expert opinions offered in this litigation.

7.     I am being compensated in this matter at a rate of $175 per hour, including any testimony.  My compensation is not contingent upon the substance of my opinions or the outcome of this case.

## II.     SCOPE OF ASSIGNMENT

8.     I have been retained by Arnold & Porter Kaye Scholer LLP, the Washington Lawyers' Committee for Civil Rights and Urban Affairs, and the American Civil Liberties Union of Maryland, counsel for Plaintiffs in the matter of *Hispanic National Law Enforcement Officers et al. v. Prince George's County, Maryland et al.*, District of Maryland Case No. 18-3821.  I have been asked to evaluate the facts and circumstances involving police practices used at the Prince George's County Police Department ("PGPD" or the "Department"), including assessment of Departmental policies, practices, and customs.  This assessment has included evaluation of PGPD's policies, practices, and customs when presented with complaints of racial discrimination, racial harassment, and retaliation, the PGPD's training concerning such issues, the PGPD's methods of evaluating, investigating, and disciplining such complaints, its Internal Affairs function, its

3

disciplinary function, and promotions and their impact on the racial composition of the varying ranks of the force.

## III.   SUMMARY OF OPINIONS

9.     Based on my professional experience and my analysis to date, I have reached the following conclusions:

a.  The Department's policies for handling complaints about racial harassment and discrimination are inadequate.

b.  The Department has customs and practices of not enforcing its policies prohibiting racial harassment, discrimination and retaliation.

c.  There are practices within the Department that result in complaints by minority officers about racial harassment or discrimination not being treated appropriately, in that they are either not investigated, not investigated appropriately, or not disciplined appropriately. The current leadership of the Department appears to have made a deliberate choice not to track or monitor its performance concerning these matters.

d.  There are practices within the Department that result in complaints by civilians about racial harassment or discrimination not being

4

treated appropriately, in that they are not investigated, not investigated appropriately, or not disciplined appropriately.  This is evident in the Department's failure to address issues involving complaints of racial profiling and other complaints, the lack of discipline when senior command officers were caught giving incentive pay for "high production," and the failure to address pervasive trends in the use of force against minority civilians.

e.  There are practices within the Department that result in serious allegations of misconduct being treated differently when the charges are made against white officers as opposed to officers of color.  In addition, the current leadership of the Department appears to have made a deliberate choice not to track or monitor its performance concerning these matters.

f.  There is a practice or custom in the Department that when officers of color complain about any of the foregoing conduct, they experience retaliation, in that they are transferred or otherwise removed from their jobs and sometimes face counter-charges.  The pattern of retaliation indicates that leadership of the Department

condones retaliation, and, in certain cases, evidence reflects direct participation of leadership of the Department in retaliatory acts.

g.   There are practices within the Department that result in discrimination in the promotions system, particularly in selection of Lieutenants and Captains.  Officers of these ranks play critical roles in the Department, including significant roles in enforcement of EEO policies, the investigation and discipline of misconduct, the assessment of uses of force, and community relations.  The failure of officers of these ranks to reflect the community may contribute to some of the discriminatory trends observed in this report.

## IV.   BACKGROUND

10.   Prince George's County is a "majority-minority" community, meaning that a majority of its residents are members of a racial or ethnic minority. According to the U.S. Census, the estimated population of the county is 909,327 (as of July 1, 2019) current population of the County is 64.4 percent black, 19.5 percent Hispanic, 12.3 percent white/non-Hispanic, and 4.4 Asian.[1]

---

[1] U.S. Census, County Quick Facts, available at
https://www.census.gov/quickfacts/fact/table/princegeorgescountymaryland,US/PST045219

11.    The primary law enforcement and public safety agency in the County is the Prince George's County Police Department ("PGPD"), which is the fourth largest law enforcement agency in the State of Maryland.[2]

12.    According to recent information presented by the Acting Chief of the Department, Hector Velez, the current demographic composition of the PGPD overall force is 43 percent black, 10.5 percent Hispanic, 42.5 white/non-Hispanic, and 3.7 percent Asian.[3]

13.    The demographic composition of the PGPD includes a smaller percentage of racial and ethnic minorities (blacks, Hispanics, and Asians) than the County population as a whole; conversely, the PGPD has significantly higher percentage of white officers than the County as a whole.  And the primary command-level staff (Captains and Lieutenants) are approximately 80 and 65 percent white respectively—a significantly higher percentage than the County and the PGPD as a whole.

14.    The Plaintiffs in this matter have alleged that the fact that the majority of PGPD officers and senior officers are white has caused tension with the community the Department is supposed to serve.[4]  In particular, the Plaintiffs have

---

[2] PG0000986142.
[3]  Velez, Prince George's County Police Department, Presentation to Task Force on Police Reform (July 2020).
[4] Complaint ¶¶ 2-5.

alleged that senior managers of the Department have condoned racist behavior and other misconduct by white officers directed towards minority civilians and officers, and that the Department has engaged in retaliation against minority officers who have complained about such conduct.[5]

15.     The racial tension that the PGPD has had with the community is not new.  For example, in October 2000, the Department of Justice initiated a pattern and practice investigation regarding use of excessive force throughout the Police Department.  This investigation resulted in the County and PGPD entering into a "Memorandum of Agreement" with the Department of Justice in January 2004.[6]

16.     Pursuant to the Memorandum of Agreement, the Department was required to overhaul its use of force and reporting protocols, including its systems of documentation and review of use of force, its officer training, its processes for reviewing and tracking other officer misconduct allegations, and enhancing its "early identification system" to record all uses of force, all complaints, and all disciplinary actions taken against officers.[7]  Pursuant to the Memorandum of Agreement, the County agreed to appoint an independent monitor, who served until 2009.

---

[5] Complaint ¶¶ 2-5.
[6] Memorandum of Agreement, available at
http://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/pg_memo_agree.pdf.
[7] Memorandum of Agreement.

8

17.     The problems of the County and the PGPD continued after the monitor ceased its activities.  An empirical study released in 2015 noted a significant increase of use of force incidents from 2010 to 2014.[8]  The study noted news reports about a "pattern of unlawful and corrupt behavior among PGPD officers and a continued absence of respect for the rule of law among certain county officials . . . the Prince George's County government is either unwilling or unable to make police accountability and department transparency a priority . . ."

18.     As discussed in this report, these problems continue to this day.  On October 24, 2016, senior leadership of PGPD were advised that certain of the Plaintiffs in this action had filed a complaint with the Department of Justice concerning Civil Rights violations.[9]  In response to learning that information, Chief Stawinski convened a "Panel on Equity in Promotions, Discipline & Practices," which started meeting in April 2017. [10] In September 2017, the County was advised by the Department of Justice that it was conducting an investigation whether PGPD is engaged in a pattern or practice "of discrimination against Hispanics and African Americans . . . with respect to their employment in sworn

---

[8] J. Chanin, *Evaluating Section 14141: An Empirical Review of Pattern or Practice Police Misconduct Reform*, Ohio State Journal of Criminal Law, Volume 14:67, 95-101.
[9] PG0000155315.
[10] PG0000155315.

positions."[11]  In early 2018, the Panel on Promotions, Discipline & Practices stopped meeting, without issuing any findings or recommendations.

19.    My understanding is that the Department of Justice continues to investigate issues of discrimination on the force.

## V.    ANALYSIS

### A.    The Department's Policies for Handling Complaints About Racial Harassment and Discrimination Are Inadequate

20.     It is the responsibility of Police Departments operating in a diverse, multicultural society to treat allegations of racial discrimination and harassment seriously.  When allegations of discriminatory conduct by a law enforcement officer are presented, they should be investigated and violations should be disciplined appropriately.

21.     I have reviewed Prince George's County Police Department General Order Manual, in particular Volume I, Chapter 12 on Discrimination & Sexual Harassment ("Discrimination & Sexual Harassment Policies"),[12] which is the Department's primary policy concerning racial discrimination and harassment, as

---

[11] PG0000155355.

[12] Prince George's County Police Department General Order Manual ("General Order"), Vol. I, Ch. 12 (Discrimination & Sexual Harassment), available at https://www.princegeorgescountymd.gov/DocumentCenter/View/16570/Volume-I-Administration-PDF.  Unless otherwise specified, citations to the General Order reference the version available at the link in this footnote.

well as Volume I, Chapter 4 on Complaints, which also gives direction to employees regarding filing complaints and promises them protection from retaliation ("Complaints Policy")[13] (collectively, "PGPD Policies" or "Policies").  I have concluded that these policies are flawed in a number of respects, as set forth below.

22.     First, PGPD's Policies have flawed reporting requirements.  The reporting process required by PGPD's Policies is deficient in a number of ways.  Most notably, the Policies state that "[w]hen employees, other than victims, become aware of conduct believed to be sexual harassment or discrimination . . . they shall report the incident to their supervisor or Commander/Manager."  Vol. I. Ch. 12 § V[14] (Procedures).  And, even if an employee is uncomfortable with this directive and instead makes a complaint directly to the EEO Coordinator, the Coordinator is authorized to "[r]efer [the complaint back] to the employee's Commander/Manager for mediation."  *Id*. § V.3 (Complaint Procedures).

23.     The reporting procedure for "victims" is more daunting as it states that as the first step, "Attempts will be made to settle discrimination complaints at the employee/supervisory level by dialogue between the parties concerned.  When

---

[13] General Order, Vol. I, Ch. 4 (Complaints).

[14] General Order, Vol. I, Ch. 12 § V (Discrimination & Sexual Harassment: Procedures).

a solution cannot be reached at this level, employees are urged to seek the

assistance of either the Equal Employment Opportunity Coordinator or the

Assistant Coordinator."  *Id*. § V.2.  Once again, if the "victim" employee is

uncomfortable with this directive and instead makes a complaint directly to the

EEO Coordinator, the Coordinator is authorized to "[r]efer [the complaint back] to

the employee's Commander/Manager for mediation."  *Id*. § V.3 (Complaint

Procedures).

24.     If the victim complains to the EEO Coordinator, the procedure

provides the victim "shall complete Part I of the Equal Employment Opportunity

Complaint Form …" and "shall either mail the form (marked confidential) or take

it directly to the Deputy Chief, BOAHS," the assigned EEO Coordinator.  *Id*.  This

is flawed.  In contrast, the U.S. EEOC states, "When an employee complains to

management about alleged harassment, the employer is obligated to investigate the

allegation regardless of whether it conforms to a particular format or is made in

writing."[15]

---

[15] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors
(June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

25.     Similarly, the Complaints Policy requires all employees who become aware of "unlawful conduct" or "violation of written directives" of any kind to report it to their Commander.  Vol. I, Ch. 4 § V.6 (Internal Complaints).[16]

26.     Read in tandem, these provisions restrict all employees' options such that it is difficult, if not impossible, to break out of the chain of command.  Policies like PGPD's that require employees to report within the chain of command are ineffective because a supervisor may be the alleged offender, or may have a relationship with the alleged offender, thereby compromising the potential for objective and impartial investigation and determination of complaints.

27.     The Equal Employment Opportunity Commission also recommends that an employer "provide accessible points of contact for the initial complaint" and designate officials "outside an employee's chain of command" as the recipient of complaints, in order to ensure that complaints are handled in an impartial manner.[17]  Consistent with this guidance, the Model Policy on Harassment, Discrimination, and Unprofessional Conduct put forth by the IACP ("IACP Model Policy") provides that complainants may report either to a supervisor or to the

---

[16] General Order, Vol. I, Ch. 4 § V.6 (Complaints: Internal Complaints).
[17]  EEOC, Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

13

Office of Professional Responsibility.[18]  Following this guidance, the Chicago

Police Department's Equal Employment Opportunity Policy specifically excludes

discrimination or harassment complaints from up the chain of command.[19]  The

Maricopa County Sherriff's Department[20] policy advises employees who do not

feel comfortable reporting to the chain of command that they have a duty to report

directly to other parties, including Human Resources, the Compliance Bureau

Chief, or the Professional Standards Bureau.[21]

28.     Second, PGPD's Policies contain an ineffective investigation and

resolution process.  The PGPD Policies do not provide for a mechanism for

effective and timely investigation of discrimination and harassment complaints.

EEOC guidance requires employers to engage in a "prompt, thorough and

impartial investigation" into an alleged complaint, including, if necessary, a

detailed fact-finding.  In cases in which the harasser does not deny the accusations,

---

[18] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy, Harassment, Discrimination, and Unprofessional Conduct § V.C (2) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

[19] Chicago Police Department, Equal Employment Opportunity Policy (August 22, 2017) at IV (B)(1)(a) http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

[20] The Maricopa County Sheriff's Office has been the subject of multiple discrimination lawsuits and Department of Justice consent decrees. This policy was adopted over three years after the consent decree.

[21] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), pages 5-6, §§ 5(c )(1), 5(c )(2), 5(c )(5), https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

14

the EEOC recommends the immediate determination of appropriate corrective action.[22]

29.     The PGPD Discrimination & Harassment Policy provides for no investigative process if a report is made up the chain of command.  The Policy is silent on what, if anything, a Commander must do upon receipt of a complaint.

30.     The PGPD Discrimination & Harassment Policy provides that if the Department's EEO Coordinator, the Deputy Chief of Bureau Administration and Homeland Security, receives a complaint, the Coordinator may "handle informally" the complaint, issue a "final determination," or simply refer it back to the chain of command for "mediation."  Vol. I, Ch. 12 § V.3 (Complaint Procedures).[23]  None of these options contemplates a thorough investigation. While the EEO Coordinator may also choose to "assign for investigation" the complaint, the Discrimination & Harassment Policy is silent on who will conduct that investigation, how, in what time frame, and how the investigation will be documented.  *Id*.  Although the Complaint Policy separately states that "abusive language" and "harassment" must be investigated by the Internal Affairs

---

[22] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.
[23] General Order, Vol. I, Ch. 12 § V.3 (Discrimination & Sexual Harassment: Complaint Procedures).

15

Department (IAD) of PGPD, Vol. I, Ch.4 § V.7 (Complaint Assignment),[24] and the EEO Coordinator could presumably use this provision to refer harassment complaints for investigation to IAD, the Policies contain no provisions stating that IAD is also responsible for investigation of discrimination complaints.  Indeed, there is evidence that the actual practice is that when internal complaints are discovered to be associated with an EEOC charge, the investigations are terminated and the cases closed.  Several examples are discussed below.[25]

31.     The IACP Model Policy, in contrast, directs that the Office of Professional Standards has responsibility for investigation of harassment and discrimination complaints.[26]  Similarly, the Maricopa County Sheriff's Office Policy and Procedures directs that discrimination and harassment complaints be "immediately" taken to the Professional Standards Bureau, which documents them in IAPro and conducts an investigation.[27]  The Chicago Police Department also states that the Bureau of Internal Affairs has "primary responsibility for conducting

---

[24] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).
[25]  See Paragraph 67.
[26] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy Harassment, Discrimination, and Unprofessional Conduct § V.C (6) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.
[27] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), pages 5-7, https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

a prompt and thorough investigation of complaints of employment discrimination."[28]

32.      In lieu of an effective investigation process by IAD, the PGPD Policies place a heavy, and inappropriate, emphasis on direct confrontation between complainants and alleged offenders.  The Policies encourage employees "to confront the offender and make it clear the offensive behavior must stop."  Vol. I. Ch. 12 § V.2 (Internal Complaints).[29]  Similarly, the Policies state that "[a]ttempts will be made" to address discrimination complaints in the first instance "by dialogue between the parties concerned."  *Id.*

33.      These provisions undermine an effective investigative process and may deter victims from coming forward.  Employees should feel no compulsion to resolve discrimination or harassment by themselves.  The Maricopa County Sheriff's Office Policy and Procedures, for example, explicitly states that "[a]n employee is not required to directly confront the offender who is alleged to have engaged in unlawful or wrongful conduct."[30]

---

[28] Chicago Police Department, Equal Employment Opportunity Policy (August 22, 2017) at § IV(B)(4)(a), http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

[29] General Order, Vol. I, Ch. 12 § V.2 (Discrimination & Sexual Harassment: Internal Complaints).

[30] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), page 5, § 5(C )(1), https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

34.     Third, PGPD's Policies lack appropriate confidentiality protections. According to the EEOC, an anti-harassment policy should contain, at bare minimum, an "[a]ssurance that the employer will protect the confidentiality of harassment complaints to the extent possible."[31]  The IACP Model Policy provides for such confidentiality.[32]  The PGPD Policies, however, fail to provide any assurance of confidentiality to would-be complainants.  At minimum, the lack of such fundamental protections can result in a chilling effect on would-be complainants; at worst, it can expose complainants to open hostility and retaliation.

35.     Fourth, PGPD's Policies fail to protect complainants from contacts with the suspected offender.  The EEOC provides that an employer may need to take intermediate measures pending the completion of an investigation, such as "scheduling changes so as to avoid contact between the parties; transferring the alleged harasser; or placing the alleged harasser on non-disciplinary leave with pay pending the conclusion of the investigation."[33]  The PGPD Policies contain no provisions allowing PGPD to take appropriate measures to protect complainants

---

[31] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.
[32] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy Harassment, Discrimination, and Unprofessional Conduct § V.C (7) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.
[33] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

from contact with alleged offenders during the investigation of a harassment or discrimination claim.  As a result, complainants may be forced to continue working alongside offenders, or worse, if the offenders are the complainants' supervisors, and potentially endure ongoing discrimination, hostility, or reprisal, while their complaint is adjudicated.

36.     Fifth, PGPD's Policies do not prohibit all unlawful forms of harassment and discrimination.  In particular, PGPD Policies do not protect employees from the full range of conduct that is unlawful under applicable law. An effective anti-harassment and anti-discrimination policy should prohibit discrimination and harassment based on sex, race, color, religion, national origin, age, disability, and protected activity.[34]

37.     The scope of PGPD's policies falls short in a number of ways. Notably, although PGPD prohibits sexual harassment, it does not prohibit harassment based on other protected characteristics, including racial harassment.[35] Relatedly, PGPD's policies do not contain clear anti-discrimination provisions. The Discrimination & Harassment Policy lacks a clear statement that the

---

[34] EEOC, Enforcement Guidance: Vicarious Liability for Unlawful harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.
[35] EEOC Compliance Manual, Section 15: Race and Color Discrimination, § 15-VII (A)(racial harassment) (April 19, 2006), https://www.eeoc.gov/policy/docs/race-color.html.

Department as a whole prohibits unlawful discrimination and harassment by all employees.

38.     The Discrimination & Sexual Harassment Policy also lacks a plain, easily comprehensible prohibition on different treatment in the terms, conditions, and privileges of employment because of an individual's protected characteristic. Instead, the definition section of the Policy is hard to follow.  It differentiates between "arbitrary discrimination" and "personal discrimination,"[36] which are not terms used in either guidance by the EEOC or the policies of other Police Departments that I have reviewed.  "Arbitrary discrimination" is defined in part by reference to other defined terms, while "personal discrimination" is defined as deprivation of "a right," without explanation of what rights may be applicable in the context of employment.  The other terms in the definition section, including "prejudice," "racism," "disparaging terms," and "stereotyping," do little to clarify what kind of activity is prohibited.

39.     The policies of other police departments contain clearer and more effective prohibitions on harassment and discrimination.  The IACP Model Policy defines discrimination as "[u]nfair or unequal treatment of an individual or group

---

[36] General Order, Vol. I, Ch. 12 § III (Discrimination & Sexual Harassment: Definitions).

based on protected class status."[37]  The Chicago Police Department clearly states

that "City and Department policies prohibit discrimination against employees" on

various bases.[38]  The 2019 Maricopa County Sheriff's Office Policy and

Procedures "prohibits unlawful discrimination and harassment based on an

individual's membership in a category protected by federal or state law."[39]  It

further defines discrimination as different treatment in the terms and conditions of

employment based on a protected characteristic, and proscribes all unlawful forms

of harassment, not just sexual harassment.[40]

  40.  Finally, PGPD's policies are deficient in their protections for officers

who raise complaints of misconduct by other officers.  Vol. I, Ch. 4 § V.6[41] states

that "Any employee who becomes aware of unlawful conduct or a violation of

written directives shall report it to the involved employee's Commander/Manager.

---

[37] International Association of Chiefs of Police Law Enforcement Policy Center, Model Policy Harassment, Discrimination, and Unprofessional Conduct § III (definitions) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

[38] Chicago Police Department, Equal Employment Opportunity Policy (August 22, 2017) at II, http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

[39] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), page 1, https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

[40] Maricopa County Sheriff's Office Policy and Procedures, Workplace Professionalism: Discrimination and Harassment (Jan 24, 2019), page 2, https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

[41] General Order, Vol. I, Ch. 4 § V.6 (Complaints: Internal Complaints).

In confidential matters, reports may be made directly to the Commander, IAD."

This policy does not define what a "confidential matter" is.  Nor does it provide

any direction for employees who have reason not to report up the chain of

command, such as EEO issues or complaints against a supervisor.  In addition,

nothing in the policies imposes any requirement that the IAD Commander

investigate the complaint or honor the confidentiality request.  The policy should

give the option for all officers to report misconduct to the Internal Affairs Division,

with the assurances that the complaint be thoroughly investigated and its

confidentiality maintained.

41.    The anti-retaliation provisions contained in Vol. I. Ch. 4 § V.9[42] also

do not do enough to protect officers who report misconduct.  The policy states that

retaliation is prohibited, that the officer against whom allegations were made shall

not have contact with the complainant and witness, and that "[t]he same standards

of conduct shall apply when officers are witnesses or complainants."  The Policy

then focuses on the need to call supervisors to the scene when a citizen

complainant interacts with an officer under investigation.  The protection for

officer complainants should be placed in a separate section of the policy to

---

[42] General Order, Vol. I, Ch. 4 § V.9 (Complaints: Retaliatory Acts Against Complainants
Prohibited).

emphasize the importance of protecting officers who make good faith

complainants about misconduct.  Similar to the anti-discrimination policy, there is

no mechanism for complainants to be removed from working with or under the

supervision about whom they have complained.  There is also no mechanism to

report retaliation or investigate allegations that retaliation has occurred.

42.     Despite the many complaints of incidents of racial discrimination,

harassment, and retaliation within the Department,[43] the Department's EEO

Coordinators made little effort to ensure officers understood their obligations under

the existing policies or to promote anti-discrimination or anti-retaliation efforts

within the Department.  In their depositions, the three last EEO Coordinators

described their the anti-discrimination and anti-retaliation efforts  as limited to

"ensuring the EEO posters were posted around the Department," sending "out

quarterly e-mails referenc[ing] how to file an EEO complaint [and with] general

information on the EEO."[44] The current EEO Coordinator also testified (as the

County's 30(b)(6) witness) that "supervisors are required to attend EEO training"

and "the general orders has annual in-service training provided to officers which

---

[43] *See, e.g.*, infra ¶¶ 66-68.
[44] Grant Dep. Tr. 35:12-37:19; *see also* Harvin Dep. Tr. 52:5-53:14; 152:1-11; Powell Dep. Tr. 25:3-26:10.

state our policy on ensuring that all district commands are free of

discrimination."[45]

43.    I have also reviewed a printed copy "Prince George's County Police

Department Supervisors and Managers Equal Employment Opportunity (EEO)

Training," which is a Power Point that appears to be primarily presented through a

DVD presentation.[46]  I understand that this was the only training materials

submitted by PGPD to the Department of Justice in response to a request for

training materials regarding discrimination or harassment, and that Defendants

have not produced substantially different anti-discrimination training materials in

discovery in this matter.  PGPD's training on employment discrimination is

deficient.  For example:

- While the training provides examples of sexual harassment, it does

  not explain that a hostile work environment is unlawful when

  based on any protected category, including race.  It would be

  important to have modules on how racial slurs and jokes are

  harmful and unlawful.

---

[45] Harvin Dep. Tr. 51:8-53:2.
[46] PG0000000348-394; PG0000000395-441.

- The training contains minimal discussion of retaliation, and no discussion of steps supervisors should take to discourage, prevent, or report retaliation.[47]

- The policy also fails to accurately advise recipients on a number of critical issues.  For example, it is misleading as to the deadlines for filing a charge of discrimination, in that it does not make clear that internal reporting of discrimination does not toll deadlines to file an external complaint or charge.[48]

- The training also ignores key protections under Maryland state law, including accommodation for pregnant employees and prohibitions on discrimination on the basis of sexual orientation, gender identity, and marital status.  Md. Code State. Gov. § 20-606.

44.     Based on the materials produced by Defendants, I have other significant questions about PGPD's anti-discrimination training:

- Who receives the training?  Is training given to new recruits?  Is training given to rank-and-file officers?  The presentation title of

---

[47] PG0000000348-394 at 363.
[48] PG0000000348-394 at 383.

the training Power Point indicates that the intended audience is limited to supervisors (which is consistent with internal emails and some of the training sign-in sheets Defendants have produced).[49] This is also consistent with the testimony of the current EEO Coordinator, who testified (as the County's designated representative) that "[a]ll supervisors are required to attend EEO training," "[t]here's training provided to both commanders and managers," Commanders are "responsible for ensuring that all supervisors attend annual in-service training," and "there is no formal training for the rank-and-file."[50]  PGPD has produced records indicating that only a small percentage of rank-and-file officers received this training,[51] which is consistent with internal emails and testimony indicating the training is limited to supervisors.[52]  All members of the Department should receive anti-discrimination training.  Indeed, the Power Point includes language

---

[49] PG0000154901-902; PG0000966820-966830.

[50] Harvin Dep. Tr. 52;22-23, 55:25-56:1, 74:18-24; 188:5-6.  *See also* Harvin Tr. 93:19-20 ("EEO training is provided to all supervisors and commanders"); 97:25-98:2 ("each officer the rank of sergeant and above attends EEO training as a sergeant").

[51] PG0000968917-33; PG0000968914-16; PG0000969037-042; PG0000966820-30; PG PG0000969165-75; PG0000969221-23; PG0000969043-45; PG0000969743-50; PG0000969751-61; PG0000969762-77; PG0000969224-31; PG0000968965-79.

[52] PG0000154901-902; PG0000658090-658091.

that supervisors should "Ensure that all employees have attended
the mandatory Workplace Harassment Training (WHAT) during
New Employee Orientation."[53]  But the current EEO Coordinator
acknowledged there was no training for rank-and-file officers but
he planned to commence such training for new police officers at
"the start of being hired as a police officer" starting in July 2020.[54]
Defendants have not produced any materials in discovery
indicating that this effort has actually commenced.

