**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| HISPANIC NATIONAL LAW ENFORCEMENT ASSOCIATION NCR, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> PRINCE GEORGE'S COUNTY, MARYLAND, *et al.*, <br><br> Defendants. | Case No. 18-cv-03821 TDC |

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION CONCERNING
DEFENDANTS' DISCRIMINATORY PROMOTIONS POLICIES**

Dennis A. Corkery (D. Md. Bar No. 19076)
Joanna K. Wasik (D. Md. Bar No. 21063)
WASHINGTON LAWYERS'
  COMMITTEE FOR CIVIL RIGHTS
  AND URBAN AFFAIRS
700 14th St., N.W., Suite 400
Washington, DC  20005
(202) 319-1000
dennis_corkery@washlaw.org
joanna_wasik@washlaw.org

Deborah A. Jeon (D. Md. Bar No. 06905)
ACLU OF MARYLAND
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
(410) 889-8555
jeon@aclu-md.org

John A. Freedman (D. Md. Bar No. 20276)
Adam M. Pergament (*pro hac vice*)
Kaitlin Robinson (*pro hac vice forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
John.Freedman@arnoldporter.com
Adam.Pergament@arnoldporter.com
Kaitlin.Robinson@arnoldporter.com

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ..................................................................................................2

    1.    Overview.....................................................................................................2

    2.    The County's Promotional Policies ........................................................3

    3.    The Promotional Policies and Tests for POFC and Corporal ...................4

    4.    Promotional Policies and Tests for Sergeant, Lieutenant and Captain ......8

    5.    Plaintiffs and Members of the Organizational Plaintiffs Have Been Directly Injured by the Discriminatory Promotional Tests.......................................10

    6.    The County's Awareness of and Failure to Remedy the Discriminatory Impact of the Promotional Policies........................................................12

    7.    The County Has Not Addressed Either the Known Discriminatory Impact or the Identified Reasons for Discrimination .................................................17

ARGUMENT ....................................................................................................................20

I.     Plaintiffs Are Likely To Prevail on the Merits Because, When Presented With Clear Evidence of Systemic Promotional Discrimination, the County Chose to Keep That System in Place and Have No "Business Necessity" to Discriminate..............................20

II.    Plaintiffs Will Be Harmed If Preliminary Relief is Not Granted.......................................28

III.   The Balance of the Equities and Public Interest Favor the Grant of Preliminary Relief...30

IV.   Relief Requested ........................................................................................32

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975)...................................................................................................22, 28

*Am. Civil Liberties Union of Kentucky v. McCreary Cnty, Kentucky*,
    354 F.3d. 438 (6th Cir. 2003), aff'd 545 U.S. 844, 125 S. Ct. 2722 (2005)...........................29

*Beardsley v. Webb*,
    30 F.3d 524 (4th Cir. 1994) ...............................................................................................21

*Bourman v. Block*,
    940 F.2d 1211 (9th Cir. 1991) ...........................................................................................26

*Brown v. City of Chicago*,
    8 F. Supp. 2d 1095 (N.D. Ill. 1998) ...................................................................................28

*Eldredge v. Carpenters 46 Northern California Joint Apprentice& Training Comm.*,
    833 F.2d 1334 (9th Cir. 1987) ...........................................................................................26

*Elrod v. Burns*,
    427 U.S. 347, 96 S. Ct. 2673 (1976).................................................................................29

*Giovani Carandola, Ltd. v. Bason*,
    303 F. 3d. 507 (4th Cir. 2002) ...........................................................................................31

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971)......................................................................................................22, 24

*Guardians Ass'n of New York City Police Dept. v. Civil Service Commission of New York City*,
    630 F.2d 79 (2d Cir. 1980)...........................................................................................25, 27

*Guerrero v. Cal. Dept. of Corrections and Rehabilitation*,
    701 Fed. Appx. 613 (9th Cir. 2017)....................................................................................25

*Gulino v. Bd. of Educ. of the City Sch. Dist. of N.Y.*,
    907 F. Supp. 2d 492 (S.D.N.Y. 2012).................................................................................27

*Howe v. City of Akron*,
    723 F.3d 651 (6th Cir. 2013) ........................................................................................25, 29

*Johnson v. City of Memphis*,
    444 Fed. App'x 856 (6th Cir. 2011) ....................................................................................29

*Leisner v. New York Tel. Co.*,
  358 F. Supp. 359 (S.D.N.Y. 1973) ...................................................30

*Love-Lane v. Martin*,
  355 F.3d 766 (4th Cir. 2004) ........................................................21

*Merritt v. Old Dominion Freight Line, Inc.*,
  601 F.3d 289 (4th Cir. 22010) ......................................................24

*North Carolina State Conference of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ........................................................24

*Owens v Baltimore City State's Attorneys Office*,
  767 F.3d 379 (4th Cir. 2014) ........................................................21

*Police Officers for Equal Rights v. City of Columbus*,
  644 F. Supp. 393 (S.D. Ohio 1985) ...............................................25

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
  575 F.3d 342 (4th Cir. 2009) ........................................................20

*Ross v. Messe*,
  818 F.2d 1132 (4th Cir 1987) ........................................................29

*United States v. City of New York*,
  637 F. Supp. 2d 77 (E.D.N.Y. 2009) .............................................27

*United States v. Delaware*,
  2004 U.S. Dist. Lexis 4560 (D. Del. 2004)....................................27

*Vanguard Justice Soc. v. Hughes*,
  592 F. Supp. 245 (D. Md. 1984) .........................................27, 28, 33

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ........................................................24

*Vulcan Pioneers, Inc. v. New Jersey Dept of Child Care*,
  625 F. Supp. 527 (D.N.J. 1985) ....................................................26

*Walston v. Cnty. School Bd. of Nanesmond Cnty., Virginia*,
  492 F.2d 919 (4th Cir. 1974) ........................................................26

*Watson v. Fort Worth Bank and Trust*,
  487 U.S. 977 (1988)......................................................................24

*Weathersbee v. Baltimore City Fire Dept.*,
  970 F. Supp. 2d 418 (D. Md. 2013)...............................................22

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................................20

**Other Authorities**

APA, AERA & NCME *Standards for educational and psychological testing*
    (2014)......................................................................................................................19

Prince George's County Government Website,
    https://www.youtube.com/watch?v=PufSwbySC8k&feature=youtu.be .................18

Prince George's County Government Website,
    https://www.youtube.com/watch?v=q76oDk_CGGI&feature=youtu.be .........................17, 32

Prince George's County Government Website,
    https://www.princegeorgescountymd.gov/DocumentCenter/View/31495/PGP
    D-Overview-Presentation-July-30-2020-PDF .........................................................3

SIOP, *Principles for the Validation and Use of Personnel Selection Procedures*
    (4th Ed.) (2003), (5th Ed.)(2018) ............................................................................19

U.S. Const. amend XIV .................................................................................................21

U.S. EEOC, *Uniform Guidelines on Employee Selection Procedures*, Sec. 4C............................6

Discovery in this matter has now confirmed that Defendant Prince George's County has instituted and maintained a set of policies which discriminate against Black and Hispanic officers in promotions. For at least the last eight years, the Defendant Prince George's County has knowingly employed a system of promotional tests for members of the Police Department which has resulted in the consistent, significant over-promotion of white officers at the expense of Black and Hispanic officers.  Although the discriminatory impact is present throughout the Department's ranks, it is particularly pronounced at Commander level, where over 80 percent of Captains and 60 percent of Lieutenants are white/Non-Hispanic.

The County's discriminatory policies are persistent and widespread; and the County has made a series of deliberate choices to maintain them, even when presented—over and over—with evidence of the discriminatory impact of its promotional policies—including by its own outside testing consultant.  In 2017,  an "Equity Panel" which the County purportedly appointed specifically to study issues of discrimination within the Department was presented with evidence confirming the discriminatory impact of the County's promotional policies, but the County still did nothing to remedy the problem. The County neither adopted nondiscriminatory tests, nor changed the discriminatory assignment system which exacerbates the discriminatory impact of the tests.  Instead, the County sought to obscure the impact of its discriminatory policies, insisting that the reports of its testing consultant were "confidential" and could not be disclosed to the public or officers who are victims of its discriminatory policies.

