**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

HISPANIC NATIONAL LAW
ENFORCEMENT ASSOCIATION NCR, *et al.*,

Plaintiffs,

v.

PRINCE GEORGE'S COUNTY, *et al.*,

Defendants.

Civil Action No. 8:18-cv-03821

Hon. Theodore D. Chuang

### DECLARATION OF THOMAS BOONE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Thomas Boone, declare:

1.      I am over the age of eighteen. I have personal knowledge of the facts stated herein and am competent to testify to them.

2.      I am an African-American man and am the President of the United Black Police Officers Association (UBPOA).  I have been the President of UBPOA since 2014.

3.      I joined the Prince George's County Police Department ("PGPD" or "Department") in 1998.  Prior to my work as a police officer, I graduated from Bowie State University, and worked for the U.S. Capitol Police.

4.      At PGPD, I was initially assigned to Patrol District.   In 2004, I was promoted to Corporal.  In 2008, I took and passed the Sergeant's exam but was not promoted because I was not high enough on the list.  In 2010 I took and failed the Sergeants exam.  In 2012 I took and

passed in the Sergeant's exam again. In 2014, I was promoted to Sergeant, at which point I was transferred to the District I.

5.      In or around 2017, I filed a complaint against Major Misty Mints following her making a derogatory statement about a Nigerian candidate for employment. Following my complaint, I was involuntarily transferred to District II, where Major Mints was the Commander.

6.      In 2016, I took the exam to be promoted to Lieutenant but did not pass. I retook that exam in 2018 and did pass. In 2020, I was promoted to Lieutenant.

7.      In my time at the Department, I have been and am concerned about discrimination in the Department's promotional policies, and in particular, the failure of the Department to promote Blacks and Hispanics, particularly to command positions. On average, Black and  Hispanic candidates have scored lower on promotional tests, and in most cycles, far more White officers are promoted than Black and Hispanic Officers. The difference is particularly stark at the Captain and Lieutenant levels, where approximately 80 percent and 60 percent of officers are White.

8.      The failure to promote Black and Hispanic officers causes substantial injury to those officers, to the force as a whole, and to the community we serve.

9.      UBPOA's mission "is to create a meaningful organization that will help with the relationship between law enforcement, and the culturally diverse minority communities it serves. To help bridge the divide or perceived divide between law enforcement and its minority communities. To mentor and establish a relationship with minority youth who are interested in careers within the law enforcement profession."

10.     UBPOA advocates for a more diverse and inclusive police force and more equitable employment practices within the PGPD, including fairness in the promotions system.

11.     The failure to promote more minority officers, particularly to command positions, has a negative impact on how the force interacts with the community, and undermines the mission of both organizations.  The predominance of White officers in command positions has a significant impact on how the force interacts with the community.  For example, command officers have a significant role in investigating and evaluating community complaints, including complaints about use of force, and for maintaining positive relations with the community.

12.     The disconnect between the demographics of the police force and the community which it serves is a root cause of the Department's failure to adequately serve the community, and the entrenchment of white officers in command positions has fostered division with the community, making it more difficult for all officers to perform their jobs.

13.     Because command officers have significant input into the hiring and promotions systems, as well as the selection of officers for specialty units, the predominance of white officers in command position has put the Department in a self-perpetuating cycle where white officers have become entrenched in more powerful, more prestigious, and higher paying jobs.

14.     Many officers have expressed to me that it is extremely discouraging to work in a system where promotions are made on a basis that is fundamentally unfair.

15.     For individual officers, gaining seniority in rank opens opportunities for assignment and further promotion.  Certain specialty units and command positions are only open to those who have attained the rank of Corporal, Sergeant or Lieutenant.  For example, the Crime Scene Investigation Division and the Forensic Science Division, the Criminal Investigation Division Homicide, Robbery, and Sexual Assault Units, the Narcotics Enforcement Division, the Internal Affairs Division, the Recruiting and Background Division, the Gang Unit, and the K9 Unit are generally not open to officers. In addition, within a patrol squad, the position "9-Car" which

functions as the second-in-command of the squad, is only open to officers who have attained the rank of corporal.  Seniority of rank also generally provides significant benefits in terms of greater control over working hours and conditions.  And denial of a promotion has cascading effects: because an officer is only eligible to seek promotion after they have served a certain time in grade at the lower position, the failure to promote minority officers mean that there are fewer minority officers in command positions.

16.     During my tenure at the Department, I am aware of a number of complaints about the County's failure to promote Black and Hispanic officers.

17.     One such complaint was made in 2016.  On behalf of UBPOA, I filed a complaint with the U.S. Department of Justice complaining about the Department's history of promotions, particularly to the command ranks.

18.     In spring 2017, former Chief Stawinski announced the formation of an Equity Panel on Promotions, Discipline, and Practices.  This Panel was co-led by Carlos Acosta, the Inspector General of the Department, who reported directly to Chief Stawinski.  My understanding is that the Panel was established at the behest of the County Executive, Rushern Baker, and the Panel included several senior County employees, including Stephen Whitted (the main County Attorney who represented the Department) and Michael Lyles (the head of the County's Human Rights Commission.  I was not originally chosen to serve on the Panel, but believed that, in my capacity as President of UBPOA, my participation would be beneficial, and requested to be appointed.  I was subsequently appointed as a member of the Panel.

19.     Promotions was the first topic raised during the Fairness Panel hearings.  I recall that we received briefings from Ms. Jewel Graves, a representative of the County's promotions consultant, and Major Robert Brewer.

20.     During Major Brewer's presentation on June 14, 2017, he presented data concerning promotions.  Major Brewer's data showed that there was significantly less minority representation at command ranks.  That is consistent with what I witnessed throughout my time at the Department -- there are far fewer Black and Hispanic officers serving as Captains and Lieutenants than White officers.

21.     At the June 14, 2017 session, I recall discussion that one significant issue with the promotional policies was that there were more white officers assigned to specialty units, and those assignments affords officers in specialty units far more time to study for promotional exams than officers assigned to the patrol unit. I believe Major Brock raised this issue.

22.     From what I have observed, the specialty units also provide skills, training and experience with specific topics that are more likely to be assessed during the promotional process.

23.     At the June 14, 2017 session, another of the panelists specifically identified particular specialty units that were disproportionately white, including the Criminal Investigation Division, the Narcotics Enforcement Division, the Regional Investigation Division, the Special Investigation Division, and the Special Operations Division.  This is consistent with my understanding, and I believe these units are still disproportionately white.

24.     After the Panel discussed the issue of disparities within the promotions process at the Fairness Panel, I am not aware of the County changing its promotional policies in any respect. Instead, when Mr. Acosta left the Department, the Panel stopped meeting and never enacted any recommendations.

25.     Following the Panel, the County continued to promote a disproportionate number of White officers.

26.      I am aware of several UBPOA members who have been passed over for promotion, including individuals who were passed over during the 2016 and 2018 cycles.

27.      In June 2020, following the resignation of Chief Stawinski, the County announced the formation of a Task Force on Police Reform. My understanding is that the Task Force included a number of senior County employees, as well as other interested parties.

28.      On behalf of UBPOA and with HNLEA, on July 23, I sent a letter to the Task Force with certain recommendations. This letter noted significant discrimination in promotions, including that only 30% of Lieutenants and 18% of Captains are Black or Hispanic, and included recommendations to address discrimination in promotions.  A copy of this letter is attached as Exhibit A.

29.      At the July 30, 2020 Task Force hearing, Acting Chief Velez presented information concerning promotions, and confirmed that over 80 percent of Captains and 60 percent of Lieutenants are white.

30.       Following this presentation and letter, the Task Force Co-Chair announced that the Task Force had been directed by the County Executive not to address the merits of any issue that was at issue in any pending or potential litigation.  Consistent with the direction of the County, the Task Force did not propose any reforms to address discrimination in promotions in the set of 50 recommendations it released on December 4, 2020.  A copy of these recommendations is attached as Exhibit B.

31.      In April 2020, the County cancelled the scheduled promotional exam because of the COVID-19 emergency.

32.      In September 2020, the County Office of Human Resources Management conducted a survey of over 400 officers who registered to take the next scheduled promotional exam.  Almost

60 percent of the surveyed officers indicated that they were not comfortable taking the exam or did not wish to participate in the exam because of the COVID-19 emergency.

33.    In addition to the survey results, I am aware of a number of UBPOA members who specifically objected to promotional exams being conducted due to the emergency.

34.    Notwithstanding this, the County went ahead and administered a set of promotional exams on September 12, 2020.  I am aware of many officers, including UBPOA members, who did not take the exam because they did not feel safe taking the exam under the conditions due to the COVID-19 emergency.

35.    My understanding is that the Department has not yet conducted the assessment phase of the promotional process for the 2020 Sergeant, Lieutenant, and Captain exams.  These normally would have been conducted in the month or two after the written exam.  I assume that the Department has suspended its promotion processes in light of the objections lodged to conducting promotional exams in the midst of a pandemic.

This Declaration was signed by me on January 11, 2021, at

___/s/ Thomas Boone_____
Thomas Boone

# Exhibit A

 

July 23, 2020

To Judge Lamasney, Delegate Washington, and Members of the Task Force:

Congratulations on your recent appointment to the Task Force on Reforming the Prince George's County Police Department.  We understand that County Executive Alsobrooks has charged you with examining the "full spectrum" of PGPD's operations and making recommendations for reform.

As the presidents, respectively, of the Hispanic National Law Enforcement Association (HNLEA) and the United Black Police Officers Association (UBPOA)—representing the Hispanic and Black officers of the Prince George's County Police Department—we and our organizations have been deeply involved in efforts to reform PGPD so as to make the Department responsive and accountable to the community we are charged with protecting and serving, and a fairer organization for all officers, including Black, Indigenous, and Persons of Color (BIPOC).  In light of this, we thought it would be helpful to make you aware of some background regarding prior unsuccessful reform efforts directed at PGPD and provide some specific recommendations we believe your Task Force should adopt.

## BACKGROUND CONCERNING YOUR REVIEW

1. After a significant period in which leadership of the PGPD did not address serious issues of racism and discrimination on the force, in 2016, our organizations filed the first in a series of complaints with the U.S. Department of Justice.  That complaint detailed particular instances of racism and discrimination, as well as policies and customs within PGPD that fostered such misconduct.  The Complaint had a particular focus on how these incidents and policies impacted PGPD's ability to protect and serve the community, and how inaction by PGPD leadership fostered racial division on the force.  This Complaint was ultimately signed by over one hundred BIPOC officers.  A copy of the Complaint is attached as Exhibit A (without supporting documentation).

2. When Chief Stawinski announced the formation in February 2017 of his Equality for Promotions, Discipline, and Practices Panel, we viewed that as a positive development and

agreed to serve as panelists.  That Panel was co-chaired by then Inspector General (now Judge) Carlos Acosta and retired PGPD Sgt. Jerry Moore.  Ostensibly, it was given a similar mandate to your Task Force.  According to Chief Stawinski, the "goal of the Panel [was] to obtain facts and gain insights into perceptions about the Department and then provide specific guidance to [the Chief] to correct issues identified during the process."

The "Fairness Panel," as it was generally called by its members, held eight meetings from April through August 2017 at which it heard from Subject Matter Experts designated by PGPD leadership to address the promotion and discipline portions of its inquiry.  During and after those hearings, the Panel made a number of specific requests to PGPD for statistical and other information on both subjects (some of which were ignored).  Members of the Fairness Panel discussed a number of recommendations relative to promotions and discipline, some of which are discussed in this letter.  We would recommend that members of your Task Force review the recorded videos of the Fairness Panel's discussions, particularly the ones on July 25 and 26, 2017, which began discussion of discrimination and other defects in the Internal Affairs process.

Unfortunately, the Fairness Panel was not allowed to complete its hearings or to issue any report.  Instead, the Panel ceased to function in January 2018 because Chief Stawinski refused to designate a replacement for Mr. Acosta when he became a Circuit Court Judge in January 2018.  After that point, the Panel never met again.  The Panel did not complete work on its report and never issued any recommendations.

3.  During the same time frame (most notably in March 2017), the Department of Justice invited PGPD leadership, HNLEA, and UBPOA to attempt to mediate the problems cited by our organizations in a formal conciliation session.  Chief Stawinski, however, refused to participate in that process.  In December 2017, the Department of Justice issued a formal request for documents in furtherance of its investigation of PGPD.  That investigation continues today.

4.  Following Chief Stawinski's refusal to mediate and the termination of the prior Fairness Panel, we filed a civil rights lawsuit in late 2018, specifically identifying incidents of racism and discrimination on the force, and describing in detail how PGPD leadership condoned this conduct and allowed it to flourish.  The Complaint highlights numerous instances of retaliation against BIPOC officers who complained about the conduct.  In this suit, we are represented by two of the regions preeminent civil rights organizations—the Washington Lawyers' Committee for Civil Rights and Urban Affairs and the American Civil Liberties Union.  We later amended our Complaint to also detail how Department leadership took efforts to conceal discrimination from the Department of Justice.  A copy of the Amended Complaint is attached as Exhibit B.

5.  On June 18, 2020, our counsel filed with the Court a preliminary assessment of PGPD's policies and customs by Michael Graham, the former Assistant Sheriff for Los Angeles County Sheriffs' Department—one of the largest law enforcement agencies in the country.  Mr. Graham has long been associated with the International Association of Chiefs of Police, and has been repeatedly retained by the Department of Justice on police practice cases throughout the United States.

Mr. Graham's report sets forth his views regarding fundamental deficiencies in PGPD's policies and customs which fail to (i) respond appropriately to community complaints about racism and discrimination, (ii) handle appropriately EEO complaints of discrimination, (iii) investigate or discipline appropriately misconduct on the police force, including racist conduct and acts by officers, and (iv) prevent retaliation against officers who complain about the foregoing conduct. Less than six hours after Mr. Graham's Report was filed, County Executive Alsobrooks asked for, and received, Chief Stawinski's resignation.

6. The day after the Graham Report was released, County Executive Alsobrooks announced the formation of your Task Force. Although the County has insisted that certain information in Mr. Graham's Report should not be made public, we have attached a redacted version of Mr. Graham's Report as Exhibit C. We encourage you to request the County to provide the full, unredacted report (and the supporting documents, which are largely PGPD emails and other files) so that you may adequately prepare for your own deliberations.

Your Task Force should be aware that, starting with Chief Stawinski's refusal to participate in the Department of Justice's conciliation process, the County and PGPD have adamantly refused to discuss with our organizations how PGPD can start the long process of addressing its problems and healing the institution. Instead, the County has spent millions of taxpayer dollars defending the policies and customs of Chief Stawinski and engaging in a systematic campaign of retaliation against the leadership and prominent members of our organizations. Remarkably, in the 16 months from the start of our litigation through end of April 2020, the County spent over $6.3 million blaming the messengers and denying that it has a problem. Since April, that number has undoubtedly gone up. At its recent rate of spending, the total spent by the County defending the practices of Chief Stawinski and other top senior leaders is likely approaching $8 million. We sincerely hope your Task Force, by contrast, will recognize that the first step to addressing PGPD's problems is to acknowledge that the County has a serious leadership problem on its hands.

Sadly, the County has never once asked our organizations what reforms would be necessary to address the situation. It is our hope that your Task Force, with its broad and important mandate, will find the recommendations in this letter helpful. In many cases, the County could have implemented the recommendations we outline below for far less money than it has spent defending the indefensible. It is also our hope that your Task Force will not meet the fate of its predecessor Panel, whose efforts were thrown into the trash bin as soon as former Chief Stawinski and other leaders thought they could safely do so.

## DETERMINING THE SCOPE AND AGENDA OF YOUR DELIBERATIONS

We respectfully submit that, in conjunction with planning your agenda and approach for the next three months, you consider the deliberations of the Fairness Panel, the Graham Report, and the testimony that senior PGPD leadership has provided in conjunction with the litigation, including Judge Acosta, Ms. Jewell Graves (the long-time Manager of the PGPD Personnel Office), and Major James McCreary (the current head of Internal Affairs).

## RECOMMENDATIONS

I.    **PROTECTING THE PUBLIC AND THE OFFICERS WHO PROTECT THE PUBLIC**

   **A.  *Creating a Police Force Representative of the Community It Protects***

   All reforms must begin with—and will be substantially advanced by—creating a force which is representative of the County it polices.  As you well know given your own civic positions, Prince George's County is 65% Black, 20% Latinx, 3% Asian, and 12% white.  The PGPD, by contrast, is only 43% Black, 10% Latinx, 3% Asian, and 44% white.

   The disconnect between the demographics of the police force and the community are a root cause for the Department's failure to adequately serve the community.  And the gap between the demographics of the force and the community it polices is not narrowing.  That gap must be eliminated through a commitment to bring the force much more in line with the racial composition of the citizens who live in the County.  Time and time again, we hear white officers dehumanize the residents of Prince George's County and view them all as criminals simply because they are people of color.  More specifically:

   Recommendation #1:  The County should adopt an enhanced Affirmative Action Plan to correct the current imbalance and make PGPD a more representative force.  As discussed below, this Plan should have targets for initial recruits, promotions, and selections to "specialty" units.

   Recommendation #2:  The County should also adopt a residency requirement, which would eventually be applicable to all sworn officers.  While this policy can be phased-in, it must start at the top.  We would recommend requiring all members of the Chief's Office and all "Commanders" (individuals ranked Major and higher) to be County residents within one year; all other rank officers (Lieutenants and Captains) to be County residents within two years.  Starting in 2022, the County should provide financial incentives (such as tax breaks) to all other rank-and-file officers who are, or become, County residents.

   **B.  *Enhanced Monitoring and Supervision of Civilian Interactions and Complaints***

   For years, we as well as others in the community have complained that there are fundamental deficiencies in how the Department monitors and assesses officer/civilian interactions for discrimination and bias.

   Specifically, for most of the last ten years, the Department failed to properly monitor police/civilian interactions for racial profiling.  The number of incidents investigated has been significantly less than the number of community complaints about unjustified stops, searches, seizures and other infractions.  Indeed, under Chief Stawinski, the Department ceased even preparing monthly and annual reports of the number or outcome of racial profiling investigations as required by the Department's General Orders.

There are also significant flaws with the Department's use of force policies and the Department's assessment of use of force. The use of force policy does not mandate officers avoid the use of force and take steps to de-escalate before engaging. Force that may be legally authorized may not be appropriate and may well be viewed as illegitimate by members of the community—commonly referred to by police officials as "lawful but awful." These practices disserve police and the public.

Moreover, the Department's initial screening of many of these incidents is by the chain of command before they are investigated. The result has been that the predominantly white chain of command has consistently cleared certain white officers who repeatedly use violence against BIPOC civilians without conducting an adequate investigation (including consideration whether the officer took steps to avoid use of force and to de-escalate) or considering the pattern of conduct. In conjunction with the litigation, our counsel has identified specific examples of white PGPD officers who have repeatedly engaged in use of force against BIPOC civilians without being disciplined (or in many cases, investigated). Our experience is that the County has only taken significant disciplinary action against a small handful of these white officers when the conduct is recorded on video or involves particularly brutal attacks.

Recommendation #3: The County should overhaul its policies and practices to prohibit consideration of race, as would be consistent with the Department of Justice December 2014 *Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity*.[1] The County should also overhaul its policies for monitoring, tracking, and independently assessing officer/civilian interactions for discrimination or bias (including unlawful stops, searches, seizures (including false arrests), use of force, theft of property or other potential criminal behavior, and racial or ethnic profiling. The authority to oversee this policy revision should be vested in the Office of Compliance (Recommendation # 12). These incidents should not be evaluated as to simply whether the conduct was legally "justified," but whether it is wrong. Evaluation of these incidents should consider whether the officer has a pattern of similar conduct indicative of bias or discrimination. The assessment of a pattern of discrimination or bias needs to be conducted outside the chain of command by the Office of Compliance. For officers who display such bias, there should be a progressive discipline ranging from supplemental training on implicit bias up to, and including, termination.

Recommendation #4: Under the auspices of the Office of Compliance, the Department should develop and implement regular, targeted, and random internal reviews and integrity audits to promote compliance with PGPD policy and constitutional policing. The Department should also conduct integrity audits and compliance reviews to identify and investigate all officers who have engaged in misconduct including unlawful stops, searches, seizures (including false arrests); uses of force; theft of property or other potential criminal behavior; and racial or ethnic profiling. The integrity audits and compliance reviews should also seek to identify officers who discourage the filing of complaints, fail to report misconduct or complaints, or otherwise undermine PGPD's integrity and accountability systems. The Office of Compliance should issue

---

[1] Available at https://www.justice.gov/sites/default/files/ag/pages/attachments/2014/12/08/use-of-race-policy.pdf.

periodic reports to the public on the number of civilian and officer complaints about harassment, discrimination and retaliation, as well as instances of harassment, discrimination, and retaliation identified by the Office of Compliance through its reviews and integrity audits

### C. *The Promotions System Needs to Be Overhauled to Eliminate Bias so that the Senior Officers and Specialty Units are Representative of the Community*

For years, we have complained that the Department's promotional system is unfair. As discussed in the Graham Report, the underrepresentation of BIPOC officers in PGPD significantly increases with seniority in the ranks. For example, while Black and Latinx people make up about 85% of County residents, only 30% of PGPD Lieutenants and 18% of Captains are Black or Hispanic. And the percentage of BIPOC officers in leadership positions has actually decreased under Chief Stawinski.

Because these officers have a significant role in investigating and evaluating community complaints (including screening use of force incidents for further investigation), the predominance of white officers in these positions has a significant impact on how the force interacts with the community. And because officers from these ranks have significant input into hiring and promotion systems, the predominance of white officers has put the Department in a self-perpetuating cycle undermining current affirmative action goals.

The Fairness Panel members learned that one significant reason for disparities in promotions was that candidates who had been assigned to "specialty units" had a substantial advantage over officers assigned to "Patrol" both in receiving special training in the areas most often tested on the promotional exams and in the on-duty time to study the voluminous materials tested on the exams. Under current PGPD custom, those "specialty" units are selected at the discretion of the Chief in consultation with the predominantly white unit commanders—the specialty units are also disproportionately white. (We also note that some of the more egregious examples of racist or discriminatory conduct were perpetrated by white officers assigned to these units.)

Because promoting a diverse pool of officers requires a diverse pool of applicants to be hired, adopting an enhanced affirmative action program (Recommendation #1) is an essential component to fixing the promotions process. And adopting a residency requirement (Recommendation #2) will help ensure the leadership of the force is more in tune with community sentiment. In addition to these items, we endorse the specific recommendations discussed by the Fairness Panel in 2017 before it was disbanded.

Recommendation # 5: The Panel should adopt the specific recommendations discussed by the Fairness Panel.

- Subject matter experts involved in the development of promotional tests should be from outside the PGPD. The Panel noted that there was a frequently-reported problem that Subject Matter Experts selected from within the Department were predominantly white, and that some of these individuals were providing tips or answers to persons taking the tests.

- Assessment of candidate performance for the skills assessment portion of the test should be based on audio rather than video recording, to avoid implicit bias of assessors.

Recommendation # 6:  The enhanced affirmative action plan should have specific provisions focused on improving diversity in "specialty units."  Selection for these units should be removed from the chain of command and assigned to the Office of Compliance.  And because these units can become insular and have proven to foster dangerous attitudes towards the community, the time officers can spend in a particular specialty unit should be limited before rotation.

### D. *Ending the Culture of Retaliation*

For years, we have complained that the Department has a custom of retaliating against officers who object to racist statements, racist conduct, and discrimination by white officers.  Officers who have lodged or supported complaints about this conduct have been the subject of harassment, investigative proceedings commenced in retaliation, and involuntary transfers.  In his report, Mr. Graham details specific instances of retaliation and notes specific examples where the retaliatory conduct was authorized or condoned by the highest levels of the Department.  We also note that since filing our lawsuit (and consistent with the County strategy of "blaming the messenger") over half the Individual Plaintiffs have experienced retaliation at the behest of senior leadership of the Department.

Although the Department includes anti-retaliation and "no contact" policies in its General Orders, these provisions have not been enforced.  There do not appear to be any instances where an officer has been investigated or disciplined for violating either provision.

Changing a Department's custom and cultures—particularly the "us" (police) against "them" (civilians) and "you are with us, or you are with them" mentality pervasive on the PGPD will not be easy.  But other police departments have made significant improvements in this area.

Recommendation #7:  The County should adopt an officer-bystander intervention program that teaches officers how to intervene to stop a wrongful action before it incurs.  By equipping, encouraging, and supporting officers to intervene to stop wrongful conduct, the Department can start to instill a culture of high-quality and ethical policing—one that promotes community safety and mutual respect on the force.  Such programs have been adopted by a number of large police departments around the country.  Additional materials concerning New Orleans's program can be found at http://epic.nola.gov/home/.

Recommendation #8:  The Department should strictly enforce its anti-retaliation and no contact provisions, both of which should be considered Category IV offenses (terminable offenses).  Responsibility for investigating these provisions should be vested in the Office of Compliance (Recommendation # 12).

## II.    PROMOTING FAIRNESS IN INVESTIGATIONS AND DISCIPLINE

For years, we have complained that there is significant racial bias in how the County and Department investigate and discipline officer misconduct: white officers are treated significantly more favorably by the system than BIPOC officers.  As noted above, many white officers who have had discriminatory interactions with civilians (use of force, racial profiling) and BIPOC members of the force (use of racist language, engaging in racist acts, or discriminatory conduct) have not been adequately investigated or disciplined.