- How often is training given?  When asked that question, former
  Deputy Chief Raphael Grant, the former EEO Coordinator, could
  not say.[55]  Neither could former Deputy Chief Melvin Powell, who
  served as EEO Coordinator after Grant.[56]  The records produced by
  Defendants indicate that training was given sporadically, and in
  many years, few officers attended.  The sign-in sheets produced in
  discovery reflect that only:

  i.  53 officers attended EEO training in 2014 (all supervisors),

---

[53] PG0000000348-394 at 370.
[54] Harvin Dep. Tr. 188:5-15.
[55] Grant Dep. Tr. 76:25-77-19, 81:18-81:24.
[56] Powell Dep. Tr. 25:16-22, 26:7-10.

    ii.  63 officers attended the EEO training in 2015 (all supervisors);

    iii.  235 officers attended the EEO training in 2016 (all supervisors);

    iv.  633 officers attended the EEO training in 2017, the majority after the Department learned the Justice Department was conducting an investigation;

    v.  no officers attended EEO training in 2018;

    vi.  68 officers attended EEO training in 2019 (all supervisors), and

    vii.  251 supervisors have attended EEO training at "administrative school" in 2020.[57]

- How often are officers required to attend EEO training?  The current EEO Coordinator testified that supervisors received EEO training in "supervisor school" which "is attended once," and Commanders received EEO training in "administrative school,"

---

[57] PG0000968917-33; PG0000968914-16; PG0000969037-042; PG0000966820-30; PG PG0000969165-75; PG0000969221-23; PG0000969043-45; PG0000969743-50; PG0000969751-61; PG0000969762-77; PG0000969224-31; PG0000968965-79.

which is also attended once.[58]  Anti-discrimination training should be given at least annually.

- Is training conducted live and is an instructor present for the training?  The current EEO Coordinator testified that "historically it's been live," but acknowledged that "there are some occasions of when . . . they do offer the video."[59]  While the EEO Coordinator testified that video viewing is supposed to be done "in a classroom" supervised by an instructor, he could not say whether that was "always the case."[60]  In at least one instance, supervisors were directed to the clerk's office to check out a DVD by signing it out.[61]  How did the Department confirm that these individuals actually viewed the DVD?  The Power Point contains several hypothetical questions that present scenarios and ask the viewer to determine whether the conduct constitutes harassment; but the written answer is given immediately following the question.  If there is no instructor present, how is the viewer supposed to

---

[58] Harvin Dep. Tr. 179:22-180:12.
[59] Harvin Dep. Tr. 179:3-11.
[60] Harvin Dep. Tr. 190:23-191:11.
[61] PG0000154901-154902.

discuss the scenario or ask any questions?  The DVD is a training aid, designed as a support for a subject matter expert's presentation, not a substitution.  A qualified instructor should present this information live in a format that allows interaction.

- Does the Department do anything to ensure that viewers actually and accurately understand the training?  The Power Point presentation is not interactive and does not test to ensure the viewer understands the information.  The Department has recently produced a draft "quiz" in discovery, but the questions are limited to questions about sexual harassment (i.e., they do not test comprehension about other types of discrimination or retaliation) and contain questions about North Carolina rather than Maryland law; the Department has produced no evidence the quiz was ever administered.[62]  And during his testimony, the current EEO Coordinator testified that he was "not aware of any quiz" or any other written evaluation of comprehension of the EEO training or discrimination.[63]  Testing is important because it confirms the

---

[62] PG0000967475-967476.
[63] Harvin Dep. Tr. 193:2-193:11, 195:5-19.

viewer understands the information, and would allow the
Department to identify supervisors who score poorly for remedial
training.  The Department does not appear to do anything beyond
confirming officers signed a sign-in sheet.

45.    In sum, while I have a number of open questions, there appear to be
significant flaws in PGPD's anti-discrimination and anti-retaliation policies and
training related to such policies.

## B.    The Department Does Not Enforce Critical Components of Its Anti-Discrimination, Anti-Harassment, and Anti-Retaliation Policies

46.    The Department made almost no effort to ensure that the
Department's anti-discrimination, anti-harassment, and anti-retaliation policies
were enforced.  Of note, the Department never conducted any audit, survey,
assessment or review during Chief Stawinski's tenure to determine whether its
commands were free from racial harassment or discrimination.[64]

47.    Rather, the task of enforcing the anti-discrimination, anti-harassment,
and anti-retaliation policies was left exclusively to his Deputy Chiefs, specifically
EEO Coordinator Raphael Grant and his successors, Deputy Chiefs Melvin Powell

---

[64] Stawinski Dep. Tr. 87:4-90:11; Harvin Dep. Tr. 83:3-8.

and Robert Harvin.[65]  Their testimony, however, confirms that measures to ensure these anti-discrimination and anti-retaliation policies were enforced were minimal. For instance, former Deputy Chief and EEO Coordinator Raphael Grant testified his only actions to ensure the Department was free from discrimination were limited to "ensuring that the EEO posters were posted around the Department," and sending "out quarterly e-mails [that] reference how to ifle an EEO complaint."[66]  In fact, Deputy Chief Grant testified that the only thing he himself did to ensure that commanders or managers strictly enforced the discrimination policy promptly and appropriately was to attend the Academy-run trainings himself.[67]  During Deputy Chief Robert Harvin's tenure as EEO Coordinator, he testified that his efforts to enforce his anti-discrimination policies were limited to sending quarterly emails and providing the EEO training, which (for the reasons described above) were not adequate.[68]

48.    The Department's failure to enforce its anti-discrimination and anti-harassment policies is reflected by the lack of consequences for officers who fail to adhere to these policies.  For instance, during Chief Stawinski's tenure, despite numerous instances of racist or discriminatory conduct on the force (discussed

---

[65] Stawinski Dep. Tr. 87:4-90:11.
[66] Grant Dep. Tr. 35:19-22, 35:25-36:1.
[67] Grant Dep. Tr. 46:5-17.
[68] Harvin Dep. Tr. 52:5-53:14; 152:1-11; *see also* Powell Dep. Tr. 25:3-26:10.

below) the Department never relieved any Commander or Manager of their command for failing to ensure their command was free from harassment or discrimination.[69]  Nor was any Commander or Manager ever disciplined for failing to ensure that their command was free from harassment or discrimination during Chief Stawinski's tenure.[70]

49.    Moreover, during Chief Stawinski's tenure, no supervisor was investigated for failing to ensure that their command was free from harassment or discrimination.[71]  Nor had any supervisor been disciplined during Chief Stawinski's tenure for failing to take prompt and appropriate corrective action when they were made aware of conduct that may be interpreted as discrimination or harassment.[72]

50.    It was the Department's practice that complaints of racial harassment or discrimination were not investigated by Internal Affairs if the complainant filed a charge or complaint with the Equal Employment Opportunity Commission.[73] The Department's 30(b)(6) witness for Internal Affairs Division matters testified that if a complaint related to discrimination or harassment was received by Internal

---

[69] Stawinski Dep. Tr. 91:14-25, 94:24-95:6; Velez Dep. Tr. 173:9-13; Grant Dep. Tr. 44:24-45:3.
[70] Stawinski Dep. Tr. 93:3-13; Velez Dep. Tr. 173:15-20; Grant Dep. Tr. 44:19-23.
[71] Stawinski Dep. Tr. 93:3-13; Velez Dep. Tr. 173:15-20; Grant Dep. Tr. 44:19-23.
[72] Stawinski Dep. Tr. 93:14-94:4; Grant Dep. Tr. 46:5-49:16.
[73] McCreary Dep. Tr. 42:17-43:7.

Affairs, that complaint is sent to the EEO Coordinator, who "makes the determination on whether it falls within the realm of an EEOC complaint."[74]  If the EEO Coordinator determines that the complaint "falls within the realm of an EEOC complaint," then the complaint "would remain with the EEOC coordinator" and no parallel Internal Affairs Division investigation would be conducted.[75]  This policy treats officers who file EEO complaints differently than officers who file all other types of complaints, which are investigated by IAD on the basis of the allegations.  It makes no sense to stop an investigation merely because the officer indicates they have or intend to file a charge with the EEOC—all complaints should be evaluated for merit, and if the complaint has merit, it should be investigated.  It also makes no sense that, by policy, a minority civilian's discrimination or harassment complaint would be investigated by IAD, but a similar complaint from a minority police officer, by an unwritten policy, would not.

     51.    The Department similarly failed to enforce adequately its anti-retaliation policies.  As confirmed by several command staff, including Chief Stawinski and Acting Chief Velez, the Department never conducted any audit,

---

[74] McCreary Dep. Tr. 42:22-24.
[75] McCreary Dep. Tr. 43:3-7.

survey assessment or review to determine whether retaliatory acts against complainants or witnesses had occurred.[76]

52.     Department leadership similarly could not identify a single instance in which a supervisor, commander, or manager was ever investigated, terminated, or disciplined for failure to enforce the provision of the Department's anti-retaliation policy, or the Department's "no contact" policy that the officer against whom allegations were made shall not have contact with the complainant and witness.[77] Nor could they identify any supervisor, commander, or manager lost their command for failure to enforce the "no-contact" policy during Chief Stawinski's tenure.[78]  Witnesses similarly testified that during Chief Stawinski's tenure, no officer was ever investigated[79] or disciplined[80]  for engaging in retaliatory acts against complainants or witnesses.

## C.     The Department Does Not Treat Complaints About Racial Harassment or Discrimination Appropriately

53.      It is the responsibility of the Prince George's County Police Department to treat allegations of racial discrimination and harassment seriously.

---

[76] McCreary Dep. Tr. 182:5-25; Velez Dep. Tr. 146:20-148:13; Stawinski Dep. Tr. 52:22-53:23.
[77] Stawinski Dep. Tr. 57:8-58:19; Velez Dep. Tr. 155:7-156:1.
[78] Stawinski Dep. Tr. 57:13-17; Velez Dep. Tr. 155:12-16.
[79] Stawinski Dep. Tr. 54:21-55:21; Velez Dep. Tr. 147:10-152:4; McCreary Dep. Tr. 183:15-184:25; Grant Dep. Tr. 50:8-51:1; Mills Dep. Tr. 32:22-33:18; ; Powell Dep. Tr. 54:21-55:2.
[80] Stawinski Dep. Tr. 52:24-54:20; Velez Dep. Tr. 147:10-152:4; McCreary Dep. Tr. 183:15-184:25; Grant Dep. Tr. 50:8-51:1; Mills Dep. Tr. 31:20-32:21; Powell Dep. Tr. 54:15-17.

When allegations of discriminatory conduct by a law enforcement officer are presented, they should be investigated and violations should be disciplined appropriately.

54.     The Department has certain policies that speak to issues of racial discrimination and harassment.  As noted above, the Department has General Order Volume I, Chapter 12,[81] which is its general policy that addresses racial discrimination and harassment.

55.     In addition, the Department has certain specific policies regarding the investigation and discipline of racial discrimination and harassment.  For example:

> a.  General Order Volume I, Chapter 4 concerns "complaints," and covers both internal and external complaints.  Chapter 4 Paragraph V.7 states that certain types of serious complaints, including "use of force, abusive language, harassment . . . must be investigated by IAD." [82]
>
> b.  General Order Volume I, Chapter 4 Paragraph V.10[83] concerns complaints of "bias-based profiling" and states that "Officers are prohibited from using bias-based profiling."  That section also

---

[81] General Order, Vol. I, Ch. 12 (Discrimination & Sexual Harassment).
[82] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).
[83] General Order, Vol. I, Ch. 4 § V.10 (Complaints: Bias-Based Profiling).

provides that there is to be "annual training" and "re-training on profiling," and that the "Commander, IAD, shall submit a monthly report to the Chief of Police that summarizes all complaints of profiling against Departmental employees" and "the Commander, IAD, shall conduct an annual analysis of complaints and investigations, and submit a report to the Chief of Police." *Id.*

c. General Order Volume I, Chapter 11[84] concerns "Discipline."  The Department has policies that treat certain types of serious complaints, such as use of "discriminatory language" or "excessive force" warrant the most severe "Category IV" discipline, which include reduction of rank, removal from the promotional cycle, suspensions exceeding 40 hours, and termination.

56.     There is also a significant inconsistency in Department policy concerning investigation of complaints of racial harassment and discrimination. While General Order Volume I, Chapter 4, Paragraph V.7[85] states that serious complaints (including harassment and abusive language) "must be investigated" by the Internal Affairs Division, another policy directs such complaints in the first

---

[84] General Order, Vol. I, Ch.11 (Discipline).
[85] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).

instance to be addressed by the employee's supervisor and through direct

confrontation:

> **2. Internal Complaints:**  Attempts will be made to settle
> discrimination complaints at the employee/supervisory level by
> dialogue between the Parties concerned . . .  When an employee
> observes behavior or finds a casual remark to be offensive, the
> employee is encouraged to confront the offender and make it clear
> that the offensive behavior must stop.  General Order, Vol. I, Ch.
> 12, § V.2.[86]

57.     Contrary to the Department's policies, based on my review of the

available evidence, complaints of racial discrimination and harassment are usually

not investigated at all.  As discussed below in paragraphs 67 and 68, the few

instances that Defendants have identified that were formally investigated have not

been adequately investigated.[87]  Moreover, former Chief Stawinski and other

witnesses testified that the Department's unwritten policy is that when complaints

of discrimination are discovered to be associated with an EEO charge, they will not

be investigated.[88]  Record evidence also indicates that if an investigation was

---

[86] General Order, Vol. I, Ch. 12 § V.2 (Discrimination & Sexual Harassment: Internal Complaints).
[87] The Defendants identified such a list of cases at PG0000001362-63.  In addition to these matters, I have independently reviewed to see whether the matters the Defendants have identified where EEOC charges were filed were also investigated by the Department.  These matters are discussed in paragraph 67 below.
[88] Harvin Dep. Tr. 145:11-146:13; Grant Dep. Tr. 76:16-77:2; Powell Dep. Tr. 59:8-15.

underway and the complainant files an EEO charge, the investigation is terminated and the cases closed.[89]  These matters are discussed below.

58.     The lack of investigation into complaints of racial discrimination and harassment is confirmed by the (i) examination of the Department's response to the Department of Justice, (ii) examination of the Department's response to formal charges of discrimination filed with the U.S. Equal Employment Opportunity Commission (EEOC), (iii) review of the Department's IAPro database, and (iv) specific incidents identified in the Complaint and by the Plaintiffs.

59.     In conjunction with responding to requests by the Department of Justice investigation to identify "[a]ny and all Internal Affairs investigative case files  . . . involving employment-related allegations including . . . discrimination, unfair treatment, disparate treatment, bias, harassment, race . . . retaliation, [and] hostile work environment," the Defendants identified a handful of investigations between 2013 and 2019 which involved a complaint that a white (or unknown) officer engaged in racist conduct.[90]

---

[89] Grant Dep. Tr. 76:16-77:2; Harvin Dep. Tr. 145:11-146:13; Powell Dep. Tr. 59:8-15; IA2015-092 (PG0000042371-42436 at 42391).

[90] PG0000001362-63; PG0000852473.  The Defendants' lists of such incidents also included several matters where a white officer filed a complaint, and three matters where a minority complainant does not appear to be alleging racist conduct.  IAQ2015-021 (████████████████);  IA2014-017 (██████████████); IA2018-012 (███████████████████).

60.     As discussed below, the evidence indicates that these investigations represent a small number of the incidents that were brought to the Department's attention.

61.     For example, in response to discovery requests, the Defendants have identified approximately 57 matters where a PGPD officer or employee filed a formal charge with the EEOC.[91]  Of these 57 charges, there is no record in the materials produced of any investigation (by Internal Affairs or by field command) for 49 of these.[92]  In other words, over 85 percent of complaints of discrimination or harassment did not result in a formal investigation.

62.     The Department's discrimination and harassment policy provides that in the event the supervisor cannot resolve the matter, employees have recourse to the Department's Equal Employment Opportunity Coordinator or Assistant Coordinator.  General Order, Vol. I, Ch. 12 § V.2-3.[93]  The same policy states that the EEO Coordinator and Assistant Coordinator are required to meet and discuss "a method of resolution with the employee," which methods of resolution include "investigation" and making a "final determination."  *Id.*  In response to discovery

---

[91] PG0000001364-1372; PG0000936765-93769.

[92] There is overlap between these cases and the cases the Department identified for the Department of Justice.  IA2015-092, IA2016-008, and IA2013-075 are on both lists.

[93] General Order, Vol. I, Ch. 12 § V.2-3 (Discrimination & Sexual Harassment: Internal Complaints, Complaint Procedures).

requests, I understand the Defendants have not identified any investigations or final determinations made by the EEO Coordinator or Assistant Coordinator, nor (with one exception) have they produced any document indicating that any such investigations or determinations were made.[94]  At his deposition, Deputy Chief Grant, who served as the EEO Coordinator, stated that he did not meet with the complainants or conduct an investigation if the complainant had filed an EEO charge, and that he only interviewed only a single complainant.[95]  Deputy Chiefs Harvin and Powell confirmed that this was their practice as EEO Coordinators as well.  Deputy Chief Powell confirmed that it was his practice as EEO Coordinator to not undertake a screening interview with a complainant if the case is associated with an EEO charge.[96]  Deputy Chief Powell could not point to any written policy providing that an EEO charge should preclude the Department's EEO Coordinator from conducting a parallel investigation,[97] while Deputy Chief Harvin attributed this policy to a directive from the County Law Office.[98]  I also understand that in

---

[94] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No 2; Prince George's County's Objections and Answers to Plaintiffs' Fourth Set of Interrogatories Nos. 10 & 11.  The sole exception produced in discovery is that ████████████

[95] Grant Dep. Tr. 76:25-77-19, 81:18-24.
[96] Powell Dep. Tr. 59:8-15.
[97] Powell Dep. Tr. 59:21-24.
[98] Harvin Dep. Tr. 142:9-19.

response to discovery requests, the Defendants have neither identified nor produced any instances where the EEO Coordinator or Assistant Coordinator referred an allegation of discrimination or harassment to IAD.[99]

63.    The IAPro database, as described below, also confirms that contrary to Department policy under General Order Volume I, Chapter 4, § V.7,[100] which states that certain types of serious complaints "must be investigated by IAD," there are a number of cases involving allegations of racial harassment, abusive language, use of force, and criminal misconduct that were left to the field command to investigate or were treated as "inquiries" and closed without investigation.  I have attached a schedule of these matters as Exhibit A.

64.    This policy violation and relegation of serious allegations of racist conduct to the field for investigation is consistent with what I have observed in the record, as well as information the plaintiffs have provided.  For example, the record indicates that in May 2017, IAD Commander Kathleen Mills was presented with two separate allegations of racial harassment by Sergeant ████████ made by officers under his direct supervision, Police Officer ████████████ and Corporal ████████████.[101]  These allegations followed several other complaints

---

[99] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No 3.
[100] General Order, Vol. I, Ch. 4 § V.7 (Complaints: Complaint Assignment).
[101] PG0000156074-156106 at 156075-077 and 156089-156101.

against Sgt. █████ for engaging in racist behavior (one of which was sustained),[102]

and HNLEA and UBPOA specifically brought to Chief Stawinski's attention on

May 8, 2017.[103]  Adhering to the Department's Complaint Policy regarding

harassment, these matters were ████████████████████████████████

████████████████████████████████████.  On May 16, 2017, in a

breach of Policy regarding Internal Complaints and confidentiality, ███████

███████████████████████████████████████████████████

██████████████████,[104] ████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████.[105]  There

are several notable aspects of this episode:

- At her deposition, Commander Mills ████████████████████

  ███████████████████████████████████████████████

  ███████████████████████████████████████████████

  ███████████████████████████.[106]  As senior Internal Affairs

---

[102] Compl. ¶ 61(b); IA2016-008 (PG0000043186-43284) and IA2016-034 (PG0000025286-25415).

[103] PG00000155747.

[104] PG0000156074-156106 at 156078 and 156102; Mills Dep. Tr. 354:4-356:10; Watkins Dep. Tr. 227:3-7.

[105] PG0000162779-162780.

[106] Mills Dep. Tr.  354:4-355:1; Watkins Dep. Tr. 233:24-8 , 235-20-236:8.

officers, both Major Mills and ████████████ should understand the Department's policies regarding investigation of harassment and discrimination complaints. ██████████████████

████████████████████████

███████████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

██████████████

- ███████████████████████

████████████████████

██████████████████████████

██████████[107]

- ██████████████████████████

██████████████████████

███████████████████████████

██████████████████████

---

[107] PG0000156074-156106 at 156078 and 156103.



- In violation of the Department's Discrimination and Sexual

  Harassment Policy, Commander Mills wrote to the complainants, "█

  ████████████████████████████████████████

  ████████████████████████████ █[109]

- ████████████████████████████████

  ██████████████████████████████████

  ████████████████████████████████████

  ██████████████████████ [110]

- There is no evidence in IAPro or the Internal Affairs investigative

  files produced by the Department that there was any investigation into

  Sgt. █████'s conduct concerning these complaints.  At his deposition,

  ████████████ confirmed ███████████████████████

  ████████████████████████████████████

  ██████████████ [111]

---

[108] PG0000000595-598 at 597.
[109] PG0000156074-156106 at 156078.
[110] IAD Standard Operating Procedures C1-C3, C5 & C8 (PG0000000497-530); Mills Dep. Tr. 357:9-12.
[111] ████████████████████████

- 

  [112]

  [113]

- There is no evidence that Sgt. ██████ was separated from the complainants or that he or other supervisors were admonished not to retaliate.  Rather, as discussed below in paragraph 144, both Officers ██████ and ██████ experienced retaliatory transfers after filing their complaints.

---

[112] PG0000165875-165876 at 165875; Mills Dep. Tr. 355:13-22.
[113] PG0000168875-168876 at 168875; PG000180150 (██████████████████).

65.     It is not clear how many other such complaints came to Commander
Mills' attention and were dealt with in a similar fashion.  It is notable, however,
that several of the incidents identified by the Department to the Department of
Justice were similarly referred to the field and handled by field supervisors.[114]

66.     The Plaintiffs have identified a number of other incidents in their
complaint and discovery responses where no investigation appears to have been
conducted.  For each of the following matters, there is no indication in the IAPro
database or the Internal Affairs files produced by Defendants that there has been
any investigation into the following matters:

> a.  During a recruiting meeting in December 2016 to discuss new
>     applicants, Major ▮▮▮▮▮▮ made a derogatory comment about
>     Nigerian-Americans.  Although Lieutenant Thomas Boone
>     complained to several senior members of the Department,[115]  there
>     is no indication in IAPro or the Defendants' discovery responses
>     that this matter was investigated or Major ▮▮▮▮ was disciplined.
>     As discussed in more detail below, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>     ▮▮▮▮▮▮▮▮▮  As noted below in Paragraph 144, following the
>     lodging of his complaint, Lt. Boone was transferred.
>
> b.  In April 2016, a complaint was made regarding an offensive
>     personalized license plate by a Sergeant assigned to IAD
>     (Lieutenant Brian Selway), which was an acronym for "Go F***
>     Yourself Obama."  Although a complaint was made about this

---

[114] PG0000001362-1363.
[115] PG0000334331; Compl. ¶ 122.

matter,[116] there is no indication in IAPro or the Defendants'
discovery responses that this matter was investigated,



, and Chief Stawinski
indicated he was aware about the incident during a press
conference.[118]  There is no evidence that Lt. Selway was
investigated or disciplined over this matter.[119]

c.  During a community K-9 demonstration to a group of students, a
white corporal (⬛⬛⬛⬛⬛) said "if a black bad guy is running
and he drops a cell phone or he drops this piece of leather that may
have evidence or DNA on it, or he fired a gun and it may have that
shell there."[120]  There were multiple civilian complaints about this
incident.  Major Mills and Captain Watkins were both aware of
these citizen complaints, and Major Mills directed Captain
Watkins to maintain a file with all citizen complaints related to this
incident, which does not appear to have been produced in
discovery.[121] The incident was captured on video, Chief Stawinski
publicly apologized for the incident, and the incident was
broadcast on local news, but there is no indication in IAPro or the
Defendants' discovery responses that Corporal ⬛⬛⬛⬛⬛ was

---

[116] Compl. ¶ 61(d); PG0000020673-20697 at 20676; PG0000169720-169725.

[117] PG000020673-20697 at 20694.

[118] *See* https://pgpolice.blogspot.com/2017/02/todays-full-length-press-conference.html (at 07:06).

[119] *See* Defendant Prince George County's Objections and Answers to Plaintiff United Black Police Officers Association's First Set of Interrogatories No. 7.

[120] PG00000171860-171867; Compl. ¶ 253.

[121] Mills Dep. Tr. 73:6-14; Watkins Dep. Tr. 202:6-8, 205:12-206:15.

investigated or disciplined.[122]  At her deposition, Major Mills confirmed that Internal Affairs did not investigate that incident.[123]

d.  In June 2015, a white officer  posted, in the Homicide Unit of the Criminal Investigation Division, derogatory images of Major ████ ████, a senior Hispanic officer in the Department, including images where he was given "googly" eyes and another where he was depicted as a voodoo doll, and accompanied by captions making light of his ethnicity (



).[124]

[125]

[126]

[127]

[128]

[122]  PG00000084440-84446 at 84441 and 84446; PG0000431462-431463; Defendant Prince George County's Objections and Answers to Plaintiff United Black Police Officers Association's First Set of Interrogatories No. 7; Lorenzo Hall, *Chief apologizes after 'bad black guy' example used by Md. Officer teaching kids about K-9s* (Aug. 18, 2018), https://www.wusa9.com/article/news/local/maryland/chief-apologizes-after-black-bad-guy-example-used-by-md-officer-teaching-kids-about-k-9s/65-588570746.
[123] Mills Dep. Tr. 70:16-19.
[124] PG00000972106; Compl. ¶ 61(c); Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 1, at 21, 27; PG0000166349-166350; PG0000166322-166323.
[125] PG00000972106.
[126] PG00000972106.
[127] PG00000972107.
[128] PG00000972107.

██████████████████████████████████████████████
██████████████████████████████,"[129]

e. In 2016, Lieutenant Scott Finn made a derisive comment about "Black lives matter" activists and was quoted in the Washington Post and New York Times.[130]  Although this statement was the subject of a complaint and Lt. Finn was the subject of other complaints for ████████████,[131] there is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated or Lt. Finn was disciplined.

f. Corporal Steven Jones made a series of negative comments about Black civilians and officers, including that "at least slaves had food and a place to live" referring to President Obama as a "coon," and referring to a black officer as a "signal 7."[132]  Cpl. Jones also defended the Ku Klux Klan and equated the Black Lives Matter Movement with the Ku Klux Klan.[133]  Cpl. Jones was the subject of complaints made to Major Misty Mints (who advised that she did not want to hear about discrimination), Lieutenant Thomas Calmon (who denied a request for a meeting to discuss the complaint), as well as the EEO Coordinator (who acknowledged the complaint but did not schedule a meeting with the complainant).[134] There is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated or Cpl. Jones was disciplined.

---

[129] PG00000972107.

[130] Compl. ¶ 61(g); *see also* Radley Balko, Washington Post, *Scott Finn, model cop for a model police department* (July 27, 2016), https://www.washingtonpost.com/news/the-watch/wp/2016/07/27/scott-finn-model-cop-for-a-model-police-department/; The New York Times, *One Police Shift: Patrolling an Anxious America* (July 23, 2016), https://www.nytimes.com/2016/07/24/us/police-ridealongs.html.