Now those records and the testimony of the architects of that biased system can be put before this Court.  They have been reviewed by experts for both sides, who agree that the statistical evidence shows widespread and persistent discriminatory impact.  That evidence amply establishes the need for  preliminary injunctive relief requiring the County to submit its

promotional practices to review by experts who owe their allegiance only to this Court—and to follow their recommendations for the type of reform the County should have enacted years ago—before the County administers yet another round of promotional exams that discriminate against Black and Hispanic officers.

If the County follows its normal schedule, it will administer the next promotional tests on April 25, 2021, and the resulting further discrimination against Black and Hispanic officers will cause irreparable harm to those officers, who include Individual Plaintiffs and members of the Organizational Plaintiffs.  If this Court were to enter the preliminary injunction Plaintiffs request in early March, however, the Court and County would be able to obtain such an independent review—and make the recommended reforms—in time to administer nondiscriminatory tests only a few months beyond the "normal" schedule (just as the County did in 2020 because of the first wave of COVID-19.)  The officers of color, who will otherwise be harmed by another round of discriminatory tests and promotions, deserve at least that much.

## FACTUAL BACKGROUND

1. **<u>Overview</u>**: The promotion of PGPD officers depends solely on tests which consistently result in the promotion of white officers over Black or Hispanic officers, to such an extent that adverse impact is both statistically significant and violates the U.S. Equal Employment Opportunity Commission's "Four-Fifths Rule" for identifying systems that presumptively violate federal law. The direct result of the County's promotional policies has been, and continues to be, discrimination against minority officers in the leadership ranks of PGPD which is both statistically significant and a matter of documented concern to the citizens of the County.  The discriminatory impact permeates the Department, where today over 80 percent of Captains and 60 percent of Lieutenants are white.  And the disparity has grown even worse at the top levels over the last five years:

2

*Percentage of PGPD Officers Who Are white Non-Hispanic*

| Rank | 2015 | July 2020 |
|------|------|-----------|
| Captains | 76.7% | 80.6% |
| Lieutenants | 61.2% | 60.9% |
| Sergeants | 53.1% | 51.2% |
| Corporals | 43.1% | 39.5% |
| POFC | 40.3% | 42.0% |
| Patrol Officer | 42.5% | 31.2% |
| Overall Force | 45.5% | 42.5% |

Ex. 14 (*Expert Report of John Hausknecht, Ph.D.* (Oct. 12, 2020) at 15),  citing Ex. 19 (*Graves Dep. Ex. 10 (PG0000179306))* and Ex. 20 (*Graves Dep. Ex. 11 (PG0000000244)*); *Presentation of Interim Police Chief Hector Velez to Task Force on Police Reform* (July 2020) (available on Prince George's County Government Website, https://www.princegeorgescountymd.gov/DocumentCenter/View/31495/PGPD-Overview-Presentation-July-30-2020-PDF). [1]

Despite this clear statistical disparity along racial lines, the Defendants—most notably, the County—have admitted at testimony and in responses to Requests for Admission that they do not believe that Black or Hispanic officers fare poorly on the promotional tests because they are less intelligent, less well-trained, less motivated, or study less than white officers.  Indeed, the County disclaims any such view.

Finally, although the discriminatory effect of the County's promotional policies and practices was reviewed by the "Equity Panel" appointed to remedy that problem in 2017—and that Panel heard evidence linking the adverse impact of the promotional tests to the assignment system which also works against minority candidates—the Panel was not even permitted to report those findings, and no action was ever taken to remedy the situation.

**2.  The County's Promotional Policies**: The County is entirely responsible for the policies with respect to the promotion of PGPD officers pursuant to the Collective Bargaining

---

[1] Unless otherwise indicated, all Exhibits cited are exhibits to the Declaration of John A. Freedman.

Agreement between the County and the local chapter of the Fraternal Order of Police (F.O.P.). Ex. 3 (*CBA (July 1, 2015 through June 30, 2016) at 24, Art. 14) (PG0000042770)*); Ex. 7 (*CBA (July 1, 2018 through June 30, 2020) at 20, Art. 14 (PG0000011518)*).  The County thus sets the procedures for all promotions through a Joint Study Committee on which it has four members. *Id.* And the County exercises direct and complete control over the promotion of PGPD officers through the County's Office of Human Resources Management.  Ex. 10 (*Magaw Dep. Tr.* 30:17-30:22; 33:9-14).

Since at least 2012, the promotion of all officers from Police Officer through Captain has been dependent solely on a candidate's performance on tests created, administered and reviewed by an outside testing organization retained by the County, Fields Consulting ("Fields"). Eligibility to take a test for promotion requires a candidate to have served a set amount of time in the immediately lower rank.  The discriminatory impact of the promotional tests on lower ranks thus has a cascading impact on promotion to the higher ranks: The discriminatory policies winnow the pool of Black and Hispanic candidates at each level, beginning at the bottom.  For example, in the series of tests administered by the County in 2016 and 2018, only 35 percent of the candidates for promotion to Captain were Black or Hispanic, notwithstanding that the overall force is approximately 55% Black or Hispanic.

    **3.**  **The Promotional Policies and Tests for POFC and Corporal**: Under the Department's policies, the tests for promotion from Police Officer to Police Officer First Class (POFC)— and then from POFC to Corporal—are composed solely of 50 multiple-choice questions.  The County has consistently required officers to answer 70% on the questions correctly to be promoted. An officer who answers 70% of the questions correctly is promoted; an officer who does not, is held back.  The POFC and Corporal tests are given twice each year.

For at least the last eight years, the County's tests for POFC and Corporal have consistently produced significantly higher scores—and hence significantly higher promotion rates—for white candidates than for either Black or Hispanic candidates.  From April 2012 through October 2019, **the mean score for white candidates was higher than the mean scores for either Black or Hispanic candidates on every one of the 16 tests for promotion from Police Officer to POFC, and that those differences were statistically significant in most cases for Black candidates and in some cases for Hispanic candidates** (with the number of Hispanic candidates typically being too small for such statistical comparisons).  A summary of the results is set forth in the following table:

| POFC Tests | | | | |
|---|---|---|---|---|
| | white Mean > Black Mean | Degree of Difference | white Mean > Hispanic Mean | Degree of Difference |
| Apr. 12 | Yes | High | Yes | Moderate |
| Oct. 12 | Yes | High | Yes | High |
| Apr. 13 | Yes | Significant | Yes | Significant |
| Oct. 13 | Yes | Significant | Yes | NS |
| Apr. 14 | Yes | Slightly Higher | Yes | — |
| Oct. 14 | Yes | Slightly Higher | Yes | — |
| Apr. 15 | Yes | Significant | Yes | NS |
| Oct. 15 | Yes | Slightly Higher | Yes | — |
| Apr. 16 | Yes | Higher | Yes | — |
| Oct. 16 | Yes | Significant | Yes | — |
| Apr. 17 | Yes | Significant | Yes | — |
| Oct. 17 | Yes | Significant | Yes | — |
| Apr. 18 | Yes | Significant | Yes | Significant |
| Oct. 18 | Yes | Higher | Yes | — |
| Apr. 19 | Yes | Higher | Yes | Significant |
| Oct. 19 | Yes | Higher | Yes | Higher |

*Note*:  A dashed entry (–) indicates that Fields stated the sample size was too small to calculate a meaningful value for statistical significance testing.

Ex. 14 (*Expert Report of John Hausknecht, Ph.D.* (Oct. 12, 2020) at 6).

Those results were then confirmed by Plaintiffs' expert, Professor John Hausknecht of Cornell University.  Professor Hausknecht and Plaintiffs' statistical expert, Marc Simon of BDO

Consulting, showed that the cumulative difference in the results of the POFC test over the entire eight-year period—with the scores for white candidates exceeding the scores for Black and Hispanic candidates—was statistically significant and therefore highly unlikely to be due to chance.  Ex. 14 (*Expert Report of John Hausknecht, Ph.D.* (Oct. 12, 2020) at 6); Ex. 11 (*Expert Report of Marc Simon on Promotion Statistics* (Aug. 25, 2020) at 10).