With access to the Department's data and certain of the Department's investigative files, Mr. Graham has confirmed our worst fears.  His report identifies a number of areas in which the PGPD investigative and disciplinary policies and customs ignore, contradict, or fail to live up to the standards of other professional police forces and organizations.  And he found that there is significant bias in favor of white officers throughout the investigative and disciplinary process— starting with the decision whether to open an investigation, continuing through the decision to sustain charges and whether to impose discipline, and ending with termination, where BIPOC officers have been terminated three times as frequently as white officers.  Mr. Graham also identified specific investigators within the Internal Affairs Division (which is a specialty unit) who display significant bias.  We note that our organizations had complained to Chief Stawinski about several of these individuals, with no apparent consequence.

It is important for your Task Force to know that the Fairness Panel attempted to look into the same issue, by requesting detailed statistical demographic information from the Department regarding racial disparities in charging decisions and punishments imposed.  The Commander of Internal Affairs, however, declined to provide this information, contending the Department should not track or monitor whether these practices were discriminatory because consideration of race in investigative and disciplinary decisions was a "slippery slope."  The County's decision to willfully blind itself to what was going on has allowed this discrimination to fester.

Recommendation #9:  The Internal Affairs Division should be monitored and report on bias and discrimination in investigation and disciplinary decisions to the Office of Compliance, the Chief of Police, and the County Executive.  These reports should include monitoring individual investigators for potential bias, and should cover use of force, racial profiling, use of language, discrimination, and other bias complaints.  The Internal Affairs Division should also implement peer review of investigations and random external reviews by the Office of Compliance.  Investigators with a biased track record should immediately be transferred out of Internal Affairs.

## III.    ADOPTING A FAIRER EEO PROCESS

For years, we have complained that the Department's EEO process is fundamentally deficient.  The Department's policies vest EEO responsibility with the Deputy Chief for the Bureau of Administration and Homeland Security, who has no background on EEO issues, is given no training on how to perform the EEO function, no sworn officer staff, no resources to carry out this function, and is expected to fulfill this role in addition to other responsibilities. The result has been fundamentally deficient policies that (i) encourage resolution of complaints

of racism or discrimination within the direct chain of command, with emphasis on direct confrontation between perpetrators and victims of discrimination, (ii) routinely fail to investigate claims of discrimination, (iii) fail to consider patterns or practices of discriminatory conduct by particular officers, and (iv) expose complainants to retaliation. The failures of the system has led many officers to file directly with the EEOC and Maryland Commission on Civil Rights because of their frustrations with the PGPD process.

In his report, Mr. Graham detailed numerous areas in which the Department's EEO policies fail to meet the standards set forth by federal Equal Employment Opportunity Commission Guidelines (which the Department concedes, were not considered in drafting Department policies) or the model policies proposed by the International Association of Chiefs of Police. And as Mr. Graham notes, the Department has compounded these problems because there are fundamental deficiencies in its training program, which do not put sufficient emphasis on preventing racial discrimination or harassment, retaliation, or implicit bias.

Recommendation #10: The Department should revise its EEO complaint policy so that complaints can be made outside the chain of command and are confidential. EEO complaints, as well as other external and internal complaints of discrimination, bias, harassment, and retaliation should no longer be investigated within the chain of command. Within the Office of Compliance, the Department should establish a dedicated corps of investigators specifically trained on EEO issues to investigate external and internal complaints of discrimination, bias, harassment, and retaliation.

Recommendation # 11: All officers (regardless of rank) should have annual anti-discrimination, anti-retaliation, anti-harassment, and implicit bias training. Consistent with Recommendation #3, officers should also be retrained on use of force to avoid the use of force and take steps to de-escalate before engaging. Both components of training should assess comprehension, and there should be consequences for officers who do not pass.

## IV.    ENFORCEMENT AND COMPLIANCE

The Department's historical reliance on the Internal Affairs Division and the EEO Coordinator to address issues of racial equity and justice has been a failure. Neither of these entities has the training or resources to fulfill these critical responsibilities. The Department needs to charge an officer with sufficient rank with responsibility and provide dedicated resources to implement these recommendations. And there needs to be public reporting, transparency, and accountability to ensure that these recommendations are implemented.

Recommendation #12: The Department should appoint a senior, full time officer (with rank higher than the Deputy Chiefs) as the Chief Compliance Officer of the Department. The Chief Compliance Officer should head a new Office of Compliance whose sole responsibility should be over the areas identified in these recommendations, including independent authority to set EEO policies and provides, and investigative and disciplinary authority over EEO matters and civilian interactions with potential for discrimination. Among other things, the Chief Compliance Officer must (i) be actively involved in the training and enforcement of anti-discrimination, anti-harassment, anti-bias, and anti-retaliation policies and resolution of all

discrimination, harassment, and retaliation allegations; (ii) set goals for recruitment, promotions, and transfers to specialty assignments; (iii) have authority over the recruitment, promotion, and specialty unit transfer processes to ensure the Department achieves its goals; (iv) monitor the investigation and disciplinary functions of the department for bias and discrimination; (v) oversee revisions to the Department's policies and practices concerning civilian interactions and the monitoring and assessment of police/civilian interactions (including the internal reviews and integrity audits); and (vi) oversee the establishment of the officer-bystander program.  The Chief Compliance Officer should have sufficient sworn and civilian staff to carry out the duties of their office.  The Chief Compliance Officer should report directly to the Chief of Police, and should issue periodic public reports to the community on issues of discrimination and racism and how the Department and individual officers have been held accountable.

*****************

The Recommendations set forth above are only a partial list of the ways in which PGPD should be reformed with respect to its hiring, promotional, disciplinary, and EEO functions.  We know that the Task Force has other responsibilities, such as ensuring that the officers and leadership of PGPD act in a non-racist manner with respect to the community at-large.  But the steps discussed above would be an important start towards creating a force in which all officers act in a non-racist manner, both with respect to their fellow officers and to the overall community.

Should you or members of the Task Force wish to review any of the information discussed in this letter or that we have received in the litigation concerning these important matters, we would be happy to provide them (with the permission of the County.)

Respectfully submitted,

Joe Perez

Thomas Boone

cc:     The Honorable Angela Alsobrooks
        Members of the Prince George's County Council

# Exhibit B




**Angela D. Alsobrooks**
*County Executive*

# 2020

## Prince George's County, Maryland

# POLICE REFORM WORK GROUP

Re-imagining Policing in Prince George's County
Report and Recommendations

Presented to
The Honorable Angela D. Alsobrooks
Prince George's County Executive

### Co-Chairs

The Honorable Maureen Lamasney
Retired Judge, Prince George's County
Circuit Court

The Honorable Alonzo T. Washington
Maryland House of Delegates
District 22

# 2020 PRINCE GEORGE'S COUNTY, MARYLAND POLICE REFORM WORK GROUP

# RE-IMAGINING POLICING IN PRINCE GEORGE'S COUNTY REPORT AND RECOMMENDATIONS

## PRESENTED TO
## THE HONORABLE ANGELA D. ALSOBROOKS
## PRINCE GEORGE'S COUNTY EXECUTIVE

**December 4, 2020**

**PRINCE GEORGE'S COUNTY GOVERNMENT**
Office of the County Executive
*"Prince George's Proud"*



**Angela D. Alsobrooks**
*County Executive*

Dear Prince Georgians:

Back in July, I created the Police Reform Work Group to study and review policies within our Police Department covering the full spectrum of its operations. While we have made great strides together as a community to build a responsive, transparent and accountable Police Department, we also realize there is still work to be done. That is why I asked this diverse group of public officials and community advocates to use their review of the Police Department to create a list of recommendations for reforms, which are compiled into this final report.

I want to thank the members of our Police Reform Work Group, especially Co-Chairs Judge Maureen Lamasney and Delegate Alonzo Washington, for their hard work over these past several months. They represented a diverse set of voices with backgrounds in a variety of relevant fields, including law enforcement, criminal justice reform and civil rights. They volunteered their time for several months, hosting regular meetings and in-depth conversations about the future of our Police Department. The thoughtful and thorough recommendations included in this report are a testament to their dedication and commitment to our community.

I also want to thank Prince Georgians for being so actively engaged with our Work Group. When the Work Group hosted public listening sessions, you answered the call and provided critical input. Community members, community groups, advocacy groups, faith leaders, business leaders, and so many others met with the Work Group and sent them thoughtful ideas and recommendations. Your engagement played a significant role in helping guide the Work Group, and I know your efforts are certainly reflected in the final recommendations included in this report.

This year, we have witnessed a national social justice movement during the midst of a global pandemic. I understand the pain and desire for change that has driven this movement, as it is a discussion that hits close to home through my own family history. What we have shown is that in Prince George's County, we are meeting this moment with true change that will greatly benefit our residents. Most importantly, we have shown that we will continue working together as a community to confront each and every challenge that we collectively face.

I am *Prince George's Proud* of the hard work and dedication that has been put into this thorough report. Again, I want to thank the members of the Police Reform Work Group and the many members of our community who were part of this critical effort. Together, we are bringing transformative change to our Police Department, helping it become a model for the nation.

Yours in service,

Angela Alsobrooks
County Executive

1

## WORK GROUP CO-CHAIRS

### The Honorable Maureen Lamasney, Co-Chair

I was honored and humbled when I was asked to serve as Co-Chair of the Police Reform Work Group and eagerly accepted. It is a true privilege to be part of the continuing progress of the Prince George's County Police Department, and I thank County Executive Angela Alsobrooks for her confidence in me.

I also thank my Co-Chair, Delegate Alonzo Washington, whose expertise, organizational skills, and leadership made for such an efficient work group. The members of the work group were, without exception, dedicated, tireless, and perceptive. They are true leaders of our community.

We were charged with the mission of providing our County Executive with recommendations that will establish fair practices across the board and restore public trust in law enforcement. The recommendations in this report are designed to accomplish those goals by making the operations of the Prince George's County Police Department more transparent, holding the employees of the department more accountable, and amplifying the voice of the community in developing the department's policies and procedures.

This work group was convened twenty years after The Community Task Force on Police Accountability was established by then County Executive Wayne K. Curry. At that time, I was recently appointed Circuit Court judge after having worked in the Public Defender's Office since law school. I recall the interest generated by that report issued in February 2001. I read that report again in preparation for the 2020 Work Group as a retired Circuit Court judge. Many, if not most, of the issues addressed by both work groups were the same.

I hope this report is greeted, not only with interest, but also with resolve on the part of all concerned that no future work groups must be convened. I hope the changes longed for by the community will occur. Our County Executive will choose the best recommendations for our county, and I know she will ensure they are implemented in an appropriate and prompt manner. Real and lasting change will occur when we take the next steps toward the trust, cooperation, and respect that both the Prince George's County Police and the community want. I believe our future is bright!

**ALONZO T. WASHINGTON**
*Legislative District 22*
Prince George's County

———

*Vice Chair*
Ways and Means Committee

———

Chair, Education Subcommittee

The Maryland House of Delegates
6 Bladen Street, Room 131
Annapolis, Maryland 21401
410-841-3652 · 301-858-3652
800-492-7122 *Ext.* 3652
*Fax* 410-841-3699 · 301-858-3699
Alonzo.Washington@house.state.md.us



## THE MARYLAND HOUSE OF DELEGATES
### ANNAPOLIS, MARYLAND 21401

Dear Prince Georgians,

It was an honor and privilege to serve as a Co-Chair of the Prince George's County Police Reform Task Force at the request of County Executive Angela Alsobrooks. The Task Force was created at the heels of this nation's most historic social uprising sparked by the murder of George Floyd, an unarmed Black man, killed by the Minneapolis police; and months after the murder of William Green, an unarmed Black man, who was killed by a Prince George's County Police Officer this January. These horrific incidents and what has proven to be all too often a toxic police culture are happening here in our community. I want to thank Ms. Alsobrooks for giving our Task Force the opportunity to address these issues and propose solutions.

As someone who grew up in Prince George's County, the issues plaguing the Prince George's County Police Department (PGPD) are very personal to me. I have seen firsthand the abuse of power from the officers who are sworn to protect and serve the community. I graduated from Prince George's County Public Schools, and have also witnessed the school-to-prison pipeline and its disastrous implications for the young people in our community. As Co-Chair of the Task Force, I worked diligently to ensure the final report would yield meaningful recommendations that if implemented would create a more professional police force that better serves our community - our residents cannot afford to wait any longer.

The charge of the Task Force was to develop comprehensive recommendations to address every area of policing in Prince George's County. In order to carry this out effectively, the Task Force was broken down into five subcommittees, each responsible for their own unique policy area. The subcommittees and full task force met weekly, received various presentations from the Department, expert testimony, and public input. These meetings culminated in each subcommittee creating their own set of recommendations. At the conclusion of our efforts, the full Task Force met as a full body to vote and approve these recommendations for the final report.

The Task Force quickly realized through presentations from the Department that PGPD was facing many dire challenges and issues that have far too long gone unaddressed. Regrettably, we made several requests for different data sets on a variety of topics that went unanswered. Proper procedures to effectively evaluate police officers have not been implemented, which has resulted in the continued deployment of officers unfit for duty. The current internal investigations process is wrought with conflicts of interest and an unclear overlap of responsibilities. PGPD has even failed to retain its accreditation for the last several years, which it blames on reporting standards that are too strict. Ultimately, these issues demonstrate the myriad of ways PGPD is failing - both its own officers and the community they are sworn to protect and serve. By failing to take every action necessary to ensure the support of the community, we are also doing a disservice to the many officers who truly serve our residents and perform a critical and often difficult role.

Over the course of nearly six months, the Task Force worked to produce robust, comprehensive recommendations that if implemented, will fundamentally change public safety and policing in Prince George's County. We aligned our proposals closely with what the community has been calling for, such

3

as a new Office of Integrity and Compliance that will increase oversight and drastically reduce conflicts of interest. We included additional strict training standards to include Use of Force, anti-discrimination, and anti-racial bias instruction. We also included recommendations on School Resource Officers, comprehensive community engagement, data reporting standards, and several other meaningful and far reaching proposals.

I want to sincerely thank every member of the Task Force for their efforts, including my fellow Co-Chair, Judge Maureen Lamasney. Her years of experience in the judicial system were critical for the development of dozens of key recommendations. I also want to thank the many County staff members, attorneys, and administrative aides who were critical in the production of this report. Most importantly, I want to give my gratitude to the residents of Prince George's County. Without tireless advocacy from community members over the years, this Task Force would not exist. It is my hope that our recommendations are fully implemented, and that they help create the meaningful change our community deserves.

Sincerely,

Alonzo T. Washington
Maryland State Delegate

4

# POLICE REFORM WORK GROUP MEMBERS

*Co-Chairs*

**The Honorable Maureen Lamasney**
*Retired Judge, Prince George's County Circuit Court*

**The Honorable Alonzo T. Washington**
*Maryland House of Delegates, District 22*

## Work Group Subcommittees

### Community Engagement and Quality Services

Florence Felix-Lawson (*Chair*)
Citizen Complaint Oversight Panel

Tara Jackson
Prince George's County Deputy Chief Administrative
Officer for Government Operations

Josephine Mourning
Prince George's County Southern Christian Leadership
Conference (SCLC)

James Robinson
Pastor, Tree of Life Christian Ministries

### Employee Recruitment and Retention

Dr. Kris Marsh (*Chair*)
University of Maryland College Park

Dr. George Askew
Prince George's County Deputy Chief Administrative
Officer for Health, Human Services, and Education

Dwayne Preston
City of Bowie Police Department

Sonia Pruitt
National Black Police Association

Donnell Turner
Prince George's Office of the Inspector General

### Financial Management

Judy Danso (*Chair*)
Prince George's Office of the State's Attorney

Archie O'Neil
Prince George's County Public Schools

Krystal Oriadha
PG Changemakers

The Honorable Rodney Streeter
Prince George's County Council, District 7

### Independent Oversight, Compliance, and Integrity

The Honorable Wanika Fisher (*Chair*)
Maryland House of Delegates, District 47B

Bob Ross
Prince George's County National Association for the
Advancement of Colored People (NAACP)

Keith Lotridge
Prince George's Office of the Public Defender

Orlando Barnes
Prince George's County Office of the Sheriff

### Internal Policies and County Regulations

Glenn Ivey (*Chair*)
Former Prince George's County State's Attorney

Llamilet Gutierrez
Amara Legal Center

Joseph Ruddy
Prince George's Office of Law

The Honorable Alexander Williams, Jr.
Retired Judge, United States District Court for the District of Maryland

5

## ACKNOWLEDGEMENTS

The Prince George's County Community
Sam Jackson
(Legislative Aide to Co-Chair Delegate Alonzo T. Washington)

### Key Support Staff

Danon Ashton
Jonathan Bender
Miriam Brewer
Rocquel Broady
Denise Buckler
Donna Engles
Rhea Harris
Charmaine Harvin
Katina Rojas Joy
Tammy Maguire
Pastor Charles McNeill
Ryan Middleton
Sadia Noah-Hope
Shaka Pack de Flores
Paula Speiden
Valerie Watson
Sgt. David Young

### Work Group Interns

Jikaela Call
Quintin Harry
Matthew Hatchett
India Roebuck
Bilqees Stover

## SPECIAL THANKS TO

Dr. Kris Marsh

# TABLE OF CONTENTS

**Statement from the Honorable Angela D. Alsobrooks** ...............................................1

**The Work Group Co-Chairs** ...............................................................................2

**Listing of Work Group Members** .......................................................................5

**Acknowledgments** ..............................................................................................6

**Origins of the Police Reform Work Group and Approach to Review** ...................8

**Recommendations** ..............................................................................................10

    A. Community Engagement and Quality Services.........................................10
    B. Employee Recruitment and Retention......................................................17
    C. Financial Management..............................................................................21
    D. Independent Oversight, Compliance, and Integrity...................................25
    E. Internal Policies and County Regulations ................................................31

**Appendix** ...........................................................................................................37

    A. Listening Session Questions and Comments ............................................37
    B. Police Department Organizational Charts ...............................................43
    C. PGPD Use of Force Data..........................................................................48
    D. Calls for Service and Crime Statistics ....................................................50
    E. Police Department Employment Data ......................................................52
    F. 2019 Traffic Stop Data by Race ..............................................................57
    G. Complaint Process Overview ...................................................................61
    H. Police Department Budget Data ...............................................................79
    I. OHRM Police Applicant and Hiring Overview ........................................82
    J. Inspector General Overview ....................................................................85
    K. School Resource Officer and Security Personnel .....................................87
    L. Law Enforcement Officers Bill of Rights Overview .................................91
    M. Department of Social Services Overview ................................................92

**Glossary of Terms, Abbreviations, and Acronyms** ...........................................97

**List of Presenters** ............................................................................................99

**Executive Orders** ............................................................................................101

**ORIGINS OF THE POLICE REFORM WORK GROUP AND APPROACH TO REVIEW**

The mission of the Prince George's County Police Reform Work Group is to provide County Executive Angela Alsobrooks with substantive recommendations that will establish fair practices across the board, maximize transparency, and restore public trust in law enforcement.

The Police Reform Work Group was not created to decide the merits of any pending or potential litigation. Nor did the Work Group make any factual determinations regarding any lawsuits or controversies. The Police Reform Work Group was created to make recommendations regarding the policies of the Prince George's County Police Department and not to resolve, discuss, or comment upon any specific or alleged events.

At the direction of the County Executive's executive order, the Police Reform Work Group studied and reviewed Police Department policies that covered a full spectrum of its operations including hiring, training, and use of force.

The Police Reform Work Group had two desired outcomes:

*1. Provide high-quality short-term internal policy changes and recommendations for best practices to deliver critical services to County residents.*

*2. Develop long-term strategies that involve the police and community working collectively to ensure safe living and working environments. The desired result of this collaboration is to strengthen healthy relationships where they exist and repair relationships with the community where trust has been compromised.*

To meet these outcomes, the Police Reform Work Group publicly conducted two community listening sessions and received over 35 presentations from public safety officials, academics, community advocates, government agencies, labor unions, and faith-based leaders.

The Police Reform Work Group was given wide latitude to cover nearly every aspect of policing in Prince George's County. In order to sufficiently provide recommendations on as many policy areas as possible, the Work Group was strategically broken up into five distinct subcommittees.

As facilitators of the Work Group, the Co-Chairs considered it necessary to focus on what the community expressed as the most pressing areas of concern in the police department. Instead of having the full membership vaguely focus on each topic, small groups of four to five Work Group members conducted in-depth analysis, research, and discussion on assigned subject matter. The Work Group was divided into five subcommittees focused on the following policy areas:

- Community Engagement and Quality Services
- Employee Recruitment and Retention
- Financial Management
- Independent Oversight, Compliance, and Integrity
- Internal Policies and County Regulations

8

Members were assigned to each subcommittee based on their own unique backgrounds, experiences, and perspectives. To provide balance and ensure all recommendations align with the overall mission of the Work Group, the Co-Chairs also served as voting members on every subcommittee. Each subcommittee met weekly, hosted their own presenters, and developed their own set of recommendations. The full body then came together to vote on each set of recommendations to be adopted to the final report.

# RECOMMENDATIONS

## Community Engagement and Quality Services Recommendations

The Community Engagement and Quality Services subcommittee examined opportunities to broaden the Police Department's role as a proactive participant in addressing the long-term causes of crime and societal ills.  Community Engagement and Quality Services studied policies and procedures aimed at building trust, improving quality of life, and diverting children and adults alike from being needlessly engrossed in the criminal justice system.  Moving away from an adversarial nature of police and community interactions with a focus on data-driven approaches to reducing crime may lead to increased confidence in the Police Department's mission to protect and serve Prince George's County residents.

The Community Engagement and Quality Services subcommittee was tasked with addressing the following subject areas:
- Community-oriented approach to public safety
- Community complaints
- Social, health, and family services
- Community resource officers (community policing)
- School resource officers in the public schools
- Calls for service
- Community empowerment and public information
- Youth involvement and engagement

The committee met with the following organizations and/or entities:
- Director of Safety and Security Services
- Teens for Justice

**Recommendation 1: Invest in mental health programs and restorative approaches to student discipline to help dismantle the school-to-prison pipeline.**

A. **Realignment of PGCPS security protocol.** PGCPS needs a realignment of its current safety and security structure. Doing so would equip its administration with tools and resources needed to appropriately deal with student misbehavior and to maintain a safe environment for learning and nurturing.[1]

B. **Restructure School Resource Officers (SROs) and security personnel.** Remove arrest powers of all internal security personnel. Reduce the size of internal security personnel and

---

[1] According to the SRO presentations on October 22, 2020, data showing who was being arrested highlighted disparities. There were 935 arrests within the last three school years, of which 97% arrests were of students of color. However, African-American and special education children were disproportionately represented overall. For African-American students, although they make up 57% of the student population, they comprise about 86% of students arrested within the last three school years. Similar disproportions exist for special education students. They comprise 11% of the student population, but have represented between 19% and 28% of students arrested within the last three years. Also noteworthy, data shows over 60% of total arrests were of children in the 9th and 10th grades. See Appendix I for additional information.

reallocate funding towards mental and behavioral health for students. PGPD and PGCPS should ensure all SROs supervisors routinely check-in with SROs (during school hours) and with PGCPS administration. Require SROs to appear in 'soft' uniforms or plain clothes. Require SROs to wear body cameras. Rename school security personnel to "School Safety Monitors." PGPD should assign one supervisor for all PGPD-assigned SROs in PGCPS, and all municipalities with an assigned a PGCPS SRO should select one municipal supervisor for the PGCPS SRO.

C. **Update school safety training requirements.** Require recurring (e.g., annual/biannual) joint training to teachers, school administrators, and SROs in de-escalation, mediation, disciplinarian roles, and crisis intervention so they have the skills and techniques to respond appropriately to student misbehavior. Require recurring (e.g., monthly, quarterly basis) joint meetings with student body representatives, Parent/Teacher Association, principals, administrators, teachers, SROs, and school security personnel to discuss pertinent safety/behavioral issues to facilitate engagement. Training should also emphasize the prohibition of PGCPS staff, SROs and school security personnel inquiring about a student's immigration status. All SRO supervisors should complete annual SRO training required by the state and PGCPS.

D. **Establish school safety data metrics to eventually phase out security personnel.** Establish metrics for ideal school safety and develop milestones for a data-driven analysis of the possible phaseout of security personnel. Require PGCPS to collect SRO and school security personnel data on arrests and use of force and publish it annually on the PGCPS website.

E. **Invest in prevention and intervention programming for students.**[2] Invest in and increase the number of high school counselors, mental health counselors, community intervention workers, and restorative justice coordinators to respond to student behavioral problems. Create a crisis prevention model within the Department of Social Services. Consider tasking a diverse group of experts (e.g., individuals from the State's Attorney's Office, Public Defender's Office, the advocate community, and mental health counselors) to determine the types of behavior resulting in school-based incidents that could be addressed via alternate means and should be excluded from criminal charges. Develop

---

[2] The subcommittee also reviewed data showing why PGCPS students were being arrested. Recent data show that the reasons for arrests were for behavior like fighting and disruption, that could have been handled by alternate means not involving the criminal justice system. In the 2018-19 school year, 61% of arrests (190 out of 311) were for fights not involving weapons, other interpersonal conflicts, and disruption. In the 2019-20 school year, the top three crimes committed in school were fighting, disruption, and other weapons. When considering school arrests, data showed most were made by internal security personnel with arrest powers. Currently, there are 33 School Resource Officers who are local police officers reporting to PGCPS schools. There are an additional 237 unarmed internal security personnel responsible for safety and security-related services. Of the 237 security personnel, 66 are certified police officers with arrest powers within school premises. Data from the last two school years shows that most arrests were made by the cadre of school security personnel with arrest powers. Specifically, they made 88% of the arrests in both school years, while SROs made 12% of arrests. PGCPS is the only school system within the state of Maryland with school security personnel with arrest powers. Overall, data showed that African-American and special education students were disproportionately disadvantaged by school arrests, school-based arrests were commonly made for behavior like fighting and disruption, and most of those arrests were made by school security personnel.