[131] IA2004-017 (PG0000783482-783871); IA2014-069 (PG0000113804-113898).  Lt. Finn also had recent complaints for ███████. IA2014-006 (PG0000045906-46095); IA2014-100 (PG0000046241-46302).

[132] Declaration of Chris Smith ¶¶ 6-17.

[133] Declaration of Chris Smith ¶¶ 6-17.

[134] Compl. ¶ 61(f); Declaration of Chris Smith ¶¶ 6-17; PG0000254415-254416.

    g. In response to a communication to the Department announcing the establishment of the United Black Police Officers Association in August 2016, numerous senior white officers, including Lt. Finn and Major Crandall Weaver, sent derogatory responses.[135]  There is no indication in IAPro that any of these officers were  ever investigated.[136]

67.    The Plaintiffs have also identified a number of other instances where, although an investigation was opened, the investigation was inadequate. This includes the few cases where an EEOC charge was filed that were investigated by IAD.  Notably, four of these cases were administratively closed, one was handled as a field inquiry, and the remaining two failed to consider the pendency of other related charges against the respondent.  Specifically:

    a. **Miller/**███ :  Corporal Sean G. Miller filed an EEO charge alleging ███████ from Sgt. ██████ (EEO Charge No. 531-2016-01761).[137]  There was a related IA investigation (IA2016-034) of Sgt. ███ based on the complaint filed by Cpl. Miller alleging that Sgt. ███ (1) used the word "nigga" multiple times in reading a text message that was part of an evidence of investigation, (2) asked to see a picture of Cpl. Miller's fiancée and upon finding out that she was Mexican-American, commenting she was cheating "cuz that's what they [Latinos] do" and that "███████████████████" and (3) said in March 2016 "█████████████"[138]  Sgt. ██████ was exonerated of a ██████, and his ████████ charges were non-sustained. From my review of the file, the investigator did not appear to consider that other similar charges had been brought against Sgt.

[135] *See, e.g.*, PG0000111973 and  PG0000111979.
[136] Defendant PG County's Plaintiff UBPOA's First Set of Interrogatories No. 7.
[137] Compl. ¶ 61(b); PG0000002232-2270.
[138] IA2016-034 (PG0000042437-42543) at 42453, 42479, 42483; PG00000104392.

██████, nor was there inquiry into whether Sgt. ██████ engaged in other discriminatory conduct.

b.  ██████████████: Sergeant ████████████ filed an EEO charge alleging retaliation and discrimination based on race from Sergeant ████████████ (EEO Charge No. 531-2012-02186C).[139] IAPro indicates there was a related IA investigation (IA2012-063)[140] based on the complaint filed by Sgt. ████████ alleging that (1) ████████████████████████████████████████████ (2) ████████████████████████████████████████████, and (3) ████████████████████████████. Specifically, Sgt. ████████ complained ████████████████████████████████████████████[141] The IAD Investigation was administratively closed without finding.[142] ████████████████████████████████████████████ ██████████[143] I understand the Department has not produced this file in discovery.

c.  ██████████████: Corporal ████████████████ filed an EEO complaint alleging disparate treatment from Sgt. ████████ (discussed above) relating to disciplinary action (EEO Charge No. 531-2014-00065C).[144] Cpl. ████████ also filed an IA complaint (IA2013-075)[145] against Sgt. ████████ alleging that Sgt. ████████████████████████████████████████████ Sgt. ██████ ████████████████████████████████████████████; IAD should have taken into account that Sgt. ████████ was the subject of a prior complaint. ████████████████[146] ██████████████████████████████████████.



---

[139] PG0000001968-2028 at 1968.
[140] IAPro Entry for IA2012-063 (file not produced).
[141] PG0000001968-2028 at 1968.
[142] IAPro Entry for IA2012-063 (file not produced).
[143] PG000001968-2028 at 1970-73.
[144] PG0000002223-2270 at 2223-2230.
[145] IA2013-075 (PG0000041479-41834).
[146] PG0000002223-2270 at 2226-2228.

███████ the file does not reflect that there was any consideration that Sgt. ██████ had been accused of discriminatory conduct in another matter.[147]

d. **Sharpe/** ████████████████████████ (IA2015-092):  POFC Earl E. Sharpe, Jr. filed two separate EEO charges regarding the conditions at the ██████ unit.  POFC Sharpe alleged race discrimination and retaliation in the first charge (531-2016-00712), and alleged race discrimination in the second charge (531-2017-01180).[148]  There was a related IA investigation (IA2015-092), which commenced after IAD received an anonymous complaint about a pervasive racially hostile environment in the ███ unit, which was under the command of Lieutenant ██████████, and concerned allegations about discriminatory conduct by Sgt. ██████ and Detective Corporal ████████.[149]  The IAD investigator interviewed ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████[150] ████████████████ ████████████████████████████ IAD administratively closed the matter.[151]  Materials produced in discovery reflect that POFC Sharpe ████████████████████████████████████ ████████████████████████████████████████ █████████████[152]

e. ██████████████: ████████████████████████████ ████████████████, filed an EEO chare alleging harassment and intimidation from Sergeant ██████████ based on national origin (EEO Charge No. 531-2013-01057).  IAPro indicates there

---

[147] PG0000002223-2270 at 2223-2230.
[148] PG0000157216 and PG0000657800.
[149] Compl. ¶ 61(b); IA2015-092 (PG0000042371-42436 at 42378).
[150] IA2015-092 (PG0000042371-42436 at 42418-20).
[151] IA2015-092 (PG0000042371-42436 at 42391).
[152] PG0000658128-658130.

was a related IA investigation (IA2013-029)[153] of Sgt. █████
based on a complaint filed by Cpl. ██████ alleging that Sgt.
███████ █████████ (IA2013-029). Sgt. ████████ was charged with
█████████████, which was found to be unfounded. I
understand the Department has not produced this file in discovery.

f. ████████: Civilian Employee ████████████ filed an EEO
charge alleging ████████████████████████
█████ (EEO Charge No. 531-2017-00157). There was a
related IA investigation (IA2016-071)[154] of ████ based on a
complaint alleging ████████████████████
████████████ (IA2016-071). The investigation was
administratively closed.

g. **Chambers/**████: Police Officer Sharon L. Chambers filed an
EEO charge alleging discrimination from Sergeant ████████
████ (EEO Charge No. 531-2019-00277).[155] PO Chambers
alleged that Sgt. ██████ (1) called her a "Sig 7," which is a
Department code for a suspicious person and a derogatory term
when used to question an officer's integrity, (2) called her a
disgrace to the police department, and (3) singled her out for
discipline. PO Chambers specifically noted that Lieutenant ████
████ and others in the station were notified of Sgt. ██████'s
conduct, and apparently did nothing. Although this matter was
subsequently brought to the attention of IAD during the course of
another investigation,[156] Commander Mills ████████████



---

[153] PG0000001798████; IAPro Entry for IA2013-029 (file not produced).
[154] PG0000158497; IA2016-071 (PGIAD0000088985-89011).
[155] PGPD-CHA-0001334-1352 at 1352.
[156] FCIQ2018-068 (PG0000121755-121799 at 121782); Mills Dep. Tr. 310:18-311:1.
[157] FCIQ2018-068 (PG0000121755-121799); Mills Dep. Tr. 311:17-313:19.



; rather, Lt. ███████ closed the inquiry without any action taken against Sgt. ███████.[159]

68.     From my review, there are several other matters (in addition to those listed above) where the investigation was inadequate because the investigators did not pursue leads, did not make basic inquiries, and failed to conduct fair and complete investigations.  These are some examples of such matters:

   a.   **"Color Guard" Incident: (SI2017-008)**:  In February 2017, an unknown individual vandalized a locker in the Special Operations Division "Color Guard" by crossing out the word "Color" and writing "African-American."[160]



---

[158] Mills Dep. Tr. 310:13-313:13; Watkins Dep. Tr. 257:16-260:9.
[159] FCIQ2018-068 (PG0000121755-121799 at 121756).
[160] Compl. ¶ 61(i); SI2017-008 (PG0000024868-25099 at 24869).
[161] SI2017-008 (PG0000024868-25099 at 24869).
[162] SI2017-008 (PG0000024868-25099 at 24905).



The matter was administratively closed, and no one was disciplined, in spite of clear policy violations of failing to report discrimination and the failure of managers to keep their commands free from harassment and discrimination.



b. **"Training dummy" Incident (SI-2017-067)**: An unknown individual placed a picture of an African-American face and an Afro wig on a training dummy used to practice baton strikes. Pictures of the training dummy with hand-written words "black face" and "afro wig" were circulated within the Department.[166] The assigned investigator



---

[163] SI2017-008 (PG0000024868-25099 at 24873-74).
[164] Mills Dep. Tr. 272:11-275:15.
[165] PG00000183132; PG0000183205.
[166] Compl. ¶ 61(h); SI2017-067 (PG0000020698-21052 at 20705).



---

[167] SI2017-067 (PG0000020698-21052 at 20776).

[168] SI2017-067 (PG0000020698-21052 at 20776).

[169] SI2017-067 (PG0000020698-21052 at 20768-20769).

[170] SI2017-067 (PG0000020698-21052 at 20745, 20753); PG0000166342-166344.

[171] SI2017-067 (PG0000020698-21052).



[172]

Then- ████████████████████████████████████
████████████████████████
████████████████████████████████████████"[173]  But no one was
charged or ██████
[174]
████████████████████████████████████████████████
███████████████████████████
[175]

c.  **Sergeant** ████████████ **& Officer** ████████████████ **(IA2019-
058):**  In early 2017, Police Officer First Class (POFC) ██████
██████, Sergeant ████████████ and Sergeant ████████████ exchanged
racist text messages ████████████████ saying things like "we should bring back public

[172] SI2017-067 (PG0000020698-21052 at 20738-20740).
[173] M. Smith Dep. Tr. 91:4-7.
[174] SI2017-067 (PG0000020698-21052 at 20738).
[175] PG0000000595-598.

hangings," posting a picture of Adolph Hitler, and making misogynistic comments about female Black officers.[176]



[177]

d. **Sergeant ▮▮▮▮ (IA2016-034)**: Cpl. ▮▮▮▮ alleged that, among others, (i) during a robbery investigation on May 7, 2016, Sgt. ▮▮▮ read a suspect's text message putting emphasis on the suspect's use of the word "nigga" four times,[179] (ii) Sgt. ▮▮▮ asked to see a picture of Cpl. ▮▮▮'s fiancée on May 8, 2016, asked her nationality, and when he told Sgt. ▮▮▮ she was from Mexico, Sgt. ▮▮▮ said she was cheating on him "cuz that's what they [Latinos] do," that "▮▮▮▮▮▮▮▮▮▮," and [180] (iii) Sgt. ▮▮▮ said in March 2016 "▮▮▮▮▮▮,"[181] (iv) noted that Sgt. ▮▮▮ had a

---

[176] Compl. ¶ 61(e); PGPD-PER-0067207-67240 at 67219, PGPDPLS0000310-347 at 343-347.
[177] IA2019-058 (PG0000982700-982879 at 982871.
[178] IA2019-058 (PG0000982700-982879 at 982701-702.
[179] IA2016-034 (PG0000042437-42543 at 42458-42459).
[180] IA2016-034 (PG0000042437-42543 at 42458-42459, 42479).
[181] IA2016-034 (PG0000042437-42543 at 42453, 42459, 42483).



history of similar statements,[182] and (v) complained that Sgt. ███ had arranged for Cpl. ███'s transfer after he filed his complaint.[183]  The assigned investigator (Sergeant ██████████████████████████████████[184] ██████████████████████████████████ ███ Sgt. ███████ was exonerated of the ████████ charge and his ████ charges of █████████████ were found to be non-sustained.[185] No one was disciplined in the matter, in spite of clear policy violations of the Department's policies against discrimination and retaliation.[186]

**Corporal** ████████: Cpl. ████████ was the subject of ██ ██████████████████████████████████ that Cpl. █████████████████████[187]████████████████ ██████████████████████████████████ ██████████████[188] In none of these matters did the investigator consider the pattern of allegations against Cpl. ████ by African-American men; Cpl. ██████ had no similar complaints from white civilians.  None of these matters was sustained, and Cpl. ██████ was not disciplined in any way.  Cpl. ██████ has also been the subject of at least ██████████ ████ (all by

[182] IA2016-034 (PG0000042437-42543 at 42475, 42485 and 42490).
[183] IA2016-034 (PG0000042437-42543 at 42453 and 42491).
[184] IA2016-034 (PG000042437-42543 at 42533-34 and 42512).
[185] IA2016-034 (PG0000042437-42543 at 42440).
[186] IA2016-034 (PG0000042437-42543).
[187] *See* FC2013-031 ("████████████") (PG0000134164-134179 at 13176); IA2014-037 ("██████████████") (PG0000134984-135105 at 135033); IA2014-078 ("██████████████") (PG0000132332-132549 at 132372); IA2015-039 ("███████████████████") (PG0000123411-123533 at 123438); IA2015-067 ("████████████████") (PG0000134180-134270 at 134207); IA2017-008 ("██████████████") (PG0000133939-134162 at 133973).
[188] FC2013-031 (PG0000134164-134179 at 134167).

60

minority civilians),[189] was frequently identified on the Department's Early Warning System reports,[190] and was the subject of several complaints for ███████████, none of which considered his other alleged infractions or imposed any discipline.[191]



f.   ████████████████████████ **(SI2017-064)**: In ██████████ Corporal █████████ assaulted a black homeless woman.[192] ████████████████████████████ ███████ -- ████████████████████. Corporal ████ was eventually criminally convicted of assault, and was terminated from the Department.[193]



In conjunction with the ████████ investigation, the ████████ that ████████████ and Officer ████████████████████████.[196]

---

[189] IA2016-006 (PG0000134704-134964); SI2015-030 (PG0000133390-133529); SI2015-054 (PG0000096102-96444); PS2015-237 (PG0000132747-132804).
[190] Cpl. ████ appeared on the reports (███████████████████████████) in September 2014 (PG0000609518-609569), January 2015 (PG00000609764-609809), March 2015 (PG0000609853-609897), May 2015 (PG0000609969-610015), June 2015 (PG00000610016-610081), August 2015 (PG0000610139-61204), and January 2016 (PG0000610611-610652).
[191] IA2014-078 (PG0000132332-132549); IA2016-004 (PG0000132633-132726).
[192] SI2016-059 (PG0000084795-85168).
[193] SI2016-059 (PG0000084795-85168).
[194] SI2017-064 (PGIAD00000135296-135456 at 135439-135441).
[195] SI2017-064 (PGIAD0000135296-135456 at 135329-135331).
[196] SI2017-064 (PGIAD0000135296-135456 at 135391-135394).



---

[197] SI2017-064, PGIAD0000135296-135456 at 135379-135380).
[198] SI2017-064 (PGIAD0000135296-135456 at 135300).



"[199]  Using similar reasoning, the

██████████████████████.

The file does not include ████████████████████

[200]

The Department also ████████████████████

In addition, there is no evidence ████████████████

g. **Sergeant Joseph Bunce (IA2017-003)**:  Plaintiff Richard Torres
alleged that Sgt. Bunce used profanity and racial slurs ("NECA")
in a text message and made a statement that a suspect was "

"  The assigned investigator (

[199] SI2017-064 (PGIAD0000135296-135456 at 135303-135304).
[200] SI2017-064 (PGIAD0000135296-135456 at 135296).



The investigator also did not assess why Cpl. Torres's superior officers ( ) failed to alert IAD when Cpl. Torres raised Sgt. Bunce's text message with them.[204]

h. **Police Officer                    (IA2017-054)**:  In October 2017, PO        told a Black officer that he was "

Although the IA investigator (        ) interviewed several witnesses, she did not

---

[201] IA2017-003 (PG0000020498-20525 at 20501-04, 20510).
[202] IA2017-003 (PG000020526-20554 at 20549, 20552); IA2017-003 (PG000020498-20525 at 20501-20504).
[203] IA2017-003 (PG000020332-20351 at 20343-20348).
[204] PG0000103530, PG0000103567.
[205] IA2017-003 (PG0000020498-20525 at 20514-20516).
[206] PG0000656569-656571.
[207] IA2016-008 (PGIAD00000041940-42075 at 42014 and 42020); PG0000656569-656571.
[208] IA2016-008 (PGIAD0000041940-42075 at 42004).

inquire whether PO ███████ had a history of similar statements[209]



69.     From my review, there are also several incidents where charges of racism were sustained, but the discipline was inadequate.  These are some examples of such incidents:

 a. **Sgt. ████████ (IA2016-008)**: As noted above, Sgt. ████ has been the subject of a number of complaints by minority officers for racist conduct.  On April 25, 2015, Sgt. █████ sent a text message to his subordinate officers ██████████████████████████, which contained a video clip with racist language, ███████████████████████████████[212]  Two recipients of the video, POFC █████ and Corporal ████████, were both minority officers.[213] Sgt. █████ was charged with "████████████████," which was ██████. IAD does not appear to have considered the repeated complaints about Sgt. ████'s racist conduct (including ██████████ ██████) discussed elsewhere in this report and failed to charge him with discriminatory language, which is a Category IV offense under the Department's disciplinary policy and has been the basis for termination of minority officers.[214]  In his discovery responses, Chief Stawinski acknowledges he personally interceded to lower

---

[209] IA2017-054 (PGIAD0000041940-42075).

[210] IA2017-054 (PGIAD0000041940-42075 at 42004).

[211] PG0000656568; PG0000656569-656571.

[212] IA2016-008 (PG0000043186-43284 at 43202-43211).

[213] IA2016-008 (PG0000043186-43284 at 43211).

[214] IA2015-052, IA2014-087; PG0000174351-174495 at 174352-53; PG0000174649; PG0000174650; General Order, Vol. I, Ch.11 (Discipline).

IAD's recommended discipline to a $██ fine.[215]  Notably, the Department did not require Sgt. ██ to complete any racial sensitivity training.

b.  

c.  **Corporal ██████ (IA2016-038 and IA2017-019**: During a Police and Citizen Interaction Class, an African-American training instructor showed a slide depicting a white police officer pointing his gun at a Black man while a citizen recorded the incident. When the instructor asked the officers what the slide depicted, Cpl.

---

[215] Henry Stawinski's Responses and Objections to HNLEA NCR's First Set of Interrogatories No. 2.
[216] IA2015-016 (PG0000002307-2320).
[217] IA2015-016 (PG0000002335-2373 at 2356).
[218] IA2015-016 (PG0000966025-966027).
[219] General Order, Vol. I, Ch.11 (Discipline).
[220] IA2015-016 (PG0000002335-2373 at 2343).
[221] IA2015-015 (PG0000002335-2373 at 2354-2358)

█████ responded "Oh, that's that Black Lives Matter crap."[222] Plaintiff ████████████ took offense to this comment, and stated, "You don't know me!" Lt. █████ was ordered to leave the classroom, and he complied.[223] Following this, Cpl. █████ contacted her superior officers with false statements about the incident and filed a charge alleging that Lt. ████████ charged towards her, yelled he was "████████████████" █████████████, and had to be physically restrained and ████████████████████.[224] None of the ██ eye witnesses interviewed by IAD confirmed Cpl. █████ account. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████

According to recently produced materials, in fall 2016, the investigator recommended that Cpl. █████ be charged with ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████[225]████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████[226]█████████ ████████████████████████████████████ █████[227]

In his April 21, 2017 email, Lt. █████ complained that "█████ ████████████████████████████████

---

[222] IA2016-038 (PG0000023826-24386 at 23859).  During her interview, Cpl. █████ stated that ████ PG000023826-24386 at 23868.

[223] IA2016-038 (PG0000023826-24386 at 23859).

[224] IA2016-038 (PG0000023826-24386 at 23884-23892).

[225] IA2016-063 (PG0000023458-23752 at 23487-23488); IA2016-038 (PG0000972690-972726 at 972694 972698, 972707-972713).

[226] IA2017-019 (PG0000080458-80538 at 80480).

[227] IA2017-019 (PG0000080458-80538 at 80458-80538).

67



[228]

Cpl. ████ was ultimately charged with a ████████ violation and an ████████ violation, both of which were sustained. They were considered ████████████████. She received two $███ fines.[230] The Department notably did not require Cpl. ████ to complete any racial sensitivity training, nor did the Department charge her with using discriminatory language or repeating the same false statement to other members of the department including her Captain, both of which are Category IV offenses (Highest level violations) under the Department's disciplinary policy,[231] and have been the basis for terminating numerous minority officers.[232]

---

[228] IA2017-019 (PG0000080458-80538 at 80480).

[229] IA2016-038 (PG0000972690-972726 at 972693).

[230] IA2016-038 (PG0000023826-24386 at 23832).

[231] General Order, Vol. I, Ch. 11 § V.5 (Discipline: Disciplinary Action Recommendations Guide).

[232] IAPro SI2014-052 (████████████████████████████████); SI2015-015 (████████████████████); SI2016-006 (████████████); SI2016-011 (████), SI2016-031 (████████); SI2017-006 (████████████████);

The record also reflects that Commander Mills approved the decision ████████████████████████████████████████████████████ ██████████████████████[233] .████████████████████████ ████████████████████[234] The Citizen Complaint Oversight Panel expressed ██████████████████████████████



[235]

███████████████████████████████████████████████████████████ ████████████████████████████[236]  Notwithstanding this, the charge was found to be "unfounded."  Notably, IAD did not charge or investigate Cpl. ████████████████ for ███████████████████████████████████ ████████████████████████████

d. **<u>Lieutenant Thomas Denault (IA2011-042)</u>**:  Thomas Denault at the time of this event was a sergeant.  He was identified as an officer who ██████████████████████████████████████████

---

SI2017-049 (████████████████████████████); IA2014-087 (████████████ ██████████████████); IA2015-052 (██████████████████████ ████████████████).

[233] IA2016-038 (PG0000023826-24386 at 23833-23834).
[234] IA2016-038 (PG0000023826-24386 at 23827).
[235] IA2016-038 (PG0000023826-24386 at 23840).
[236] IA2017-019 (PG0000080458-80538 at 80507, 80513).



[237] Among other things, Sgt. Denault (i) referring to members of the  command staff as "baboons,"[238] (ii) stated, [239] (iii) [240] During the course of the investigation concerning these posts, the Department learned that Sgt. Denault had previously made "[241] [242] [243], Sgt. Denault's discipline was downgraded by the Chief of Police to a

---

[237] IA2011-042 (PG0000002503-2724 at 2614).
[238] Compl. ¶ 61(a).
[239] IA2011-042 (PG0000002503-2724 at 2614).
[240] IA2011-042 (PG0000002503-2724 at 2615).
[241] IA2011-042 (PG0000002503-2724 at 2616).
[242] IA2011-042 (PG0000002503-2724 at 2616-17).
[243] IA2011-042 (PG0000002503-2724 at 2580, 2619).

, and $\_\_\_ in fines.[244]

"[245]

[246]  He was retained by the Department and in February 2018 was promoted to the rank of Lieutenant.[247]

e.

[248]

[249]

---

[244] IA2011-042 (PG0000002503-2724 at 2509).
[245] Magaw Dep. Tr. 327:3-8.
[246] IA2011-042 (PG0000002503-2724 at 2506).
[247] Compl. ¶ 61(a); PG000080720-80806 at 80783.
[248] SI2017-073 (PG0000937466-937606 at 937513, 937534-937594).
[249] SI2017-073 PG0000937466-937606 at 937522-937530).



---

[250] SI2017-073 (PG0000937466-937606 at 937467-937468. ████████████ PG00000928065.

████████████████████████

[251] IAPro IA2015-052; IA2014-087.

[252] PG0000982683-982699 at 982683.

[253] SI2017-073 (PG0000937466-937606 at 937467-937468).

[254] IA2016-044 (PG0000096907-97031 at 96935).

[255] PG00000104349.

[256] IA2016-044 (PG0000096907-97031 at 96910).

[257] IA2016-044 PG0000096907-97031 at 96935-96937).

72

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

70.     In conclusion, there is extensive evidence that the Department has

persistently and systemically failed to investigate or discipline adequately

allegations of discrimination.  This failure was known at the senior most ranks of

the Department who either directly authorized or condoned it.

**D.     The Department Does Not Treat or Evaluate Citizen Complaints About Racial Harassment or Discrimination Appropriately**

71.     The Department's failure to investigate (adequately or at all) or

impose discipline for complaints of racial discrimination and harassment, is

consistent with the Department's failure to investigate adequately or discipline

civilian complaints of racist conduct by officers, as well as the failure of its

policies and systems to analyze and detect bias in the conduct of its officers in

complaints, uses of force, and other information that is readily available to the

command staff.

---

[258] IAPro SI2014-052 (██████████████████████████████); SI2015-015 (██████████████████████████); SI2016-006 (█████████████); ), SI2016-011 (██████████████); SI2016-031 (████████████); ); SI2017-006 (█████████████████████); SI2017-049 (█████████████████████), IA2014-087 (██████████████████████); IA2015-052 (████████████████████).

[259] IA2016-044 (PG0000096907-97031 at 96910).

72.     As noted above, the Department has policies concerning civilian complaints, most notably General Order Volume I, Chapter 4.  This requires investigation by IAD of certain types of civilian complaints.  And it also requires training and monthly and annual reporting of "bias-based profiling."  General Order Vol. I, Ch. 4, § V.7 & V.10.[260]

73.     Under the current leadership of the Department, the available evidence indicates the Department is not in compliance with its policies.  Rather, under Defendants Chief Stawinski and Commander Mills, the Department has a practice or custom of ignoring its own policies regarding civilian complaints.

74.     For example, the record indicates that until 2016, the Internal Affairs Division prepared an annual report to the Chief of Police regarding its activities, including the Section V.10 report on allegations of bias-based profiling by police officers.[261]  Defendants Mills and Stawinski confirmed in their testimony that no subsequent reports, or any of the other Section V.10 bias-based profiling reports were prepared.[262]  Chief Stawinski testified that he believed that the "foundation"

---

[260] General Order, Vol. I, Ch. 4 § V.7, V.10 (Complaints: Internal Complaints).

[261] *See, e.g.*, PGPD-PER-0079789-804 at 79799-80, PGPD-PER-0096185-96199 at 96195, PGPD-PER-0079789-804, PG0000113615-629 at 113625, PG0000104641-656 at 651-52, PG0000149836-850 at 149846.

[262] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6; Feb. 20, 2020 Alsip Response to Pergament Feb. 10 Letter, Page 3; Prince George's County's Supplemental Response to UBPOA First Set of Interrogatories No. 6 ("Defendant is

of the annual bias-based reports were reported to the MPCTC, but Defendants have yet to produce those reports as requested by Plaintiffs.[263]

75.    The Department does not appear to have adequate anti-racial bias training,  Defendants do not appear to have provided in discovery any training materials (also called for in Section V.10) to instruct officers on bias-based profiling.  While I understand from press reports that PGPD has publicized such training,[264] it is far from clear that the program has the support of Department leadership.