Professor Hausknecht also computed the "adverse impact" of the POFC tests in terms of the percentage of candidates promoted.  In that comparison, Dr. Hausknecht applied the rule that the EEOC has endorsed where an unlawful discriminatory effect is presumed whenever the percentage of minority candidates who are promoted is less than 80% ("Four-Fifths") of the percentage of white candidates so promoted.  Ex. 14 (*Hausknecht Expert Report* at 10 (*quoting* U.S. EEOC, *Uniform Guidelines on Employee Selection Procedures*, Sec. 4C.))  **Professor Hausknecht found that of the 13 POFC tests for which there was a sufficient number of candidates to apply the EEOC rule, 8 failed to meet that minimal standard:**

| Rank/Year | white Pass Rate | Black Pass Rate | Hispanic Pass Rate | B/W Adverse Impact Ratio | H/W Adverse Impact Ratio |
|---|---|---|---|---|---|
| **POFC** | | | | | |
| 2016 Spring | 70.2% | 57.5% | 46.7% | 81.9% | **66.5%** |
| 2016 Fall | 83.7% | 61.5% | 94.4% | **73.5%** | 112.8% |
| 2017 Spring | 52.2% | 34.5% | 0.0% | **66.1%** | *insufficient data* |
| 2017 Fall | 40.0% | 17.4% | 50.0% | **43.5%** | *insufficient data* |
| 2018 Spring | 100.0% | 69.7% | 60.0% | **69.7%** | **60.0%** |
| 2018 Fall | 61.1% | 53.8% | 33.3% | 88.1% | *insufficient data* |
| 2019 Spring | 90.5% | 53.6% | 50.0% | **59.2%** | **55.3%** |
| 2019 Fall | 72.7% | 60.7% | 66.7% | 83.5% | 91.7% |

*Note*:  Bolded and shaded adverse impact ratios indicate practical significance under the Four-Fifths rule.  B/W=Black vs. white.  H/W=Hispanic vs. white.

6

Ex. 14 (*Hausknecht Expert Report* at 9).

Both the County's long-time testing consultant Fields and Plaintiffs' litigation expert reported similar results with respect to the County's 16 tests regarding the promotion of POFC officers to Corporal from April 2012 to October 2019. **In every one of the 16 tests, the mean scores for white candidates were higher than the mean scores for either Black or Hispanic candidates**.

| Corporal Tests | | | | |
|---|---|---|---|---|
| | white Mean > Black Mean | Degree of Difference | white Mean > Hispanic Mean | Degree of Difference |
| Apr. 12 | Yes | Moderate | Yes | Moderate |
| Oct. 12 | Yes | Moderate | Yes | High |
| Apr. 13 | Yes | Significant | Yes | NS |
| Oct. 13 | Yes | Significant | Yes | — |
| Apr. 14 | Yes | Significant | Yes | NS |
| Oct. 14 | Yes | Slightly Higher | Yes | Slightly |
| Apr. 15 | Yes | Significant | Yes | — |
| Oct. 15 | Yes | Significant | Yes | — |
| Apr. 16 | Yes | Significant | Yes | — |
| Oct. 16 | Yes | Significant | Yes | — |
| Apr. 17 | Yes | Significant | Yes | — |
| Oct. 17 | Yes | Significant | Yes | — |
| Apr. 18 | Yes | Significant | Yes | Significant |
| Oct. 18 | Yes | Significant | Yes | — |
| Apr. 19 | Yes | Significant | Yes | NS |
| Oct. 19 | Yes | Significant | Yes | NS |

*Note*:  A dashed entry (–) indicates that Fields stated the sample size was too small to calculate a meaningful value for statistical significance testing.

Ex. 14 (*Hausknecht Expert Report* at 7).

Similarly, Professor Hausknecht found that **the percentage of Black and Hispanic candidates who were promoted to Corporal as a result of their test scores failed to meet the**

**EEOC's minimal standard of 80% of the promotion rates for white candidates in 11 of the**

**14 tests** for which there was sufficient data to permit such a comparisons:

| Rank/Year | white Pass Rate | Black Pass Rate | Hispanic Pass Rate | B/W Adverse Impact Ratio | H/W Adverse Impact Ratio |
|---|---|---|---|---|---|
| **Corporal** | | | | | |
| 2016 Spring | 94.1% | 47.4% | 61.5% | **50.3%** | **65.4%** |
| 2016 Fall | 77.8% | 47.1% | 50.0% | **60.5%** | **64.3%** |
| 2017 Spring | 95.2% | 41.9% | 33.3% | **44.0%** | *insufficient data* |
| 2017 Fall | 73.1% | 34.9% | 14.3% | **47.7%** | **19.5%** |
| 2018 Spring | 93.3% | 75.0% | 58.3% | 80.4% | **62.5%** |
| 2018 Fall | 52.8% | 33.3% | 20.0% | **63.2%** | **37.9%** |
| 2019 Spring | 100.0% | 83.7% | 87.0% | 83.7% | 87.0% |
| 2019 Fall | 91.7% | 50.0% | 50.0% | **54.5%** | *insufficient data* |

*Note*: Bolded and shaded adverse impact ratios indicate practical significance under the Four-Fifths rule. B/W=Black vs. white. H/W=Hispanic vs. white.

Ex. 14 (*Hausknecht Expert Report* at 9).

The Defendants' own expert, Dr. Toni Locklear of ABT Metrics, reported her own

tabulations for the POFC and Corporal tests for 2016-2019 which ███████████

███████████. Ex. 13 (*Expert Report of Dr. Toni S. Locklear (Sept. 28, 2020)* at Tables

1b & 3b).



**4. Promotional Policies and Tests for Sergeant, Lieutenant and Captain**: Under the

Department's policies, promotions to the ranks of Sergeant, Lieutenant and Captain are

determined by a two-stage process. The first stage consists of a 100-multiple-choice-question

test, which is given every other year. The County has required applicants to score at least 70%

on that test to proceed to the second stage, which is a "skills assessment." The skills assessment,

in turn, requires a candidate to perform various written tasks (such as drafting a report) and oral

exercises, where the candidate responds in a videotaped answer outlining their actions with

respect to some hypothetical problem. The skills assessment portion is graded by police officers from other Departments selected by Fields from states in the Southeast and Maryland. Although the PGPD candidates are identified only by a number, the use of video responses generally permits the assessors to know the race/ethnicity of the candidates.

The scores of the multiple-choice exam and skills assessment are then combined and used to generate a rank list of all candidates. As openings occur over the next two years, officers are offered promotion in the order in which they appear on the rank list.

**Once again, the reports made by Fields to the County establish that white candidates so significantly outscored the Black and Hispanic candidates on the combined multiple-choice exams and "skills assessments" for Sergeant in both 2016 and 2018** (Defendants have not produced the reports for prior years) **that the ratio of the Black/white and Hispanic/white candidates promoted from the rank-ordered lists over the next two years was not even close to the 80% ratio the EEOC considers to be the minimal mark of a nondiscriminatory process.** Similarly, **the results for Lieutenant in 2016 and 2018, in terms of promotion from the ordered lists, failed the EEOC 80% standard in 3 of the 4 comparisons** (the sole exception being the 2018 Hispanic/white ratio which involved only eight Hispanic applicants):

| Rank/Year | white Promo Rate | Black Promo Rate | Hispanic Promo Rate | B/W Adverse Impact Ratio | H/W Adverse Impact Ratio |
|---|---|---|---|---|---|
| **Sergeant** | | | | | |
| 2016 | 22.7% | 11.5% | 7.1% | **50.8%** | **31.5%** |
| 2018 | 25.8% | 11.8% | 11.8% | **45.7%** | **45.7%** |
| **Lieutenant** | | | | | |
| 2016 | 49.0% | 20.0% | 0.0% | **40.8%** | **0.0%** |
| 2018 | 34.5% | 20.0% | 33.3% | **57.9%** | 96.5% |

*Note*: Bolded and shaded adverse impact ratios indicate practical significance under the Four-Fifths rule. B/W=Black vs. white. H/W=Hispanic vs. white. As indicated by "--", there were no Hispanic applicants for the 2016 Captain promotional exam.

Ex. 14 (*Hausknecht Expert Report* at 11).

Again, Defendants' litigation expert, Dr. Locklear, confirmed this analysis.  Ex. 13 (*Locklear Expert Report (Sept. 28, 2020)* at Tables 5b & 6b).