11

diversion programs and emphasize close partnership with PGCPS leadership and the State's Attorney's Office, requiring close communication about the status of students' diverted cases. Decriminalize age-appropriate student behavior (e.g., disruption or disruptive behavior are among the top three offenses committed) and use alternatives to arrests.[3] The administration should also define and develop a contact between an SRO and school security personnel, including questioning for law enforcement purposes, detainment of a student, and arrest of a student.

**Recommendation 2: Overhaul the County's Crisis Response System to include mapping resources, training law enforcement, securing a new (best) provider, structuring mobile crisis teams, and establishing a new innovative crisis center.**

A. **Map the Crisis Response System.** Prince George's County should establish a team to immediately evaluate community needs and assess the available resources and gaps in the current system. The team will also collect data to understand how to meet the needs of people regularly engaged with law enforcement and who may have behavioral health concerns.

B. **Train law enforcement.** All PGPD officers should receive recurring, basic mental health and first aid training. A specialized unit of training officers should be developed, undergo and implement Crisis Intervention Training (CIT). Basic mental health and crisis intervention training should be offered to municipal departments to ensure consistency in treatment of community members with mental health needs in the County. Body-worn camera footage should be used and analyzed to enhance in-service and recruit-level training for situations involving mental illness.

C. **Secure a new (best) mental health provider.** Prince George's County should issue a solicitation for a mental health provider. In the interim, the County should ensure that crisis response services are delivered in an effective manner.

D. **Structuring mobile crisis teams.** Prince George's County should determine the appropriate model that works best for the County based on the following options:
   1. Mobile crisis teams include a mental health professional(s) and a CIT-trained officer;
   2. Mental health professionals respond to calls with officers (or meet officers at the scene), where appropriate;
   3. The mental health professional does not work within PGPD, and instead works within a separate governmental entity (e.g., Department of Health and Human Services) to ensure the clinician's autonomy in decision-making when assessing how to respond in a situation and the appropriate treatment;
   4. Specially trained PGPD officers responding to mental health crises wear 'non-uniforms' or 'soft uniforms' to reduce tactical appearance;

---

[3] According to the Maryland Coalition to Reform School Discipline presentation on October 22, 2020, 61% of PGCPS school-based arrests (190 of 311) during the 2018-19 school year were for fights not involving weapons, other interpersonal conflicts, or disruption, which are better addressed through alternative approaches.

5. Ensure an appropriate number of mobile crisis teams, based on a data-driven assessment, are available to address the needs of the County and ensure the mobile crisis teams are always available to respond to calls in the County within an acceptable time frame;

6. Ensure the mobile crisis team undertakes follow-up service for "high utilizers" and coordinates follow-up care for community members engaged with the mobile crisis team on a call for service;

7. PGPD and the Health Department develop and implement policies on mobile crisis team responses;

8. Consider a pilot program in key areas if unable to secure funding for County-wide program;

9. Identify specific ways to strengthen the relationship between the Health Department and PGPD (e.g., attendance at roll call, shadowing crisis team, ride alongs).

E. **Create a "warm line" for mental health services.** Prince George's County should develop a dedicated mental health phone number or "warm line" for community members in crisis. The line should initially be operational daily for at least 12 hours per day, with an eventual goal of 24-hour availability. The "warm line" would provide community members in crisis with assistance and connections to other government agencies and services. Mobile crisis teams could be dispatched through the warm line and 9-1-1, depending on circumstances. This dedicated warm line would be separate from the Maryland 2-1-1 line.

F. **Establish and fund a mental health crisis facility.** Prince George's County should establish a 24-hour crisis assessment and stabilization facility as part of an existing crisis response system. It could provide an alternative destination for first responders to transfer clients in crisis in lieu of hospital emergency departments or jail.

**Recommendation 3: Bolster the 9-1-1 Call Center's capabilities to ensure it attracts and retains the staff needed to provide vital services.**

A. **Innovate the 9-1-1 Call Center.**[4] Prince George's County should promote a public service campaign to direct community members to appropriate, non-emergency services. Establish an "internet reporting tool" for community members to report a variety of lower-level crimes (e.g., reporting minor vandalization or stolen tags).

B. **Collect data.** Conduct an annual analysis of PGPD calls for service per district to eliminate and/or reduce calls that are not police-related, but require government assistance (e.g., provide more community interaction between residents and the appropriate governmental

---

[4] According to the Office of Emergency Management/Public Safety Communications 9-1-1 presentation on September 24, 2020, of 25 neighboring jurisdictions, the Prince George's County Call Center (Call Center) is ranked the third busiest Public Safety Answering Point (PSAP) in the nation, responsible for answering and processing emergency and non-emergency phone calls and text messages. The Call Center dispatches County Police, EMS, Fire, Sheriff, and 18 municipal police departments for emergency call responses. In 2019, the Call Center dispatched over 1.5 million emergency calls. Through August 2020, the Call Center outpaced last year's emergency calls by 25,000. The ability to effectively process these requests for service while supporting the agencies is imperative to ensuring Prince George's County community members obtain necessary emergency services.

entity, and allow more time for officers to proactively patrol and engage with community members in a non-enforcement manner). The analysis should be published and reported to the County Council annually. Maintain data on the number of calls dropped, the number of unanswered calls, and the number of calls being referred to the wrong addresses.

C. **Revitalize staffing.**[5] Identify funding resources to increase the rate of pay for Call Center employees to be competitive with nearby jurisdictions. Create bonus and/or financial incentives to help recruit and retain employees (e.g., signing bonuses, bonuses given out after every year of service completed, temporary hazard pay during national crises). Create non-financial incentives to support employee retention, (e.g., flexible hours, alternative work schedules, training programs that foster the professional development of employees, and employee recognition awards for exemplary public service). Identify and maintain funding resources to hire a clinician to provide mental health support to Call Center personnel. Establish a recruiting team of 9-1-1 supervisors to provide outreach at job fairs, schools, and churches. Aim to maintain a 3% or less vacancy rate. Allow telework for home-based dispatchers who access the Computer Aided Dispatch (CAD) system remotely.

## Recommendation 4: Empower and cultivate underserved communities through the expansion of community-oriented policing services (COPS).[6]

To improve the relationship between PGPD and the community, increase the number of community police officers in the department. Provide training to all officers on community policing. Dedicate at least 25% of the PGPD force to formal community police officer roles.

## Recommendation 5: Hire a new, non-sworn civilian Deputy Chief to oversee a newly-formed Community Resource Bureau within PGPD to assist with prioritizing community engagement.

A. **Establish a new, non-sworn Deputy Chief position.** PGPD should conduct a national search for candidates with years of community engagement, organizational development, community development, and law enforcement experience.

---

[5] Maintaining these services requires staffing, training, quality assurance, and technical support services. In addition, the Call Center is required to implement enhanced services, including Next Generation 9-1-1 (NG911) and its associated core services by early 2021.

[6] PGPD has a COPS program, which is a community-based program that dedicates police officers to reducing crime and enhancing the quality of life in Prince George's County neighborhoods. Earning the trust of the community and making community members stakeholders in their own safety enables law enforcement to better understand and address both the needs of the community and the factors that contribute to crime. This approach allows the police and the community to work closely together in creative ways to solve problems like crime issues, fear of crime, physical and social disorders, and allows everyone to collectively work for the betterment of the community. However, out of the ~1,600 PGPD officers, there are about 60 (4%) who are currently part of the COPS program. The program needs to be more robust for it to truly be effective.

B. **Create a Community Resource Bureau.** Create the Community Resource Bureau. Creation of the new bureau and Deputy Chief position will enable PGPD to enhance community engagement efforts and continue to build trust in the community. Enhance department communications with the public. Align organizational partners with similar missions to eliminate silos and inefficiencies. Create a framework for the evolving needs of the community and department as well as fill gaps in services not addressed by PGPD.

C. **Community Resource Bureau's jurisdiction.** The Community Resource Bureau would have within its jurisdiction PGPD's Community Services Division, the Community Oriented Policing Service (COPS) program, and other services with a direct link to the community (e.g., victims' services and chaplain services).

**Recommendation 6: Leverage existing youth programs sponsored by PGPD and other organizations and collaborate with partners to promote quality interactions between County youth and PGPD.**

A. **Navigate internal and external partnerships.** Explore multiple sources of funding revenue from grant makers, donors, corporate sponsors and others in the private sector who can allocate resources to fund youth engagement initiatives, including youth and community programs sponsored by PGPD and Department of Family Services, with an emphasis on funding non-profit organizations with a unique expertise to help deliver youth engagement initiatives.

B. **Convene a youth group roundtable.** Establish a group of individuals who represent various advocacy, mentoring, and youth groups in the County for a series of roundtable discussions to assess the needs of County youth. A roundtable would facilitate identifying and filling gaps in assistance.[7]

C. **Leverage existing youth programs with a special focus on high crime and low-income areas.** After identifying a diverse source of funding for County youth programs, identify and concentrate on at-risk youth in the pockets of the community in high crime and low-income areas that would most benefit from youth programs.

**Recommendation 7: Empower the community through public information by developing measures to determine an effective police department to be published annually on the PGPD website and evaluated by an independent, third party to ensure accuracy.**

A. **Establish a two to three-year strategic plan.** PGPD shall establish a plan to develop qualitative and quantitative measures to determine an effective police department.

---

[7] According to the Prince George's County Department of Social Services presentation on October 22, 2020**,** young people who live in poverty, foster care, or have parents who are undocumented face a myriad of issues that can negatively impact their development and well-being. As a result, these challenges increase their chances of encountering the criminal justice system. Many of our youth live in economically disadvantaged environments where fear of eviction, homelessness, or deportation can have a significant impact on their mental health. The Work Group considered the challenges that Prince George's County youth faces and how to foster a more positive and productive relationship with law enforcement.

B. **Report crime data.** Crimes in each neighborhood, categorized by "violent/nonviolent" within a neighborhood, city, and district. Crime analysis and statistics.

C. **Document transparency data.** Provide annual data on the number of use of force incidents, the number of community member complaints, PGPD personnel morale, and resident satisfaction via annual or biannual surveys.

D. **Post comparative data.** Comparative data on percentage of crimes in a city as compared to other cities in the United States. Comparative data on ratio of PGPD law enforcement per residents (e.g., x number of police officers per 1000 residents).

E. **Define and disseminate metrics.** Once metrics are established that measure the safety of our County and the effectiveness of PGPD, that data should be shared publicly.

F. **Direct resources accordingly.** The findings should be used to gain insight into community needs. The data should serve as a basis for where police officers are assigned in the County. Neighborhoods with higher incidences of crime should receive more community police officers who can engage the community and collaborate with strategic partners to holistically address community needs.

**Employee Recruitment and Retention Subcommittee Recommendations**

The Employee Recruitment and Retention subcommittee was tasked with finding ways to improve the process to attract diverse and qualified police officers who are invested in Prince George's County.  On top of recruiting the best candidates, the subcommittee searched for methods to better mental and physical health outcomes for police officers.  The subcommittee emphasized ongoing training, incentives, and health reviews to maintain a quality department.

The Employee Recruitment and Retention subcommittee was tasked with addressing the following subject areas:
- Recruiting
- Hiring
- Training
- Promotions and evaluations
- Human resources
- Mental health

The committee met with the following organizations and/or entities:
- Project Active Bystandership for Law Enforcement (ABLE)[8]
- PGPD Training Academy
- PGPD Use of Force Expert
- Office of Human Resources Management (OHRM)
- PGPD Recruiting Unit
- PGPD Psychological Services

**Recommendation 1: Recruit qualified diverse individuals.**

A. **Hire a consultant.** PGPD should hire a professional consultant to help determine a more accurate picture of staffing needs for PGPD.

B. **Create a PGPD and the Office of Human Resources Management (OHRM) recruitment partnership.** PGPD Recruiting Unit and OHRM should partner on recruiting efforts by leveraging subject matter expertise from both groups.

C. **Enhance recruitment strategies.** PGPD and OHRM should utilize the Equal Employment Opportunity (EEO) reports to guide and develop targeted recruitment strategies.

---

[8] In partnership with The Georgetown Innovative Policing Program and the global law firm Sheppard Mullin, Project ABLE* prepare officers to successfully intervene to prevent harm and to create a law enforcement culture that supports peer intervention. Project ABLE is a national hub for training, technical assistance, and research, all with the aim of creating a police culture in which officers routinely intervene as necessary to: Prevent misconduct, Avoid police mistakes, and Promote officer health and wellness (https://www.law.georgetown.edu/innovative-policing-program/active-bystandership-for-law-enforcement/).

D. **Conduct community and career information sessions.** OHRM should partner with PGPD leadership and Recruiting Unit to conduct community and career information sessions prior to posting positions and during the time position announcements are posted.

E. **Attend regional career day events.** PGPD Recruiting Unit should attend career day events at colleges, universities, middle schools, and high schools in the region between the months of September and May.

F. **Formalize community partnerships.** PGPD should ensure that the Chief of Police, Deputy Chiefs, command staff, management team, and PGPD Recruiters formalize partnerships with the minority faith-based community and other community leaders, groups, and organizations to explain recruitment priorities and solicit assistance.

G. **Develop targeted branding campaigns.** OHRM and PGPD should engage the County's Media Relations Division to develop and execute targeted and innovative branding campaigns to market and promote career opportunities in Public Safety.

H. **Establish recruitment incentives for County residency.** PGPD should provide incentives for recruits that are county residents. PGPD should offer incentives for recruits with a college degree from Prince George's Community College or Bowie State University.

I. **Provide free tuition for County residency.** PGPD should work with Prince George's Community College to offer free tuition to community college students interested in or recruited to join the department. To qualify the students and/or recruits must agree to maintain county residency five years post-graduation.

**Recommendation 2: Create an incentive for current officers to live in the County.**

A. **Research incentives for County residency among officers.** PGPD should research various forms of incentives for current officers to live in the County. These incentives should be monetary in nature (e.g., salary increases, tax credits for housing, and tuition assistance).

B. **Establish incentives for County residency among officers.** PGPD should utilize their research to establish monetary incentives for current officers to maintain residency in Prince George's County.

**Recommendation 3: Establish a fair, balanced, and robust hiring process.**

A. **Revise the hiring process.** Support state proposal to repeal prior marijuana use as a disqualifying factor in the hiring process for prospective officers.

B. **Coordinate not hiring officers with a history of misconduct.** PGPD should not hire officers who were fired or resigned while under investigation for misconduct.

C. **Incorporate not hiring officers with a history of disciplinary issues.** PGPD shall not hire officers from other jurisdictions where the officer was fired or resigned due to disciplinary issues.

**Recommendation 4: Provide innovative, consistent, and comprehensive training for all PGPD staff.**

A. **Formalize the review of training policies, procedures and requirements annually.** PGPD should formally conduct an annual review and assess its training procedures and requirements to determine if best practices are being implemented. The purpose of this review will be to ensure that our officers are receiving the highest quality and comprehensive training. A report detailing any substantive or non-substantive changes shall be issued publicly.

B. **Establish required annual training topics.** PGPD should ensure that all officers will receive annual in-service training on de-escalation, anti-discrimination, anti-retaliation, anti-harassment, use of force, implicit bias, equity, diversity, and inclusion.

C. **Implement community driven training.** Implement new training procedures that incorporate community members as trainers to provide perspective on the history of police relations in various neighborhoods, communities, and districts in the County.

D. **Promote supervisory leadership training.** PGPD should promote and enhance supervisory leadership training. Such training has the potential to increase oversight and accountability and reduce the number of community complaints.

E. **Incorporate updated or new legislation into mandated training.** PGPD should ensure that all updated and/or new legislation (e.g., anti-trafficking and domestic violence) are included in mandated training.

**Recommendation 5: Ensure the mental and physical well-being of officers.**

A. **Evaluate mental health and well-being annually.** PGPD requires mental health screenings and assessments prior to hiring any officer. PGPD should require that all officers have an annual mental health and well-being reevaluation by a certified mental health professional.

B. **Implement an officer wellness program.** To ensure all officers are in the best possible condition to respond to crises, PGPD should implement an officer wellness program with a pilot intervention system for officers in crisis. This includes improving peer support, providing counselors to those in need, considering relaxation techniques, and holding peers accountable.

C. **Emphasize the mental health of officers.** PGPD should pay closer attention to the mental health of officers and the morale of the department. PGPD should implement a rotating

process that assigns officers exhibiting stress or crisis in their personal and professional lives to less eventful areas of the County until they are better.

**Recommendation 6: Provide continuing education opportunities for all PGPD employees.**

A.  **Promote financial assistance for continuing education.** PGPD should consider financial assistance for all current departmental employees (sworn and civilian) that choose to pursue a college degree.

B.  **Establish education requirements for leadership positions.** PGPD should require that in order to be eligible for a supervisor or commander position an officer should possess at least an associate's degree.

**Financial Management Subcommittee Recommendations**

The Financial Management subcommittee explored opportunities to prioritize efficiency, promote transparency, and redirect budget dollars toward crime prevention programs and generated revenues toward societal needs. A budget reflects an agency's priorities, and the subcommittee sought to support the greater Work Group's desire to expand the scope of the Department's community service-oriented functions and transparency and accountability apparatuses.

The Financial Management subcommittee was tasked with addressing the following subject areas:
- Budget
- Accreditations
- Liability insurance
- Union contract
- Technology (DNA labs)
- Lawsuits
- External contracts

The committee met with the following organizations and/or entities:
- PGPD Fiscal Affairs
- PGPD Office of Management and Budget
- The Sante Group
- Behavioral Health Division of the Health Department
- Department of Family Services
- Department of Social Services
- PGPD Bureau of Patrol

**Recommendation 1: Dedicate PGPD revenue to health and human services needs.**

A. **Establish a plan.** PGPD should work with the Office of Management and Budget to establish a plan to ensure that all revenue generated by the Department be earmarked as revenue specifically dedicated to spending on major areas of need including health, housing, and social services.

B. **Develop a memorandum of understanding (MOU).** PGPD should establish a MOU involving all applicable agencies to provide the programs to set aside this revenue for.

**Recommendation 2: Eliminate all military equipment from PGPD.**

PGPD should not acquire or purchase any military equipment from programs (e.g., the Defense Logistics Agency's 1033 Program).[9]

---

[9] Promote demilitarization. This recommendation is necessary to eliminate the "us versus them" militarized dichotomy from community member and police interactions. In the wake of nationwide protests against police violence, demilitarization is especially critical. PGPD officers do not need to be outfitted for war to protect the public. In fact, use of military-style equipment often serves to escalate tensions between community members and police officers.

**Recommendation 3: Reduce PGPD overtime pay and revise related policies.**

A. **Establish interagency agreement.** PGPD should establish a MOU that reflects an interagency agreement by and between the Department, the District Court for Prince George's County and the State's Attorney's Office to significantly reduce court time and overtime.[10]

B. **Coordinate court dates and officer's day work shift schedule.** The use of Court Availability sheets completed by officers and submitted to their supervisors can ensure that court dates requested coincide with an officer's scheduled daywork shift. Additionally, the Court Liaison Officers can work directly with the Court Clerk to confirm an officer's scheduled daywork shifts. Upon verification of the shift, the Court Clerk and Court Liaison Officer may select the appropriate court dates and return them to the officers and their supervisors. Given that officers assigned to the Bureau of Patrol receive their work schedule for the entire year, this would drastically cut court overtime expenses.

**Recommendation 4: Prioritize filling current and/or vacant civilian roles with civilians, and re-assign sworn officers from civilian positions.**

A. **Secure civilian positions.** PGPD should strive to ensure that at least 30% of all civilian positions are filled by qualified civilian employees by the end of each fiscal year. Having qualified civilian staff will help ensure officers are not placed in positions reserved for non-sworn employees.

B. **Revise hiring protocols to prioritize civilians.** PGPD should update its hiring protocols for civilian positions to be filled within 60 days from the date of advertisement. For all vacant civilian positions, PGPD should prioritize the recruitment and hiring for civilian candidates before any consideration is given to a sworn officer. Reducing the number of vacant civilian positions in PGPD is vital to creating a department that prioritizes service first. Shortened windows to fill vacancies will increase staff support to police officers and increase overall departmental efficiency.

C. **Establish a sworn versus civilian hiring ratio.** PGPD should establish a sworn versus civilian hiring ratio at a benchmark minimum of 20%. Moreover, there should be a 3-year moratorium from assigning sworn officers to civilian positions. OHRM and PGPD should meet quarterly to ensure these goals are met. A benchmark will provide for an equivalent rate of hiring for recruits versus civilians.

---

[10] Based on Prince George's County Police Department Fiscal Affairs Division presentation on September 17, 2020, Reducing PGPD's overtime budget and accumulations for court overtime pay is vital to better stewardship over the manpower, time, and resources. The reduction will enable officers to be scheduled for court cases based on actual availability, thereby avoiding unnecessary use of court overtime See Appendix F, Police Department Budget Data.

**Recommendation 5: Conduct an annual financial audit of all payouts, lawsuits, settlements, and fines related to PGPD.**

The County Council's Audits and Investigations Division or an independent auditor should perform an annual audit for all payouts, lawsuits, settlements, fines, accidents, police misconduct, and any other related activities or events resulting from officer action or inaction attributable to their official functions and duties.

**Recommendation 6: Reimagine PGPD's budget to effectively deliver progressive public safety reforms.**

A. **Review the cost of policing in Prince George's County.** PGPD should conduct an internal forensic, financial review of the costs of policing in Prince George's County.

B. **Changes and implementation.** Based on the data and outcomes found in the current budget and current police operations, the financial review should enable the County Executive to make comprehensive changes to the PGPD budget and implement the forensic report's recommendations and further reforms as needed.

**Recommendation 7: Improve transparency in collective bargaining agreements.**

OHRM shall create opportunities for public comment prior to and during ongoing collective bargaining negotiations for the Fraternal Order of Police in Prince George's County.

**Recommendation 8: Increase funding for the diversion expansion programs through a collaboration with PGPD and the Prince George's County State's Attorney Office (SAO).**

A. **Collaboration for expansion.** PGPD and the Office of the State's Attorney should collaborate to identify partnership opportunities to expand the diversion program.

B. **Focus on relevant issues.** The diversion program should focus on relevant issues (e.g., homelessness, juveniles in crisis, human trafficking, and commercial sex-worker issues) throughout the County.

**Recommendation 9: Explore third party liability coverage opportunities for PGPD.**

A. **Explore external liability insurance.**[11] The Office of the County Executive should direct the Risk Management Program and PGPD to work with the Office of Law to examine the viability of comprehensive departmental insurance coverage separate from the County's current coverage.

---

[11] A comparative analysis between the County's status quo of paying settlements from the budget versus potential third-party liability coverage may be helpful in finding opportunities to limit the fiscal impact on the County's budget and operations of PGPD.

23

B. **Review and revise settlement processes.** Considering Prince George's County's recent $20 million settlement arising out of a police shooting, the government should evaluate and potentially revise current processes around settlements and payouts against the County.

C. **Consider supplemental individual coverage.** Supplemental individual officer coverage and comprehensive departmental coverage for incidents involving intentional criminal conduct or gross misconduct on the part of an officer employee should all be considered.

**Recommendation 10: Explore and adopt a new automated operations system.**

A. **Reduce overtime through automation.** PGPD should adopt and implement a new automated operation system to reduce overtime and improve the efficiency of the organization.

B. **Research processes for potential automation.**[12] PGPD should research areas to automate its operations to include an evaluation of current processes by the County's Office of Information and Technology, and in the interim, conduct a business case analysis of potential software (e.g., Telestaff that will result in cost-savings impact).

**Recommendation 11: Review the current funding allocation for specialty units.**

A. **Coordinate with County providers and advocates.** PGPD should coordinate with the University of Maryland Safe Center and other County providers and advocates to address human trafficking and the current allocation of funding for specialty units like the Vice Unit to determine operational effectiveness.

B. **Review Specialty Units.** PGPD should assess the utility and functionality of their specialty units.

---

[12] During a conversation with Anne Arundel County Police Department and PGPD it was discussed that automating operations will cut costs and increase efficiency, particularly as it pertains to overtime. Automation may also curb preferential treatment and afford better monitoring of overtime assignments. Automation as a mechanism for community member complaints allows residents to report incidents that do not necessarily require police presence, thereby improving response times for incidents that do. To this end, automation also allows for a systemized complaint process involving police officers with a tracking and oversight process of these types of complaints and their ultimate findings and resolutions.

**Independent Oversight, Compliance, and Integrity Subcommittee Recommendations**

The Independent Oversight, Compliance, and Integrity subcommittee was tasked with fortifying the mechanisms required to maintain the community's trust in the Police Department. Having institutions present to maximize transparency is essential to keeping the public safe and respecting civil rights. The subcommittee inspected the Police Department's internal and external checks to ensure the Department keeps the public adequately informed and holds accountable all personnel engaged in conduct outside the scope of their employment.

The Independent Oversight, Compliance, and Integrity subcommittee was tasked with addressing the following subject areas:
- Inspector General Office
- Internal Affairs Division
- Civilian review boards
- Discipline and misconduct
- Trial boards
- Data collection and evaluations
- Law Enforcement Officers' Bill of Rights (LEOBR)
- Independent investigations
- Racial equity audits and anti-discriminatory practice

The committee met with the following organizations and/or entities:
- PGPD Internal Affairs Division
- PGPD Office of the Inspector General

**Recommendation 1: Establish the Office of Integrity and Compliance where the Inspector General will serve as the Director; a Race & Gender Equity Director should also be hired.**

A. **Create the Office of Integrity and Compliance.** Move the position of the Inspector General to the Office of the County Executive. Create the Office of the Integrity and Compliance and include the Inspector General. The Office of Integrity and Compliance would report to the County Executive. The new office would disentangle the Inspector General from PGPD leadership, making way for more robust auditing and inspections of PGPD.