76.    For example, during June 2018, there was a highly publicized incident where a group of predominantly white officers walked out of an in-service "implicit bias" training workshop being conducted by the University of Maryland.[265]  A complaint was made to the County,[266] and the Chief's office was notified along with other command staff.[267]  Although Deputy Chief Rafterry believed a "review" of the incident had occurred,[268] there is no evidence in the

---

not presently aware of any regular, monthly reports addressing bias-based profiling."); Mills Dep. Tr. 18:9-26:16; Stawinski Dep. Tr. 48:24-50:5.

[263] Stawinski Dep. Tr. 49:18-50:5.

[264] NBC Washington, *Prince George's County Police Work to Prevent Bias* (Feb. 3, 2018), https://www.nbcwashington.com/news/local/Prince-Georges-County-Police-Work-to-Prevent-Bias_Washington-DC-472436063.html.

[265] PG0000162500-162502; Declaration of Michael Anis ¶ 6.

[266] PGPD-PER-0122769-122770.

[267] Declaration of Michael Anis ¶ 7; Watkins Dep. Tr. 192:5-13.

[268] Rafterry Dep. Tr. 163:21-164:8.

discovery produced by Defendants to indicate that such a review or an investigation of any sort occurred.

77.     Rather, it appears that senior command officers decided that there should be no investigation of this matter, and sought to excuse their failure to investigate or discipline this conduct at their depositions.  For example, at his deposition Deputy Chief Murtha attempted to justify the walk-out by stating that one of the trainers had made what Murtha characterized as "anti-police social media posts," and had invited University of Maryland students to observe.[269] Major Watkins similarly testified that he heard from one officer in attendance that the officers walked out because they were "offended" by observations posted to social media by University of Maryland students in attendance at the training, and based on that officer's observation, Major Watkins felt no further investigation or discipline was warranted.[270]

78.     In a Declaration by Plaintiff Michael Anis, one of few officers who did not walk out, he observed "To my further dismay, PGPD was entirely unconcerned with the walkout.  Shortly after the training occurred, Deputy [Chief] Murtha made light of the walk-out in front of a group of officers.  Moreover, the

---

[269] Murtha Dep. Tr. 106:13-112:15.
[270] Watkins Dep. Tr. 193:10-194:22, 196:5-20.

Department notified officers who walked out that it did not intend to reschedule the training. PGPD only changed course once the walk-out was reported to in the news . . . PGPD never conducted an investigation into the details of the walk-out, nor did it contact me or the other officer who stayed ….To my knowledge, no officers were disciplined as a result of the walk-out."[271]

79.    The Internal Affairs Department also appears not to investigate adequately civilian complaints about racial profiling.  According to the IAPro data Defendants produced, the Internal Affairs Department has not sustained racial profiling charges.[272]  Not one.  And according to the IAPro data Defendants produced, no officer has been disciplined for racial profiling.  This was confirmed in deposition testimony of senior Department officials.[273]  In my experience, that is indicative of a lack of commitment by Department leadership to address a significant issue of community tension.[274]

---

[271] Declaration of Michael Anis ¶¶ 7-9.

[272] A schedule of these incidents can be found at Exhibit B.

[273] Stawinski Dep. Tr. 50:24-51:3; Mills Dep. Tr. 28:4-20.

[274] *See, e.g.,* Nick Dutton, *Md. Officers suspended over 'driving while black' YouTube vids* (Nov. 17, 2012), https://wtvr.com/2012/11/17/md-officers-suspended-over-racist-youtube-vids/; Ebony, *Black Cop Says He Was Unfairly Detained by Police* (Oct. 27, 2016), https://www.ebony.com/news/black-cop-unfairly-detained/; Jonathan W. Hutto, Sr. & Rodney D. Green, *Social Movements Against Racist Police Brutality and Department of Justice Intervention in Prince George's County, Maryland*, 93 J. Urban Health 89 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4824689/.

80.     This lack of attention to civilian complaints is also confirmed by the discovery responses the Defendants have provided.  For example, in November 2015, the Department received a complaint from an African-American ███████ ████████████████████████████████████████████████████[275] I understand that Defendants have not produced this investigative file, but according to IAPro and Defendants' discovery responses, after opening a matter, IAD closed the file, concluding that the complaint was unfounded.[276]  Similarly, in October 2015, Defendants received an email from the civil rights organization █████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████[277] Defendants' discovery responses confirm that no investigation into this matter was conducted.[278]

81.     The Department also did not treat external complaints against senior officers of encouraging improper police conduct appropriately.

82.     For example, in recently produced materials, the Defendants disclosed a 2019 investigation into ██████ ██████████████████████████████████████

_____

[275] PG0000108655-57.
[276] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6.
[277] PG0000153441-153444.
[278] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6.

██████████████████████████████████████████ ██

████████████, █████████████████████████████ █

██████████████ ███████████████████████████████

██████ ███████████████ ███ ███████ ████████████

████████████████████ ███ ████████████████████

████████████████████████████████████.″[280]

83.    ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████.″[281] █████████████

████████████████████████████



[279] PS2019-114 (PGIAD0000127799-127818 at 127809); PS2019-115, PGIAD00000127819-834, at 127831.

[280] PG2019-114 (PGIAD0000127799-127818 at 127813).

[281] PS2019-115 (PGIAD0000127819-127834 at 1278).

[282] PS2019-115 (PGIAD00000127819-127834 at 127831); PS2019-114 (PGIAD0000127799-127818 at 127808).

The Department's handling of this episode was deficient in several respects.



a. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

c. According to the files, ████████████ ████ ████ ████████████

████████████████████████ ████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

---

[283] PS2019-114 (PGIAD0000127799-127818 at 127803-127804); PS2019-115 (PGIAD00000127819-127834 at 127823-127824).
[284] PGIAD00000127824, PGIAD00000127804.



[286] There is no explanation in the file why ███████████████ ███ ██ ██ ███ ██

i. ████████████████████

---

[285] PS2019-114 (PGIAD0000127799-127818 at 127802); PS2019-115 (PGIAD00000127819-127834 at 127822).

[286] PS2019-114 (PGIAD0000127799-127818 at 127800-127802); PS2019-115 (PGIAD00000127819-127834 at 127820-127822).

84.     It is also apparent from the discovery produced by Defendants that Defendants did not thoroughly investigate or adequately discipline external complaints from civilians of discrimination or abusive conduct.  These are additional examples from  materials produced in discovery:



a.  In January 2016, Chief Stawinski received a complaint by email from the Prince Georges County State's Attorney Office [287] The officer who allegedly made this statement is Cpl. IAD [288]

b.  In July 2016, Chief Stawinski received a complaint forwarded by State Representative [289] Notwithstanding the complaint of harassment, [290]

---

[287] IA2016-004 (PG0000132633-132726); PG0000113485-87.
[288] IA2016-004 (PG0000132633-132726 at 132635).
[289] PG0000155665.
[290] PG0000154333.

c. In October 2018, Chief Stawinski received a complaint forwarded by Prince George's Councilmember



, the IAPro data and the IA log indicate no investigation was opened into this matter. Rather,

d. In May 2015, the Department received a complaint from the Prince George's County Fire Department

there is no indication in IAPro or Defendants' discovery response that reflects that the Department conducted any investigation into this matter.[295]  The officer who made this comment appears to be Lieutenant Kenneth Fox.

e. In April 2016, Chief Stawinski received a complaint forwarded by Councilmember ▮▮▮▮▮▮▮ from a member of the New

---

[291] PG0000172194-172197 at 172196.
[292] PG0000870882-870887 at 870886.
[293] FCIQ2018-048 (PGIAD0000031514-31530) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); FCIQ2018-079 (PGIAD0000032322-32361) (▮▮▮▮▮▮▮▮▮▮).
[294] PG0000864287-864288; PG0000864289; PG0000864290-864291.
[295] Prince George's County's Objections and Answers to UBPOA's First Set of Interrogatories No. 6.



f. In December 2018, the Department received notification from the Annapolis Police Department that three members of its Special Operations Team had been involved in an altercation at a bar in Annapolis, after one officer (Corporal ▮▮▮▮▮▮▮▮▮▮) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ When Annapolis police officers arrived, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and was observed with a firearm.[299] According to the materials produced in discovery, none of these officers were investigated or disciplined.

g. 

---

[296] PG0000893933-893944 at 893939-893940.

[297] PG0000893933-893944 at 893934.

[298] SI2016-059 (PG0000084795-85168); Circuit Court for Prince George's County CT170241X; Drew Gerber, *Prince George's County officer found guilty of assaulting a homeless woman to rout her* (Nov. 14, 2017), https://www.washingtonpost.com/local/prince-georges-county-officer-found-guilty-of-assaulting-a-homeless-woman-to-rout-her/2017/11/14/b70f9ad6-c8bb-11e7-8321-481fd63f174d_story.html.

[299] NBC Washington, *Prince George's SWAT Officers Investigated After Bar Fight* (Dec. 19, 2018), https://www.nbcwashington.com/news/local/prince-georges-swat-officers-investigated-after-bar-fight_washington-dc/166364/; PG0000854965-854966.



85.      Defendants' recent production of use of force data also shows

significant racial disparities in the use of force against civilians, as well as flaws in

the Department's processes for evaluating and investigating use of force incidents.

86.      Data produced by the County indicates that there were 6,805 instances

where officers used force between January 1, 2016 and the end of 2019.  Chief

Stawinski and Chief Velez served as Chief and Assistant Chief of the Department

---

[300] PG0000104622-104623.
[301] SI2017-064 (PGIAD0000135296-135456 at 135439-135441).
[302] SI2017-064 (PGIAD0000135296-135456 at 135379-380).
[303] SI2017-064 (PGIAD0000135296-135456 at 135300).

during this period.[304]  This corresponds to approximately 1,700 uses of force per year.

87.     Of the 6,805 uses of force reported, 94% of the uses of force involved a minority civilian.  Of the uses of forces reported, 86% were against a black civilian, and another 8% were against a Hispanic civilian.  The percentage of black civilians subject to use of force is significantly higher than its demographic composition of the County population.  In other words, the Department appears to use force disproportionately against black civilians.

88.     My opinion is that there are significant deficiencies in the Department's administration of its use of force policies, as well as its assessment and investigation of uses of force.

89.     The Department's review of use of force includes two significant components.

90.     First, under the Department's Use of Force policy, General Order Volume II, Chapter 57, each use of force is supposed to be immediately reported and reviewed by a supervisor and the relevant command officers (including the Shift Commander/Lieutenant, the Assistant District Commander/Captain)

---

[304] PG0000985307.

86

culminating in review by the District Commander (typically the Major).[305]  The use of force review is supposed to assess, among other things, whether or not officers are properly trained in use of force techniques and whether the use of force was within Departmental guidelines.  Certain "serious" use of force incidents (such as those involving a broken bone or hospitalization of a subject, or an officer discharges of a firearm) are required to be reported to the Special Investigations Response Team (SIRT) division of Internal Affairs.

91.     Second, under the Department's Early Identification System Policy, General Order Volume I, Chapter 14, the Internal Affairs Commander is supposed to prepare a series of monthly and quarterly reports allowing a systemic review of significant events such as complaints and uses of force.[306]

- The monthly reports are supposed to identify all officers who have been the subject of a combination two or more uses of force or complaints within a 60 day period.

- The quarterly reports are supposed to identify all officers who have bene the subject of a combination of three or more uses of force or complaints in a three-month period, or two complaints during that

---

[305] PG0000054575-54590.
[306] PG0000000607-610.

period.  Under the Policy, when an officer is identified on either the report, the officer's Commander, their Captain, their Lieutenant, and their direct supervisor are required to "personally meet with the subject employee," and the Commander is required to "respond back to the Chief of Police in writing, indicating the date and time of the interview, as well as the participants and results" including "their assessment and any intervention action taken.  If no intervention is taken, the Commander . . . must articulate specific reasons for not taking action."

92.    My opinion is that the reporting of EIS information needs to be timely and reported to the senior-most levels of the Department in order to be an effective "part of the Department's police-community relations strategy."  Untimely reporting or the failure to report information impedes the Department's policy of identifying "police employees who may be at risk for future disciplinary actions."[307]

93.    The establishment the Early Identification System, in its current form, was as a result of a prior Department of Justice investigation into the use of force in the County.  As described in the Policy, it is "an integral part of the

---

[307] General Order Volume I, Chapter 14, PG0000000607-610.

Department's police-community relations strategy . . . and it benefits the public by minimizing the number of police employees who may be at risk for future disciplinary actions."[308]

94.     With regard to the use of force reviews, the Department places primary responsibility on the supervisor and command review, but does not appear to assess the effectiveness of the "command review" and whether it detects whether uses of force are within Departmental guidelines.  The Policy provides that the assessment is to be "evaluated based on the facts known to the officer at the time of the incident,"[309] and does not provide for consideration that the officer may have a pattern of use of force, or that the officer may be deploying force in a discriminatory manner.

95.     My review of the use of force data produced by the Department[310]  is that a relatively small number of officers are responsible for a disproportionate number of uses of force.  For example, the following 19 officers are responsible for 685 uses of force, or 10 percent of the total reported.

---

[308] PG0000000607-610.
[309] PG0000054575-54590.
[310] PG0000985307.

| Officer Name | Officer Race | Black Civilian | White Civilian | Hispanic Civilian | Other Civilians | Total UoF |
|---|---|---|---|---|---|---|
| ███ | White | 46 | 1 | 1 | | 48 |
| ███ | White | 45 | | 2 | | 47 |
| ███ | White | 40 | 3 | 2 | | 45 |
| ███ | Black | 42 | 1 | 1 | 1 | 45 |
| ███ | White | 40 | | 2 | | 42 |
| ███ | Black | 37 | | | 1 | 38 |
| ███ | White | 16 | 10 | 11 | | 37 |
| ███ | White | 34 | | | 3 | 37 |
| ███ | White | 32 | 1 | 1 | 1 | 35 |
| ███ | White | 31 | 1 | 1 | 1 | 34 |
| ███ | White | 31 | 1 | 2 | | 34 |
| ███ | Black | 32 | | 1 | | 33 |
| ███ | White | 17 | 1 | 12 | | 30 |
| ███ | White | 30 | | | | 30 |
| ███ | White | 29 | | 1 | | 30 |
| ███ | Black | 20 | 7 | 3 | | 30 |
| ███ | White | 28 | | | 2 | 30 |
| ███ | White | 29 | 1 | | | 30 |
| ███ | Black | 28 | 2 | | | 30 |

90

96.     Each of these officers had 30 or more uses of force, averaging more than seven per year.  Of these nineteen officers, 74 percent (14) were white and 26 percent (5) were black.  Of the uses of force involving these officers, 96 percent involved minority civilians—and for most of these officers, all or virtually all of their uses of force were against minority civilians.

97.     As Exhibit C to this report, I have attached a list of the officers who had 20 or more uses of force reported over a four year period.  Collectively, these 61 officers were involved in 1,670 uses of force or just under 25 percent of the total uses of force reported over the period.  Of these 61 officers, 64 percent (39) are white, 28 percent (17) are black, 5 percent (3) are Hispanic, and 3 percent (2) are Asian.  Of the uses of force involving these officers, 99.1 percent involved minority civilians.

98.     My review also identified a number of concerns with the command review of use of force.  The command review involves supervisors (typically Sergeants), Lieutenants and Captains, and as noted later in this report, the individuals who hold these positions are disproportionately and (for Lieutenants and Captains) predominantly white.

- My review of the use of force reports Defendants have produced in this litigation (which cover 1,219 uses of force since January 1,

91

2016)[311] reflects that there is widespread non-compliance with Department policy that "District/Division Commanders/Mangers shall conduct the final review" of use of force incident reports, as required by General Order Volume II, Chapter 57.[312]  Among other commanders, the reports produced do not indicate or reflect that Majors Mills, Mints or Weaver (whom are all discussed elsewhere in this report) reviewed the use of force reports arising under their commands.

- My review has also identified that a significant number of the uses of force were reviewed by officers who have expressed racial animus or otherwise been involved in discriminatory conduct.  These uses of force, which overwhelmingly concerned use of force against minority civilians, uniformly concluded that use of force was justified.

- For example, 134 of the 1,219 uses of force (11%) were reviewed by ███████████████.  ████████████ concurred that every

---

[311] PGIAD0000138481-147338.
[312] PG000054575-54590 at 54582.

single use of force was justified.  And every use of force he reviewed involved use of force against a minority civilian.

- Similarly, 99 of the 1,219 uses of force (8.1%) were reviewed by ███████████████.  █████████████ found that every single use of force was justified.  And only 2 of the 99 uses of force ████ reviewed involved a white civilian.

- Other white officers discussed in this report also reviewed many use of force reports.  For example, ████████████ reviewed 20, ████████████ reviewed 25, ████████████████ reviewed 17, ████ reviewed 24, █████████████ reviewed 30, and ██████ reviewed 21.  All of these reviews uniformly found that the use of force was justified.  And these uses of force almost entirely concerned incidents against minority civilians.

- Based on the use of force reports produced, it appears that the command review is doing little more than giving rubber stamp approval to the use of force.  In the 1,219 uses of force covered by the reports, there was not a single instance where the command officer did not concur that the use of force was reasonable.

99.     Consistent with this "rubber stamp" assessment, of the 6,805 uses of force reported, the Police Department concluded that only 15 were non-justified. In other words, in the review of uses of force, the Department concluded that 99.8% of uses of force were justified.

100.    I have also reviewed IAPro data concerning investigations of uses of force.

- The overwhelming majority of uses of force reported in the database do not appear to have been investigated by Internal Affairs.

- Of the 15 officers who engaged in "non-justified" uses of force, IAD appears to have conducted use of force investigations concerning five of them.[313]  Internal Affairs sustained charges in two of these matters, and both respondents received a fine.[314]

- Of the "justified" uses of force investigated by Internal Affairs, charges of use of force or excessive force are rarely sustained.  In cases logged in IA Pro since January 1, 2016, Internal Affairs did

[313] UoF incidents 16-267 (█████████████████████, investigated as IA2016-052 & IA2016-013 ), 17-219 (█████████████, investigated as IA2017-029 & IA2017-044) & 17-320 (█████████, inquiry at SIQ2017-003 & SIQ201-008)
[314] IA2016-052 (█████████, IA2017-029 (█████████).

not sustain 237 use of force or excessive force charges, and only

sustained charges against four PGPD officers accused of engaging

in use of force or excessive use of force.[315]

- Of the four sustained charges, one of these officers, █████

  █████, was terminated following his criminal conviction for

  assaulting a black homeless woman.[316]  A second officer, ████

  █████, was terminated after █████████████████████

  █████[317]  In the other two matters, the officers were fined.[318]

101.   There also appear to be significant deficiencies in the Department's

compliance with its Early Identification System policy.

102.   First, the monthly reports prepared by the Department do not appear

to comply with the policy that the reports identify all officers who have been the

subject of two or more uses of force or complaints within a 60-day period.  Rather,

the reports identify officers who had two uses of force complaints within a

calendar month.  During their depositions, Chief Stawinski (who is supposed to

receive the monthly reports) nor Commander Mills (who as Commander of

---

[315] A schedule of the IAPro investigations of use of force or excessive use of force is attached as
Exhibit D.  During this time frame, Internal Affairs also sustained an excessive charge against a
Riverdale Park Police Officer.  IA 2017-011.
[316] SI2016-059 (PG0000084795-85168).
[317] SI2016-034 (PG0000785926-786231).
[318] IA2016-052 (PGIAD0000086540-87248); IA2017-029 (PGIAD0000039546-39680).

Internal Affairs is in charge of preparing such reports) did not appear to be aware that the reports did not comply with policy.[319]

103.   The failure to generate compliant reports is not an academic issue. Limiting the reports to officers with two triggering events within a calendar month will not identify all of the officers who should be reviewed as required by the Policy.  This underreports the number of officers by a significant amount.  By underreporting, the Department has undermined the purpose of the reporting system, which is to identify officers before they become a problem to the community.  A number of the officers identified above who most frequently engaged in uses of force were only rarely identified on the monthly reports produced in discovery[320]—this includes Officers ████████████████████ ███████████.

---

[319] Stawinski Dep. Tr. 61:11-74:5; Mills Dep. Tr. 106:19-109:11.

[320] Defendants produced reports from January 2014 through December 2018 (with gaps from October through December 2016 and June through December 2017). ( PG0000608940, PG0000608989, PG0000609039, PG0000965837, PG0000609106, PG0000609180, PG0000609228, PG0000609286, PG0000609355, PG0000609405, PG0000609449, PG0000609518, PG0000609570, PG0000609631, PG0000609662, PG0000609708, PG0000609720, PG0000609764, PG0000609810, PG0000609853, PG0000965832, PG0000609898, PG0000609969, PG0000610016, PG0000965832, PG0000610082, PG0000610139, PG0000610205, PG0000965832, PG0000610269, PG0000610317, PG0000610376, PG0000610558, PG0000965832, PG0000610611, PG0000610653, PG0000610684, PG0000610739, PG0000610785, PG0000610838, PG0000610868, PG0000610924, PG0000610972, PG0000611012, PG0000611012, PG0000611077, PG0000611121, PG0000611129, PG0000611173, PG0000611225, PG0000611276, PG0000965834, PG0000965834, PG0000611326, PG0000611367, PG0000611430, PG0000611473, PG0000611532, PG0000611578, PG0000611618, PG0000611650,

104.   Second, as Commander Mills acknowledged during her testimony, after Mills became Commander of IAD, IAD stopped producing the required quarterly EIS reports.[321] IAD did not produce quarterly reports for the last two quarters of 2016 and for most of 2017.  I also note that Defendants have not produced in discovery the monthly EIS reports for any of the months in the last quarter of 2016 and the period between June and December 2017, corresponding with start of Commander Mills' tenure at IAD, and the appointment of Captain Watkins as AIS Commander.[322]  During her deposition, Commander Mills also testified that Captain Watkins had substantial difficulty producing the monthly EIS reports on time.[323]  Failing to produce reports undermines the purpose of the

---

PG0000611684, PG0000611751, PG0000611769, PG0000611815, PG0000611863, PG0000611897, PG0000611906, PG0000611951, PG0000612017))

[321] Mills Dep. Tr. 109:12-116:6.
[322] PG0000608940, PG0000608989, PG0000609039, PG0000965837, PG0000609106, PG0000609180, PG0000609228, PG0000609286, PG0000609355, PG0000609405, PG0000609449, PG0000609518, PG0000609570, PG0000609631, PG0000609662, PG0000609708, PG0000609720, PG0000609764, PG0000609810, PG0000609853, PG0000965832, PG0000609898, PG0000609969, PG0000610016, PG0000965832, PG0000610082, PG0000610139, PG0000610205, PG0000965832, PG0000610269, PG0000610317, PG0000610376, PG0000610558, PG0000965832, PG0000610611, PG0000610653, PG0000610684, PG0000610739, PG0000610785, PG0000610838, PG0000610868, PG0000610924, PG0000610972, PG0000611012, PG0000611012, PG0000611077, PG0000611121, PG0000611129, PG0000611173, PG0000611225, PG0000611276, PG0000965834, PG0000965834, PG0000611326, PG0000611367, PG0000611430, PG0000611473, PG0000611532, PG0000611578, PG0000611618, PG0000611650, PG0000611684, PG0000611751, PG0000611769, PG0000611815, PG0000611863, PG0000611897, PG0000611906, PG0000611951, PG0000612017; *see also* Letter from A. Pergament to M. Alsip (Dec. 9, 2019).
[323] Mills Dep. Tr. 114:1-22.

reporting system, which is to identify officers before they become a problem to the community.

105.   The virtual shut down of the Department's EIS breaks the promises the County made in 2004 to the U.S. Department of Justice (USDOJ).  In 2004, after an investigation by the Justice Department Civil Rights Division, on behalf of Prince George County and its Police Department (PGPD), then County Executive Jack B. Johnson and Chief of Police Melvin High signed a Memorandum of Agreement (MOA) with the Justice Department to reform the Police Department.[324]  The MOA details numerous reforms, including the reform of the Police Department's Early Identification System.  Section VII of the MOA (entitled "MANAGEMENT AND SUPERVISION, A. Early Identification System") provides: "The PGPD will enhance and expand its Early Identification System to include a computerized relational database for maintaining, integrating, and retrieving data necessary for supervision and management of the entire PGPD. The PGPD will regularly use this data to manage risk and liability; and to evaluate

---

[324] MOA Section B, General Provision 2 states: "The United States and Prince George's County, a chartered governmental corporation in the State of Maryland, share a mutual interest in promoting effective and respectful policing. They join together in entering this Agreement in order to promote police integrity and prevent conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." (page 1)

the performance of officers across all ranks, units, and shifts."[325]  The County has not lived up to this critical part of the Agreement.

106.   Third, the evidence in the discovery record indicates that District Commanders did not report back to the Chief of Police "in writing" following their interviews with individuals identified on the monthly or quarterly reports.  Such reports do not appear to have been produced in discovery, and Chief Stawinski testified he did not receive such written reports.[326]  Commander Mills also testified that when she was a District Commander, she did not prepare such reports directly to the Chief of Police.[327]

107.   Fourth, there is evidence in the record indicating that District Commanders did not "personally meet" with officers identified on the monthly or quarterly reports, as required by Department Policy.  For example:

- Prior to becoming Commander of IAD, Major Mills served as the Commander of District III, where many of the officers who most frequently engaged in use of force served, e.g., Officers ███████ ████████████████████████████████████████

---

[325] MOA at 18 ¶ 75.
[326] Stawinski Dep. Tr. 68:23-69:5.
[327] Mills Dep. Tr. 67:5-68:12.

- Commander Mills testified that when she was a District Commander, she frequently delegated the responsibility to meet with officers on the list to her subordinates.[328]

- Commander Mills testified that she did not recall meeting with a number of officers who were on the monthly report who were under her command when she was a District Commander.  For example, she did not recall meeting with ███████████████ ████████████████████—all of whom were on at least one monthly report during her tenure as District 3 Commander, and were among the officers who most frequently engaged in use of force.[329]

Commander Mills similarly did not recall meeting with other officers who frequently engaged in use of force who served under her command who appeared on monthly reports, including █████████████████████████ ████████[330]  There appears to be little disciplinary consequence for officers who frequently appear on the monthly reports.

---

[328] Mills Dep. Tr. 65:7-16.
[329] Mills Dep. Tr. 119:15-121:9, 146:17-147:8, 147:16-148:1.
[330] Mills Dep. Tr. 68:20-69:1, 121:1-3, 147:9-15, 149:5-150:2

108.   In conclusion, there is extensive evidence that the Department has persistently and systemically failed to enforce its policies regarding civilian interactions, particularly complaints of racial bias.  The Department similarly failed to follow its policies concerning use of force, which appear to have a disproportionate impact on minority communities; officers who have engaged in frequent use of force against minority civilians do not appear to have been adequately investigated or disciplined.  This failure of the Department to abide by its policies was known (or should have been known) at the senior most ranks of the Department who either directly authorized or condoned it.