Because the discriminatory policies so winnow the pool of Black and Hispanic officers eligible for promotion to Captain—by preventing Black and Hispanic officers from climbing to the ranks to Sergeant and Lieutenant—it is preordained that a substantial majority of Captains will be white.  For example, as defense expert Dr. Locklear's data shows, ███████████

████████████████████████████████████████████████████████████████████

████████  Ex. 13 (*Locklear Expert Report (Sept. 28, 2020)* at Table 7a); Ex. 2 (*PG0000861762*).  In 2018 ██████████████████████████████████████████████

██████████████████████████████ *Id.*

Starting with this already racially skewed pool, the 2016 exam for Captain then resulted in the promotion of  15 white, 10 Black, and no Hispanic officers to Captain over the next two years.  The results of the 2018 process were even worse, dictating the promotions of 14 white, 6 Black, and 2 Hispanic officers to Captain from mid-2018 through the end of 2020.  Ex. 13 (*Locklear Expert Report (Sept. 28, 2020)* at Table 7a).

**5. Plaintiffs and Members of the Organizational Plaintiffs Have Been Directly Injured by the Discriminatory Promotional Tests**: Several of the Individual Plaintiffs and members of the Organizational Plaintiffs have been unfairly denied promotion as a direct result of the County's discriminatory promotions policies.  Boone Decl. ¶¶ 16-17, 26; Mack Decl. ¶¶ 12-19; Perez Decl. ¶¶ 17, 27.   For example, Sergeant Mack was on the cusp of being promoted to Lieutenant based on the 2016 test, but scored just below individuals who were promoted.  Mack Decl. ¶¶ 13-16.  A HNLEA member was similarly on the cusp of being promoted to Sergeant

based on the 2018 promotion cycle, but scored just below individuals who were promoted; the same individual was similarly passed over during the 2016 promotional cycle.  Perez Decl. ¶ 27. Another member  of HNLEA and UBPOA was on the cusp of being promoted to Lieutenant in 2018, but scored just below individuals who were promoted.  Perez Decl. ¶ 27.

Unfair denial of a promotion injures the denied officer in a number of ways.  Beyond loss of prestige and compensation from higher rank, many professional opportunities within the Department are only open to officers who have attained a particular rank.  For example, many specialty units (such as Internal Affairs, Narcotics Enforcement, the Criminal Investigations Homicide, Robbery, and Sexual Assault Units, the Gang Unit, the K9 Unit, the Crime Scene Investigations and the Forensic Science Divisions, and the Recruiting and Background Divisions are generally only open to officers who have attained the rank of Corporal, Sergeant, or Lieutenant.  Boone Decl. ¶ 15; Perez Decl. ¶ 15.  And within each patrol squad, the position "9-Car" which functions as the second-in-command of the squad, is only open to officers who have attained the rank of Corporal.  The 9-Car officer has a great deal of discretion in assigning individual officers to patrol cars or teams, scheduling leaves, and is viewed as a stepping-stone to higher command positions.  Boone Decl. ¶ 15; Perez Decl. ¶ 15.  Seniority of rank also generally provides significant benefits in terms of greater control over working hours and conditions. Boone Decl. ¶ 15; Perez Decl. ¶ 15.

Relatedly, an officer who fails a lower-level test or is not promoted based on the higher-level assessments, must wait up to two years to take the next test.  Boone Decl. ¶ 4, 6, 15; Perez Decl. ¶¶ 5, 15; Mack Decl. ¶¶ 8-9, 12-13.  And because the ability of a particular officer to attain higher rank is dependent on having served a required period in grade, officers who are promoted

later than their peers (because they were ranked lower due to receiving a worse score on the test) may miss a promotions cycle because they did not have the required time in grade.

The unfairness of the latest set of promotional tests conducted in September 2020 was exacerbated by the County's attitude on the pandemic. Those tests were originally scheduled for April 2020, but were postponed due to the pandemic. When the County Office of Human Resources Management conducted a survey in September 2020 of the over 400 officers who registered to take the test in September, almost 60 percent of respondents indicated they were uncomfortable or would not take the test because of COVID-19. Boone Decl. ¶¶ 31-32; Perez Decl. ¶¶ 32-33. Many officers specifically objected to the test going forward. Yet, the County went ahead and administered the tests in September. Many officers, including Sergeant Mack, and other members of HNLEA and UBPOA, did not take the exam because they did not feel safe—all of these officers were deprived of the opportunity for promotion, and (absent relief from the court) many may have to wait two additional years to have another opportunity. Boone ¶ 34; Mack ¶ 24; Perez ¶ 35.

The failure to promote more minority officers also has a significant impact on how the force interacts with the community. Boone Decl. ¶¶ 11-12; Perez Decl. ¶¶ 11-12. For example, command officers have a significant role in investigating and evaluating community complaints, and for maintaining positive relations with the community; the entrenchment of white officers in command positions has fostered division with the community, making it more difficult for all officers to perform their jobs. Boone Decl. ¶¶ 11-12; Perez Decl. ¶¶ 12-13.

**6. The County's Awareness of and Failure to Remedy the Discriminatory Impact of the Promotional Policies**: The lack of diversity at the ranks of Sergeant and above—especially the command rank of Captain—has been an open concern within the Department for a number of

years.  The discovery record now confirms that the County was aware that the promotional tests were discriminatory and that the impact of the promotional policies resulted in more white candidates being promoted.  For example, at his deposition, Defendant Magaw—who was PGPD Chief from 2010 through 2015, and since 2016 has served as the Deputy County Administrator for Public Safety and Homeland Security (the highest-ranking County office with primary responsibility for the police force)—likewise conceded that PGPD senior leadership is not sufficiently diverse.  Indeed, Mr. Magaw testified that he and former County Executive Baker had gone so far as to discuss a change which would have removed promotions to Captain from the County's testing process, but that reform was never made because of a lack of "political will":

> **I had conversations with Mr. Baker about making the captain's position an appointment**.  The FOP—just quickly, **the FOP objected to it**, thought it was too subjective, and it didn't—**the political will was not there to change**—many police departments, especially big police departments across the country, the captains in the senior executive staff.  In Prince George's County, when you make captain, you leave the FOP.  You are no longer represented by the FOP.  So, my perspective was—is that may be an option to look at as we move forward—mainly to be able to include more minorities in the executive staff.

Ex. 10 (*Magaw Dep. Tr.* 111:13-112:8) (emphasis added).

In addition, Fields Consulting President Flaig testified that her firm provided reports (which on their face show that whites outperformed Blacks and Hispanics) to the County following each testing cycle, that she attended the County's Promotions Committee meetings, but that she was never asked to assess the adverse impact of the tests. Ex. 9 (*Flaig Dep. Tr.* 23:15-24:6; 86:21-90:22).

The County twice conducted self-examinations about the discriminatory nature of its promotions policies and decided to make no changes.  First, in early 2017, Defendant Stawinski and then-County Executive Baker—after being advised by the Plaintiffs and the Department of

Justice that Plaintiffs had filed a complaint with the Civil Rights Division—convened an "Equity Panel on Promotions, Discipline and Practices" (later referred to as the "Fairness Panel"). Ex. 6 (*Acosta Dep. Tr.* 88:7-24). As its name implied, the first of the three topics to be reviewed by the Panel was the complaint that the PGPD promotions process favors white candidates. The Fairness Panel was co-chaired by then PGPD Inspector General Carlos Acosta and retired PGPD Sergeant Gerald Moore, and consisted of County officials, other PGPD officers, and community representatives. The County appointees included Michael Lyles, then Chairman of the County's Human Rights Commission (a unit of the County Government), and Stephen Whitted, the County Attorney's Office employee responsible for PGPD employment disputes. Ex. 6 (*Acosta Dep. Tr.* 52:4-64:17).

In March, April and May 2017, the Panel heard from the key players in the promotional process, including Personnel Director Jewel Graves and Ms. Flaig. The Panel likewise heard from several PGPD officers who directly tied discrimination in the Department's policies for making assignments to "specialty units" and discrimination in the promotions system. The Department's policy for assignment to "specialty units" allows unit commanders to select their subordinates at their sole discretion (with the subsequent approval of the Chief), and has resulted in many "specialty units" being significantly more white. The Panel heard complaints that members of the specialty units have an advantage in scoring higher on the promotional tests, both because their daily work provides training in subjects and procedures not covered at the Academy, and because they have more time "on the job" to study for the promotional exams.