B. **Redefine the position of Inspector General.** Inspector General should be given full legal authority to review, analyze, and investigate all aspects of PGPD. The duties of the new Inspector General position should include:
   1. Auditing, overseeing, and reviewing the complaint process;
   2. Recordkeeping of all complaints and actions taken;
   3. Collecting and inspecting the details of an incident or complaint;
   4. Collate and analyze complaint data of the IAPro system and develop presentation of trends and patterns in annual or quarterly regional reports to the County Executive's Senior Leadership team;
   5. Make recommendations to the Chief of Police on Best Practices and benchmarks which will be marked by the trends and patterns of the data;

25

6. Overseeing the data entry and collection for the electronic system (i.e. IA Pro or any other system); and

7. Oversee any other County operations that the County Executive deems appropriate.

C. **Hire a Race & Gender Equity Director.** The Race & Gender Equity Director should be responsible for analyzing and reviewing current practices utilizing industry standardized racial and gender equity tools. The Race & Gender Equity Director should be directly responsible for overseeing all operations related to systemic equity as well as managing, design, coordination and implementation of programs, policies, and practices aimed at addressing the systemic disparities existing within PGPD. The Race & Gender Equity Director should be responsible for conducting an in-depth racial and gender equity audit every year.

D. **Provide adequate staffing.** Provide adequate staffing (e.g., approximately five to seven staff members) to the Office of Integrity and Compliance to assist with Internal Affairs cases, the Citizen Complaint Oversight Panel process, and any other duties necessary to complete the mission of the Office of Integrity and Compliance.

**Recommendation 2: Establish a more robust and equitable Citizen Complaint Oversight Panel (CCOP).**

A. **Amend County code.** Amend Prince George's County Code Sec. 18-186.03 governing the CCOP by increasing the number of members, allowing remote and virtual meetings, and increasing the stipend to each member per meeting.

B. **Bolster CCOP membership, staff, and budget.** Increase the budget to allow for a greater number of staff and legal counsel dedicated to handling cases. Additional CCOP members should represent the geographical and racial diversity of Prince George's County. The County Executive should seek candidates from the criminal justice reform advocacy community.

C. **Require the Chief of Police to give equal weight to reports.** The Chief of Police should give equal weight when considering recommendations from the CCOP and the Internal Affairs Unit.

D. **Create an appeal process.** Create an appeal process for the CCOP to challenge disciplinary decisions administered by the Chief of Police (a consideration supporting the elimination of the LEOBR).

E. **Allow CCOP investigation authority.** Allow the CCOP independent investigation authority in cases of serious bodily injury or death caused by an officer.

F. **Provide automatic notifications.** The CCOP should receive automatic advisement notifications by the Internal Affairs Division of police-involved deaths and high-profile use of force cases at the same time as the Prince George's County State's Attorney Office.

26

G. **Expand the data capacity.**[13] CCOP needs an interactive database to electronically import and transfer data between CCOP and PGPD's investigative files for each case.

**Recommendation 3: Support the repeal of the Law Enforcement Officers' Bill of Rights (LEOBR) in the General Assembly Session for 2021.**

**Repeal LEOBR.** The LEOBR provides police officers accused of wrongdoing ample time and cover to create justifications for misconduct and compromises the Chief of Police's authority to terminate employment or discipline officers.

**Recommendation 4: Modify certain sections of the Law Enforcement Officers' Bill of Rights (LEOBR), if repeal of the LEOBR is not made possible by the Maryland General Assembly.**

A. **Increase time to file a complaint.** Increase the time to file a brutality complaint against an officer from one to two years.

B. **Change investigation timeline.** Strengthen public trust in the investigatory process by providing a reasonable expectation for when a complaint will begin and end in all case, including use of force.

C. **Conduct concurrent investigations.** Codify the process for having the Internal Affairs Division conduct concurrent criminal and administrative investigations into officer misconduct to avoid delays in the production of evidence, the rendering of decisions, or the waiting on the possibility of criminal charges being dropped.

D. **Eliminate time gaps.** Provide County members with a clear explanation and expectation of the timeline and process by eliminating time gaps in the process from the decisions of the Administrative hearing board to the decision on punishment by the Chief of Police.

**Recommendation 5: Change the Administrative Hearing Board (AHB) Process in the Law Enforcement Officer's Bill of Rights (LEOBR), if repeal of the LEOBR is not made possible by the Maryland General Assembly.**

A. **Enhance the role of Administrative Law Judges.** To add formality to the process, Administrative Law Judges should preside over hearings and administer the Oath to witnesses.

B. **Include community members.** Two community members should be added to the Administrative Hearing Board. These community members should have voting rights.

---

[13] CCOP had been in consultation with Prince George's Community College to improve CCOP's reporting and data analysis, but conversations were stalled when resources and funding were no longer available. The data requested in this recommendation may reveal departmental trends among individual officers or officers in a particular region or region of which PGPD and the community should be aware. This data may also provide (1) valuable feedback to newer officers that could prevent problematic behavior in the future; (2) more informed CCOP decisions stemming from increased data access that might reveal officer patterns of behavior; and (3) an added layer of transparency to keep community members informed.

C. **Revise delivery time of board report.** The Administrative Hearing Board Chair should provide the final report to the Chief of Police within 15 days of the board's conclusion. The Chief of Police should render final discipline within 21 days of receiving the AHB report.

D. **Eliminate expungement.**[14] Eliminate the expungement of the officer's record of the charge of the AHB so the charges are discoverable by attorneys and decertification officials. The AHB decisions that are non-sustained should not be expunged from an officer's disciplinary record.

**Recommendation 6: Codify the new discipline matrix under review by the Chief of Police.**

A. **Execute discipline matrix and apply fairly.** PGPD has prepared a new discipline matrix for the punishment and discipline of officers to include discipline for body-worn camera functions (e.g. intentionally disabling body-worn cameras). PGPD should codify this matrix so they can apply punishment and discipline fairly, equitably, and consistently across the ranks of officers.

B. **Evaluate some administered punishments and disciplinary actions monthly.** Certain administered punishments and discipline, (e.g., leave with pay) should be evaluated every 30 days by the Chief of Police or designee to prevent indefinite continuation.

C. **Increase punishment for racial (and other related) bias.** PGPD should increase infractions of racial (and other related) bias to a category that allows for termination.

**Recommendations 7: Improve the public complaint process to ensure more access, oversight and accountability in PGPD.**

A. **Create a civilian position to collect complaints against officers.** PGPD should consider all public complaints seriously. PGPD should assign a civilian in each police station the responsibility for collecting any complaints against officers whether verbal, written, faxed, online, emailed, or other. The position's duties should consist of contacting the complainant for follow-up verification of the complaint, interviewing the complainant, and providing periodical updates to the complainant until the issues have been resolved. All submitted public complaints should be initially responded to within 24 hours of the complaint being submitted to PGPD.

B. **Establish an online complaint portal.** PGPD should establish an online public complaint form and/or portal should be established and placed on PGPD's homepage. The portal

---

[14] Eliminating expungement of the officer's record after the hearing allows for information to be made available to a defense attorney during the pre-trial discovery process. This allows for the officer's record including information regarding allegations that could not clearly be refuted or corroborated due to insufficient evidence (e.g., officer misconduct may occur out of public view or in locations where corroborating or refuting evidence cannot be collected). If the involved officer(s) were to transfer to another agency, that agency would not have access to non-sustained allegations of misconduct because they can currently be expunged.

should consist of an option for complaints to be submitted anonymously. Anonymous complaints (i.e. whistleblower complaints) should be tracked through the system internally.

**Recommendation 8: Improve the staff capacity of the PGPD Discovery Compliance Unit.**

A. **Hire appropriate staff.**[15] PGPD should appropriately staff the Discovery Compliance Unit to reduce the waiting time for body-worn and dash camera footage distribution in a case.

B. **Share footage across agencies.** Within 48 hours, PGPD should share body-worn and dash camera footage with other County agencies (e.g., State's Attorney's Office, Inspector General, Internal Affairs, and CCOP).

**Recommendation 9: Research and adopt a new internal data collection software system for PGPD.**

A. **Research and adopt effective data software systems.**[16] PGPD should work in collaboration with the Office of Information Technology in order to research and purchase a data software system that meets the needs of the department.

B. **Ensure system as interagency reporting capacities.** The system should allow for the input of data from several other agencies such as OHRM, the Inspector General (Office of Integrity and Compliance), and the Office of the State's Attorney.

C. **Analysis and staff support.** Analysis should be performed by relevant agencies, especially the Office of Integrity and Compliance and the CCOP. Additionally, PGPD staff should be reassigned to provide for reporting and tracking.

D. **Align with municipalities.** Prince George's County municipalities should be able to buy into the chosen data system for data alignment.

**Recommendation 10: Develop a user-friendly data dashboard for transparency in PGPD.**

A. **Create an interactive online platform for data transparency.** PGPD should develop an interactive website that allows the public to easily view and understand statistics about the Department, preferably on the PGPD website.

---

[15] The PGPD Discovery Compliance Unit supplies copies of body-worn and dash camera footage to the defense attorneys. Increasing staff should ensure there is no extreme amount of wait time for an attorney to receive footage copies of an incident.

[16] According to PGPD, it currently uses IAPro and only one person is tasked with managing the system. Regardless of whether PGPD continues to use the system, it needs to be upgraded and adequately staffed to meet the department's needs.

B. **PGPD shall post various data points online.** PGPD should maintain and host an online platform (e.g., dashboard) that include the following data:
   1. Use of Force statistics: date, time, location; race, ethnicity, age of resident and officer involved; and description of the incident.
   2. County Traffic Stops: date, time, location; race, ethnicity, age of the individuals in the car and the officer; reason for stop; Outcome (ticket, arrest, warning, etc.);
   3. Public records on settlements: everything besides the name of officers and victims;
   4. Collect, analyze, and release information about all police incidents involving shootings or death; and
   5. PGPD annual budget should be accessible from the PGPD web page.

**Recommendation 11: Develop modifications to the Maryland Public Information Act (MPIA) for body-worn camera footage.**

A. **Revise the MPIA.**[17] The County Executive should consider supporting legislation that would restructure the MPIA so that officer's discipline records are available with a timely request.

B. **Provide officer hearings.** The officer should have a hearing as to the decision on what discipline records are available depending on sustained or unfounded. None of the officer's personal information should be available.

**Recommendation 12: PGPD should pursue and acquire the Commission on Accreditation for Law Enforcement Agencies (CALEA) Certification.**[18]

A. **Acquire CALEA Certification.** PGPD should become a CALEA accredited department and include the public safety training academy and law enforcement accreditations for the benefit of improving upon the delivery of public safety services, primarily by maintaining a body of standards.

B. **Benefits of CALEA Certification.**[19]  CALEA establishes baseline standards for best practices by which to compare PGPD's policies and procedures to other police departments nationwide. Furthermore, CALEA accreditation improves PGPD's accountability and relationship with the community.

---

[17] Currently, an officer's disciplinary history is categorized under personnel records, and therefore, not available for MPIA requests.

[18] This recommendation is collaboration with the Independent Oversight, Compliance, and Integrity subcommittee.

[19] According to the Chief of Police presentation on September 3, 2020, PGPD was certified by CALEA in 2016, but lost its accreditation by failing to adhere to the data collection requirements by CALEA.

**Internal Policies and County Regulations Subcommittee Recommendations**

The Internal Policies and County Regulations subcommittee sought to ensure that Police Department directives reflect Prince George's County residents' desire for a transparent and community service-oriented police department.  Clear and defined guidelines governing officer tactics and conduct are needed to keep police and community member interactions civil and protect against ambiguity when misconduct occurs, thereby safeguarding community trust in the Police Department.

The Internal Policies and County Regulations subcommittee was tasked with addressing the following subject areas:
- Mission and vision
- Policies
- Practices and General Orders
- Use of force statue and complaints
- Gang units and registry
- Body cameras
- Officer tactics
- Prioritizing enforcement
- Traffic stops
- Municipalities
- Consent decrees

The committee met with the following organizations and/or entities:
- PGPD Body and Cruiser Camera Unit
- PGPD Gang Unit
- PGPD Compliance Coordination Unit

**Recommendation 1: PGPD should adopt General Orders to limit pre-textual stops to help decrease racial profiling.**[20]

    A. **Issue a General Order on vehicle infractions.** The County Executive should direct the Chief of Police to issue a General Order that motor vehicles with regulatory infractions, that are otherwise operating lawfully, will not be stopped.

    B. **Research alternative methods of notifications for vehicle infractions.** PGPD should consider other methods (e.g., mail, email, etc.) to notify the owner of the vehicle of the infraction and any other details related to the infraction.

    C. **Restrict consent searches.** Reduce frequency of consent searches by requiring officers to document that they have informed community members of their right to refuse, revoke, or consent to searches of their vehicles.

---

[20] Currently, PGPD is required to maintain "a policy against race–based traffic stops that is to be used as a management tool to promote nondiscriminatory law enforcement and in the training and counseling of its officers," MD Code Ann., Transportation § 25-113(g)(1).

D. Warrants, training, and reporting. Search warrants should be sought whenever possible prior to vehicle searches. Comprehensive training on best practices for stops, searches, and arrests should also be provided. When vehicles are stopped, detailed reports should be submitted as soon as possible.

**Recommendation 2: Remove racial biases from the gang and criminal organization registry, and update policies and procedures.[21]**

The Chief of Police is to develop a procedure to ensure the accuracy of information concerning gang and criminal organization membership, before a name is placed on the registry. The Chief of Police is also to develop a procedure to remove a name from the registry after a period of time or because of another appropriate circumstance.

**Recommendation 3: Reform PGPD no-knock and night-time search warrant policies and procedures.**

A. **Revise no-knock and night-time search warrant protocols.** All no-knock warrants should be carried out by the PGPD Swat Team. PGPD should limit their search warrants during the night-time. There should be a heavy preference for day-time search warrants. The timing of the execution of the search warrant should be discussed with the State's Attorney. Night-time searches should require additional justification beyond the probable cause of a day-time search.

B. **Review process for no-knock search warrant.** More scrutiny should be required before entering a home. Therefore, before a no-knock warrant is presented to the State's Attorney for review or to the Court for issuance, it should be approved by the Chief of Police or his high-ranking designee. If the Chief of Police or designee believe an individual represents a threat to the community and a no-knock warrant can be justified, PGPD and the State's Attorney should plan how the no-knock warrant should be executed.

**Recommendation 4: Establish a cross-jurisdictional use of force training and coordination protocols for incidents.**

A. **Facilitate a coordinated response to incidents that might involve multiple agencies.** Police departments and agencies in Prince George's County should facilitate a coordinated response to incidents that might involve multiple agencies. The Chief of Police should work in conjunction with the County municipal police departments to develop coordinated protocols for cross-jurisdictional incidents; develop a uniform use of force training; and develop one use of force policy. Police departments and agencies in Prince George's

---

[21] During Work Group meetings, concerns arose that people unaffiliated with gangs or other criminal organizations were being added to the gang unit registry. It remains unclear how individuals can remove their names from the database. Moreover, Work Group members noted their apprehension that alleged gang affiliation could be inappropriately influenced by individuals' race, ethnicity, or community and could be used in subsequent criminal or immigration proceedings.

County should facilitate a coordinated response to incidents that might involve multiple agencies.

B. **Submit and present an annual use of force report.** The Chief of Police should submit a use of force report to the County Executive and Prince George's County Council and publicly present the report annually.

C. **Enhance Supervisory Training.** First-time supervisors should be required to patrol with their subordinate officers and regularly counsel inexperienced officers during the new officers' probationary period.

**Recommendation 5: Improve access and operations of all PGPD cameras (e.g., body-worn cameras, interrogation room cameras, dash cameras, and in-car cameras).**

A. **Ensure PGPD cameras are properly working.** PGPD is in the process of supplying body-worn cameras, especially to patrol officers. Ensure that the body-worn cameras are in good working order and used at the appropriate times. PGPD should also take steps to address problems with dash cameras and interrogation room cameras.

B. **Improve access to PGPD camera footage.** PGPD should ensure that the individual in the camera footage will have access upon request under the Maryland Public Information Act (MPIA). PGPD should provide camera footage to family members to watch, but not for release.

**Recommendation 6: Implement and emphasize policies and training to prevent racially biased policing in PGPD.**

A. **Revise policy to prohibit officers from using race, ethnicity, or national origin to determine reasonable suspicion or probable cause.** PGPD should adopt or update policies stating that officers may not use race, ethnicity, or national origin in determining reasonable suspicion or probable cause, unless these factors are used as part of a suspect's description.

B. **Establish policies that prohibit officers from ignoring or condoning biased policing.** PGPD should develop policies that prohibit officers from ignoring or condoning biased policing. PGPD must require officers to report incidents in which they observe or are aware of other officers who have engaged in biased policing.

33

**Recommendation 7: Increase access to Internal Affairs documents with the Prince George's County State's Attorney's Office (SAO).**[22]

A. **Develop a memorandum of understanding (MOU).** A MOU should be created between all law enforcement agencies in Prince George's County (LE), the Prince George's County State's Attorney's Office (SAO) and the Prince George's County Office of Law (OOL). Pursuant to the MOU, all LE should immediately notify the SAO-assigned prosecutor of any misconduct charges that exist. The SAO will then work with the OOL to determine any and pertinent records that should be provided to defense counsel under the SAO discovery obligations.

B. **Sign a use agreement.** If there are any records that should be disclosed, the SAO will require defense counsel to sign a use agreement that limits how the LE records may be used and prohibit any further disclosure of the information contained in the records. Once that agreement is signed, defense counsel will be permitted to review the records and take any necessary notes. The SAO will not provide copies, nor permit copies of the records from being made.

**Recommendation 8: Improve professional interactions between PGPD and the community by providing business cards on routine traffic stops and during other interactions with community members.**

A. **Distribute uniformed business cards department wide.** PGPD should provide uniformly consistent business cards to the officers so that the public knows the name of the officer and how to reach them for complaints and praise.

B. **Design universal PGPD business cards.** PGPD should design universal business cards. The front of the card should have identifiable information about the officer in the field. The back of the card should contain methods for complaints or compliments as well as recruitment efforts.

C. **Maintain connections.** PGPD should create mandatory business cards. PGPD should provide these cards to all officers. PGPD should require that all officers provide their business cards to individuals they have had contact with, no matter the circumstance or degree of the crime.

**Recommendation 9: Establish a robust "customer service" campaign.**

A. **Establish a customer service policy.** PGPD should create a broad policy surrounding treatment of County residents banning the use of profanity and establishing common respect standards.

---

[22] *Brady v. Maryland*, 373 U.S. 83 (1963) requires exculpatory or impeaching evidence that is material to the guilt or innocence or punishment of a defendant to be disclosed by the prosecution. Lapses in communication between PGPD and the SAO may prevent the disclosure of impeaching information in an officer's personnel file that could result in *Brady* violations that reverse convictions for serious crimes.

B. **Emphasize professional language.** PGPD should ban all culturally insensitive language within its internal and external communications.

**Recommendation 10: Stop all references of "paramilitary organization" within PGPD.**

Stop referring to PGPD as a paramilitary organization and utilize more inclusive language to address County residents and visitors.[23]

**Recommendation 11: Prince George's County Council should establish a county-wide use of force statute.**

A. **Establish a duty-to-intervene policy.** The County Council should establish a duty-to-intervene on the part of law enforcement agents who witness excessive force "beyond what is objectively reasonable." Require officers to administer medical assistance to people injured because of an interaction with the police.

B. **Require supervisor presence.** The County Council should require supervising officers to respond to the scene when a law enforcement agent has used physical forces that result in the injury or death of a civilian. Order that all instances where force is used must be documented.

C. **Adopt policy for supervisory review.** The County Council should require that the Department adopt a written policy requiring supervisory review of use of force incidents.

D. **Mandate and document required training (e.g., use of force and less lethal force training).** The County Council should require officers to undergo training that would teach them skills they could use in the field that are less likely to lead to death or serious injury. The County Council should order law enforcement agents to sign a document following completion of their training signifying that they understand and will comply with the use of force statute.

E. **Define parameters for use of deadly force.** The County Council should specify that officers may use only deadly force in the face of an imminent threat that may lead to the death or serious injury of themselves.

F. **Develop a moving vehicle policy.** The County Council should establish a policy that bans shooting at moving vehicles unless they are being used as a weapon.

**Recommendation 12: Require extensive training for use of flash bang.**

Limit the use of flash bangs and provide more extensive training.[24]

---

[23] The police and the military serve radically different functions. Many community members view the police as "an occupying force" rather than a fellow stakeholder in building better and stronger communities. Talking about PGPD in militaristic terms exacerbates the problem.

[24] In situations where de-escalation is critical, flash bangs can be extremely counterproductive, (e.g., in situations involving individuals suffering from certain mental health issues, flash bangs can aggravate situations that might

**Recommendation 13:  Consider the feasibility of transfer of traffic enforcement.**

To reduce the possibility of racially biased traffic stops, Prince George's County should seek state legislation to enable moving additional traffic enforcement authority from PGPD to the Prince George's County Revenue authority, however, the County should study the feasibility of implementation.

**Recommendation 14: Update the PGPD Use of Force policy in the General Orders.**

A. **Revise the use of force policy in the General Orders.**  PGPD should update their General Order on the use of force policy.

B. **Adopt recommended language for General Orders.** PGPD should adopt the recommended language for the revised use of force policy:
"Officers, in carrying out their duties, shall apply nonviolent means, when possible, before resorting to the use of physical force. An officer may use physical force only if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of serious bodily injury or death to the officer or another person.  When physical force is used, an officer shall: (a) not use deadly physical force to apprehend a person who is suspected of only a minor or nonviolent offense; (b) use only a degree of force consistent with the minimization of injury to others; (c) ensure that any identified relatives or next of kin of persons who have sustained serious bodily injury or death are notified as soon as practicable.

An officer is justified in using deadly physical force to make an arrest only when all other means of apprehension are unreasonable given the circumstances and: (a) the arrest is for a felony involving conduct including the use or threatened use of deadly physical force; (b) the suspect poses an immediate threat to the officer or another person; (c) the force employed does not create a substantial risk of injury to other persons.

An officer shall identify himself or herself as a police officer and give a clear verbal warning of his or her intent to use firearms or other deadly physical force, with sufficient time for the warning to be observed, unless to do so would unduly place officers at risk of injury, would create a risk of death or injury to other persons. An officer is justified in using deadly force if the officer has an objectively reasonable belief that a lesser degree of force is inadequate and the peace officer has objectively reasonable grounds to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving serious bodily injury."

---

already be dangerous). *City of Canon, Ohio v. Harris*, 489 U.S. 378 (1989) states, "Failure to train may be fairly said to represent a policy for which a municipality is responsible and for which it may be held liable where injury results, if in light of the duties assigned to specific officers, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the municipality can reasonably said to have been deliberately indifferent."

**APPENDIX A**

**July 22, 2020 Listening Session Questions and Comments**

On July 22, 2020, for its first official meeting, the Police Reform Work Group hosted a listening session to hear Prince George's County community members' suggestions and concerns regarding public safety. For this initial listening session, approximately 434 community members attended and provided comments. Below is a sampling of some of the comments offered by County community members.

*Adrea B.:* Would it be beneficial for the community and Police Department if police officers patrolled their own neighborhoods? Is there any way to provide an incentive for police to move in the neighborhoods they patrol? Some sort of buying discount or tax cut from the state. I believe that will strengthen the relationship police will have with their Community. Then it no longer becomes the police and the community. It becomes the police and *their* community. Thank you and blessings to all. I pray we all make a blessed impact.

*Ashleigh B.:* As we know, minority neighborhoods across the country are heavily policed. When we think about police operations, use of force, hiring, and training, these are all areas that need reviewing and adjusting. However, when police officers are given (correct me if I'm wrong) quotas to meet each month, the outcome is minorities being targeted. Quotas for tickets and arrests are a big source of income for police. What changes can be made to the monthly quota system to protect minorities from being targeted?

*Ashley M.:* We have seen how positive it is for communities to be involved in keeping each other safe. What will this working group do to strengthen civilian review boards and establish a uniform community member complaint process that would require complainants to receive a copy of the investigative file and prior complaints filed against an officer?

*Darryl W.:* Will there be a community review board to examine officers that operate outside their authority that has subpoena power?

*Ellen R.:* I am calling for this workgroup to investigate and recommend transformative changes for and reductions to the Prince George's County Police Department. I would like to see the role of police officers addressed through this working group. This work group needs to look at how to shift responsibilities and funding from the police to other departments and agencies.

*Eric D.:* (1) During the hiring phase, as part of the psychological profile, will it now cover a questionnaire that can identify traits of racism? (2) During internal investigations, when a particular officer has been identified as a respondent, will the investigator be allowed to identify any senior officials that knew or should have known about the misconduct and be charged with such infractions? (3) Examine use of force training policies, train each officer to be accountable for each other, and maintain that a failure to take action will result in disciplinary action. (4) It should be a priority to get first responders body cameras and vehicle dash cameras, along with the proper maintenance program, to eliminate the excuse of, "it isn't working!" (5) Are mid-level managers being mentored properly, if at all?

*Fai N.:* It appears the county may redirect funds from police budget to youth jobs, health initiatives, and damages for those who have suffered discrimination? If so, what industries can the county look forward to entering?  What does the training for unarmed community professionals look like with the new policing task force?  What are the steps to be involved for those of interest to law enforcement?