### E.    The Department's Internal Investigative and Disciplinary Mechanisms Treat Officers Differently Based on Their Race

109.   The Department states in its General Order that its policy is to "accept all complaints of employee misconduct at all levels of the Department . . . investigate complaints in a fair and impartial manner, and to impose disciplinary action, if necessary, in a uniform and timely fashion."  General Order Vol. I, Ch. 4, § I.[331]  The Department further states that the Department policy is "to ensure that all investigations arising from a complaint are conducted fairly and openly." General Order Vol. I, Ch. 22, §  I.[332]  And the Department further states that its

---

[331] General Order, Vol. I, Ch. 4 § I (Complaints: Policy).
[332] General Order, Vol. I, Ch. 22 § I (Internal Investigative Procedures: Policy).

policy is that "[t]he Commander, IAD, will confer with the Chief of Police to ensure discipline is consistent throughout the agency."  General Order Vol. I, Ch. 11, § V.2.[333]

110.   Based on my experience overseeing the internal affairs and disciplinary functions of one of the largest police departments in the country (LASD), as well as my expertise evaluating numerous other police departments, a hallmark of a "fair and impartial" system of investigation and a "uniform" system of discipline is that one would not expect that there would be disparities in investigative outcomes or disciplinary consequences according to race.

111.   I have reviewed the data from the IAPro system that Defendants produced in this matter.  This data covers a six-year period starting in mid-2013.

112.   I am familiar with IAPro, which was developed by former internal affairs officials and is used throughout the United States.  One of the features of the software is that it allows police departments to analyze investigative and disciplinary trends, including trends by race.  This analysis can be useful in assisting a department in determining whether there are issues of discrimination within its investigative or disciplinary functions.  As discussed below, members of the "Equality for Promotions, Discipline and Practices Panel" and the Department

---

[333] General Order, Vol. I, Ch. 11 § V.2 (Discipline: Procedures).

convened in 2017 and discussed a proposal that Internal Affairs use this feature to allow the Department to track whether its processes were fair; Defendant Commander Mills refused to do so.[334]

113.    The IAPro data produced by the Defendants demonstrates significant disparities in the PGPD system of investigation which, in turn, demonstrates that the Department is not adhering to its policy that investigations should be conducted in a "fair and impartial" manner or that investigations are being "conducted fairly."

114.    The data indicates significant disparities by race in whether the Department (i) opened formal investigations, (ii) sustained charges, (iii) imposed discipline at all, (iv) imposed severe discipline, and (v) resulted in resignations and/or terminations.

115.    The IAPro data produced by the Defendants demonstrates significant disparities in the PGPD system of discipline that demonstrate that the Department is not adhering to its policy that discipline should be should be imposed in a "uniform" manner.   Among other things, the IAPro data demonstrates:

- Black and Hispanic officers are more likely than a white officer to be charged with an offense;

---

[334] PG0000157312 (Video of July 26, 2017 Equality for Promotions, Discipline and Practices Panel); PG0000161480-161482.

- Black and Hispanic officers are then more likely to face a formal disciplinary proceeding than white officers, whose misconduct is more often dismissed through one of the mere "inquiry" proceedings, which do not result in punishment.

- When charges are evaluated in a formal disciplinary process, a black or Hispanic officer is more likely than a white officer to be found guilty—that is, the charge is "sustained."

- Black and Hispanic officers are then much more likely to be subject to the more severe forms of punishment (reduction in rank, removal from the normal promotion cycle, and termination) than lesser forms such as a reprimand.

116.    Analysis of the disparities in the PGPD investigative and disciplinary processes begin with documenting the racial composition of the sworn officers subject to that process.  Although Prince George's County is approximately 67% African-American, 17% Hispanic, and 14% non-Hispanic white, the sworn officer force is substantially skewed towards white officers.  Specifically, in December

2017—the midpoint of the six-year period reviewed in this analysis—42.8% of the sworn officers were Black, 9.1% Hispanic, and 44.5% non-Hispanic white.[335]

117.    It is likewise important to recognize that the senior management of the PGPD—and specifically the commanders responsible for the disciplinary process—are even more skewed in favor of whites.  Specifically, the percentage of the three senior ranks (Major, Captain and Lieutenant) was 65.4% white in 2015—significantly more than the approximately 45% of the overall force which was white—shortly before Chief Stawinski became Chief.  In 2017 the percentage of the three senior ranks was 68.8% white and in 2019 remained 68.6% white.  Over the same period, the percentage of senior officers who were Black or Hispanic went down from 31.4% in 2015 (already well below the 53% of the overall force in those two racial groups) to 29.2% in 2017 and 28.2% in 2019.[336]

118.    The IAPro dataset initially produced by the Defendants in September 2019 was provided in Excel format, which allowed computation of the impact of particular practices by race, including: (1) charges initially filed, (2) charges

---

[335] PG0000000291-335 at 335.  The 3.6% of the force that was categorized as Asian is not reflected on the summary charts below as they are not at issue in this case.  In addition, the small sample size does not permit meaningful comparisons of the disciplinary results with that group and the other three racial groups.
[336] PG0000173546; PG0000085344; PG0000085430.

formally processed (rather than treated as inquiry), (3) charges sustained against the respondent officer, and then (4) punishments imposed.

119.   I have reviewed the expert report of Marc Simon, a partner at BDO LLP.  Mr. Simon analyzed the IAPro dataset produced by Defendants in December 2019, which was not produced in Excel or a format that I could readily analyze.  I note that Mr. Simon's findings regarding racial disparities in investigative and disciplinary decisions are consistent with my analysis and conclusions concerning the first IAPro dataset produced.  This is not surprising, as much of the data in the dataset I analyzed remained in the subsequent IAPro dataset.

120.   The following chart summarizes the racial disparities throughout the PGPD's entire system of investigation and discipline based on the IAPro set initially produced by Defendants.



121.   This chart—and the tabulated counts and percentages in the Appendix to this report, attached as Exhibit E—shows that, as compared to the racial composition of the overall force (42.8% Black, 9.1% Hispanic, and 44.5% non-Hispanic white), the breakdown of:

  a.   The percentage of all charges against all officers was 46.2% Black, 10.2% Hispanic, and 40.7% white;

  b.   The number of charges handled as "inquiries" (FCIQ, IAQ, and SIQ) was slightly skewed in favor of white officers, but the

charges handled through formal processes, which can lead to a

punishment, was disproportionately directed against minority

officers (47.4% Black, 10.6% Hispanic, only 39.2% white);

c. The composition of "sustained" charges was 50.8% Black, 12.3%

Hispanic versus only 33.8% white; and

d. Of officers punished in any way 54.0% were Black, 10.5%

Hispanic, and only 33.2% white.

122.   Where discipline was imposed, the tabulations attached as Exhibits F

and G show the disparity increases as the level of severity of the discipline

increases.

123.   As compared to the racial composition of the overall force (42.8%

Black, 9.1% Hispanic, and 44.5% non-Hispanic white), the IAPro data indicates

the following the disciplinary trends:

a. Starting with the least severe form of discipline -- a reprimand --

the breakdown of the races is somewhat closer to the composition

of the force as a whole -- 49.1 % Black, 12.2% Hispanic, and

35.0% white;

b.   Moving on to fines, one finds a greater disparity against officers of color:  52.7% of all fines were levied against Black officers, 11.1% Hispanic, and 34.0% white;

c.   For suspensions and leave without pay, the breakdown is 65.5% Black, 3.5% Hispanic, and only 29.3% white;

d.   For reduction in rank and removal from the promotion cycle, the breakdown is 57.1% were Black, 14.3% Hispanic, and only 28.6% white; and

e.   For officers who either resigned rather than face discipline or who were actually terminated, 71.4% were Black, 4.8% were Hispanic, and 21.4% were white.

124.   I have also reviewed IAPro data that suggests that specific investigators display significant disparities in their investigations based on race.  In particular, the IAPro data produced by Defendants finds dramatically different rates at which the following officers "sustain" cases against white officers as opposed to minority officers.  Since my preliminary report, I have updated this analysis to include data reflected in the later IAPro productions.  The analysis shows:

109

a. Corporal ██████████: White respondents sustained—8 of 43 (18.60%); Black and Hispanic respondents sustained—35 of 72 (48.61%).

b. Corporal ██████████:  White respondents sustained—3 of 51 (5.88%); Black and Hispanic respondents sustained—16 of 76 (21.05%).

c. Corporal ██████████: White respondents sustained—4 of 38 (10.53%); Black and Hispanic respondents sustained—40 of 76 (52.63%).

d. Sergeant ██████████:  White respondents sustained—10 of 44 (22.73%); Black and Hispanic respondents sustained—27 of 63 (42.86%).

e. Sergeant ████████████:  White respondents sustained—7 of 32 (21.88%); Black and Hispanic respondents sustained—29 of 85 (34.12%).

f. Sergeant ███████████:  White respondents sustained—6 of 29 (21.21%); Black and Hispanic respondents sustained—21 of 57 (36.84%).

g. Sgt. ████████████: White respondents sustained—3 of 33 (9.09%); Black and Hispanic respondents sustained—13 of 30 (43.33%)

h. Sgt. █████████:  White respondents sustained—5 of 22 (22.73%); Black and Hispanic respondents sustained—31 of 56 (55.36%).

i. Sergeant ███████████:  White respondents sustained—1 of 38 (2.63%); Black and Hispanic respondents sustained—9 of 40 (22.5%).

Troublingly, these disparities are evident among several senior white officers in the

Internal Affairs Department when they conducted investigations:

j. Major ████████: White respondents sustained—3 of 22 (13.64%); Black and Hispanic respondents sustained—21 of 38 (55.26%).

k. Captain ████████: White respondents sustained—4 of 25 (16%), Black and Hispanic respondents sustained—6 of 18 (33.33%).

l. Captain ████████: White respondents sustained—9 of 19 (47.37%), Black and Hispanic respondents sustained—59 of 84 (70.24%).

By contrast, there are several Internal Affairs Department investigators who

"sustain" cases more equally among racial groups:

a. Sergeant ████████: White respondents sustained—4 of 43 (9.30%), Black and Hispanic respondents sustained—4 of 28 (14.29%).

b. Sergeant ████████: White respondents sustained—5 of 24 (20.83%), Black and Hispanic respondents sustained—4 of 25 (16.00%).

c. Sergeant ████████: White respondents sustained—12 of 22 (54.55%), Black and Hispanic respondents sustained—24 of 39 (61.45%).

d. Sergeant ████████: White respondents sustained—2 of 31 (6.45%), Black and Hispanic respondents sustained—3 of 25 (12.00%)

e. Lieutenant ████████: White respondents sustained—13 of 40 (32.50%), Black and Hispanic respondents sustained—17 of 51 (33.33%).

125.   During testimony, Chief Stawinski and Commander Mills confirmed that they had never analyzed the potential racial bias of IAD investigators.[337]

126.   In addition to the significant disparities in particular investigators' "sustain" rates, the number of Black and Hispanic officers terminated as a result of investigations by these investigators is notable.  Of the Black and Hispanic officers terminated during Chief Stawinski's tenure, three of those investigations were conducted by ██████████[338]; three by █████████████[339]; two by ████ ██████[340]; and one by ██████████████[341]  That is, most of the minority officers terminated during Chief Stawinski's tenure had been investigated by a handful of investigators with disparate Black and Hispanic officer "sustain" rates.

127.   I have seen evidence that the senior leadership of the Department made a conscious decision not to track, monitor, or analyze race in its investigative or disciplinary function, although it would have been easy for them to do so.  In particular, I have reviewed an email send by IAD Commander Mills in which she rejects a proposal raised at the Equality for Promotions, Discipline, and Practices

---

[337] Mills Dep. Tr. 213:8-13; Stawinski Dep. Tr. 230:12-20; *see also* M. Smith Dep. Tr. 52:1-3.
[338] Terminations of ████████, SI2016-011 (PG0000170989-170994); ████████, SI2016-031 (PGIAD103604-612); ████████, SI2014-052 (PG0000321922-321925).
[339] Terminations of ████████, SI2014-039 (PG0000012123-12429); ████████, SI2017-039 (PGIAD0000067714- 67714); ████████, (PG0000161272-161274).
[340] Termination of ████████, IA2014-130 (PG0000013412-13524); Termination of ████████, IA2015-040 (PG000070896 -902).
[341] Termination of ████████, SI2017-043 (PG0000785926-786231).

Panel that IAD use IAPro to track race and sex.  Specifically, Commander Mills

received an email from Capt. Ghattas reporting that a Panel member proposed that

"we need to track race and sex . . . so we can make sure that [discipline] is being

fairly imposed . . . If we can ever get IAPro set up correctly, we would be able to

do it both ways very easily."  In response, Commander Mills wrote:

> We do not currently track this through IAPro, however it has been
> discussed.  I believe this is a slippery slope as that may present a
> tendency to try to make things fair based on race/sex, when in
> actuality it needs to be on a case by case basis and never focus on
> what an officer of one race/sex got for a punishment as opposed to
> another . . . At the end of the day, it is about ensuring that the
> investigation is complete and thorough and that the officer is
> treated fairly, regardless of race/sex.  Having said that, the most
> important thing to keep in mind is that if the focus is on race/sex,
> then cases are examined with that consideration, thereby negating
> the very core of what this is all about, which is treating officers
> fairly based on their actions and not their race/sex, therefore
> enabling us to be impartial.[342]

Commander Mills vetted this answer with Hector Velez, the Acting Chief of the

Department.[343]

128.   Following this email exchange, and demonstrating Ghattas' statement

that this analysis could be performed fairly easily, Internal Affairs prepared an

---

[342] PG0000161480-161482, PG0000875393-875493 at 875465; *see also* Ghattas Dep. Tr. 201-218.
[343] PG0000182196-182199.

analysis of cases handled by its Administrative Investigation Section (AIS), which are cases with an IA Prefix.[344]   Major Mills promptly provided this information to the Equality for Promotions, Discipline, and Practices Panel, but failed to advise the Panel that the information was limited to the AIS section cases, and did not include all cases handled by Internal Affairs (such as the cases handled by the Serious Incident Response Team (SIRT)) and did not include cases investigated by supervisors in the field (PS or FC cases).  I note that this flawed analysis could have deceived the Panel into believing there was no racial bias in the investigations.  It is clear that had Commander Mills presented all of the IAPro data to the Panel, the racial disparity in investigations would have been clear (as discussed above).

129.   Commander Mills noted in her email that the proposal for IAD to track by race had "been discussed" before and rejected.  *Id.*  As discussed above, there is significant evidence that Internal Affairs has neither "treat[ed] officers fairly," nor has it been "impartial"; rather, the data shows a significant, troublesome disparity that disadvantages minority officers and advantages white officers at every stage of PGPD's investigative and disciplinary processes.  In addition, the Department deliberately blinds itself to this information by not

---

[344] PG0000000182-201 at 186-189.

monitoring or analyzing race in its investigative or disciplinary function by switching off the part of their internal investigations and discipline system that could track such discrimination.

130.     Following the time that Major Mills provided partial data to the Equality for Promotions, Discipline, and Practices Panel, there is no evidence that the Department tracked investigative or disciplinary data by race.  I have also reviewed the deposition testimony of the IAD "Statistical Coordinator," Linda Washington.  In her testimony, she confirmed that the Department does not prepare analysis of its investigations or discipline by race.[345]  Numerous senior officers including Chief Stawinski and Major Mills testified that the Department does not analyze such data.[346]  I am aware the Defendants have subsequently confirmed in writing that the Department does not have or prepare any such statistical reports.[347]

131.   I have seen another series of emails from Commander Mills in which she expresses conduct inconsistent with Department policy to "investigate complaints in a fair and impartial manner."[348]  Notably, in conjunction with her efforts to work with the President of the local Fraternal Order of Police to

---

[345] Washington Dep. Tr. 43-48.
[346] Stawinski Dep. Tr. 233:8-235:12; Mills Dep. Tr. 178:16-179:21.
[347] Dec. 18, 2019 Alsip Response to Pergament Dec. 9 Letter at 5, item b; Feb. 14, 2020 Alsip Response to Pergament Feb. 1 Letter at 5.
[348] General Order, Vol. I, Ch. 4 § I (Complaints: Policy).

encourage officers to seek expungement of their files, on July 20, 2017

Commander Mills wrote in a series of emails:[349]

> First of all, you are not a good Catholic… I know better…. I'll pray
> for your soul….
>
> Please note the show of good faith from the Commander of IAD…
> I cannot always set your people free but I can certainly cross the
> aisle.  I look out for them whenever I can.  You can buy me a beer
> anytime… I would actually prefer it brought to my office today so I
> can alleviate some of the stress that your people are causing me of
> late… ☺[350]

In my opinion, this is completely inappropriate conduct for a law enforcement

professional.  They are certainly inappropriate for the individual charged by the

Department with responsibility for ensuring that complaints be investigated in a

"fair and impartial manner."

132.   These statistical trends are consistent with what the Plaintiffs alleged

in the complaint regarding disparate discipline for similar infractions.

133.   Based on my review, the Department has a practice of diverging from

its stated policy of "uniform" discipline.

---

[349] Compl. ¶ 103(a); Pippin Dep. Tr. 79:8-86:14.
[350] PG0000182444-182445; PG0000182462-182463.  Three days after sending this email,
Commander Mills personally reviewed Sgt. Rush's request for expungement.  PG0000855439;
PG0000855440-855445 at 855541.  Commander Mills subordinates reported that they were
"inundated with requests."  PG000903780.

134.   These are some examples where I have questions about the fairness of the discipline.  While the conduct at issue in all of these matters is serious, and in many cases, serious discipline is warranted, there is a pattern where minority officers have received harsher discipline than white officers for similar violations:



a.   **Plaintiff Sharon Chambers and Corporal** ███████████ **v. Corporal** ████████████ **, Lieutenant** ██████████ **, Lieutenant** ████████████ **, Sergeant** **Corporal** ████████ **and Corporal** ████████: PO Chambers is a Black female officer who retired in 2019. While on duty, she returned to her vehicle and found that her firearm had been stolen. She was suspended pending investigation, fined $500 and received a written reprimand.[351] Cpl. ██████, a Black male officer, also had his firearm stolen from his vehicle; he was suspended for ████████████████.[352] The discipline records produced by PGPD contain several instances in which white male officers reported their firearms lost under similar or worse circumstances—none of them were disciplined as severely as PO Chambers or Cpl. ██████, and none of the white officers were suspended pending investigation. Cpl. ██████ had his firearm stolen from his vehicle and was fined $500 but received no written reprimand.[353]

[354]

[355]

[356]

[357]

---

[351] PS2017-090 (PG0000023408-23457 at 23410-23411).
[352] PS2017-084 (PG0000016450-16531 at 16450-16452).
[353] PS2016-083 (PGIAD0000092647-92687 at 92650-92651).
[354] PS2016-185 (PGIAD0000096744-96759 at 96747).
[355] PS2013-541 (PG0000080388-80436 at 80391-80392).
[356] PS2014-290 (PG0000157689-157741 at 157692).
[357] PS2016-111 (PGIAD0000093557-93597 at 93560-93561).

██████████████████████████████████████████

██████████████████████ [358]

b. **Police Officer Arvester Horner v. Police Officer ██████,
Corporal ████████ and Sgt. ████**:  PO Arvester Horner is a
Black officer.  In North Carolina, he was charged with driving
under the influence, he was investigated and disciplined with a
suspension without pay for 120 hours and reduction of two ranks
and removed from the promotional cycle for one year.[359]  PO ████
is a white officer.  After being stopped and arrested for driving
under the influence, he was investigated ████████████████
████████████████████ [360]  Cpl. ████ is a white
officer.  After being stopped and arrested in Idaho for driving
under the influence ████████████ he was investigated ████
█████████ [361]  Sgt. ████ is a white officer. ████████
██████████ and charged with
driving under the influence, he was investigated. ██████████
██████████ [362] ████████ and imposed fines.[363]

c. **Police Officer Tasha Oatis v. Sergeant ████████ (SIQ2016-
012, SI2017-001), Lieutenant ████████ (SIQ2017-006)**:  PO
Oatis is a Black officer. She was accused of "double dipping"
(leaving early to go to her part-time security job).  Her matter was
formally investigated by Internal Affairs.  She was suspended nine
months after her investigation started, and she was terminated in
2016.[364]  Sgt. ████ is a white officer accused of 71 counts of

---

[358] IAPro Entry for IA2014-058 (file not produced).
[359] SI2014-055 (PG0000786754-786878 at 786761).
[360] SI2017-072 (PGIAD000075164-75309 at 75168).
[361] SI2014-045 (PG0000001248-1251 at 1249).
[362] SI2010-003 (PG0000022038-22322 at 22095).
[363] SI2010-003 (PG0000022038-22322 at 22039).
[364] IA2014-130 (PG0000013412-13524 at 13431).

unbecoming conduct related to "double dipping." ███████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████ at which point she was charged with 61
counts of unbecoming conduct related to double dipping. ████████
███████████████████ [365] Lt. ████████ is a white officer
accused of double dipping ████████████████████████████
███████████████████████████████ [366]

d. **POFC Eric Beale v. Lt.** ████████████████: POFC ██████ is a
   Black officer.  He was terminated after being investigated for
   ████████████████ ████████████████ attempting to track
   down a civilian accused of impersonating a police officer.[367] Lt.
   ████████ is a white officer.  He was investigated for
   "█████████████████████." ████████████████████████
   ██████████████████████████████████████ Lt. ██████ was
   for ████████████████ [368] As noted above, he had a prior
   disciplinary infraction where ████████████████████████████.
   He was subsequently promoted twice.

e. **Corporal Michael Brown v. Corporals** ████████████
   ████████████████████████ **(IA 2015-006), and** ████████
   ████████: Cpl. M. Brown is a Black officer.  After he was
   investigated for "use of language" and "unbecoming conduct"
   violations following an off-duty confrontation in the District of
   Columbia where he drew a weapon, and was arrested; Cpl. M.
   Brown was suspended and subsequently threatened with
   termination, and resigned the day before the termination was to

[365] IAPro Entry for SIQ2016-012 (file not produced); SI2017-001 (PG0000975400-975725 at 975422); PG0000939411-939412; PG0000086663; PG0000080569.
[366] IAPro entry for SIQ2017-006 (file not produced).
[367] SI2016-011 (PGIAD0000113736-113978 at 113743).
[368] Compl. ¶ 61(a); SI2015-037 (PG0000021848-22037 at 21856).

occur.[369]  Cpl. ███████████ is a white officer.  He was involved in an altercation ███████████████████████████████████████████ [370] according to the materials produced in discovery, he was not suspended and there is no indication in IAPro or other discovery materials that he was investigated for this incident.  Cpl. ████████ is a white officer.  He was accused ███████████████████ ████████████████████████████████████████  According to IAPro, he received a ██████████████████.[371] Cpl. ████ ████████ is a white officer.  He was involved in a ██████████ ████████████████████████████████████████████ there is no indication in IAPro or other discovery materials that he was investigated for the incident; ███████ █████████████████████ [372]

f.  **POFC ███████████ and Police Officer ███████████ v. Police** ███████████████ is a Black officer.  After a domestic violence incident alleged by his ████████████████, POFC ███████ was investigated and subsequently terminated.[373]  PO ████ is a Hispanic officer.  After being criminally charged with harassment arising out of a domestic violence incident █████████████████, he was charged with ██████████████████████████████████████ [374]



[369] SI2014-039 (PG0000012123-12429 at 12130).
[370] NBC Washington, *Prince George's SWAT Officers Investigated After Bar Fight* (Dec. 19, 2018), https://www.nbcwashington.com/news/local/prince-georges-swat-officers-investigated-after-bar-fight_washington-dc/166364/; PG0000854965-854966.
[371]  IAPro Entry for IA2015-006 (file not produced).
[372] PG0000104622-104623.
[373] SI2016-004 (PG0000160486-160570; PGIAD0000099257-99459).
[374] PG000000819-825 at 824.

 and terminated him.[375]  PO ███████ is a white officer.  PO ████████████████████████████████████████████████████████████████████████████████████████████████ PO ████ was investigated and disciplined ████████████████████████████████████[376]  He remains on the force.  POFC ████████ is a white officer.  He was involved in a domestic dispute.  The ████████████████████████████████████████████████████████████████████████████[377] POFC ████████ was charged with ████████████, which was not sustained, and ████ with a ████████████, which was sustained.  He was fined $██.[378]

135.   Again, the point of this analysis is not to deemphasize the seriousness of any of this misconduct—it is simply to illustrate that there is a pattern where minority officers have received harsher discipline than white officers for similar violations.  In this regard, it bears emphasis that, as discussed above (i) in several of these cases, the minority officer was investigated by one of the IAD investigators who displayed significant disparities in their investigations based on

---

[375] PG000000826-830 at 826-827.
[376] SI2017-069 (PG0000875704-875707).
[377] SI2014-005 (PGIAD00000131308- 131457 at 131331.
[378] SI2014-005 (PGIAD0000131308-131457 at 131319); District for Prince George's County Case No. 0501SP005312014.

race, and (ii) under Chief Stawinski, the Department appeared to have a significantly higher threshold for terminating white officers (*i.e.,* the only white sworn officers terminated during Chief Stawinski's tenure were those who were criminally convicted of crimes of violence) than minority officers.

136.   The discrepancies in discipline are also evident at the command ranks of the Department.   For example, as discussed below, Captain Joe Perez, the President of HNLEA, experienced various forms of retaliation following the time in which he reported that he had filed an EEO charge against Chief Stawinski and Commander Mills, and advised the senior commanders of the Department that HNLEA and UBPOA had filed a complaint with the Department of Justice. Following this disclosure, Internal Affairs (headed by Commander Mills) instituted an investigation of Captain Perez, stemming from a complaint from the Mayor of Seat Pleasant, Maryland.  As a result of this investigation, Captain Perez was ultimately demoted, leaving the Department with no Hispanic Captains.

137.   In conjunction with the Perez investigation, in August 2019, Commander Mills was requested ███████████████████████████ ████████████████. In response, she wrote: "████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ [379]

138.   In writing this, Commander Mills failed to consider the following four incidents:



---

[379] PG0000150199-150200.
[380] Stawinski Dep. Tr. 314:21-315:9.
[381] PG0000144137-144138.



---

[382] IA2016-030 (PG0000447426-447764).
[383] PS2019-114 (PGIAD0000127799-127818 at 127809;); PS2019-115, PGIAD00000127819-834, at 127831.
[384] PS2019-114 (PGIAD0000127799-127818 at 127809); PS2019-115, PGIAD00000127819-834, at 127831.
[385] PS2019-115 (PGIAD0000127819-127834 at 127831).



139.   In sum, there is extensive evidence that the Department discriminates against minority officers relative to white officers in its investigative and disciplinary decisions, and that senior leaders of the Department were deliberately indifferent to such discrimination.