Specifically, on June 14, 2017, Major Victoria Brock—at the time the highest-ranking Black woman in the Department—specifically criticized that officers assigned to specialty units, which were disproportionately white, had an advantage in the testing process. Brock Decl. ¶¶ 8-

14

9  Similarly, Plaintiff Boone, the president of Plaintiff UBPOA, similarly noted that Panel members discussed there were significantly less minority officers in command ranks, and one cause of this was that more white officers are assigned to specialty units which gives them certain advantages in the promotions process.  Boone Decl. ¶¶ 20-23.  These observations were memorialized in the handwritten notes of Co-Chair Acosta.  Ex. 4 *(PG0000967665-666)* ("specialty units allow more time to study than patrol units. . .  some people do not get same opportunities to study for test.").  *See also* Ex. 6 (*Acosta Dep. Tr.* 120:3-122:25).   The Panel requested demographic data for the specialty units, which confirmed "there was, in fact, a discrepancy in the make-up of those [specialty] units.  In some units the . . . difference was pretty glaring between having significantly fewer minority members in their make up." Ex. 5 (*PG0000928896*).  That was clear from the data from the year-end 2015 the Panel was presented Ex. 1 (*PG0000000095*), and it is clear today:

| | Patrol Units Dec. 2015 | Specialty Units Dec. 2015 | Patrol Units Mar. 2020 | Specialty Units Mar. 2020 |
|---|---|---|---|---|
| white | 42.93% | 50.95% | 37.71% | 48.98% |
| Black | 44.43% | 37.79% | 47.11% | 38.83% |
| Hispanic | 8.75% | 7.63% | 10.84% | 8.92% |
| Asian | 3.80% | 3.24% | 4.10% | 3.16% |
| Other/NA | 0.08% | 0.38% | .24% | .14% |

Following the Panel's completion of its review of the promotional process, on July 14, 2017, Panel member Corporal Thomas Hilligoss summarized what the Panel had heard regarding discrimination in the promotions system, observing that the Department's assignment process, in which minority officers are more often consigned to patrol units, was having a disparate impact on the promotions process because the white candidates received more relevant training and had more study time when they were more often assigned to specialty units:

**Another area of concern that was brought up in our later meetings was the ability to prepare for the promotion process and how some on the department have a much better opportunity to prepare than others, based on their work assignment. Inherently, there are some positions that allow much more specialized training and more flexibility to study than others. …This was one of the biggest concerns I heard in the meetings, and *[sic]* issue that I just don't feel can be ignored.** While it is very true that the written test is basically an 'it is what it is' type process, and there isn't much bias that can be put into the actual questions and answers that comprise the test, there was a very valid concern brought up in regards to the candidate's opportunities to prepare for that test. **There absolutely seems to be an advantage that goes to those who are not in a 'patrol' capacity when it comes to study and test preparation. Due to the nature of work demands, those who are in so-called 'specialty units' have a much more flexible schedule, much more specific training not available to the department as a whole, more experience in things that others may learn from studying books, and more opportunities on a day today *[sic]* basis to study for a written test than those who are tied to the radio in patrol for their entire work day.**

Ex. 5 (*PG0000928896*) (emphasis added) (ellipsis in original).

During her deposition, Ms. Graves, the Department's Personnel Director, agreed that officers in specialty units "have more time to get through the study materials than officers who have to go out on patrol" and that "because of the specialty nature of the units . . . there may be additional information that folks are exposed to that they're not exposed to in patrol" which "m[a]y help them ultimately on these tests." Ex. 8 (*Graves Dep. Tr.* 142:11-144:1).

Despite its examination of discrimination in promotions, the Fairness Panel never issued a report or recommendations on promotions (or any other topic). When Mr. Acosta left the Department in January 2018, Defendant Stawinski failed to replace him and the Fairness Panel never met again. Ex. 6 (*Acosta Dep. Tr.* 34:4-12, 126:11-131:2, 277:8-286:8). (As Mr. Acosta acknowledged, had Chief Stawinski wanted the Panel to continue and complete its work, the Panel would have done so. *Id.* at 262:13-18.)

The County examined its discriminatory practices again after June 18, 2020, the day on which the Graham Report was released and Defendant Stawinski resigned. In the wake of these

events, County Executive Alsobrooks convened a "Task Force on Police Reform," comprised primarily of County officials, state legislators, and a handful of community representatives.  On July 30, the Task Force was presented with the PGPD demographics by rank.  After presenting the information (including the fact that over 80 percent of Captains and 60 percent of Lieutenants are white), Acting Chief Velez once again acknowledged that the County had considered "making the captain's position an appointed position" but "that idea received a lot of pushback from the FOP. . . . I do know that the FOP was involved in the discussions and . . . that's the reason why it did not go any further."  July 30 Video Minutes at 22:35-23:06.[2]  Although that Task Force has released dozens of recommendations, it did not make any findings or recommendations on the promotional process because (as quoted below) the Panel was directed not to consider any of the matters at issue in this litigation.  *See pp.* 32 *infra*, Video Minutes of Sept. 17, 2020 Meeting at 00:56-01:10.[3]

**7.  <u>The County Has Not Addressed Either the Known Discriminatory Impact or the Identified Reasons for Discrimination</u>**:  As shown above, Fields has advised the County  every year, since at least 2012, that its promotional policies and tests were having an adverse impact, but the County has done nothing to change that outcome.  The County has undertaken no study of why there is an adverse impact; have made no attempt to try a different type of assessment; and have made no attempt to change their policies.  Even when presented with compelling information during the 2017 Fairness Panel that tied discrimination in the Department's specialty unit assignment policies to discrimination in promotions—specifically the advantage officers in the disproportionately white specialty units had because the tests relied on information that one

---

[2] Video available on Prince George's County Government Website, https://www.youtube.com/watch?v=q76oDk_CGGI&feature=youtu.be.
[3] video available on Prince George's County Government Website, https://www.youtube.com/watch?v=PufSwbySC8k&feature=youtu.be.

acquires in specialty units and provides more time to study on the job— the County did nothing to examine, analyze, or address that specific discrimination.

At the same time, the County has admitted that it has no basis even to contend (much less prove) that the substantially lower rate of promotions of Black and Hispanic officers can be attributed to any inherent deficiencies in them as candidates. **In its response to a Request for Admission in September 2020, Defendants conceded that, "neither the Department [PGPD], the County or Fields/ESCI possesse[d], or is aware of, any data, study, or analysis that indicates that, as compared to white promotion candidates, Black promotion candidates, are less intelligent, were not as well trained at the Police Academy, are less motivated to work towards promotions, or study less for the tests."** Ex. 12 (*Response of Defendant County to Mack Request for Admission No. 5* (Sept. 21, 2020) at 9). **The Defendants made an identical admission with respect to Hispanic candidates**. *Id*. at 9.

The County's formal admission followed concessions from personnel director Graves, Ms. Flaig and others that they knew of no such data to explain, much less justify, the adverse impact of the promotional policies on Black and Hispanic officers. Ex. 8 (*Graves Dep. Tr.* 227:2-230:8); Ex. 9 (*Flaig Dep. Tr.* 33:6-34:15). And Dr. Locklear, Defendants' expert witness, has similarly not cited any data—or offered any opinion—that PGPD officers of color score lower on the promotional tests than white officers because they are somehow less competent than their white counterparts.

Unable to offer any legitimate reason for the demonstrated racially adverse impact of the County's policies, Dr. Locklear cites a "validation" study that Fields conducted, entirely on its own, of the tests that were administered in 2015.[4] Ex. 13 (*Locklear Expert Report* at 18-29).

---

[4] Tellingly, neither Defendants nor Fields produced the 2015 "validation" study prior to the

The "validation" effort was not independent (i.e., it was conducted by the firm that designed the tests) and, as Professor Hausknecht explained, it failed to comply with the relevant professional standards developed by the EEOC, American Psychological Association ("APA"),[5] and the Society for Industrial and Organizational Psychology ("SOIP") to "avoid[] bias in employment decisions"[6]:

- The study did not attempt to determine the cause of the race disparity.  For example, the study did not explain the adverse effects of their tests, nor has it tried to evaluate the adverse effect of the assignment policies on the fairness of the promotional process. Ex. 9 (*Flaig Dep. Tr.* 34:21-35:7).  And, contrary to EEOC and APA standards, the study made no effort to consider the effect of maintaining the same 70% passing score ("cutoff score") without any consideration of the impact such scores were having on candidates of different races. Ex. 14 (*Hausknecht Expert Report*  at 19-20).