*Heather C.:* Incremental reforms such as adding new training requirements and pieces of equipment have not made us any safer. I am calling for this workgroup to investigate and recommend transformative changes for and reductions to the Prince George's County Police Department. One area I would like to see addressed through this workgroup is how to put a plan in place to reduce the size and scope of the County police department by shifting resources from police/policing to community services such as mental health support and social services.

*Ibrahim A.:* There has been a lot of recent attention paid to the idea that as crime has generally decreased nationwide police budgets have not. Per a recent Politico article on the subject, "Since 1995, the year after the landmark national crime bill went into effect, the U.S. homicide rate has dropped by a third. Police spending per capita, however, has increased by 46 percent nationally — and in some cities, by far more." Currently, the County has allocated roughly $361 million from the general fund to the Police Department, $5.9 million to the Department of Family Services and $6 million to the Department of Social Services. Is there any discussion/planning into placing more resources into the root causes of crime, broken families, children and individuals versus jailing and arresting them after the die has been cast?

*Kay M.:* Our neighborhood police officers seem to change every few months--we almost never know who they are or how to contact them. Is there a way to assign the police in certain neighborhoods for a year or more and let neighbors know who they are and how to contact them when another person is assigned to the neighborhood?  Currently, there is no continuity in this regard.

*Margaret B.:* What provisions are you going to put in place that will make our Black residents feel safer from police violence?  What kinds of measures are you going to take to de-escalate situations where alcohol, drugs, or domestic violence are involved; where the use of a counselor or mediator would be better than putting someone in jail?  What new training will be instituted to lower the arrest rates of Black people in our county?

*Naomi S.:* Do you believe that fostering trust between the community and the police department is integral to the success of the police department?  If so, how do you plan on building this trust?  How can our County be assured that you have our best interest at heart as a community?  What programs and ideas do you have that will expressly benefit the community instead of alienating community trust?  What are some key values you believe are important to be a chief of police?  If you were faced with officers guilty of murdering a civilian like in the George Floyd situation, how would you deal with it?  There are two universities in Prince George's County, one is a PWI, the other is an HBCU. How would you ensure that the police interactions at these universities are equal and not marred by racism?  It is easy to stand in front of a crowd and declare oneself "not racist." It is harder to take actions that support that. How do you hope to foster equality not only

within your organization, but among the community as well?  Do you plan on integrating de-escalation tactics in your method of policing?  If so, how?  If not, why not? Without such, how do you plan to keep the community from being antagonized by police?

**Nicole L.:** Will reform include integrating mental health and de-escalation training for police - in and after they complete academy training?  Will there be an increase in Crisis Intervention Officers (CIOs) on each shift?   Will a review of the candidate's record include community impact as well as department morale?  Has s/he been an innovator or status quo chief?

**Penny C.:** Is there a committee or a way of keeping track of an officer's negative dealings/complaints with the public and if an officer has several complaints from the public what is done about it? How often is an officer's record checked for complaints?

**Peter B.:** As a former law enforcement officer for the State of Maryland and a retired federal investigator, I have legitimate concerns regarding hiring practices for police recruits, appropriate training, internal affairs investigation process and defunding of any law enforcement agency that ultimately puts the agency personnel and the members of the community/ jurisdiction they are sworn to protect at a higher risk.

**Ronald C.:** Will the core and advanced training doctrines for police officers be examined by an ethics review committee to determine what systemic ideological tactics require reform?

**Sheila B.:** How will you ensure that 911 calls, which indicate someone is in mental crisis, gets a mental health response rather than an armed police response?  Do we currently have mental health provider assets within the police department who are trained to de-escalate situations rather than the use of blunt force?

**Vanessa M.:** Police uniforms should not be complimented by a gun by default. When responding to a nonviolent inquiry or call, officers should not be allowed to bring a gun. If an officer draws a weapon, the supervisor should get a written report to provide justification that is filed and reviewed yearly. Resisting arrest law should be revisited and redefined.

**November 5, 2020 Listening Session Questions and Comments**

On November 5, 2020, the Police Reform Work Group held a final listening session to close out its public meetings before deliberating and voting on its recommendations. Seventy-six County community members responded. Below is a sampling from some of the comments offered during that final session.

***Jonathan H.:*** How can we reform and strengthen the CCOP, along with full transparency to the County's historical and present involvement and engagement with the DOD's 1033 program?

***Linda G.:*** Would like to see resources devoted to alternative systems besides policing. The American Public Health Association's position on policing and prisons is that they are largely counterproductive, do not solve problems, and should be replaced. A small part of the problem is that police (SROs) can be removed from schools in Prince George's County and more money should be spent on staff such as nurses, counselors, social workers.

***Richard E.:*** Can Prince George's County implement local decertification of police officers, and will the County Council, State's Attorney, and County Executive support a repeal of LEOBOR?

***Keith C.:*** Is every officer given a rotation from fieldwork to desk work regularly to combat natural trauma, with required counseling sessions caused by field work?  Is there a separate training for dealing with substance abuse and mental illness while in the field to prevent fatal encounters with individuals?  Are police officers taught to use their tasers as a first line of defense in an altercation and their service weapon as a last line of defense?  If so, are there ways to have accountability for those not following protocol?

***Shameka S.:*** It is my professional and clinical recommendation that officers receive specific training on cognitive and communication disorders awareness (autism, down syndrome, traumatic brain injuries, etc.) and how to de-escalate situations. Crisis intervention training does not address this, and mental health illnesses are not the same thing and manifest differently. In Prince George's County, an officer is just as likely to encounter an individual with a cognitive and communication disorder as they are a mental health impairment.

***Margaret B.:*** I want to know if there will be additional training, so the officers are not in a kill mode any time they receive a non-emergency call, but in de-escalation mode, especially when they first encounter a person of color. Aggression often is only met with aggression when what is needed is a return to "Officer Friendly" and the use of counselors for both the police and the drug addicts or disturbed people who have been upset by the current climate and various circumstances in their lives. We need to be more in touch with the community that we serve.

***Rodney:*** I feel that the way police sit in restaurants and/or park their cruisers in front of restaurants is over policing and a form of intimidation and racism. It also makes people uncomfortable when they dine out with their families and or friends. It sends the message that it is not safe to eat at these places without a high police presence in and around the restaurants. It also makes people feel like they are being watched for no reason, like they are criminals who need to be watched. It causes stress in the communities to know all over Prince George's County including the National Harbor,

40

you are made to feel like a criminal by just dining out or wanting to walk around places to enjoy the day or night with family and friends. I think it also deters other prominent businesses from wanting to open locations here because wherever people dine there is a heavy, intimidating police presence as if the County is always under martial law or patrolled like a prison. Why can't there be presence without making people feel uncomfortable or like they are criminals in a way to be seen but not overwhelming? Why do you need to have police inside restaurants staring at patrons and watching them as they walk out? It really puts everyone on edge, and it doesn't make people feel safer. It makes people angry, paranoid, and made to feel like criminals.

**Victor K.:** With respect to the Prince George's County Police Department's hiring practices, I believe that the Citizen Complaint Oversight Panel should be revised to also have a role in hiring decisions. Prospective officers should have to interview with a new civilian oversight board and receive a favorable recommendation from the board before joining the Department. The civilian oversight board should be composed of people from all walks of life, including mental health experts, social justice advocates, teachers, and former offenders. In addition, the Department should not be allowed to hire any officers who have been fired by any other police departments due to use-of-force or dishonesty issues. These changes may help prevent problematic individuals from even being hired by the Department. With respect to mental health crises, 911 dispatchers should assign calls related to mental health, substance abuse, or homelessness to a police officer and a mental health professional who are paired up in a patrol car. Similar programs have been adopted in California and Colorado. In addition, police officers should be required to intervene when other officers use excessive force. Officers should also be required to undergo psychological exams every two years. With respect to police misconduct, the new civilian oversight board should be able to fire police officers itself. Police misconduct should also be investigated and prosecuted by independent prosecutors. Police officers should also be forced to have professional liability insurance, so that taxpayers do not have to pay police brutality lawsuit settlements. Within the next five years, the Department's budget should also be reduced by 50%, and the newly freed funds should instead be spent on education, jobs training, housing, and mental health services. These new investments should attract new businesses to the county and improve the quality of life for county residents.

**Blake F.:** I want to recommend a citizen review board that has meaningful power to review use of force by police. Appointed by the County Executive with the authority to assert corrective action up to termination of officers, with referrals to the State's Attorney in worst case situations. But also, the power/authority to commend and recognize officers who go above and beyond, so it is not just a punitive body. Perhaps even an "officer of the year" recognition by that board which carries a small bonus.

**John H.:** Police should be better trained to handle all types of situations with empathy and understanding, especially since they're often meeting people when they're having their worst day. Their actions should be to "serve and protect," since compassionately serving the community - a community in which they should live - should always come first. They shouldn't, however, be expected to be experts at everything. We ask too much of our officers. Just like there's SWAT, for example, police need to have a rapid response mental health division that's staffed by educated mental health experts who become cops instead of bringing in cops with more weapons training than coursework on mental health. We expect officers to be jacks of all trades, and training in all

41

areas is a good thing since they're first responders, but departments should make a concerted effort to have experts on staff 24/7 that can diffuse the situation instead of escalating it, as many times it's the officer who creates the sometimes-deadly situation. Officers who fully understand when someone's having a mental health crisis and search for words instead of finding their taser or gun. Cops who understand the fear of Black and brown people, especially children and teens, and can set them at ease instead of creating another generation of people who fear the police. Officers who understand that true crime prevention - which should be the metric by which officer success is measured instead of only arrest and convictions - starts with community relations. True leaders create leaders. Police are leaders of their communities, and their success should be measured by the number of doctors they help raise instead of the number of convicts they help create. Serve first.

# APPENDIX B

## Police Department Organizational Charts

Office of the Chief of Police



Bureau of Patrol



Bureau of Investigations



Bureau of Administration and Homeland Security



Bureau of Forensic Science and Intelligence



## APPENDIX C

## PGPD Use of Force Data

Most Frequent Use of Force Types

| Allegation | 2018 | 2019 | 2020 | Totals |
|---|---|---|---|---|
| Total UOF Reviews | 658 | 869 | 555 | 2,082 |
| Take-Downs | 491 | 697 | 396 | 1584 |
| Control Holds | 14 | 258 | 259 | 531 |
| Tactical Baton | 26 | 20 | 10 | 56 |
| Strikes/Kicks/Punches | 166 | 347 | 178 | 691 |
| Taser | 123 | 164 | 125 | 412 |
| OC Spray | 24 | 33 | 20 | 77 |
| Vehicle Extraction | 24 | 19 | 33 | 76 |
| Joint Manipulation | 19 | 230 | 199 | 448 |
| Hobble Strap | 14 | 54 | 53 | 121 |
| Grabbed | 12 | 220 | 203 | 435 |
| Escort Techniques | 2 | 72 | 94 | 168 |
| Pressure Points | 5 | 31 | 11 | 47 |
| **Total types of force** | **920** | **2145** | **1581** | **4646** |

*Total types of force can include multiple types of force per review.*
*\*From Internal Affairs Division Report received on December 1, 2020*

An analysis of the types of force used from 2018- August 31, 2020 shows an increase in overall Use of Force reviews. This trend coincides with a change in policy regarding UOF. The standard threshold for documenting a UOF was amended to include any physical contact with a citizen to gain compliance, regardless of how minor the force appeared on its face.

Based on the change in reporting requirements and subsequent supervisor training the department has seen an increase in force such as control holds, escort techniques, and grabs, that would not have been documenting under the former policy.

Takedowns continue to be the most common use of force.
- Out of 2082 UOF reviews from 2018 to August 31, 2020 1584 involved a takedown (76.08%)

Strikes accounted for the 2nd most common use of force.
- Out of 2082 UOF reviews from 2018 to August 31, 2020 691 involved strikes (33.03%)[25]

Control holds accounted for the 3nd most used technique (33.03%)
- Out of 2082 UOF reviews from 2018 to August 31, 2020 531 involved a control hold (25.5%)

---

[25] A pattern of increased use of strikes from 2018 to 2019 was identified and additional training was implemented. As of August 31, 2020, there appears to be a downward trend in use of strikes and an increased use of control holds, grabs and, escort techniques.

Departmental Shootings by Year (2018-Present)[26]

| Allegation | 2018 | 2019 | 2020 |
|---|---|---|---|
| Fatal Shootings | 5 | 1 | 0* |
| Contact Shootings | 2 | - | 1 |
| Non-contact Shootings | 2 | 3 | 2 |
| Armed w/Firearm | 8 | 1 | 3 |
| Individual Fired at Officer | 5 | - | 3 |
| Armed w/Knife | - | 1 | - |
| Unarmed | 1 | - | - |
| Vehicle accelerated toward Officer | - | 2 | - |
| **Total Departmental Shootings** | **9** | **4** | **3** |

*From Internal Affairs Division Report received on December 1, 2020*

An analysis of the departmental shooting data from 2018-2020 shows that out of the 16 total shootings:

- 12 out of 16 involved individuals that were armed with a handgun (75%)
- 8 out of 16 involved individuals that shot at the Officers (50%)
- 2 out of 16 involved vehicles accelerating toward Officers (12.5%)
- 1 out of 16 involved an unarmed individual (6.25%)
- 1 out of 23 total individuals were unarmed (4.34%)

---

[26] The homicide investigation involving Cpl. Michael Owen was not included as a fatal departmental shooting and was classified as murder.

## APPENDIX D

### Calls for Service and Crime Statistics

**Calls for Service**

| | 2018 | | 2019 | | 2020 (Jan 1-Aug 31) | |
|---|---|---|---|---|---|---|
| | **Count** | **%** | **Count** | **%** | **Count** | **%** |
| PGPD Calls for Service | 522,698 | 100.00 | 530,393 | 100.00 | 305,622 | 100.00 |
| Traffic Stops | 102,933 | 19.69 | 102,425 | 19.31 | 20,200 | 6.61 |
| Subject Stops | 16,613 | 3.18 | 18,213 | 3.43 | 6,238 | 2.04 |
| Arrests | 9, 130 | 1.75 | 9, 015 | 1.70 | 3,253 | 1.06 |
| Emergency Petition Services (EPS) | 1,240 | 0.24 | 1,056 | 0.20 | 589 | 0.19 |
| Use of Force Reviews | 658 | 0.13 | 869 | 0.17 | 555 | 0.18 |
| Internal Affairs Division Cases | 147 | 0.03 | 171 | 0.03 | 110 | 0.04 |
| Excessive/Unnecessary Force Cases | 48 | 0.01 | 69 | 0.01 | 54 | 0.02 |

*All percentages are a comparison of the line item to the calls for service total for that year*
*From Internal Affairs Division Report received on December 1, 2020*

- Calls for Service by Calendar Year – PGPD only
  - CY2016                       556,715
  - CY2017                       594,328
  - CY2018                       522,698
  - CY2019                       530,393
  - January 1 through June 30, 2020      223,356

**Violent Crimes**
- Violent crimes include homicide, forcible rape, robbery (commercial, residential, citizen), carjacking, and assault.
  - CY2016                       2,868
  - CY2017                       2,700
  - CY2018                       2,390
  - CY2019                       2,174
  - January 1 through June 30, 2020      1,019

**Property Crimes**
- Property crimes include burglary (commercial, residential, other), all thefts and stolen vehicles.
  - CY2016                       14,707
  - CY2017                       15,233
  - CY2018                       13,706
  - CY2019                       10,998
  - January 1 through June 30, 2020      5,492

50

Arrests per Uniform Crime Statistics (UCR)*

| | 2020 (Until June) | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|
| Murder/ Manslaughter | 31 | 49 | 57 | 38 | 41 |
| Negligent Manslaughter | 0 | 1 | 0 | 0 | 1 |
| Rape | 18 | 35 | 65 | 21 | 23 |
| Robbery | 132 | 321 | 302 | 196 | 213 |
| Aggravated Assault | 141 | 292 | 288 | 307 | 357 |
| Other Assaults | 383 | 962 | 901 | 680 | 672 |
| Burglary | 74 | 90 | 183 | 283 | 205 |
| Larceny/Theft | 288 | 717 | 803 | 944 | 1,017 |
| Motor Vehicle Theft | 76 | 108 | 137 | 231 | 145 |
| Arson | 0 | 1 | 1 | 1 | 2 |
| Curfew/Loiter Violation | 3 | 2 | 10 | 5 | 10 |
| Disorderly Conduct | 315 | 664 | 627 | 590 | 487 |
| Driving Under Influence | 310 | 668 | 652 | 483 | 590 |
| Drug Related | 569 | 1142 | 1,257 | 1,478 | 1,311 |
| Drunkenness | 0 | 21 | 34 | 42 | N/A |
| Embezzlement | 5 | 15 | 5 | 0 | 18 |
| Family/Child Offense | 6 | 8 | 22 | 15 | 10 |
| Forgery/Counterfeit | 5 | 20 | 17 | 22 | 31 |
| Fraud | 16 | 45 | 50 | 44 | 78 |
| Gambling | 2 | 1 | 7 | 0 | 3 |
| Human Trafficking/Sex Acts | 0 | 5 | 3 | 4 | N/A |
| Human Trafficking/Involuntary | 1 | 1 | 2 | 1 | N/A |
| Liquor Law Violations | 3 | 31 | 69 | 85 | 288 |
| Prostitution/Vice | 60 | 231 | 161 | 253 | 109 |
| Sex Offenses | 13 | 83 | 85 | 52 | 18 |
| Stolen Property | 97 | 137 | 174 | 24 | 103 |
| Vandalism | 113 | 219 | 179 | 152 | 149 |
| Weapons | 349 | 550 | 488 | 523 | 436 |
| Other Offenses | 386 | 828 | 798 | 876 | 941 |

*Data collected on July 29, 2020*

## APPENDIX E

### Police Department Employment Data

**Police Department Employment Data All Employees by Race and Gender for 2020***

| Total Employees | Employee Count | | |
|---|---|---|---|
| Race/Gender | Civilian | Sworn | Grand Total |
| American Indian/Alaskan Native | 1 | 2 | 3 |
| ● Female | 1 | 1 | 2 |
| ● Male | | 1 | 1 |
| Asian | 10 | 57 | 67 |
| ● Female | 5 | 3 | 8 |
| ● Male | 5 | 54 | 59 |
| Black/Not Hispanic origin | 191 | 661 | 852 |
| ● Female | 152 | 132 | 284 |
| ● Male | 39 | 529 | 568 |
| Hispanic | 12 | 162 | 174 |
| ● Female | 7 | 20 | 27 |
| ● Male | 5 | 142 | 147 |
| Native Hawaiian/Pacific Island | | 2 | 2 |
| ● Male | | 2 | 2 |
| White/Not Hispanic origin | 112 | 653 | 765 |
| ● Female | 65 | 67 | 132 |
| ● Male | 47 | 586 | 633 |
| Other | | 1 | 1 |
| ● Male | | 1 | 1 |
| Grand Total | 326 | 1538 | 1864 |

*Data collected on July 29, 2020

**All Employees by Race and Gender as a Percent of Civilian and Sworn for 2020\***

| Total Employees | Employee Count | | |
|---|---|---|---|
| Race/Gender | Civilian | Sworn | Grand Total |
| American Indian/Alaskan Native | 0.31% | 0.13% | 0.16% |
| ● Female | 0.31% | 0.07% | 0.11% |
| ● Male | 0.00% | 0.07% | 0.05% |
| Asian | 3.07% | 3.71% | 3.59% |
| ● Female | 1.53% | 0.20% | 0.43% |
| ● Male | 1.53% | 3.51% | 3.17% |
| Black/Not Hispanic origin | 58.59% | 42.98% | 45.71% |
| ● Female | 46.63% | 8.58% | 15.24% |
| ● Male | 11.96% | 34.40% | 30.47% |
| Hispanic | 3.68% | 10.53% | 9.33% |
| ● Female | 2.15% | 1.30% | 1.45% |
| ● Male | 1.53% | 9.23% | 7.89% |
| Native Hawaiian/Pacific Island | 0.00% | 0.13% | 0.11% |
| ● Male | 0.00% | 0.13% | 0.11% |
| White/Not Hispanic origin | 34.36% | 42.46% | 41.04% |
| ● Female | 19.94% | 4.36% | 7.08% |
| ● Male | 14.42% | 38.10% | 33.96% |
| Other | 0.00% | 0.07% | 0.05% |
| ● Male | 0.00% | 0.07% | 0.05% |
| Grand Total | 100% | 100% | 100% |

**\****Data collected on July 29, 2020*

53

**Number of Sworn Employees by Rank, Race, and Gender for 2020***

| Employee Count | By Rank | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Race/Gender | Interim Chief of Police | Deputy Chief | Police Major | Police Captain | Police Lieutenant | Police Sergeant | Police Corporal | Police Officer First Class | Police Officer | Grand Total |
| American Indian/Alaskan Native | | | | | | 1 | 1 | | | 2 |
| ● Female | | | | | | 1 | | | | 1 |
| ● Male | | | | | | | 1 | | | 1 |
| Asian | | | 1 | | 6 | 3 | 37 | 4 | 6 | 57 |
| ● Female | | | | | 1 | | 1 | | 1 | 3 |
| ● Male | | | 1 | | 5 | 3 | 36 | 4 | 5 | 54 |
| Black/Not Hispanic origin | | 2 | 9 | 6 | 25 | 84 | 369 | 81 | 85 | 661 |
| ● Female | | | 3 | 1 | 7 | 15 | 82 | 11 | 13 | 132 |
| ● Male | | 2 | 6 | 5 | 18 | 69 | 287 | 70 | 72 | 529 |
| Hispanic | 1 | | 2 | | 5 | 11 | 92 | 16 | 35 | 162 |
| ● Female | | | | 1 | 1 | | 9 | 2 | 7 | 20 |
| ● Male | 1 | | 2 | | 4 | 10 | 83 | 14 | 28 | 142 |
| Native Hawaiian/Pacific Island | | | | | | | 2 | | | 2 |
| ● Male | | | | | | | 2 | | | 2 |
| Other | | | | | | | 1 | | | 1 |
| ● Male | | | | | | | 1 | | | 1 |
| White/Not Hispanic origin | | 2 | 13 | 25 | 56 | 104 | 328 | 68 | 57 | 653 |
| ● Female | | 1 | 2 | 5 | 3 | 11 | 35 | 5 | 5 | 67 |
| ● Male | | 1 | 11 | 20 | 53 | 93 | 293 | 63 | 52 | 586 |
| Grand Total | 1 | 4 | 25 | 31 | 92 | 203 | 830 | 169 | 183 | 1538 |

*Data collected on July 29, 2020*

**Sworn Employees by Rank, Race, and Gender displayed as a Percentage of Rank Total for 2020\***

| Employee Count | By Rank | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Race/Gender | Interim Chief of Police | Deputy Chief | Police Major | Police Captain | Police Lieutenant | Police Sergeant | Police Corporal | Police Officer First Class | Police Officer | Grand Total |
| American Indian/Alaskan Native | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.49% | 0.12% | 0.00% | 0.00% | 0.13% |
| ● Female | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.49% | 0.00% | 0.00% | 0.00% | 0.07% |
| ● Male | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.12% | 0.00% | 0.00% | 0.07% |
| Asian | 0.00% | 0.00% | 4.00% | 0.00% | 6.52% | 1.48% | 4.46% | 2.37% | 3.28% | 3.71% |
| ● Female | 0.00% | 0.00% | 0.00% | 0.00% | 1.09% | 0.00% | 0.12% | 0.00% | 0.55% | 0.20% |
| ● Male | 0.00% | 0.00% | 4.00% | 0.00% | 5.43% | 1.48% | 4.34% | 2.37% | 2.73% | 3.51% |
| Black/Not Hispanic origin | 0.00% | 50.00% | 36.00% | 19.35% | 27.17% | 41.38% | 44.46% | 47.93% | 46.45% | 42.98% |
| ● Female | 0.00% | 0.00% | 12.00% | 3.23% | 7.61% | 7.39% | 9.88% | 6.51% | 7.10% | 8.58% |
| ● Male | 0.00% | 50.00% | 24.00% | 16.13% | 19.57% | 33.99% | 34.58% | 41.42% | 39.34% | 34.40% |
| Hispanic | 100.00% | 0.00% | 8.00% | 0.00% | 5.43% | 5.42% | 11.08% | 9.47% | 19.13% | 10.53% |
| ● Female | 0.00% | 0.00% | 0.00% | 0.00% | 1.09% | 0.49% | 1.08% | 1.18% | 3.83% | 1.30% |
| ● Male | 100.00% | 0.00% | 8.00% | 0.00% | 4.35% | 4.93% | 10.00% | 8.28% | 15.30% | 9.23% |
| Native Hawaiian/ Pacific Island | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.24% | 0.00% | 0.00% | 0.13% |
| ● Male | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.24% | 0.00% | 0.00% | 0.13% |
| Other | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.12% | 0.00% | 0.00% | 0.07% |
| ● Male | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.12% | 0.00% | 0.00% | 0.07% |
| White/Not Hispanic origin | 0.00% | 50.00% | 52.00% | 80.65% | 60.87% | 51.23% | 39.52% | 40.24% | 31.15% | 42.46% |
| ● Female | 0.00% | 25.00% | 8.00% | 16.13% | 3.26% | 5.42% | 4.22% | 2.96% | 2.73% | 4.36% |
| ● Male | 0.00% | 25.00% | 44.00% | 64.52% | 57.61% | 45.81% | 35.30% | 37.28% | 28.42% | 38.10% |
| **Grand Total** | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

*\*Data collected on July 29, 2020*

55

**Executive Command Staff by Rank, Race, and Gender for 2020\***

| Employee | Rank | | |
|---|---|---|---|
| Race/Gender | Deputy Chief | Interim Chief of Police | Grand Total |
| Black/Not Hispanic origin | 2 | | 2 |
| ● Male | 2 | | 2 |
| Hispanic | | 1 | 1 |
| ● Male | | 1 | 1 |
| White/Not Hispanic origin | 2 | | 2 |
| ● Female | 1 | | 1 |
| ● Male | 1 | | 1 |
| Grand Total | 4 | 1 | 5 |

*Data collected on July 29, 2020*

**Police Department Civilian Positions by Race for 2020\***

| Civilians by Race/Gender | # of Employees | % of Total |
|---|---|---|
| American Indian/Alaskan Native | 1 | 0.31% |
| ● Female | 1 | 0.31% |
| Asian | 10 | 3.80% |
| ● Female | 5 | 2.07% |
| ● Male | 5 | 1.73% |
| Black/Not Hispanic origin | 190 | 61.35% |
| ● Female | 151 | 45.86% |
| ● Male | 39 | 15.49% |
| Hispanic | 13 | 6.17% |
| ● Female | 8 | 4.28% |
| ● Male | 5 | 1.89% |
| White/Not Hispanic origin | 115 | 28.36% |
| ● Female | 66 | 17.12% |
| ● Male | 49 | 11.24% |
| Grand Total | 329 | 100.00% |

*Data collected on July 29, 2020*



## APPENDIX F

### 2019 Traffic Stop Data by Race
### Provided by Governor's Office of Crime Prevention, Youth, and Victim Services

#### Stop Reason Statistics

| Stop Reason | Traffic Stops | Percent of Traffic Stops | Search Percent | Arrest Percent |
|---|---|---|---|---|
| 13 (Registration) | 11244 | 20.27% | 3.37% | 0.79% |
| 16 (License Violations) | 1366 | 2.46% | 4.69% | 1.17% |
| 21.11 (Misc. Rules) | 2462 | 4.44% | 0.69% | 0.37% |
| 21.13 (Registration) | 20 | 0.04% | 5.00% | 0.00% |
| 21.14 (Toll Violations) | 39 | 0.07% | 0.00% | 0.00% |
| 21.2 (Signs, Signals, and Markings) | 5703 | 10.28% | 1.89% | 0.58% |
| 21.3 (Right side of road, Passing) | 2540 | 4.58% | 2.60% | 0.83% |
| 21.4 (Right of Way) | 1124 | 2.03% | 1.07% | 0.27% |
| 21.5 (Pedestrian Rules and Rights) | 147 | 0.26% | 2.72% | 1.36% |
| 21.6 (Turning, Signals, and Stopping) | 588 | 1.06% | 4.76% | 2.04% |
| 21.7 (Special Stops) | 2753 | 4.96% | 1.56% | 0.58% |
| 21.8 (Moving Violations) | 4577 | 8.25% | 2.62% | 1.20% |
| 21.9 (Reckless Driving or Fleeing) | 447 | 0.81% | 11.63% | 7.61% |
| 22 (Equipment) | 11758 | 21.20% | 3.16% | 0.70% |
| 99 (All other stops) | 10705 | 19.30% | 1.51% | 0.28% |
| **Total** | **55473** | **100.00%** | **2.57%** | **0.72%** |

*Race Based Traffic Stop Data Dashboard*

57



*Race Based Traffic Stop Data Dashboard*



*Race Based Traffic Stop Data Dashboard*



*Race Based Traffic Stop Data Dashboard*

- Limitations on Data
  - Possibility of omitted variables that may account for any differences observed between race/ethnicities (driver's behavior, the driver's violation history, law enforcement deployment etc.)
  - No analysis of spatial or temporal traveling patterns
  - No definitive conclusions can be drawn from this report regarding the effect of race/ethnicity on the frequency or characteristics associated with traffic stops due to data limitations beyond the scope of what reporting agencies could provide.