### F.   The Department's Culture of Retaliation

140.   There is a practice and custom in the department that when minority officers complain, and particularly when they complain about racial discrimination or harassment by white officers, they experience retaliation.  From my review, the two most prevalent forms of retaliation are (i) transfers of complainants, and (ii) institution of retaliatory investigations of the complainants.

141.   Although the Department has policies concerning retaliation,[387] I have seen no evidence in IAPro or the Defendants' response to discovery that these policies are enforced.  In particular, a search of the IAPro data produced by Defendants for "retaliation" finds several complaints from civilians, but no matters

---

[386] SI2017-064 (PGIAD0000135296-135456 at 135379-135380).

[387] *See* General Orders Vol. I, Ch. 4, § V.9; *id.* at Vol. I, Ch. 12, § V.4.

where an officer alleges they were subjected to retaliation.  As discussed in this section, numerous minority officers have claimed retaliation and there is no evidence that these charges were investigated by either IAD or the EEO Coordinator.

142.    This lack of investigation and enforcement of the Department's anti-retaliation policies is consistent with the materials I have reviewed concerning the Department's training for supervisors and managers concerning retaliation, which is inadequate.  The Department's 46-slide EEO training for supervisors and managers only discusses retaliation on 2 pages.[388]  In my opinion, this training provided is inadequate, particularly given the culture of retaliation in the PGPD.

143.    From my review, I noted the following incidents where minority officers who complained of conduct (including racist and other unprofessional conduct) by white officers experienced reciprocal charges (or other forms of retaliation) that were brought in response to or proximate in time to the minority officer's complaint.

    a. **<u>Plaintiff Danita Ingram</u>**:  While Cpl. Ingram (a Black officer) was sitting (undercover) in a courtroom, she was confronted by a white officer, POFC Michael Rushlow.[389] POFC Rushlow demanded that she surrender her seat to him and proceeded to verbally harass and disparage her.  Cpl. Ingram reported the

---

[388] PG0000000348-394 at 362-363; PG0000000395-441 at 409-410.
[389] Compl. ¶ 136; IA2017-007 (PG0000025416-25896 at 25468).

incident to the court liaison and filed an internal written complaint against POFC Rushlow, in which she accused him of discrimination and racial bias.[390] ███████████████████

███████████[391]  When POFC Rushlow learned about Cpl. Ingram's complaint, he filed a counter-complaint against Cpl. Ingram concerning the same incident.[392]  During his investigation interview, POFC Rushlow stated that he filed a complaint against Cpl. Ingram only ████████

███████████████████[393]  Nonetheless, IAD did not charge POFC Rushlow for violating the Department's anti-retaliation provisions. ███████████████████

███████████████████[394]  Instead, Commander Mills directed both officers be given the sustained charge of discourtesy."[395]  POFC Rushlow accepted the punishment; Cpl. Ingram took this charge to an administrative hearing and won.[396]  In their report to the Chief, the Administrative Hearing Board not only found Cpl. Ingram "Not Guilty" but detailed numerous conduct violations committed by POFC Rushlow that were not charged, noting that Cpl. Ingram had tried to end his abuse at several points in the confrontation.[397] Still, during the pendency of the case, which lasted over a year, Cpl. Ingram was ineligible for a promotion.[398]

---

[390] Compl. ¶ 136; IA2017-007 (PG0000025416-25896 at 25468).
[391] IA2017-007 (PG0000025416-25896 at 25588, 25598, 25573).
[392] Compl. ¶ 138; IA2017-007 (PG0000025416-25896 at 25678).
[393] IA2017-007 (PG0000025416-25896 at 25513-25515).
[394] PG00000939321 (points 5 and 6); Kathleen Mills's Response to HNLEA's First Set of Interrogatories No. 1.
[395] Kathleen Mills's Responses and Objections to HNLEA's First Set of Interrogatories No. 1.
[396] Compl. ¶ 140; IA2017-007 (PG0000025416-25896 at 25449).
[397] IA2017-007 (PG0000025416-25896 at 25449).
[398] Compl. ¶ 139; IA2017-007 (PG0000025416-25896 at 25441).

b. **Captain** ███████ ██████: Capt. █████ (a Hispanic officer) filed a complaint against Lieutenant ████████████ ██████ following the ████████████████████████████, during which Lt. ████████████████████████ Capt. ████████████ ███████████ ██████████.[399] Police department witnesses ███████████████████████████████████ ████████████████████████████ Several civilian witnesses also filed complaints against Lt. ███████ stemming out of this incident.[401] After Capt. ██████ filed the complaint, Lt. █████ subsequently filed one against Capt. █████.[402] IAD concluded that the allegations as to Lt. ██████ were unfounded (█████████████████) and non-sustained (██████████), despite the ample corroboration of Capt. █████'s allegation and the civilian complaints.[403] IAD also concluded that Lt. █████'s █████████ allegation against Capt. █████ was unfounded.[404] IAD ████████████████████████████████████████████████████████████████████████[405]

c. **Officers** ████████████ **and** ████████ **(SI2017-064)**: As discussed above, Officers ██████████ ████ and █████████ reported Corporal ██████████ after ████████ and cooperated in his criminal prosecution. After they first made the charges, they were subject to a number of hostile and retaliatory acts ████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[399] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 1, at 9-10; IA2017-069 (PG0000025100-25285 at 25116).

[400] IA2017-069 (PG0000025100-25285 at 25111-25112).

[401] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 1, at 9-10; PG0000162177-79.

[402] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 1, at 9-10; IA2017-069 (PG0000025100-25285 at 25269).

[403] IA2017-069 (PG0000025100-25285 at 25107- 25108).

[404] IA2017-069 (PG0000025100-25285 at 25107-25108).

[405] IA2017-069 (PG0000025100-25285 at 25269).

128



d. **Plaintiff Patrick McClam**:  Lt. McClam witnessed William
████████, the white Director of the Forensic Lab, make racist and
sexist statements concerning minority female employees of the
lab.[409]  With Lt. McClam's encouragement, two female civilian
employees of color filed EEOC charges concerning the
████████.[410]  After learning that Lt. McClam was a witness to the
EEOC charges and was cooperating in the EEOC investigation, the
Department  transferred Lt. McClam involuntarily to the Patrol
Bureau.[411] ████████████████████████████████████
████████████████████████████████████[412]  In August 2017,
when Lt. McClam was on track to be promoted to supervisor for a
Special Assignment Team, he was again involuntarily transferred
to a less desirable assignment in the Patrol Bureau.[413]  Since
cooperating in the EEO investigation, the Department has pursued
four individual meritless investigations into Lt. McClam.[414]  I
understand that Defendants recently charged Lt. McClam in a fifth
matter and are seeking his termination.

---

[406] SI2017-064 (PGIAD0000135296-135456 at 135335-135349).

[407] SI2017-064 (PGIAD0000135296-135456 at 135339) ("████████████████████████████
████████").

[408] SI2017-064 (PGIAD0000135296-135456 at 135439-135441, 135300).

[409] Compl. ¶ 222.

[410] PG0000158501 and PG0000158507.

[411] Compl. ¶¶ 222, 227; Patrick McClam's Third Supplemental Responses and Objections to
Defendant's First Set of Interrogatories No. 6; PG0000162400-162402.

[412] PG0000162391-162392.

[413] *Id.*

[414] *Id.*; IA2016-038 (PG0000023826-24386); IAQ2018-014 (PG0000027646-27747);
FCIQ2017-067 (PGIAD0000028915-28922); FCIQ2018-105 (PGIAD0000032967-33006).

129

e. **POFC Earl Sharpe**:  Four days after POFC Sharpe's cooperation in an investigation during which he reported Sgt. Rush's racist conduct and other racist conduct in the ███████ division (discussed above, IA2015-092), POFC Sharpe was transferred out of the Investigations Bureau to the Patrol Bureau without explanation.[415]  Although the Department has advised the Justice Department that Sharpe was ██████████████████████████ ████████████████████████████████████ ████████████████████████████ ██████████" Defendants have not produced evidence of such conduct; I also note that Defendants ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████[416]  Approximately one month after Sharpe's transfer, IAD reopened a stale investigation (started in 2014) into POFC Sharpe relating to a worker's compensation claim.[417]  POFC Sharpe was charged with a Category IV offense, and he was told by the investigator that ████████████████████████████ ████████████████████

f. **Plaintiff Joe Perez**:  During 2015 and 2016, Capt. Perez filed a number of complaints with the PGPD Inspector General regarding discrimination against officers of color related to promotions, discipline in Internal Affairs investigations, and assignments to specialty units.[418] Additionally, Capt. Perez complained about racially hostile conduct and unethical conduct by white officers.[419] In March 2016, Capt. Perez, as President of HNLEA and along with other officers filed a complaint with the U.S. Department of Justice raising the same issues. After Defendant Commander Mills was transferred to IAD in August 2016, Capt. Perez witnessed her make a number of discriminatory comments about minority

---

[415] EEO Charge 531-2016-00712 (PG0000157216), PG0000908213-908214; Sharpe Decl. ¶ 11.
[416] PG0000964709-964718 at 964717; IA2015-092 (PG0000042371-436, at 42405-421).
[417] SI2014-015 (PG0000137899-138649).
[418] Compl. ¶ 107.
[419] Compl. ¶ 107.

officers and engage in discriminatory practices regarding investigation and disciplinary issues.[420]  In October 2016, Capt. Perez was denied promotion to Major.[421]  In a meeting following this to discuss his complaints against Defendant Commander Mills, Capt. Perez informed Chief Stawinski that he would be filing an EEOC complaint and a supplement to the DOJ Complaint.[422] Within 45 minutes of the meeting ending, Capt. Perez was informed he was being transferred from Internal Affairs to Planning & Research.[423]  His direct supervisor in Planning & Research was Major ███████████, who was the subject of one of his prior complaints about unethical conduct.[424]  Moreover, around this time, Defendant Commander Mills and her subordinates engaged in retaliatory efforts against Capt. Perez for raising concerns about himself and other minority officers.[425]  For example, Major ███████████████████████ and Defendant Commander Mills contemplated suspending Capt. Perez for "insubordinate behavior."[426]

In ████████████, Defendants Chief Stawinski and Commander Mills learned ████████████



---

[420] PGPD-PER-0069987-69992.
[421] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.
[422] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; Stawinski Dep. Tr. 115:1-135:7.
[423] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; PG0000147518; PG0000147519-147522.
[424] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; PG0000300016-300018.
[425] Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6, at 48 ("[T]he manner in which Chief Stawinski and Major Kathleen Mills handled the investigation was retaliatory and incongruent with PGPD's disciplinary policies.").
[426] PG0000785918-19; PG0000785910; PG0000956075.
[427] PG0000144137-144138.

███████████████████████████████████████[428]   Following this, Chief Stawinski had a series of contentious meetings with Capt. Perez and UBPOA leadership ██████████████████████████████ and complaints about discriminatory treatment of minority officers.[429]   Around the same time as these meetings, Commander Mills and Chief Stawinski engaged in a series of actions against Capt. Perez, including Commander Mills ████████████████████████████

███████████████████████████████████████[430]   During their depositions, Chief Stawinski and Major Mills acknowledged that Assistant Chief Velez had ordered an ████████████"[431]   Around the same time, Commander Mills had her subordinates conduct research into potential grounds to terminate an unspecified officer.[432]   And Chief Stawinski had Commander Mills ████████████████████████████████

████████████████████████████████████████[433]   This is the same timeframe that the Seat Pleasant Chief complained that Capt. Perez had attempted to use his position within PGPD to obtain leave for his son.[434]   Major Mills was also aware that ████████████████████████

---

[428] PG0000162691-162711 at 162698-162699; PG0000181256-181257; PG0000787555-787693 at 787569-787570.
[429] PG0000162169-162171; PG0000162510-162511.
[430] PG0000150850; PG0000171078-171079; PG0000929099-929102.
[431] Stawinski Dep. Tr. 335:5-337:6; Mills Dep. Tr. 418:7-419:7.
[432] PG0000169211-169213; PG0000169310-169311; PG0000165790.
[433] PG0000155548-155549.
[434] Compl. ¶¶ 115-116 & 118.

████████████████████ – notwithstanding this knowledge, ██████ was not charged with or investigated for retaliation.[435]

Captain Perez filed two further complaints of harassment during the summer and fall 2017 – ██████████████████████████████████ ████████████████████████████████ Neither of these complaints appears to have been investigated.[436]

Capt. Perez filed a supplemental EEOC charge on October 10, 2017 after he was denied the opportunity to compete for a promotion to Major.[437]  Two months later, on January 10, 2018, PGPD informed Capt. Perez that there was an Internal Affairs investigation ██████████████[438]███████████████████ ████████████████████████████████████████ There appear to be significant procedural irregularities in this investigation, including ██████████████████████████ ████████████████[439]███████████ ███████████████[440]████ ████████[441]█████████████

---

[435] Mills Dep. Tr. 412:20-413:3, 416:10-14; Stawinski Dep. Tr. 316:4-7, 317:2-15.

[436] PG0000971542-50; PG0000875170; PG0000171280-86.

[437] Compl. ¶ 114-115.

[438] PGIAD0000097141; Compl.¶ 115; Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[439] PGIAD0000097141.

[440] Compl. ¶ 116; Joseph Perez's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; PGPD IAD Standard Operating Procedures at 10 (PG0000000497-530 at 506) ("Upon receipt at Internal Affairs, each complaint will be assigned a unique identified (case number), which will be provided to the complainant within ten (10) business days. . . . IAD investigations must be completed within 90 days absent extenuating circumstances.").

[441] PG0000973606.



On February 13, 2019, the EEOC issued a determination that Defendants had "subjected [Capt. Perez] to unequal terms and conditions of employment concerning involuntary transfer and internal affair processing, denied promotional opportunities, reassigned, disciplined, demoted, and retaliated against for engaging in protected activity due to his national origin."[445]

g. **Plaintiff Adrian Crudup**:  In 2015, Cpl. Crudup made several complaints against his supervisor, Lt. Hampson. One such complaint alleged that Lt. Hampson had called a civilian a "project n****."[446]  In October 2016, Cpl. Crudup was suspended with pay and transferred from the Special Investigations Division Gang Unit to the Financial Crimes Unit;

"[447] Crudup was not given any explanation for this transfer.[448]  Crudup's request for a hearing was denied.[449]  Cpl. Crudup subsequently learned that his transfer was a result of Lt. Hampson filing an IAD complaint against him for allegedly interfering with an investigation dating back to May 2015.[450]  The

---

[442] *See* PG0000970325.

[443] Watkins Dep. Tr. 116:23-117:5, 140:18-144:8.

[444] Watkins Dep. Tr. 302:2-3, 310:3-16.

[445] EEOC_Perez_00001-355 at 00007.

[446] Compl. ¶ 240, Adrian Crudup's Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[447] PG0000964709-964718 at 964713.

[448] Compl. ¶ 240; PG0000202216; PG000150392; PG0000171445.

[449] Compl. ¶ 240.

[450] Adrian Crudup's Third Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6; SI2016-008 (PG0000198478-198479).

Complaint █████████████████████████████ was referred
to the State's Attorney and all charges were dismissed as in
February 2018.[451]  IAD does not appear to have investigated Lt.
Hampson for retaliation, and there is no evidence Defendants
opened an investigation into Cpl. Crudup's complaints about Lt.
Hampson's racist conduct.  As a result of this investigation, ████
█████████████████████████

h. **Lt. ███████████**: Lt. █████████, a prominent member of
HNLEA, reported Sgt. ████████ and Sgt. █████████ for
███████████████ (including ████
█████████).[452] Lt. ██████████████████████
█████████████████████████████████[453]
Sgt. █████████████████████████████████
███████████████████████[454] IAD does not
appear to have investigated Sgt. ██████ for ██████████, despite the
fact that Sgt. ██████████████████████████████████
██████████████████████.

144.    Several of these incidents (Lt. McClam, POFC Sharpe, and Capt.

Perez) involved transfers after the minority officer filed a complaint or cooperated

in an investigation against a white officer.  From my review, I noted other

incidents where minority officers who complained of conduct (including racist and

other unprofessional conduct) by white officers were transferred promptly (or

experienced other hostile environment) after lodging their complaint.  These

include:

---

[451] PG00000171445.
[452] IA2015-087 (PG0000041835-42055 at 41881 and 41967-68).
[453] IA2015-087 (PG0000041835-42055 at 41869, 41877-41882).
[454] IA2016-031 (PG0000043028-43150).

a. <u>**Plaintiff Richard Torres**</u>: As discussed above, in May 2016, Cpl. Torres received a text message from Sgt. Bunce, his white supervisor.  In the text message, Sgt. Bunce used the word "NECA" to describe an African-American civilian and made a derogatory reference to a suspect.[455]  Cpl. Torres complained to then-Captain Powell about the text message.[456]  Cpl. Torres subsequently told Capt. Powell that Sgt. Bunce was a racist with whom he no longer wanted to work.[457]  Despite hearing Cpl. Torres's allegations and reading the text message, Capt. Powell declined to notify Internal Affairs or the EEO Coordinator.[458]  Further, there is no indication that Capt. Powell either tried to remove Cpl. Torres from under Sgt. Bunce's supervision or warn Sgt. Bunce not to retaliate.  In November 2016, Sgt. Bunce issued a performance evaluation of Cpl. Torres alleging that he had failed to perform his duties satisfactorily; ███████████████████████████████████████ [459] ████████████████████████████████████████ [460] Shortly thereafter, Cpl. Torres was transferred from Investigations to the Patrol Bureau.[461]

b. <u>**Plaintiff Sonya Zollicoffer**</u>: While assigned to IAD, Lt. Zollicoffer had a number of disagreements with Defendant Commander Mills, including a disagreement where Commander Mills ordered Lt. Zollicoffer to charge Plaintiff Cpl. Ingram after she filed a charge against POFC Rushlow.[462]  Lt. Zollicoffer was

---

[455] PG0000150665-150693 at 150669-150670; Richard Torres's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[456] Richard Torres's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[457] Richard Torres's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[458] Compl. ¶ 166.

[459] PG0000150665-150693 at 150669-150670; PG0000103513-103525..

[460] PG0000103511.

[461] PG0000179546; PG00000446894-446898 at 446897; PG0000144565-144566.

[462] Compl. ¶¶ 36, 144.

promoted to Lieutenant in February 2018.[463]  She expressed interest in remaining in the Internal Affairs Division because there were two open Lieutenant positions. Despite that, Lt. Zollicoffer was involuntarily transferred from Internal Affairs to the Patrol Bureau to work the overnight shift starting in April 2018.[464] ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[465]  Notwithstanding this, the Department reassigned her to the District where she was assaulted.[466] Although the Defendants have advised the Department of Justice that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" they did not inform the Department of Justice (i) that Zollicoffer had requested to stay in Internal Affairs, (ii) other officers in Internal Affairs who had been promoted were allowed to stay in Internal Affairs, and (iii) the Defendants proposed to transfer her to a unit where she had been sexually assaulted by her training officer.[467]

c. **<u>Plaintiff Thomas Boone</u>**:  Since December 2016, Lt. Boone has repeatedly complained to his supervisors of the incidents of racially motivated wrongdoing in the work environment, including complaints about inappropriate language, unfair transfers, disparate discipline, unfair hiring practice, racially insensitive and offensive pictures, retaliation for reporting wrongdoing and other racially motivated behaviors.[468]  Additionally, Lt. Boone met with Chief

---

[463] Sonya Zollicoffer Supplemental Interrogatory Responses and Objections to Defendants' First Set of Interrogatories No. 6; PG0000007180-7396 at 7186.

[464] Sonya Zollicoffer Supplemental Interrogatory Responses and Objections to Defendants' First Set of Interrogatories No. 6; PG0000446894-446898 at 446897.

[465] PG0000162977.

[466] Compl. ¶ 146.

[467] PG0000964740-964745 at 964744.

[468] *See, e.g.*, PG0000155770; PG0000155786; Thomas Boone Supplemental Responses and Objections to Defendants' First Set of Interrogatories No. 6.

Stawinski on a number of occasions to complain about these problems.[469] On October 1, 2018, Major David Renner informed Lt. Boone that he was being transferred.[470]  Lt. Boone made clear that he did not wish to be transferred from his current position; however, based on his understanding that a transfer was mandatory, he agreed to be transferred to the Property Division.[471] Lt. Boone was ultimately transferred to Patrol, under the command of Major Mints, against whom he had previously made a complaint; and he was stationed in District 2, where Lt. Boone had previously experienced a traumatic event.[472]

d. **<u>Plaintiff Chris Smith</u>**: In October and December 2015, Cpl. Smith complained to Lt. Vondell Smith that Cpl. Smith's colleagues had created a racially hostile environment by disparaging African-American civilians.[473] Lt. Smith took no action.[474] In March 2016, Cpl. Smith was involuntarily transferred to the Patrol Bureau, a transfer that Cpl. Smith believes was retaliatory in response to his prior complaints.[475]  In June, 2016, Darryl Kriess gave Cpl. Smith a poor performance evaluation after Cpl. Smith had complained to him about the racist environment on the team.[476]

e. 

---

[469] Thomas Boone Supplemental Responses and Objections to Defendants' First Set of Interrogatories No. 6.

[470] Thomas Boone Supplemental Responses and Objections to Defendants' First Set of Interrogatories No. 6.

[471] Boone Dep. Tr. 128:17-22, 69:6-20, 72:16-25.

[472] Boone Dep. Tr. 69:21-23, 74: 22-25,  75:1-25, 76:1-14, 220: 17-25, 221:1-25, 222:1-8.

[473] Compl. ¶ 189.

[474] Compl. ¶ 189.

[475] Chris Smith's Supplemental Responses and Objections to Defendant's First Set of Interrogatories No. 6.

[476] C. Smith Dep. Tr. 241:10 -242:20.



f.

g.

[477] PG0000001713-1802 at 1715, 1755.
[478] PG0000905763-905765.
[479] PG0000905763-905765.
[480] EEO Charge No. 531-2017-0161 (PG0000001550-1642 at 1550).
[481] EEO Charge No. 531-2017-01616 (PG0000001550-1642 at 1550).
[482] PG0000001265-1351 at 1336; PG0000154090-154091.
[483] EEO Charge No. 531-2017-01487 (PG0000001375-1457 at 1382).



h.

Although the Department has advised the Department of Justice that ███████████████████████████████████████████ ███████████████████ I also note that Defendants attribute the transfer decision to Major ████ ██████ and Captain ████████; ████ provided evidence against ████, both of whom are discussed elsewhere in this report; ████ provided evidence of ██████ discriminatory acts, as well as ██████ and ██████████ failure to keep their command free from discrimination.[487]

i.

[484] PG0000154090-154091.

[485] IA2015-092 (PG0000042371-42436 at 42386).

[486] IA2015-092 (PG0000042371-42436 at 42399-42404); PG0000446894-446898 at 446896.

[487] IA2015-092 (PG0000042371-436, at 42422-436); PG0000964709-964718 at 964716.

[488] IA2015-092 (PG0000042371-42436 at 42375-42375).

[489] EEO Charge No. 12F-2016-00639 (PG0000002029-2055 at 2030).

[490] EEO Charge No. 12F-2016-00639 (PG0000002029-2055 at 2029).

████████████████████████████████████████████
[491]

145.    In conclusion, there is abundant evidence that the Department did not have adequate anti-retaliation policies or training, and that there is a widespread and persistent issue of retaliation against minority officers who complain about white officers, and that senior Department leaders directly participated in or condoned such actions.

G.    **Discrimination in the Department's Promotions**

146.    There is a significant disparity between the demographics of Prince George's County and its police force; and that disparity is greatest in PGPD's senior ranks.

147.    A comparison of the racial composition of the County as a whole, as reported by the U.S. Census,[492] and the racial composition of PGPD and its senior officers, as shown in a recent presentation by Interim Chief Velez,[493] documents those disparities well:

---

[491] PG0000964740-964745 at 964741; EEO Charge No. 12F-2016-00639 (PG0000002029-2055 at 2030); PG0000446894-446898 at 446897.
[492] Graves Dep, Ex 1, U.S. Census, County Quick Facts.
[493] PG0000986142.

Racial Composition (in Percents)

|  | Asian | Black | Hispanic | White/Non-Hispanic |
|---|---|---|---|---|
| Prince George's County | 4.4 | 64.4 | 19.5 | 12.3 |
| PGPD Overall Force | 3.7 | 43.0 | 10.5 | 42.5 |
| PGPD Lieutenants | 6.5 | 27.1 | 5.4 | 60.9 |
| PGPD Captains | 0 | 19.4 | 0 | 80.6 |

148.   These figures from the files of PGPD show that, although blacks and Hispanics make up 84% of the citizens of Prince George's County, they are policed by a force that is only 53.5% black or Hispanic—and that that force, in turn, is led by captains and lieutenants who are, respectively, only 19.4% and 32.5% black or Hispanic.  (The smaller number of Majors are somewhat closer to the overall force in that the combined percentage of blacks and Hispanics at that level is 44%.  That appears to reflect the fact that appointments to that level must be approved by the County government, including the County Council.  According to Defendant Magaw, the former chief of PGPD, when he suggested that that procedure be extended down to Captains, in part to increase the racial diversity of leadership, the proposal was vetoed by the police union.[494])

149.   These disparities appear to result from the County's repeated failure to meet goals for the initial hiring of more entry-level black and Hispanic

---

[494] Magaw Dep. Tr. 106-13.

officers, and then an assignment/promotional system that favors white candidates.[495]

150.   I have reviewed the results of the semi-annual promotional tests for the most common levels of promotions, as stated in the reports provided to the County by its testing consultants,[496] as well as the statistical analysis of those results by Marc Simon of BDO.[497]  Those results show that, over the last 8 years, white/non-Hispanic candidates have scored, on average, higher than either black or Hispanic candidates in every one of those 32 tests.

151.   I have also reviewed the depositions of both the outside testing consultant and the PGPD Personnel Director who have testified that they cannot explain why white candidates consistently score higher on these promotional exams.[498]

152.   In that regard, I have also read a memorandum submitted by one of the members of the Equality in Promotions, Discipline and Practices Panel which held hearings, and reviewed other data, on that issue in 2017.[499]  That "Fairness Panel" member (an officer on the force who happened to be white) explained to the

---

[495] Graves Dep. Tr. 26:1-29:25.
[496] Flaig Dep. Exs.5-8.
[497] Report of Marc Simon, BDO, Statistical Report on Promotions (Aug. 26, 2020).
[498] Graves Dep. Tr. 226-30; Flaig Dep. Tr. 31-34.
[499] Graves Dep. Ex. 9, PG0000928895-928898.

other Panel members that the promotional tests favor candidates from "specialty" units within PGPD because they are, by those assignments, exposed, in the course of their normal duties, to the differing subjects contained on the tests -- and also because the members of those specialty units also have more time to study for the exams than officers assigned to patrol units.  As the Panel member also noted, the officers assigned to those specialty units (through an assignment process in which unit commanders are free to select whomever they want) are disproportionately white/non-Hispanic; the patrol units, by contrast, are disproportionately black and Hispanic.