- The study did not show (or attempt to show) empirical relationships (i.e., correlations) between test scores and job performance, which is one of the recommended means of validating a testing program. Ex. 14 (*Hausknecht Expert Report*  at 15-16).

- No "validation" has been attempted since 2015.  There has been no further effort to revise the job analysis or validate the tests, and there has never been an attempt to evaluate less discriminatory alternatives.  This violates EEOC, SIOP, and APA principles which all require alternative evaluation techniques, or additional validation attempts whenever, as here,

---

depositions of relevant witnesses.  After Dr. Locklear relied on the study in her September 28 report, it was belatedly produced on October 7.
[5] APA, AERA & NCME *Standards for educational and psychological testing* (2014).
[6] SIOP, *Principles for the Validation and Use of Personnel Selection Procedures*, (5th Ed.) (2018) available at https://www.apa.org/ed/accreditation/about/policies/personnel-selection-procedures.pdf.

the existing tests continue to have an adverse impact on candidates of color.  Ex. 14

(*Hausknecht Expert Report*  at 18-20).

## ARGUMENT

In the Fourth Circuit as elsewhere, a party seeking preliminary relief must show "[1] that

he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence

of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is

in the public interest."  *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342,

346 (4th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20

(2008).  Here, all four factors favor the grant of a preliminary injunction suspending the

promotional testing until an independent expert advises that sufficient changes have been made

to insure a nondiscriminatory result—i.e.,  to do what the County has failed to do for years.

**I.    Plaintiffs Are Likely to Prevail on the Merits Because, When Presented With Clear Evidence of Systemic Promotional Discrimination, the County Chose to Keep That System in Place and Have No "Business Necessity" to Discriminate**

In this case, the largely admitted facts and controlling law work together to make a clear

showing that Plaintiffs are likely to prevail on the merits.  In Section 1983 litigation, plaintiffs

may prove an unconstitutional municipal policy or custom  by demonstrating a "persistent and

widespread practice of municipal officials, the duration and frequency of which indicate that

policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it

due to their deliberate indifference."  *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d

379, 402 (4th Cir. 2014) (internal punctuation omitted).  Here, the County's policies, including

its reliance on biased tests and the role of the discriminatory assignment policies, have been both

"persistent and widespread" in that the challenged promotional policies have resulted in

unconstitutional discrimination against Black and Hispanic candidates in promotion cycle after

promotion cycle for at least the last eight years, all in violation of the Equal Protection Clause of the Fourteenth Amendment. The County's own testing consultant—and now its litigation expert—has admitted that eight years of test results (and hence mandated promotion results) show a clear adverse impact on Black and Hispanic officers. The County has further admitted that there is no data or reason to excuse those discriminatory results. Ex. 12 (*Response of Defendant County to Mack Request for Admission No. 5* (Sept. 21, 2020) at 9). And the County has demonstrated "deliberate indifference": when presented with complaints and evidence of race-based discrimination resulting from its promotional policies, it has twice (in 2017 and 2020) failed to do anything to address the issue.

Courts have applied standards developed in Title VII litigation to discrimination allegations brought under Section 1983. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) ("the elements required to establish such a case are the same"); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994) ("[c]ourts may apply the standards developed in Title VII litigation to similar litigation under § 1983"). As another judge of this Court has stated, "[d]iscrimination may be proven by . . . direct or indirect evidence of discrimination," *Weathersbee v. Baltimore City Fire Dept.*, 970 F. Supp. 2d 418, 430 (D. Md. 2013), or a the burden-shifting approach in which plaintiffs show that the system "select[s] applicants for hire or promotion in a racial pattern" that is statistically significant, and the employer carries "the burden of showing any given requirement [has] … a manifest relationship to the employment in question." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)).

Plaintiffs here present both direct evidence of discrimination and evidence under the burden shifting approach. Specifically, there is direct evidence that the County deliberately

retained its discriminatory policy, even when presented with complaints and evidence of race-based discrimination. As shown above, since at least 2012, every year on a semiannual basis, the County has received reports from its testing consultant, that the promotional system was discriminating against Black and Hispanic officers. Ex. 9 (*Flaig Dep. Tr.* 86:21-89:1, 133:6-151:10). At deposition, Defendant Magaw acknowledged that he was aware of the problem when he was Police Chief, discussed it with the County Executive, but did not change anything due to lack of "political will." Ex. 10 (*Magaw Dep. Tr.* 111:13-112:8). Defendant Stawinski, in collaboration with County officials, announced his Equity Panel on Promotions, Discipline and Practices, which included senior County officials, including the Chair of the County's Human Rights Commission and a senior lawyer from the County Attorney's office. Ex. 6 (*Acosta Dep. Tr.* 52:4-64:17). That Panel heard testimony that the most likely cause of the consistent disparity in promotions between white officers and others was the advantages to the predominantly white members of specialty units in terms of daily training in certain subjects found on the tests and additional on-the-job time to study the voluminous materials as compared to the predominantly Black and Hispanic members of patrol units. Brock Decl. ¶¶ 8-10, Boone Decl. ¶¶ 21-23; Ex. 6 (*Acosta Dep. Tr.* 120:3-122:11); Ex. 4 (*PG0000967665-66*); Ex. 5 (*PG0000928895-896*).

But when presented with this information, the County did nothing to address the concerns. The County did not ask that any data be collected or studies be done to assess the validity of what Major Brock and Corporal Hilligoss had explained—and no such study has ever been made. Ex. 9 (*Flaig Dep. Tr.* 34:21-35:7). The County did not ask Fields to address the problem in constructing future tests in a different manner; and Fields did not try to address the problem themselves. And they did not alter, or even monitor, the PGPD assignment system to create a more equitable racial composition of the specialty and patrol units. Instead, after Chief

22

Stawinski failed to appoint anyone to succeed Mr. Acosta as co-chair, the Panel simply ceased to exist without ever issuing one word on any topic at all.

Similarly, in 2020, the County Task Force on Police Reform was presented with stark statistics showing ongoing discrimination against Black and Hispanic officers. The Task Force was directed by the County to play ostrich, stick its head in the sand, and do nothing.

This is a textbook case of deliberate indifference: when presented with an established adverse impact of its promotional policies over so long a period of time, the County deliberately chose to ignore it. Over the last four years—just as for the five years prior to the Fairness Panel's deliberations—the County has deliberately chosen to ignore the issue, and the adverse impact of its promotional tests has continued unabated. This "conscious disregard" is a prime example of the type of conduct that had led other courts to find "deliberate" discrimination and other unconstitutional conduct. Indeed, the Fourth Circuit and other courts have found deliberate discrimination where a governmental decisionmaker was aware that some policy or practice disproportionately impacted a protected class and then ignored that fact. *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 229-30 (4th Cir. 2016) (finding discriminatory intent where the North Carolina legislature was provided with a study showing that proposed voting restrictions would disproportionately affect African Americans and subsequently passed the restrictions); *Veasey v. Abbott*, 830 F.3d 216, 236-37 (5th Cir. 2016) (finding discriminatory intent where legislators were "aware of the likely disproportionate effect of the law on minorities" and "nonetheless passed the bill without adopting a number of proposed ameliorative measures that might have lessened this impact"). The County's failure to change its promotional policies when directly confronted with the discriminatory impact of such policies is sufficient to establish likelihood of success on the merits.

On top of direct evidence of discrimination, a further analysis under the burden-shifting framework reinforces the conclusion that Plaintiffs have established "discrimination vel non." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294-95 (4th Cir. 2010).   A *prima facie* case can be established using statistical evidence, *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988), and here, that evidence of *prima facie* discrimination in promotions is overwhelming, and agreed upon by experts from both sides.  Thus, the County's promotional policies have denied an employment opportunity to Black and Hispanic officers, both of whom are in a protected class.  *Griggs*, 401 U.S. at 431.