**APPENDIX G**

**Complaint Process Overview**



Internal Affairs Division
● Mission
  ○ To investigate all complaints in any manner and form they are submitted
  ○ To ensure that all complaints are investigated in a complete, fair and impartial manner
  ○ To impose disciplinary action, if necessary, in a uniform and timely fashion

Internal Affairs Division Workload – Administrative Investigation Section
Workload as of August 31, 2020

| Total Cases | | Open Cases | |
|---|---|---|---|
| 2017 | 71 | Sergeant | 10 |
| 2018 | 71 | Sergeant | 8 |
| 2019 | 92 | Sergeant | 2 |
| 2020 | 53 | Sergeant | 9 |
| Other Agency | 11 | Sergeant | 7 |
| **Totals** | **298** | Sergeant | 6 |
| | | Sergeant | 8 |
| | | Sergeant | 7 |
| | | Corporal | 10 |
| | | **Totals** | **67** |

*\*From Internal Affairs Division Report received on December 1, 2020*

61

Internal Affairs Division Workload – Special Investigative Response Team
Workload as of August 31, 2020

| Total Cases | | Open Cases | |
|---|---|---|---|
| 2017 | 78 | Sergeant 1 | 7 |
| 2018 | 76 | Sergeant 2 | 7 |
| 2019 | 79 | Sergeant 3 | 7 |
| 2020 | 57 | Sergeant 4 | 11 |
| **Totals** | **298** | Corporal 1 | 14 |
| | | Corporal 2 | 12 |
| | | Corporal 3 | 3 |
| | | Corporal 4 | 9 |
| | | **Totals** | **70** |

*From Internal Affairs Division Report received on December 1, 2020*

- Screening Process
  - All complaints received will be screened by Internal Affairs to determine investigative responsibility and provide case numbers to supervisors.
  - Requests for case numbers are generated by field supervisors when they anticipate handling an investigation at their level. These are screened by the Commander of the Administrative Investigative Section to ensure that it can be handled at the requesting supervisor's level prior to case numbers being issued.

- IAD Investigations versus Supervisory Investigations
  - IAD
    - Criminal Investigations
    - Administrative Investigations
      - Termination
      - Reduction in rank
      - Significant fines and suspension

  - Supervisory Investigations
    - Minor Violations
    - Simple, non-complex investigation

- Supervisory Investigations
  - Supervisors assigned an investigation will review, gather, and examine all the available evidence.
  - Supervisors will complete a Report of Investigation documenting the findings and submit it for review.

  - Case Findings
    - *Sustained* – The Respondent is found guilty of the allegation
    - *Non-Sustained* – There is inconclusive evidence to sustain a charge
    - *Unfounded* – The allegation of offense did not occur
    - *Exonerated* – The allegation of offense did occur, but was justified

○ Once served with Final Discipline the officer has two options:
   ■ Accept the recommended Discipline
   ■ Request an Administrative Hearing Board

IAD Cases by Incident Classification

| Incident Classification | 2018 | 2019 | 2020 |
|---|---|---|---|
| Accidental Discharge | 3 | 2 | 1 |
| Bias-Based Profiling | 2 | 3 | 2 |
| Criminal Misconduct | 19 | 21 | 5 |
| Departmental Shooting | 9 | 3 | 1 |
| Discharge of Firearm | 1 | 5 | - |
| Ethics Violation | 6 | 7 | 3 |
| Excessive/Unnecessary Force | 48 | 69 | 54 |
| Extra Duty Employment | - | 1 | 1 |
| Harassment | 6 | 5 | 2 |
| Insubordination | 1 | 2 | 1 |
| Integrity Violation | 3 | 3 | 2 |
| Misrepresentation of Facts | 2 | 2 | 1 |
| No Linked Allegation | 1 | - | - |
| Investigation for Other Agency | 4 | - | - |
| Procedural Violation | 10 | 8 | 6 |
| Protocol Violation | 1 | 7 | - |
| Unbecoming Conduct | 16 | 24 | 18 |
| Use of Language | 16 | 7 | 13 |
| **Total Cases** | **148** | **172** | **110** |

*From Internal Affairs Division Report received on December 1, 2020*

IAD Cases by Disposition

| Case Disposition | 2018 | 2019 | 2020 |
|---|---|---|---|
| Active Investigation | 41 | 164 | 108 |
| Administrative Closure | 7 | 3 | 2 |
| Exonerated | 21 | 3 | - |
| Non-Sustained | 28 | - | - |
| Sustained | 38 | - | - |
| Unfounded | 12 | 1 | - |
| **Total Cases** | **147** | **171** | **110** |

*From Internal Affairs Division Report received on December 1, 2020*

Allegations Investigated by Year[27]

| Allegation | 2018 | 2019 | 2020 |
|---|---|---|---|
| Accidental Discharge | 3 | 3 | 2 |
| Attention to Duty | 3 | - | 1 |
| Bias-Based Profiling | 3 | 9 | 3 |
| Criminal Misconduct | 30 | 39 | 8 |
| Departmental Shooting | 15 | 4 | 3* |
| Discharge of Firearm | 9 | 12 | 2 |
| Ethics Violation | 17 | 19 | 3 |
| Excessive/Unnecessary Force | 118 | 194 | 175 |
| Extra Duty Employment | 2 | 1 | 1 |
| Failure to Report Discharge | 1 | - | - |
| Firearms and Intoxicants | 1 | - | - |
| Harassment | 14 | 19 | 2 |
| Insubordination | 1 | 2 | 1 |
| Integrity Violation | 11 | 11 | 3 |
| Investigation for Other Agency | 4 | 21 | 1 |
| Misrepresentation of Facts | 16 | 13 | 2 |
| No Linked Allegation | 1 | 1 | 4 |
| Procedural Violation | 78 | 119 | 88 |
| Protocol Violation | 47 | 60 | 44 |
| Unbecoming Conduct | 140 | 116 | 66 |
| Use of Language | 69 | 53 | 54 |
| **Total Allegations** | **575** | **698** | **468** |

*From Internal Affairs Division Report received on December 1, 2020*

Racial Demographic of Officer Involved by Year

| Racial Demographic of Officer | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian / Pacific Islander | 25 | 37 | 19 |
| Black / African American | 260 | 288 | 191 |
| Hispanic / Latino | 47 | 41 | 43 |
| White / Caucasian | 237 | 326 | 210 |
| Unknown | 6 | 6 | 5 |
| **Total Allegations** | **575** | **698** | **468** |

*From Internal Affairs Division Report received on December 1, 2020*

---

[27] The homicide investigation involving Cpl. Michael Owen was not included as a fatal departmental shooting and was classified as murder.

Racial Demographic of Involved Community Member by Year

| Racial Demographic of Community Member | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian / Pacific Islander | 2 | 5 | - |
| Black / African American | 188 | 161 | 240 |
| Hispanic / Latino | 18 | 18 | 52 |
| White / Caucasian | 20 | 12 | 12 |
| Unknown | 210 | 310 | 121 |
| No Citizen Involved | 137 | 192 | 43 |
| **Total Allegations** | **575** | **698** | **468** |

*From Internal Affairs Division Report received on December 1, 2020*

Biased-Based Profiling Allegations – Racial Demographic of Involved Officer

| Racial Demographic of Officer | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian / Pacific Islander | 2 | 1 | - |
| Black / African American | - | 2 | 1 |
| Hispanic / Latino | - | 1 | - |
| White / Caucasian | 1 | 5 | 2 |
| Unknown | - | - | - |
| **Totals** | **3** | **9** | **3** |

*From Internal Affairs Division Report received on December 1, 2020*

Biased-Based Profiling Allegations – Racial Demographic of Involved Community Member by Year

| Racial Demographic of Community Member | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian / Pacific Islander | - | - | - |
| Black / African American | - | - | - |
| Hispanic / Latino | - | - | 1 |
| White / Caucasian | - | - | - |
| Unknown | 3 | 9 | 2 |
| **Totals** | **3** | **9** | **3** |

*From Internal Affairs Division Report received on December 1, 2020*

Biased-Based Profiling Allegations – Case Disposition by Racial Demographic of Involved Officer

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | 1 | 3 | 1 | 7 | - | **12** |
| Administrative Closure | - | - | - | - | - | **-** |
| Exonerated | - | - | - | - | - | **-** |
| Non-Sustained | - | - | - | - | - | **-** |
| Sustained | - | - | - | - | - | **-** |
| Unfounded | 2 | - | - | 1 | - | **3** |
| **Totals** | **3** | **3** | **1** | **8** | **-** | **15** |

*From Internal Affairs Division Report received on December 1, 2020*

Biased-Based Profiling Allegations – Case Disposition by Racial Demographic of Involved Community Member

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | - | - | 1 | - | 11 | 12 |
| Administrative Closure | - | - | - | - | - | - |
| Exonerated | - | - | - | - | - | - |
| Non-Sustained | - | - | - | - | - | - |
| Sustained | - | - | - | - | - | - |
| Unfounded | - | - | - | - | 3 | 3 |
| **Totals** | **-** | **-** | **1** | **-** | **14** | **15** |

*From Internal Affairs Division Report received on December 1, 2020*

Criminal Misconduct Allegations – Racial Demographic of Involved Officer by Year

| Racial Demographic of Officer | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian/Pacific Islander | - | - | - |
| Black/African American | 21 | 20 | 4 |
| Hispanic/Latino | - | 5 | - |
| White/Caucasian | 8 | 14 | 4 |
| Unknown | 1 | - | - |
| **Totals** | **30** | **39** | **8** |

*From Internal Affairs Division Report received on December 1, 2020*

Criminal Misconduct Allegations – Racial Demographic of Involved Community Member by Year

| Racial Demographic of Community Member | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian/Pacific Islander | 1 | - | - |
| Black/African American | 10 | 16 | 1 |
| Hispanic/Latino | 2 | 5 | - |
| White/Caucasian | 3 | 3 | 3 |
| Unknown | 1 | - | 2 |
| No Citizen Involved | 13 | 15 | 2 |
| **Totals** | **30** | **39** | **8** |

*From Internal Affairs Division Report received on December 1, 2020*

Criminal Misconduct Allegations – Case Disposition by Racial Demographic of Involved Officer

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | - | 31 | 4 | 21 | - | **56** |
| Administrative Closure | - | 1 | - | - | 1 | **2** |
| Exonerated | - | - | - | - | - | **-** |
| Non-Sustained | - | 2 | - | - | - | **2** |
| Sustained | - | - | - | 1 | - | **1** |
| Unfounded | - | 11 | - | 4 | - | **15** |
| **Totals** | **-** | **45** | **4** | **26** | **1** | **76** |

*From Internal Affairs Division Report received on December 1, 2020*

Criminal Misconduct Allegations – Case Disposition by Racial Demographic of Involved Community Member

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | 1 | 17 | 6 | 9 | 2 | **35** |
| Administrative Closure | - | - | - | - | - | **-** |
| Exonerated | - | - | - | - | - | **-** |
| Non-Sustained | - | - | 1 | - | - | **1** |
| Sustained | - | - | - | - | - | **-** |
| Unfounded | - | 10 | - | - | 1 | **11** |
| **Totals** | **1** | **27** | **7** | **9** | **3** | **47** |

*Allegations with no citizen involvement excluded from this table.*
*From Internal Affairs Division Report received on December 1, 2020*

Excessive Force Allegations – Racial Demographic of Involved Officer by Year

| Racial Demographic of Officer | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian/Pacific Islander | 5 | 14 | 7 |
| Black/African American | 49 | 80 | 63 |
| Hispanic/Latino | 13 | 8 | 18 |
| White/Caucasian | 51 | 92 | 87 |
| Unknown | - | - | - |
| **Totals** | **118** | **194** | **175** |

*From Internal Affairs Division Report received on December 1, 2020*

Excessive Force Allegations – Racial Demographic of Involved Community Member by Year

| Racial Demographic of Community Member | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian / Pacific Islander | - | 1 | - |
| Black / African American | 61 | 80 | 112 |
| Hispanic / Latino | 4 | 1 | 28 |
| White / Caucasian | - | - | - |
| Unknown | 53 | 112 | 35 |
| **Totals** | **118** | **194** | **175** |

*From Internal Affairs Division Report received on December 1, 2020*

Excessive Force Incident Case Dispositions by Year

| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Total Excessive Force Incidents** | **51** | **35** | **43** | **48** | **69** |
| **Total UOF Reviews**** | **542** | **499** | **641** | **658** | **869** |
| **Excessive Force Disposition Breakdown:** | | | | | |
| Administrative Closure | 1 | 1 | 0 | 1 | 1 |
| Exonerated | 10 | 8 | 10 | 9 | 2 |
| Non-Sustained | 19 | 13 | 16 | 16 | 0 |
| Sustained | 14 | 11 | 11 | 10 | 0 |
| Unfounded | 7 | 1 | 4 | 3 | 0 |
| Open/Pending Cmdr Review/CCOP Review | 0 | 1 | 0 | 7 | 57 |
| Open/Pending AHB | 0 | 0 | 2 | 0 | 0 |
| Open/Officer on Leave; Cannot Serve DAR | 0 | 0 | 0 | 1 | 0 |
| Open/With Investigator | 0 | 0 | 0 | 1 | 9 |
| **Total** | 51 | 35 | 43 | 48 | 69 |

*Data from Internal Affairs Division received on December 1, 2020*

Excessive Force Allegations – Case Disposition by Racial Demographic of Involved Officer

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | 22 | 143 | 25 | 183 | - | **373** |
| Administrative Closure | - | 3 | 1 | 4 | - | **8** |
| Exonerated | 3 | 22 | 5 | 18 | - | **48** |
| Non-Sustained | 1 | 11 | 4 | 13 | - | **29** |
| Sustained | - | - | - | 1 | - | **1** |
| Unfounded | - | 13 | 4 | 11 | - | **28** |
| **Totals** | **26** | **192** | **39** | **230** | **-** | **487** |

*From Internal Affairs Division Report received on December 1, 2020*

Excessive Force Allegations – Case Disposition by Racial Demographic of Involved Community Member

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| **Active** | 1 | 194 | 31 | - | 147 | **373** |
| **Administrative Closure** | - | 7 | - | - | 1 | **8** |
| **Exonerated** | - | 28 | 1 | - | 19 | **48** |
| **Non-Sustained** | - | 18 | - | - | 11 | **29** |
| **Sustained** | - | - | 1 | - | - | **1** |
| **Unfounded** | - | 6 | - | - | 22 | **28** |
| **Totals** | **1** | **253** | **33** | **-** | **178** | **487** |

*From Internal Affairs Division Report received on December 1, 2020*

Harassment Allegations – Racial Demographic of Involved Officer by Year

| Racial Demographic of Officer | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian/Pacific Islander | - | 2 | - |
| Black/African American | 8 | 7 | 1 |
| Hispanic/Latino | - | 1 | - |
| White/Caucasian | 6 | 8 | 1 |
| Unknown | - | 1 | - |
| **Totals** | **14** | **19** | **2** |

*From Internal Affairs Division Report received on December 1, 2020*

Harassment Allegations – Racial Demographic of Involved Community Member by Year

| Racial Demographic of Officer | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian/Pacific Islander | - | - | - |
| Black/African American | 8 | 6 | - |
| Hispanic/Latino | - | - | - |
| White/Caucasian | 6 | - | - |
| Unknown | - | 13 | 2 |
| **Totals** | **14** | **19** | **2** |

*From Internal Affairs Division Report received on December 1, 2020*

Harassment Allegations – Case Disposition by Racial Demographic of Involved Officer

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | 2 | 8 | 1 | 11 | 1 | **23** |
| Administrative Closure | - | - | - | - | - | **-** |
| Exonerated | - | 3 | - | 2 | - | **5** |
| Non-Sustained | - | - | - | - | - | **-** |
| Sustained | - | - | - | - | - | **-** |
| Unfounded | - | 5 | - | 2 | - | **7** |
| **Totals** | **2** | **16** | **1** | **15** | **1** | **35** |

*From Internal Affairs Division Report received on December 1, 2020*

Harassment Allegations – Case Disposition by Racial Demographic of Involved Community Member

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | - | 6 | - | - | 17 | **23** |
| Administrative Closure | - | - | - | - | - | **-** |
| Exonerated | - | 4 | - | - | 1 | **5** |
| Non-Sustained | - | - | - | - | - | **-** |
| Sustained | - | - | - | - | - | **-** |
| Unfounded | - | 4 | - | - | 3 | **7** |
| **Totals** | **-** | **14** | **-** | **-** | **21** | **35** |

*From Internal Affairs Division Report received on December 1, 2020*

Use of Language Allegations – Racial Demographic of Involved Officer by Year

| Racial Demographic of Officer | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian / Pacific Islander | 4 | 1 | 3 |
| Black / African American | 30 | 25 | 25 |
| Hispanic / Latino | 3 | 4 | 7 |
| White / Caucasian | 31 | 23 | 19 |
| Unknown | 1 | - | - |
| Totals | 69 | 53 | 54 |

*From Internal Affairs Division Report received on December 1, 2020*

Use of Language Allegations – Racial Demographic of Involved Community Member by Year

| Racial Demographic of Citizen | 2018 | 2019 | 2020 |
|---|---|---|---|
| Asian/Pacific Islander | - | - | - |
| Black/African American | 16 | 9 | 23 |
| Hispanic/Latino | - | - | - |
| White/Caucasian | - | - | 1 |
| Unknown | 37 | 27 | 25 |
| No Citizen Involved | 16 | 17 | 5 |
| Totals | 69 | 53 | 54 |

*From Internal Affairs Division Report received on December 1, 2020*

Use of Language Allegations – Case Disposition by Racial Demographic of Involved Officer

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | 5 | 55 | 10 | 47 | - | 117 |
| Administrative Closure | 1 | - | 1 | - | 1 | 3 |
| Exonerated | - | 1 | - | 4 | - | 5 |
| Non-Sustained | 1 | 15 | 2 | 19 | - | 37 |
| Sustained | 1 | 7 | - | 3 | - | 11 |
| Unfounded | - | 2 | 1 | - | - | 3 |
| Totals | 8 | 80 | 14 | 73 | 1 | 176 |

*From Internal Affairs Division Report received on December 1, 2020*

Use of Language Allegations – Case Disposition by Racial Demographic of Involved Community Member

| Case Disposition | Asian | Black | Hispanic | White | Unknown | Totals |
|---|---|---|---|---|---|---|
| Active | - | 37 | - | 1 | 56 | **94** |
| Administrative Closure | - | 1 | - | - | 1 | **2** |
| Exonerated | - | 2 | - | - | 1 | **3** |
| Non-Sustained | - | 7 | - | - | 25 | **32** |
| Sustained | - | 1 | - | - | 4 | **5** |
| Unfounded | - | - | - | - | 2 | **2** |
| **Totals** | **-** | **48** | **-** | **1** | **89** | **138** |

*From Internal Affairs Division Report received on December 1, 2020*

Current Termination Cases (Pending Administrative Hearing Board) – Cases by Violation

| Violation | Count |
|---|---|
| Alcohol Related | 8 |
| Domestic Related | 6 |
| Integrity | 7 |
| Other | 5 |
| **Total Cases** | **26** |

*From Internal Affairs Division Report received on December 1, 2020*

Current Termination Cases (Pending Administrative Hearing Board) – Cases by Rank and Demographic

| Demographic | Lieutenant | Sergeant | Corporal | POFC | Police Officer | Totals |
|---|---|---|---|---|---|---|
| Asian Male | - | - | - | - | - | **-** |
| Asian Female | - | - | - | - | - | **-** |
| Black Male | 1 | 1 | 1 | 3 | 5 | **11** |
| Black Female | 1 | - | - | - | 2 | **3** |
| Hispanic Male | - | 1 | 1 | - | 1 | **3** |
| Hispanic Female | - | - | - | - | - | **-** |
| White Male | 1 | 1 | 6 | - | - | **8** |
| White Female | 1 | - | - | - | - | **1** |
| **Totals** | **6** | **2** | **7** | **3** | **5** | **26** |

*From Internal Affairs Division Report received on December 1, 2020*

Previous Termination Cases (2015-2020)

| Violation | Count |
|---|---|
| Criminal Misconduct | 4 |
| Ethics/Integrity | 15 |
| Excessive Force | 1 |
| Unbecoming Conduct | 5 |
| Other | 2 |
| **Total Cases** | **27** |

*\*From Internal Affairs Division Report received on December 1, 2020*

Previous Termination Cases (2015-2020) – Cases by Rank and Demographic

| Demographic | Corporal | POFC | Police Officer | Recruit | Civilian | Totals |
|---|---|---|---|---|---|---|
| Asian Male | - | - | - | - | - | **-** |
| Asian Female | - | - | - | - | - | **-** |
| Black Male | 4 | 3 | 5 | 3 | - | **15** |
| Black Female | 1 | - | 1 | - | 2 | **4** |
| Hispanic Male | - | - | 2 | - | - | **2** |
| Hispanic Female | - | - | - | - | - | **-** |
| White Male | 2 | - | 3 | - | - | **5** |
| White Female | - | - | 1 | - | - | **1** |
| **Totals** | **7** | **3** | **12** | **3** | **2** | **27** |

*\*From Internal Affairs Division Report received on December 1, 2020*

- Administrative Hearing Board (AHB)
  - The AHB is a quasi-judicial process similar to a criminal trial.
  - The prosecution and defense get a chance to present their legal argument, present evidence and take testimony.
  - The hearing is recorded, and notes are taken by the board members. Items of evidence that are submitted can be tracked by either a clerk/recorder, a board member, or the AHB Coordinator.
  - At the conclusion of the hearing the AHB will go over all the evidence and testimony that was gathered and provide a finding of guilty or not guilty.
  - A three person AHB does not have to be unanimous in their decision, and the findings are based on the majority of votes for each charge.

  - Three Member Panel
    - The Chair, a Major, and Co-Chair, a Captain, are chosen by the Chief of Police or the Chief's representative, such as the Inspector General's Office.
    - The third member of equal rank is chosen randomly in the presence of the Respondent with 4 alternates. The Respondent has the right to strike one individual without any questions asked. Any other person that is struck by the Respondent must have just cause.