153.   Despite the fact that that Panel member made those observations about the effect of the assignment process on promotions, the Panel itself was disbanded in early 2018 without issuing any report or recommendations on that or any other topic.[500]  No one at PGPD has conducted any further study of that issue. And the system of assignments and promotional tests has not been changed in any respect.

154.   One can see the net effect of this system on the current ranks of PGPD, again recently released by interim Chief Velez.  As this chart shows, the

_____

[500] Acosta Dep. Tr.  34, 125-27, 262.

ranks become increasingly white/non-Hispanic as officers progress up the ranks as

determined by the assignments and promotional test process:



155.   As discussed above, Captains and Lieutenants play a critical roles in

the Department, including significant roles in enforcement of EEO policies, the

investigation and discipline of misconduct, the assessment of uses of force, and

community relations.  The failure of officers of these ranks to reflect the

community may contribute to some of the discriminatory trends observed in this

report.

**********

145

Since the time I filed a preliminary version of this report on June 18, 2020, Defendants have made substantial additional productions of documents and data, including several thousands of pages of Commander Mills files, numerous Internal Affairs investigative files, and made other belated productions as recently as the evening of August 21.  As noted above, I reserve the right to supplement, update, refine, or revise my conclusions or opinions should any additional information be provided to me in the future and to supplement or amend them to address any additional expert opinions offered in this litigation.

_____

Michael Graham

146

# APPENDIX  A

# MICHAEL E. GRAHAM

<u>Background Information</u>:

California State University at Los Angeles (B.S. 1970)
University of Southern California (M.A. 1974)
Instructor and lecturer in various law enforcement and management subjects for:
       California Peace Officers Standards and Training
       California State University, L.A.
       Rio Hondo College

<u>Professional Organizations and Associations</u>:

International Association of Chiefs of Police
       National Law Enforcement Policy Center, Member - 1993 to 2017
       Contractor for the review of the Miami Beach Police Department regarding use of force, internal affairs and citizen complaints - 2003
       Contractor for policy development for the Pentagon Police Department – 2007-8
U.S. Department of Justice, Community Oriented Policing Consultant - 2000
U.S. Department of Justice, Special Litigation Section, Police Practices Consultant regarding use of force, internal affairs and citizen complaints - 2000 to Present:
       Chicago, Illinois
       Columbus, Ohio
       Detroit, Michigan
       Escambia County, Florida
       Los Angeles, CA.
       New Orleans, Louisiana
       Newark, New Jersey
       Orange County, Florida
       Portland, Maine
       Prince George County, Maryland
       Riverside, CA.
       Seattle, Washington
       Washington, D.C.
Police Accountability Resource Center (PARC), Board of Directors - Present
       Consultant for the Portland, Oregon Police Bureau regarding use of force – 2004-8
County of Los Angeles – 2001 to 2016:
       Consultant for the Department of Probation
       Monitor for the Agreement between the DOJ and the County regarding the conditions in the juvenile halls.
       Monitor for the Agreement between the DOJ and the County regarding the conditions in the Probation Camps.

California Police and Fire Games, President, - 1987 to 2018
World Police and Fire Games, President - 1987 to the Present

<u>Employment</u>:

Michael Graham was employed by the Los Angeles Sheriff's Department for over 33 years rising through the ranks from Deputy the position of Assistant Sheriff (A/S). As the third ranking member of the largest Sheriff's Department in the Nation, A/S Graham was responsible for the policing and detective functions for the three million residents in the unincorporated areas and 40 contract cities in Los Angeles County. As part of his duties he was required to review all serious force cases, approve appropriate discipline and implement policy and training to reduce inappropriate use of force.

From January 1993 until his promotion to A/S in March 1995, he was the Chief of the Professional Standards and Training Division where he oversaw the implementation of the Kolts Commission recommendations. He had responsibility for Department training, inspections, civil litigation, internal affairs and internal criminal investigations. During this period, he established and implemented the Department's risk management unit and early warning system. As part of his duties, he created and supervised the Department's Shooting and Serious Force Rollout Teams. He reviewed and had settlement responsibility for all claims and civil suits, including suits alleging excessive force.

<u>Sheriff's Department Accomplishments</u>:

<u>Accountability</u>: Starting in 1993, he initiated a series of accountability policies, training and review mechanisms to strengthen management and individual accountability:

-Policy: comprehensive delineation of responsibilities by rank and assignment; prioritization of critical issues; audits of key accountability areas

-Complaints: open public complaint system; written resolution and tracking of all complaints; appeal process to an ombudsman for dissatisfied complainants; integrity testing

-Force: complete reporting and tracking of all force; force training; less lethal weapon's options

-Performance Tracking: track all force, complaints, claims and lawsuits, etc., via an early warning system; lifetime tracking, intervention and periodic performance review of individual problem employees

-Risk Management: created the bureau in 1993; made all unit commanders accountable to reduce the risk factors that lead to claims and lawsuits through annual risk reduction plans

-Critical Issues Forum: every unit commander required to account for crime rate, budget and internal integrity and administrative controls of his/her unit each month in an open forum with Department executives

2

<u>Community Policing</u>: Beginning in 1996, he initiated and oversaw several community policing strategies:

      -High Impact Community Oriented Policing: characterized by door-to door surveys of residents; identify community concerns about crime and neighborhood deterioration; organize and mobilize the community and other governmental service providers; follow community plan for neighborhood revitalization.

      -Hate Crimes: organize stakeholders; contract among stakeholders to help and support each other; training for patrol officers and detectives

      -Gangs: chief components include alternatives to arrest; vertical prosecution where necessary; probation and parole sweeps; parent accountability

      -Family Violence: the focus includes spouse, child and elder abuse; intervention with a unique "predictor of family violence" computer program

      -Regional Community Policing Institute: a major feature is the emphasis on domestic violence

<u>Jail Reform Project</u>: In November 1997, at the conclusion of the U.S. Department of Justice, Civil Rights Division's investigation, he was assigned the additional responsibility to reorganize and improve the delivery of medical and mental health services to the inmates in the Department's nine jail facilities. This project was expanded to reform all services provided to prisoners.

# APPENDIX  B

**Appendix B**
**Documents Considered for Report**

1. Prince George's County Police Department General Order Manual

2. Prince George's County's Internal Affairs Standard Operating Procedure

3. Defendants' Discovery Responses

4. Plaintiffs' Discovery Reponses

5. Amended Complaint (ECF 54)

6. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss (ECF 31)

7. Memorandum of Agreement between the United States Department of Justice and Prince George's County, Maryland and The Prince George's County Police Department (January 22, 2004), available at http://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/pg_memo_agree.pdf

8. Agreement Made by and Between Prince Georges County, Maryland and Fraternal Order of Police Price Georges County Lodge 89, Inc. (July 1, 2016 through June 30, 2018)

9. Defendants' Reply to Opposition to Motion in Limine and for Appropriate Relief

10. Expert Report of Marc Simon, CPA, CFA, Statistical Analysis of Rank & Promotional Test Result Data (August 25, 2020)

11. Hector Velez, Prince George's County Police Department, Presentation to Task Force on Police Reform (July 2020)

12. Raphael Grant Deposition (March 16, 2020)

13. Joseph Ghattas Deposition (October 6, 2019 and July 8, 2020)

14. Linda Washington Deposition (October 6, 2019)

15. Carlos Acosta Deposition (June 3, 2020)

16. James McCreary Deposition (June 15, 2020)

17. Robert Harvin Jr. (June 18, 2020)

18. Stephen Whitted (June 24, 2020)

19. Melvin Powell Deposition (June 30, 2020)

20. Jewell Graves Deposition (July 1, 2020)

21. Art'z Watkins Deposition (July 10, 2020)

22. Hector Velez Deposition (July 15, 2020)

23. Jacqueline Rafterry Deposition (July 17, 2020)

24. Michael Smith Deposition (July 22, 2020)

25. Christopher Smith (July 29, 2020)

26. Henry Stawinksi Deposition (July 31, 2020)

27. Hugh Darden Deposition (August 4, 2020)

28. Christopher Murtha Deposition (August 5, 2020)

29. Kathleen Mills Deposition (August 6, 2020)

30. Jennifer Flaig Deposition (August 7, 2020)

31. Mark Magaw Deposition (August 17, 2020)

32. Richard Pippin Deposition (December 20, 2019)

33. Jacqueline Rafterry Deposition (July 19, 2020)

34. Thomas Boone Deposition Transcript

35. Earl Sharpe Declaration

36.  PGPD Promotion lists

37.  PGPD Rosters

38.  PGPD Transfer Lists

39.  Plaintiffs' Personnel Files

40.  Early Warning System reports

41.  PGPD EEO Training documents, including but not limited to PG0000000343,
     PG0000000348, PG0000000395, PG0000000627, PG0000152721, PG0000179336,

PG0000432822, PG0000658090, PG0000783353, PG0000154901, PG0000966820, PG0000967475

42. IAPro spreadsheet (4 versions)

43. Internal Affairs files, including but not limited to:
- DA2014-120
- DA2015-050
- DA2015-059
- DA2015-117
- DA2015-166
- DA2016-015
- DA2016-017
- DA2016-020
- DA2016-073
- DA2016-103
- DA2016-105
- DA2017-110
- DA2016-111
- DA2017-035
- DA2017-085
- DA2017-138
- DA2018-018
- DA2018-071
- DA2018-077
- DA2018-088
- DA2018-138
- DA2019-010
- DA2019-033
- FC2013-024
- FC2013-029
- FC2013-031
- FCIQ2013-153
- FCIQ2014-026
- FCIQ2015-017
- FCIQ2015-086
- FCIQ2016-007
- FCIQ2016-009
- FCIQ2016-053
- FCIQ2016-055
- FCIQ2016-075
- FCIQ2016-076
- FCIQ2016-086
- FCIQ2017-035

- FCIQ2017-052
- FCIQ2017-067
- FCIQ2017-071
- FCIQ2017-072
- FCIQ2017-076
- FCIQ2017-082
- FCIQ2017-103
- FCIQ2017-105
- FCIQ2018-002
- FCIQ2018-011
- FCIQ2018-034
- FCIQ2018-040
- FCIQ2018-048
- FCIQ2018-068
- FCIQ2018-079.
- FCIQ2018-089
- FCIQ2018-105
- FCIQ2019-052
- FIQ2015-094
- FQI2016-053
- IA2004-017
- IA2006-027
- IA2009-068
- IA2011-042
- IA2011-054
- IA2013-049
- IA2013-071
- IA2013-075
- IA2013-084
- IA2014-006
- IA2014-017
- IA2014-037
- IA2014-053
- IA2014-062
- IA2014-065
- IA2014-068
- IA2014-069
- IA2014-072
- IA2014-078
- IA2014-079
- IA2014-099
- IA2014-100
- IA2014-106
- IA2014-111

- IA2014-114
- IA2014-130
- IA2015-010
- IA2015-016
- IA2015-028
- IA2015-031
- IA2015-032
- IA2015-035
- IA2015-038
- IA2015-039
- IA2015-040
- IA2015-056
- IA2015-063
- IA2015-067
- IA2015-072
- IA2015-083
- IA2015-086
- IA2015-087
- IA2015-088
- IA2015-092
- IA2016-004
- IA2016-006
- IA2016-007
- IA2016-008
- IA2016-013
- IA2016-027
- IA2016-030
- IA2016-031
- IA2016-034
- IA2016-035
- IA2016-038
- IA2016-044
- IA2016-046
- IA2016-050
- IA2016-052
- IA2016-054
- IA2016-055
- IA2016-063
- IA2016-067
- IA2016-071
- IA2016-075
- IA2017-001
- IA2017-003
- IA2017-007

- IA2017-008
- IA2017-013
- IA2017-014
- IA2017-019
- IA2017-020
- IA2017-022
- IA2017-031
- IA2017-034
- IA2017-036
- IA2017-037
- IA2017-038
- IA2017-042
- IA2017-048
- IA2017-053
- IA2017-054
- IA2017-055
- IA2017-056
- IA2017-058
- IA2017-059
- IA2017-060
- IA2017-064
- IA2017-069
- IA2017-070
- IA2018-002
- IA2018-009
- IA2018-012
- IA2018-020
- IA2018-027
- IA2018-032
- IA2018-034
- IA2018-054
- IAQ2014-046
- IAQ2014-047
- IAQ2015-004
- IAQ2015-018
- IAQ2015-019
- IAQ2015-020
- IAQ2015-021
- IAQ2015-024
- IAQ2016-009
- IAQ2016-023
- IAQ2018-006
- IAQ2018-014
- IAQ2019-002

- PS2013-541
- PS2014-154
- PS2014-290
- PS2014-385
- PS2015-034
- PS2015-039
- PS2015-050
- PS2015-066
- PS2015-125
- PS2015-198
- PS2015-220
- PS2015-237
- PS2015-287
- PS2015-369
- PS2016-052
- PS2016-053
- PS2016-068
- PS2016-083
- PS2016-111
- PS2016-131
- PS2016-185
- PS2016-190
- PS2016-194
- PS2017-013
- PS2017-075
- PS2017-084
- PS2017-090
- PS2017-110
- PS2017-124
- PS2017-172
- PS2017-192
- PS2017-194
- PS2018-038
- PS2018-068
- PS2018-072
- PS2018-137
- PS2019-036
- PS2019-090
- PS2019-114
- PS2019-115
- SI2010-003
- SI2010-006
- SI2010-027
- SI2011-075

- SI2014-003
- SI2014-005
- SI2014-015
- SI2014-016
- SI2014-017
- SI2014-028
- SI2014-039
- SI2014-045
- SI2014-055
- SI2015-009
- SI2015-015
- SI2015-022
- SI2015-030
- SI2015-037
- SI2015-045
- SI2015-052
- SI2015-053
- SI2015-054
- SI2015-055
- SI2016-004
- SI2016-006
- SI2016-008
- SI2016-011
- SI2016-013
- SI2016-031
- SI2016-033
- SI2016-034
- SI2016-039
- SI2016-042
- SI2016-053
- SI2016-059
- SI2016-068
- SI2017-001
- SI2017-006
- SI2017-008
- SI2017-039
- SI2017-043
- SI2017-048
- SI2017-049
- SI2017-060
- SI2017-062
- SI2017-064
- SI2017-064,
- SI2017-066

- SI2017-067
- SI2017-069
- SI2017-072
- SI2017-073
- SI2019-077
- SIQ2015-002
- SIQ2015-013
- SIQ2016-003
- SIQ2017-006
- SIQ2019-007

44. Internal Affairs Division Standard Operating Procedures (PG0000000497, PG0000853984)

45. Internal Affairs Division Standard Operating Procedure, IAP SOP March 2014 draft (PG0000875393)

46. Internal Affairs Log Books (PG0000787213, PG0000787352, PG0000787555, PG0000787694, PG0000787873)

47. Internal Affairs 2013 Annual Report (PG0000149836)

48. Internal Affairs 2014 Annual Report (PG0000113615)

49. Internal Affairs 2015 Annual Report (PG0000104641)

50. PGPD Internal Investigations Guide (PG0000310607-310664)

51. Like Discipline documents analyses, including but not limited to PG0000174650, PG0000651606, PG0000651608, PG0000651609, PG0000651612, PG0000651614, PG0000651617, PG0000651619, PG0000651622, PG0000651624, PG0000651627, PG0000651629, PG0000651633, PG0000651638, PG0000651641, PG0000651644, PG0000651647, PG0000651649, PG0000651651, PG0000651652, PG0000651659, PG0000651661, PG0000651665, PG0000651668, PG0000651670, PG0000651674, PG0000651678, PG0000651681, PG0000651684, PG0000651687, PG0000651690, PG0000651694, PG0000651698, PG0000651700, PG0000651703,  PG0000651705, PG0000651708, PG0000651713, PG0000651715, PG0000651719, PG0000651720, PG0000651722, PG0000651724, PG0000651729, PG0000651734, PG0000651736, PG0000651737, PG0000651741, PG0000651749, PG0000651752, PG0000651755, PG0000651757, PG0000651762, PG0000651764, PG0000651768, PG0000651772, PG0000651775, PG0000651777, PG0000651779, PG0000651780, PG0000651785, PG0000651791, PG0000651795, PG0000651798, PG0000651801, PG0000651804, PG0000651807, PG0000651810, PG0000651814, PG0000651819, PG0000651822, PG0000651827, PG0000651830, PG0000651835, PG0000651837, PG0000651842, PG0000651847, PG0000651852, PG0000651857, PG0000651863, PG0000651866, PG0000651870, PG0000651875, PG0000651876, PG0000651882, PG0000651884,

PG0000651887, PG0000651895, PG0000651896, PG0000651899, PG0000651902,
PG0000651906, PG0000651908, PG0000651913, PG0000651917, PG0000651920,
PG0000651922, PG0000651924, PG0000651927, PG0000651933, PG0000651935,
PG0000651940, PG0000651943, PG0000651945, PG0000651949, PG0000651952,
PG0000651955, PG0000651962, PG0000651967, PG0000651969, PG0000651972,
PG0000651975, PG0000651978, PG0000651980, PG0000651986, PG0000651992,
PG0000651994, PG0000651997, PG0000652005, PG0000652010, PG0000652015,
PG0000652019, PG0000652023, PG0000652027, PG0000652030, PG0000652033,
PG0000652036, PG0000652039, PG0000652042, PG0000652046, PG0000652049,
PG0000652053, PG0000652055, PG0000652060, PG0000652065, PG0000652070,
G0000652076, PG0000652082, PG0000652086, PG0000652090, PG0000652093,
PG0000652096, PG0000652100, PG0000652104, PG0000652107, PG0000652110,
PG0000652113, PG0000652118, PG0000652121, PG0000652125, PG0000652130,
PG0000652136, PG0000652139, PG0000652141, PG0000652146, PG0000652150,
PG0000652152, PG0000652154, PG0000652159, PG0000652162, PG0000652166,
PG0000652169, PG0000652172, PG0000652182, PG0000652186, PG0000652193,
PG0000652197, PG0000652204, PG0000652206, PG0000652210, PG0000652213,
PG0000652216, PG0000652218, PG0000652222, PG0000652225, PG0000652229,
PG0000652233, PG0000652235, PG0000652239, PG0000652242, PG0000652247,
PG0000652250, PG0000652255, PG0000652259, PG0000652263, PG0000652266,
PG0000652272, PG0000652275, PG0000652278, PG0000652282, PG0000652286,
PG0000652291, PG0000652295, PG0000652298, PG0000652303, PG0000652308,
PG0000652316, PG0000652323,  PG0000652327, PG0000652332, PG0000652335,
PG0000652342, PG0000652346, PG0000652349, PG0000652354, PG0000652360,
PG0000652365, PG0000652370, PG0000652372, PG0000652377, PG0000652380,
PG0000652383, PG0000652387, PG0000652390, PG0000652393, PG0000652397,
PG0000652402, PG0000652405, PG0000652408, PG0000652411, PG0000652414,
PG0000652419, PG0000652422, PG0000652425, PG0000652428, PG0000652432,
PG0000652441, PG0000652442, PG0000652446, PG0000652449, PG0000652454,
PG0000652458, PG0000652463, PG0000652466, PG0000652471, PG0000652474,
PG0000652477, PG0000652479, PG0000652484, PG0000652487, PG0000652490,
PG0000652493, PG0000652496, PG0000652500, PG0000652504, PG0000652507,
PG0000652511, PG0000652513, PG0000652515, PG0000652521, PG0000652525,
PG0000652528, PG0000652533, PG0000652537, PG0000652538, PG0000652540,
PG0000652544, PG0000652549, PG0000652552, PG0000652557,  PG0000652562,
PG0000652566, PG0000652569, PG0000652572, PG0000652577, PG0000652580,
PG0000652582, PG0000652585, PG0000652588, PG0000652596, PG0000652598,
PG0000652603, PG0000652608, PG0000652614, PG0000652619, PG0000652623,
PG0000652627, PG0000652630, PG0000652635, PG0000652637.

52. EEO files (EEOC_Perez_000001, PG0000001364, PG0000001375, PG0000001379,
PG0000001417, PG0000001458, PG0000001501, PG0000001550, PG0000001584,
PG0000001624, PG0000001643, PG0000001671, PG0000001676, PG0000001710,
PG0000001713, PG0000001759, PG0000001790, PG0000001798, PG0000001803,
PG0000001968, PG0000001975, PG0000001984, PG0000002015, PG0000002029,
PG0000002056, PG0000002097, PG0000002122, PG0000002128, PG0000002146,

PG0000002167, PG0000002170, PG0000002223, PG0000002232, PG0000011201,
PG0000011319, PG0000071313, PG0000071485, PG0000071525, PG0000071563,
PG0000071611,PG0000071664, PG0000080229, PG0000080231, PG0000095591,
PG0000103668, PG0000103669, PG0000103670, PG0000103739, PG0000103788,
PG0000103791, PG0000103792, PG0000103793, PG0000103794, PG0000104194,
PG0000104208, PG0000150184, PG0000155487, PG0000156112, PG0000156238,
PG0000157026, PG0000446823, PG0000157200, PG0000157210, PG0000157216,
PG0000446826, PG0000157263,PG0000446844, PG0000158494, PG0000158495,
PG0000158497, PG0000158498, PG0000158500, PG0000158501, PG0000158502,
PG0000158503, PG0000158504, PG0000158506, PG0000158507, PG0000158508,
PG0000158509, PG0000158512, PG0000158514, PG0000158515, PG0000158516,
PG0000158517, PG0000158520, PG0000158521, PG0000158522, PG0000158523,
PG0000161290, PG0000161295, PG0000161299, PG0000161945, PG0000171506,
PG0000171706, PG0000171766, PG0000178403, PG0000178409, PG0000178428,
PG0000178447, PG0000178510, PG0000178512, PG0000178627, PG0000178631,
PG0000178784, PG0000178873, PG0000179292, PG0000179436, PG0000179635,
PG0000179756, PG0000179768, PG0000179770, PG0000179777, PG0000179881,
PG0000181838, PG0000184313, PG0000289570, PG0000313412, PG0000319749,
PG0000324006, PG0000324021, PG0000340815, PG0000350133, PG0000350134,
PG0000426840, PG0000432182, PG0000432247, PG0000432507, PG0000613562,
PG0000613563, PG0000613814, PG0000613823, PG0000656580, PG0000656714,
PG0000656768, PG0000656803, PG0000657585, PG0000657661, PG0000657734,
PG0000657735, PG0000657800, PG0000657862, PG0000657867, PG0000657909,
PG0000657911, PG0000657914, PG0000657954, PG0000658050, PG0000658082,
PG0000658184, PG0000658189, PG0000658217, PG0000658298, PG0000658495,
PG0000658790, PG0000658803, PG0000658828, PG0000658880, PG0000658905,
PG0000659020, PG0000659099, PG0000659148, PG0000659173, PG0000659212,
PG0000659214, PG0000659322, PG0000659380, PG0000659548, PG0000659563,
PG0000659940, PG0000660008, PG0000660017, PG0000660019, PG0000660098,
PG0000660173, PG0000660252, PG0000660438, PG0000660463, PG0000672268,
PG0000755034, PG0000785662, PG0000785700, PG0000856903, PG0000857064,
PG0000857102, PG0000857105, PG0000857152, PG0000857183, PG0000857261,
PG0000857276, PG0000860399, PG0000860563, PG0000860617, PG0000860778,
PG0000860982, PG0000861105, PG0000861261, PG0000861307, PG0000861390,
PG0000861418, PG0000861588, PG0000861596, PG0000861624, PG0000861786,
PG0000861880, PG0000861968, PG0000862208, PG0000862714, PG0000862720,
PG0000862791, PG0000863042, PG0000863132, PG0000863244, PG0000863259,
PG0000863751, PG0000863770, PG0000863773, PG0000863844, PG0000863945,
PG0000863996, PG0000864000, PG0000864031, PG0000864090, PG0000864345,
PG0000865066, PG0000865983, PG0000866006, PG0000866060, PG0000866066,
PG0000866534, PG0000866619, PG0000866862, PG0000866865, PG0000866973,
PG0000867003, PG0000867096, PG0000867121, PG0000867174, PG0000868089,
PG0000870537, PG0000905504, PG0000905774, PG0000905776, PG0000907893,
PG0000908065, PG0000908115, PG0000908182, PG0000908185, PG0000908298,
PG0000908299, PG0000909161, PG0000909164, PG0000909743, PG0000909755,
PG0000909816, PG0000909902, PG0000909903, PG0000909926, PG0000914063,

PG0000917366, PG0000920198, PG0000923033, PG0000925264, PG0000928742, PG0000934569, PG0000934570, PG0000934685, PG0000934776, PG0000935030, PG0000935034, PG0000935062, PG0000935164, PG0000935191, PG0000936765, PGX0000000443, PGX0000001031, PGPD-PER-0067207, PGPD-PER-0069987, PGPDPLS0000310)

53. List of Suspensions (PG0000080569-80719)

54. Various materials produced by PGPD to DOJ

55. Adrian Crudups' Circuit Court for Prince George's County Case files (No. 17-273X)

56. Robert Folchetti Circuit Court Docket (Case No. 0501SP005312014)

57. George Merkel Circuit Court Docket (Case No. CT170241X)

Other PGPD produced documents:
(PG0000000595,  PG0000000607,  PG0000001265,  PG0000001362,  PG0000001364, PG0000001713,  PG0000001798,  PG0000001968,  PG0000002223,  PG0000002232, PG0000007180,  PG000000819,  PG000000826,  PG0000010434,  PG0000010439, PG0000015574,  PG0000017144,  PG0000017186,  PG0000018313,  PG000001968, PG0000020673,  PG0000044689,  PG0000054575,  PG0000080569,  PG0000085344, PG0000085430,  PG0000086663,  PG00000939321,  PG00000972106,  PG0000972107, PG0000103511,  PG0000103513,  PG0000103530,,  PG0000104622,  PG0000108655, PG0000111973 ,  PG0000113485,  PG0000144137,  PG0000144565,  PG0000147518, PG0000147519,  PG0000150199,  PG0000150665,  PG0000150850,  PG0000153441, PG0000154090,  PG0000154333,  PG0000154901,  PG0000155315,  PG0000155355, PG0000155548,  PG0000155665,  PG0000155770,  PG0000155786,  PG0000156074, PG0000157216 ,  PG0000157312 ,  PG0000158497,  PG0000158501 ,  PG0000161480, PG0000162169,  PG0000162177,  PG0000162391,  PG0000162400,  PG0000162500, PG0000162510,  PG0000162691,  PG0000162779,  PG0000162977,  PG0000165790, PG0000165875,  PG0000166322,  PG0000166342,  PG0000166349,  PG0000168875, PG0000169211,  PG0000169310,  PG0000169720,  PG0000171078,  PG0000171280, PG0000171445,  PG0000172194,  PG0000173546,  PG0000174351,  PG0000174649, PG0000174650,  PG0000179546,  PG0000181256,  PG0000182196,  PG0000182444, PG0000182462,  PG0000183205,  PG0000202216,  PG0000206732,  PG0000254415, PG0000300016,  PG0000334331,  PG0000446894,  PG0000608940,,  PG0000656568, PG0000656569,  PG0000658090,  PG0000658128,  PG0000785910,  PG0000785918, PG0000787555,  PG0000807208,  PG0000852473,  PG0000854965,  PG0000855440, PG0000864287,  PG0000864289,  PG0000864290,  PG0000870882,  PG0000875170, PG0000893933,  PG0000905763,  PG0000929099,  PG0000936765,  PG0000939411, PG0000956075,  PG0000964709,  PG0000964740,  PG0000966820,  PG0000967475, PG0000968914,  PG0000968917,  PG0000968965,  PG0000969037,  PG0000969043, PG0000969221,  PG0000969224,  PG0000969743,  PG0000969751,  PG0000969762, PG0000970325,  PG0000971542,  PG0000973606,  PG0000982683,  PG0000985307, PG0000986142,  PG000150392,  PG000180150 ,  PG2019114 , PG0000161272,