In considering statistical evidence, some courts apply standard statistical tests, analyzing the difference in pass rates in terms of standard deviations and p-values, which assess the extent a given numerical result might be the product of chance.  In the specific context of employment discrimination, courts also often look to the EEOC's Four-Fifths rule which compares the pass promotion rate of the allegedly disfavored group to the rate of the most successful group, and where the disfavored group who are ultimately promoted is less than 80% of the rate of the most successful group, the EEOC—and often the courts—presume an adverse impact and discrimination which must then be justified.  *See, e.g.*, *Guardians Ass'n of New York City Police Dept. v. Civil Service Commission of New York City*, 630 F.2d 79, 86-87 (2d Cir. 1980);  *Police Officers for Equal Rights v. City of Columbus*, 644 F. Supp. 393, 407-08 (S.D. Ohio 1985) (utilizing Four-Fifths rule to confirm other statistical evidence);  *Howe v. City of Akron*, 723 F.3d 651, 659-62 (6th Cir. 2013) (affirming preliminary injunction after finding "substantial" likelihood of success based on application of Four-Fifths Rule to police promotions);  *Guerrero v. Cal. Dept. of Corrections and Rehabilitation*, 701 Fed. Appx. 613, 617 (9th Cir 2017).

Here, the test results establish an adverse impact only whether one uses classic statistical tests or the Four-Fifths Rule. Fields, the County's consultant, in its contemporaneous reports to the County and in deposition testimony conceded that ███████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Ex. 9 (*Flaig Dep.* 133:13-151:10); Exs. 15-18 (*Flaig Dep.* Exs. 5-8).

Those admissions by Ms. Flaig—the long-time agent for the County in creating, administering, and evaluating the tests—are more than sufficient to establish *prima facie* evidence of discrimination. And those results have been confirmed by all three experts—Plaintiffs' statistician (Mr. Simon), Plaintiffs' industrial organizational expert (Professor Hausknecht), and Defendants' litigation expert (Dr. Locklear). As set forth above and in their respective reports, the Fields reports and Mr. Simon used traditional statistical analysis which found the tests advantaged white participants and found the p-value was less than .0001. Ex. 11 (*Simon Expert Report* at 10-11). Professor Hausknecht reviewed Field's work and confirmed Fields assessment of statistical significance was accurate. He then also conducted analysis under the Four-Fifths analysis and found the promotions failed most of the time. Ex. 14 (*Hausknecht Expert Report* at 6-14). Dr. Locklear did not take issue with Fields' calculations or any of Simon or Hausknecht's calculations.[7]

---

[7] Although Dr. Locklear disputes Mr. Simon's presentation of aggregated test results over time, courts have often relied on employee evaluation results aggregated over time in holding that, so viewed, they show an adverse impact that is significant. *See, e.g.*, *Eldredge v. Carpenters 46*

The County cannot establish a viable defense to Plaintiffs' proof of persistent, well-known disparities in the promotional process. *Walston v. Cnty. School Bd. of Nanesmond Cnty., Virginia*, 492 F.2d 919, 924 (4th Cir. 1974). Here, the County admits that it is not aware of any data, study or analysis that supports the view that Black or Hispanic officers are less intelligent, less motivated, or less well-trained, or that they study any less for the tests than their white competition. Ex. 12 (*Response of Defendant County to Mack Request for Admission No. 5* (Sept. 21, 2020) at 8); Ex. 8 (*Graves Dep. Tr.* 227:2-230:8); Ex. 9 (*Flaig Dep. Tr.* 33:6-34:15).

Defendants' expert—Dr. Locklear offered one "defense"—that one earlier version of the tests was sufficiently self-validated by Fields based on the 2015 report. But that validation hardly diminishes the demonstrated likelihood that Plaintiffs will ultimately prevail on their promotions claim.

Indeed, that validation "defense" is unavailing for a number of reasons. First, the "validation" was for 2015 tests only, and did not validate tests prior to or after that point.

Second, the "validation" did not attempt to determine the cause of the race disparity, and the County has never assessed the cause identified during the 2017 Fairness Panel that applicants from specialty units (which are disproportionately white) have advantages in preparing for the exams. Ex. 9 (*Flaig Dep. Tr.* 34:21-35:7).

Third, even on its own terms, the Fields self-study fails to validate the 2015 exams in accordance with professional standards. *See generally* Ex. 14 (*Hausknecht Expert Report* at 15-20). For example, PGPD "has presented no evidence that its chosen cutoff score [of 70

---

*Northern California Joint Apprentice& Training Comm.*, 833 F.2d 1334, 1339 (9th Cir. 1987) (aggregating nine years of results); *Bourman v. Block*, 940 F.2d 1211, 1225 (9th Cir. 1991) (two years); *Vulcan Pioneers, Inc. v. New Jersey Dept of Child Care*, 625 F. Supp. 527, 544-45 (D.N.J. 1985) (collecting cases where aggregation was held appropriate). And, here, whether one aggregates or not, the conclusion is the same—the adverse impact is rampant.

percent]? bear[s] any relationship to the necessary qualifications for the job of" police officer.
*United States v. City of New York*, 637 F. Supp. 2d 77, 123-125 (E.D.N.Y. 2009) ( "A cutoff
score unrelated to job performance may well lead to rejection of applicants who were fully
capable of performing the job") (quoting *Guardians Asso. of New York City Police Dept., Inc. v.
Civil Service Com.*, 630 F.2d 79, 82 (2d Cir. 1980)). *See also United States v. Delaware*, 2004
U.S. Dist. Lexis 4560 at *2, 93 Fair Empl. Prac. Cas. (BNA 1248 (D. Del. 2004) (invalid cutoff
score used by law enforcement agency); *Vanguard Justice Soc. v. Hughes*, 592 F. Supp. 245, 268
(D. Md. 1984) (invalid cutoff score used for MD state police officer exam).  Moreover, the
Defendants' validation did not assess whether the County's tests measure skills or abilities—
outside of knowledge—that underlie the job performance of police work.  *United States v. City
of New York*, 637 F. Supp. 2d 77, 118-122 (E.D.N.Y. 2009) (test for firefighters not properly
validated because it failed to test "important cognitive and noncognitive abilities").  *See also
Gulino v. Bd. of Educ. of the City Sch. Dist. of N.Y.*, 907 F. Supp. 2d 492, 521-22 (S.D.N.Y.
2012) (standardized test for teachers did not "provide evidence of the important knowledge,
skills, and abilities required for the job, and demonstrate the extent to which they are tested for
on the exam"); *Vanguard Justice Soc., Inc. v. Hughes*, 592 F. Supp. 245, 260 (D. Md. 1984) (test
for MD police officers "omitted important work behaviors").

Last, the County cannot establish a viable defense because it has not, in the face of
constant and well-documented adverse impact, assessed alternatives that may have a lesser
adverse impact. "[E]ven validated tests might be a 'pretext' for discrimination in light of
alternative selection procedures available…." *Albemarle Paper Co.*, 422 U.S. at 436.  Courts
have cited the failure of municipalities to consider less discriminatory alternatives in concluding
promotional exams illegal. *See, e.g., Brown v. City of Chicago*, 8 F. Supp. 2d 1095, 1113 (N.D.

Ill. 1998) (police promotional exam illegal because it ignored "an equally valid less discriminatory method of promotion").

In short, although the County has known for over 8 years and been repeatedly presented with evidence confirming that their promotional policies were discriminatory, and that its tests were perpetuating discrimination, the County has impermissibly chosen to maintain a set of policies that has, year after year, given an advantage to white over Black and Hispanic officers. The nonindependent effort of the test designer to "validate" the tests did not even ask the correct questions. The undisputed statistical evidence, along with the County's refusal to investigate alternative, nondiscriminatory promotional selection procedures, show that Plaintiffs are likely to prevail on their claims.

## II.    Plaintiffs Will Be Harmed If Preliminary Relief Is Not Granted

There can be no question about the likely harm to the Plaintiffs and other Black and Hispanic officers if the preliminary injunction is not issued. As the Fourth Circuit and other courts have recognized, "the denial of a constitutional right … constituted irreparable harm," *Ross v. Messe*, 818 F.2d 1132,1135 (4th Cir 1987), and hence where, as here, "a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Am. Civil Liberties Union of Kentucky v. McCreary Cnty, Kentucky*, 354 F.3d. 438, 445 (6th Cir. 2003), aff'd 545 U.S. 844, 125 S. Ct. 2722 (2005) (citing *Elrod v. Burns*, 427 U.S. 347, 96 S. Ct. 2673 (1976)).