73

The same rules of striking a member of equal rank also applies to the Department.

○ One Member Panel
- One person AHB is a Captain or above that is chosen by the Chief of Police or the Chief's representative, such as the Inspector General's Office.
- If the recommended discipline is less than a One Hundred and Fifty Dollar ($150) fine or less than a Three (3) Day Suspension Without Pay, the Respondent will have a one (1) person hearing board.

○ AHB Completion
- If the finding for any charge(s) is/are guilty, then the respondent has the right to a Character Hearing. Once that process is completed, the board will request discipline for any sustained allegations and draft a board report summarizing the proceedings and how they arrived at their conclusion. It will also include their discipline recommendation.
- A cover sheet with the board report goes to the Chief of Police for review. After review, the Respondent is called into the AHB Coordinator's Office and provided the board report and the cover sheet.
- The Respondent has five (5) working days to submit a letter to the Chief of Police on their behalf, requesting leniency in most cases.
- The Chief of Police or designee has the right to accept the proposed discipline or can change the proposed discipline. If the discipline is increased, the Chief must have a formal recorded meeting with the Respondent and their legal representative to go over the change in discipline.

○ Final Discipline
- After the Chief of Police or designee determines the final discipline, a Notice of Final Discipline is approved and served to the Respondent.
- If the Respondent so chooses, they can still appeal to the Circuit Court for Prince George's County within 30 days from the date they were served pursuant to Chapter 200, Maryland Rules of Procedure.

Citizen Complaint Oversight Panel (CCOP)[28]
Independent Civilian Panel appointed by County Executive's Office to assist the Department with achieving the goal of complete, thorough and impartial IAD investigations.
- The CCOP reviews Reports of Investigation for completeness and impartiality and submits comments and recommendations to the Chief of Police within 30 working days.
- The CCOP may conduct its own investigation independently of, and concurrently with, any investigation being conducted by IAD.
- The CCOP may also apply to the Prince George's County Council for the issuance of subpoenas upon any person to appear before the CCOP.

- When the CCOP reviews an investigation, they may:
  ○ Concur with the investigation, findings, and allegations.
  ○ Non-Concur with any part of the investigation, findings, and allegations.

---

[28] Codified in Prince George's County Code § 18-186.03.

- When the CCOP does not concur, they will submit a letter advising as to why they do not concur.
  - The Department must respond to the CCOP letter. There are various types of responses and below are some examples:
    - The Department must clarify how they reached their findings.
    - There was an oversight in a violation that was not part of the initial investigation. For example, a procedural violation for failing to turn on a microphone when that violation was not the target of the complaint and has no bearing on the investigation.
    - The investigator missed collecting a piece of evidence or did not ask all pertinent questions during an interview.
    - CCOP at times does not concur with the actual finding related to an allegation. Sometimes this is when there is some concern between something being non-sustained versus exonerated or unfounded.

- Legislation related to the CCOP includes:
  - *CB-23-2007*
    - This legislation increased compensation of CCOP members from a maximum of $10,000 per year to $15,000 per year.

  - *CB-25-1990*
    - This legislation created the CCOP, providing for objective community participation in the complaint process and strengthening existing procedures for handling complaints made by community members against members of the PGPD for allegations of excessive force, harassment, and/or abusive language.

  - *CB-44-1994*
    - This legislation amended the terms of the Panel members, from two years to four years.

  - *CB-59-2001*
    - This legislation expanded the CCOP's powers, giving it the authority to conduct its own investigations and to issue subpoenas through the County Council. It also expanded the scope of investigations reviewed to include all complaints filed against a member of PGPD for violation of any law or regulation (whether brought by a community member, superior officer or any source), all discharge of firearms, and all in-custody deaths that may have resulted from an officer's use of force. It also gives CCOP the authority to review disciplinary documents and hearing board reports.

- Panel Authority
  - Review investigation of complaints against officers of the PGPD;
  - The CCOP's authority does not extend to Park Police, State and Municipal Police Forces, or the Sheriff's Department;
  - Make recommendations regarding policy changes, supervision, operational procedures, training and recruitment;
  - Participate in police accountability outreach and information dissemination;

○ Conduct concurrent and subsequent investigations, and issue subpoenas through the County Council (CCOP has neither conducted investigations nor issued subpoenas due to lack of funding); and

○ Issue an annual report to the public, which is posted on the CCOP website.

● Panel Composition
  ○ The CCOP comprises seven members appointed by the County Executive and confirmed by the County Council.
  ○ The Panel members must be Prince George's County residents and broadly representative of the County.
  ○ Members cannot be current employees or elected officials of any non-federal jurisdiction, a candidate for such office, or employed by any law enforcement organization.
  ○ The County Executive designates the Panel chair. The Panel selects the vice chair.

● Historical Data (provided by CCOP)
  ○ 2,925 Investigations from 2001-2017
  ○ 9,927 Allegations from 2001-2017







- 2019 Allegations and Recommendations (provided by CCOP)
  - The CCOP does subsequent reviews of investigations completed by the Internal Affairs Division. As such, the investigations reviewed are for complaints filed during a prior period or prior year. Therefore, the types of conduct reviewed by the CCOP does not reflect police conduct for the current year.





| Recommendations | 2018 | 2019 | Change from 2018 |
|---|---|---|---|
| Exonerated | 61 | 77 | 26.2% |
| Non-Sustained | 140 | 157 | 12.1% |
| Sustained | 142 | 133 | -6.3% |
| Unfounded | 68 | 128 | 88% |
| **Total** | **418** | **495** | 18.4% |

78

**APPENDIX H**

**Police Department Budget Data**

Approved Training Budget -- FY2021 - $259,200

| Bureau | Description | Amount |
|--------|-------------|--------|
| Office of the Chief | IACP, Police Exec Research Forum, Financial Conference, IT Training, IAPro, Media Training | $80,000 |
| Bureau of Patrol | Mandated Aviation Pilot Training and SRO Training | $55,000 |
| Bureau of Investigation | Investigative Training | $28,000 |
| Bureau of Forensic Science & Intelligence | Forensic Training (Mandated) | $52,100 |
| Bureau of Administration & Homeland Security | Job Fairs, Human Trafficking, Promotional Exam | $44,100 |

Operating Expenditures –                     $34,327,300
- Vehicle/Equipment Maintenance –       $8,379,800
- Office Automation –                          $8,033,400
- Gas and Oil –                                   $4,375,200
- General and Administrative Contracts –  $5,496,200
- Telephones –                                    $1,800,000
- Equipment Lease –                            $1,608,400
- Building Lease –                               $434,000

FY 2021 GF Operating Contracts - $5,496,200

| Contracts | Budget | Description |
|-----------|--------|-------------|
| Axon | $361,800 | Replace tasers for Department |
| Security Guard | $250,000 | Security Guards at County Buildings |
| Summit Aviation | $900,000 | Helicopter Maintenance |
| Towing Contract | $200,000 | Tow Services |
| Temporary Services | $272,500 | Temporary Staff |
| Janitorial Services | $40,000 | Janitorial Services @ Leased Locations |
| Audit | $6,000 | Audit services |
| Metropolitan Archives | $11,000 | Record Storage |
| Unifirst | $5,700 | Uniform Rental |
| Johnson Controls | $90,000 | Maintenance of Security Cameras |
| LexisNexis | $7,800 | Legal Subscription |
| Legal Services | $1,092,400 | Legal Fees |

| Highway Vet | $85,000 | | Veterinary Svcs |
| Crunchies | $25,000 | | Food for Canines |
| Affiliated Santé | $484,900 | | Mobile Crisis Services |
| Applied Research | $98,000 | | Implicit Bias Contract |
| Software Maintenance Contracts | $ 400,000 | | Software Maintenance |
| Hotel | $195,000 | | Promotional Test |
| School Resource | $ 240,000 | | Bowie, Hyattsville, Greenbelt |
| LPR Maintenance | $363,000 | | License Plate Readers |
| BODE | $54,800 | | DNA Analysis |
| Intervid Maintenance | $313,300 | | Camera Maintenance |

Discretionary Budget -- FY 2021 - $4,200,300

| List of Discretionary Expenditures | FY2021 Amount |
| --- | --- |
| Office Supplies (includes ammunition) | $2,472,600 |
| Printing | $32,100 |
| Memberships | $39,400 |
| Mileage | $4,200 |
| Equipment Repair | 212,900 |
| Equipment Purchases | $945,200 |
| Insurance | $197,900 |
| Building Repair | $46,000 |
| Interest Expense | $250,000 |

Police Department Equipment –        $945,200
- Ballistic Vests –        $400,000
- Canines –        $30,000
- Ballistic Helmets –        $150,000
- Computer Equipment -        $365,200

Attorney's Fees
- The Police Department spent $121,093.80 for legal fees as of September 16, 2020.
- Total spending in FY 2020 – $6,231,182.43

Overtime Budget Breakdown

| Bureau | Unit | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| BOP | Eastern Av | $175,000 | $230,000 | $230,000 | $380,000 | $350,000 | $360,000 |
| BOP | District 1 | $200,000 | $300,000 | $300,000 | $350,000 | $375,000 | $385,000 |
| BOP | District 2 | $160,000 | $150,000 | $130,000 | $110,000 | $356,600 | $180,000 |
| BOP | District 3 | $350,000 | $300,000 | $340,000 | $400,000 | $262,500 | $142,500 |
| BOP | District 4 | $320,000 | $300,000 | $300,000 | $395,000 | $375,000 | $375,000 |
| BOP | District 5 | $90,000 | $85,000 | $72,000 | $72,000 | $99,000 | $109,000 |
| BOP | District 6 | $90,000 | $85,000 | $82,000 | $90,000 | $114,000 | $115,000 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BOP | District 7 | $60,000 | $60,000 | $82,000 | $50,000 | $70,000 | $80,000 |
| BOP | District 8 | N/A | N/A | N/A | N/A | $189,500 | $200,000 |
| BOP | SOD | $250,000 | $250,000 | $300,000 | $315,000 | $335,000 | $450,000 |
| BOP | Fixed Post | $2,798,000 | $2,900,000 | $3,425,494 | $3,500,000 | $3,620,000 | $3,620,000 |
| BOP | Ped Safety | $102,000 | $103,000 | $75,000 | $100,000 | $120,000 | $115,000 |
| BOP | CSD | $10,000 | $1,500 | $2,500 | $2,000 | $3,500 | $3,500 |
| BOP | C Grd | $20,000 | $25,000 | $25,000 | $26,000 | $30,000 | $25,000 |
| Chief | Office of Chief | $135,000 | $100,000 | $120,000 | $170,000 | $173,000 | $173,000 |
| Chief | Internal Aff | $70,000 | $75,000 | $80,000 | $125,000 | $130,000 | $400,000 |
| Chief | Technical Svc | $3,000 | $3,000 | $25,279 | $25,000 | $25,000 | $85,000 |
| Chief | Protective | $500 | $400 | $1,500 | $1,100 | $4,000 | $4,000 |
| Chief | Fiscal | $0 | $30,000 | $35,000 | $35,000 | $35,000 | $36,000 |
| Chief | Critical Support | $0 | $0 | $1,000 | $1,000 | $1,000 | $4,000 |
| Chief | Media | $30,000 | $30,000 | $35,000 | $35,000 | $35,000 | $35,000 |
| BOI | CID | $130,000 | $90,000 | $150,000 | $240,000 | $25,000 | $50,000 |
| BOI | Dom Viol | $0 | $0 | $0 | $0 | $200,000 | $300,000 |
| BOI | Homicide | $700,000 | $1,100,000 | $1,200,000 | $1,200,000 | $1,300,000 | $1,500,000 |
| BOI | Robbery | $500,000 | $400,000 | $450,000 | $480,000 | $493,000 | $480,000 |
| BOI | Sex Crimes | $150,000 | $150,000 | $180,000 | $320,000 | $325,000 | $325,000 |
| BOI | NED | $250,000 | $300,000 | $290,000 | $275,000 | $300,000 | $367,000 |
| BOI | Ghost Sq | $0 | $0 | $0 | $0 | $0 | $80,000 |
| BOI | RID | $600,000 | $900,000 | $1,000,000 | $1,200,000 | $1,240,000 | $1,360,000 |
| BOI | SID | $700,000 | $500,000 | $660,000 | $700,000 | $709,000 | $910,000 |
| BOA | TED | $50,000 | $90,000 | $100,000 | $160,000 | $167,000 | $150,000 |
| BOA | Recruit | $10,000 | $16,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| BOA | Risk | $0 | $0 | $0 | $0 | $0 | $5,000 |
| BOA | A. Shooter | $0 | $0 | $0 | $50,000 | $0 | $0 |
| BOA | Intelligence | $0 | $110,000 | $105,000 | $60,000 | $100,000 | $100,000 |
| BOA | Personnel | $10,000 | $7,000 | $3,500 | $3,500 | $7,000 | $7,000 |
| BOFSI | DNA | $10,000 | $3,000 | $7,000 | $11,000 | $11,000 | $11,000 |
| BOFSI | Forensic | $0 | $1,000 | $0 | $0 | $0 | $0 |
| BOFSI | Firearms | $1.,500 | $1,500 | $2,500 | $2,500 | $2,500 | $3,500 |
| BOFSI | Drug Lab | $15,000 | $16,000 | $16,000 | $16,000 | $15,000 | $15,000 |
| BOFSI | CSID | $90,000 | $120,000 | $90,000 | $100,000 | $98,000 | $98,000 |
| BOFSI | Gun Intel | $70,000 | $60,000 | $65,000 | $65,000 | $65,000 | $98,000 |
| BOFSI | Teletype | $0 | $20,000 | $15,000 | $5,000 | $10,000 | $10,000 |
| BOFSI | RAFIS | $10,000 | $9,000 | $12,000 | $12,000 | $13,000 | $13,000 |
| BOFSI | Records | $180,000 | $105,000 | $125,000 | $100,000 | $100,000 | $60,000 |

**APPENDIX I**

**OHRM Police Applicant and Hiring Overview**

| Step | Description |
|---|---|
| STEP 1: Application/Written Exam and Agility Test | Applicant will fill out application via www.pgpolice.org and are screened objectively and electronically against minimum qualifications such age, US Citizenship requirement, High School Diploma etc. Candidates are required to pass the Applicant Physical Requirement Test (APRT) before moving on to the Written Exam, which has a minimum scoring requirement of 70%; passing scores on the written exam are valid for one year. If they are unsuccessful on the written exam, they may re-take the exam once within a year. |
| STEP 2: Preliminary Screening Questionnaire & Interview | Completed at the same time upon passing of written and physical examinations. |
| STEP 3: Initial Interview & Background Investigation | Applicant is scheduled for an initial interview approximately 2-3 weeks after exam date. If the applicant fails either written exam, agility, or have background concerns identified in the Preliminary Background Questionnaire, they will be notified by mail and the interview appointment will be cancelled. Checks include: agency, criminal, credit, neighborhood, employment, domestic partner, etc. |
| STEP 4: Polygraph | Applicant is scheduled after successful completion of initial interview (to take place within 2-3 weeks). |
| STEP 5: Oral Board | Applicant is scheduled immediately after successful completion of Polygraph. Applicant meets with a 3-board panel of Law Enforcement personnel for an oral interview (takes place within 1-2 weeks). |
| STEP 6: Psychological Exam | Will be scheduled immediately after successful completion of Polygraph and Oral Board examination (to take place in approximately within 1-2 weeks). |
| STEP 7: Medical Examination & Ride-Along | Ride-Along with certified sworn officer. Medical will be scheduled within 1-2 weeks after successfully completing the Psychological Exam. |
| STEP 8: Certification & Appointment | Applicants are certified upon passing all test components. The applicant's file is forwarded to the Deputy Chief Bureau of Administration Homeland Security (BOAHS). Based upon agency selection or non-selection, applicant will be notified of next available class date. |

FY 2020 Applicant and Hiring Demographics - Entry Level Positions by Race

| Race | Applicants | Hires | Hiring % |
|---|---|---|---|
| American Indian/Alaskan Native | 14 | 0 | 0% |
| Asian | 29 | 2 | 6.9% |
| Black/Not Hispanic | 883 | 15 | 1.7% |
| Hispanic | 212 | 12 | 5.7% |
| White/Not Hispanic | 265 | 11 | 4.2% |
| Total | **1469*** | **40** | **2.7%** |

- A significantly low percentage of applicants are ultimately hired
- African Americans comprised 60% of the applicant pool and 38% of the hired candidates
- Diverse applicants comprised 77% of the applicant pool and 73% percent of the hired candidates
- Non diverse applicants comprised 18% of the applicant pool and 28% of all hires
- * Includes 66 candidates who elected not to disclose their race

FY 2019 Applicant and Hiring Demographics - Entry Level Positions by Race

| Race | Applicants | Hires | Hiring % |
|------|-----------|-------|----------|
| American Indian/Alaskan Native | 23 | 1 | 4.3% |
| Asian | 28 | 0 | 0% |
| Black/Not Hispanic | 1139 | 9 | .8% |
| Hispanic | 204 | 5 | 2.5% |
| White/Not Hispanic | 369 | 10 | 2.7% |
| Total | **1828*** | **25** | **1.4%** |

- A significantly low percentage of all applicants are ultimately hired
- African Americans comprised 62% of the applicant pool and 36% of the hired candidates
- Diverse applicants comprised 76% of the applicant pool and 60% percent of the hired candidates
- White or/Non-Hispanic applicants comprised 20% of the applicant pool and 40% of all hires
- *Includes 65 candidates who elected not to disclose their race

FY 2019 Applicant and Hiring Demographics - Entry Level Positions by Race

| Race | Applicants | Hires | Hiring % |
|------|-----------|-------|----------|
| American Indian/Alaskan Native | 9 | 0 | 0% |
| Asian | 49 | 3 | 6.1% |
| Black/Not Hispanic | 1373 | 32 | 2.3% |
| Hispanic | 261 | 12 | 4.6% |
| White/Not Hispanic | 520 | 19 | 3.7% |
| Total | **2308*** | **66** | **2.9%** |

- A significantly low percentage of candidates who applied are ultimately hired
- African Americans comprised 59% of the applicant pool and 48% of the hired candidates
- Diverse applicants comprised 73% of the applicant pool and 71% percent of the hired candidates
- White/Non-Hispanic applicants comprised 23% of the applicant pool and 29% of all hires
- *This total does not include 96 candidates who elected not to disclose their race

Police Promotional Examination Process

*Noncompetitive and Competitive Examinations*

- Based Collective Bargaining Agreement requirements, officers' eligibility is based on time-in-grade and satisfactory past performance appraisals
- Written Examination – 70% pass score
- Noncompetitive promotional candidates who pass are promoted

*Competitive Examinations continue...*

- Skills Assessment – practical examination – scored by independent assessors from various Police Depts. (external). Use of benchmarks established by Testing Vendor and Subject Matter Experts (SME)
- Cumulative score determines rank on eligibility list for promotion and promotions are given in rank order of eligibility list, based on available vacancies

Candidate Non-selection Data

FY 2020

| Non-Select/Disqualification Reason (Police 2019) | # of Applicants | Percent Ratio |
|---|---|---|
| AutoDQ-TEMPORARY-Marijuana | 160 | 10.89% |
| AutoDQ-TEMPORARY-Minimum Qualifications | 95 | 6.47% |
| DQ - Previous Permanent Disqualification | 78 | 5.31% |
| DQ-PERMANENT-Deception | 55 | 3.74% |
| Not Selected | 52 | 3.54% |
| AutoDQ-PERMANENT-Marijuana | 47 | 3.20% |
| AutoDQ-PERMANENT-Legal History (Criminal Acts) | 36 | 2.45% |
| AutoDQ-PERMANENT-Drug History | 31 | 2.11% |
| Applicant Withdrew | 27 | 1.84% |
| AutoDQ-TEMPORARY-Driving History | 21 | 1.43% |

FY 2019

| Non-Select/Disqualification Reason (Police 2018) | # of Applicants | Percent Ratio |
|---|---|---|
| Failed to Respond to Notices | 495 | 27.08% |
| Announcement Closed | 381 | 20.84% |
| AutoDQ-TEMPORARY-Marijuana | 163 | 8.92% |
| DQ-PERMANENT-Deception | 149 | 8.15% |
| DQ - Previous Permanent Disqualification | 84 | 4.60% |
| AutoDQ-TEMPORARY-Minimum Qualifications | 79 | 4.32% |
| Not Selected | 63 | 3.45% |
| AutoDQ-PERMANENT-Legal History (Criminal Acts) | 59 | 3.23% |
| Applicant Withdrew | 57 | 3.12% |
| AutoDQ-PERMANENT-Marijuana | 40 | 2.19% |

FY 2018

| Non-Select/Disqualification Reason (Police 2017) | # of Applicants | Percent Ratio |
|---|---|---|
| Failed to Respond to Notices | 763 | 33.06% |
| Announcement Closed | 259 | 11.22% |
| AutoDQ-TEMPORARY-Marijuana | 186 | 8.06% |
| Not Selected | 143 | 6.20% |
| Failed to show for performance exam (APRT,COPAT,CPAT) | 119 | 5.16% |
| AutoDQ-TEMPORARY-Minimum Qualifications | 115 | 4.98% |
| DQ-PERMANENT-Deception | 115 | 4.98% |
| DQ - Previous Permanent Disqualification | 93 | 4.03% |
| AutoDQ-PERMANENT-Legal History (Criminal Acts) | 85 | 3.68% |
| Applicant Withdrew | 65 | 2.82% |

# APPENDIX J

## Inspector General Overview

- The Office of the Inspector General (OIG) serves as an independent and objective investigative and inspection body to promote economy, efficiency, and effectiveness in the administration of PGPD operations and programs and uphold the Department's public safety mission based on constitutional policing.
- Essential goals of the OIG are to prevent and detect fraud, waste, abuse, mismanagement, and wrongdoing in the Department.

- To achieve these goals, the OIG –
  - Handles certain external and internal complaints against sworn and unsworn employees
  - Collaborates with the Internal Affairs Division of the Department regarding discipline oversight
  - Oversees the Administrative Hearing Board regarding disciplinary hearings
  - Collaborates with the Bureau of Administration & Homeland Security (Training and Education) regarding training and hiring
  - Works with Fiscal Management Division to resolve financial issues, including the appropriate expenditure of funds allocated for specific purposes and recovery of monies purportedly owed to the Department by current or former employees
  - Oversees the Planning and Research Division (PRD), which is responsible for evaluating the Department's policies and procedures, and determining and implementing best practices; in addition, PRD partners with higher education institutions and research organizations to conduct studies that further the development of the law enforcement profession
  - Works closely with the Chief of Police regarding various projects and initiatives and provides legal guidance to the entire Executive Team on matters

- Internal Affairs Division Independent Authority
  - Routinely review case files and evidence and provide legal insight and recommendations regarding sufficiency of the evidence and potential administrative charges against officers
  - Purpose is to help ensure fairness and equity in the administration of disciplinary action instituted against officers
  - Review of cases also provides greater insight into whether General Orders are appropriate or should be modified
  - No auditing of IAD cases (CCOP reviews cases post-adjudication)

- AHB Oversight
  - Under LEOBR, officers who have been charged with disciplinary action may elect to have a trial board; depending on the charge(s), the board will consist of one (1) or three (3) members.
  - Within PGPD, there are two (2) permanent hearing board co-chairs, a Major and a Captain; the third is an officer of equal rank selected by the Chief of Police and the charged officer.
  - The Inspector General oversees the hearing by providing legal guidance when needed to the board members during the hearing.
  - No involvement in deliberations or recommended punishment if convicted

85

- ○ Post-hearing debriefings

- PRD Oversight
  - ○ At least 25% of time spent working with PRD to ensure that appropriate policies and procedures are in place regarding operations and to address wrongdoing
    - ■ Examples:
      - Immigration Policy
      - Social Media Policy
      - Incentive Program Prohibition Policy
      - Grooming Policy
      - False Statement/Misrepresentation of Facts
      - Body-Worn Camera Policy

- Training Oversight
  - ○ Review training curriculum and make recommendations to ensure best practices (e.g., duty to intervene/EPIC; crisis intervention teams)
  - ○ Conduct supervisory and regular in-service training to officers
  - ○ Ethics
  - ○ Social Media Usage
  - ○ Provide written legal guidance to Department regarding important appellate decisions
  - ○ Coordinate Executive Review Panels for critical incidents

- Collaboration with Chief's Office on Projects
  - ○ Includes Assistant Chief and Deputy Chiefs
  - ○ Conduct review of historical Departmental performance in critical areas (e.g., firearm discharges and vehicle pursuits)
  - ○ Attend internal meetings with Executive Team members and provide legal guidance
  - ○ Issues involving the State's Attorney's Office, U.S. Attorney's Office or the Courts
  - ○ Issues surrounding Forensic Evidence (e.g., NIBIN Leads & GSR)
  - ○ Facilitate and attend external meetings with the public to resolve community concerns/build stronger community relationships
  - ○ Draft memoranda regarding myriad issues pertaining to police operations and policy-related matters
  - ○ Draft letters on behalf of Chief of Police, Executive Team, and Office of the County Executive

- Other Responsibilities
  - ○ Serve as POC to the District Court Administrative Judge regarding issues arising in the courtroom
  - ○ Serve as liaison between the Department and the State's Attorney's Office
  - ○ Provide oversight regarding the County's Speed Camera Program

**APPENDIX K**

**School Resource Officers and Security Personnel**

- The Safe to Learn Act of 2018[29] mandates either the assignment of an SRO or adequate law enforcement coverage for each individual school within each of Maryland's twenty-four local school systems. Any Maryland school without assigned SROs would still need to ensure that an individual with expertise in law enforcement was assigned to serve on the behavioral assessment teams serving the school system to comply with the Safe to Learn Act.
  - SROs and school security personnel in Maryland receive instruction in Maryland's five-day SRO training curriculum; yet, individuals providing "adequate law enforcement coverage" to schools without assigned SROs are not required to complete this comprehensive training.
  - Topics required by law to be covered in Maryland's SRO training curriculum include De-escalation, Disability Awareness, Maintaining a Positive School Climate, Constructive Interactions with Students, Implicit Bias, and Disability and Diversity Awareness with specific attention to Racial and Ethnic Disparities.