PG0000853378, PG0000855170, PG0000875249, PG0000875251, PG0000929100,
PG0000166288, PG0000169922, PG0000170011, PG0000292231, PG0000772690,
PG0000155747, PG0000180150, PG0000084440, PG0000431462, PG0000166362,
PG0000111973, PG0000111979, PG0000104392, PG0000103530, PG0000103567,
PG0000180223, PG0000171193, PG0000853346, PG0000928065, PGIAD0000031514,
PGIAD0000032322, PG0000864292, PG0000082873, PG0000104182, PG0000855439,
PG0000903780, PG0000162728, PG0000164312, PG0000939321, PG0000908213,
PG0000162667, PG0000165717, PG0000144647, PG0000027248, PG0000095217,
PG0000027459, PG0000973900, PG0000965764, PG0000966009, PG0000966013,
PG0000966019, PG0000966022, PG0000966026, PG0000966028, PG0000966031,
PG0000970756, PG0000970852, PG0000971923, PG0000972060, PG0000972106,
PG0000972482, PG0000973548, PG0000982700, PGIAD0000119998, PGIAD0000120201,
PGIAD0000120284, PGIAD0000120700, PGIAD0000121232, PGIAD0000121298,
PGIAD0000121632, PGIAD0000127799, PGIAD0000127819, PGIAD0000131308,
PGIAD0000131458, PGIAD0000131637, PGIAD0000131867, PGIAD0000131999,
PGIAD0000135296, PGIAD0000135457, PGIAD0000135665, PGIAD0000137520,
PG0000987135, PGIAD0000138481, PGIAD0000039546, PGIAD0000086540,
PGIAD0000127420, PGIAD0000127088, PGIAD0000127183, PGIAD0000137029,
PG0000023826, PGIAD0000040805, PGIAD0000139025, PG0000979493, PG0000447426,
PG0000928895, PG00000155315, PG0000608940, PG0000608989, PG0000609039,
PG0000965837, PG0000609106, PG0000609180, PG0000609228, PG0000609286,
PG0000609355, PG0000609405, PG0000609449, PG0000609518, PG0000609570,
PG0000609631, PG0000609662, PG0000609720, PG0000609764,
PG0000609810, PG0000609853, PG0000965832, PG0000609898, PG0000609969,
PG0000610016, PG0000610082, PG0000610139, PG0000610205, PG0000610269,
PG0000610317, PG0000610376, PG0000610558, PG0000610611, PG0000610653,
PG0000610684, PG0000610739, PG0000610765, PG0000610838, PG0000610868,
PG0000610924, PG0000610972, PG0000611012, PG0000611077, PG0000611121,
PG0000611129, PG0000611173, PG0000611225, PG0000611276, PG0000965834,
PG0000611326, PG0000611367, PG0000611430, PG0000611473, PG0000611532,
PG0000611578, PG0000611618, PG0000611650, PG0000611684, PG0000611751,
PG0000611769, PG0000611815, PG0000611863, PG0000611897, PG0000611906,
PG0000611951, PG0000612017, PG0000103513, PG0000103530, PG0000104622,
PG0000108655, PG0000111973 , PG0000113485, PG0000144137, PG0000144565,
PG0000147518 , PG0000147519, PG0000150199, PG0000150665, PG0000150850
PG0000153441, PG0000154090, PG0000154333, PG0000154901, PG0000155315,
PG0000155355, PG0000155548, PG0000155665, PG0000155770 , PG0000157216 ,
PG0000162169, PG0000162177, PG0000162391, PG0000162400, PG0000162500,
PG0000162510, PG0000162691, PG0000162779, PG0000162977, PG0000165790,
PG0000165875, PG0000166322, PG0000166342, PG0000166349, PG0000168875,
PG0000169211, PG0000169310, PG0000169720, PG0000171078, PG0000171280,
PG0000171445, PG0000172194, PG0000173546 , PG0000174649 , PG0000182196,
PG0000182444, PG0000182462, PG0000183205, PG0000202216 PG000020673,
PG0000300016, PG0000334331 PG0000446894, PG0000012123, PG0000155786 ,
PG0000156074, PG0000157312 , PG0000158497 , PG0000158501 , PG0000161480,
PG0000174351, PG0000174650 , PG0000179546 , PG0000181256,

58. Other Plaintiff produced documents (PGPD-CHA-0001334, PGPD-PER-0122769, PGPD-BOO-0000134)

59. EEOC, *Enforcement Guidance on Vicarious Employer Liability for Unlawful harassment by Supervisors* (Jun. 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

60. EEOC Compliance Manual, *Section 15: Race & Color Discrimination*, § 15-VII (A)(racial harassment) (Apr. 19, 2006), https://www.eeoc.gov/policy/docs/race-color.html

61. Matt Zapotosky & Mary Pat Flaherty, *Pr. George's officers transferred*, The Washington Post (Jan. 28, 2011) http://www.washingtonpost.com/wp-dyn/content/article/2011/01/27/AR2011012707491.html

62. Nick Dutton, *Md. Officers suspended over 'driving while back' YouTube vids* (Nov. 17, 2012), https://wtvr.com/2012/11/17/md-officers-suspended-over-racist-youtube-vids/

63. Joshua Chanin, Evaluating Section 14141: An Empirical Review of Pattern or Practice Police Misconduct Reform, Ohio State Journal of Criminal Law, Vol. 14: 67, 95-101

64. Jonathan W. Hutto, Sr. & Rodney D. Green, *Social Movements Against Racist Police Brutality and Department of Justice Intervention in Prince George's County, Maryland*, 93 J. Urban Health 89 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4824689/

65. Lynh Bui, *Lifelong resident and officer's son confirmed to lead Prince George's police department*, The Washington Post (Feb. 16, 2016) https://www.washingtonpost.com/local/public-safety/lifelong-resident-and-son-of-a-cop-set-to-lead-pr-georges-police-department/2016/02/16/3042ea76-d3fd-11e5-b195-2e29a4e13425_story.html

66. *One Police Shift: Patrolling an Anxious America*, The New York Times (Jul. 23, 2016) (https://www.nytimes.com/2016/07/24/us/police-ridealongs.html

67. Radley Balko, *Scott Finn, model cop for a model police department*, The Washington Post (Jul. 27, 2016) https://www.washingtonpost.com/news/the-watch/wp/2016/07/27/scott-finn-model-cop-for-a-model-police-department/

68. Ebony, *Black Cop Says He Was Unfairly Detained by Police* (Oct. 27, 2016), https://www.ebony.com/news/black-cop-unfairly-detained/

69. PGPD News, *Full-Length Press Conference With Police Chief Hank Stawinski* (Feb. 9, 2017) https://pgpolice.blogspot.com/2017/02/todays-full-length-press-conference.html

70. Chicago Police Department, *Equal Employment Opportunity Policy* (August 22, 2017) at IV (B)(a) http://directives.chicagopolice.org/directives/data/a7a57be2-1288324b-8a612-8833-4bfc750afb536ed2.html.

71. Drew Gerber, *Prince George's County officer found guilty of assaulting a homeless woman to roust her*, The Washington Post (Nov. 14, 2017) https://www.washingtonpost.com/local/prince-georges-county-officer-found-guilty-of-assaulting-a-homeless-woman-to-roust-her/2017/11/14/b70f9ad6-c8bb-11e7-8321-481fd63f174d_story.html

72. Jim Handley, *Prince George's County Police Work to Prevent Bias*, NBC4 Washington DC news report (Feb. 3, 2018) https://www.nbcwashington.com/news/local/Prince-Georges-County-Police-Work-to-Prevent-Bias_Washington-DC-472436063.html

73. Lorenzo Hall, *Chief apologizes after 'black bad guy' example used by Md. Officer teaching kids about K-9s*, WUSA9 (Aug. 28, 2018) (https://www.wusa9.com/article/news/local/maryland/chief-apologizes-after-black-bad-guy-example-used-by-md-officer-teaching-kids-about-k-9s/65-588570746

74. *Prince George's SWAT Officers Investigated After Bar Fight*, NBC4 Washington DC news report (Dec. 19, 2018) https://www.nbcwashington.com/news/local/prince-georges-swat-officers-investigated-after-bar-fight_washington-dc/166364/

75. Maricopa County Sheriff's Office Policy and Procedures, *Workplace Professionalism: Discrimination and Harassment* (Jan 24, 2019), pages 5-6, §§ 5(c )(1), 5(c )(2), 5(c )(5), https://www.mcso.org/documents/Policy/Critical/CP-3.pdf.

76. International Association of Chiefs of Police Law Enforcement Policy Center, *Model Policy, Harassment, Discrimination, and Unprofessional Conduct* § V.C (2) (May 2019), https://www.theiacp.org/sites/default/files/2019-05/Harassment%20Discrimination%20Policy%20-%202019%20-%20revised.pdf.

77. December 18, 2019 Alsip Response to Pergament December 9 Letter

78. February 14, 2020 Alsip Response to Pergament February 1 Letter

79. February 20, 2020 Alsip response to February 10 letter

80. U.S. Census, County Quick Facts, available at https://www.census.gov/quickfacts/fact/table/princegeorgescountymaryland,US/PST045219

81. Prince George's County Police Department, available at https://www.princegeorgescountymd.gov/345/Police

# EXHIBIT  A

| File # | Respondent Name | Respondent Race | Respondent Gender | Allegation/Accusation Type | Allegation/Accusation Sub-Type | Finding | Discipline/Punishment | Date Rec'd in IAD/Entered in IAPro | Investigator(s) | Investigative Unit(s) | Date Investigation Completed/Charges Sustained | Complainant(s) | Respondent(s) & Allegation(s) & Finding(s) & Discipline/Punishment(s) | Summary/Narrative | Discipline Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SBQ2011-058 | ▉ | ▉ | ▉ | Criminal Misconduct | ▉ | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2011-062 | ▉ | ▉ | ▉ | Criminal Misconduct | ▉ | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2012-022 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2012-022 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2012-022 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2012-031 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2013-013 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2013-015 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2013-018 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2013-025 | ▉ | ▉ | ▉ | Criminal Misconduct | | Inquiry completed | ▉ | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2014-035 | ▉ | ▉ | ▉ | Criminal Misconduct Inquiry | | | ▉ | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2013-003 | ▉ | ▉ | ▉ | Criminal Misconduct Inquiry | | Inquiry completed | | | ▉ | ▉ | | ▉ | ▉ | | |
| SBQ2013-007 | ▉ | ▉ | ▉ | Criminal Misconduct Inquiry | | Inquiry completed | | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2015-009 | ▉ | ▉ | ▉ | Excessive/Unnecessary Force | | Inquiry completed | | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2015-013 | ▉ | ▉ | ▉ | Excessive/Unnecessary Force | | Inquiry completed | | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2015-016 | ▉ | ▉ | ▉ | Excessive/Unnecessary Force | | Inquiry completed | | | ▉ | ▉ | | ▉ | ▉ | ▉ | |
| SBQ2015-019 | ▉ | ▉ | ▉ | Excessive/Unnecessary Force | | Inquiry completed | | | ▉ | ▉ | | ▉ | ▉ | ▉ | |

Exhibit A1



| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SIIQ2016-001 | | | | Excessive/Unnecessary Force | | Inquiry completed | | | | | | | |
| SIIQ2017-003 | | | | Excessive/Unnecessary Force | | Inquiry completed | | | | | | | |
| SIIQ2017-008 | | | | Excessive/Unnecessary Force | | Inquiry Completed | | | | | | | |
| SIIQ2018-009 | | | | Excessive/Unnecessary Force | | Inquiry completed | | | | | | | |
| FC2012-035 | | | | Harassment | | Non-Sustained | | | | | | | |
| IAQ2014-044 | | | | Harassment | | Inquiry completed | | | | | | | |
| IAQ2014-047 | | | | Harassment | | Inquiry completed | | | | | | | |
| IAQ2014-047 | | | | Harassment | | Inquiry completed | | | | | | | |
| IAQ2014-047 | | | | Harassment | | Inquiry completed | | | | | | | |
| SIIQ2015-015 | | | | | | Inquiry completed | | | | | | | |
| IAQ2014-011 | | | | Use of Force | | Inquiry completed | | | | | | | |

2

Exhibit A

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SIQ2013-008 | | | | Use of Force | | Inquiry completed | | | | | | |
| SIQ2013-008 | | | | Use of Force | | Inquiry completed | | | | | | |
| SIQ2013-008 | | | | Use of Force | | Inquiry completed | | | | | | |
| SIQ2013-021 | | | | Use of Force | | Inquiry completed | | | | | | |
| SIQ2017-004 | | | | Use of Force | | Unfounded | | | | | | |

3

A.99

# EXHIBIT  B



| File # | Respondent Name | Respondent Race | Respondent Gender | Allegation/Accusation Type | Allegation/Accusation Sub-Type | Finding | Discipline/Punishment | Date Rec'd in IAD/Entered in IAPro | Investigator(s) | Investigative Unit(s) | Date Investigation Completed/Charges Sustained | Complainant(s) | Respondent(s) & Allegation(s) & Finding(s) & Discipline/Punishment(s) | Summary/Narrative | Discipline Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IA2014-099 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2016-090 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2014-031 | | | | Bias | | Unfounded | | | | | | | | | |
| IA2015-062 | | | | Bias | | Unfounded | | | | | | | | | |
| IA2017-014 | | | | Bias | | Unfounded | | | | | | | | | |
| IAQ2014-039 | | | | Bias | | Inquiry completed | | | | | | | | | |
| IA2014-048 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2014-107 | | | | Bias | | Unfounded | | | | | | | | | |
| IA2014-118 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2015-073 | | | | Bias | | Non-Sustained | | | | | | | | | |
| IA2015-084 | | | | Bias | | Unfounded | | | | | | | | | |

1





**EXHIBIT  C**

**Exhibit C**

**Officers With Over 20 Use of Force Incidents**

| Officer First Name | Officer Race | Black Complainant | White Complainant | Hispanic Complainant | Other Complainant | Total Complaints |
|---|---|---|---|---|---|---|
| ████████ | White | 46 | 1 | 1 | | 48 |
| ████████ | White | 45 | | 2 | | 47 |
| ████████ | White | 40 | 3 | 2 | | 45 |
| ████████ | Black | 42 | 1 | 1 | 1 | 45 |
| ████████ | White | 40 | | 2 | | 42 |
| ████████ | Black | 37 | | | 1 | 38 |
| ████████ | White | 16 | 10 | 11 | | 37 |
| ████████ | White | 34 | | | 3 | 37 |
| ████████ | White | 32 | 1 | 1 | 1 | 35 |
| ████████ | White | 31 | 1 | 1 | 1 | 34 |
| ████████ | White | 31 | 1 | 2 | | 34 |
| ████████ | Black | 32 | | 1 | | 33 |
| ████████ | White | 17 | 1 | 12 | | 30 |
| ████████ | White | 30 | | | | 30 |
| ████████ | White | 29 | | 1 | | 30 |
| ████████ | Black | 20 | 7 | 3 | | 30 |
| ████████ | White | 28 | | | 2 | 30 |
| ████████ | White | 29 | 1 | | | 30 |

| Officer First Name | Officer Race | Black Complainant | White Complainant | Hispanic Complainant | Other Complainant | Total Complaints |
|---|---|---|---|---|---|---|
| ▮ | Black | 28 | 2 | | | 30 |
| ▮ | Black | 25 | 1 | 1 | 2 | 29 |
| ▮ | White | 25 | 3 | | | 28 |
| ▮ | Black | 25 | | 2 | 1 | 28 |
| ▮ | Black | 25 | 1 | 1 | | 27 |
| ▮ | Hispanic | 22 | | 3 | 2 | 27 |
| ▮ | White | 21 | 2 | 3 | | 26 |
| ▮ | White | 26 | | | | 26 |
| ▮ | Black | 26 | | | | 26 |
| ▮ | Black | 18 | 6 | 1 | | 25 |
| ▮ | Hispanic | 24 | | 1 | | 25 |
| ▮ | White | 22 | | 3 | | 25 |
| ▮ | Asian | 24 | 1 | | | 25 |
| ▮ | White | 24 | 1 | | | 25 |
| ▮ | White | 25 | | | | 25 |
| ▮ | White | 16 | 2 | 7 | | 25 |
| ▮ | White | 23 | 1 | | 1 | 25 |
| ▮ | White | 24 | | | | 24 |
| ▮ | White | 24 | | | | 24 |
| ▮ | White | 21 | | | 3 | 24 |
| ▮ | White | 20 | | | 3 | 23 |

| Officer First Name | Officer Race | Black Complainant | White Complainant | Hispanic Complainant | Other Complainant | Total Complaints |
|---|---|---|---|---|---|---|
| ▉ | Black | 22 | | 1 | | 23 |
| ▉ | White | 22 | | | 1 | 23 |
| ▉ | White | 14 | 3 | 5 | 1 | 23 |
| ▉ | White | 22 | | | 1 | 23 |
| ▉ | White | 20 | | 3 | | 23 |
| ▉ | Black | 21 | 1 | | | 22 |
| ▉ | White | 20 | 2 | | | 22 |
| ▉ | White | 20 | 2 | | | 22 |
| ▉ | White | 21 | | 1 | | 22 |
| ▉ | Black | 20 | | 2 | | 22 |
| ▉ | White | 12 | 6 | 4 | | 22 |
| ▉ | Black | 20 | | 1 | | 21 |
| ▉ | Black | 20 | | | 1 | 21 |
| ▉ | White | 19 | 1 | 1 | | 21 |
| ▉ | Black | 20 | | | 1 | 21 |
| ▉ | Hispanic | 21 | | | | 21 |
| ▉ | White | 12 | 3 | 6 | | 21 |
| ▉ | White | 20 | | | | 20 |
| ▉ | Black | 14 | | 5 | 1 | 20 |
| ▉ | Asian | 20 | | | | 20 |
| ▉ | White | 20 | | | | 20 |

| Officer First Name | Officer Race | Black Complainant | White Complainant | Hispanic Complainant | Other Complainant | Total Complaints |
|---|---|---|---|---|---|---|
| ███████ | White | 20 | | | | 20 |

# EXHIBIT  D



| File # | Respondent Name | Respondent Race | Respondent Gender | Allegation/Accusation Type | Allegation/Accusation Sub-Type | Finding | Discipline/Punishment | File # | Date Rec'd in IAD/Entered in IAPro | Investigator(s) | Investigative Unit(s) | Date Investigation Completed/Charges Sustained | Complainant(s) | Respondent(s) & Allegation(s) & Finding(s) & Discipline/Punishment(s) | Summary/Narrative | Discipline Category |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IA2016-003 | | | | Excessive/Unnecessary Force | | Non-Sustained | | | | | | | | | | |
| IA2016-003 | | | | Excessive/Unnecessary Force | | Exonerated | | | | | | | | | | |
| IA2016-003 | | | | Excessive/Unnecessary Force | | Exonerated | | | | | | | | | | |





























| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| IA2016-052 | ▮ | ▮ | ▮ | Excessive/Unnecessary Force | Sustained | ▮ | ▮ | ▮ | ████ | ████ |
| IA2016-052 | ▮ | ▮ | ▮ | Excessive/Unnecessary Force | Non-Sustained | ▮ | ▮ | ▮ | ████ | ████ |
| IA2016-052 | ▮ | ▮ | ▮ | Excessive/Unnecessary Force | Non-Sustained | ▮ | ▮ | ▮ | ████ | ████ |



| IA2016-052 | | | Excessive/Unnecessary Force | Exonerated | | | | | | | |
| IA2016-052 | | | Excessive/Unnecessary Force | Unfounded | | | | | | | |
| IA2016-055 | | | Excessive/Unnecessary Force | Administrative Closure | | | | | | | |
| IA2016-058 | | | Excessive/Unnecessary Force | Non-Sustained | | | | | | | |



| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IA2016-058 | ▬ | | | Excessive/Unnecessary Force | Non-Sustained | ▬▬ | ▬ | | ▬▬ ▬ | ▬ | ▬ | ████████████ ▬ | ████████████ ▬ | ▬ |
| IA2016-063 | ▬ | ▬ | | Excessive/Unnecessary Force | Exonerated | ▬ | ▬ | | ▬ ▬ | ▬ | ▬▬ | ████████████ | ████████████ | ▬ |
| IA2016-066 | ▬ | ▬ | ▬ | Excessive/Unnecessary Force | Non-Sustained | ▬▬ | ▬ | | ▬ ▬ | ▬ | ▬ ▬ | ████████████ | ████████████ | ▬ |
| IA2016-066 | ▬ | ▬ | ▬ | Excessive/Unnecessary Force | Non-Sustained | ▬▬ | ▬ | | ▬ | ▬ | ▬ | ████████████ | ████████████ | ▬ |























































| IA2018-014 | ▆ | ▆ | ▆ | Excessive/Unnecessary Force | Unfounded | ▆ | ▆ | ▆ | ▆ | | ▆ | ▆ | ▆ |
| IA2018-014 | ▆ | ▆ | ▆ | Excessive/Unnecessary Force | Unfounded | ▆ | ▆ | ▆ | ▆ | | ▆ | ▆ | ▆ |
| IA2018-014 | ▆ | ▆ | ▆ | Excessive/Unnecessary Force | Unfounded | ▆ | ▆ | ▆ | ▆ | | ▆ | ▆ | ▆ |
| IA2018-016 | ▆ | ▆ | ▆ | Excessive/Unnecessary Force | Non-Sustained | ▆ | ▆ | ▆ | ▆ | | ▆ | ▆ | ▆ |

































































# EXHIBIT  E

## **Exhibit E**

*(All Figures in Percent)*

|  | **Black** | **Hispanic** | **White** |
|---|---|---|---|
| **Overall Sworn Force** | **42.8** | **9.1** | **44.5** |
| All Charges Processed | 46.2 | 10.2 | 40.7 |
| Charges Dismissed - Inquiry Only (FCIQ, IAQ, SIQ) | 41.0 | 8.4 | 47.0 |
| External Charges Pursued (IA & SI) | 44.9 | 8.3 | 44.3 |
| Internal Charges Pursued (PS) | 51.2 | 14.2 | 31.2 |
| All Charges Sustained | 50.8 | 12.3 | 33.8 |
| All Actions/Punishments | 54.0 | 10.5 | 33.2 |
| Reprimands | 49.1 | 12.2 | 35.0 |
| Fines | 52.7 | 11.1 | 34.1 |
| Suspensions/Leave without Pay | 65.5 | 3.5 | 29.3 |
| Rank Reduction | 57.1 | 14.3 | 28.6 |
| Removal from Promotion Cycle |  |  |  |
| Resigned to Avoid Discipline | 73.9 | 0 | 21.7 |
| Terminated | 71.4 | 9.5 | 19.1 |

**EXHIBIT  F**

**EXHIBIT F**

**Disciplinary Acts By Race of Officers**

| | Asian | Black | Hispanic | White | Total |
|---|---|---|---|---|---|
| (Excludes Cases Where Race Not Shown) | | | | | |
| **All Charges** | **203** | **3222** | **712** | **2836** | **6973** |
| | | | | | |
| | | | | | |
| **INQUIRY ONLY** | | | | | |
| FCIQ | 36 | 399 | 86 | 439 | |
| IAQ | 7 | 92 | 16 | 109 | |
| SIQ | 3 | 36 | 6 | 56 | |
| **TOTAL** | **46** | **527** | **108** | **604** | **1285** |
| | | | | | |
| | | | | | |
| **FORMAL PROCESS** | | | | | |
| IA | 58 | 966 | 222 | 1043 | |
| PS | 70 | 1158 | 318 | 708 | |
| SI | 29 | 579 | 64 | 481 | |
| **TOTAL** | **157** | **2695** | **604** | **2232** | **5688** |
| | | | | | |
| | | | | | |
| **SUSTAINED** | **93** | **1530** | **370** | **1016** | **3009** |
| | | | | | |

| TOTAL PUNISHMENT | 20 | 459 | 89 | 282 | 850 |
|---|---|---|---|---|---|
| | | | | | |
| REPRIMAND | 11 | 185 | 46 | 132 | 377 |
| | | | | | |
| FINES | 6 | 147 | 31 | 95 | 279 |
| | | | | | |
| SUSP./LEAVE WITHOUT PAY | 2 | 76 | 4 | 34 | 116 |
| | | | | | |
| RANK ACTIONS | 0 | 24 | 6 | 12 | 42 |
| | | | | | |
| RESIGN/TERMINATION | (1)(0) 1 | (17)(13) 30 | (0)(2) 2 | (5 )(4) 9 | 42 |

**EXHIBIT  G**

**Exhibit G**

**Percentages of Disciplinary Acts by Race of Officers**

|  | Asian | Black | Hispanic | White |
|---|---|---|---|---|
| **ALL CHARGES** | 2.9 | 46.2 | 10.2 | 40.7 |
| **INQUIRY ONLY** | 3.6 | 41.0 | 8.4 | 47.0 |
| **FORMAL PROCESS** | 2.8 | 47.4 | 10.6 | 39.2 |
| **SUSTAINED** | 3.1 | 50.8 | 12.3 | 33.8 |
|  |  |  |  |  |
|  |  |  |  |  |
| **TOTAL PUNISHMENTS** | 2.4 | 54.0 | 10.5 | 33.2 |
|  |  |  |  |  |
| **REPRIMANDS** | 2.9 | 49.1 | 12.2 | 35.0 |
| **FINES** | 2.2 | 52.7 | 11.1 | 34.0 |
| **SUSPENSION/LEAVE WITHOUT PAY** | 1.8 | 65.5 | 3.5 | 29.3 |
| **RANK ACTIONS** | 0 | 57.1 | 14.3 | 28.6 |
| **RESIGN/TERMINATE** | 2.4 | 71.4 | 4.8 | 21.4 |