Unless enjoined, that next round of promotions will harm Black and Hispanic officers who fall below its arbitrary and unfair "standard" not merely for years to come—and in a way which can never be undone. Beyond the obvious harm of being denied a more prestigious job and a fair opportunity for a higher salary, the County's discriminatory promotional system has irreparable effects on an officer who is denied a promotion in a given cycle. As discussed above,

28

many professional and leadership opportunities within the Department (access to prestigious specialty units, squad leadership) are only open to officers who have attained a particular rank. Boone Decl. ¶ 15; Perez Decl. ¶ 15.  And because promotional tests for certain positions are held only every two years, an officer who is not promoted (as well as officers who are promoted with lower test scores and have less time in rank) may have to wait two years (or more) to apply again.  Time at rank when an officer has been unjustly denied promotion can never be recouped, and courts have recognized that delayed promotions can constitute irreparable harm.  *See, e.g.*, *Howe v. City of Akron*, 723 F.3d 651, 662 (6th Cir. 2013) (affirming preliminary injunction where promotion delay constituted irreparable harm for firefighters because they were "unable to gain experience and unable to seek the next rank during the following round of testing"); *Johnson v. City of Memphis*, 444 Fed. App'x 856, 860 (6th Cir. 2011) (affirming grant of preliminary injunction where plaintiffs' "loss of experience and chances to compete for promotions" constituted irreparable harm); *Leisner v. New York Tel. Co.,* 358 F. Supp. 359, 369 (S.D.N.Y. 1973) ("[u]nless preliminary injunctive relief is granted . . . qualified women will not be promoted . . . [p]ositions in the interim would be filled and thus unavailable to qualified women").

Beyond these tangible injuries, it is extremely discouraging to work in a system that is fundamentally unfair.  Mack Decl. ¶ 28; Boone Decl. ¶ 14; Perez Decl. ¶ 14.  As Sergeant Mack expresses it, it is "frustrating and unfair" and to be denied "a promotion while watching white officers move ahead is disheartening."  Mack Decl. ¶ 28. The "broken promotions system is yet another way in which the Department devalues officers of color." *Id.*

The perpetuation of a discriminatory promotion system irreparably harms the Organizational Plaintiffs and their members, both of which, as part of their missions, seek to

foster a better relationship between the Department and the community its officers have sworn to protect and serve.  Boone Decl. ¶¶ 8-11; Perez Decl. ¶¶ 8-11.  The failure to promote more minority officers, particularly to command positions, has a negative impact on how the force interacts with the community, and undermines the mission of both organizations.  Boone Decl. ¶¶ 8-11; Perez Decl. ¶ 8-11.  For example, command officers have a significant role in investigating and evaluating community complaints, including complaints about use of force, and for maintaining positive relations with the community.  The disconnect between the demographics of the police force and the community which it serves is a root cause of the Department's failure to adequately serve the community, and the entrenchment of white officers in command positions has fostered division with the community, making it more difficult for all officers to perform their jobs. Boone Decl. ¶¶ 11-12; Perez Decl. ¶¶ 11-12.   In addition, because command officers have significant input into the hiring and promotions systems, as well as the selection of officers for specialty units, the predominance of white officers in command position has put the Department in a self-perpetuating cycle where white officers have become entrenched in more powerful, more prestigious, and higher-paying jobs.  Boone Decl. ¶ 13; Perez Decl. ¶ 13.  The future harm to the members of the Organizations -- in terms of delayed professional and leadership opportunities, and delay in promotion and loss of time -- warrant a preliminary injunction.  *See, e.g.,* , *Howe*, 723 F.3d 651 (6th Cir. 2013).

## III.    The Balance of the Equities and Public Interest Favor the Grant of Preliminary Relief

The Fourth Circuit, like other courts, has recognized that where, as here, the defendant is a government entity, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F. 3d. 507, 521 (4th Cir. 2002).

In this case, the lack of any harm to the County in being forced to reform its promotional system to provide a fairer opportunity for advancement by officers of color not will not "harm" the County in any way. To the contrary, it will serve important interests the County professes to hold. Specifically, the County has long expressed concern that the higher ranks of PGPD do not reflect the racial composition of the force as a whole (much less the composition of the community it polices). As noted, Defendant McGaw, the highest-ranking County public safety official, conceded at his deposition that the disproportionately white makeup of the highest ranks, especially the command position of Captain, was such a concern that he and then County Executive Baker considered removing that promotional decision from the discriminatory County tests, but ultimately abandoned that plan because of politics. Ex. 10 (*Magaw Dep. Tr.* 111:13-112:8).

More recently, in July 2020, the Work Group on Police Reform appointed by County Executive Alsobrooks considered the waning percentages of minority officers in each rank in a presentation by Interim Chief Velez which contained the numbers set forth above. See Police Reform Work Group (July 23, 2020).[8] But, as Co-Chair Lamasney stated at the start of each Work Group session, they were "not created to decide the merits of any pending or potential litigation nor will the work group make any factual determinations in regard to any lawsuits or controversies [or] resolve, discuss, nor comment upon any specific or alleged events." *See, e.g.*, Video of Work Group Meeting (Sept. 17, 2020 at 00:00:56-00:01:10). True to their word, the Work Group refused to address the issue of promotions in their list of recommendations to Ms. Alsobrooks.

---

[8]  Video available on Prince George's County Government Website, https://www.youtube.com/watch?v=q76oDk_CGGI&feature=youtu.be.

Instead, the County has decided to spend a small fortune -- over half a million dollars a month -- to defend its discriminatory policies, including its patently discriminatory promotional policies. But the decisions by the County not to reform its promotional process—and leave that matter to be resolved in this litigation—obviously does not diminish the importance of such reform to the officers of color who have been injured by it for so long and will continue to be irreparably injured so long as those recognized problems go unaddressed; to the PGPD which will continue to be led by senior leaders who do not even reflect the racial composition of the force; and to the public at large who must live under their decisions. Here, quite clearly, the "balance of the equities" and "the public interest" fully support the issuance of effective, preliminary relief.

## IV.    Relief Requested

For purposes of the preliminary injunction, Plaintiffs seek to enjoin further administration of discriminatory tests until such a time as the County can replace the promotional policies and testing program with one that reduces (and ideally eliminates) these discriminatory effects and is in compliance with EEOC and professional standards. To conduct such an assessment, Plaintiffs propose a neutral expert (perhaps one mutually agreed upon by Dr. Locklear and Professor Hausknecht) with the selected expert (or head of team) being required to have a doctorate in Industrial Organizational Psychology. *See* Hausknecht Decl. ¶¶ 8-13. This is consistent with remedies proposed in other litigation over promotional policies, where it has been found that relief "must include the opportunity for all members of the plaintiff classes to take and to attempt to pass a valid promotional procedure as soon as possible." *Vanguard Justice Soc. v. Hughes*, 592 F. Supp. 245, 271 (D. Md. 1984).

Dated:  January 11, 2021                 Respectfully submitted,

/s/ John A. Freedman

Dennis A. Corkery (D. Md. Bar No. 19076)    John A. Freedman (D. Md. Bar No. 20276)
Joanna Wasik (D. Md. Bar No. 21063)        Adam M. Pergament (*pro hac vice*)
WASHINGTON LAWYERS'                 Kaitlin Robinson (*pro hac vice forthcoming*)]
   COMMITTEE FOR CIVIL RIGHTS AND      ARNOLD & PORTER KAYE SCHOLER LLP
   URBAN AFFAIRS                         601 Massachusetts Ave., NW
700 14thd Street, N.W. Suite 400            Washington, DC 20001-3743
Washington, DC 20005                     John.Freedman@arnoldporter.com
(202) 319-1000                           Adam.Pergament@arnoldporter.com
dennis_corkery@washlaw.org           Kaitlin.Robinson@arnoldporter.com
joanna_wasik@washlaw.org

Deborah A. Jeon (D. Md. Bar No. 06905)    *Counsel for Plaintiffs*
ACLU OF MARYLAND
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
(410) 889-8555
jeon@aclu-md.org