- Duties
  - SROs will acknowledge the authority of the principal, as the administrator of the school, at all times as to matters within the scope of his/her authority.
  - The SROs will assist school staff in enhancing safety inside their assigned schools and serve as a liaison between his/her agency and PGCPS officials for school and police- related concerns and incidents.
  - The SRO will present a visible presence and serve as a positive role model for students.
  - The SRO will assist in fostering amiable working relationships between law enforcement, staff and students.
  - Unless there are extenuating circumstances, such as rumors of a fight or some other serious event, the SRO will patrol the school and the school grounds on a random schedule. (Personnel other than SROs should staff assignments to stationary or fixed posts on school grounds.)
  - The use of force by an SRO will be done in a reasonable manner in accordance with the Police Department's Use of Force General Order. Any use of force by the SRO will be investigated by the Police Department according to regulations. The SRO should be familiar with PGCPS's Student Safety Administrative Procedures.

- Personnel with Arrest Powers
  - There are 33 SROs with arrest powers that are assigned to work in high schools only. The Department of Safety and Security Services has 66 school security personnel with arrest powers. School security personnel do not carry weapons. The only armed personnel in schools are SROs. PGCPS is the only school system in Maryland with school security personnel that have arrest powers. During the 2019/20 school year, 73% of the 274 arrests were carried out by school security personnel.

  - Total Number of School Resource Officers =  (33)
    - Prince George's County Police –            28

---

[29] Codified in MD Code Ann., Education § 7-1501, *et. seq.*

- ■ Bowie Police Department –     2
- ■ Greenbelt Police Department –     1
- ■ Hyattsville City Police Department –     2

- ○ Total School Security Personnel with Arrest Powers = (66)
- ○ Total Number of School Security Personnel and SROs with Arrest Powers = (99)
- ○ Total spent on school security: $17 million
- ○ Total spent on SROs: $4.32 million

- Arrests by School Level, Gender, and Ethnicity, and Grade
  - ○ School Year 2019/20 (274 Arrests)
    - ■ School Level
      - High Schools –     232
      - Middle Schools –     35
      - Combined Schools –     7

    - ■ Gender
      - Males –     184
      - Females –     90

    - ■ Ethnicity
      - American Indian –     1
      - Asian –     2
      - African American –     235
      - Hispanic –     33
      - White –     2
      - More than one race –     1

    - ■ Grade
      - 12th Grade –     23
      - 11th Grade –     30
      - 10th Grade –     55 (20%)
      - 9th Grade –     127 (46.3%)
      - 8th Grade –     16
      - 7th Grade –     20
      - 6th Grade –     3

    - ■ Repeat Arrests (students arrested twice or more per school year)
      - 13 students were arrested twice or more
      - 27 arrests attributed to those 13 students

  - School Year 2018/19 (311 Arrests)[30]
    - ■ School Level
      - High Schools –     272

---

[30] African American students received 87% of school-based arrests despite representing 57% of the student population (Maryland State Department of education, Maryland Public Schools Arrest Data: School Year 2018-19 (2020)).

- Middle Schools –        27
- Combined Schools –      10
- Elementary –            2

■ Gender
- Males –                 219
- Females –               92

■ Ethnicity
- American Indian –       0
- Asian –                 0
- African American –      270
- Hispanic –              31
- White –                 4
- More than one race –    6

■ Grade
- 12th Grade –            33
- 11th Grade –            46
- 10th Grade –            91 (29.2%)
- 9th Grade –             110 (35.3%)
- 8th Grade –             12
- 7th Grade –             14
- 6th Grade –             3
- 5th Grade –             2

■ Repeat Arrests (students arrested twice or more per school year)
- 17 students were arrested twice or more
- 39 arrests attributed to those 17 students

○ School Year 2017/18 (350 Arrests)
■ School Level
- High Schools –          295
- Middle Schools –        41
- Combined Schools –      10
- Elementary –            4

■ Gender
- Males –                 226
- Females –               124

■ Ethnicity
- American Indian –       10
- Asian –                 1
- African American –      305
- Hispanic –              0

89

- White – 23
- More than one race – 7
- Hawaiian – 4

■ Grade
  - 12th Grade – 21
  - 11th Grade – 46
  - 10th Grade – 87 (24.8%)
  - 9th Grade – 136 (38.8%)
  - 8th Grade – 20
  - 7th Grade – 19
  - 6th Grade – 13
  - 5th Grade – 6
  - 4th Grade – 1
  - 3rd Grade – 1

■ Repeat Arrests (students arrested twice or more per school year)
  - 27 students were arrested twice or more
  - 60 arrests attributed to those 27 students

**APPENDIX L**

**Law Enforcement Officers' Bill of Rights Overview**

The Law Enforcement Officers' Bill of Rights (LEOBR) is a state law found in MD Code Ann., Public Safety § 3-101, *et. seq.*, guaranteeing certain procedural safeguards to law enforcement officers during any investigation, interview, or interrogation that could lead to disciplinary action, demotion, or dismissal. LEOBR sets guidelines for administrative hearing boards and time limits for filing administrative charges (generally, one year).

The LEOBR mandates an officer provide a statement in all administrative investigations
- Non-probationary officers are allowed up to five days when under administrative investigation to delay interrogation in order to secure counsel
- Probationary officers are only afforded five days during use of force investigations

Criminal investigations are handled in conjunction with the Office of the State's Attorney, and the provisions of the LEOBR do not apply during the criminal phase of an investigation.

91

**APPENDIX M**

**Prince George's Department of Social Services (DSS) Overview**

- Mission
  - Provide opportunities for County community members to become independent, responsible, and stable members of the community
  - Achieved by providing intervention services that strengthen families, protect children and vulnerable adults, encourage self-sufficiency, and promote personal responsibility

- Office of Strategic Partnerships and Community Solutions (OSPCS)
  - Serves to strengthen the connection between DSS, local government agencies, and community-based organizations.

  - DSS supports 15 middle schools within PGCPS. Participants typically experience challenges navigating adolescent development and often require additional support as they develop their own personal identities, strengthen relationships with peers and family members. DSS Human Service Navigators will conduct regular individual check-ins, home visits, and small student group sessions to support each schools' effort to positively impact students personal and academic growth.

  - During the 2019-2020 school year, OSPCS collaborated with eight partners to provide crisis intervention, behavioral health, college and career readiness, and social-emotional support to students. Since as early as April 2019, OSPCS receives a weekly runaways report from Prince George's Police Department to contact families of students that may attend schools that Human Service Navigators support. Navigators make every effort to contact families, offer referrals to necessary intervention/prevention services and coordinate school-based wraparound support for runaway youth.

  - Multi-service Centers
    - Langley Park Multi-Service Center
    - Bridge Center at Adam's House
    - The Solutions Center at Southview
    - Employ Prince George's American Jobs Center

  - 2019-20 School Year Overview
    - General Referrals
      - 2,163 students were referred for general support needs
      - 330 students were referred for clothing, technology, educational materials, and holiday assistance

    - Behavioral Health
      - 4,385 students received therapy
      - 67% of students successfully met treatment goals

- ■ Intensive Case Management
  - ● 4,385 students received therapy
  - ● 1,672 students received case management support related to homelessness, group interventions and connections to culturally and linguistically appropriate resources

- ■ Intensive Case Management
  - ● 4,385 students received therapy
  - ● 1,672 students received case management support related to homelessness, group interventions and connections to culturally and linguistically appropriate resources

- ■ College and Career Readiness
  - ● 505 students participated in dropout prevention programming
  - ● 50 students participated in a youth employment training academy

- ● Child Protective Services
  - ○ A state-mandated program responsible for ensuring the safety and well-being of children and families in the community through the receipt and investigation of allegations of physical abuse, sexual abuse, neglect, and mental injury of children under the age of 18.

  - ○ CPS investigations are conducted in a trauma-focused, child-friendly manner by professionals trained to assess and discern the safety and wellbeing of child victims of abuse and maltreatment. PGCDSS follows the laws, policies, and practices set forth by federal, state, and local government.

  - ○ The Child Advocacy Center (CAC) led by DSS and including the county police department, State's Attorney Office, and other partners is a child-friendly facility where child victims of sexual abuse and maltreatment have forensic interview, undergo medical exams, linked with a family advocate and receive family therapy.

- ● Foster Care and Adoption
  - ○ Provides short-term care and supportive services to children who are unable to live at home due to child abuse and neglect. Children are placed in family foster homes, kinship care, as well as congregate care.

  - ○ Foster Care is the response of last resort to abuse and neglect. The goal of Prince George's County child welfare agency is to keep children with their families. Under the recently implemented Family First Prevention Services Act states, territories, and tribes with an approved Title IV-E plan have the option to use these funds for prevention services that would allow "candidates for foster care" to stay with their parents or relatives. States can be reimbursed for prevention services for up to 12 months.

  - ○ AFFIRM
    - ■ Provides LGBT+ youth and their families the support and resources necessary to help youth improve their coping skills and provide peer support. It also gives the parents and caregivers the tools to celebrate, honor and validate LGBT+ identities and experiences and recognize the impact of discrimination and stigma on the well-being of youth.

- In the last year, 23 youth self-identified as LGBT+ and participated in AFFIRM. Twelve of these youth received mental health services. None of the 23 youth had any known encounters with law enforcement.

- In partnership, with the Human Rights Campaign, all DSS staff participate in mandatory training to improve the services provided to LGBT+ youth.

○ Crossover Youth Program
- The Prince George's Model Court which includes the Circuit Court, DSS, the Department of Juvenile Services and many other partners implemented the Crossover Youth Program to provide better care for all children who are involved with child welfare and juvenile services.

- Of the 152 youth served since inception, the Crossover Youth program has successfully diverted 57% from subsequent court involvement. There has been a noticeable reduction in the number of child welfare youth arrested and significant increase in joint case planning between the systems for youth formally adjudicated.

- For FY 21 there are six (6) participants in the Crossover Youth Program. All have experienced encounters with law enforcement; however, there are no negative interactions reported. All 6 are currently receiving behavioral health services.

○ Ready by 21
- An expansion of the continuum of services provided by PGCDSS through the strategic realignment of relationships with public and private sectors to ensure that youth are provided with the opportunity to achieve positive outcomes as an adult.

- Services Overview
  ● Preparing youth for approaching adulthood
  ● Providing supportive services to youth as they age out of care
  ● Providing tailored strategies for each youth to best support their needs
  ● Offering career development and job placement assistance to eligible youth

- As part of the Model Court program, each youth is assessed for independence based on a checklist developed by Model Court partners. Ready by 21 seeks to ensure that every young adult is appropriately prepared for independence once they leave foster care.

● Youth Homelessness Demonstration Project (YHDP)
○ Prince George's County is committed to preventing and eliminating homelessness whenever and wherever possible and ensuring that when homelessness does occur, those episodes are rare, brief and non-recurring. DSS and other Continuum of Care partners operate shelters for families, women and children, men, and unaccompanied youth who are homeless.

○ DSS is part of the US Department of Housing and Urban Development's (HUD) Youth Homelessness Demonstration Project, which is designed to reduce the number of youth

experiencing homelessness, including unaccompanied, pregnant, and parenting youth.

○ As part of the Department of Social Services led Youth Homelessness Demonstration Project (YHDP), seven projects have been selected and submitted to HUD for final approval and will serve unaccompanied youth and young adults aged 24 or younger who are experiencing homelessness. The projects include new capacity in the following areas:
  ■ Drop-In Center
  ■ Street Outreach
  ■ Crisis beds for those experiencing a significant behavioral health crisis
  ■ Joint transitional and Rapid re-housing
  ■ Joint transitional and Rapid re-housing for high education students
  ■ Permanent Supportive housing for those significant somatic, behavioral, or intellectual challenges

○ Current Resources for Youth Experiencing Homelessness
  ■ Promise Place
    ● An emergency youth shelter that provides homeless, abandoned, abused, neglected and runaway youth a safe place to stay as alternative to the streets and/or unstable housing. Operated in partnership with Sasha Bruce, Inc., Promise Place is open 24 hours a day and serves up to 20 youth at one time. On-site services include crisis intervention; individual, group, and family counseling; case management, support for shelter graduates, and temporary respite care.

  ■ St. Ann's Center
    ● Supports families supports families and youth on their journey to stability. On-site services include teen mother and baby programs, transitional housing, life skills, and an education center.

  ■ Maryland Multicultural Youth Services
    ● Offers a family-based or host home model for youth with short-term housing needs and youth who could benefit from long-term placement with a family. It provides emergency shelter to homeless and runaway youth.

● Eligibility Services
  ○ Food and Cash Assistance
    ■ Supplemental Nutrition Assistance Program (SNAP)
      ● The Federal Program for Maryland's Food Supplement Program, SNAP offers nutrition assistance to millions of eligible, low-income individuals and families and provides economic benefits to communities. SNAP is the largest program in the domestic hunger safety net.

    ■ Temporary Cash Assistance (TCA)
      ● Provides need-based supportive services to families with minor children; it has a requirement that all work mandatory applicants seek employment and be involved in work activities from the day they apply.

- ■ Emergency Assistance to Families with Children (EAFC)
  - ● Provides emergency cash assistance to families who need emergency help paying rent, utilities, or other emergency bills. Customers may only receive one grant within a 24-month period. Each family situation is assessed to determine the type of emergency help needed. Families must have one or more children under 21 and living with them.

- ○ Affordable Care Act
  - ■ Prince George's County Health Connect (PGCHC)
    - ● The Department of Social Services is the administrator for Prince George's County health insurance marketplace; providing enrollment assistance, education, and outreach to Prince George's County community members. PGCHC uses certified navigators to provide in-person assistance to help residents learn about, apply for, and enroll in health insurance; including Medicaid (MA), Maryland Children's Health Program (MCHP), and private insurers.

  - ■ Medicaid
    - ● A program that pays the medical bills of certain low-income individuals. Administered by the State, it pays medical bills with Federal and State funds. While most Medicaid applications are handled through the State, PGCDSS remains responsible for eligibility and management of special populations such as ineligible immigrants, SSI households, persons ages 65 and over, children in foster care, and juvenile justice systems.

## GLOSSARY OF TERMS, ABBREVIATIONS, AND ACRONYMS

**AHB, Administrative Hearing Board** – A quasi-judicial body with the appellate function of reviewing cases of police officer misconduct and rendering final discipline.

**Citizen** – the term is used interchangeably with resident or community member to refer to persons who live or work in Prince George's County.

**CCOP, Citizen Complaint Oversight Panel** – Agency responsible for reviewing the processing of investigations by the Internal Affairs Division of citizen complaints of alleged use of force, abusive language, and harassment against Prince George's County Police Officers.

**Crisis Intervention** – An immediate and short-term emergency response to stabilize individuals mental, physical, or behavioral distress.

**DSS, Department of Social Services** – Provides child and adult services including protective services, foster care, adoptions, and family preservation services. Family services include temporary cash assistance, food supplement, medical assistance, homeless prevention and intervention, energy assistance, emergency assistance, and child care assistance.

**Equal Employment Opportunity (EEO)** – Equal opportunity to attain or maintain employment in a company, organization, or other institution.

**IAPro system** – Prince George's County Police Department database of the department's internal investigations records.

**Internal Affairs Division (IAD)** – Conducts or monitors internal investigations of police officers; has authority and control over all complaints about the conduct of Police Department employees.

**Inspector General (IG)** – Serves as an independent and objective, audit and investigative body to promote economy, efficiency, and effectiveness in the administration of Police Department programs and operations, and to prevent and detect fraud, waste, abuse, and mismanagement in Police Department programs and operations.

**Mobile Crisis Unit** – A team of professionals that provide same-day intervention for individuals experiencing mental health crises to prevent escalating emergencies that require law enforcement or involuntary hospitalization.

**OHRM, Office of Human Resources Management** – Provides Prince George's County staffing and compensatory services including recruitment; background investigations; classification; training and career development; health and benefit administration; and pension programs. Employee management services include labor and employment law interpretation and advice; developing and monitoring personnel policy and procedures; handling grievances; labor negotiations; records management; and position control monitoring.

**SAO, Prince George's County State's Attorney's Office** – Ensures the fair administration of justice including criminal investigations and prosecutions; victim and witness assistance; and limited civil matters such as forfeitures and collateral review proceedings.

**Schools Security Personnel** – An individual who is not a school resource officer and is employed by a local school system to provide security-related services at a public school.

**SRO, School Resource Officers** – A law enforcement officer from the County or municipal police department assigned to a school in accordance between a memorandum of understanding between the chief of a law enforcement agency and the local education agency.

## LIST OF PRESENTERS

**July 30, 2020 - Police Department Overview**

1. **Hector Velez**, Interim Chief of the Prince George's County Police Department, (police department overview)

**August 12, 2020 - Hiring and Training**

1. **Shawn Stokes**, Director of Prince George's County Office of Human Resources Management, (police officer hiring/promotional process and data)
2. **Major William Alexander**, Prince George's County Police Department, (police officer basic training, de-escalation, and 21st Century Policing)

**August 20, 2020 - Internal Affairs and Investigations**

1. **Major James McCreary**, Prince George's County Internal Affairs Division (IAD), (IAD and complaint process overview)
2. **The Honorable Aisha Braveboy**, Prince George's County State's Attorney, (internal investigations against police)

**August 27, 2020 - Complaints**

1. **Rhonda Weaver**, County Attorney of Prince George's County, (Office of Law overview)
2. **Florence Felix-Lawson**, Chair of the Citizen Complaint Oversight Panel (CCOP), (CCOP overview and challenges)
3. **Donnell Turner**, Inspector General (IG) of Prince George's County, (IG overview)

**September 3, 2020 - Police Department Data Examination**

1. **Hector Velez**, Interim Chief of the Prince George's County Police Department, (calls for service, traffic stops, body-worn cameras)

**September 17, 2020 - Police Department Finances**

1. **Angela Fair**, Comptroller of Prince George's County Police Department Fiscal Affairs Division, (County Police Budget)

**September 24, 2020 - Crisis Response**

1. **Gevonia Whittington**, Director of Prince George's County Office of Emergency Management/Public Safety Communications 9-1-1, (9-1-1 Call Center and Dispatch Overview)
2. **James Blake**, Director of the Sante Group, (2015-2020 Prince George's Crisis Response data)

**October 8, 2020 - Local and National Perspectives**

1. **Dr. Tyrone Powers**, Powers Consulting Group, LLC, (use of force, cross jurisdiction training)
2. **Kristina Roth,** Amnesty International (local use of force policies)

**October 15, 2020 - Training, Hiring, and Accountability**

1. **Dr. Rashawn Ray**, Professor of Sociology at the University of Maryland, (data reporting, bias-free policing, and racial equity in policing)
2. **Jeff Zuback**, Governor's Office of Crime Prevention, Youth, and Victim Services, (Prince George's County Police Department traffic stop data)
3. **Keith Lotridge**, Prince George's County Office of the Public Defender, (data; information; video footage collection; police practices; and stops, searches, and arrests)
4. **Amber Widgery and Zach Herman**, National Conference of State Legislatures (NCSL), (nationwide review of state laws and recent legislation concerning police departments)

**October 22, 2020 - Consent Decrees, Family Services, and School Resource Officers (SROs)**

1. **Dr. Monica Goldson and Barry Stanton**, Chief Executive and Chief Operating Officers of Prince George's County Public Schools, (school resource officers and security staff overview)
2. **Michael Harrison**, Chief of Baltimore City Police Department, (managing police departments under consent decrees)
3. **Gloria Brown**, Director of the Prince George's County Department of Social Services, (family preservation, child protective services, foster care & adoption, youth homelessness, and eligibility services)
4. **Michael Rudinski**, Maryland Center for School Safety, (state-level school resource officer training)
5. **Aarti Sidhu and Megan Berger**, Maryland Coalition to Reform School Discipline, (school safety and removal of police presence)

**October 29, 2020 - Advocacy Day**

1. **Shawn Stokes**, Director of Prince George's County Office of Human Resources Management, (update on police chief search)
2. **The Family of William Green**
3. **Angelo Consoli**, President of the Fraternal Order of Police Lodge 89
4. **Reverend Tony Lee**, Community of Hope AME Church
5. **Amity Pope**, Co-Chair of PG Changemakers
6. **Gustavo Torres**, CASA de Maryland
7. **Kelly White**, Program Director of Capital Area Immigrant Rights (CAIR) Coalition
8. **Beth Reed**, Vice President of the Riverdale Heights, Riverdale Hills, and Crestwood Community Association
9. **Doris Reed**, Executive Director of the Association of Supervisory and Administrative School Personnel Union

**EXECUTIVE ORDERS**



# PRINCE GEORGE'S COUNTY GOVERNMENT

## OFFICE OF THE COUNTY EXECUTIVE

Angela D. Alsobrooks
County Executive

**EXECUTIVE ORDER**

**No. 17-2020**

(Supercedes Executive Order No. 16-2020)

**July 9, 2020**

**2020 PRINCE GEORGE'S COUNTY, MARYLAND POLICE REFORM TASK FORCE**

WHEREAS, law enforcement officers provide essential protection to ensure safety and welfare in our communities. Essential to this mission is trust and cooperation between the public and law enforcement community to provide safe living and working environments; and

WHEREAS, law enforcement officers are entrusted with a great amount of legal authority which if utilized improperly has detrimental and devastating effects on our communities and the mission of providing safe communities is severely impaired; and

WHEREAS, recent tragic events across of the nation remind us of the need to continually be vigilant in ensuring that the public has confidence that persons entrusted with law enforcement authority are using best practices to deliver critical services to our communities; and

WHEREAS, Article V, Section 506 of the Charter for Prince George's County, Maryland, provides for the County Executive to appoint, for designated periods, one or more temporary advisory boards of citizens of the County who shall assist in the consideration of County policies and programs; now therefore,

IT IS HEREBY ORDERED, on this 9th day of July 2020, that I, Angela D. Alsobrooks, County Executive for Prince George's County, Maryland, do hereby order the following that supercedes Executive Order No. 16-2020:

I.    The 2020 Police Reform Task Force is hereby established. The mission of the task force will be to study and review policies of the Police Department in areas that cover a full spectrum of its operations including hiring, training and use of force policies.

II.    The Task Force will consist of no more than 23 persons and will be comprised of a cross-section of Prince George's County, including persons with specialties and relevant backgrounds who can provide insightful and useful input into police reform recommendations.

III.    Members of the Task Force will be comprised of representatives from the following local groups: County residents, academia, judicial branch (federal and state), County Council, County Executive Office, County Police Department, State's Attorney Office, Office of Law, County Public Schools, Office of the Sheriff, Public Defender Office, Citizen Complaint Oversight Panel, and citizen advocacy.

Wayne K. Curry Administration Building • 1301 McCormick Drive, Largo, MD 20774
(301) 952-4131 • www.princegeorgescountymd.gov

IV.    The Task Force will develop its own procedural rules.    A recommendation report should be completed no later than October 30, 2020.

V.    This Executive Order shall remain in effect through October 30, 2020, unless amended, extended or terminated prior to that date.

VI.    If any provision of this Executive Order or its application to any person, entity, or circumstance is held invalid by any court of competent jurisdiction, all other provisions or applications of the Order shall remain in effect to the extent possible without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are severable.

Angela D. Alsobrooks
County Executive

Wayne K. Curry Administration Building • 1301 McCormick Drive, Largo, MD 20774
(301) 952-4131 • www.princegeorgescountymd.gov

102



# PRINCE GEORGE'S COUNTY GOVERNMENT
### OFFICE OF THE COUNTY EXECUTIVE

**EXECUTIVE ORDER**
**No. 21 – 2020**

**September 21, 2020**

**EXTENSION OF DEADLINE FOR THE 2020 POLICE REFORM TASK FORCE**

**WHEREAS**, the 2020 Police Reform Task Force has earnestly begun its work in reviewing and studying the policies of the Prince George's County Police Department, including holding regular, public meetings; and

**WHEREAS**, more time is needed for study and review prior to finalizing its recommendations; and

**WHEREAS**, the Police Reform Task Force has requested an extension to December 4, 2020 to present its recommendations to the County Executive; now therefore,

**IT IS HEREBY ORDERED**, on this 21st day of September 2020, that I, Angela D. Alsobrooks, County Executive for Prince George's County, Maryland, do hereby order:

I.    The 2020 Police Reform Task Force request for additional time complete its recommendation report is reasonable and promotes the public interests.

II.    A recommendation report should be completed no later than December 4, 2020.

III.    This Executive Order is an amendment to Executive Order 17-2020, dated July 9, 2020.

IV.    This Executive Order and all other provisions in Executive Order 17-2020, not inconsistent with this Executive Order, shall remain in effect through December 4, 2020, unless amended, extended or terminated prior to that date.

V.    If any provision of this Executive Order or its application to any person, entity, or circumstance is held invalid by any court of competent jurisdiction, all other provisions or applications of the Order shall remain in effect to the extent possible without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are severable.

_Angela Alsobrooks_
Angela D. Alsobrooks
County Executive

Wayne K. Curry Administration Building • 1301 McCormick Drive, Largo, MD 20774
(301) 952-4131 • www.princegeorgescountymd.gov

103