# Expert Report

Prepared By

## *J. Thomas Manger*

In

Hispanic National Law Enforcement Assoc. NCR et al.
v.
Prince George's County et al.,

United States District Court
District of Maryland

Civil Action No.: 8:18-cv-03821-TDC

CONFIDENTIAL

## TABLE OF CONTENTS

Experience ........................................................................................................................... 5

Scope of Analysis ................................................................................................................. 7

Materials Reviewed ............................................................................................................. 7

Summary of Conclusions ...................................................................................................... 8

Landscape of Policing in the Washington D.C. Metropolitan Area ............................................ 10

    A.    Recruitment ............................................................................................ 11

    B.    Background on Prince George's County Police Department ...................................... 12

Analysis and Opinions ......................................................................................................... 14

    PART 1.  INTERNAL AND EXTERNAL EEO COMPLAINT PROCEDURES ........................................ 14

    A.    Prince George's County Police Department Policies for Addressing Harassment and Discrimination Complaints is Consistent with Industry Standards and Incorporates Best Practices. ............................................................................................................. 14

    B.    Prince George's County Police Department Conducts Routine, In Person, Harassment and Discrimination Trainings That Are Generally Presented by the County's Commission on Civil Rights. ........................................................................................................... 20

    PART 2.  IAD REASONABLY APPLIES DISCIPLINE AND PERFORMS INVESTIGATIONS IN ACCORDANCE WITH BEST PRACTICES ................................................................................... 23

    A.    Prince George's County Police Department's Complaint Policies Are Reasonable ... 23

    B.    IAD's Screening and Assignment Procedures Are Reasonable .................................. 24

    C.    IAD's Practices Comply with LEOBR and Have Several Layers of Internal and External Review ............................................................................................................... 26

        i.    Investigations ..................................................................................... 26

        ii.    Recommending Discipline and Like Discipline ........................................ 27

        iii.    Recommending Terminations ............................................................. 31

        iv.    CCOP Review .................................................................................... 33

        v.    AHB Hearing ....................................................................................... 34

        vi.    Circuit Court Review .......................................................................... 35

        vii.    Diversity in the Disciplinary Process .................................................. 35

    D.    The Individual Plaintiffs Were Reasonably Disciplined ............................................. 37

        i.    The investigations into Plaintiff Perez were not retaliatory or harassment ......... 37

        ii.    Plaintiff Oatis was disciplined fairly ...................................................... 41

        iii.    Michael Brown was Fairly Disciplined .................................................. 44

        iv.    McClam Was Not Retaliated Against During Internal Investigations .................... 50

2

v.    The investigation into Plaintiff Crudup was not retaliatory. .................................. 51

E.    Prince George's County Police Department Acted Reasonably with Regard to Other Investigations If and When Complaints Were Made ............................................................ 54

F.    The Department Responded Appropriately to Facts and Circumstances, Even If No Complaint Was Filed ............................................................................................................ 54

    i.    "GFYOBMA" License Plate ........................................................................................ 54

    ii.    Lieutenant Edward Scott Finn's Comment Published in a New York Times Article 55

    iii.    A String of Statements Allegedly Made by Corporal Steven Jones ....................... 57

G.    The Department Repeatedly Carried Out Sufficient Investigations Despite Impediments Caused by Plaintiffs or Circumstances Unrelated to the IAD Leadership ...... 59

    i.    The Color Guard Locker, SI2017-018 ...................................................................... 59

    ii.    Training Dummy, SI2017-067 .................................................................................. 61

    iii.    Sergeant Bunce, IA2017-003 ................................................................................. 63

    iv.    Sergeant Rush, IA2016-034 and Parallel EEO Complaint ...................................... 64

H.    The Department Determined Discipline for All Cases in Light of the Evidence Available and Consistent with Best Practices ........................................................................ 66

I.    IAD Exercised Its Discretion Appropriately When Deeming Cases Suitable for Review by Alternative Avenues ............................................................................................................... 68

    i.    Complaints by Police Officer Latashia Pinckney and Corporal Terrence Brown .... 68

    ii.    Compensatory Time Incentive Program ................................................................ 69

PART 3.  THE DEPARTMENT'S PROMOTION PROCESSES ARE EQUITABLE. ............................. 73

A.    Contrary to His Assertions in the First Amended Complaint, Plaintiff Paul Mack Did Not Test High Enough to Be Promoted to Lieutenant During the 2016 Promotional Cycle  75

B.    Plaintiff Perez's Failure to Earn a Promotion to Major Does Not Indicate Retaliation or Discrimination ................................................................................................................... 76

PART 4.  THE DEPARTMENT MAKES TRANSFERS REASONABLY AND FAIRLY WITHOUT RACIAL BIAS AND WITHOUT RETALIATION ................................................................................. 77

A.    Perez's transfer was not retaliatory. ......................................................................... 79

B.    Corporal Michael Anis Was Not Discriminated Against in Connection with His Transfer Requests ................................................................................................................. 80

C.    Plaintiff Thomas Boone's Transfer Was Not Retaliatory .......................................... 80

D.    Plaintiff Sonya Zollicoffer's Transfer Was Not Retaliatory ...................................... 81

E.    Corporal Chris Smith's Reassignment Was Not Retaliatory ..................................... 84

F.    Plaintiff Patrick McClam's Transfer Was Not Retaliatory ......................................... 86

G.    Plaintiff Richard Torres's Transfer Was Not Retaliatory ........................................... 86

CONFIDENTIAL

PART 5.  USE OF FORCE .......................................................................................................... 88

PART 6.  THE DEPARTMENT PROVIDES IMPLICT BIAS TRAINING CONSISTENT WITH BEST
PRACTICES .......................................................................................................................... 93

Summary and Conclusions ................................................................................................... 97

CONFIDENTIAL

## EXPERIENCE

1)      I spent 42 years as a police officer from 1977 to 2019.  After being sworn in as a Fairfax County, Virginia police officer, I rose through the ranks and was appointed the Chief of Police in 1998.  During my career, I worked as a patrol officer, a supervisor, had a variety of administrative and operational assignments as a Lieutenant, and then commanded two District Stations as a Captain.  As a supervisor, I conducted numerous investigations of complaints, both those generated internally, as well as complaints from the public involving personnel under my supervision.  As a District Commander, I gained extensive experience reviewing and making decisions on internal investigations as well as disciplinary decisions.  For over three years, I was assigned as the Night Duty Officer, and was in charge of all police operations from 4 p.m. to 4 a.m.  In that role, I managed hundreds of police operations involving violent crimes, hostage-barricade events, protests, police shootings and other use of deadly force cases, traffic fatalities, and other high-profile incidents.  I also headed the Patrol Bureau for two years.  The District Station Commanders reported directly to me.  I oversaw transfers, staffing issues, coordination of special assignment teams, and reviewed discipline for all cases involving patrol officers, supervisors and Commanders.  Before I was appointed as the Chief of Police, I served as the Deputy Chief for Administration ("DCA"), then the Deputy Chief for Operations ("DCO").  As the DCA, I oversaw Training, Human Resources, Technology, Planning, the 9-1-1 Center, Animal Control and the Budget.  In my role as DCO, I supervised Investigations, Special Operations and Patrol.

2)      From 1998 to 2004, I served as the Chief of Police for Fairfax County.  In that position, I exercised oversight and final decision-making authority for all aspects of the Department's operations, including hiring the right people, investing in their training, and holding every member of the Department accountable for doing the job the way it should be done.  I was responsible for delivering police service to 1.2 million members of the community and spent a good deal of my time doing outreach to the community, listening to their concerns, and being responsive to their issues.  I had final decision-making authority over all personnel issues, the budget, transfers, grievances, internal investigations, promotions, policy development, and interfacing with elected officials.  I ensured that the Department and its members had the resources they needed to reduce and prevent crime in the County.

3)      In 2004, after serving six years as the police chief in Fairfax County, I left the Department to accept the position as the Chief of Police in Montgomery County, Maryland.  I remained in that position for 15 years, until July 2019.  As the Chief, I was responsible for an agency with over 1900 employees and an annual budget of $285 million.  My duties included delivering police services to over 1 million residents.  In 2016, Montgomery County Police Department was the first large police department in the D.C. area to mandate body-worn cameras for all of our patrol officers.  For 21 years, I had direct oversight and responsibility over the Internal Affairs Division Commander.  I was directly involved in serious disciplinary matters as well as disciplinary appeals, and I worked closely with the Fraternal Order of Police ("FOP"), the exclusive collective bargaining representative of sworn officers and its elected leadership.

CONFIDENTIAL

Upon my retirement, the County Executive issued an executive order naming the Police Headquarters building, the "Chief J. Thomas Manger Public Safety Headquarters."

4)      In my capacities as the Chief of Police for Fairfax County and Montgomery County, my departments had occasion to become involved in coordinated police operations with other police departments in the Washington Metropolitan Area.  A prime example of such cooperative activities occurred in October 2002 during the D.C. Beltway Sniper case.  As a result of these types of interactions within other police departments and other shared connections, I gained a general familiarity with the organizational structure and operations of the other major police departments in the region, including the Prince George's County Police Department.

5)      During my 21 years as a police chief, I was very active in a number of professional associations.  I am now a "lifetime active" member of the International Association of Chiefs of Police ("IACP") the Police Executive Research Forum ("PERF"), as well as the Major Cities Chiefs Association ("MCCA"), an Association of the 70 largest police departments in the United States and Canada.  I served on the IACP's Highway Safety Committee, Research Committee, and the Police Explorer Committee.  I also served as the Vice-President of the PERF Board for four years and was the Chair of MCCA's Legislative Committee for 7 years.  In 2014, I was elected by my peers to be the President of MCCA.  I was re-elected in 2016 and served as President for a second (two-year) term until 2018.  As the MCCA President, I presided over a closed session roundtable comprised of Police Chiefs only, where we discussed our most serious challenges facing our agencies and our profession.  Race, accountability, community outreach, and internal problems were all regular topics at these all-day roundtables.  They were held three to four times each year.  Prince George's County Police Department was a member of MCCA and had regular participation.  I participated in MCCA meetings from 2001-2019.

6)      In my role on the Board of MCCA, I was invited to testify in front of various Congressional Committees on several topics impacting policing.  I was also invited to several meetings with members of the Senate to brief them on current issues in policing.  In addition, I participated in several meetings, alongside other law enforcement leaders, with President Bush, President Obama, President Trump, and Vice-President Biden.  I also sat down with the Attorney General of the United States and the Secretary of Homeland Security more than a dozen times.  Each of these meetings during the Bush and Obama Administrations focused on current issues with regard to policing, including, but not limited to, use of force, race, violent crime, guns, immigration, and gangs.

7)      Upon my retirement in 2019, I began doing consulting work.  Among other contracts, I am a Strategic Site Leader for the Department of Justice's Public Safety Partnership program where I am working with the Davenport, Iowa Police Department in its effort to reduce a rising violent crime rate.  A more complete review of my experience and qualifications are contained in my curriculum vitae, which is attached as Appendix A.

6

CONFIDENTIAL

**SCOPE OF ANALYSIS**

8)      I have been retained by Venable LLP, counsel for the Defendants in the matter of Hispanic National Law Enforcement Officers et al. v. Prince George's County, Maryland et al., United States District Court of Maryland Case No. 8:18-cv-03821- TDC.[1]  Specifically, I have been asked to review the policies, practices, and procedures of the Prince George's County Police Department (the "Department") with regard to the prohibition of discrimination and the Equal Employment Opportunity ("EEO") complaint process, the Internal Affairs Division ("IAD") investigation and disciplinary process, transfer processes and procedures, the promotional process and procedure, and give my assessment of its conformance to what, in my experience, constitute industry norms for such policies and procedures.  I have also been asked to review the facts and circumstances surrounding various allegations made by Plaintiffs in the Amended Complaint filed in this case.  In addition, I have been asked to present my expert opinions regarding the expert report of Mr. Michael Graham ("Mr. Graham's Report").[2]

**MATERIALS REVIEWED**

9)      In the course of this review and analysis, I conducted interviews with Department employees and former employees and reviewed extensive documents, which include the documents generally described as follows:

- Pleadings and other case filings, including the Amended Complaint and Answer;
- Written discovery responses from both Plaintiffs and Defendants;
- Deposition Testimony;
- The Department's General Order Manual;[3]
- IAD policies, procedures, and case files;
- Documents produced in discovery in this case; and
- Documents, correspondence, and deposition testimony relating to the review and investigation by Mr. Graham.

---

[1] I am charging $350 per hour for my work on this matter.

[2] The scope of my analysis is primarily limited to Plaintiffs' claims which involve the alleged treatment of Plaintiffs themselves.  I have been advised that Plaintiffs have alleged over 122 acts involving over 150 Prince George's County Police Department employees that are not tied to the Plaintiffs themselves and bear no relation to their alleged treatment.  I have also been informed that those alleged acts are the subject of a pending Motion In Limine whereby Defendants are requesting the Court to limit the number of acts that Plaintiffs may seek to introduce at trial, require Plaintiffs to identify the acts on which they will rely and grant Defendants the right to conduct discovery in connection with the acts.  I reserve the right to supplement this report with additional analysis of those alleged acts pending the outcome of that motion.

[3] Prince George's County Police Department General Order Manual (hereinafter "General Order Manual" or "GOM"), PG0000944536-945397.

CONFIDENTIAL

**SUMMARY OF CONCLUSIONS**

10)      It is my opinion, held to a reasonable degree of certainty, and based upon my police operations and management expertise, training and experience, that:

- Prince George's County Police Department's policies for addressing harassment and discrimination complaints are commensurate with best practices and industry standards. Mr. Graham failed to take into consideration all of the relevant General Orders when rendering his opinion, which severely undermined his conclusions that the Department's policies for handling complaints about racial harassment and discrimination are inadequate.
- After conducting a full review of all the Department's relevant harassment and discrimination policies and General Orders, and, based on my law enforcement background, I found no significant deficiencies.
- Mr. Graham's criticism of the Department's EEO compliance trainings are equally unfounded.  The Department conducts routine, in person, harassment and discrimination trainings that are generally presented by the County's Human Resources Commission, and as of 2020, by a County Attorney.  Mr. Graham's reliance solely on the documents produced in this litigation to establish the number of attendees at EEO Compliance trainings and the content of the EEO Compliance trainings was improper, inaccurate and further undermines the Graham Report's conclusions.
- Prince George's County Police Department affords members of the community and officers multiple complaint avenues, which in turn, are managed by a reasonable screening and assignment process that considers the Department's investigatory assets.
- The Department's multi-stage discipline process involves various levels of comment and approval from internal and external decision-makers, which fosters a fair and equitable process for all complainants and respondents.  The demographic makeup of the officers involved in the discipline process demonstrates the Department's commitment to prohibiting any racial bias.
- The discipline imposed against Plaintiffs Perez, Oatis, Brown, McClam and Crudup was warranted based on their actions, which proper and thorough IAD investigations revealed were in violation of the Department's policies to various degrees.
- The Department has repeatedly handled circumstances brought to its attention reasonably and thoroughly regardless of various challenges by conducting IAD investigations where appropriate, disciplining officers when investigations indicated such action was necessary, and authorizing review of complaints by multiple units as authorized under the Department's written policies and procedures.
- Prince George's County Police Department's promotion processes give all officers an equitable opportunity to advance within the Department.
- Most officers must take and pass a promotional examination in order to be promoted. The examination process involves multiple layers of accountability, including the

8

CONFIDENTIAL

County's Office of Human Resource Management, an independent third-party consultant, and the officers' union (the Fraternal Order of Police). At the highest ranks, the Chief makes promotional decisions with significant input from the Assistant Chief and Deputy Chiefs.

- Contrary to the assertions in the Graham Report, the Department offers a promotional process which is largely transparent and offers all officers an equal opportunity to advance in rank.

- Plaintiff Mack's and Perez's failure to earn a promotion was not discriminatory or retaliatory; Mack did not test high enough to be promoted to Lieutenant during the 2016 promotional cycle and there is no evidence to suggest that Perez's failure to earn a promotion was discriminatory or retaliatory.

- Prince George's County Police Department's transfer procedures are commensurate with best practices in a law enforcement agency of Prince George's County Police Department's size.

- The Department's practice of using a deliberative process for deciding transfers with the participation of the Executive Command Staff is commensurate with best practices.

- In a police department of Prince George's County Police Department's size, multiple factors related to the needs of the Department inform the transfer process, and regular transfers are a best practice for ensuring officer experience and career development.

- The transfers of Plaintiffs Perez, Anis, Boone Zollicoffer, Smith, McClam and Torres were not discriminatory or retaliatory.

- The Graham Report misunderstands the issue of use of force.  Contrary to Mr. Graham's assertions, there were not 6,805 instances of force used by Prince George's County Police Department officers in January 2016 through 2019.

- Under the Prince George's County Police Department's policies, officers must report any resisted physical coercion, no matter how minor. Mr. Graham does not explain this important context.

- The Department's use of force review matters represent a tiny fraction of its actual number of contacts with members of the public.

- The Department's use of force policies are fair and comprehensive, and they reflect many of the most progressive trends in the field of policing today.  The Department has extensive use of force training, which incorporates leading guidance on ethical policing, de-escalation, and the duty to intervene.

- In reviewing and investigating uses of force, the Department follows its policies.

- A high number of "justified" use of force reviews is not a product of "rubber-stamping." This is a product of a well-trained police force—officers who know what force is reasonable, who use force appropriately, and who report the force when used.

- Prince George's County Police Department has been providing Implicit Bias Training as a required part of Department-wide in-service training since 2018.  Recruits have

CONFIDENTIAL

been receiving Implicit Bias Training since 2015.  The Department's provision of this training is consistent with current best practices in the field of law enforcement.

- Department leadership has supported Implicit Bias Training from the onset and continues to support it today.  Chief Stawinski, himself requested a subject matter expert to institute the training.  Chief Velez and Department leadership also support implicit bias training, which is ongoing.
- Officers did not "walk out" of Implicit Bias training on June 12, 2018.  Concerns with how the class was conducted in a prior training session had been raised with the trainers the previous week by the Department but were ignored by the team conducting the training on June 12, 2018.  After receiving notification that the Department's expressed concerns had not been addressed, authorized representatives of the Department excused the officers in attendance that day from completion of the class and those excused officers completed the training on a later day.
- Contrary to the assertions in the Graham Report, there were not "complaints to the County" regarding this incident that Department leadership ignored, and, based upon my law enforcement experience, no IAD or disciplinary action was warranted.

## LANDSCAPE OF POLICING IN THE WASHINGTON D.C. METROPOLITAN AREA

11)      The population of the Washington D.C. metropolitan area is just over 6.2 million.[4] There are over 20 police departments, Federal, State and Local, that operate within the metro area, and of those, there are four large police departments that provide police service to the vast majority of the residents.  Those 4 agencies are: the Metropolitan Police Department of Washington D.C. (over 3,000 Officers and 650 civilians), the Prince George's County Police Department (over 1700 Officers and 326 civilians), the Fairfax County VA Police Department (approximately 1400 Officers and over 500 civilians), and the Montgomery County MD Police Department (approximately 1300 Officers and over 500 civilians).

12)      In an effort to coordinate law enforcement efforts among the more than two dozen police departments within the D.C. region, to include Federal partners, the Metropolitan Washington Council of Governments created a Police Chiefs Committee (the "Committee").  The Committee meets monthly to exchange information, learn about the latest trends and data, share best practices, and develop solutions to the region's major challenges.[5]  I attended these meetings for over 20 years.  These meetings were an opportunity for police chiefs to discuss critical topics that impacted our Departments, including racial profiling, bias training, and other troubling trends we were seeing across the nation.

---

[4] Census Reporter, "Census profile: Washington-Arlington-Alexandria, DC-VA-MD-WV Metro Area," retrieved September 20, 2020, available at https://censusreporter.org/profiles/31000US47900-washington-arlington-alexandria-dc-va-md-wv-metro-area.

[5] Metropolitan Washington Council of Governments, "About Us, Committees & Members," available at https://www.mwcog.org/about-us/committees-and-members/.

CONFIDENTIAL

13)     The Census Reporter breaks down the race and ethnicity of the D.C. area as follows:[6]

- White – 45%
- Black – 25%
- Hispanic – 16%
- Asian – 10%
- All others – 4%

## A.   Recruitment

14)     Most police departments endeavor to recruit a diverse workforce that reflects the diversity of the communities they serve.   The Maryland Police Training and Standards Commission (the "Commission") sets the hiring standards for all police officers in the State of Maryland, which includes Prince George's County Police Department.[7]  As one of its duties, the Commission provides for the development of strategies for recruiting women, Black, Hispanic, and other minority candidates.[8]

15)     The Commission advances that "[d]iversity is not only determined by race and gender, but also by religion, sexual orientation, gender identity, language ability, background, and experience.  True diversity within an agency serves as a critically important tool in building trust with communities."  The Commissions also highlights that "[m]inority applicants often deal with negativity from their own community when it is revealed that they desire to enter the profession of law enforcement."[9]

16)     Using race as a sole diversity measure is not consistent with 'true diversity' as described by the Maryland Police Training and Standards Commission.  And, in fact, as the police chief of two of large jurisdictions in the region, my recruiting efforts to identify diverse candidates was always a challenge, first and foremost, because of the competition with Federal Law Enforcement Agencies.  Unfortunately, it is very difficult to compete with the salary, benefits and prestige of working for the Federal Bureau of Investigation and other federal agencies.  Our applicant pool was further limited by the requirements to become a police officer in the State of Maryland.  Two of the Maryland prerequisites are a high school diploma and U.S. Citizenship, which can be far more burdensome for areas like Prince George's County, which has a significant immigrant population.

---

[6] Census Reporter, "Census profile: Washington-Arlington-Alexandria, DC-VA-MD-WV Metro Area," retrieved September 20, 2020, available at https://censusreporter.org/profiles/31000US47900-washington-arlington-alexandria-dc-va-md-wv-metro-area.
[7] Md. Code Ann., Public Safety § 3-207.
[8] Md. Code Ann., Public Safety § 3-207(a)(20).
[9] Maryland Police Training and Standards Commission, "Public Safety and Policing," available at https://www.mdle.net/pdf/Recruitment_Document.pdf.

CONFIDENTIAL

17)     The racial and ethnic diversity of Prince George's County (the "County") has grown steadily for the past 40 years, or more.  The diversity of the Prince George's Police Department has also increased within its ranks over the past 40 years.  As with any police department, there is always a lag time to match the diversity of the community.  Mr. Graham's Report is critical of the diversity of the Department.[10]  While diversity should be measured by more than just race and ethnicity, the Department has demonstrated a history of increasing the diversity of its personnel in recent years.  This analysis should include sworn and civilian members of the organization, not just officers as in Mr. Graham's Report.  It is always a work in progress, for nearly every police department in the Nation.  Mr. Graham uses the Prince George's County population demographics for his comparative analysis.[11]  But, this is flawed, as the reality is that not everyone in the County can meet the minimum standards to become a police officer in the State of Maryland.

## B.    Background on Prince George's County Police Department

18)     Prince George's County, like Washington, D.C. and Montgomery County, is a majority-minority community.  Montgomery County has the most residents with a population of more than one million, and Prince George's County is the second most populous jurisdiction in the State of Maryland, with just over 900,000 residents.

19)     Mr. Graham's Report points out that although the County's population is 64 percent Black, the Sworn members of the Department are only 43 percent Black.[12]  To be precise, that does not include the 326 Civilian employees of the Department, many of whom have daily contact with the public and play critical roles, such as 9-1-1 operators, within the organization. The civilian police employees are 58.5 percent Black.

20)     Mr. Graham also describes the rank of Lieutenant and Captain as the "primary command-level staff."[13]  In fact, within the Department, the rank of Lieutenant is the entry level rank to the executive staff.  Even Captains are considered a mid-level executive rank within the Department's structure.  Most often, it is the rank of Major that is in charge of a "Command." They command District Stations and Divisions.  Lieutenants and Captains report directly to Majors.  They are the assistants or deputies to the rank of Major.  There are 25 Majors, and that is the primary rank in terms of decision making and running the daily operations of the Department.  Of the 25 Majors, according to Interim Chief Hector Velez's PowerPoint[14] used by Mr. Graham, 12 are of a minority race or ethnicity, 11 are white males, and two are white females.

21)     The upper-level command officers in the Prince George's Police Department are at the rank of Major, Deputy Chief, Assistant Chief, and Chief.  Currently, according to Interim

---

[10] Graham Report, ¶¶ 13-14, p. 7.
[11] Graham Report, ¶ 13, p. 7.
[12] Graham Report, ¶ 12, p. 7.
[13] Graham Report, ¶ 13, p. 7.
[14] *See* PG0000986142.

CONFIDENTIAL

Chief Velez, of the five individuals occupying the three "Chief" level ranks, two are Black, two are White, and one is Hispanic.  Thus, the five most senior leaders in the Department are majority-minority.[15]

22)     According to Mr. Graham, the Plaintiffs have alleged that, "the fact that the majority of Prince George's County Police Department officers and senior officers are white has caused tension with the community . . . ."[16]  As noted above, the majority of Prince George's County Police Department officers are NOT White.  According to Interim Chief Velez, 42.5 percent of the officers are White.  Therefore, the majority of the Department is of minority race or ethnicity.  Respectfully, it is my opinion that neither the Plaintiffs, nor any group of officers can speak for the entire Community, with regard to their level of "tension", as Mr. Graham suggests.

23)     A reference is made in Mr. Graham's Report about racial tension between the Department and the community from 20 years ago.[17]  While it is true that this led to a Consent Decree and Memorandum of Agreement ("MOA") with the Department of Justice, Mr. Graham's Report refers to these events dating back 10 years despite the fact that the Department successfully completed the Consent Decree and MOA in 2007 and 2009, respectively, and incorporated improvements that remain in place today.

24)     To put the improvements enacted during that period in perspective, the following quote from Chief Hank Stawinski in 2013 states it clearly: *"Our Department was placed under a memorandum of understanding and consent decree in 2004, and after coming out on the other end, it was a very positive experience for us.  I think the key is understanding, going into the process, that there are no cut-and-dried answers.  As we negotiated with the Justice Department, DOJ didn't say, 'You have to do A, B, and C.'  Rather, they said, 'You have to live up to certain Constitutional standards to policing in Prince George's County while remaining effective.  So that's how we approached it.  Every policy was custom-made and then approved by the independent monitors.  The outcome was a greater degree of policy and practice clarity for our personnel, which we think is contributing to crime reduction.  We fundamentally explain to our officers where the boundaries are on a variety of issues so they are able to aggressively fight crime while policing Constitutionally."[18]*

25)     This philosophy of focusing on policing constitutionally while working on effective crime fighting strategies clearly remained with Chief Stawinski as he continued to rise through the senior ranks.  During the years that Chief Stawinski led the department, Prince George's County saw a dramatic reduction in crime.

---

[15] PG0000986142.
[16] Graham Report, ¶ 14, p.7.
[17] Graham Report, ¶ 15, p. 8.
[18] Police Executive Research Forum (PERF), "Critical Issues in Policing Series, Civil Rights Investigations of Local Police: Lessons                    Learned,"                    available                    at https://www.policeforum.org/assets/docs/Critical_Issues_Series/civil%20rights%20investigations%20of%20local%20police%20-%20lessons%20learned%202013.pdf.

CONFIDENTIAL

26)     Mr. Graham's Report also refers to an empirical study released in 2015 that noted a significant increase in use of force incidents from 2010 to 2014.[19]  The study, according to Mr. Graham's Report, cited "news reports" as evidence of unlawful behavior of police and a continued absence of respect for the rule of law among certain County officials.  News reports are not an empirical study.  What is not mentioned in Mr. Graham's Report is the fact that the increase in the numbers of use of force incidents, according to Chief Mark Magaw, were explained by the increase in the population of the County and the newly expanded definition of "use of force."  Chief Magaw was quoted, "The way I read these numbers is we're doing a better job, we're holding our Officers more accountable and we're being more transparent."[20]  An interview with First Sergeant William Gleason, who oversees use of force training at the Department's Training and Education Division and trains and testifies as an expert on these issues nationwide, confirmed that supervisors are trained to complete use of force reviews for even the most minor uses of force by their personnel.  He advised that this also accounted for a lot of the increase in the number of use of force reports.

<u>**ANALYSIS AND OPINIONS**</u>

**PART 1.     INTERNAL AND EXTERNAL EEO COMPLAINT PROCEDURES**

**A.  Prince George's County Police Department Policies for Addressing Harassment and Discrimination Complaints is Consistent with Industry Standards and Incorporates Best Practices.**

27)     The Department has a policy on Discrimination and Sexual Harassment that is generally outlined in General Order Manual, Vol. 1, Chapter 12.[21]  Chapter 12, however, is not the only applicable policy related to the Department's handling of Discrimination and Sexual Harassment Complaints.  In addition, the Department follows the EEO requirements included in the County's Personnel Law[22] and General Order Manual, Vol. I, Chapters 4, 12, 31, 32 (collectively, with County law, "the EEO Policy").[23]  Mr. Graham's Report fails to take all of the relevant GOM sections into consideration when rendering his opinion.  Mr. Graham's failure to review and analyze all applicable general orders undermines his conclusion that the Department's policies for handling complaints about racial harassment and discrimination are inadequate.  My detailed review of all the relevant general orders found no deficiencies.

---

[19] Graham Report, ¶ 17, p. 9.

[20] J. Chanin, "Evaluating Section 14141: An Empirical Review of Pattern or Practice Police Misconduct Reform," Ohio State J. of Crim. L., Vol. 14:67, pp. 95-101.

[21] GOM, Vol. I, Ch. 12, PG0000944716-944719.

[22] Samples of the policies and procedures for EEO, harassment, and discrimination were provided to the DOJ, PG0000000442-496.  *See* PG0000000493-496 (Personnel Law 16-109); PG0000000443-459 (Personnel Procedure 208); PG0000000484-492 (Administrative Procedure 221).

[23] *Id.*; GOM, Vol. I, Chs. 4, 12, 31, 32.

CONFIDENTIAL

28)     As an initial matter, the EEO Policy outlines equal opportunity in County employment,[24] the prohibitions on discrimination, sexual harassment and retaliation against employees, and procedures for handling employee or third-party complaints.[25]  These concepts are contained in the General Order Manual and are distributed to all Department employees. EEO information regarding complaint procedures is also disseminated to all employees quarterly by the Assistant EEO Coordinator.[26]  In addition, the EEO Coordinator ensures all Department stations are outfitted with placards that address EEO compliance.[27]

29)     First, Mr. Graham's Report unjustifiably criticizes the Department's reporting requirements because it inaccurately describes the content of the general orders related to the Complaint Procedures.   The Complaint Procedures allow the EEO Coordinator to resolve Complaints in one of three ways, depending on the circumstances of the complaint:  (1) Handle informally; (2) Refer to the Employees Commander/Manager for mediation; or (3) Assign for Investigation.[28]  Referrals to the employee's Commander/Manager for resolution is not unreasonable and is not the only option for resolution.  Mr. Graham's Report states that "even if an employee is uncomfortable with this directive and instead makes a complaint directly to the EEO Coordinator, the Coordinator is authorized to . . . refer the complaint back to the employee's Commander for mediation."[29]  This would lead the reader to believe that a victim of harassment or discrimination has no other avenue, other than his or her chain of command, to make a complaint.  Mr. Graham's Report goes so far to say that under the EEO Policy, "it is difficult, if not impossible, to break out of the chain of command."[30]  This is not accurate.  The General Order Manual specifically states in Volume I, Chapter 32 (Protocol, Section 19) that employees may go around the chain of command "[t]o transmit confidential or sensitive information" and "[t]o directly discuss an equal employment opportunity complaint with an employee designated to investigate such complaints."[31]  Chapter 12 of the General Order Manual also provides that "The Coordinator and Assistant Coordinator are authorized by the Chief of Police to become directly involved in issues of this nature [internal complaints] at any level, regardless of command responsibility."[32]

30)     Contrary to the assertions in Mr. Graham's Report, the Department's EEO Policy is consistent with industry standards and incorporates best practices.  One aspect of the EEO Policy that is considered a best practice, is the ability for employees to make complaints to external agencies outside of the police department at any point in time.  The EEO Policy specifically delineates all of the external agencies where a complainant may file a report.[33]

---

[24] PG0000000493-496.

[25] GOM, Vol. I, Ch. 12, PG0000944716-944719.

[26] PG0000000344; PG0000103651; PG0000145106; PG0000144779; PG0000155489; PG0000145106; PG0000967037; PG0000432824.

[27] Harvin Tr. 51 (June 18, 2020).

[28] GOM, Vol. I, Ch. 12, PG0000944718.

[29] Graham Report, ¶ 22, p. 11.

[30] Graham Report, ¶ 26, p. 13.

[31] GOM, Vol. I, Ch. 32, PG0000944877.

[32] GOM, Vol. I, Ch. 12, PG0000944717-944718.

[33] *E.g.*, GOM, Vol. I, Chs. 12, 32.

CONFIDENTIAL

Specifically, it states that Department personnel may contact any one of the following agencies to resolve or investigate complaints: County Office of Personnel and Labor Relations, Employee Services Division, Equal Employment Opportunity Commission ("EEOC"), the Maryland Human Relations Commission, or their Union representative.[34]   This is consistent with other model policies around the nation that understand that victims may be hesitant or fearful to internally report complaints of this nature.[35]   The Department's policy allows the complainant to have some control in how their complaint is first heard and investigated.  This too, is a best practice.

31)   Mr. Graham's Report cites guidelines published by the EEOC as evidence that employees should not have to report complaints through their chain of command.[36] First, the EEOC guidelines are just that, *guidelines*, and are not the law.  Second, as stated above, chain of command reporting is not the only reporting option.  Again, the EEO Policy makes clear that employees have multiple alternative external reporting methods outside their chain of command for EEO-related complaints.

32)   Another best practice, which has been adopted by the Department, is to try to resolve complaints informally through mediation.  This is permitted by Department policy, but not mandated.  The Department's EEO Coordinator has both the authority and discretion to work with the complainant on resolving the complaint according to the complainants' wishes.  This practice allows the complainant to discuss how they would like to see the complaint resolved.[37]

33)   Second, Mr. Graham's Report criticizes how employees can initiate resolution of a complaint under the EEO Policy.  The Report states that in order for a complainant to initiate a complaint, they are required to complete a form and mail it to the Department's EEO Coordinator.[38]  This is wrong.  While the EEO Policy does specify that an employee *can* complete a Complaint Form and mail or directly deliver it to the EEO Coordinator, this is not the only method of initiating a complaint.  Employees can also initiate a complaint by emailing, calling, or directly speaking to the Assistant EEO Coordinator or EEO Coordinator.  In fact, many of the internal complaints the Department has received are initiated in this manner.  It is not unusual for the Assistant EEO Coordinator or EEO Coordinator to follow up with an employee about a possible complaint that had been verbally communicated to the EEO Office.[39]  Further, the EEO Policy states that an employee may contact his or her Supervisor or Commander with complaints.[40]  In addition, and as stated above, any complainant may go directly to any of the external agencies to make their complaint.  This would not require any particular format or require anything to be put in writing.

---

[34] GOM, Vol. I, Ch. 12, PG0000944718.
[35] Jurisdictions with similar policies include Arlington County and Montgomery County.
[36] Graham Report, ¶ 24, p. 24.
[37] GOM, Vol. 1, Ch. 12 (V.3), PG000034965.
[38] Graham Report, ¶ 24, p. 12.
[39] *E.g.*, PG0000968590; Robert Harvin Jr. Deposition Transcript ("Harvin Tr.") 134-138 (June 18, 2020); Jewell Graves Deposition Transcript ("Graves Tr.") 239-243 (July 1, 2020).
[40] GOM, Vol. I, Ch. 12, PG0000944717.

CONFIDENTIAL

34)     Mr. Graham's Report states that the Department has no investigative process if a report is made up the chain of command and is "silent" on what a Commander does upon receipt of a complaint.  This is also inaccurate.  Chapter 12 of the General Orders Manual directs Commanders to ensure their commands are free from harassment and discrimination, and states "[a]ttempts will be made to settle complaints at the employee supervisory level by dialogue between the parties concerned."  When resolution at that level cannot be reached, employees are urged to seek assistance from the EEO Office.[41]  Contrary to Mr. Graham's assertions, this provides clear guidance on the expectations and responsibilities for Commanders on how to handle a complaint they receive from a subordinate.

35)     Mr. Graham's Report also condemns the Department's investigation and resolution process.  Mr. Graham's Report states that the methods the Department's EEO Coordinator may resolve a complaint does not "contemplate[] a thorough investigation."  This is not correct.  The Department's EEO Coordinator is a Deputy Chief.  The fact that the Department gives that responsibility to a senior executive of that rank is a clear indication of the importance that the Department places on these issues.  By design, the EEO Policy allows the Deputy Chief broad authority in handling these complaints.  The Deputy Chief has the ability to appropriately assign a case for the best resolution.  This includes initiating a formal investigation, mediation, or informal resolution.[42]  The Deputy Chief may also consult with the Internal Affairs Division to determine whether the EEO Office or IAD should handle the investigation and remediation of an internal complaint.[43]

36)     If the EEO Coordinator or the Chief decides to assign a complaint for formal investigation, they may either send it to Internal Affairs or refer the complainant to the County Human Relations Commission or EEOC.[44]  The best practice for conducting investigations of this type require that a single investigative process be followed where the complainant is treated as the central figure of importance.  Conducting dual investigations opens the door for conflicting evidence to be gathered, including statements from victims, witnesses or accused members of the Department.  Collecting contradicting evidence can compromise the investigative process and can prohibit an appropriate and just conclusion.  The fact that IAD would administratively close an investigation or the EEO Coordinator would cease remediating a complaint once another external agency received notice of the complaint is a best practice.  Mr. Graham's assertion that "it makes no sense to stop an investigation merely because the officer indicates they have or intend to file a charge with the EEOC"[45] contemplates a dual investigation that runs the risk of the issues stated above.

37)     Mr. Graham's statement that the Department places a "heavy" emphasis[46] on direct confrontation between complainants and alleged offenders is misleading.  The EEO Policy

---

[41] *Id.*
[42] GOM, Vol. I, Ch. 12, PG000034963-34966; Harvin Tr. 104-105 (June 18, 2020).
[43] PG0000179481-179482.
[44] PG0000155772 (referral of Plaintiff Perez's complaint to the Executive Director of HRC).
[45] Graham Report, ¶ 50, p. 34.
[46] Graham Report, ¶ 32, p. 17.

CONFIDENTIAL

allows for a complaint to be handled at the lowest level possible through a dialogue between the concerned parties.  This method is only one option described in the General Order Manual, and the EEO Policy clearly states that employees are urged to seek the assistance of the EEO Coordinator.[47]  Again, the complainant can be heard by Department leadership with regard to how their complaint is handled.  When deemed appropriate, the EEO Coordinator can become directly involved at any time regardless of command responsibility.[48]

38)     Third, Mr. Graham's Report also incorrectly asserts that the Department's policies lack appropriate confidentiality protections.[49]   However, confidentiality is addressed in both GOM, Vol. 1, Chapter 4 and Chapter 22.   Specifically, Chapter 22, states that, "Internal investigations shall be handled confidentially.  Investigative information and evidence shall not be disclosed unless authorized by law or by the Chief of Police."  In addition, the Department's Harassment and Discrimination trainings address the importance of maintaining confidentiality.

39)     Fourth, Mr. Graham's Report states that there are no policies in place to protect complainants from contact with suspected offenders.[50]  This is not true.  General Order Manual Vol. 1, Chapter 31, states that, "The Chief of Police reserves the right to transfer, permanently or temporarily, any employee, and may staff on operational necessity."[51] Operational necessity includes separating complainants and alleged offenders when appropriate.  Additionally, General Order Manual, Chapter 12, Section V places responsibility on commanders and managers to ensure their commands are free from harassment and discrimination "and that supervisors strictly enforce the sexual harassment and discrimination policy promptly and appropriately."  In practice, this can mean adjusting employee work schedules, moving an employee to a sister squad, or similar assignment modifications.[52]

40)     Fifth, Mr. Graham's Report states that the Department policies don't prohibit "all unlawful forms of harassment."  This is also false.  Forms of harassment are addressed in several general orders.  Most notably, in Chapters 4 and 12 of the GOM.  Chapter 12 specifically defines "disparaging terms" in the context of negative statements pertaining to one's age, national origin, color, race, ethnic group, religion, gender, sexual orientation, or disability.[53]  Chapters 4 and 12 of the General Order Manual specifically prohibit retaliatory acts, which are unlawful forms of harassment.[54]

41)     At the end of many of the Department's general orders, "Governing Legislation" is provided.  This is done to ensure that if the general order is not updated, any changes in the

---

[47] GOM, Vol. I, Ch. 12, PG0000944717.
[48] GOM, Vol. 1, Ch. 12, PG0000944717-944718.
[49] Graham Report, ¶ 34, p. 18.
[50] *Id.*
[51] GOM, Vol. I, Ch. 31, PG0000944868.
[52] GOM, Vol. I, Ch. 12, PG0000944717; *e.g.*, PG0000968887; PG0000154090-154091 (Major Guixens' offer to transfer a complainant so that he may avoid working with his supervisor with whom he had conflict and moving the complainant to a sister squad as he requested).
[53] GOM, Vol. I, Ch. 12, PG0000944716.
[54] GOM, Vol. I, Ch. 4, PG0000944650; GOM, Vol. I, Ch. 12, PG0000944716.

CONFIDENTIAL

law will take precedence.  Specifically, in general order, Chapter 12, Discrimination and Sexual Harassment, the governing legislation listed is the Civil Rights Act of 1964, the Equal Employment Opportunity Act of 1972, as well as the Prince George's County Executive Order No. 61-1995.  It has been my experience that police agencies attach the laws that are directly associated with their policies to ensure any lag time between a law change and a corresponding update in the General Order.  This prevents an Officer from citing to an outdated general order as a defense to a violation of law.  The fact that the Prince George's County Police Department lists this governing legislation is a best practice.

42)    Mr. Graham's Report is critical of the EEO Coordinator's efforts to "promote anti-discrimination or anti-retaliation efforts within the Department."  The criticism is not justified. The EEO Coordinator's efforts are appropriate and in line with best practices.  Ensuring that officers are reminded frequently of their obligation to keep a discrimination and harassment-free workplace is a best practice for police departments.  Placing posters within the District Stations, that are seen daily by all employees, are a great way to give those reminders.  The posters are typically put in the roll call and report rooms, so that all personnel are likely to see them.  There are relatively few authorized posters that are permitted to be displayed on the walls at the workplace.  This is another indication of the importance that the Department places on this issue. That and the fact that EEO compliance trainings are regularly conducted.  In addition, in several depositions, the Deputy Chiefs assigned as the EEO Coordinator advised that quarterly emails were sent to all personnel in the Department on how to file an EEO complaint, along with general information on the EEO.[55]  As a police chief for two large agencies for more  than 21 years, I know there are very few issues that get this level of attention.  The only other issues I've seen addressed with posters and email reminders dealt with: 1) Officer Safety (wear your vest, "arrive alive" for driving safely, and 2) Employee Assistance Program.  The Department's commitment to placing EEO issues at that level is a strong statement indicating the importance of having a discrimination-free environment.

43)    Finally, the Department's handling of complaints that have been filed with external agencies is reasonable.  The Deputy Chief (EEO Coordinator) and Assistant EEO Coordinator (Director of Personnel) (collectively, "EEO Office") are the point of contact for receiving external employee complaints filed with agencies such as the EEOC, the Prince George's County Human Relations Commission ("HRC"), and the Maryland Commission on Civil Rights. When a complaint is received from an external agency, the EEO Office investigates the factual circumstances alleged in the complaint in order to compile relevant documents and draft a response for the Office of Law to review and submit on behalf of the Department.

44)    Mr. Graham's Report criticizes the Department for failing to investigate complaints that have been filed with external agencies like the EEOC.[56]  This assertion is without merit.  After the external agency sends the Department a copy of the charge, the agency sends a Request for Information that the Department must fulfill.  In response, the EEO Office gathers

---

[55] Raphael Grant Deposition Transcript ("Grant Tr.") 35-37 (March 16, 2020); Melvin Powell Deposition Transcript ("Powell Tr.") 25-26 (June 30, 2020); Harvin Tr. 52-53, 152 (June 18, 2020).

[56] *E.g.*, Graham Report, ¶ 61, p. 40.

CONFIDENTIAL

extensive documentation related to the allegations in the charge in order to fully respond to the agency's request.  The EEO Office supplies the Office of Law with a detailed written report defending the Department's position and/or supplying the external agency with the requested information.  By way of example, the EEO Office conducted investigations and supplied fulsome responses to external complaints filed by Plaintiffs.[57]

**B.    Prince George's County Police Department Conducts Routine, In Person, Harassment and Discrimination Trainings That Are Generally Presented by the County's Commission on Civil Rights.**

45)    The Department conducts routine, in-person, trainings related to EEO compliance. In accordance with County law, all new Department hires, including new recruits in the Training Academy, complete Workplace Harassment Avoidance Training ("WHAT") at the beginning of their employment.[58]   The WHAT training presentation was created by the County's Office of Human Resources & Management ("OHRM").[59]  EEO training presented by the County's HRC is generally done annually to Department administrators and supervisors (consisting of ranks Acting Sergeant and above).  In 2017, an EEO presentation titled "Discrimination at the Workplace" was presented during In-Service training to all rank and file employees.[60]   More specifically, the in-person EEO trainings during the relevant period occurred as follows:

- On or about June 2015, the HRC presented a training on the HRC generally, discrimination in the workplace, and supervisory best practices to supervisors at a Department Crime Meeting.[61]  In or around November and December 2015, the HRC presented two-hour trainings titled "EEO/Sexual Harassment" to supervisors and administrators.[62]

- Between June and October 2016 during In-Service Training, the HRC presented an EEO training to supervisors.[63]  On or about November 2016, the HRC presented an EEO-related training to supervisors at First Line Supervisor School.[64]

- On or about August 2017, the HRC presented a training titled "EEO/Sexual Harassment" to supervisors.[65]   Between August and December 2017 during In-Service Training, a

---

[57]    PG0000071313-71484  (Perez);   PG0000071525-71562   (Torres);   PG0000071563-71610   (Zollicoffer);  PG0000071611-71663 (Ingram); PG0000071664-71751 (Anis).
[58] Human Resources Management, "Workplace Harassment Prevention Training," Prince George's County, MD, available at https://www.princegeorgescountymd.gov/3547/Workplace-Harassment-Prevention-Training; PG0000000370.
[59] PG0000968917-968933; PG0000969101-969118; PG0000969046-969090; PG0000968980-969025.
[60] PG0000969232-969252; PG0000969743-969750; PG0000969751-969761; PG0000969762-969777.
[61] PG0000967249-967290; PG0000907898-907939.
[62] PG0000968914-968916; PG0000969037-969042; PG0000967249-967290; PG0000907898-907939.
[63] PG0000966820-966830; PG0000969165-969175; PG0000969046-969090; PG0000968980-969025.
[64] PG0000969221-969223; PG0000969119-969164.
[65] PG0000969043-969045.

20

CONFIDENTIAL

Training Academy instructor presented the EEO training titled "Discrimination at the Workplace" to rank and file employees.[66]

- On or about July and September 2018, two EEO trainings were presented to supervisors by Assistant Commander Daniel Sheffield.  Materials were disseminated to attendees by the Assistant EEO Coordinator after the training session.[67]  Between June and December 2018, rank and file officers received Implicit Bias Training at In-Service Training.[68]

- On or about February 2019, the current Director of HRC, Renee Battle-Brooks, presented a training titled "EEO/Sexual Harassment" to supervisors at First Line Supervisor School.[69] On or about March 2019, the HRC presented a training titled "EEOC" to administrators at Administrator School.[70]

- Between January and March 2020, Associate County Attorney Annie Koshy presented trainings titled "EEO & Grievances" to supervisors at Leadership School.[71]  In 2020, Deputy Chief of the Bureau of Administration and Homeland Security Robert Harvin instituted EEO training for all rank and file employees.  This new rank and file training has been implemented remotely due to COVID-19.[72]

46)     Mr. Graham's Report relies on training session sign-in sheets and concludes that the officers whose signatures appear on those particular sheets are the *only* officers who received EEO training from 2014 to 2020.[73]  It is improper for Mr. Graham's Report to rely on the absence of documents produced in this litigation to establish the number of attendees at EEO Compliance trainings.  The hard copy sign-in sheets which were accessible and produced in the course of the lawsuit would not necessarily be determinative of the actual number of officers who attended trainings.  A more accurate measure of officer attendance at trainings can be derived from the fact that all officers must complete In-Service Training in order to remain Maryland Police and Correctional Training Commission ("MPCTC") certified.

47)     In addition to the above trainings, the Department disseminates information to all Department employees about filing EEO-related complaints and procedures.  As discussed previously, on a quarterly basis, the Assistant EEO Coordinator sends EEO information to all Department employees via the Police_Only list serve, including a Complaint Pathways chart and a comprehensive PowerPoint outlining EEO policy and procedure ("Prince George's County Police

---

[66] PG0000969743-969750; PG0000969751-969761; PG0000969762-969777; PG0000969232-969252.

[67] PG0000967291; PG0000968934-968964.

[68] *E.g.*, In-Service Implicit Bias Training Classroom Participation Sign-In Sheets (2018).

[69] PG0000969224-969225; PG0000969229-969231.

[70] PG0000969226-969230.

[71] PG0000968965-968979; PG0000969026-969036; PG0000969091-969100.

[72] Harvin Tr. 179, 188 (June 18, 2020).

[73] Graham Report, ¶ 44, p. 28.

CONFIDENTIAL

Department EEO PowerPoint"),[74] and the EEO Coordinator ensures all Department stations are outfitted with placards that address EEO compliance.[75]

48)     Mr. Graham's Report asserts that Deputy Chief Harvin testified in his deposition that new rank and file officers do not receive WHAT training.[76] Graham misread or misunderstood the testimony.  Harvin testified that rank and file officers are not given a training *on the Prince George's County Police Department EEO PowerPoint* (Exhibit 7 in the deposition) but will begin to receive such training as of mid-2020.[77]  Mr. Graham's Report confused WHAT training with EEO training and drew an incorrect conclusion.  Mr. Graham's Report also asserts that the Department's EEO PowerPoint "appears to be primarily presented through a DVD presentation" and cites only the PowerPoint itself as evidence of this speculation.[78]  However, one EEO training was recorded and a DVD was made available for officers who were required to view it as part of a settlement agreement between the Department and the EEOC.[79]  In fact, Mr. Graham's Report references this instance and then leaps to the conclusion that trainings are not regularly conducted with a live instructor.[80]  The EEO Coordinator monitored compliance for those who were required to view the DVD and collected signed acknowledgment forms from the officers.[81]

49)     Mr. Graham's Report proceeds to critique the substance of the Department's EEO PowerPoint and doesn't account for the fact that the trainings are conducted by a live instructor who provides additional information to attendees.  Mr. Graham's Report inaccurately asserts the PowerPoint "ignores key protections . . . including accommodations for pregnant employees and prohibitions on the basis of sexual orientation, gender identity, and marital status."[82]  Yet, there is reference made to all three of these protected classifications in the PowerPoint.[83]  Mr. Graham's Report also concludes that the EEO training is deficient because it "contains minimal discussion of retaliation" and cites only one page of the PowerPoint for this assertion.[84]  Prohibitions on retaliation are referenced on no less than nine different pages of the PowerPoint.[85]

50)     Mr. Graham further concludes that EEO training is deficient because it lacks an element of "testing" and "[t]he Department does not appear to do anything beyond confirming

---

[74]   PG0000000344;   PG0000103651;   PG0000145106;   PG0000144779;   PG0000155489;   PG0000145106; PG0000967037; PG0000432824.
[75] Harvin Tr. 51 (June 18, 2020).
[76] Graham Report, ¶ 44, p. 28.
[77] Harvin Tr. 188 (June 18, 2020).
[78] Graham Report, ¶ 43, p. 24.
[79]   PG0000928316-928618;      PG0000928319-928620;      PG0000783353;      PG0000908227;      PG0000152721; PG0000154901-154902.
[80] Graham Report, ¶ 44, p. 28.
[81] PG0000154901-154902; PG0000329248-329249; PG0000329749-329750; PG0000152721; PG0000928400.
[82] Graham Report, ¶ 43, p. 25.
[83]   PG0000000397 (pregnancy, gender identity, and sexual orientation); PG0000000399 and PG0000000406 (pregnancy); PG0000000433 (marital status).
[84] Graham Report, ¶ 44, p. 25.
[85] PG0000000399-403; PG0000000406; PG0000000409; PG0000000410; PG0000000433.

22

CONFIDENTIAL

officers signed a sign-in sheet."[86]  The PowerPoints used during in-person EEO-related trainings contain slides with case examples and scenarios that are discussed with class attendees.[87]  This practice is consistent with my experience as to how such training sessions are often conducted.

### PART 2.   IAD REASONABLY APPLIES DISCIPLINE AND PERFORMS INVESTIGATIONS IN ACCORDANCE WITH BEST PRACTICES

51)    The stated mission of the Department's Internal Affairs Division is to investigate all complaints in any manner and form they are submitted.[88]  This is designed to ensure that all complaints are investigated in a complete, fair, and impartial manner and to impose disciplinary action, if necessary, in a uniform and timely fashion.  Based on my review of the IAD policies, procedures, and practices, and my experience overseeing officer investigations and discipline, IAD has been achieving that goal.

### A.  Prince George's County Police Department's Complaint Policies Are Reasonable

52)    Vol. 1, Chapter 4 of the General Order Manual details the Department's Complaints policy.  It contains sound guidelines that address the importance of creating and maintaining a relationship of mutual trust and confidence with the community.  The order recognizes the obligation to notify the public about its complaint filing procedures and acknowledges each individual's rights to file a complaint against an employee.  It clearly states that the Department accepts all complaints of employee misconduct at all levels of the Department.[89]  The entire policy reflects best practices.

53)    Mr. Graham's Report criticizes the internal complaint process by stating that it restricts employees of any ability to file a complaint out of their chain of command.[90]  Again, this is not accurate.  In confidential matters, reports may be made directly to the Commander of the Internal Affairs Division.[91]  In cases where an employee is complaining about his or her supervisor or anyone in their chain of command, they are afforded the opportunity to go directly to IAD.

54)    Mr. Graham's Report discusses the IACP model policy on Harassment, Discrimination, and Unprofessional Conduct, which cites as a best practice the ability of an employee to make a complaint outside of their chain of command.[92]   Vol. 1, Chapter 4 of the Department's General Order Manual does exactly that as noted above.

---

[86] Graham Report, ¶ 44, pp. 25-31.
[87] *E.g.*, PG0000969238-969239; PG0000969249-969252; PG0000969137; PG0000969158-969164; PG0000968947-968962; PG0000907926-907939.
[88] *See* PowerPoint presentation by Major James McCreary, "Internal Affairs Division" (September 16, 2020) (hereinafter "McCreary IAD PowerPoint").
[89] GOM, Vol. 1, Ch. 4, PG0000944646.
[90] Graham Report, ¶ 25, p. 13.
[91] GOM, Vol. 1, Ch. 4, PG0000944646.
[92] Graham Report, ¶ 27, p. 13.

CONFIDENTIAL

**B.    IAD's Screening and Assignment Procedures Are Reasonable**

55)    The detectives in the Internal Affairs Division of any police department must be held to the highest standards of integrity.  As such, it is industry standard that the personnel selected to be assigned to IAD as investigators have a proven reputation and high ethical standards.

56)    Internal Affairs cases are not just assigned randomly.  The nature of the case will influence which investigator is assigned to a specific case.  That said, it has been my experience that commanders will assign the most difficult cases to their best detectives.  It is also my experience that often a routine or minor case could be assigned to a less experienced investigator to build his or her skill set and confidence.

57)    IAD's screening and assignment procedures at Prince George's County Police Department are reasonable.   IAD screens complaints to determine the investigatory responsibility.[93]  This is both necessary and appropriate so the investigation can be directed to the appropriate investigative avenue in accordance with the stated mission above.  Without the screening process, valuable and limited resources can be wasted by needlessly tying up specially trained IAD investigators with conducting investigations that are better and more appropriately investigated at lower levels of the department.

58)    The Prince George's County Police Department assigns complaints it receives for investigation after screening the complaint.[94]  Complaints involving criminal allegations and administrative investigations that can lead to termination, reduction in rank or significant fines and suspension are retained by IAD for investigation.[95]  These types of cases also include allegations of use of force, abusive language, and harassment.[96]

59)    Complaints of minor violations or simpler investigations are assigned to a supervisor or command officer at the division or district level for investigation.  This allows IAD to focus on the more serious investigations that require more specialized training and experience.  This best practice utilizes limited specialized personnel resources in a more efficient manner.  This also places the investigation into the hands of supervisors and commanders who are well-situated to understand and resolve day-to-day management or performance issues.

60)    Graham implies that "inquiries" and "field cases" are improper but ignores or mischaracterizes the facts of the cases he cites.  For example:

---

[93] Art'z Watkins Deposition Transcript ("Watkins Tr.") 119-122 (July 10, 2020); IAD Standard Operating Procedures, PG00000000497-530; GOM, Vol. I, Ch. 4.
[94] McCreary IAD PowerPoint, *supra* note 87; Watkins Tr. 119-122; GOM, Vol. I, Ch. 4.
[95] *Id.*
[96] McCreary IAD PowerPoint, *supra* note 87; GOM, Vol. I, Ch. 4, PG0000944649.

CONFIDENTIAL

- **Plaintiff Chambers:** Mr. Graham criticizes IAD for referring Plaintiff Sharon Chambers' complaint about her supervisor, Sergeant Norton, to the District as an inquiry. In June 2018, while under investigation for suspected false statements in connection with her loss and recovery of her Department-issued firearm, Plaintiff Chambers first complained to IAD that Norton had called her a "Signal 7" a year earlier. The term "Signal 7" is a radio signal from the General Order Manual and is used to identify a suspicious individual as part of police operations. This radio signal is race-neutral.[97]  Plaintiff Chambers claimed that Norton used the term when issuing her a Department order requiring her to submit to a DNA swab requested by the independent police department investigating her missing firearm. She also asserted that Norton had only started treating her differently after she lost her firearm. She did not indicate to IAD that Norton's conduct was race-based.[98]  In my opinion, IAD's referral of this matter to the District Commander for an inquiry was appropriate, based upon what IAD knew about Plaintiff Chambers' allegation at the time it was referred.

  Mr. Graham's criticisms are based upon his misleading and incorrect statements about Plaintiff Chambers' complaint. He suggests that IAD improperly referred that complaint in light of information it allegedly had from Plaintiff Chambers' charge of discrimination with the EEOC, but Mr. Graham's Report is inaccurate regarding both the *content* and the *timing* of that charge. First, Mr. Graham suggests that the charge (A) stated that Norton called Plaintiff Chambers a "Signal 7" and disgrace, and (B) "specifically noted that [Plaintiff Chambers' Commander, Lieutenant Raymond Aure,] and others in the station were notified of Sergeant Norton's conduct, and apparently did nothing."[99] However, these allegations are not included anywhere in the EEOC charge itself.[100]  The charge contains no allegations about Aure at all, and no allegations about any comments purportedly made by Norton.  Nor does it include any allegations of race-based discrimination of any kind.[101]  Second, Mr. Graham states that Plaintiff Chambers first filed her EEOC charge, and that her allegations were "**subsequently** brought to the attention of IAD during the course of another investigation."[102]  In fact, Plaintiff Chambers reported Norton's alleged race-neutral comments to IAD nearly *five months prior* to filing a charge of discrimination with the EEOC. IAD referred the matter for an inquiry *two months prior*

---

[97] GOM, Vol. II, Ch. 49, PG0000945310.

[98] *See* Transcript of Plaintiff Chambers' June 18, 2018 Interrogation, PGPD-CHA-0000384; PGPD-CHA 0000385, PGPD-CHA-0000389.

[99] Graham Report, ¶ 67(g), pp. 54-55.

[100] PGPD-CHA-0000944 (EEOC Charge).

[101] In fact, Plaintiff Chambers asserted in the charge that Norton was engaging in *gender-based* discrimination, and she cited two Black officers who she claimed were treated more favorably than she had been.  *See* PGPD-CHA-0000944.

[102] Graham Report, ¶ 67(g), p. 54 (emphasis added).

CONFIDENTIAL

to this filing.[103]  These inaccuracies undermine Mr. Graham's suggestion that IAD failed to properly address a claim of race discrimination advanced in any EEOC charge.[104]

- **Plaintiff McClam:** IAD's course was also appropriate when it referred (to District III) as an inquiry a Sergeant's complaint that Plaintiff Patrick McClam had responded to an email in a way that was disrespectful and inappropriate and that attacked the Sergeant's character and integrity.[105]  After conducting several witness interviews and reviewing the email correspondence, Captain Sunny Mrotek "conclude[d] that Lieutenant McClam did not violate any departmental regulation," but that he had "**indicated a repeat pattern of not working well with others, taking things personal and responding in an unprofessional manner.**"[106] Captain Mrotek reported that he and Captain Katina Gomez counseled Plaintiff McClam on his conduct.[107]  These types of complaints are appropriately handled at the command level.

61)    Furthermore, the Department trains district and division level supervisors to conduct investigations.[108]  It is appropriate for the Department to assign investigations to supervisors outside of IAD.  And, the Department follows the best practice dictating that those supervisors be trained.

### C.    IAD's Practices Comply with LEOBR and Have Several Layers of Internal and External Review

62)    Prince George's County Police Department's IAD practices comply with the Law Enforcement Officers' Bill of Rights ("LEOBR") and allow for review of discipline inside and outside of the Department.  Prince George's County Police Department's disciplinary process has multiple levels, involving many decision-makers, as established under Prince George's County Police Department's policies, Maryland law, and the union agreement.

### i.    *Investigations*

---

[103] *See* Transcript of Plaintiff Chambers' June 18, 2018 Interrogation, PGPD-CHA-0000384; PGPD-CHA-0000385; PGPD-CHA-0000944; PG0000121755.

[104] The Report is also inaccurate regarding IAD's interaction with Plaintiff Chambers following her allegations about Norton.  While Mr. Graham claims that IAD did not interview her, (Graham Report, ¶ 67(g), p. 55), the IAD investigator conducting the interrogation in fact asked numerous questions about her account of these events when she first raised them.  *See* PGPD-CHA-0000384; PGPD-CHA-0000396.  Similarly, Mr. Graham also fails to accurately reflect the nature of the inquiry that Aure conducted.  During that inquiry, Plaintiff Chambers indicated that Norton allegedly made the complained-of comments "*because [Chambers] initially refused to provide Charles County Sheriff's Department with [the] DNA swab of her mouth*," (PG0000121756 (emphasis added)), undermining any assertion that Norton's comments were race-based.  While the Report also claims that Aure "did not question Sgt. Norton," Aure's memorandum memorializing the investigation notes that he spoke with Norton about Plaintiff Chambers' allegations, and she denied making the alleged comments. PG0000121756.

[105] *See* PGIAD0000032990.

[106] PGIAD0000032974 (emphasis added).

[107] PGIAD0000032972-32974.

[108] Interview with IAD Commander Major James McCreary.

26

CONFIDENTIAL

63)     Disciplinary investigations vary depending on the type of case, but certain principles apply throughout.  One of those principles is that investigations are reviewed and approved through the chain of command.  This allows for multiple sets of eyes on a file and collaboration across multiple decision-makers, which is a best practice.

64)     Further, IAD investigations draw on various sources for expertise.  One example is use of force investigations.  Special Investigative Response Team ("SIRT") cases involving use of force, complaints from members of the public on use of force, or non-justified use of force reviews are often investigated with input from First Sergeant William Gleason, an experienced use of force expert .[109]  Another example is allegations of criminal misconduct, which are handled by SIRT.  These investigations are worked in conjunction with the State Attorney's office.  This is another example of a best practice as the State Attorney's office can provide expert guidance and oversight during the investigative process and provides outside eyes to help assure the integrity of the investigation.

65)     At the end of an investigation, a finding is made with respect to each allegation and there are four choices:

- Sustained – A preponderance of the evidence proves the allegation violated departmental policy or procedure;
- Non-sustained—The evidence fails to prove or disprove the alleged act(s) occurred;
- Exonerated (Proper Conduct)—The evidence proves that the alleged act(s) occurred, however, the act(s) were justified, lawful, or proper; and
- Unfounded—The evidence proves the alleged act(s) did not occur or the accused officer was not involved.

66)     By trying to associate "sustained" percentages with certain IAD investigators, Mr. Graham ignores the process used at Prince George's County Police Department.  For IA and SI cases, the investigator's work is reviewed and approved by his or her Lieutenant and Captain in IAD.[110]  Though the investigator has input, sustaining a charge is a collective decision.  The IAD Commander generally reviews and signs off on the recommendation from the Lieutenant and Captain, sometimes consulting with the Assistant Chief.[111]   This collaborative process is reasonable and in line with what is seen in other agencies.

*ii.*   ***Recommending Discipline and Like Discipline***

67)     IAD's steps after completing an investigation also show a fair and balanced process.  If an IA or SI charge is sustained, the AHB Coordinator (not the investigator or supervising officer) collects a range of potential discipline based on a review of "like discipline" imposed in other cases.[112]  This is a best practice in the industry.  In Major Kathleen Mills' tenure

---

[109] Interview with 1st Sergeant William Gleason.

[110] Interview with IAD Commander Major James McCreary.

[111] *Id.*

[112] McCreary IAD PowerPoint, *supra* note 87; Interview with IAD Commander Major James McCreary.

CONFIDENTIAL

as IAD Commander, the Commander of the Administrative Investigation Section ("AIS") or SIRT generally adopted the Administrative Hearing Board's ("AHB") Coordinator's selection of like discipline, and in some cases sought the input of Major Mills.  And, she sometimes sought input from the Assistant Chief.[113]  The Commander of AIS or SIRT would then serve the recommended discipline on the officer in a Disciplinary Action Recommendation ("DAR"), subject to final review by the Commander of IAD.  In some cases involving more severe proposed discipline, the Assistant Chief would review and sign the DAR.  In addition, when the Commander of AIS or SIRT was unavailable, the Commander of IAD would execute the DAR.  At all times relevant here, this process of determining and issuing discipline had multiple layers of review.

68)      Mr. Graham attempts to call into question the fairness of the Department's handling of the assessment of "Like Discipline" in a selective group of cases involving disciplinary actions against Command level employees.[114] Graham recounts that Major Mills was tasked with identifying "like discipline" in connection with the Department's determination of the appropriate punishment to impose on Plaintiff Joe Perez for the sustained charges against him resulting from a complaint from the Mayor of Seat Pleasant, Maryland.  Mr. Graham challenges Major Mills' conclusion that "like discipline" did not exist for Captain Perez's infractions because "a command level employee has not been disciplined for the behavior and unprofessional conduct Captain Perez has."  Specifically, he faults Major Mills for failing to have considered the punishments imposed in connection with four separate IAD cases involving command level employees which resulted in lesser disciplinary punishments.

69)      To properly assess whether Plaintiff Perez received harsher discipline than the four command level employees Mr. Graham identifies, I reviewed the category and severity of the charges which were sustained against Plaintiff Perez as compared to the others.  Based on AIS Commander Captain Art'z Watkins' investigation in IA2018-002,[115] Plaintiff Perez was issued a DAR[116] by Assistant Chief of Police Hector Velez, charging him with two Ethics violations and a Loyalty violation.[117]  Assistant Chief Velez recommended the following disciplinary action:

> **That you shall receive a Reduction in Rank and Salary to that of Lieutenant, and . . . be removed from the Promotional Cycle for Captain for One (1) Year from the date that this disciplinary action becomes final. You will be ineligible to participate in the promotional process for the rank of Captain until the time in grade requirement is met without any previous time and grade being counted.[118]**

Plaintiff Perez disputed his discipline.  The Final Disciplinary Action by the Department adopted the AHB's disciplinary action of reduction in rank and salary to that of Lieutenant.[119]

---

[113] Kathleen Mills Deposition Transcript ("Mills Tr.") 24, 296 (August 6, 2020).

[114] Graham Report, ¶¶ 136-138, pp. 122-125.

[115] PG0000980426-980432 (IA2018-002) (Report of Investigation).

[116] PG0000984011-980414 (IA2018-002) (Disciplinary Action Recommendation).

[117] The facts of this incident are recounted elsewhere in this report.

[118] PG0000984012-984013 (IA2018-002) (Disciplinary Action Recommendation).

[119] PG0000980339-980341 (IA2018-002).

CONFIDENTIAL

70)     Based on my extensive experience overseeing and evaluating the conduct of the internal affairs divisions of two large police departments and my familiarity with internal affairs investigation best practices, it is my opinion held to a reasonable degree of certainty that Major Mills did not err by not considering the disciplinary penalties imposed in the cases below as "like discipline" for the charges sustained against Plaintiff Perez.  Specifically:

- **Deputy Chief Christopher ▮▮▮▮▮ (IA2016-030).** In Deputy Chief ▮▮▮▮▮ case, following a thorough investigation conducted under the authority of the Department's Office of Inspector General, Deputy Chief ▮▮▮▮ was charged with four counts of failing to adhere to a quarterly reporting requirement[120] contained in the Temporary Duty Assignments ("TDY") provisions of the General Order Manual. [121]  The proposed progressive disciplinary penalty for the four identical procedural infractions was a written reprimand and three separate monetary fines totaling $300.  Deputy Chief ▮▮▮▮ accepted the proposed disciplinary action.[122] Mr. Graham's Report ignores the detailed factual findings of the assigned lead investigator, Major Irene Burks,[123] choosing instead to recite allegations from the anonymous complaint which sparked the investigation that were ultimately determined to be without merit. [124]  Finally, Mr. Graham's reference to the CCOP's disagreement with the findings of the Inspector General's investigation unfairly fails to acknowledge Chief Stawinski's stated reason for exercising his right to disagree with the findings of the CCOP. [125]  Neither the charges nor the facts resemble Plaintiff Perez's disciplinary case.

- **Major ▮▮▮▮▮▮▮▮▮ (PS2019-114) and Captain ▮▮▮▮▮▮▮▮ (PS2019-015).** Major ▮▮▮▮ and Captain ▮▮▮▮ were charged with a violation of Volume I, Chapter 27 of General Order Manual. [126]  The charges resulted from the discovery

---

[120] PG0000447427-447430 (IA2016-030).

[121] GOM, Vol. I, Ch. 31, PG0000944871 states in relevant part:

> Commanders/Managers may make temporary assignments within their commands. They shall review each TDY assignment under their authority every 90 days and report to the Chief of Police on the status of the assignment. This written report shall include all of the following:
> - Projected length of the temporary assignment
> - Reason for continuing the assignment
> - Efforts to permanently fill the position when a vacancy exists

[122] PG0000447427-447430 (IA2016-030).

[123] Also, Mr. Graham misleadingly suggests that "the assigned investigator" was promoted and assigned to work for Deputy Chief ▮▮▮▮ as a reward for initially clearing ▮▮▮▮ of any infraction. However, the individual to whom Graham refers, Lieutenant Lightner—originally chosen to assist with the investigation of the anonymous complaint by Plaintiff Perez and continued in that capacity by Major Burks—was promoted to Captain as part of the Department's competitive promotional process. Upon his promotion, Lightner was assigned to work in its largest division, Bureau of Patrol, as one of numerous Captains falling under ▮▮▮▮ command.

[124] PG0000447445-447453; PG0000162691-162711 (IA2016-030).

[125] Henry P. Stawinski III Deposition Transcript ("Stawinski Tr.") 313 (July 31, 2020).

[126] Officers may earn either pay or compensatory time for hours worked beyond their regular schedule. County compensatory time is earned when the total hours worked during one pay period exceeds 80 hours.

CONFIDENTIAL



that while serving as the Commander and Assistant Commander of District II, ████ and ████ had authorized the award of compensatory time for officers under their command for hours that were not worked in connection with their use of an unauthorized performance incentive program.[127] The summary punishment proposed following a PS investigation of their charged violation of a written directive of the Prince George's County Police Department was a suspension without pay (two days for ████ and one day for ████). Additionally, ████ and ████ were removed from their command positions in District II and transferred to other assignments. ████ and ████ elected to accept the summary punishment proposed in their respective cases in lieu of a formal investigation and waived their LEOBR right to an AHB.[128] In assessing the severity and comparability of these charges, it is worthy noting that the unauthorized performance incentive program overseen by ████ and ████ for six months was determined not to be per se illegal and was not expressly prohibited by then existing Department policies.[129] Neither the charges nor the facts resemble Plaintiff Perez's disciplinary case.

- **Major ████████ (SI2017-064).** Contrary to Mr. Graham's interpretation of Major ████ testimony as a witness in this matter, she did not admit to directing her subordinate, Lieutenant ████, to try to dissuade two officers from cooperating in a criminal investigation of another officer. Major ████ told IAD that she requested Lieutenant ████ to speak to one officer about the reported incident, but she did not intend for any intimidation or coercion to occur.[130] Major ████ was not a respondent in SI2017-064, nor did the disposition of that case result in a separate set of charges being brought against her. Accordingly, there was no record of sustained charges and disciplinary action against Major ████ for Major Mills to have considered as "like discipline" in her evaluation of the appropriate discipline to impose on Plaintiff Perez.

71)   Based on my experience evaluating internal affairs investigations, it is my opinion that the disciplinary charges sustained against Deputy Chief ████ Major ████ and Captain ████, and SI2017-064 as well as the resulting punishments imposed in those respective matters should not have been considered by Major Mills as "like discipline" in an evaluation of the proposed punishment to recommend in the case of Plaintiff Perez.

---

[127] *See* pp. 68-71, *infra.*
[128] PGIAD0000127802 (PS2019-114); PGIAD0000127822 (PS2019-115).
[129] Prince George's County Police Deparment, "Chief Hank Stawinski Ends Unauthorized Incentive Program At District Station" (Aug. 7, 2019), available at https://youtu.be/Pe1LfmB9TuM.
[130] PGIAD0000135380 (SI2017-064).

30

CONFIDENTIAL

iii.    *Recommending Terminations*

72)    Mr. Graham's Report fails to mention that terminations under Major Mills' tenure were brought to the Executive Command Staff for a briefing and a vote on discipline.[131]  Looking back to 2016, that Executive Command has included Hank Stawinski or Hector Velez, as Chief; Hector Velez as Assistant Chief; Carlos Acosta or Donnell Turner as Inspector Generals; and Melvin Powell, Raphael Grant, Robert Harvin, George Nichols, George Nader, Samir Patel, Genia Reaves, Anthony Schartner, Chris Murtha, and/or Jacqueline Rafferry as Deputy Chiefs.  With consensus from this group, the Assistant Chief or Chief of Police issued recommendations of termination.[132]

73)    Mr. Graham's Report misunderstands the IAD process when he ties terminations to certain investigators.  IAD investigators are not involved in selecting discipline.  Mr. Graham improperly blames three investigators who he claims have higher "sustain" rates against Officers of Color for the terminations of ten Black and Hispanic officers.[133]  Included among the ten cases Mr. Graham tries to attribute to biased investigators are:

- **Former Plaintiff Clarence Rucker:**  Rucker was investigated by IAD after it was notified that Rucker may be involved in an inappropriate romantic relationship with a domestic violence victim from one of his assigned cases.  The IAD investigation uncovered evidence that Rucker had obtained personal information of multiple domestic violence victims from his assigned cases and used this information to initiate and/or attempt to initiate intimate relationships with three of the domestic violence victims involved in cases assigned to Rucker for his investigation.[134]  Rucker was found to have sent sexually graphic messages to domestic violence victims in the cases he was investigating.[135]  This included pictures of his genitals and a video of himself masturbating, which was inadvertently opened by one victim's daughter.[136]  The Department recommended termination, and Rucker resigned pending discipline.[137]  He then sued in this case, alleging that his termination was discriminatory and retaliatory.[138]  After over a year of pursuing his lawsuit, he dropped his case without explanation.[139]

- **Juan Hernandez:**  Hernandez was criminally convicted of second-degree assault in May 2017 based on dash cam footage of him chasing down and striking with his police cruiser

---

[131] Under McCreary's tenure, the Executive Command Staff votes on any termination or demotion. *See* McCreary IAD PowerPoint, *supra* note 87; Interview with IAD Commander Major Kathleen Mills; Interview with IAD Commander Major James McCreary.
[132] *See id.*
[133] Graham Report, ¶ 126, p. 112.
[134] Defendants' Answer to Plaintiffs' First Amended Complaint, ¶ 212 [ECF 142].
[135] PG0000070896-70902; PG0000070916-70926.
[136] PG0000070916-70926.
[137] PG0000070896-70902; PG0000070894.
[138] Plaintiffs' First Amended Complaint, ¶¶ 210-21 [ECF 51].
[139] Motion To Vacate Clarence Rucker's Notice of Fed. R. Civ. P. 41(A) Voluntary Dismissal Without Prejudice And For Entry of Dismissal With Prejudice (ECF 266).

CONFIDENTIAL

a suspect fleeing on foot in a field.[140] 
█████████.[141]

- **James Sims:** Sims pled guilty to four counts of visual surveillance with prurient interest and two counts of misconduct in office.[142]  The criminal investigation revealed that Sims had taken upskirt photos of multiple women while on duty.[143]  After pleading guilty, an internal investigation progressed. ███████████████████████████████
███████.[144]

- ████████████████:  Judge Albert Northup issued a protective order against ███████ in 2017, finding that ███████ put his two-year-old son in serious danger when he took the child away from his mother during a visitation and drove off recklessly with the child in his arms.[145]  In 2016, ███████ had been criminally charged and suspended from the Department for punching and slapping his son's mother on a separate occasion while trying to take the child without permission.[146]  The Department recommended termination.[147]

- **Tempitope Asaya:** Asaya was criminally charged for theft.[148]  Video surveillance showed Asaya and a companion stealing a woman's iPad.[149]  After the theft, the owner put her device on "lost mode" with instructions to call her.[150]  According to the police reports, "[a] man called the owner and told her the tablet was purchased from Craigslist," and the call was traced to Asaya.[151] The Department recommended termination for multiple charges, one of which was false statement.[152]

---

[140] *Hernandez v. State*, 2018 Md. App. LEXIS 587 (Md. Ct. Spec. App. 2018); Lynh Bui, "Md. police officer convicted of assault after being caught on video striking man with cruiser," The Washington Post (May 18, 2017), available at https://www.washingtonpost.com/local/public-safety/md-police-officer-convicted-of-assault-after-being-caught-on-video-striking-man-with-cruiser/2017/05/17/64bcf024-3b46-11e7-a058-ddbb23c75d82_story.html.

[141] PG0000852384-852394; PG0000966028-966030.

[142] CBS Baltimore, "Maryland Officer Pleads Guilty To Taking Upskirt Photos of Women" (January 17, 2017), available at   https://baltimore.cbslocal.com/2017/01/17/maryland-officer-pleads-guilty-to-taking-up-skirt-photos-of-women/

[143] *Id.*

[144] PGIAD0000103604-103612.

[145] PGIAD0000072294-72303 (SI2017-039).

[146] *See* PGIAD0000099627-99643; Jamie Forzato, "Prince George's Co. officer suspended following domestic-related arrest," WTOP News (February 29, 2016), available at https://wtop.com/prince-georges-county/2016/02/prince-georges-co-officer-suspended-following-domestic-related-arrest/.

[147] PGIAD0000072294-72303 (SI2017-039).

[148] Moriah Balingit, "Police officer from Prince George's County suspended following theft charge," The Washington Post (October 4, 2014), available at https://www.washingtonpost.com/local/crime/police-officer-from-prince-georges-county-suspended-following-theft-charge/2014/10/04/b9848b4a-4bec-11e4-891d-713f052086a0_story.html

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] Interview with Major Katie Mills.

CONFIDENTIAL

74)     None of these officers were worthy of holding the certification of a police officer and I fully concur with the decisions made by Prince George's County Police Department to recommend termination.  Mr. Graham's implication in paragraph 126 of his report that specific investigators' racial biases caused these officers to be investigated and terminated is not tied to the IAD process or the facts of these cases.

*iv.   CCOP Review*

75)     The Prince George's County Police Department utilizes an independent seven-member civilian panel appointed by the County Executive's Office to assist the Department in achieving its goal of complete, thorough and impartial IAD investigations.[153]  The panel is called the Citizens Complaint Oversight Panel ("CCOP").   It reviews disciplinary investigations for completeness and impartiality.  It also submits comments and recommendations to the Chief of Police.  Furthermore, it has the power to conduct its own investigation either independent of or concurrently with any IAD investigation.  The panel has subpoena power, through the Prince George's County Council for people to appear before it.[154]

76)     In 2018, the CCOP reviewed 109 complete investigations containing 401 allegations.  Of those 401 allegations, the CCOP disagreed with IAD findings in 10 instances.[155]  In 2019, the CCOP reviewed 105 complete investigations containing 495 allegations.  Out of those 495 allegations, the CCOP disagreed with IAD findings in 25 instances.[156]  These numbers appear normal, indicating that IAD performs quality investigations and that the CCOP is not simply rubber stamping its work.

77)     In the ██████ case discussed above, for which Mr. Graham finds investigator bias to have caused the termination, the CCOP also recommended a discipline: termination.  Chairperson Dale Crowell wrote to the Department: "[T]he Panel recommends that the Department consider terminating this officer. Our considerations in making this recommendation include: 1) the Respondent's combative behavior . . . 2) his repeated false statements and challenges with the truth; 3) his glaring lack of judgement that endangered him and others including a minor; and 4) his disregard for the law."[157]

78)     Public oversight is a best practice.  The CCOP precludes the Department from conducting internal investigations in a vacuum and without community oversight.  Partnering with the State Attorney as well as the CCOP allow a level of transparency and accountability that are also best practices.

---

[153] PG0000938025 (Citizen Complaint Oversight Panel, Prince George's County 2018 Annual Report).
[154] *Id.*
[155] PG0000938031-938042 (Citizen Complaint Oversight Panel, Prince George's County 2018 Annual Report).
[156] Citizen Complaint Oversight Panel, Prince George's County 2019 Annual Report, pp. 10-21.
[157] PGIAD0000072311 (SI2017-039).

CONFIDENTIAL

### v.   AHB Hearing

79)     Under LEOBR, officers have the right to dispute the discipline recommended by the Department for sustained findings.  When disputed, the case progresses to an Administrative Hearing Board.  The AHB hearing functions like a legal proceeding—with evidence and witnesses from both sides, presented by counsel, into an extensive record.  If the AHB finds an officer guilty of any charge, the officer has the right to a Character Hearing.  The same board then requests "like discipline" information before making its own recommendation on discipline for any sustained/guilty charge.  This process is intended to ensure consistency in disciplinary decisions. A report summarizing the proceedings, how the board arrived at its conclusion and the discipline recommendation is prepared and sent to the Chief of Police.

80)     The accused officer has five working days to submit a letter to the Office of the Chief requesting leniency.  By law, the Chief or his designee can accept the proposed discipline or change it.  Only if the discipline is increased does the Chief have to have a formal and recorded meeting with the accused officer and their legal representative to review the change in discipline.[158]   Chief Stawinski had a stated policy never to deviate from the discipline recommended by an AHB.[159]

81)     Pursuant to the CBA with the FOP, the Department's three-person AHB consists of an appointed Major as the AHB Chair and an appointed Captain as the AHB Co-Chair, with an officer of equal rank selected on a rotating basis.[160]  Based on my experience, this is a reasonable formation of the AHB.

82)     Many instances of discipline that Mr. Graham characterizes as retaliatory or inadequate were reviewed and decided upon by a three-person AHB of the Department—three officers who take a fresh look at the case to reach their own determination.  The AHB recommended termination for Plaintiff Brown and Plaintiff Oatis, for example.

83)     To establish additional independence in the hearing board review, Prince George's County Police Department outsourced various AHBs, meaning that officers from other Maryland agencies conducted the hearing, reviewed the investigation, and independently recommended discipline.  In an industry like ours, this is an act that ensures that there is no pre-conceived notion about the case.  Mr. Graham fails to mention this, insisting that the Department and IAD retaliated even when officers from other jurisdictions reached their own conclusions.  This includes Plaintiff McClam's discipline (where an AHB of Howard County PD officers *unanimously* found him guilty on three charges and recommended 30 hours of suspension without pay, removal from the promotional cycles for one year, letter of reprimand, and a $250 fine);[161] Plaintiff Perez's discipline (where an AHB of Baltimore County PD officers *unanimously* found him

---

[158] Mark Magaw Deposition Transcript ("Magaw Tr.") 26-27 (August 12, 2020).
[159] *See* Stawinski Tr. 250 (July 31, 2020).
[160] Agreement between Prince George's County Maryland and Fraternal Order of Police, Lodge 89, Inc, ("CBA"), PG0000000580-581; Magaw Tr. 24-26 (August 12, 2020).
[161] PG0000982883-982898.

CONFIDENTIAL

guilty on three charges and recommended a reduction in rank and salary and ineligibility for promotion for one year); and Plaintiff Crudup's discipline (where an AHB of Baltimore County PD officers *unanimously* found him guilty on 13 charges—and, for each of the 13 counts, recommended termination).

84)     Without acknowledging the facts or multiple levels of independent review, Mr. Graham claims that cases like Plaintiff McClam's, Plaintiff Perez's and Plaintiff Crudup's were a product of a "culture of retaliation." I disagree, and I have discussed the facts surrounding these officers' extensive misconduct below.

### vi.     Circuit Court Review

85)     An officer has a right to appeal the decision of an AHB to the Prince George's County Circuit Court and, again, to the Court of Special Appeals.[162] This provides yet another level of independent oversight into the Department's system of discipline. Once again, there are disciplinary actions that Mr. Graham characterizes as discrimination or retaliation—like Plaintiff Perez, ████, and Beale—that were reviewed and upheld by Maryland judges.[163]

### vii.    Diversity in the Disciplinary Process

86)     The extent to which the Department has consistently placed Black and Hispanic officers into pivotal positions in the disciplinary process during the period relevant to the litigation undercuts Mr. Graham's suggestion that disciplinary investigations are tainted by discriminatory animus. Demographic diversity within the senior ranks of the Department is a critically important and effective way to prevent racial discrimination in the disciplinary process and to improve relationships with the community. The chart below identifies Officers of Color who have held such positions in the Department's disciplinary process at different times since 2015.

**ASSISTANT CHIEFS AND DEPUTY CHIEFS**

| Name | Race | Bureau (for Deputy Chiefs) |
|---|---|---|
| Grant, Raphael | B | Deputy Chief, Bureau of Administration and Homeland Security (BOAHS) |
| Harvin, Robert | B | Deputy Chief, BOAHS |
| Howard, Craig | B | Assistant Chief |
| Nader, George | W (Lebanese) | Deputy Chief, BOAHS |
| Nichols, George | B/M | Deputy Chief, Bureau of Forensic Science & Intelligence |
| Patel, Samir | A (Indian) | Deputy Chief, Bureau of Investigations |
| Powell, Melvin | B | Deputy Chief, BOAHS |

---

[162] LEOBR, §3-109.

[163] *See, e.g.*, *Joseph Perez v. Prince George's County Police Department*, Civil Action 19-36458, (Circuit Court for Prince George's County, Maryland); *see also* Sullivan DOJ letter dated Nov. 27, 2019 (Request No. 1).

CONFIDENTIAL

| Reaves, Genia | B | Deputy Chief, BOAHS |
|---|---|---|
| Velez, Hector | H | Deputy Chief, Bureau of Investigations (before he was Assistant Chief) |
| Velez, Hector | H | Assistant Chief |
| Whittington, Genovia | B | Deputy Chief, BOAHS |

**COMMANDER OF IA**

| Name | Race |
|---|---|
| McCreary, James | B |
| Grant, Raphael | B |

**COMMANDER OF AIS**

| Name | Race |
|---|---|
| Perez, Joseph | H |
| Watkins, Art'z | B |
| Watson, Trevel | B |

**COMMANDER OF SIRT**

| Name | Race |
|---|---|
| Sheppard, Terrance | B |

**AHB CHAIRPERSON**

| Name | Race |
|---|---|
| Burks, Irene | B |
| Watkins, Art'z | B |

87)     Moreover, the demographics of the employees assigned to IAD during the period relevant to the litigation also serve to undercut the suggestion in Mr. Graham's Report that the disciplinary process is implemented in a racially discriminatory manner.  As the chart below demonstrates, when reviewing the January and July rosters for each year since Chief Stawinski assumed leadership of the Division, employees of color have consistently outnumbered White employees in IAD.  That has remained the case through Major Mills' tenure as well.

CONFIDENTIAL



88)     Building and maintaining the community's trust is an ongoing pursuit for any police department.  It has been my experience that community members are more likely to come forward to make complaints against the police when they have confidence that their complaints will be handled competently.   Moreover, my opinion, based on my experience, is that a victim or complainant often feels more comfortable speaking with someone they believe will understand their point of view. Placing minority officers in pivotal positions in the disciplinary process is, therefore, a best practice for building the community's trust and confidence in the investigatory and disciplinary process, and for preventing racial discrimination in the process.

### D.     The Individual Plaintiffs Were Reasonably Disciplined

### i.     The investigations into Plaintiff Perez were not retaliatory or harassment

89)     Contrary to Mr. Graham's assertion that Plaintiff Perez faced retaliatory or reciprocal charges for making complaints, it is my opinion that the Department's treatment of Plaintiff Perez has been thorough, careful, and fair and not retaliatory.

90)     Mr. Graham's Report discusses Plaintiff Perez in the context of "reciprocal charges," which indicates a focus on the Department's IAD investigation into Plaintiff Perez's conduct at the Seat Pleasant Police Department.[164]  Mr. Graham's Report also mentions Plaintiff Perez's transfer in 2016 from the Internal Affairs Division to the Planning and Research Division and the Department's failure to promote Plaintiff Perez to the rank of Major, along with other minor acts which Mr. Graham appears to believe were retaliatory.[165]

91)     The facts of the Seat Pleasant incident are as follows: Jose Perez, the son of Plaintiff Perez, was employed by the Seat Pleasant Police Department as a Corporal.[166]  During April 2017, Lieutenant Ploof of the Seat Pleasant Police Department denied Jose Perez's request to use leave from April 14-16, 2017.[167] After his son's leave request was denied, on April 10, 2017,

---

[164] Graham Report, ¶ 143(f), pp. 130-134.

[165] Id.

[166] PG0000980350-980354.

[167] Id.

CONFIDENTIAL

while on duty, Plaintiff Perez approached Lieutenant Ploof, identifying himself as a Captain in Prince George's County Police Department.[168]  Plaintiff Perez demanded that Lieutenant Ploof change his mind and approve the leave that Jose Perez had requested.[169] When Lieutenant Ploof did not immediately agree, Plaintiff Perez left and said he would talk to Lieutenant Ploof's Chief about the leave.[170]  Plaintiff Perez then called Chief Devan Martin of the Seat Pleasant Police Department and stated, "You heard about the [Department of Justice] complaint I made at the County" and "You know, got some issues over there [in Seat Pleasant] some unfair practices and I'd hate to have to come over and make a complaint around there."[171]

92)    A day later, Seat Pleasant Mayor E. Grant texted Chief Stawinski to inform him that a Prince George's County Police Department officer was threatening his police chief.[172]  On April 14, 2017, Seat Pleasant Police Chief Martin also sent a written complaint to Prince George's County Police Department.[173] Prince George's County Police Department initiated an investigation through its Internal Affairs Division, which sustained three charges against Plaintiff Perez: two charges of Ethics and one charge of Loyalty. Plaintiff Perez challenged the Department's actions three times.  First, Plaintiff Perez filed a request with the Circuit Court for Prince George's County requesting a "Show Cause" hearing to determine whether Prince George's County Police Department's actions in the investigation were retaliatory.[174]  The court determined they were not.[175]  Next, an administrative hearing board composed of officers from a neighboring jurisdiction was convened under the Maryland Law Enforcement Officers Bill of Rights law.  It found Plaintiff Perez guilty of all three charges.[176]  Finally, the Circuit Court for Prince George's County Maryland upheld the AHB's findings, stating that there was "substantial evidence to support the [Administrative Hearing] Board's finding… and that "any reasoning mind can find [Plaintiff Perez's conduct] to be intimidating."[177]  The court further found that Plaintiff Perez "use[d] the prestige of [his] office to gain access and ultimately to gain personal benefit…."[178]  As a result of his actions, Plaintiff Perez received a demotion from Captain to Lieutenant, and was removed from the promotion cycle for one year.[179]

93)    Mr. Graham's Report claims that there were "significant procedural irregularities" in the Department's investigation.  Notably, as described above, Plaintiff Perez has already challenged these alleged irregularities before the Circuit Court for Prince George's County, Maryland, which specifically found that "[w]here the Department deviated from its standard

---

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.*

[172] PG0000980347; PG0000990252.

[173] PG0000990252.

[174] PG0000080041.

[175] PG0000161564.

[176] PG0000980342-980358.

[177] Transcript of July 31, 2020 Motions Hearing, *Joseph Perez v. Prince George's County Police Department*, Civil Action 19-36458, (Circuit Court for Prince George's County, Maryland) ("Perez Circuit Court Hearing") at 34-35.

[178] Perez Circuit Court Hearing at 35.

[179] PG0000980339-980341.

CONFIDENTIAL

operating procedures, it had believable explanations" and noted that "the Department conducted the investigation with an abundance of caution."[180]  It is my opinion that the Circuit Court was correct, and this investigation was conducted with an abundance of caution and in a fair and non-retaliatory manner.

94)      The Department did not commence this investigation "well after" the time of the initial third-party complaint.  The Department received a complaint from the Mayor of Seat Pleasant on April 11, 2017, and it assigned an investigator – Captain Art'z Watkins – on the same day.[181]  There are understandable reasons why the investigation took more time than usual and why Plaintiff Perez was not notified sooner.  For example, Director of Public Safety Mark Magaw wanted to better understand the timeline of Plaintiff Perez's complaints to understand if an investigation could be viewed in a problematic light; the principle witness was involved in a motorcycle accident with life threatening injuries; and the Department of Justice made an extensive request for documents that Captain Watkins needed to attend to.[182]  Further, during the investigation, the Department of Justice informed Prince George's County Police Department that it would be conducting a formal investigation into Plaintiff Perez's complaint to it, and Prince George's County Police Department communicated with the Department of Justice about the pending allegations against Plaintiff Perez and its concern that a continued investigation would be viewed as retaliation for his complaint.[183]  Captain Watkins took great care to make sure the serious allegations against Plaintiff Perez were kept confidential from other employees in the Department and were treated appropriately.[184]

95)      Mr. Graham's Report claims that the Department failed to turn over certain materials during the investigation. Plaintiff Perez was represented by counsel during the entire process, and never raised such an objection.[185]

96)      The Department's handling of the investigation and subsequent proceedings was even-handed, non-retaliatory, handled in accordance with the LEOBR law and consistent with what I would expect when a police department investigates a high-ranking officer for a serious charge.  The Department received a complaint from a third-party and was obligated to investigate the complaint.  As described above, its investigation was fair and non-retaliatory.

97)      Next, Mr. Graham's Report implies that Prince George's County Police Department retaliated against Plaintiff Perez when the Department did not investigate Deputy Chief Murtha for filing a complaint against Plaintiff Perez.  It is my opinion that Mr. Graham's analysis of this event is flawed, as he does not appear to have read Deputy Chief  Murtha's

---

[180] PG0000161564.
[181] PG0000990252; PG0000095242 (the date of the incident was April 10, 2017); PG0000095245 (first interviews conducted on April 13, 2017).
[182]  PG0000990252;  PG0000095250-95251;  PG0000095254-95256;  PG0000095270-9525278;  PG0000095299-9525301.
[183] PG0000990252; PG0000095157-95159.
[184] PG0000095172; PG0000095198-95202.
[185] See generally PG0000095217; Perez Circuit Court Hearing.

CONFIDENTIAL

complaint.[186]  Mr. Graham claims that the complaint was "ostensibl[e] for reporting [Murtha's alleged] misconduct to the State's Attorney's office."[187]  However, the complaint itself, as well as Deputy Chief Murtha's testimony, make clear that Deputy Chief Murtha was frustrated with Plaintiff Perez for releasing information regarding his confidential investigation to other employees in the Department and to members of the media.[188]  Indeed, the evidence in this case makes clear that Plaintiff Perez was doing exactly what Deputy Chief Murtha was alleging.[189]  In my experience, it is extremely inappropriate for the investigator in an internal affairs matter to release investigative material or findings to individuals outside the Internal Affairs Division or to members of the media.   Plaintiff Perez had access to Deputy Chief Murtha's personnel information only as a result of his role in the investigation and his rank within the Internal Affairs Division.  In my opinion, Deputy Chief Murtha's complaint was not retaliatory, but was based on Plaintiff Perez's inappropriate behavior.

98)     Mr. Graham also notes his opinion that Major Mills and the Department were engaging in "retaliatory efforts" against Plaintiff Perez or that they were attempting to "generate complaints" against Plaintiff Perez.  In my experience, the incidents Mr. Graham refers to are routine matters occurring in all police departments. For example, Mr. Graham cites a dispute between Plaintiff Perez and his subordinate regarding Plaintiff Perez's belief that his subordinate had committed insubordination.[190]  Major Mills merely mediated a dispute between employees within her chain of command.[191]   Further, testimony in this case evidences that certain complaints Mr. Graham cites had nothing to do with Plaintiff Perez.[192]

99)     Similarly, the Department's transmission of information related to Plaintiff Perez's son, ███, to the Maryland State Police was also not retaliation.  The transmission of information related to ██████ was done at the behest of the Seat Pleasant Police Department as a result of an audit of their own records, and was not initiated by Prince George's County Police Department.[193]   Seat Pleasant Police Department is too small to conduct its own IAD investigations, and it had an agreement with Prince George's County Police Department to conduct them instead.  After Seat Pleasant sent the initial information to Prince George's County Police Department, it was referred to the Maryland State Police, as that is the agency that handles the databases at issue.  In my experience, Prince George's County Police Department responded correctly when faced with this information, as the Maryland State Police is the agency best-suited to determine what, if any, infraction occurred with regard to its database.

[186] See PG0000971483-971484.
[187] Graham Report, ¶ 143(f), pp. 132-133.
[188] PG0000971483-971484; Christopher Murtha Deposition Transcript ("Murtha Tr.") 61-94 (August 5, 2020).
[189] PGPD-PER-0069140.
[190] Graham Report, p. 131, note 426, citing PG0000785918-785919.
[191] PGPD-PER-0067452; PGPD-PER-0098783.
[192] Compare Graham Report, p. 132, note 432 (citing PG0000169211-169213) with Michael Smith Deposition Transcript ("M. Smith Tr.") 155-156 (July 22, 2020) and Joseph Ghattas Deposition Transcript ("Ghattas Tr.") 221-229 (July 8, 2020).
[193] PG0000155728; Stawinski Tr. 343-349 (July 31, 2020).

CONFIDENTIAL

100)    Mr. Graham's analysis of Plaintiff Perez's claims also contains numerous inaccuracies and frequently cites to allegations without supporting evidence.  For example, Mr. Graham claims that Plaintiff Perez witnessed Defendant Mills making discriminatory comments in 2016.  The document Mr. Graham cites for that assertion is a *draft* of Plaintiff Perez's EEOC charge that he was exchanging with his wife for comments.[194]  Even in this document, it is clear that Plaintiff Perez was referencing comments made in 2014, not 2016.[195]  Further, Mr. Graham frequently cites the Plaintiffs' Complaint, but apparently did not consider the Defendants' Answer, which denies those same paragraphs.  Next, Mr. Graham's Report contends that two of Plaintiff Perez's complaints of "harassment" were never investigated.  This is plainly inaccurate, as investigative reports were produced for both complaints Mr. Graham highlighted.[196]  Finally, Mr. Graham appears to place great stock in the EEOC's "reasonable cause" determination.  It must be, however, that such determinations are not proof that discrimination occurred and can vary greatly in quality.

### ii.    *Plaintiff Oatis was disciplined fairly*

101)    Mr. Graham outlines the investigations into the conduct of Plaintiff Tasha Oatis (case number IA2014-130), Sergeant Lisa Garland (case number SI2017-0010, and Lieutenant ███████ (SIQ2017-006) as indicative of a lack of fairness in discipline by the Prince George's County Police Department and contends that minority officers have received harsher discipline than white officers for similar violations.[197]  I disagree with Mr. Graham's assessment because his discussion of the two cases that he points to as comparable to Plaintiff Oatis's contain certain misstatements and omit facts.

102)    Plaintiff Oatis was not just accused, but in fact, was found guilty by an Administrative Hearing Board, of violations of the Department's prohibition on Extra-Duty Restrictions ("double-dipping") and Dedication to Duty violations. On December 16, 2014, Acting Lieutenant M. Snyder sent a memorandum to his District II Commander, Major Irene Burks, requesting an investigation into whether Plaintiff Oatis was leaving her patrol area without permission and receiving compensation for secondary employment for time when she was also receiving compensation from the County for her regular patrol shift.[198]  IAD initiated an investigation under case number IA2014-130. The investigation was led by Detective Brett Shapiro, who issued a Report of Investigation on February 4, 2015, in which he concluded that Plaintiff Oatis had on numerous occasions left her patrol area without permission and "double-dipped," that is received compensation from two employers for the same time periods.[199] (PG0000013443).

[194] *See* PGPD-PER-0069986.
[195] PGPD-PER-0069987; *see also* Joseph Perez Deposition Transcript ("Perez Tr.") 104-106 (July 30, 2020).
[196] *See* PG0000971542; PGIAD000002956.
[197] Graham Report, ¶ 134(c), pp. 118-119.
[198] PG0000013433-13434.
[199] PG0000013436-13443.

CONFIDENTIAL

103)     The GOM expressly prohibits officers from engaging in "double dipping." Vol. I, Ch. 18, Section V, sub-section 3 of the General Order Manual states: "[N]o employee shall work any Non-Departmental Secondary Employment or Secondary Law Enforcement Employment . . . [r]eceiving payment from two or more employers simultaneously without written permission of the multiple employers."[200]   The GOM also states that "[e]mployees shall not, without authorization, leave an assigned workplace during the tour of duty."[201]

104)     On August 18, 2015, IAD issued a DAR for these violations, charging Plaintiff Oatis with eight violations of the prohibition on Extra-Duty Restrictions and six violations of the Dedication to Duty requirements.[202] The recommended disciplinary action for the Extra-Duty Restriction charges was termination.[203] The recommended disciplinary action range in the GOM for violations of the extra-duty restrictions on double-dipping (a Category IV offense) includes termination from the Department.[204] Plaintiff Oatis did not accept the DAR, and on August 26, 2015, she chose to exercise her right under LEOBR to request an AHB.[205] She was suspended from the Department on September 25, 2015, just over one month after the issuance of the DAR recommending her termination.[206] After an evidentiary hearing, the AHB found Plaintiff Oatis guilty of the eight charges of Extra-Duty Restrictions violations ("double-dipping") and the six charges of Dedication to Duty (leaving her patrol area without permission).[207] The AHB recommended termination for each of the double-dipping charges and removal from the promotional cycle for one year, plus a one- to three-day suspension for the dedication to duty charges.[208] Chief Stawinski issued a Final Disciplinary Action on February 5, 2016 in which he approved the findings and recommendations of the AHB.[209] Plaintiff Oatis's separation from the Department – Termination for Misconduct – was effective February 6, 2016.[210]

105)     In my opinion, Plaintiff Oatis's actions could be considered theft under Maryland's criminal code.   Therefore, termination was a reasonable punishment for the conduct she admitted to having engaged in.

106)     Like Plaintiff Oatis, Sergeant Garland was found to have engaged in violations of the Extra-Duty Restrictions, among other charges.  In late 2016, allegations were made that since January 2016, Sergeant Garland had inflated her time sheets for a part-time position with the Revenue Authority, worked for multiple employers at the same time without written permission (i.e., double-dipped), and put her supervisor's signature on payroll forms without his

---

[200] PG0000958909-958910.
[201] PG0000959013
[202] PGPD-OAT-0000021- PGPD-OAT-0000027.
[203] PGPD-OAT-0000025.
[204] PG0000958841.
[205] PGPD-OAT-0000027.
[206] PG0000006277.
[207] PG0000013412-13423.
[208] PG0000013422-13423.
[209] PG0000013427-13432.
[210] PG0000988686.

CONFIDENTIAL

permission.[211]   The case was initially assigned as an inquiry investigation under case number SIQ2016-012, but on January 4, 2017, IAD initiated an investigation under case number SI2017-001.[212]

107)    After completing an initial investigation, the Department screened Sergeant Garland's case with the Office of the State's Attorney for Prince George's County in September 2017.   In March, 2018, the Assistant State's Attorney issued a decline to prosecute letter indicating that the Office of the State's Attorney would not prosecute the matter in criminal court.[213]  IAD identified and investigated 71 allegations against Sergeant Garland and sustained 61 of them.[214]  On March 22, 2019, IAD issued a DAR charging Sergeant Garland with 61 violations of the GOM – 20 counts of Extra-Duty Restrictions, 30 counts of Unbecoming Conduct-Theft, and 11 counts of Unbecoming Conduct-Forgery.  The recommended disciplinary action for each and every one of the charges was termination from the Department. [215] Sergeant Garland did not accept the DAR and requested an AHB.[216]   However, Sergeant Garland retired from the Department prior to the AHB proceeding, "with prejudice."[217]

108)    Under the Collective Bargaining Agreement ("CBA") between the Department and the Fraternal Order of Police, the Department cannot interfere with an officer's choice to exercise his or her right to retire, if that officer has met the in-service time for eligibility for retirement.[218] Sergeant Garland exercised her right under the CBA to retire, as she had already put in her twenty (20) years of service to the Department.[219] Sergeant Garland retired from the Department effective June 1, 2019.[220] Unlike Sergeant Garland, however, Plaintiff Oatis was unable to exercise such a right to retirement because she had not met the minimum threshold for service under the CBA, as she was originally hired by the Department on October 24, 2011.[221]

109)    In November 2017, the Department received a complaint that Lieutenant ███ ███ was working two law enforcement jobs, an extra-duty restrictions violation.  Lieutenant Hugh Darden of the SIRT Division of IAD conducted an inquiry into the allegations under case number SIQ2017-006.[222]

110)    The GOM prohibits officers from engaging in secondary employment "[a]s a commissioned police officer for any other county, municipality, or political subdivision."[223] Lieutenant Darden concluded that Lieutenant ███ had not engaged in any violations of the

---

[211] PG0000972018; PG0000980259.
[212] PG0000980240; PG0000980271.
[213] PG0000978816; PG0000971924.
[214] PG0000975424-975466.
[215] PG0000971926-971948.
[216] PG0000971948.
[217] PG0000939411-93413
[218] PG0000000531.
[219] PG0000000531; PG0000988686.
[220] PG0000971992; PG0000988686.
[221] PG0000988686.
[222] PG0000159211.
[223] PG0000960608.

CONFIDENTIAL

extra-duty restriction on secondary employment with another law enforcement agency.   He concluded that Lieutenant ██████ secondary employment was with ██████████, a private non-law enforcement entity, and that Lieutenant ██████ was hired by the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") through ██████████ as a private contractor.[224]   A Group Supervisor with the ATF for the Washington/Baltimore region informed Lieutenant Darden that Lieutenant ██████ "[a]s a civilian contractor . . . does not have law enforcement authority" and pointed to the statement of work requirements for contractors, which prohibited Lieutenant ██████ from carrying a firearm while performing his secondary employment duties with the ATF.[225]   Lieutenant Darden correctly concluded that there was no foundation for the anonymous allegations against Lieutenant ██████.

111)    The investigation into the anonymous complaint against Lieutenant ██████ is not comparable to Plaintiff Oatis's case.   First, and unlike in Plaintiff Oatis's case, there was no allegation that Lieutenant ██████ was engaged in double-dipping.   Second, the recommended disciplinary action range in the GOM for the conduct in which Lieutenant ██████ was alleged to have engaged – working secondary employment as a commissioned police officer for another political subdivision (a Category III offense) – does not include termination from the Department as a possible form of punishment.[226]   Third, and most importantly, Lieutenant ██████ was found not to have committed any violations, unlike Plaintiff Oatis.

112)    In my opinion, the Department conducted investigations into these complaints in a complete, fair, and impartial manner and imposed disciplinary action in an appropriate, uniform, and timely fashion.

### iii.    Michael Brown was Fairly Disciplined

113)    Mr. Graham's Report presents comparative discussions into the conduct of Plaintiff Michael Brown, Corporal ██████████████████, Corporal ██████████████, and Corpoal Robert Heaney in connection with different, unrelated incidents as reflective of a pattern in the Department "where minority officers have received harsher discipline than white officers for similar violations."[227]   I disagree with Mr. Graham's allegation that these four cases are examples of unfair or disparate discipline because the conduct of Plaintiff Brown and circumstances surrounding the incident that led an AHB to recommend his termination were far more serious than any of the actions and incidents alleged to be connected to the other individuals identified as possible comparators.

> a.   *Plaintiff Michael Brown Resigned from the Department After Being Found Guilty by an Administrative Hearing Board of Three Charges (Unbecoming Conduct, Misrepresentation of Facts, and Display of Firearm Prohibited) and Being Faced With Termination.*

---

[224] PG0000159211.
[225] PG0000159212; PG0000159224.
[226] PG0000960546.
[227] Graham Report, ¶ 134(e), pp. 119-120.

CONFIDENTIAL

114)     Plaintiff Brown was not just investigated for, but in fact, was found guilty by an AHB, of violations of the Department's prohibitions on Unbecoming Conduct, Misrepresentation of Facts, Use of Language, and Display of Firearm Prohibited. A Metropolitan Police Department (Washington, DC) Arrest/Prosecution Report indicates that on July 10, 2014, Plaintiff Brown was arrested and charged with assault as a result of a private altercation in which he engaged outside of the Howard Theatre in Washington, DC while armed with his firearm.[228] According to the report, Sameal Molla, a parking valet at the Howard Theatre, stated that he was trying to help Mark McCutcheon, a close friend of Plaintiff Brown's, with an issue regarding McCutcheon's car headlights, which had been left running, when McCutcheon struck him in the stomach and the face, knocking him to the ground.[229] Witnesses then observed Plaintiff Brown run across the street toward the fight and punch Molla in the back of the head.[230] A fight ensued between Plaintiff Brown and McCutcheon and a number of the parking valets.  Witnesses stated that Plaintiff Brown and McCutcheon retreated to their vehicles, at which point McCutcheon retrieved a tire iron and Plaintiff Brown retrieved his firearm, and then began to reengage with the group.[231]  Plaintiff Brown pointed his firearm at the parking valets, including Molla.[232]  Video footage of the incident shows that Molla begged someone to call 911 as Plaintiff Brown continued to confront him.[233] The Metropolitan Police filed charges against Plaintiff Brown and he was indicted for, among other things, assault.  Ultimately, the U.S. Attorney's Office for the District of Columbia dismissed the charges without prejudice.[234]

115)     The IAD conducted an investigation of the incident under case number SI2014-03 9.  On March 24, 2016, Major Raphael Grant (the Commander of IAD) approved the completion of the internal investigation, which sustained seven charges against Plaintiff Brown and non-sustained two charges.[235] Plaintiff  Brown disagreed with the findings and recommendations of the Disciplinary Action Recommendation, which recommended termination from the Department, and requested that his case be heard by the AHB.[236]

116)     The AHB convened a hearing, and on August 1, 2016, the AHB issued its report, in which it found Plaintiff Brown guilty of Unbecoming Conduct, Violation of Laws – Misrepresentation of Fact, Use of Language, and Display of Firearm Prohibited.[237] The AHB found, among other things, that Plaintiff Brown "reacted unreasonably" to the altercation that McCutcheon engaged in "by running across the street and striking Mr. Molla with an unwarranted strike from behind on the side of his head, causing him to fall to his knees."[238] The

---

[228] PG0000012402-12404.
[229] PG0000012404.
[230] *Id.*
[231] *Id.*
[232] *Id.*
[233] PG0000963932.
[234] PG0000012429.
[235] PG0000012157-12163.
[236] PG0000070346-70350.
[237] PG0000012147-12158.
[238] PG0000012153.

CONFIDENTIAL

AHB further found that, once Plaintiff Brown had disengaged and crossed the street, he had "an opportunity to use cover behind his vehicle . . . and summon[] local law enforcement, as necessary."[239] In addition, the AHB concluded that Plaintiff Brown "intentionally misrepresented how he struck Molla in an effort to avoid being held administratively responsible for employing an ear clap, an unauthorized use of force."[240]  The AHB recommended termination of Plaintiff Brown's employment with the Department for each of the violations of Unbecoming Conduct, Misrepresentation of Fact, and Display of Firearm Prohibited.[241]

117)    Plaintiff Brown resigned from the Department effective September 6, 2016, the day before his termination was to take effect.[242]  He was ineligible for retirement under the Collective Bargaining Agreement between the Department and the Fraternal Order of Police because he did not have 20 years of service to the Department (having been hired in September, 2001).[243]

   b.   *Plaintiff* ███ *Had a History of Sustained Misconduct Charges Involving Display of His Firearm and Unbecoming Conduct*

118)    The Howard Theatre incident was not the first time that Plaintiff ███ had drawn his firearm for the purpose of resolving an off-duty, private dispute.  A Charles County, Maryland Sheriff's Office Offense/Incident Report indicates that on March 14, 2010 Plaintiff ███ was involved in an altercation outside of the Getaway Lounge in Charles County in which he drew his firearm to settle a dispute after having consumed a few alcoholic beverages and getting into a fight with three members of the public.[244] ███████, one of the men involved in the altercation, informed the responding deputies that ███████ was in the parking lot of the bar with an alcoholic drink in his hand and that he (███) asked ███ to go back inside because the bartender (his girlfriend) could be fined. Plaintiff ███ then intervened, starting an argument with ███ and throwing punches. ███ identified Plaintiff ███ as having drawn a gun.[245]  Plaintiff ███ informed the sheriff's deputies that he drew his weapon because he believed that one of the three men was attempting to retrieve a weapon.[246]

119)    As a result of the incident, Plaintiff ███ was charged with six counts of assault, handgun on person, use of a handgun in the commission of a felony, disorderly conduct, and affray.[247]  A judge of the District Court of Maryland for Charles County found Plaintiff ███ guilty of three counts of second degree assault and one count of affray.[248] Plaintiff ███ appealed his conviction to the Circuit Court and entered into a plea agreement in which his case

---

[239] PG0000012153.
[240] PG0000012154.
[241] PG0000012155.
[242] PG0000012123; PG0000012134.
[243] PG0000012123.
[244] PG0000114435-11448.
[245] PG0000114446.
[246] PG0000114440.
[247] PG0000114450-14451.
[248] PG0000114464.

CONFIDENTIAL

was placed on the stet docket in exchange for Plaintiff ████ agreement to perform community service.[249]

120)    Following the disposition of the criminal case, the IAD conducted an investigation under case number SI2010-027 Plaintiff ████ accepted discipline for one charge of Firearms & Intoxicants (being armed with a firearm while under the influence of alcohol) and one charge of Attention to Duty (involving himself in a dispute with patrons of a bar while off-duty and in plain clothes when he should have contacted local authorities).[250]

121)    Plaintiff ████ was found to have engaged in additional misconduct while with the Prince George's County Police Department. On May 21, 2014, ██████████, an official with the ██████████ Church in Clinton, MD filed a complaint against Plaintiff ████. Mr. ████ complained that during a telephone conversation with Plaintiff Brown regarding Plaintiff ████ position as the lead officer of the church's secondary employment team, he informed Plaintiff ████ that the church was going to relieve him of his duties on the church's secondary employment team.[251] According to ████, Plaintiff ████ responded with profanity and threatened that, if the church relieved him of his duties, no police would provide security services in the future.[252] The church had decided to relieve Plaintiff ████ of his duties as a result of a confrontation Plaintiff ████ had a couple of weeks earlier with a visitor to the church in which Plaintiff ████ allegedly acted aggressively and prohibited the visitor from attending church.[253]

122)    The matter was investigated under case number IA2014-051. IAD did not sustain a charge against Plaintiff ████ as a result of his conduct in connection with the earlier incident involving the visitor to the church.  On March 10, 2015, Cpt. William Alexander, then-Commander of AIS, issued a DAR sustaining six charges against Plaintiff ████ in connection with the telephone conversation and other interactions with the church officials, including use of abusive and inappropriate language (three charges), unbecoming conduct (one charge), and unbecoming conduct – harassment (two charges).[254]   The CCOP, however, disagreed with Cpt. Alexander, finding that a charge against Plaintiff ████ for unbecoming conduct for his treatment of the visitor to the church should have been sustained.[255] Plaintiff ████ did not accept the discipline imposed by the DAR – written reprimand, $400 in fines, and 20 hours of suspension without pay – and elected a hearing before the AHB.[256]

123)    The AHB convened a hearing on January 17, 2016, and in a decision dated January 22, 2016, found Plaintiff ████ guilty of two charges of use of inappropriate language and one charge of unbecoming conduct, all stemming from the telephone conversation Plaintiff ████

---

[249] PG0000114469-114473.
[250] PG0000113952-113955.
[251] PG0000070049-70050.
[252] PG0000070050.
[253] PG0000070039.
[254] PG0000070029-70033.
[255] PG0000070008-70009.
[256] PG0000070031; PG0000070029.

CONFIDENTIAL

had with Mr. ████.[257] The discipline imposed by the AHB was 30 hours of suspension without pay and removal from the 2016 promotional cycle.[258] The case closure memo was approved by Plaintiff Joseph Perez on April 19, 2016.[259]

124)    Progressive discipline is an industry standard when making decisions on the level of discipline in a particular case.  Simply put, if an officer is late for roll call on one occasion, they may likely receive a low level of discipline.  If that same officer is late to roll call for a third or fourth time, however, the discipline will be more severe with each violation.  With Plaintiff Brown's disciplinary history and the severity of the Howard Theatre case, a recommendation of dismissal is fair and appropriate.

       *c.    Corporal* ██████████ *Is Not an Appropriate Comparison for Plaintiff Brown Because* ██████████ *Did Not Draw His Gun on Members of the Public, and IAD Concluded that the Allegation Against Him Was Unfounded.*

125)    Mr. Graham's Report uses a case involving Corporal ██████████ as a comparator to the Howard Theatre case involving Plaintiff Brown, as discussed above.[260] Contrary to Mr. Graham's assertions in paragraphs 84(f) and 134(e), IAD did open an investigation into allegations involving an altercation that ██████████ had outside of a bar in Annapolis. The investigation was assigned case number SI2018-076.[261] The unbecoming conduct charge against ██████████ was determined to be unfounded.[262]  Corporal ██████████ and Corporal ██████████ were exonerated of the unbecoming conduct charges alleged against them, as well.[263] The Annapolis City Police Department informed Major Christian Price, then the Commander of the Department's Special Operations Division, that it appeared there was no wrongdoing on the part of ██████████, ██████, or ████, and that ██████████ **was not armed during the incident**.[264] The State's Attorney for Anne Arundel County screened the case, including watching surveillance footage, and concluded "that there is no evidence to support any criminal charges against" the officers.[265] There would be no justification for imposing discipline on Corporal ██████████ when the administrative charge against him was determined to be unfounded. Similarly, there would be no basis for disciplining Corporals ██████ or ████ when they were exonerated of the charges against them.  This case was appropriately investigated and resolved.

---

[257] PG0000070021-70033.
[258] PG0000070028.
[259] PG0000070001.
[260] Graham Report, ¶ 84(f), p. 84, ¶ 134(e), pp. 119-120.
[261] PG0000986195.
[262] PG0000986196.
[263] PG0000986195-986196.
[264] PG0000990987.
[265] PG0000991930.

CONFIDENTIAL

    *d.  Corporal Robert Heaney Is Not an Appropriate Comparator for Corporal Brown, Because Heaney Did Not Draw His Gun on Members of the Community, and No Criminal Charges Were Filed*

126)   Mr. Graham's Report uses a case involving Corporal Heaney as another comparator to the Howard Theatre case for which the AHB recommended Plaintiff Brown's termination from the Department.[266]  According to reports, Corporal Heaney got into a fight with his best friend outside of a bar in Bethesda, Maryland on September 11, 2016.[267]  Heaney's former girlfriend (his best friend's fiancé) was also present.[268]  It does not appear that any other individuals were involved.  Lieutenant Hugh Darden of IAD's SIRT division spoke with Heaney's best friend and former girlfriend, both of whom indicated that they would not be pursuing criminal charges or an administrative complaint, and they would not provide any statements.[269]  No case file was opened involving Heaney on this matter because none of the witnesses involved were willing to cooperate with an investigation or otherwise provide a statement.[270]

127)   The incident involving Heaney is not comparable to Plaintiff Brown's incident at the Howard Theatre for several reasons.  First, there was no criminal investigation or prosecution into Heaney's actions.  A current search of publicly-available records on Maryland Judiciary Case Search does not reflect any records of a criminal case opened against Heaney in the State of Maryland in or around September 2016, while Plaintiff Brown was charged with a felony in the Superior Court of the District of Columbia.  Second, there is no suggestion that Heaney drew his weapon during the altercation, or that he was even armed.  In my experience, it is entirely reasonable for an internal affairs division to not open a formal investigation into an off-duty altercation between friends where there is no complaining witness or other suggestion of misconduct.

    *e.  Corporal _____ Is Not an Appropriate Comparator for Plaintiff Brown Because _____ Did Not Draw His Gun on a Member of the Public, There Was No Physical Altercation, and No Criminal Charges Were Filed*

128)   Finally, Mr. Graham's Report uses a case involving Corporal _____ as yet another comparator to the Howard Theatre case involving Plaintiff Brown.[271] On January 26, 2015, the AIS division of IAD received a complaint alleging that Corporal _____, while driving a private vehicle, had cut off Complainant _____ three times and displayed his gun and badge during a brief verbal exchange while stopped at a traffic light.[272] The investigation was assigned to Sergeant Carlton Jones.  Jones interviewed _____, who explained that Complainant _____ appeared to be driving at an extremely high speed, creating a possible public safety concern.

---

[266] Graham Report, ¶ 84(g), pp. 84-85, ¶ 134(e), pp. 119-120.
[267] PG000104622-104623.
[268] *Id.*
[269] PG0000974179.
[270] PG0000104622.
[271]  Graham Report, ¶ 134(e), pp. 119-120.
[272] Internal Affairs Case File, IA2015-006 (hereinafter "IA2015-06"), pp. 24-25.

CONFIDENTIAL

██████ reported that he tried to get in front of Complainant ██████ vehicle to slow him down.[273] Although Complainant ██████ testified that ██████ pointed the weapon directly at him, ██████ testified that he unholstered his weapon with his left hand, transferred it to his right hand, and kept his hand resting on the shifter/console, with the weapon pointed straight forward at the dashboard.[274]

129)   Jones prepared a Report of Investigation, dated February 23, 2015, in which he concluded that there was enough evidence to prove that ██████ cut Complainant ██████ off in traffic three times and that he had his service weapon drawn from its holster during the verbal exchange.[275]   However, Jones also concluded that there was not enough evidence to prove that when ██████ displayed his weapon, he pointed it at or directed it toward Complainant ██████.[276]  There were no other witnesses to the interaction.[277]  ██████ was charged with one count of Unbecoming Conduct for attempting to enforce Maryland vehicle law while in a personal vehicle and one count of Procedure Violation (Firearm) for drawing and displaying his weapon during the verbal exchange with Complainant ██████.[278]   Both charges were sustained, and ██████ accepted the imposed discipline of two $250 fines.[279]

130)   The incident involving ██████ is not an appropriate comparator for Plaintiff Brown's incident at the Howard Theatre for several reasons. First, there was no evidence (or allegation) that ██████ left his vehicle at any point during the exchange.  Second, there was no evidence (or allegation) that ██████ put his hands on Complainant ██████.  Third, there were no witnesses (or video footage) to confirm the complainant's account of the incident.  In this instance, the investigator was not able to confirm exactly how ██████ displayed his weapon, as the only accounts available were ██████ and Complainant ██████.  It is my opinion that the investigator took the most reasonable course of action, which was to focus on presenting charges that could be sustained based on the available and incontrovertible evidence, which in this case was that ██████ did attempt to enforce traffic laws while in a private vehicle and did display his service weapon while doing so.  In my opinion, the Department handled this case appropriately, including the discipline issued to Corporal ██████.

### iv.   McClam Was Not Retaliated Against During Internal Investigations

131)   Mr. Graham asserts that "the Department has pursued four meritless investigations into Plaintiff McClam," citing IAD case numbers FCIQ2017-067, FCIQ2018-105, IA2016-038, and IAQ2018-104.[280]  The Internal Affairs Division has a responsibility to investigate complaints that come to their attention.  One case that Mr.Graham labels "meritless," (case number FCIQ2017-067, which became case number PS2017-165) was heard by an Administrative

---

[273] IA2015-06, p. 56.
[274] IA2015-06, pp. 40-42, 56-57.
[275] IA2015-06, pp. 21-22.
[276] IA2015-06, p. 22.
[277] IA2015-06, pp. 20-21.
[278] IA2015-06, pp. 14-15.
[279] IA2015-06, p. 8.
[280] Graham Report, ¶ 143(d), p. 129.

CONFIDENTIAL

Hearing Board ("AHB"), made up of members from the Howard County Police Department.  The AHB found Plaintiff McClam guilty of multiple charges, including insubordination.[281]   Using individuals on a hearing board that come from outside the Department is a best practice to ensure impartiality in this circumstance.

132)   The remaining three cases also involved complaints with potentially serious allegations that again, could not be ignored.

•      For instance, Case No. FCIQ2018-105 noted above resulted in a conclusion by Captain Mrotek (H) that Plaintiff McClam had "indicated a repeat pattern of not working well with others, taking things personal and responding in an unprofessional manner."

•      Moreover, Case No. IA2016-038, involved a complaint against Plaintiff McClam and another officer regarding an incident that occurred during an In-Service training on May 10, 2016.[282]   The investigation was completed by July 2017 when the supplemental Report of Investigation was submitted.[283]   The case was closed as of November 13, 2017 with a finding of unfounded for one charge and non-sustained for the other charge against Plaintiff McClam.[284]

•      Case No. IAQ2018-014 was an inquiry investigation conducted by Sergeant Adrian Blount involving Facebook posts made by Plaintiff McClam under a pseudonym.[285]   The complaint was received November 9, 2018, and the inquiry was completed by December 20, 2018 with a determination that there was no evidence to suggest any violation of the Department's social media policy by Plaintiff McClam.[286]   As a result, Plaintiff McClam was not disciplined in any way relating to this incident.

133)   It is my opinion that the Department acted properly by investigating the complaints that were brought to IAD's attention.  These allegations were serious and there were many potential witnesses in these events.  Plaintiff McClam has been promoted twice since the time when Mr. Graham claims he was harmed as a result of these investigations (to Sergeant in September of 2017 and to Lieutenant in November of 2018).

**v.     The investigation into Plaintiff Crudup was not retaliatory.**

134)   Mr. Graham's Report appears to claim that Plaintiff Crudup was subjected to a retaliatory investigation because he made a complaint accusing his supervisor, Lieutenant

---

[281] PG0000982883-982898.

[282] PG0000023867.

[283] PG0000023869-23879.

[284] PG0000023828.

[285] PG0000027647.

[286] PG0000027646-27647.

CONFIDENTIAL

Hampson, of making racist comments.[287]  In my opinion, as described below, the investigation into Plaintiff Crudup was both appropriate and necessary, and was not based on retaliation.

135)    Around 2015 or 2016, Plaintiff Crudup was assigned to the Gang Unit in the Special Investigations Division.  While serving in the Gang Unit, ATF Agent Noah Slackman notified the Department that he suspected Plaintiff Crudup of passing confidential information to gang members.[288]  Specifically, Plaintiff Crudup was accused of communicating with known gang member Bryan Tiggle when Tiggle was under investigation by the FBI.[289]  When Plaintiff Crudup was confronted with this allegation by his supervisor, he lied and claimed he did not even have Tiggle's phone number and had last spoken to him about a year ago.[290]

136)    In May 2017, Plaintiff Crudup was criminally indicted regarding the incident described above.[291]  He was tried before a jury on 11 counts, including witness intimidation, accessory after the fact, and misconduct in office.  The jury found him guilty on one count: misconduct in office.  This finding was later dismissed on appeal.[292]

137)    After the conclusion of his criminal trial, the Department conducted its own investigation into Plaintiff Crudup's role and communications with gang member Tiggle.[293]  The Department found Crudup guilty of 15 Counts of Misconduct, Including Unbecoming Conduct, Violation of the Laws (False Statement), Ethics, and Loyalty.  Plaintiff Crudup requested an AHB review, and an independent Hearing Board (three members from Baltimore County Police Department) found Plaintiff Crudup guilty of 13 out of 15 administrative charges.[294]  The AHB recommended termination as the discipline for each of these 13 charges.[295]

138)    During the Hearing Board, the Department introduced twenty-seven exhibits into evidence and called nine witnesses to testify, which revealed numerous false statements that Plaintiff Crudup made to impede the investigation conducted by Agent Slackman into Tiggle.[296]  The AHB relied on sworn testimony by Agent Slackman during Plaintiff Crudup's criminal trial that Plaintiff Crudup telephoned him and inquired about Tiggle's arrest and the identity of the Confidential Informant that assisted Agent Slackman in the investigation.[297]

139)    The Hearing Board found that Plaintiff Crudup concealed the extent of his relationship with Tiggle.[298]  After reviewing the evidence and hearing the testimony of the Department's nine witnesses, the Hearing Board determined Plaintiff Crudup intentionally

[287] Graham Report, ¶ 143(g), pp. 134-135.
[288] PG0000984909.
[289] *See* PG0000978140.
[290] *Id.*
[291] PG0000984910.
[292] *Id.*
[293] *See generally* PG0000984414-0984956.
[294] PG0000978140.
[295] *Id.*
[296] *Id.*
[297] *Id.*
[298] *Id.*

CONFIDENTIAL

provided the incorrect phone number for Tiggle, had approximately 84 contacts with him less than three months before his arrest, was aware of his criminal past, and performed unauthorized LINX searches for Tiggle.[299]

140)    Crudup's complaints against Lieutenant Hampson were completely irrelevant to this IAD investigation.  Notably, ATF Agent Noah Slackman initiated the investigation by reporting his concerns about Plaintiff Crudup to the Department, thus dispelling any allegations of retaliation.[300]

141)    Furthermore, Plaintiff Crudup's allegations that he made a complaint were never documented and only surfaced once he faced criminal and administrative charges.  Indeed, Plaintiff Crudup testified at his criminal trial that he had never reported Lieutenant Hampson's alleged comment to anyone in the Department except to talk to Lieutenant Hampson himself.[301]  As the Department had no knowledge of the alleged complaint, its investigation regarding Plaintiff Crudup's contacts with gang members could not be based on the complaint about Lieutenant Hampson.

142)    Moreover, Mr. Graham's analysis misstates key facts.  He states that the Crudup investigation was in retaliation for complaints against Lieutenant Hampson by Plaintiff Crudup made in 2015, but Plaintiff Crudup himself testified the alleged incident happened in 2014.[302]  This testimony directly contradicts Plaintiff Crudup's statements in the Amended Complaint, on which Mr. Graham relies.  Plaintiff Crudup also only alleges that he complained about a single incident with Lieutenant Hampson instead of the "several complaints" Mr. Graham alleges.[303]  Plaintiff Crudup testified following the incident in 2014 that, "he removed [himself] from [Lieutenant Hampson]" and refused to work with him.[304]  Plaintiff Crudup never testified about any additional complaints.

143)    In my opinion, the Department acted appropriately in investigating and disciplining Plaintiff Crudup, and the Department did not retaliate against him for any complaint.  In my experience, a police department must take very seriously any allegation that an officer is using confidential police information to impede law enforcement activity.  Further, my opinion that this investigation was not retaliatory is strengthened by the fact that it was initiated by an officer from a different agency, and that the Department did not know about Plaintiff Crudup's complaint.  Moreover, the factual basis for the investigation was upheld by an independent Administrative Hearing Board.

---

[299] *Id.*
[300] PG0000984909.
[301] PG0000984668-984669.
[302] Adrian Crudup Deposition Transcript ("Crudup Tr.") 65-66 (July 27, 2020).
[303] Graham Report, ¶ 143(g), pp. 134-135.
[304] Crudup Tr. 68 (July 27, 2020).

CONFIDENTIAL

E.   **Prince George's County Police Department Acted Reasonably with Regard to Other Investigations If and When Complaints Were Made**

144)   Mr. Graham's Report cites a number of incidents in which he claims: (1) no investigation occurred (thereby incorrectly assuming that a complaint was made); (2) the investigation was deficient for a variety of reasons; (3) the investigation yielded sustained charges regarding racism but inadequate discipline; or (4) IAD improperly referred the complaint back to the field.  While many of Mr. Graham's assertions seem disturbing and very serious on their face, an assessment of the facts actually underlying these incidents further demonstrates a consistent pattern in the Report: Mr. Graham's claims are groundless, inaccurate, and fail to acknowledge the record evidence.

F.   **The Department Responded Appropriately to Facts and Circumstances, Even If No Complaint Was Filed**

i.   *"GFYOBMA" License Plate*

145)   Mr. Graham's Report identifies the Department's alleged failure to investigate a case involving a so-called complaint from April 2016 regarding a personalized license plate owned by Brian Selway, a then-sergeant who was assigned to IAD at the time.  Mr. Graham claims that the complaint alleged the license plate stood for the acronym "Go F*** Yourself Obama."[305]

146)   Mr. Graham misses the mark and his conclusion disregards the established facts.  In fact, the Department did screen this matter and it is my belief that the license plate—regardless of what the officer intended it to stand for—could be considered protected speech under the First Amendment of the U.S. Constitution.  Further, it was displayed on an officer's personal vehicle.

147)   During a February 2017 press conference, Chief Stawinski stated that the license plate came to his attention in April 2016.[306]  He explained that he rejected Lieutenant Selway's explanation that GFYOBMA meant "Good for you Obama" and "immediately" consulted with his legal advisors, who informed him that a Maryland license plate had been issued and that people had a First Amendment right to express their opinions.[307]

148)   Mr. Graham's Report fails to address the fact that license plates issued by the Maryland Motor Vehicle Administration ("MVA") are not the personal property of the registered owner but are the property of the MVA and are regulated by that agency.  When the MVA

---

[305] Graham Report, ¶ 66(b), pp. 47-48.
[306] Prince George's County Police Department, "Chief Stawinski Discusses DOJ Complaint" (February 9, 2017), available at https://www.youtube.com/watch?v=TNGQ05KJDgw.
[307] *Id.*

CONFIDENTIAL

received a complaint regarding Selway's plates, it exercised its control over its property and directed him to remove the license plate.[308]  This action was outside of the Department's control.

149)    Chief Stawinski took the step that he believed he had the legal ability to do and told Selway that he could not park the vehicle with that license plate on Prince George's County property.[309]  Following that notification, Selway did not park any vehicle on County property with that license plate; both Plaintiffs and Mr. Graham fail to identify any evidence to the contrary.[310]  In a February 2017 inquiry to the MVA about the license plate, the individual inquiring did not claim, or even suggest, that Selway was still using it.[311]  Instead, the inquiry stated: "Was the license plate shown below revoked by the MVA in April 2016?  Maryland – GFYOBMA . . . If yes, can you tell me who asked for the plate to be revoked? Why did they want the plate to be revoked?"[312]

150)    Given the First Amendment concerns, the fact that the MVA owned the license plate, and the fact that the vehicle was the personal property of the officer, the Department took the appropriate action it deemed available, which I consider reasonable under the circumstances.

### ii.    Lieutenant Edward Scott Finn's Comment Published in a New York Times Article

151)    Mr. Graham also cites to comments published in the media in 2016 to purportedly demonstrate the Department's unwarranted decision not to pursue an investigation.  Mr. Graham claims that Lieutenant Scott Finn made a derisive comment about "Black Lives Matter" activists, and was quoted in articles published by the Washington Post and New York Times.  He further claims that, although this statement was the subject of a complaint and Lieutenant Finn was the subject of other complaints for Use of Language, there is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated or Lieutenant Finn was disciplined.[313]

152)    Mr. Graham's summary, above, is factually incorrect and misleading.  In July 2016, a New York Times reporter asked to arrange a ride-along with a Prince George's County Police Department officer for a project about police officers around the country and their daily work.[314]  The Department selected Lieutenant Finn to participate in the ride along, in part because he had previously been quoted in a Washington Post article about the Department two years prior.[315]

---

[308] PG0000020674.

[309] Prince George's County Police Department, "Chief Stawinski Discusses DOJ Complaint", (February 9, 2017), available at https://www.youtube.com/watch?v=TNGQ05KJDgw.

[310] Id.

[311] PG0000169924-1669926.

[312] PG0000169924-1669925.

[313] Graham Report, ¶ 66(e), p. 50.

[314] PG0000990232.

[315] Lynh Bui, *Prince George's police leveraging social media to change its reputation*, The Washington Post (July 8, 2014),  https://www.washingtonpost.com/local/crime/prince-georges-police-leveraging-social-media-to-change-its-reputation/2014/07/08/a57ff4c6-fb02-11e3-b1f4-8e77c632c07b_story.html.

CONFIDENTIAL

153)    Lieutenant Finn and the New York Times reporters met for the ride along on July 20, 2016 at 4 p.m., and the reporters rode with Finn until 2 a.m. the following morning.[316]  After leaving the scene of a deadly stabbing of a Black man during the ride along, Finn and the reporters headed to dinner.  The article, which was published on July 23, 2016, states the following:

> A handful of officers manage the scene.  Lieutenant Finn heads for dinner.  He says he prefers not to eat in the area he has been patrolling, where he might run into people he arrested or be reminded of where fellow officers were shot.  So he drives south, to a Texas Ribs & BBQ in Clinton, Md.  Talk turns to the Black Lives Matter protest. " 'Black Lives Matter When the Police Kill Them,' " Lieutenant Finn says, as if arguing with protesters.  'Have that be your name.'"[317]

154)    The article did not provide any further context for Lieutenant Finn's comments.

155)    After the article was published, Lieutenant Finn expressed his frustration to the Media Relations Division about the quote and mischaracterization.[318]  He informed the Division that his comments were taken out of context.

156)    While Mr. Graham asserts that Lieutenant Finn was quoted in a Washington Post article published on July 27, 2016, he was not in fact quoted in the opinion piece that appeared in that publication.  That piece had been written about him and the New York Times article noted above, but did not quote him.[319]  Notably, there is no indication that Lieutenant Finn was even interviewed for the piece that appeared in the Washington Post.

157)    Mr. Graham's assertion that a complaint was made about Lieutenant Finn's statement is untrue; tellingly, that assertion is completely unsupported in Mr. Graham's Report.  As the Department never received a complaint about the statement, and there was no evidence that any violation of Department policy had occurred, in my opinion and based on my experience it was entirely appropriate that no IAD investigation occurred.

158)    Similarly unreliable is Mr. Graham's citation to IA2004-017 and IA2014-069 as examples of cases where Lieutenant Finn was the subject of complaints for Use of Language.  However, IA2004-017 did not contain any allegation against Lieutenant Finn for Use of Language.[320]  And, although IA2014-069 included a Use of Language charge, the allegations that

---

[316] PG0000990240-990241.

[317] Jess Bidgood, et al., "One Police Shift: Patrolling Anxious America," The New York Times (July 23, 2016), available at                                                                      https://www.nytimes.com/2016/07/24/us/police-ridealongs.html#:~:text=Policing%20in%20America%20today%20is,into%20your%20patrol%20car%20door.&text=And%20it's%20facing%20the%20protests,of%20us%2Dversus%2Dthem.

[318] PG0000045100.

[319] Radley Balko, "Scott Finn, model cop for a model police department," The Washington Post (July 27, 2016), available at https://www.washingtonpost.com/news/the-watch/wp/2016/07/27/scott-finn-model-cop-for-a-model-police-department/.

[320] PG0000783498.

CONFIDENTIAL

led to the Use of Language charge were unfounded for multiple reasons, including that (1) the complainant's description of the police vehicle did not match Lieutenant Finn's vehicle, and (2) the complainant did not appear for a lineup to identify Finn as the subject of her complaint.

### iii.    A String of Statements Allegedly Made by Corporal Steven Jones

159)    Mr. Graham's Report further states that Corporal Steven Jones made a series of negative comments about Black members of the community and officers, including that "at least slaves had food and a place to live," referring to President Obama as a "coon," and referring to a black officer as a "Signal 7."  Mr. Graham also reports that Corporal Jones defended the Ku Klux Klan ("KKK") and equated the Black Lives Matter ("BLM") movement with the Ku Klux Klan.  Mr. Graham further claims that Corporal Jones was the subject of complaints made to Major Misty Mints (who advised that she did not want to hear about discrimination), Lieutenant Thomas Calmon (who denied a request for a meeting to discuss the complaint), and the EEO Coordinator (who acknowledged the complaint, but did not schedule a meeting with the complainant). Finally, Mr. Graham notes that there is no indication in the IAPro data produced or Defendants' discovery responses that this matter was investigated or that Corporal Jones was disciplined.[321]

160)    Reading Plaintiff Christopher Smith's deposition, Plaintiff Smith recounts that the conversations in which these comments allegedly occurred were about a variety of topics that, sometimes, included race and policing.[322] According to Plaintiff Smith, a number of Officers on his squad participated in the conversations, but he said in his deposition that Corporal Jones spoke more than the others on the team.[323]

161)    There is no evidence in the record to support Plaintiff Smith's allegation that the Department was made aware of any comments allegedly made by Corporal Jones that would have warranted an investigation or discipline. Plaintiff Smith alleges that he participated in a discussion with Jones and other members of his Special Assignment Team regarding the Black Lives Matter movement. During the discussion, Jones allegedly compared the BLM movement to the Ku Klux Klan, and pointed to an example he heard of a Black Lives Matter supporter talking about killing police officers.[324] Plaintiff Smith disagreed, and said that the KKK and BLM are nothing alike.[325] Based on my experience evaluating the conduct of police officers, it is my opinion that Jones' alleged comments, as characterized by Plaintiff Smith in his deposition, did not amount to an act of racial harassment. There is no evidence that Plaintiff Smith reported to anyone that he believed the conversation to be racial harassment, including Lieutenant Vondell Smith, Plaintiff Smith's Black supervisor, to whom he allegedly described the conversation. Moreover, the Report's characterization of Corporal Jones as "defending" the KKK is inaccurate and misleading.

---

[321] Graham Report, ¶ 66(f), p. 50.
[322] Christopher Smith Deposition Transcript ("C. Smith Tr.") 120-124 (July 29, 2020).
[323] C. Smith Tr. 118, 120, 123-124 (July 29, 2020).
[324] C. Smith Tr. 121-124 (July 29, 2020).
[325] *Id.*

CONFIDENTIAL

162)     Plaintiff Smith also alleges that Jones said that Smith looked like a "Signal 7" on a day that Smith wore plain clothes to work. "Signal 7" is the Department's official code for "suspicious person," and is used when referring to suspicious individuals of any race.[326] In his deposition, Plaintiff Smith testified that various officers made jokes and comments about others looking like "Signal 7s," including White people.[327] Based on my experience evaluating the conduct of police officers, it is my opinion that Jones' alleged "Signal 7" comment, as characterized by Plaintiff Smith's deposition testimony, did not amount to an act of racial harassment.  There is no record evidence that Plaintiff Smith reported to anyone that he believed Jones' alleged "Signal 7" comment to be racial harassment, including Lieutenant Vondell Smith, to whom he allegedly described the comment.

163)     Plaintiff Smith further alleges that Jones once attempted to discuss an article with Corporal Michael Myerly, which noted that during the time of slavery in the United States, some slaves had access to food, clothes, and shelter, whereas some nomadic white people at the time did not.[328]  Jones allegedly said that he did not know how to feel about the article, and was about to ask Corporal Myerly what he thought when Corporal Myerly interrupted him and told him that this was not an appropriate topic of conversation.[329] Plaintiff Smith and Corporal Joseph Gavin were in the room with Myerly, but did not say anything.[330] It is my opinion that Corporal Jones' alleged comments regarding this article, as characterized by Plaintiff Smith's deposition testimony, did not amount to an act of racial harassment. Following this alleged conversation, Plaintiff Smith did not report this incident as racial harassment to any supervisor or to the Department's EEO Coordinator, including to Lieutenant Smith, to whom he allegedly described the comments.

164)     Finally, Plaintiff Smith alleges that, during a conversation about President Barack Obama and his political activities, Corporal Jones referred to President Obama as a "coon."[331] Plaintiff Smith alleges that he, Police Officer First Class Kyle Colleli, and Corporal Joseph Gavin were in the room (without any supervisors present), and none of them said anything in response.[332] There is no record evidence to suggest that, following this alleged conversation, Plaintiff Smith reported this incident to any supervisor or to the Department's EEO Coordinator.

165)     Mr. Graham's Report relies on allegations in the complaint and Plaintiff Smith's June 15, 2020 Declaration.  The allegations in these documents are unsupported by the record, including specifically Plaintiff Smith's deposition testimony and contemporaneous Department documents. For example, Mr. Graham's Report incorrectly suggests that Plaintiff Smith made a complaint regarding Corporal Jones to Lieutenant Calmon.[333] After Plaintiff Smith was reassigned off the SAT, he sent an email to Lieutenant Calmon on March 7, 2016 requesting a meeting to

---

[326] C. Smith Tr. 43-44 (July 29, 2020).
[327] C. Smith Tr. 43-45, 149-152 (July 29, 2020).
[328] C. Smith Tr. 179-181 (July 29, 2020).
[329] C. Smith Tr. 180 (July 29, 2020).
[330] C. Smith Tr. 179-181 (July 29, 2020).
[331] C. Smith Tr. 161-165 (July 29, 2020).
[332] *Id.*
[333] Graham Report, ¶ 66(f), p. 50.

CONFIDENTIAL

discuss "the unforescene [sic] changes that recently occurred."[334] His email to Calmon did not mention Corporal Jones, racial harassment, discrimination or retaliation. In fact, Plaintiff Smith acknowledged in his deposition that he had never spoken to Calmon about Corporal Jones' allegedly discriminatory comments.[335]    Mr. Graham's Report also states that Calmon denied Smith's request for a meeting.  This is not accurate.  Lieutenant Calmon, via email, advised Smith to go through his chain of command first; that is, speak with his supervisors first, before Calmon would agree to meet.[336] Based on my experience, directing Plaintiff Smith to speak to his own sergeant and lieutenant first under these circumstances is an accepted practice in any police department.

166)    Similarly, Plaintiff Smith's March 21, 2016 email to EEO Coordinator George Nader requested a meeting to discuss "a sequence of events that recently occurred involving my former squad (SAT B)."[337] It also did not reference Jones, or any alleged racial harassment, discrimination, or retaliation against Plaintiff Smith.[338] Deputy Chief Nader advised in the email that he was available to meet with employees who felt they have been treated unfairly.[339] It was then, in my opinion, up to Plaintiff Smith to work with the Deputy Chief's assistant to schedule a meeting.  Although Plaintiff Smith alleges that he subsequently submitted a hand-written complaint directly to the EEO Coordinator's office, the Department has no record of any such complaint, and Plaintiff Smith said that he kept no copy.

### G. The Department Repeatedly Carried Out Sufficient Investigations Despite Impediments Caused by Plaintiffs or Circumstances Unrelated to the IAD Leadership

#### i. The Color Guard Locker, SI2017-018

167)    Mr. Graham's Report first cites the "Color Guard" incident as an example of an inadequate investigation in which investigators did not pursue leads and failed to conduct a fair and complete investigation.  This is completely inaccurate.

168)    The investigation into the "Color Guard" incident was precipitated by Plaintiff Joseph Perez receiving a text message from an unnamed "source" containing a photograph of the color guard locker.  In that photograph, the word "Color" on the locker's label was crossed out, and "African American" was written on tape above it.[340] The same day he received the text, Plaintiff Perez called Major Raymond Gordon about the locker, told him to "do the right thing,"[341] and also forwarded the text message to the Chief and Assistant Chief. Gordon consulted with

---

[334] PGPD-SMI-0000003-0000004.
[335] C. Smith Tr. 293 (July 29, 2020).
[336] PGPD-SMI-0000003-0000004.
[337] PGPD-SMI-0003951-0003952.
[338] *Id.*
[339] *Id.*
[340] PG000024869; PG000025095 (SI2017-018).
[341] PG000024886-24887 (SI2017-018).

CONFIDENTIAL

Major Kathleen Mills, and IAD commenced a formal SIRT investigation on February 7, 2017, the same day the incident came to their attention.[342]

169)    Mr. Graham's Report criticized the IAD investigation for "failing to pinpoint" the exact date that the vandalism occurred.[343]  IAD concluded the vandalism occurred on February 6, 2017 because Plaintiff Perez reported to IAD and the Chief's Office that the "source" of the text message had told him February 6, 2017 was the date it occurred.[344]  No other person in the building complained, or indicated they had noticed, that the locker had been vandalized prior to February 6.[345]  It was reasonable for the investigator, Corporal Brian Medina, to conclude that the locker vandalism occurred on February 6, particularly because Plaintiff Perez's "source" confirmed as much.

170)    Thus, given the significant number of individuals who accessed the building, it was reasonable to limit an investigation of the access card scans to that time period.  Moreover, the use of questionnaire forms to assess employees' knowledge of the locker was reasonable under the circumstances, considering there were approximately 60 potential witnesses who scanned into the building on February 6.[346]  It is also notable that the building was open to third parties to use for training purposes, and IAD noted this fact and broadened the potential suspect list as a result.[347]

171)    Mr. Graham's Report also concluded that the IAD investigation failed to investigate leads.  The case file shows that the employees who indicated in their questionnaires that they "had seen the vandalism" and "were offended" had not indicated they had seen the locker prior to the commencement of the IA investigation; each employee indicated they did not know the identity of any suspect, and had no further relevant information to share with IAD.[348]  The IAD investigators reasonably concluded that the employee witnesses had no further information that could further the investigation.

172)    It was also not reasonably possible to pursue the primary lead—the individual who first took a picture of the locker vandalism and sent the picture to Plaintiff Perez—because Plaintiff Perez adamantly refused to provide investigator Medina with the individual's identity or phone number.[349]  After telling IAD during his interview that the text message "disappeared" from his phone and denying he knew the identity of the individual in his Responses to Defendants' Interrogatories, Plaintiff Perez has now belatedly produced the text message on September 22, 2020 that he had received from an individual named "Barry".[350]

---

[342] PG000024878-24879 (SI2017-018).
[343] Graham Report, ¶¶ 56-57, pp. 37-38.
[344] PG000024905; PG000025094 (SI2017-018).
[345] PG000024911-25086 (SI2017-018) (witness questionnaire forms).
[346] Id.
[347] PG000024874-24877; PG000024882 (SI2017-018).
[348] PG000025020; PG000025023; PG000025080 (SI2017-018).
[349] PG000024905-24909 (SI2017-018).
[350] PGPD-PER-0146458-0146459.

CONFIDENTIAL

173)    Plaintiff Perez knew that IAD was investigating the circumstances of this case and actively impeded the investigation by withholding crucial information from the investigator.  In my opinion, had IAD obtained access to the text message during its investigation, it could have reasonably resulted in a charge of lying in the course of the investigation.  Based on the evidence available at the time, IAD reasonably concluded that a respondent could not be identified and the case must be administratively closed. There was no discipline imposed because a respondent could not be identified.

174)    Mr. Graham's Report suggests the IAD investigation was inadequate because unnamed individuals purportedly committed "clear policy violations of failing to report discrimination and the failure of managers to keep their commands free from harassment and discrimination."[351]  The case file shows that as soon as Major Gordon was on notice of the vandalism, he had it removed, the command staff immediately addressed the incident with employees in the building to discover related information and ensure that no further incidents occurred.  The same day a formal SIRT investigation was initiated to attempt to locate the perpetrator of the vandalism.[352]

175)    The Department made every reasonable effort to investigate this case.  The investigation was hindered at the outset due to Plaintiff Perez withholding information regarding the relevant photograph and text message.

### ii.    *Training Dummy, SI2017-067*

176)    Paragraph 68 of Mr. Graham's Report also alleges that IAD's investigation into the "training dummy" incident, SI2017-067, was incomplete.  I disagree.  The Department performed a reasonable investigation of the "training dummy" incident that while not fruitful, was thorough and conformed to standard police investigation procedures.  By way of background, Lieutenant William Rayle was the investigator assigned to SI2017-067.[353]  This investigation was launched after Plaintiff Perez brought the photographs to the attention of Chief Hank Stawinski and Assistant Chief Hector Velez on or around January 6, 2017.[354]  During Plaintiff Perez's interview for the investigation, he claimed that the photographs first came to his attention in mid-2016 when he heard individuals discussing the training dummy and the photograph.[355]  Remarkably, Plaintiff Perez failed to identify who took part in that conversation.[356]  Plaintiff Perez also

---

[351] Graham Report, ¶ 57, p. 38.

[352] PG000024869; PG000024873; PG000024879-24880 (SI2017-018).

[353] M. Smith Tr. 92 (July 22, 2020).

[354] PG0000020993-20994. Contrary to the assertion on page 57 of Mr. Graham's Report, Plaintiff Perez did not claim that he shared the photographs with Velez in November 2016.  Rather, he stated that he received the photographs under his door "after November 2016."  PG000002020767-2020768.   More importantly, in Plaintiff Perez's January 5, 2017 email to Stawinski and Velez, he said, "Attached are the pictures that I started to share with both of you *yesterday* when the meeting was ended abruptly."  PG0000020993-20994.

[355] PG0000020767-20772.

[356] *Id.*

CONFIDENTIAL

explained that a copy of the photograph was left under his door after November 2016, but he did not identify who left the photograph at his door.[357]

177)   During Jewell Graves' interview for the IAD investigation, Graves stated that multiple people showed her the photograph and she asked for a copy, and at some point thereafter a copy of the photograph was left in her mailbox by an unknown individual before December 2015.[358]   Graves could not recall who had previously shown her the photograph.[359] Graves also disclosed that sometime after she received the photograph in her mailbox, she brought it to the attention of Deputy Chief Raphael Grant.[360]   Graves could not recall when she had the discussion with Grant.[361]     However, Graves stated that when she received the photographs, she did not know how long they had been circulating, and expressed that to Grant. Grant contacted Stephanie Frankenfield, the commander of the Department's Training Division at the time, to ensure that there were no photographs of the training dummy around the Training Education Division.[362] During Frankenfield's interview for the IAD investigation, she noted that she could tell that the photograph was not taken at the facility she was assigned to at the time.[363]

178)   As discussed above, Plaintiff Perez brought the photographs to the attention of Stawinski and Velez on January 6, 2017.  On January 10, 2017, Major Mills, the then-commander of IAD, requested that Lieutenant Rayle be assigned to conduct the investigation.[364]  The same day, Lieutenant Rayle was informed that he was assigned the investigation.[365]  On January 11, 2017, Rayle began his factual investigation.[366]   Rayle conducted his first interview for the investigation on January 24, 2017.[367]  Thus, Graham's assertion that Lieutenant Rayle did not begin conducting interviews until three weeks after the case file was opened is false, and disingenuously suggests that he did not take any investigatory steps prior to conducting his first interview.  During his deposition, Captain Michael Smith, a Captain in IAD during the SI2017-067 investigation, was asked if the Internal Affairs investigation determined who brought the Afro wig (that was depicted in the photo) to the Department. Smith responded that he believed Lieutenant Rayle narrowed that down to one or two officers who were assigned to the Training Division.[368]  Smith also specifically testified that he didn't believe there was a finding about who put the Black male's face on the training dummy.[369]   Nevertheless, Mr. Graham's Report

---

[357] PG0000020767-20772.
[358] PG0000020745-20748.
[359] PG0000020754-20755.
[360] PG0000020753-20754.
[361] PG0000020754.
[362] PG0000020746; PG0000020776.
[363] PG0000020782
[364] PG0000020993.
[365] PG0000020993.
[366] PG0000020707.
[367] PG0000020767.
[368] M. Smith Tr. 91-92 (July 22, 2020). Specifically, Lieutenant Rayle's administrative closure memorandum states that Corporal George Harley, an Instructor at the Training Academy brought the black-haired wig in to be placed on a mannequin, not a training dummy, for a Shoot/No Shoot In-Service training scenario to give the mannequin a more life-like appearance. PG0000020739.
[369] M. Smith Tr. 92 (July 22, 2020).

CONFIDENTIAL

mischaracterized Smith's testimony and suggested that Lieutenant Rayle had narrowed down the potential wrongdoers, "[b]ut no one was charged or disciplined in the matter."[370]   These seemingly subtle inaccuracies further demonstrate flaws in Mr. Graham's Report.

179)     Moreover, all of this indicates IAD performed a reasonable investigation and closed it when there were no further leads.  As an initial matter, anonymous complaints lead to difficult investigations to perform, and it was determined that the photograph had been taken at least over one year before the Chief was notified of its existence.[371] Consequently, the time lag added to the already complicated investigation. Despite these impediments, the investigation revealed that the wig had been used for role-playing training scenarios, and revealed where the paper target in the photo came from.  It appears that every investigative lead was followed up on in this case.  The alleged deficiencies noted in Mr. Graham's Report wholly ignore the realities of the investigatory circumstances.

### iii.    Sergeant Bunce, IA2017-003

180)     Mr. Graham criticizes certain IAD investigations as "inadequate" and certain investigators who failed to be "fair."[372]  One of these investigations is the investigation conducted by Landos Wallace into Plaintiff Torres' complaint against Sergeant Joseph Bunce.  Mr. Graham's descriptions of this investigation are at odds with the evidence in the case file.

181)     First, Mr. Graham mistakenly writes that the investigator "did not follow up when Sergeant Bunce changed his story and said he typed rather than spoke the word 'NECA.'"[373]  It is obvious from Bunce's IAD interview that Bunce does not change his story during that interview. Instead, Bunce compared his first text to Plaintiff Torres, which was a talk-to-text, to his second text.  Bunce's second text read: "Neca doesn't mean anything it was talk to text and I don't know why it did that."[374]  In the interview, Bunce stated, "if you look down here at the bottom to my next text, it looks like I was typing then because I put N-E-C-A and it's not capitalized now so that's me probably hand typing."[375]  Mr. Graham's report on this issue is simply false.

182)     Second, Mr. Graham's Report faults Wallace for not "ask[ing] any follow up about" Bunce's alleged comment related to the Bladensburg resident who Plaintiff Torres released from police custody, despite the fact that he had an open warrant against him for a probation violation for second degree murder.[376]  Mr. Graham's Report fails to acknowledge that the transcript of Wallace's interview shows almost three full pages of discussion with Bunce about the Bladensburg resident, including Bunce's comment that allegedly followed.[377]

---

[370] Graham Report, ¶ 68(b), p. 58.
[371] PG0000020738-20739.
[372] Graham Report, ¶ 68, p. 55.
[373] Graham Report, ¶ 68(g), p. 64.
[374] PG0000020426.
[375] PG0000020504.
[376] Graham Report, ¶68(g), p. 64.
[377] PG0000020526-20554.

CONFIDENTIAL

183)     Finally, Mr. Graham's Report states that Wallace did not assess whether Bunce's conduct was retaliatory, even though "Bunce acknowledged that he wrote up Corporal Torres for infractions and Corporal Torres was transferred following the time that Corporal Torres complained to IAD."   This is false and misleading.   Plaintiff Torres was counseled for poor performance on November 30, 2016, and Captain Melvin Powell notified Plaintiff Torres of his transfer on December 28, 2016.[378]   On January 23, 2017, the same day IAD opened its investigation, Captain Watkins wrote to Plaintiff Torres that "[y]our complaint was received by [IAD] on January 17, 2017."[379]   Mr. Graham's claim that Plaintiff Torres had previously complained to IAD, which has no citation, contradicts the record.

184)     Contrary to Mr. Graham's claims, Wallace conducted an adequate investigation, which included over 20 witness interviews.   His investigation was reviewed up the chain of command for completeness, and the investigatory report completed by Wallace was approved, with signature, by IAD Assistant Commander Art'z Watkins.[380]   The CCOP agreed with IAD's determination non-sustaining the two charges against Bunce.[381]

#### iv.     Sergeant Rush, IA2016-034 and Parallel EEO Complaint

185)     Mr. Graham's Report further asserts that IAD conducted an inadequate investigation and reached the wrong result for a complaint made by Corporal Sean Miller.[382] Again, I cannot agree with his conclusion based on the record.

186)     Mr. Graham's Report discusses a complaint from Corporal Miller, upon which he later based an EEOC charge alleging racial discrimination.   Miller alleged to IAD that Sergeant Darin Rush read a suspect's text message and put emphasis on the word "nigga" four times.   In addition, Miller alleged that Rush asked to see a photograph of Miller's fiancé, and upon finding out that she was Mexican American, said she was cheating on Miller "because that's what they do."   Miller further advised that Rush said "All Latino women are whores."   In March 2016, Miller accused Rush of saying, "I can't wait to see Trump check those Hispanics." [383]

187)     After review of the record, the following information was determined:

- IAD conducted the investigation into Corporal Miller's allegations against Sergeant Rush.[384] IAD investigated Miller's allegations that Sergeant Rush made several derogatory statements that Miller found offensive.[385]

---

[378]   Richard Torres Deposition Transcript ("Torres Tr.") 175-176, 237, 187, (August 7, 2020); PGDOJ_NO9_0000000058.

[379] PG0000020415.

[380] *Id.*

[381] PG0000020472.

[382] Graham Report, ¶67, p. 51.

[383] Graham Report, ¶ 67(a), pp. 51-52, ¶ 68(d), pp. 59-60.

[384] PG0000025286-25415 (IA2016-034).

[385] *Id.*

CONFIDENTIAL

- The investigation found that Rush had read evidence out loud in an active criminal matter (a suspect's text message containing the word "nxxxa") for the purpose of conducting the investigation.  Witness officers working in Rush's and Miller's district were interviewed and none of them heard the alleged derogatory statements about Miller's fiancé or Hispanics.[386] The conclusory statement in Mr. Graham's Report that the IA investigator did not do "anything" to "inquire about Sergeant Rush's statement about checking Hispanics" is inaccurate. The case file indicates that "Allegation 3 - Unbecoming Conduct (Inappropriate comment about Hispanics)" was investigated and, based on the evidence and witness statements, was non-sustained.[387]

188)    After his IAD complaint, Miller filed an EEOC Charge (No. 531-2016-01761) alleging discrimination by Rush, and requested a Notice of Right to Sue from the Commission.[388]  Miller then commenced a civil action against the Department alleging racial discrimination and retaliation, in which the Department won dismissal of all claims on summary judgment.[389] The federal district court judge noted that Miller's claims amounted only to "employee grievances," and found no racial discrimination had occurred.[390]

189)    Mr. Graham's Report criticized the IAD investigation into Miller's allegations against Rush, alleging "the investigator did not appear to consider that other similar charges had been brought against Sergeant Rush, nor was there an inquiry into whether Sergeant Rush engaged in other discriminatory conduct."[391]   Based on my experience, an officer's past misconduct is factored into IA's disciplinary recommendation after finding a charge is sustained, but when charges are non-sustained, there is no discipline to be rendered.  An officer's history alone cannot produce a guilty or sustained verdict.

190)    The court in Miller's civil case rejected Miller's argument that Rush's history indicated guilt in other contexts; the judge stated "All I have here is the suggestion that Rush somehow was racist in other cases, and, therefore, a jury should be able to infer that in this case he was racist as well.  Can't permit it.  Not fair.  Not fair to the process, not fair to Rush."[392]

191)    In my opinion, a complete investigation into Miller's complaint was conducted and produced no evidence that would corroborate Miller's allegation of discriminatory conduct by Sergeant Rush.[393]

---

[386] PG0000025303-25308 (IA2016-034).
[387] PG0000025297-25299; PG0000025303-25308 (IA2016-034).
[388] PG0000002232-2269.
[389] PG0000940132-940144.
[390] PG0000940143.
[391] Graham Report, ¶ 67(a), pp. 51-52.
[392] PG0000940143.
[393] PG0000025286-25415 (IA2016-034).

CONFIDENTIAL

**H.    The Department Determined Discipline for All Cases in Light of the Evidence Available and Consistent with Best Practices**

192)    Mr. Graham's Report highlights the discipline imposed against Private First Class Kristen Baird in IA case number IA2016-038, and the failure to impose discipline in case number IA2017-049, as examples of "incidents where charges of racism were sustained, but the discipline was inadequate."[394] I disagree with the conclusion of Mr. Graham's Report on these matters.

193)    In May, 2016, Baird filed a complaint with IAD alleging misconduct by Plaintiff McClam during a Citizen Interaction Class.[395] Baird alleged that Plaintiff McClam made gestures with his arms and threw his arms up in disgust in response to comments made by other officers with which he disagreed.[396] Baird also alleged that Plaintiff McClam jumped out of his seat and began walking aggressively toward her and others on the opposite side of the classroom while throwing his shoulders forward, giving the impression that he wanted to fight.[397] Baird further complained that officers physically removed Plaintiff McClam from the classroom.[398]

194)    IAD assigned Baird's complaint against Plaintiff McClam to Sergeant Gerald Caver for investigation under case number IA2016-038.  Sergeant Caver prepared a Report of Investigation and a supplement to the report indicating that virtually all persons in attendance at the class were interviewed.[399] The report concluded that none of the witnesses present confirmed Baird's allegation that Plaintiff McClam had charged toward her or that he had to be physically removed from the classroom.[400] One of the instructors of the class testified that Plaintiff McClam became visibly upset at Baird and slammed his hand on the table and that she escorted Plaintiff McClam out of the room after he was given a direct order to leave.[401] Other witnesses confirmed that Plaintiff McClam was escorted out of the room by one of the instructors, not physically removed.[402] One witness testified that Plaintiff McClam used profanity.[403] Many of the witnesses also testified that Baird had stated that a picture shown by the instructors to the class was, "Black Lives Matter crap," or "Black Lives Matter shit" or was a "Black Lives Matter Campaign Logo."[404]

195)    As a result of the statements received from witnesses and the findings of the Report of Investigation, AIS charged Baird with misconduct.[405] However, Mr. Graham's Report

---

[394] Graham Report, ¶ 69(c), pp. 66-69.
[395] PG0000024330-24331.
[396] PG0000024330.
[397] PG0000024331.
[398] *Id.*
[399] PG0000023858-23879.
[400] PG000023867.
[401] PG0000023859-23860.
[402] PG0000023860-23867.
[403] PG0000023860-23861.
[404] PG0000023859-23879.
[405] PG0000023844-23846.

66

claims that "statements reflected that the investigator was told Major Mills directed that Baird not be charged."[406]  At his deposition, Art'z Watkins (who at the time was a Captain and the Commander of AIS in IAD) testified that it was Plaintiff Perez who said that Major Kathleen Mills said not to charge Baird; when he sought to clarify that with Major Mills, she informed him that she did not give Plaintiff Perez that directive.[407]

196)    Ultimately, Captain Watkins found that the charges of unbecoming conduct and Use of Language filed against Plaintiff McClam were unfounded and non-sustained, respectively.[408]  Watkins found that charges against Baird for integrity (dishonesty) and use of inappropriate language were sustained.[409]  Major Mills, then the Commander of IAD, issued a DAR against Baird for these offenses, and she accepted the discipline imposed of two $250 fines.[410] Although, as Mr. Graham notes, the CCOP disagreed with the classification of the integrity violation, the CCOP's position was not provided to the Department until after Baird was served with, and accepted, the DAR.[411]

197)    Captain Watkins and Major Mills concluded that integrity was the appropriate charge, given that witnesses testified that Plaintiff McClam became very angry, slammed his fist on the table, and had to be escorted from the classroom.[412]  As a result, the commanders found that Baird exaggerated her allegations against Plaintiff McClam in a manner that reflected dishonesty rather than making the allegations with knowledge of falsity and with intent to deceive, the elements required to sustain a charge of making a false statement.[413]

198)    In April 2017, while case IA2016-038 was still pending, Plaintiff McClam filed a harassment complaint against Baird, contending that he was "riding with the OIC, Acting Sergeant Darryl Wormuth" and that as he and Wormuth were leaving the scene of an incident, Baird asked Wormuth "if he had a 'ride-along,' while gesturing with her eyes and a head nod towards" McClam.[414]  Plaintiff McClam complained that Baird's comment and conduct were "annoying, unprofessional and it was harassment."[415]  Plaintiff McClam acknowledged that he was upset about the investigation into the training incident (case number IA2016-038), noting "[i]t is as though Corporal Baird is thumbing her nose at me."[416]

199)    Again, in my opinion, IAD followed standard procedure outlined in the GOM and initiated an investigation into Plaintiff McClam's complaint under case number IA2017-019.[417]

---

[406] Graham Report, ¶ 69(c), p. 67.
[407] Watkins Tr. 279-80 (July 10, 2020).
[408] PG0000023830.
[409] Id.
[410] PG0000023833-23835.
[411] PG0000023833-23835; PG000023840.
[412] Watkins Tr. 275-276, 286 (July 10, 2020).
[413] Watkins Tr. 286-287 (Jul. 10, 2020).
[414] PG0000080480-80481.
[415] Id.
[416] Id.
[417] PG0000080533.

CONFIDENTIAL

Although Acting Sergeant Wormuth, the only witness to the incident, confirmed that Baird asked if he had a ride-along, he notably added that during the three days he and Plaintiff McClam were riding together in the same car, "it was a pretty much standard question 'you got a ride along' and it was nothing out of the norm."[418] Accordingly, IAD concluded that the harassment charge against Baird was unfounded.[419]   Mr. Graham suggests that IAD should have charged or investigated Baird "for initiating contact with the complainant in a pending matter," but Plaintiff McClam himself acknowledged that Baird did not speak to, or otherwise initiate contact with, him on the evening the incident occurred.[420]

200)    It was entirely reasonable for the commanders of the investigative unit overseeing the investigation and the head of IAD to have arrived at these decisions in cases IA2016-038 and IA2017-019.  They were the individuals in the best positions to make a determination regarding the appropriate charges and resolution, in light of the evidence presented and their familiarity with the general orders pertaining to internal investigations and appropriate disciplinary action.

**I.    IAD Exercised Its Discretion Appropriately When Deeming Cases Suitable for Review by Alternative Avenues**

*i.    Complaints by Police Officer Latashia Pinckney and Corporal Terrence Brown*

201)    Mr. Graham's Report criticizes the Department and Major Mills for the handling of internal complaints made by Police Officer Latashia Pinckney and Corporal Terrence Brown.[421] First, Mr. Graham's Report suggests these complaints were exclusively related to the Harassment and Discrimination Policy.  This is incorrect.  In reviewing the complaints, in my opinion, it is evident they were largely interpersonal in nature and expressed dissatisfaction with the way Rush was managing the squad.[422]  Brown submitted his complaint after he was removed from the informal "9-car" position, and Pinckney submitted her complaint after she was counseled for low productivity in her job performance.[423] Given the nature of these complaints, it was reasonable for Major Mills to promptly refer the Pinckney and Brown complaints to their Commander in District I.[424]

202)    The General Order Manual ("GOM") directs employees to address internal complaints at the lowest level possible through the chain of command.[425]  Vol. I, Chapter 4, of the General Order Manual, outlining Complaint Assignment procedures, states that (A) "Complaints not investigated by IAD are handled at the lowest appropriate level of supervision;" (B) the "Commander, IAD" screens complaints to determine if they will be investigated by IAD; and (C) "less serious allegations" may be referred back to an employee's "Commander/Manager"

---

[418] PG0000080474-80476
[419] PG0000080463.
[420] PG0000080480.
[421] Graham Report, ¶ 64, pp. 42-46, ¶¶ 144(f)-(g), pp. 139-140.
[422] PG0000968875-968887; PG0000968861-968863.
[423] PG0000968861-968863; PG0000968875-968887.
[424] PG0000165875-168576; PG0000968893-968894.
[425] GOM, Vol. I, Chs. 4, 12.

CONFIDENTIAL

for handling.[426]   Major Mills' referral of these complaints was permitted by the GOM and reasonable under the circumstances. [427]   And, as stated above, these complaints were focused on Sergeant Rush's management of his squad, and were not Harassment complaints.  That said, in my opinion, the IAD Commander is not breaching any confidentiality by sending the complaint to the employees' Commander.

203)   Mr. Graham's Report asserts Pinckney and Brown were subject to retaliatory transfers.  This is not correct, in my opinion.  Pinckney's transfer had been pending since April 2017, before Pinckney sent her complaint to Major Mills in May 2017.[428]  Brown's transfer was also not retaliatory, in my opinion; Brown had requested transfer to a sister squad prior to submitting his complaint to Major Mills, and the transfer was granted.[429]

204)   Mr. Graham's Report further states that "there is no evidence . . . that anyone at senior levels in the Department took [Pinckney/Brown's complaints] seriously."[430] The record shows that Deputy Chief of the Bureau of Patrol, Christopher Murtha, discussed Rush with his Commander to assess the allegations against Rush.[431]

205)   Lastly, Mr. Graham's Report incorrectly concludes that an IAD investigation was sustained against Sergeant Darin Rush "for engaging in racist behavior."[432]  This is false.  The case file indicates that Rush was charged only with Use of Language for forwarding a movie clip that contained derogatory language; Rush was not charged with discriminatory or racist conduct.[433]

### ii.   Compensatory Time Incentive Program

206)   Mr. Graham's Report asserts that the Department did not appropriately handle external complaints against senior officers, citing the Defendants' disclosure of a 2019 Department investigation into a compensatory time bonus program conducted by the Commander and Assistant Commander of BOP District II (respectively, Major ████████ and Captain ████████) for officers assigned to that District.[434]

207)   Mr. Graham's Report asserts that the Department's handling of this episode was deficient in several respects, including that: (A) IAD did not assign it for investigation and instead let the Deputy Chief of BOP, Christopher Murtha, handle it; (B) Deputy Chief Murtha did not investigate thoroughly or inquire whether other Districts implemented similar programs; (C) the senior leadership who oversaw the program were inadequately disciplined and their discipline was "downgraded"; and (D) the CCOP was not informed of this matter in an effort to "hide this

---

[426] GOM, Vol. I, Ch. 4.
[427] PG0000968868-968869.
[428] PG968885-968886.
[429] PG0000968887; PG0000154090-154091.
[430] Graham Report, ¶ 64, p. 46.
[431] PG0000154091-154092.
[432] Graham Report, ¶ 64, p. 43.
[433] PG000045105; PG000045108 (IA2016-008).
[434] Graham Report, ¶ 82, p. 78.

CONFIDENTIAL

misconduct from public scrutiny."[435]  All of these assertions in Mr. Graham's Report are in my opinion either inconsequential or inaccurate, as explained below.

208)    First, Mr. Graham's cited sources[436] fail to confirm the assertion made in the Report that the undated anonymous correspondence sent to "███████," which forwarded a January 25, 2019 email from Lieutenant █████, was received by the Department on August 7, 2019. In point of fact, the cited pages in Mr. Graham's Report were contained in a packet of correspondence and other materials originally sent by █████ to the Office of the County Executive.  That packet was later forwarded to Chief Stawinski, who in turn forwarded the packet to the Police Department's Inspector General, Donnell Turner, on July 22, 2019.[437]

209)    Sometime between July 22, 2019 and July 26, 2019, after he had reviewed the content of the packet, Mr. Turner made BOP Deputy Chief Murtha aware of the January 25, 2019 email from Lieutenant █████, the Assistant Commander of a BOP District under Murtha's jurisdiction. Deputy Chief Murtha advised Mr. Turner that the Chief needed to be informed of the compensatory time incentive program referenced in the █████ email.  On or about July 26, 2019, Mr. Turner and Deputy Chief Murtha made the Chief and other members of Prince George's County Police Department's Executive Command Staff aware of the email revealing the existence of the unauthorized incentive program being conducted in District II.[438]

210)    On August 7, 2019, Chief Stawinski held a press conference.  At that conference, he stated that on July 26, 2019, the Department's Inspector General notified him of an email that revealed the existence of an unauthorized incentive program that had been instated by the commanders of one of the Department's District stations. The Chief further stated that he immediately convened the Deputy Chiefs and directed them to immediately ensure that no other such programs were ongoing within the Department. The Chief further stated that he had initiated an investigation with the responsible commanders, which had concluded on August 7, 2019.[439]   Additionally, the Department posted a blog that same day announcing the Chief's investigation of the unauthorized performance incentive program and the corrective actions taken as a result of the investigation.[440]

211)    The Department began its investigation into the unauthorized incentive program immediately upon the Chief's awareness of its existence on July 26, 2019. Deputy Chief Murtha and the other Deputy Chiefs were tasked with determining whether other similar incentive programs had been conducted elsewhere in the Department. The Chief also tasked the

---

[435] Graham Report, ¶¶ 83-85, p. 79.

[436] Graham Report, p. 79, notes 281 and 282 (PS2019-115, at PG0000127831 and PS2019-114, at PG0000127808).

[437] PG0000977423-977433.

[438] Information provided by telephone from Inspector General Donnell Turner on September 24, 2020 and former Deputy Chief Christopher Murtha on September 27, 2020.

[439] Prince George's County Police Department, "Chief Hank Stawinski Ends Unauthorized Incentive Program At District Station" (Aug. 7, 2019), available at https://youtu.be/Pe1LfmB9TuM.

[440] Prince George's County Police Department News, "Chief Ends Unauthorized Patrol Incentive Program for Performance at a Prince George's County Police Department District Station" (Aug. 7, 2019), available at http://pgpolice.blogspot.com/2019/08/chief-ends-unauthorized-patrol.html.

CONFIDENTIAL

Commander of IAD with investigating whether the program had resulted in citizen complaints that could be linked to increased police activity resulting from the incentive program. Initially, the investigation was conducted as an inquiry pending the collection of more information concerning the incentive program. The "Complaint" formally lodged with IAD on August 7, 2019 was made by Deputy Chief Murtha, based on the findings of his inquiry into the incentive program that had been ongoing since July 26, 2019. It was determined at the time of the submission of the request for case numbers that Murtha's complaints against ████ and ████ would be opened as Police Supervisory ("PS") cases. PS cases are investigated under the direction of the charged officers' Commander. In this case, that Commander was Deputy Chief Murtha. In my opinion based on my experience, there would have been no reason for the Commander of IAD to independently assign one of its own investigators at that point to redo an investigation of PS cases already conducted by Deputy Chief Murtha.

212)    Although it is accurate that Deputy Chief Murtha formally opened and closed the IAD PS case phase of the investigation into the unauthorized incentive program on August 7, 2019, I am unaware of any procedural restriction on the formal opening and closing of the investigation on the same date.[441]

213)    Without citations to any evidence supporting his conclusions, Mr. Graham's Report asserts that Deputy Chief Murtha "made no findings how long the program had been in existence or what 'productivity' was being incentivized."[442] Deputy Chief Murtha did in fact determine in the course of his investigation that the incentive program had been in operation for six months (a fact publicly disclosed in the Department's August 7, 2019 blog concerning the investigation[443]), and how "productivity" was measured for purposes of determining which officers were awarded a compensatory time bonus.

214)    Similarly, without record support, Mr. Graham's Report asserts that Deputy Chief Murtha "did not try to figure out how many officers were awarded 'comp time' or how much in County funds were given to the officers."[444] That assertion is inaccurate. Deputy Chief Murtha's investigation revealed that the program awarded 10 hours of comp time each month to the person in each of District II's five squads who had the highest total of measured activity. [445]

215)    Mr. Graham's Report asserts that Deputy Chief Murtha "**does not appear** to have taken any steps to inquire whether any other Districts were using similar program [sic]."[446] The Report's speculation totally ignores the Department's publicly posted pronouncement that the Chief "directed the Deputy Chiefs to convene their staffs to ensure the unauthorized

---

[441] *See generally* PS2019-115; PS2019-114.

[442] Graham Report, ¶ 83, p. 80.

[443] Prince George's County Police Department News, "Chief Ends Unauthorized Patrol Incentive Program for Performance at a Prince George's County Police Department District Station" (Aug. 7, 2019), available at http://pgpolice.blogspot.com/2019/08/chief-ends-unauthorized-patrol.html.

[444] Graham Report, ¶ 83(b), p. 80.

[445] Information provided by telephone from Inspector former Deputy Chief Murtha on September 27, 2020.

[446] Graham Report, ¶ 83(d), p. 80 (emphasis added).

CONFIDENTIAL

performance program was not being employed elsewhere in the agency."[447]  Consistent with that directive, Deputy Chief Murtha oversaw an inquiry of the Bureau of Patrol's District Commanders to confirm that no other district stations were utilizing an unauthorized incentive program.[448]

216)    The discipline determined to be appropriate for ████ and ████ implementation of an unauthorized incentive program consisted of, respectively, a two-day (████) and one-day (████) suspension without pay.  In my opinion, when evaluating the adequacy of the Department's handling of this matter, it is important to note that ████ and ████ were removed from their command positions in District II following the discovery of the unauthorized incentive program, and transferred to lesser assignments effective August 11, 2019.[449]  Contrary to the Report's assertions, the discipline for ████ and ████ was not reduced to written reprimand.  Rather, the notices of FINAL disciplinary action contained in their respective PS case files were recently determined to have incorrectly stated the actual FINAL disciplinary action that was imposed.[450]  That administrative error was later corrected.[451]

217)    Contrary to the Graham Report's assertion, the IAD case files verify that PS2019-114 and PS2019-115 were disclosed to the CCOP.[452]  Moreover, the Report's assertion that the Department's "handling of this matter appears designed to hide this misconduct from public scrutiny" is belied, based on my experience, by (A) the Department's press conference and blog posting regarding this matter; (B) its disclosure of these cases to the CCOP; and (C) its prompt adoption of a general order prohibiting the unauthorized implementation of incentive programs.[453]

218)    The press conference by Chief Stawinski fully informed the community of what had been occurring, and would have been one of the best sources for generating new complaints to the Department or Inspector General about the program.  The Chief publicly invited anyone who had a complaint about the program to report it to him or the Inspector General.  No known complaints alleging harassment or discrimination were received following the press conference.[454]

219)    It is my opinion that the investigation into this matter was appropriate, and it was conducted in an appropriate manner as a PS case.  The discipline was also appropriate.  The

[447] Prince George's County Police Department News, "Chief Ends Unauthorized Patrol Incentive Program for Performance at a Prince George's County Police Department District Station" (Aug. 7, 2019), available at http://pgpolice.blogspot.com/2019/08/chief-ends-unauthorized-patrol.html.
[448] Information provided by telephone from Inspector former Deputy Chief Murtha on September 27, 2020.
[449] "Transfer to Personnel" (August 11, 2019); Excel Workbook, "████ Suspension Without Pay"; Excel Workbook, "████ Suspension Without Pay"; PGIAD0000127806 (PS2019-114); PGIAD0000127824 (PS2019-115).
[450] PGIAD0000127801-127802 (PS2019-115); PGIAD0000127820-127822 (PS2019-114).
[451] "DISCIPLINARY ACTION – Captain ████ #1396" (December 5, 2019); "DISCPLINARY ACTION – Major ████ #2083 *(CORRECTION)*" (December 5, 2019).
[452] PGIAD0000127812 (PS2019-115); PGIAD0000127816-127817 (PS2019-114).
[453] GOM, Vol. I, Ch. 9, PG0000944680; GOM, Vol. I, Ch. 27, PG0000944847; GOM, Vol. I, Ch. 32, PG0000944882.
[454] Information provided by telephone from Inspector General Donnell Turner and Major James McCreary on September 24, 2020.

CONFIDENTIAL

highest-ranking officer received the highest discipline.  It is appropriate to hold more senior command staff to a higher level of accountability than lower members of a police department, which was done in this case.

220)     In addition to the discipline, the subsequent transfer of the Commander and Captain achieved two objectives.  To the members of the Department and the community, it demonstrated that this type of behavior would not be tolerated.  It also served to facilitate the restoration the community's trust in the Department to the extent that it could have been diminished because of this unauthorized incentive program.

## PART 3.     THE DEPARTMENT'S PROMOTION PROCESSES ARE EQUITABLE.

221)     As with many police departments, the Prince George's County Police Department offers both competitive, non-competitive, and appointed promotions.

222)     Non-competitive promotions include the ranks of Police Officer First Class and Corporal.[455] If an officer wishes to advance to a non-competitive rank, they must first meet other eligibility requirements, such as years of service in their current rank and satisfactory performance appraisals.[456]  They will then take the promotional exam, which is a multiple choice test.[457] If they receive a "passing" score on the exam, they will advance in rank.[458]  There are no limitations on the number of individuals who may be promoted to these positions.[459]  Testing for POFC and Corporal occurs twice each year.[460]

223)     Competitive promotions are promotions for which there are a limited number of positions.[461] Officers compete for competitive promotions by taking a two-part promotional exam.[462]  Officers first take the multiple choice examination.[463]  If they receive a passing score on the multiple choice test, they advance to a skills assessment, which has both a written essay or short answer component and a videotaped narrative component.[464]  Each officer's score in the exam process is ranked against other officers who took the test based on their performance, and placed in rank order on a promotional list.[465]  The promotional list remains in effect for

---

[455] Graves Tr. 34-35 (July 1, 2020).
[456] Graves Tr. 35 (July 1, 2020); *see also* PG0000968054; Video Recording: Panel for Equality Meeting (April 17, 2017).
[457] Jennifer Flaig Deposition Transcript ("Flaig Tr.") 37 (August 7, 2020).
[458] Graves Tr. 35 (July 1, 2020); Flaig Tr. 37 (August 7, 2020).
[459] Flaig Tr. 37 (August 7, 2020).
[460] Graves Tr. 38 (July 1, 2020); Flaig Tr. 22-23 (August 7, 2020).
[461] Flaig Tr. 37-38 (August 7, 2020).
[462] *See generally* PG0000968054; Video Recording: Panel for Equality Meeting (April 17, 2017).
[463] Flaig Tr. 38 (August 7, 2020).
[464] Graves Tr. 37 (July 1, 2020); Flaig Tr. 47-52 (August 7, 2020). In the videotaped portion of the test, officers may be "dispatched" to a hypothetical incident, and would be "given information about what they see on the scene" to which they need to verbally respond. Flaig Tr. 51-52; *see also* Graves Tr. 41-42 (July 1, 2020).
[465] Graves Tr. 37 (July 1, 2020).

CONFIDENTIAL

approximately two years, and as positions open up during that time period, officers will be promoted in rank order.[466]

224)    The promotion exam process involves numerous parties both inside and outside the Prince George's County Police Department. The promotional exam itself is developed and scored by a third-party consultant, ESCI (formerly called Fields Consulting), which was selected by the main office of personnel for Prince George's County.[467]  ESCI continually updates the exam, striving to ensure that it is "job related" and "predictive or significantly correlated with important elements of work behavior."[468]  ESCI also goes to great lengths to ensure that the exams are assessed in a fair and unbiased manner.[469]  All officers are provided with study materials for the promotional exam in order to ensure that they have equal access to the material needed to pass.[470]  In my experience, ESCI administers the "gold standard" in police promotional examinations.

225)    The materials that ESCI uses to prepare its written examination are reviewed by a "source review committee" within Prince George's County Police Department.[471]  The source review committee is composed of several higher-ranked individuals in the Department who are vetted with the FOP,[472] and it endeavors to makes sure that the information being tested and documents used for the test are relevant to the promotional rank for which the test is designed.[473]  For the skills portion of the test, ESCI consults with subject-matter experts—officers operating in the rank for which the test is being developed—to ensure that the skills being tested are skills relevant to and used on the job.[474]

226)    Officers may appeal their scores for both the competitive and non-competitive promotion tests to the Prince George's County Office of Human Resources & Management.[475]  The appeal process is governed by the collective bargaining agreement between the officers' union, FOP 89, and the County.[476]  Appeals are reviewed by the Joint Appeal Board, which is comprised of three members of the FOP holding the rank of Sergeant and/or Lieutenant, and two members of the Prince George's County Police Department command staff selected by the Chief of Police.[477]

---

[466] Graves Tr. 37-38 (July 1, 2020). Testing for competitive promotions occurs in even-numbered years (2016, 2018). Flaig Tr. 22-23 (August 7, 2020).
[467] Graves Tr. 40, 59-62 (July 1, 2020); Flaig Tr. 9-10 (August 7, 2020).
[468] ESCI000860.
[469] Flaig Tr. 63-70 (August 7, 2020).
[470] Flaig Tr. 96-97 (August 7, 2020).
[471] Graves Tr. 44 (July 1, 2020).
[472] Graves Tr. 82-83 (July 1, 2020).
[473] Graves Tr. 44 (July 1, 2020).
[474] Flaig Tr. 59-60 (August 7, 2020); see also ESCI000856.
[475] Flaig Tr. 38 (August 7, 2020); see also ESCI000856.
[476] CBA, Article 14 (see, e.g., PG0000000531).
[477] CBA, Article 14.

CONFIDENTIAL

227)    The promotion process overall is also examined by the "Joint Study Committee," a committee comprised of representatives from both the Department and the FOP.[478] This committee meets at least quarterly, though usually more often, and makes recommendations regarding improvements that could be made to the promotional process.  For example, the committee has addressed whether to change the dress code for the exam,[479] and whether to allow test takers to use computers on the written exam.[480]

228)    Officers who may be up for promotion but who are under investigation for an infraction which could lead to a serious disciplinary action (including discharge or demotion) will have their promotion held in abeyance pending resolution of the investigation.[481]

229)    Promotions for higher level ranks, beginning with Major, are not made based on a promotion list or test.[482] Ranks at the level of Major and above are considered "Executive Level Positions" within the Department.[483] Such positions are made by appointment of the Chief, and are subject to the approval of the County Executive or the County Chief Administrative Officer.[484] In practice, the Deputy Chiefs and Assistant Chief engage in a review of all officers at the Captain level to evaluate their qualifications for the position of Major, and make a recommendation to the Chief about who to choose for a vacant Major position.[485]  Ultimately, as required by law, the Chief makes the final decision about who is promoted to Major, subject to the approval of the County Executive or the County Chief Administrative Officer.[486]

### A.  Contrary to His Assertions in the First Amended Complaint, Plaintiff Paul Mack Did Not Test High Enough to Be Promoted to Lieutenant During the 2016 Promotional Cycle

230)    Paragraph 131 of t First Amended Complaint alleges that "[i]n 2016, Sergeant Mack tested to be promoted to Lieutenant. He received a high ranking, within the promotional range of openings but he was not promoted."  Paragraph 132 goes on to allege that "[i]n 2018, Sergeant Mack again tested to be promoted to Lieutenant.  Three White male officers—Steven Cobb, James Rogers, and William Gleason—who ranked lower than Sergeant Mack and another Officer of Color, were promoted to the position of Lieutenant. Instead of promoting Sergeant Mack, [the Department] allowed the remaining Lieutenant position to stay vacant."   In my opinion, this complaint reflects Plaintiff Mack's misunderstanding of the promotional process.

231)    Plaintiff Mack took the 2016 exam to be promoted to Lieutenant.  After the consolidation of his written and skills assessment scores, he ranked 39th on the promotions list

---

[478] *Id.*
[479] PG0000956406-956407.
[480] PG0000956324-956325.
[481] Graves Tr. 46-47 (July 1, 2020).
[482] Graves Tr. 98-99 (July 1, 2020).
[483] Prince George's Cty. Code § 16-102.
[484] Prince George's Cty. Code § 16-148(a)(7).
[485] Video Recording: Panel for Equality Meeting (June 13, 2017).
[486] Prince George's Cty. Code § 16-148(a)(7).

CONFIDENTIAL

(eligibility register).[487]  The 2016 lieutenant eligibility register expired on February 26, 2018, 60 days before the next scheduled promotional exam in 2018.[488]  The last set of promotions off of the 2016 eligibility register occurred on February 25, 2018.[489] On that date, the day before the eligibility register expired, five sergeants were promoted to lieutenant.  Among them was Sonya Lancaster (Zollicoffer), one of the plaintiffs in this action.[490] The last sergeant promoted off of the list was Thomas Denault, who ranked 36th.[491]   Plaintiff Mack did not get promoted because he did not in fact test high enough to be promoted off of the 2016 eligibility register before it expired.

232)     Plaintiff Mack suggests that he should have been promoted off of the eligibility register to a permanent position as a lieutenant, in lieu of certain sergeants being placed into acting lieutenant positions.  What Plaintiff Mack fails to recognize, however, is that a vacancy at the lieutenant position can only be filled through a promotion off of the currently active eligibility register if there has been approval by the Office of Management & Budget ("OMB") to permanently fill the vacancy.[492]  Therefore, if OMB has not approved enough, or all, of the vacancies, then certain individuals will not be promoted off of the eligibility register, as was the case with Plaintiff Mack in 2016.[493]  In light of Plaintiff Mack's ranking on the eligibility register and the number of vacancies approved by OMB by the end of the 2016 promotional cycle, there is a reasonable and justifiable explanation for why Plaintiff Mack was not promoted to lieutenant. In my opinion, this is a nearly universal practice by police agencies nationwide.

### B.    Plaintiff Perez's Failure to Earn a Promotion to Major Does Not Indicate Retaliation or Discrimination.

233)     Mr. Graham's Report seems to imply that the Department's failure to promote Plaintiff Perez to Major is evidence of retaliation.  Mr. Graham does not cite, and I have not seen, any evidence which indicates that Plaintiff Perez's failure to earn a promotion was based on retaliation or discrimination.

234)     As described above, officers in the Department qualify for promotion to the ranks of Captain and below by taking a promotional exam.  There is no promotional exam for the rank of Major.  Instead, all Captains are considered for promotion to the rank of Major when the Deputy Chiefs and Assistant Chief review eligible officers to make a recommendation to the Chief about officers to appoint.

235)     In my experience, it is difficult for an officer to earn a promotion to Major, as officers must show a high level of leadership ability in order to be promoted to the highest ranks

---

[487] PG0000043394-43396.

[488] *Id.*

[489] PG0000080783.

[490] *Id.*

[491] *Id.*

[492] PG0000171546; PG0000171622; PG0000171629-171631.

[493] *Id.*

CONFIDENTIAL

of a department.  Officers will not advance to Major merely because they have passed a test or have served in their currently rank for a certain amount of time. Not all officers possess the necessary skills for such a promotion.  Some officers will remain at the rank of Captain if they do not possess the skills necessary to be a Major.

236)    In addition, the higher an officer goes in rank, the caliber of the officers they are competing with is higher as well.  Often, even those Captains doing a good job are eclipsed for promotion by those Captains that are performing at a superior level.

237)    In my opinion, Mr. Graham does not point to any reason to believe that Plaintiff Perez's failure to earn a promotion was based in retaliation or discrimination.

## PART 4.    THE DEPARTMENT MAKES TRANSFERS REASONABLY AND FAIRLY WITHOUT RACIAL BIAS AND WITHOUT RETALIATION

238)    Under the County Code of Prince George's County, the Chief is directed to create bureaus and divisions, and officers must transfer among those bureaus and division as needed. The County Code of Prince George's County, Maryland Sec. 18-144. (entitled "Assignment of employees; transfers") states:

> (a) The Chief of Police shall create and maintain such bureaus and divisions as are necessary for the proper functioning of the Police Department subject to approval by the County Executive. He shall assign by order competent police and civilian employees of any rank or classification which he deems proper to command and administer these bureaus and divisions.

> (b) The Chief of Police shall assign commissioned officers, noncommissioned officers, and officers to such duties as he deems proper for the efficient functioning of the Department, unless such assignments are otherwise established in accordance with law.

> (c) All employees of the Department shall be subject to transfer from one area to another or from one bureau or division of the Department to another, at the direction of the Chief of Police, unless such direction is otherwise limited in accordance with law.

239)    When joining the Department, recruits have signed a memoranda issued by the Prince George's County Government Office of Personnel and Labor Relations, which states that among other "career considerations," recruits should evaluate the following:

> As a police officer, ***you may be assigned to work in any part of Prince George's County.*** You will be required to perform shift work, including rotating day, evening and midnight shifts.  On occasion you will be required to work unscheduled overtime, and you will have

CONFIDENTIAL

to attend court to testify on your normal day or on a day where you are scheduled to work the evening or midnight shift.  You will be compensated for shift work, overtime and court time; however, you must expect these occurrences if you accept employment.[494]

240)    Performing regular transfers is a best practice to enable officers' career development and improve the efficiency and effectiveness of a department's operations, and they are necessary to carry out the Department's mission.  In a large police agency such as Prince George's County Police Department, transfers and temporary duty assignments are often necessary and occur with regularity.

241)    Chief Stawinski properly oversaw a "deliberative process involving leadership at various levels" for transfer decisions.[495]  Throughout the year on an as needed basis, members of the Executive Command Staff (the Chief, Assistant Chief, and Deputy Chiefs) meet to assess staffing needs and fill officer vacancies. The Chief's Chief of Staff also attends and provides input in many of these deliberations.  At the end of the deliberations, the Office of the Chief publishes a document referred to department wide as the "transfer list," which ranges from a handful to over one hundred transfers in a given period.[496]

242)    The Executive Command Staff has been composed of diverse officers.  From 2015 to present, the Executive Command Staff has included: (1) Hector Velez (H), the current Chief, who was also formerly part of the Executive Command Staff as Assistant Chief ; (2) Craig Howard (B), who has served as Assistant Chief; and (3) Hank Stawinski (W), George Nader (W), Gevonia Whittington (B), Christopher Murtha (W), George Nichols (B), Samir Patel (A), Raphael Grant (B), Melvin Powell (B), Jacqueline Rafterry (W), Robert Harvin (B), and Genia Reaves (B), who have all served as Chiefs, Deputy Chiefs or Acting Deputy Chiefs. [497]

243)    Based on my expert experience, I know that the Prince George's County Police Department command staff must juggle various moving pieces to construct a staffing arrangement that best serves the needs of the Department and the communities it serves.  Also based on my expert experience, many factors inform transfer decisions, including the location of current vacancies; officer experience and performance; effectiveness of command pairings, departmental priorities and crime trends; needs and preferences of each bureau; recommendations from division or unit supervisors; and, in some cases, the needs and preferences of the officers involved.  These different inputs must be evaluated by the Command Staff for the Department to function.

244)    The bulk of transfers occur in tandem with promotions in most police departments, including Prince George's County Police Department.  Promotions almost always result in the transfer of the promoted officer to fill vacancies throughout the agency.  Transferring

---

[494] PG0000069307.
[495] Stawinski Tr. 19 (July 31, 2020).
[496] PG0000432807-0000432810; PG0000107666.
[497] "Prince George's County Police Department Select Leadership Assignments" Roster; Excel Workbook, "Retirements and Separations Roster" (2016-2020).

CONFIDENTIAL

a newly promoted employee promotes career development and avoids having promoted officers supervise members of the department who were their peers the previous workday.  This has been the practice of police agencies, especially larger ones, across the nation for generations, and is considered a best practice.

245)    In any department the size of Prince George's County Police Department, some transfers occur at the division or district level without going through the executive-level deliberations.  For example, within Prince George's County Police Department, the Commander of a patrol district or a division has authority to transfer an officer from one shift or team to another.[498]  As with the transfers discussed above, many factors can go into the decision to reassign an officer within a division, district, or bureau.[499]

### A.    Perez's transfer was not retaliatory.

246)    Mr. Graham's Report appears to claim that Plaintiff Perez's transfer from IAD to the Planning and Research Division was retaliation for his various complaints.  The timeline does not bear this out.

247)    Although Plaintiff Perez was told he was being transferred on October 21, 2016, the transfer was planned far in advance.  The Department had initially planned to transfer Plaintiff Perez in February 2016.[500] As frequently happens in my experience, that transfer was delayed.  The Department began planning another round of transfers set for October 2016, and Plaintiff Perez's name was placed again on the draft transfer list by at least October 2, 2016.[501] The planned transfer long pre-dates Plaintiff Perez's revelations on or around October 21 and October 24 that he had filed complaints against the Department.  Although the Department was not aware of the DOJ complaint which Plaintiff Perez alleges was filed in March, even if it had known of the alleged complaint at that time, it had been planning his transfer for at least a month before the complaint was allegedly filed. Further, although Mr. Graham's Report notes that Plaintiff Perez was transferred to a division under Major William Alexander, against whom he had previously made complaints, there is no evidence that the individuals planning Plaintiff Perez's transfer had any knowledge of those complaints.[502]

248)    In my experience, transfers such as Plaintiff Perez's are commonplace and necessary to the running of a police department.  Plaintiff Perez had been in IAD for over six years, and this is an unusually long time for an executive to be in the same job assignment. As former-Chief Stawinski has testified, it is important that all officers receive well-rounded

---

[498] In his deposition, Chief Velez testified that "very rare[ly] do we have a meeting about a transfer into a specific specialty unit."  Hector Velez Deposition Transcript ("Velez Tr.") 39 (July 15, 2020).

[499] In some cases, division commanders, district commanders, or bureau chiefs may circulate or announce assignment changes just within their divisions, districts, or bureaus. Chief Velez testified that a particular commander has to "accept [a] person.  You know, that person will -- that commander will look at that person's qualifications and things like that."  Velez Tr. 40 (July 15, 2020).

[500] PG0000153768; PG0000153829.

[501] PG0000970332-970356.

[502] Perez Tr. 79-82 (July 30, 2020).; Stawinski Tr. 130-131 (July 31, 2020).

CONFIDENTIAL

experience so that if a vacancy occurs in the Department, many individuals have the experience necessary to fill that role.[503] I agree with Chief Stawinski, and it is my opinion that it was beyond time for Plaintiff Perez to be transferred to another assignment.

**B.      Corporal Michael Anis Was Not Discriminated Against in Connection with His Transfer Requests**

249)    Michael Anis claims that the Department failed to transfer him to positions in various specialty units due to discriminatory animus, after he submitted transfer requests in response to departmental transfer announcements.[504] He further claims that the Department did not indicate why he was not selected for those transfers.  In fact, the Department never actually transferred anyone in connection with certain of these announcements, and Plaintiff Anis withdrew himself from the evaluation process in several other instances.  For additional transfers, the Department selected candidates who were more qualified and/or performed better than Plaintiff Anis in the evaluation process.  In fact, for a number of the transfers about which he complains, the Department selected Black officers instead of Plaintiff Anis.  In my opinion, this serves to undercut Mr. Graham's suggestions of animus against minority officers generally.

250)    By way of example, Plaintiff Anis claims that he was not selected for transfer to the Department's Marine Unit in 2015, but there was in fact *no available vacancy* in that unit for any officer to fill.  Plaintiff Anis has acknowledged that *no one* was selected to transfer into the Unit at that time.[505]  While he also claims that he was not selected for the National Harbor Unit in connection with a 2017 transfer request, Plaintiff Anis himself elected not to interview for the position, asking to be removed from consideration via an email to Sergeant Benjamin of the National Harbor Unit.[506]  Further, in connection with the 2019 transfer request for the Conflict Negotiation Division, the Department selected candidates based on their scored performance in negotiation scenarios.  Plaintiff Anis performed poorly and received a low score, ranking 10th out of 11 candidates.  The three highest-scoring candidates that the Department actually selected for transfer (officers Jacob, Wellington, and Jenkins) were Black.[507]

251)    Overall, nothing in this example indicates discriminatory practices involving transfers by the Department.

**C.      Plaintiff Thomas Boone's Transfer Was Not Retaliatory**

252)    Plaintiff Boone alleges that his transfer to Patrol, District II was made in retaliation for his involvement in filing the complaint with the United States Department of Justice[508] Mr.

---

[503] Stawinski Tr. 123-126 (July 31, 2020).
[504] Excerpts of Plaintiff Anis's Third Supplemental Responses and Objections to Defendants' First Set of Interrogatories, Interrogatory No. 6, pp. 152-155.
[505] Michael Anis Deposition Transcript ("Anis Tr.") 67-68 (August 13, 2020).
[506] PG0000425817.
[507] PG0000987395 (Negotiator School Ratings).
[508] Plaintiffs' First Amended Complaint, ¶ 33 [ECF 51].

CONFIDENTIAL

Graham asserts that Plaintiff Boone was transferred when he "complained of conduct (including racist and other unprofessional conduct) by white officers," but he does not identify which complaints Boone brought that purportedly led to any alleged retaliation.[509]

253)    My opinion is that Plaintiff Boone was properly transferred based on the legitimate needs of the Department following his unwillingness to properly perform his job duties under a female supervisor.  In November 2017, Lieutenant Charmaine Harvin, a Black female, was transferred to the Bureau of Administration as Plaintiff Boone's supervisor.  On January 19, 2018, Lieutenant Harvin issued Plaintiff Boone a Performance Assessment Form ("PFA"), which is a mid-cycle counseling form issued prior to the official yearly Past Performance Appraisal ("PPA").  That January 19, 2018 PFA noted Plaintiff Boone's failure to meet deadlines, missing interviews and work information, issues with properly supervising his subordinates, and his overall inadequate management of case files.[510]  On May 30, 2018, Harvin also issued a response to Plaintiff Boone's rebuttal of her January 19, 2018 Performance Assessment Form, further supporting her position.[511]  Harvin's counseling form was issued in accordance with Department policies regarding performance reviews.

254)    Lieutenant Harvin also documented several additional performance-based issues with Plaintiff Boone, including his failure to meet deadlines and errors in reporting on his cases.[512] Harvin also cited Plaintiff Boone's AWOL offenses in several emails and discipline forms.[513] Notably, Boone conceded in his deposition testimony that he did not believe Harvin retaliated against him.[514]

255)    Furthermore, Plaintiff Boone utilized the four-step grievance process available to him, and his grievances were ultimately denied.[515] Since he had a split PPA between two supervisors that supervised him between May 2017 (Lieutenant Rivera) and May 2018 (Lieutenant Harvin), Lieutenant Rivera's score increased the overall total when the scores were averaged.  The increase, however, was not a result of any changes to Harvin's assessments; instead, the Hearing Board made the decision to factor both scores.[516]

## D.    Plaintiff Sonya Zollicoffer's Transfer Was Not Retaliatory

256)    Graham also describes Plaintiff Zollicoffer's transfer as retaliatory and prompted by her complaint(s) of conduct by white officer(s).[517]   Again, Mr. Graham's Report makes

---

[509] Graham Report, ¶ 144(c), p. 137-138.

[510] Harvin Performance Assessment Form, PG0000158533-158534; Thomas Boone Deposition Transcript ("Boone Tr.") 147-148 (August 6, 2020).

[511] PG0000158525-158528.

[512] PG0000103774-103777.

[513] PG0000939401-939402; PG0000939403-939404; PG0000103846; PG0000939361-939362; Boone Tr. 207-212 (August 6, 2020).

[514] Boone Tr. 57 (August 6, 2020).

[515] PG0000939374-939379; Boone Tr. 184, 193-194, 199 (August 6, 2020).

[516] PG0000939378-939379.

[517] Graham Report, ¶ 144(b), pp. 136-37.

CONFIDENTIAL

assertions that are inaccurate and misleading.  Mr. Graham's description of Plaintiff Zollicoffer's transfer begins by stating that she and her supervisor, Major Kathleen Mills, had multiple disagreements.[518]  While disagreements are certainly common and sometimes healthy up and down the chain of command, they do not violate rule or law.

257)     Specifically, Mr. Graham's Report highlights the IAD cross-complaints involving Plaintiff Ingram and Officer Michael Rushlow regarding an encounter between the two in February 2017.[519]  Major Mills and Plaintiff Zollicoffer disagreed on whether Plaintiff Ingram should be charged as well as Officer Rushlow.[520]  However, during her deposition, Plaintiff Zollicoffer testified that she never spoke to Major Mills about her disagreement with Mills' decision to charge Plaintiff Ingram.[521]

258)     It should be noted that Officer Rushlow's filing of a cross-complaint is not uncommon in these types of cases.  In my professional experience, I have observed that individuals who have complaints filed against them often feel that in order to have their voice heard, they need to file a complaint as well.  If Officer Rushlow believed that Plaintiff Ingram violated protocol during their interaction, he had the same right to file a complaint as Plaintiff Ingram did.  The supervisors in IAD understood this and advised Plaintiff Zollicoffer to include Officer Rushlow's complaint in the case and make Plaintiff Ingram a co-respondent.[522]  Plaintiff Zollicoffer disagreed with this decision, but regardless, the order by IAD leadership to accept Rushlow's complaint was proper.  Plaintiff Zollicoffer also disagreed with the decision to sustain charges against Plaintiff Ingram, and advised two of her superiors about her disagreement, neither of whom are Major Mills.[523]  It should also be noted that Rushlow did face a sustained charge and accepted his discipline.[524]  Ultimately, Plaintiff Ingram was not disciplined.[525]  The case was properly handled at all levels of IAD.

259)     The reality of Plaintiff Zollicoffer's transfer is that it began with her voluntary competition for the rank of Lieutenant.  She scored well enough in the promotional process to be promoted in February 2018 while she held the position of Sergeant in IAD.[526]  As a new Lieutenant, she was soon reassigned to a district station.  This is a common practice in police departments and can be a positive action for two reasons, among others:

    i)     A newly promoted officer should not have to supervise and direct subordinates who were peers as recently as the previous week.  An officer becoming accustomed to a new role and rank is better set up for success with a newer or less familiar work group.

---

[518] Graham Report, ¶ 144(b), p. 136.
[519] Graham Report, ¶ 144(b), p. 136.
[520] Sonya Zollicoffer Deposition Transcript ("Zollicoffer Tr.") 124 (July 24, 2020).
[521] Zollicoffer Tr. 123 (July 24, 2020).
[522] PG0000188792.
[523] Zollicoffer Tr. 124, 128 (July 24, 2020).
[524] PG0000012939-129340.
[525] PG0000012933.
[526] Zollicoffer Tr. 19 (July 24, 2020); PG0000104778-104780.

CONFIDENTIAL

ii)      The Patrol Bureau is the area where the great majority of police policy, strategies, and administrative skills are put into daily practice.  It's also where most of the personnel are assigned because two of the basic missions of any police department, response to calls for service and community outreach, occur there.  Placing a newly promoted officer in Patrol provides that officer with the opportunity to learn the fundamental objectives from his or her new position.  This betters the officer while bettering the Department.

260)      Contrary to page 137 of Mr. Graham's Report, Plaintiff Zollicoffer's specific request to stay in IAD was in fact made prior to her promotion.  Accordingly, Plaintiff Zollicoffer testified during her deposition that the Department sought to transfer her to Risk Management prior to and unrelated to her promotion, and at that time she requested to stay in Internal Affairs.[527]   While it is true that she had requested and was allowed to stay in IAD after being notified of a possible transfer, that changed once she advanced in rank.

261)      Mr. Graham fails to highlight that Major Mills, as the commander of IAD since 2016, had transferred officers out IAD upon promotion for the purpose of Career Development.[528]   Major Mills was assigned to IAD in August 2016 and implemented this preference since that time, which was prior to Plaintiff Zollicoffer's promotion in 2018.[529]

262)      More importantly, Major Mills was not part of the discussions surrounding Plaintiff Zollicoffer's assignment to the Bureau of Patrol, District VII.[530]  Prior to the reassignment, Assistant Chief Hector Velez informed Plaintiff Zollicoffer that she was going to be transferred to the Bureau of Patrol.[531]  At that time, Plaintiff Zollicoffer did not request to stay in IAD,[532] but instead requested to go to District VI instead of District VII.[533]

263)      In March 2018, Plaintiff Zollicoffer's transfer to the Bureau of Patrol, District VII was listed on the Department's published transfer list.[534] After the transfer was published, it was noted that the Lieutenant opening in District V was not the best alternative option for Plaintiff Zollicoffer, because Officer Glen Caradori was assigned there, and Plaintiff Zollicoffer had accused Caradori of sexual harassment in 2001 when they were assigned to District IV.[535]

---

[527] Zollicoffer Tr. 59-60 (July 24, 2020).
[528] PG0000071573.
[529] *Id.*
[530] PG0000950937.
[531] PGPD-ZOL-0005594.
[532] Zollicoffer Tr. 58-59 (July 24, 2020).
[533] PGPD-ZOL-0005594-95.  Additionally, Plaintiff Zollicoffer did not provide any documentation in support of this until March 20, 2018, when she sent then-FOP President John Teletchea a note from her doctor stating that she would benefit from working daytime hours because she ███████████████████████████████████ PG0000968412-968413.
[534] PG0000163044-163047.
[535] PG0000162977.

CONFIDENTIAL

264)    Lastly, Plaintiff Zollicoffer identified two officers, Kyle Bodenhorn and Curtis Lightner, who received promotions while assigned to IAD and were not immediately transferred out of IAD.   Mr. Graham's Report suggests that the fact that these individuals were not immediately transferred indicates an ulterior motive on the part of the Department regarding Plaintiff Zollicoffer's transfer.   However, Kyle Bodenhorn was promoted to Sergeant on January 10, 2016, and Curtis Lightner was promoted to Lieutenant on January 11, 2014.[536]   As noted above, Major Mills did not become the Commander of IAD, and thus her preference for transfer upon promotion was not implemented, until August 2016.[537]

265)    Finally, it is a common and well-known practice to transfer someone upon promotion to an executive position.   It is also an industry standard to ensure that all those in executive ranks get patrol experience, at the rank of Lieutenant and Captain especially.

### E.    Corporal Chris Smith's Reassignment Was Not Retaliatory

266)    According to Mr. Graham's Report, in October and December 2015, Plaintiff Chris Smith complained to Lieutenant Vondell Smith that Plaintiff Smith's colleagues had created a racially hostile environment by disparaging Black members of the community, and that Lieutenant Smith took no action. Mr. Graham claims that in March 2016, Plaintiff Smith was involuntarily transferred to the Patrol Bureau, a transfer that Plaintiff Smith believed was retaliatory in response to his prior complaints.   Mr. Graham further claims that in June 2016, Sergeant Darryl Kries gave Plaintiff Smith a poor performance evaluation after Plaintiff Smith had complained to him about the racist environment on the team.   The Report's characterization of Plaintiff Smith's March 2016 reassignment contains numerous inaccuracies, omits key facts, and is contrary to record evidence. Based on my experience and a review of the available evidence, it is my opinion that Plaintiff Smith's March 2016 reassignment back to regular patrol duties was not retaliatory or discriminatory.

267)    Plaintiff Smith was assigned to District II Patrol from 2013 to January 2019.   He was selected for the District II Special Assignment Team ("SAT") in March 2015, and was reassigned back to regular District II patrol duties in March 2016, after he failed to correct various deficiencies in his performance.   Contrary to Mr. Graham's claims, Plaintiff Smith's March 2016 reassignment back to regular patrol duties was not a transfer, as Plaintiff Smith remained in District II of the Patrol Bureau before, during, and well after his tenure on the District II SAT team.

268)    During the year that Plaintiff Smith was detailed to the SAT, his supervisor, Sergeant Darryl Kries, counseled him multiple times regarding his deficient performance. For example, Kries had to counsel Plaintiff Smith regarding the proper method for conducting suspicious person stops, submitting property, maintaining his issued equipment, following through on police actions, failing to appear at court, and misplacing his court summons.[538] While on the SAT, Plaintiff Smith was also counseled and disciplined for failing to properly search a

---

[536] PG0000080771; PG0000080760.
[537] PG0000080911.
[538] PG0000006862-6863.

CONFIDENTIAL

prisoner before transport.  It was subsequently discovered that the prisoner had concealed a .25 handgun on his person.[539]   In addition to the counseling from Kries, Lieutenant Vondell Smith and Lieutenant Thomas Calmon also counseled Plaintiff Smith about his poor performance, and Lieutenant Smith warned Plaintiff Smith that he risked reassignment off the SAT unless his performance improved.  In March 2016, as a result of Plaintiff Smith's failure to improve his subpar performance, and after being counseled multiple times to do so, the Department reassigned Plaintiff Smith back to regular patrol duties.  He was informed that, should his performance improve, he might be considered for the SAT again in the future.

269)    Although Plaintiff Smith disagreed with Kries' assessment of his performance, he admitted that he was in fact counseled for a number of the aforementioned performance issues in a rebuttal Plaintiff Smith submitted around June 5, 2016, in which he argued that he deserved a better performance appraisal score.[540]  While Plaintiff Smith alleged that he felt like an outcast on the SAT, his rebuttal did not mention discrimination, harassment, discriminatory comments made by anyone, or retaliation.  And, Plaintiff Smith submitted this statement after Sergeant Kries had already completed and provided Plaintiff Smith with his performance appraisal for the period from June 2015 to June 2016.  Kries submitted a memo on July 7, 2016 in response to Plaintiff Smith's rebuttal, in which Kries provided additional details and examples of Plaintiff Smith's subpar performance while on the SAT.[541]

270)    Mr. Graham's Report does not account for any of Plaintiff Smith's documented performance issues while on the SAT, or cite to any other contemporaneous documents.  Instead, Mr. Graham's Report assumes as true Plaintiff Smith's unsupported allegations that he reported the allegedly "racist environment" on the SAT team to Lieutenant Vondell Smith, Plaintiff Smith's Black supervisor.

271)    The Graham's Report's suggestion that Plaintiff Smith's March 2016 reassignment was retaliatory for his alleged complaints is unsupported by the record.  Aside from the overwhelming evidence that shows that Smith was reassigned due to his poor performance, the decision-makers who unanimously agreed to reassign Plaintiff Smith in March 2016 had no knowledge of the alleged complaints of racial hostility. As Plaintiffs' complaint concedes, Lieutenant Vondell Smith had already transferred out of District II by the time the decision was made to return Plaintiff Smith to regular patrol.  Sergeant Kries, Lieutenant Calmon, Captain Mistinette Mints, and Major Steven Yuen, collectively, made the decision to reassign Plaintiff Smith—and none of them were aware of Plaintiff Smith's alleged conversations with Lieutenant Vondell Smith.  Plaintiff Smith alleges that he complained about discrimination, harassment, and retaliation on other occasions, aside from his alleged conversation with Lieutenant Smith in the fall of 2015, but all of these alleged complaints occurred after Plaintiff Smith was already reassigned.  Therefore, these complaints cannot be the basis for a claim that Plaintiff Smith was reassigned in retaliation for making such complaints.

---

[539] PG0000006912.
[540] PG0000006868-6870.
[541] PG0000006866-6867.

CONFIDENTIAL

**F.      Plaintiff Patrick McClam's Transfer Was Not Retaliatory**

272)    In January of 2016, Plaintiff McClam was transferred from the Forensic Science Division ("FSD") as a DNA Intake Officer to the Bureau of Patrol as a School Resource Officer ("SRO") in District III.[542]  The DNA Intake Officer position was eliminated, because FSD needed to fill the Firearms Examiner position.[543]   Mr. Graham's Report claims that this transfer was retaliatory due to Plaintiff McClam allegedly: (1) witnessing the director of the DNA lab making racist and sexist statements about minority female lab employees;   (2) encouraging those employees to file a complaint; and (3) cooperating with the related EEOC investigation.[544]  Mr. Graham's Report is again flawed in its conclusions.

273)    The position that Plaintiff McClam occupied in FSD was eliminated.   In my experience, this is a routine occurrence in police departments across the country, and is often done when  a department identifies the need for a position that is determined to be of a higher priority.   Here, the Department's need for a Firearms Examiner in FSD was determined to be a greater need, and the DNA Intake Officer position was eliminated.

274)    Further, Plaintiff McClam was reassigned to another specialty position, to serve as the SRO in District III's Community Oriented Policing Service.   The SRO's normal work schedule would be daywork hours, Monday through Friday.

275)    Mr. Graham also references other transfers that he claims were used to punish Plaintiff McClam.   These other reassignments occurred as part of Plaintiff McClam's promotion.  Plaintiff McClam was promoted to the ranks of sergeant in September of 2017, and to lieutenant in November of 2018.[545]  He was promoted to the rank of sergeant with 10 other officers; at that time, Plaintiff McClam was transferred to the Bureau of Patrol, as were at least three of the officers promoted to lieutenant, and 10 other officers who held the position of sergeant.   This was a common and comprehensive reassignment that occurs regularly with the promotions, retirements, and other personnel movements that large law enforcement organizations coordinate, often more than once in a 12-month period.[546]  It is routine to be transferred when promoted to the rank of sergeant and lieutenant, and to all executive ranks within the Department.

**G.    Plaintiff Richard Torres's Transfer Was Not Retaliatory**

276)    Plaintiff Torres alleged that he was transferred for reporting that his supervisor, Sergeant Joseph Bunce, (A) texted to him an alleged racial slur (the letters "NECA," as described above), and (B) allegedly made a derogatory remark about a Bladensburg resident.   Plaintiff Torres first showed the text to his supervisor Captain Melvin Powell and complained about the

---

[542] PG00000787026; PG00000787059; PG00000787069; PG0000090339.
[543] PG00000209599; PG00000335688.
[544] Graham Report, ¶ 143(d), p. 129.
[545] PG0000080777; PG0000080790.
[546] PG0000080777-80778; PG0000787038-787039.

CONFIDENTIAL

remark roughly six months after the text was sent—on the very day Powell met with Torres to advise him that he would be transferred for multiple performance issues.[547]

277)    Mr. Graham's Report cites the transfer of Plaintiff Torres as an example of a minority officer transferred after he "filed a complaint or cooperated in an investigation of a white officer."[548]  Mr. Graham bases this interpretation on only partial and improperly-skewed facts.  The record evidence shows that Torres was transferred as a result of multiple performance issues in 2015 and 2016, for which he had been counseled.  Mr. Graham ignored all of these facts in his analysis.

278)    Plaintiff Torres was counseled for several performance issues.  For instance:

- In March 2015, Sergeant David Thompson counseled Plaintiff Torres for making an improper notification to his supervisor, leaving his division without proper staffing coverage.[549]

- On May 2, 2016, Sergeant Bunce and Lieutenant Robbie Loveday held a counseling meeting with Plaintiff Torres, stressing that he needed to improve his performance if he were to remain assigned to the Regional Investigation Division ("RID").  Among other things, they noted that Plaintiff Torres "does not follow up with his investigations in a timely manner."[550]

- In late November, Lieutenant Jordan Swonger and Sergeant John Rodriguez counseled Plaintiff Torres on multiple mistakes, including the fact that in responding to a "contact shooting," Torres improperly released someone with an open warrant from police custody, after failing to verify his identity.[551]

279)    Sergeant Bunce and Lieutenant Swonger raised concerns about Plaintiff Torres' performance up their chain of command.  Based on his poor performance—and Plaintiff Torres' own admission of "laxed" performance to Captain Powell—Captain Powell, Major David Renner, and Deputy Chief Samir Patel concluded that it was appropriate that Plaintiff Torres be transferred.[552]  After review and deliberation by the Executive Command Staff, Torres was transferred to Patrol, District II.  He was notified of his transfer on December 28, 2016. [553]

280)    Following his transfer, Plaintiff Torres's position in RID was filled by Police Officer First Class Alexander Gonzalez (H).[554]  Plaintiff Torres replaced Gonzalez on Patrol Squad 28,

---

[547] PGDOJ_NO9_00000000061.
[548] Graham Report, ¶ 144(a), p. 136.
[549] PGDOJ_NO9_00000000056.
[550] PGDOJ_NO9_00000000057.
[551] PGDOJ_NO9_00000000058.
[552] PGDOJ_NO9_00000000059; PGDOJ_NO9_00000000060; PGDOJ_NO9_00000000061.
[553] *Id.*
[554] PGDOJ_NO9_00000000062; PGDOJ_NO9_00000000064.

CONFIDENTIAL

District II.  Gonzalez had applied and interviewed for an appointment to RID and was at the top of RID's active, internal selection list of officers to bring into the unit at the that time.[555]

### PART 5.   USE OF FORCE

#### A.  Background

281)    In the Report, Mr. Graham uses the fact that Prince George's County Police Department spent three years under a DOJ Consent Decree (2004-2007) and signed a MOA with the Department of Justice to portray the current members of the Department in a negative light. In fact, the Department successfully completed both the Consent Decree and the MOA, and incorporated improvements that remain in place today.

282)    In 2013, then-Deputy Chief Stawinski was a contributor to a PERF publication, "Civil Rights Investigations of Local Police Departments: Lesson Learned."  He is quoted:

> *"Our Department was placed under a memorandum of understanding and consent decree in 2004, and after coming out on the other end, it was a very positive experience for us.  I think the key is understanding, going into the process, that there are no cut-and-dried answers.  As we negotiated with the Justice Department, DOJ didn't say, 'You have to do A, B, and C.'  Rather, they said, 'You have to live up to certain Constitutional standards to policing in Prince George's County while remaining effective.  So that's how we approached it.  Every policy was custom-made and then approved by the independent monitors.  The outcome was a greater degree of policy and practice clarity for our personnel, which we think is contributing to crime reduction.  We fundamentally explain to our officers where the boundaries are on a variety of issues so they are able to aggressively fight crime while policing Constitutionally."* [556]

283)    This philosophy of focusing on policing constitutionally while working on effective crime fighting strategies clearly remained with Chief Stawinski as he continued to rise through the senior ranks.  During the years that Chief Stawinski led the department, Prince George's County saw a dramatic reduction in crime, while maintaining its commitment to safe policing and appropriate force.

#### B.  Mr. Graham's Misstatements about Uses of Force

284)    I have reviewed the use of force review data and documents discussed in Mr. Graham's Report, including EWS documents, EWS memoranda, and use of force review files. I have interviewed IAD Commander James McCreary, whose team generated the use of force

---

[555] PGDOJ_NO9_00000000065; PGDOJ_NO9_00000000066.
[556] Critical Issues in Policing Series, Civil Rights Investigations of Local Police: Lessons Learned, PERF, p.11

CONFIDENTIAL

review dataset, and First Sergeant William Gleason, who leads Prince George's County Police Department's use of force training and testifies nationwide as an expert on use of force.

285)    Mr. Graham's Report distorts the data on use of force reviews, misstates the facts with respect to the Department's practices and investigations, and fails to mention the impressive training and policies that the Department has created and maintained.

286)    **To summarize my conclusions:**

- **There were not 6,805 instances of force used by Prince George's County Police Department officers in January 2016 through 2019.**

- **Under the Department's policies, officers must report any resisted physical coercion, no matter how minor the contact is. This includes, for example, an officer who escorts or handcuffs someone resisting arrest, as well as someone who is passively resisting arrest.**

- **The Department's use of force review matters, in fact, represent a tiny fraction of its actual number of contacts with members of the public.**

- **The Department's use of force policies are fair and comprehensive, and they reflect many of the most progressive trends in the field of policing today. The Department has extensive use of force training, which incorporates leading guidance on ethical policing, de-escalation, and the duty to intervene.**

- **In reviewing and investigating uses of force, the Department follows its policies.**

- **A high number of "justified" use of force reviews is not a product of Prince George's County Police Department "rubber-stamping." This is a product of a well-trained police force—officers who know what force is reasonable, who use force appropriately, and who report the force when used.**

<u>*There are not 6,805 uses of force since January 2016.*</u>

287)    The use of force review dataset[557] does not show 6,805 instances of force. Mr. Graham mischaracterizes the use of force review data and ignores key facts in reaching his conclusions.

288)    When IAPro generates a use of force review dataset, it creates a separate entry for *every* involved officer matched up with *every* involved member of the public, regardless of

---

[557] PG0000985307. Mr. Graham fails to appropriately distinguish "use of force" issues. The dataset he relies on reflects use of force review matters. In many circumstances, an IAD investigation is also opened into a use of force case. This includes any serious injury or discharge of a firearm. To respond to Mr. Graham's Report, I focus on the use of force review data, but it should be noted that other files exist related to use of force.

CONFIDENTIAL

which officer used force against whom.[558]  So if three officers each arrested three people, but only one officer used force against one person, there would automatically be nine entries in the dataset associated with that case.  This is evident on the face of the data, and it should have been noted by Mr. Graham.  In a use of force review case like 19-580, the dataset has 36 entries, which clearly track the 9 officers and 4 members of the public at the scene of the incident.  Mr. Graham includes those 36 entries in his distorted count of 6,805, with no consideration of the facts of these cases.  In short, his numbers are multiplied.

289)    For further context, the Department assigns a use of force review number when force is reported and creates a use of force review packet for that incident.  At the start of another year, the numbering resets, with the identifiers starting back at zero.  For the relevant period, the incidents in this dataset include (without considering missing case numbers):

**2016:** 16-001, 16-002, 16-003 . . . up to **16-507**;
**2017**: 17-001, 17-002, 17-003 . . . up to **17-655**;
**2018**: 18-001, 18-002, 18-003 . . .up to **18-662**; and
**2019**: 19-001, 19-002, 19-003 . . .up to **19-878**.[559]

290)    This is roughly 2,700 use of force review matters opened, which divides over four years to roughly 675 per year.   Mr. Graham's Report does not explain this important distinction.

_Any resisted contact constitutes force, and all force must be reported._

291)    To legitimately analyze Prince George's County Police Department's use of force policies and practices, it is essential to understand how the Department defines "force."

292)    Prince George's County Police Department's use of force continuum begins with low level control,[560] and the Prince George's County Police Department's General Order Manual defines "force" as "[a]ny physical coercion used to effect, influence, or persuade a subject to comply with an order from an officer; the term shall include the use of chemical irritants and the deployment of canine, but shall not include ordinary, unresisted handcuffing, or unresisted use of the hobble strap and unresisted escort."[561]   Prince George's County Police Department's training guide plainly states:

Officers shall notify their supervisors whenever force is used.  A Use of Force review will be completed by a supervisor who did not use or order the force. Supervisors who witness

---

[558] Interview of IAD Commander James McCreary.
[559] Additionally, in the dataset, there are gaps in these numbers assigned to use of force reviews. For simplicity, I have not outlined every single one.
[560] "Use of Force Training Guide 2015" (updated).
[561] GOM, Vol. II, Ch. 58, PG0000945352.

CONFIDENTIAL

the force may write the force review. **All force must be reported except un resisted escorts and un resisted handcuffing.**[562]

293)    Put simply, Prince George's County Police Department officers must report any resisted physical coercion, no matter how minor the contact is.  These requirements are in line with best practices, and they demonstrate how seriously Prince George's County Police Department takes the issue of force.  Mr. Graham's Report ignores these facts entirely.

294)    Mr. Graham's Report cites aggregated, inflated data but provides no information about what that data shows or the context surrounding these cases.  It helps to look at an example of what "force" means.  Take the use of force review case numbered 17-064.[563]  In that case, Plaintiff McClam responded to fight involving multiple students in a middle school gymnasium.[564]  While trying to separate the students, a student grabbed Plaintiff McClam from behind, and Plaintiff McClam "used an open hand technique to push [the student] off him to gain separation from [the student]."[565]  McClam then "continued to separate the individuals who were fighting."[566]  The student that McClam touched with his open hand "was not injured."[567]  Plaintiff McClam reported the force he used against this student, and a supervisor responded to the scene.  After gathering and reviewing the evidence related to this incident, the supervisor found that the "amount of force used was in compliance of departmental policy."[568]  The packet was reviewed by Lieutenant Finn and Captain O'Lare (O'Lare signed for himself and the District Commander); both concurred with the determination.[569]

295)    Mr. Graham tries to raise a number of "concerns" about use of force review matters like this one, which is part of his inaccurate 6,805 statistic.  Paragraph 98 of Mr. Graham's Report concludes that a "justified" determination like this one is merely a "rubber-stamp."[570]  Mr. Graham also characterizes Captain O'Lare's signature on this case, for himself and the District Commander, as "widespread non-compliance" with procedure.  In fact, this is appropriate delegation that is commonplace and even necessary in busy police districts.  Finally, Mr. Graham suggests that Lieutenant Finn's concurrence in this review is rooted in discrimination, given that he is involved in a high percentage of use of force review matters.  Mr. Graham ignores the fact that Finn was, for **all** four years, a Lieutenant in charge of District III, a populous patrol district and the district with the most crime.[571]

---

[562] "Use of Force Training Guide 2015" (updated).
[563] PG0000161455-161465.
[564] *Id.*
[565] *Id.*
[566] *Id.*
[567] *Id.*
[568] *Id.*
[569] *Id.*
[570] Graham Report, ¶ 98, pp. 91-93.
[571] PG0000090287-90291; PG0000090938-90942; PG0000091148-91153; PG0000087035-87039; Excel Workbook, "Data regarding Crime Statistics" (.xls).

CONFIDENTIAL

*The use of force review dataset shows that force is used in a small fraction of Prince George's County Police Department police contacts.*

296)    Policing, especially in busy patrol districts, requires interactions with the public. It also requires traffic stops, person stops, and arrests—all of which are detentions (even if temporary).  As stated in Prince George's County Police Department's training guide:

> The use of force by law enforcement is a matter of critical concern both to the public and the law enforcement community. Officers are involved on a daily basis in numerous and varied encounters with people, and when warranted to do so, may use force in carrying out their duties. This Department recognizes and respects the value of human life and dignity. Vesting officers with authority to use force to protect the public welfare requires a careful understanding of the limitation of this authority. Officers are held to a high standard to protect the civil rights of individuals they encounter.[572]

297)    The number of use of force reviews must be analyzed alongside the number of contacts with the public.  In all four years, 2016 through 2019, there were roughly 115,000 traffic stops and arrests made by Prince George's County Police Department officers each year.[573]  Even just using this limited set of public contacts, this means .6% of contacts each year resulted in a use of force review matter, by rough estimate (using 675 per year, as discussed above).  Even accepting Mr. Graham's incorrect count of "1,700 uses of force per year" in paragraph 86 of the report, this would constitute roughly 1.5% of contacts.  Based on my experience, this small fraction of use of force reviews is consistent with good practices and with police departments in this area.

*Prince George's County Police Department's use of force policies, training, reviews, and investigations are comprehensive.*

298)    The Department's policies and practices on use of force are impressive, and they reflect many of the most progressive trends in the industry today.  The Department requires comprehensive training on the topic at the police academy, at yearly in-service, and at the range. Many of these policies and trainings focus on de-escalation, ethical policing, duty to intervene and honoring the sanctity of life. These incorporate elements from model policies written by IACP, PERF, and other notable departments.[574]

299)    Prince George's County Police Department's practices for reviewing and investigating uses of force are reasonable and adequate.  Mr. Graham's Report incorrectly argues that, because a few months and a few quarters of EWS reports were not located and produced in litigation, that the Department has broken its "promises" to the DOJ and "virtual[ly] shut down."[575]  As IAD Commander Mills explained, Assistant Commander Watkins raised issues with

---

[572] "Use of Force Training Guide 2015" (updated).
[573] Excel Workbook, "2016-2019 Countywide Arrests and Traffic Stops."
[574] Interview with 1st Sergeant William Gleason.
[575] Graham Report, ¶ 105, pp. 98-99.

CONFIDENTIAL

the EWS reporting, citing problems with data entry. It is not uncommon for police departments to encounter technology issues like these.[576]  In my opinion, this is not widespread evidence of discrimination or a "broken promise" with DOJ.

300)    Mr. Graham's claim that the district commanders did not report back to the Chief of Police after interviewing officers flagged by the Early Warning System has no basis in fact.  I have reviewed these memoranda memorializing interviews—hundreds of which have been produced in discovery.[577]   In my opinion, the Early Warning System at the Department was working as intended by the General Order Manual.

### *Justified use of force reviews are not evidence of a rubber stamp.*

301)    Finally, Mr. Graham incorrectly ties the high percentage of "justified" use of force reviews to a culture of "rubber-stamping."  This is incorrect.  First, he uses a faulty dataset, as discussed above.  Second, justified use of force reviews are a product of a well-trained police force—officers who know what force is reasonable, who use that force appropriately, and who report the force when used.  Based on my review and relevant experience, Prince George's County Police Department is ahead of the curve with respect to use of force policies and training.  Evidence of widespread compliance on such an important issue should be celebrated because it is a product of the Department's extensive efforts to protect the community and its officers.


**PART 6.    THE DEPARTMENT PROVIDES IMPLICT BIAS TRAINING CONSISTENT WITH BEST PRACTICES**

302)    Mr. Graham's Report asserts that the "Department does not appear to have adequate anti-racial bias training" and further claims that although the Department publicized its Implicit Bias Training, "it is far from clear that the program has the support of Department leadership."[578]  This is a wholly inaccurate statement.  Based on my professional expertise, this type of training provided is consistent with industry best practices.

303)    Prince George's County Police Department provides anti-racial bias training to its officers that is given by Dr. Kris Marsh, a credentialed University of Maryland Professor, whose general areas of academic focus include issues related to the Black middle class.[579]   A common theme in her work is decomposing what it means to be Black in America.[580]   She currently provides training through her consultancy, Applied Research Services.[581]

---

[576] Mills Tr. 113-116 (August 6, 2020).
[577] PG00000988460-988670; PG0000988687-988983; PG0000988984-989152; PG0000989153-989213; PG0000989214-989349; PG0000989350-989623; PG0000989624-989877; PG0000989878-989980; PG0000990255-990534; PG0000990535-990562; PG0000990563-990839; PG0000990840-9990907.
[578] Graham Report, ¶ 75, p. 75.
[579] Declaration of Dr. Kris Marsh (hereinafter "Marsh Decl.") at ¶ 4.
[580] Marsh Decl. at ¶ 4.
[581] Marsh Decl. at ¶ 5.

CONFIDENTIAL

304)    Dr. Marsh began conducting Implicit Bias Training to all Prince George's County Police Department academy recruits in late 2015.[582]   At the request of former Chief Hank Stawinski, since March 2018, Dr. Marsh has also been conducting Implicit Bias Training for all Department officers, who are required to take this training as part of their annual In-Service Training.[583]

305)    Dr. Marsh continued to provide implicit bias training in 2019 and 2020.  Officers were required to attend as part of their In-Service training.[584]

306)    Chief Stawinski first approached Dr. Marsh about providing mandatory Implicit Bias Training to all officers in late 2015 or early 2016.[585] Chief Stawinski was consistently committed to providing Implicit Bias Training Department-wide, and current Chief Hector Velez and Department leadership maintain that commitment today.[586]

307)    In-Service Implicit Bias Training for all Department officers began as part of a sponsored research agreement between the University of Maryland and the Department. University of Maryland Sociology Professor Rashawn Ray originally worked with Dr. Marsh on the project.[587]

308)    Department leadership expressed enthusiasm for implementing Implicit Bias Training for rank and file officers.[588]  Leadership described their commitment to this successful training in their sworn deposition testimony.[589]

309)    Mr. Graham's Report states that the Department "do[es] not appear to have provided in discovery any training materials . . . to instruct officers on bias-based profiling."[590] The training that Dr. Marsh provides to the Department is discussion-based, using PowerPoint slides and video.[591]

310)    Mr. Graham's Report, incorrectly relying on the uncorroborated Declaration of Plaintiff Anis, asserts that in June 2018 "a group of predominately white officers walked out of an In-Service 'implicit biased' training workshop being conducted by the University of Maryland."[592]  This is inaccurate.  A review of this incident shows there was not a "walk out" at the training.

---

[582] Marsh Decl. at ¶ 6.
[583] Marsh Decl. at ¶ 7.
[584] Marsh Decl. at ¶ 8.
[585] Marsh Decl. at ¶ 9.
[586] Marsh Decl. at ¶ 9.
[587] Marsh Decl. at ¶ 10.
[588] PG0000162845-162846.
[589] Murtha Tr. 102-103 (August 5, 2020); Velez Tr. 179-182 (July 15, 2020); Jacqueline Rafferty Deposition Transcript ("Rafferty Tr.") 155, 163, 166 (July 17, 2020).
[590] Graham Report, ¶ 75, p. 75.
[591] Marsh Decl. ¶ 15.
[592] Graham Report, ¶¶ 76-78, pp. 75-77.

CONFIDENTIAL

311)    Originally, the In-Service Training sessions were held at the University of Maryland, College Park Campus, with officers attending in plain clothes.[593] One group of approximately 25 to 50 officers per-week received day-long training over the course of 36 weeks.[594]

312)    On June 10, 2018, Sergeant Kevin McSwain emailed Professor Ray, copying Dr. Marsh, explaining that officers had raised concerns with the previous week's training session.[595] In particular, officers were concerned that several students came to the view the class, who were using laptops and other electronic devices.[596]

313)    Among other things, officers felt that unauthorized students at the training compromised the nature of the training.[597] Sergeant McSwain asked that in the future, students not attend officer In-Service Training without express permission from the Department, and advised that the same approval should be sought from the FOP.  In an email, Sergeant McSwain expressly asked how the problem would be addressed.[598]  The email was addressed to Professor Ray and, as a research team, Dr. Marsh and Professor Ray did not respond to the Department.[599]

314)    The following week, on June 12, 2018, students were again brought to the In-Service Training.[600]  Officers were excused from continuing training that day because they again expressed concerns about the attendance of the students.[601]

315)    Mr. Graham's Report asserts that "[a] complaint was made to the County . . ." and that "there is no evidence in discovery produced by Defendants to indicate that . . . a review or an investigation of any sort occurred."[602] Again, this inaccurately reflects what occurred and wrongly contends that appropriate action was not taken.

316)    As noted in the deposition testimony of Deputy Chief Murtha, who personally looked into this incident on behalf of the Office of the Chief, those officers who were uncomfortable with continuing the June 12, 2018 training due to objections with the manner in which it was being conducted were excused from the training program on that day.[603]  Several In-Service Training attendees spoke with a supervisor during a break in the session to express their concerns.  The supervisor conferred with the training staff, the union, and other command officers. The training staff decided to reassign those officers to return to the Training and

---

[593] Marsh Decl. at ¶ 11.
[594] Marsh Decl. at ¶ 11.
[595] Marsh Decl. at ¶11.
[596] Marsh Decl. at ¶ 12.
[597] *Id.*
[598] *Id.*; Email from Kevin McSwain to Rayshawn Ray (June 10, 2018) at 3:47 p.m.
[599] Marsh Decl. at ¶ 12.
[600] Marsh Decl. at ¶ 13.
[601] *Id.*
[602] Graham Report, ¶¶ 76-78, pp. 75-77.
[603] Murtha Tr. 105-116 (August 5, 2020).

CONFIDENTIAL

Education Division to participate in additional training for the remainder of the day.[604]   These officers were properly excused as a result of a concerns with the students present in the class.

317)   The officers in attendance at the training session did not engage in a "walkout" and the Department indisputably looked into the event to determine the circumstances of the class dismissal.[605] The dismissal of the class by training staff was reasonable in light of officer concerns[606] and authorized by supervisory personnel.[607]

318)   Mr. Graham's Report also states that a "complaint was made to the County" concerning the departure of the officers from the June 12, 2018 training session.  The document Mr. Graham's Report relies upon to establish the existence of a "complaint to the County" is an email from Plaintiff Perez to an individual at the Office of the State's Attorney for Prince George's County (an arm of the State government, separate from the Prince George's County government)[608] conveying Perez's hearsay description of the incident.[609]

319)   Mr. Graham's Report asserts that "it appears that senior command officers (Murtha and Watkins) decided there should be no investigation of this matter and sought to excuse their failure to investigate or discipline this matter."[610]   This assertion is directly contradicted by the record evidence.[611]  Deposition testimony (from Murtha and Watkins) and contemporaneous internal documents about the incident fully support the Department's determination that no IAD investigation or disciplinary action was warranted.

320)   Relying solely upon quotes from the Plaintiff Anis Declaration, Mr. Graham's Report adopts as its own the Plaintiff Anis' assertions that: (A) "Prince George's County Police Department was entirely unconcerned" about the Implicit Bias Training incident; (B) "Murtha made light" of the incident in front of a group of officers; (C) "the Department notified officers" involved in the incident "that it did not intend to reschedule the training;" and (D) the

---

[604] This is corroborated by Major Holland's June 12, 2018 Inter-Office Memorandum to Deputy Chief Murtha and email correspondence between Acting Major Phillip Davis and the Deputy Chiefs. PG0000985666-985667; PG985668-985669; PG000016500-162502.

[605] Murtha Tr. 105-116 (August 5, 2020); PG0000985666-985667; PG985668-985669; PG000016500-162502; Email from Adam Popielarcheck to Kevin McSwain (June 29, 2018) at 10:35 a.m.; Email from Philip Davis to Hector Velez (June 12, 2018) at 3:37 p.m.; Email from Adam Popielarcheck to John Teletchea (October 9, 2018) at 4:46 p.m.

[606] Email from Marcus Jenkins to Kevin McSwain (June 6, 2018) at 4:22 p.m.; Email from Kevin McSwain to Rayshawn Ray (June 10, 2018) at 3:47 p.m.

[607] PG0000985666-985667.

[608] Md. Const., Art. V § 7; Md. Crim. Pro. Code Ann. §§ 15–101 and 15–102.

[609] Graham Report, p. 75, note 266, citing PGPD-PER-0122769-122770.

[610] Graham Report, ¶ 77, p. 76.

[611] *E.g.*, PG0000985666-985667; PG985668-985669; PG000016500-162502; Murtha Tr. 105-116 (August 5, 2020).

CONFIDENTIAL

Department "never conducted an investigation into the details" of the incident.[612]  The Plaintiff Anis Declaration and the Report's assertions are directly refuted by record evidence.[613]

321)   The Department followed up with officers who had been dismissed from the Implicit Bias Training class and ensured they completed their training.  Corporal Marcus Jenkins and Corporal Leslie Cauthern (Instructors in AOT) were tasked with assisting Lieutenant Adam Popielarcheck, Captain Phil Davis, and Sergeant McSwain (the Officer In Charge of AOT) in ensuring that each officer who failed to complete the class did indeed reschedule and attend.[614]  The officers did make up the training.[615]

322)   In addition to Implicit Bias training, Chief Velez points out in his PowerPoint presentation that new recruits spend an entire day at the National Museum of African American History and Culture.[616]  Prince George's County is on the leading edge of this best practice that exposes future police officers to the history of the relationship between the police and the Black community.  Many young men and women have no knowledge of how many police departments got started as slave patrols in the 1800s.  Nor are they familiar with the tactics that police used in communities to deal with civil rights protests.  This history provides context for young Officers to understand the distrust that impacts the relationship today between police and the Black community.

## SUMMARY AND CONCLUSIONS

323)   In summary, based on my experience, education, and training in police operations management, it is my opinion that Prince George's County Police Department's policies, practices, and procedures for training, managing, and disciplining its employees meet and often exceed current professional standards for largescale police departments across the United States.  Further, it is my opinion that the Department adequately and appropriately handles citizen and internal employee complaints, and applies discipline imposed through the internal investigation process reasonably and consistently.  Finally, it is my opinion that the Department's policies, practices, and procedures for transfer and promotion of personnel are consistent with industry standards.

324)   As a police officer and a police chief in two nearby jurisdictions to Prince George's County, I have watched Prince George's County Police Department transform itself into a

---

[612] Graham Report, ¶ 78, pp. 76-77.
[613] Murtha Tr. 105 -116 (August 5, 2020); PG0000985666-985667; PG985668-985669; PG000016500-162502; Email from Adam Popielarcheck to Kevin McSwain (June 29, 2018) at 10:35 a.m.; Email from Philip Davis to Hector Velez (June 12, 2018) at 3:37 p.m.; Email from Adam Popielarcheck to John Teletchea (October 9, 2018) at 4:46 p.m.
[614] Email from Adam Popielarcheck to John Teletchea (October 9, 2018) at 4:46 p.m.; Emails from Adam Popielarcheck to 37 Implicit Bias Training class attendees (October 9, 2018); PG0000588980; PG0000606204.
[615] In-Service Implicit Bias Training Classroom Participation Sign-In Sheets (2018).
[616] PG0000986142 (produced natively), slide 17.

CONFIDENTIAL

progressive agency that has instituted change and brought accountability and transparency to the public. This is evidenced most pointedly by the training the Department gives its personnel. It is my opinion that the Department has a model Use of Force policy, particularly because the training focuses on de-escalation, smart tactics, and a duty to intervene if officers see a colleague acting improperly.

325)     My experience in 42 years in policing has taught me that the two most important traits a police officer can possess are integrity and an ability to communicate effectively, with empathy a close third. If you look at the Prince George's County Police Department, you see a Use of Force policy that talks about the value of human life and dignity. Moreover, the ICAT training stresses use of smart tactics and effective communication skills. This is squarely in line with what the best police departments are now doing.

326)     The fact that the Prince George's County Police Department has assigned a Deputy Chief to be the Equal Employment Opportunity coordinator for the organization is particularly impressive. It demonstrates the level of importance that the Department leadership puts on ensuring a workplace free from discrimination and harassment. A Deputy Chief not only has an agency-wide perspective, but he or she also has direct access to the Chief and direct authority to ensure policies are followed and investigations of complaints are handled appropriately. The coordination of EEO issues with the County's HRC and the County Office of Law is also a best practice implemented and followed by the Department.

327)     The Department's Internal Affairs Division is structured in a way to ensure appropriate investigatory resources are on all levels of cases, from minor violations to serious wrongdoing. My review of the IAD's policies, practices, and procedures confirmed that the IAD Commander stays in constant contact with the Assistant Chief to ensure that the Department leadership is aware of significant investigations as well as any trends the agency experiences.

328)     No large police agency is immune from conflicts and challenges, both internal and external. In my experience, those police departments that experience significant levels of dysfunction are also deficient in their ability to deliver police services in a manner that adequately addresses crime and safety issues. Simply put, the jurisdictions with some of the highest crime rates are often dealing with significant levels of dysfunction within the agency and in their relationships with the public. This is not the case with Prince George's County Police Department, as the County has seen crime go down and community outreach efforts increase.

329)     It is my opinion, based on my 42 years of experience, education, and training in policing that the Prince George's County Police Department's leadership has demonstrated significant efforts to be responsive to the community in its mission to deliver police services in a fair and impartial manner, to reduce crime, and to keep the County safe. The Department has met these goals through best policies, practices, and procedures that are in compliance with best practices and industry standards and have been applied appropriately and consistently.

CONFIDENTIAL

J. Thomas Manger

99

CONFIDENTIAL

# APPENDIX A

CONFIDENTIAL

# J. THOMAS MANGER

Manger Group LLC
jtm@mangergroup.com
240-876-1279

## PROFESSIONAL BACKGROUND

**Principal, Manger Group LLC**   July 2019 – Present

Principal and Co-Founder of Manger Group LLC, providing public safety consulting and training services. Specializing in crisis communications, executive leadership, police management, police legitimacy and accountability, crime reduction strategies, race and policing, patrol operations, community outreach, policy development, inspections, administrative investigations, police criminal misconduct, legislative advocacy, school safety, criminal investigations, police response and tactics at major events, use of force, body-worn cameras, alcohol enforcement, traffic, first-line supervision, crime prevention, human trafficking, hate crime response, conflict resolution, immigration issues for local policing, facial recognition technology, traffic safety, community safety and security.

Top Secret Security Clearance 1998-2020.

Life Member of the International Association of Chiefs of Police, the Major Cities Chiefs Association, and the Police Executive Research Forum.

## EXPERIENCE

**Strategic Site Leader, U.S. Dept. of Justice, Public Safety Partnership Program (2019-present)**

Leading team assisting the Davenport, Iowa Police Department in reducing violent crime.  Identifying and providing training and technical assistance to police and prosecutors.

**Chief of Police, Montgomery County, MD Police Dept.  2004-2019**

Responsible for police service delivery to 1 million residents in the State of Maryland's most populous jurisdiction.  Oversaw $280 million annual budget with workforce of 1,900 employees.  Appointed by County Executive Doug Duncan in 2004.  Re-appointed by County Executive Ike Leggett in 2006.  Re-appointed by County Executive Marc Elrich in 2018.  Responsible for the management of all facets of police service, to include (but not limited to) Patrol, Investigations, Special Operations, Budget, Personnel, Internal Affairs, Technology, Community Outreach, 9-1-1 Center, Animal Control, and Media Relations. Interviewed over 200 times per year by print, radio, or television media.

CONFIDENTIAL

**Chief of Police, Fairfax County, VA Police Dept.   1998-2004**

Responsible for police service delivery to over 1 million residents in the State of Virginia's largest local jurisdiction.  Oversaw workforce of nearly 2000 employees.   Began career as a patrol officer in 1977 and rose through the ranks to be appointed Chief of Police in 1998.

**President, Major Cities Chiefs Association   2014-2018**

Elected President (two terms) by my peers from the 70 largest police departments in the United States and Canada.  Represented the Association on policy and legislative issues.  Met regularly with Officials at the White House, U.S. Congress, the Dept. of Justice and Dept. of Homeland Security.  Represented the Association three times, in meetings with President Obama at the White House.   From 2006-2014, was the Chairman of the Legislative Committee for the Association.  Represented the Association on legislative issues, and spoke at numerous Congressional hearings on police, law enforcement, crime, and homeland security issues.

**Member, Archdiocese of Washington D.C., Child Safety Advisory Board   2006- Present**

Create policy and review specific case issues regarding child protection within the Catholic church and schools.  Advisory role to the Archbishop of Washington D.C.  Assist with investigations at the request of the Archbishop.

**Co-Chairman, National Immigration Forum's Law Enforcement Immigration Task Force  2016-2019**

Led large task force of local police and Sheriff's departments on navigating immigration issues.  Met directly with Secretary of Homeland Security and his/her staff several times each year.

**Vice-President, Board, Police Executive Research Forum, two terms, 2012-2016**

Led Board, along with President Charles Ramsey, providing input to premier law enforcement think tank in the Nation.

**Member, International Association's Highway Safety Committee   1999-2014**

Researched and recommended best practices for traffic safety, crash reduction, and traffic enforcement.

**Other Memberships:**

Anti-Defamation League's Consortium on Fighting Hate  2020

Montgomery County Community Criminal Justice Commission  2004-2019

Hearts and Homes for Youth Board  2006-2014

Shelter House Board   1998-2005

2

IACP Police Explorer Committee  (1999-2019)

Selection Committee for National Law Enforcement Memorial's Destination Zero Awards (2016-present)

## EDUCATION

2006 – Senior Executive Program for State and Local Government – **John F. Kennedy School, Harvard University**

2000 - FBI National Executive Institute – **FBI Leadership Development Institute**

2000 – Senior Executive Institute – **University of Virginia**

1998 – Police Executive Leadership School – **University of Richmond**

1989 – FBI National Academy – **FBI Leadership Development Institute**

1976 - Bachelor of Arts, Criminal Justice, **University of Maryland, College Park**

## NATIONAL AWARDS AND RECOGNITION

- 2019 Major Cities Chiefs Association Leadership Award
- U.S. Senate Citation for "Excellence in Leadership and Public Service".  March 28, 2019
- Certificate of Special Congressional Recognition for "Exemplary and Passionate Service to the People of Montgomery County", Cong. Jamie Raskin, March 28, 2019
- U.S. House of Representatives Certificate of Special Recognition, "Exemplary Leadership, and Faithful Efforts to Safeguard Property and Persons living in Montgomery County."  Congressman John Sarbanes.
- April 9, 2019 - Advocates for Highway and Auto Safety – Highway Safety Hero Award
- 2018 FBI National Executive Institute's Penrith Leadership Award
- May 7, 2018 - Anti-Defamation League's Gorowitz Institute Service Award – Recognized nationally for building bridges to the Muslim and Immigrant communities and for preserving and defending our Nation's Democratic Values.
- U.S. Congressman Jamie Raskin, Certificate of Special Congressional Recognition for Extraordinary Leadership and Commitment to Public Safety
- 2017 National Immigration Forum's "Keeper of the Dream" award
- 2015 U.S. Congressional Citation (Sen. Chris Van Hollen) for dedicated service

3

CONFIDENTIAL

- 2007 Brady Campaign to Prevent Gun Violence – James S. Brady Law Enforcement Award
- 2007 Hero of Freedom Award, for Combating Child Trafficking, Charity Network Inc. (CNI)

## LOCAL AWARDS AND RECOGNITION (SELECTED)

June 12, 2019 – Olney Chamber of Commerce, Bienvenue Award, "Dedication to Serve and Protect"

June 4, 2019 – Boy Scouts of America, 2019 Distinguished Citizen Award

March 29, 2019 -  County Executive resolution to rename the County public safety headquarters to the Chief J. Thomas Manger Public Safety Headquarters

March 28, 2019 – Citation from Maryland State Senator Cheryl Kagan, "under your leadership, our community has seen increased transparency, accountability, and safety."

2018 – Selected as a "Washingtonian of the Year" by Washingtonian Magazine

2018 – Montgomery County Coalition for the Homeless, Distinguished Service Award

2017- Montgomery County Hispanic Gala, Public Service Award

March 1, 2017 – Addiction Policy Forum's award for STEER program, "Ability to integrate treatment with law enforcement response."

February 16, 2017 – Presenter, Leadership Greater Washington, "Policing in a Post-Ferguson Environment"

February 14, 2017 – Presenter, Montgomery County Council, on Preventing Hate Crimes

2017 – Instituted all Spanish-speaking Community Police Academy

Jan. 29, 2017 – Briefing on Domestic Violence to Montgomery County Commission for Women

2017 – Instituted quarterly community outreach meetings with the LGBTQ community

Jan. 4, 2017 – Presenter, Jewish Community Relations Center, Combatting anti-Semitism, Racism and Bigotry

2016 – First large police agency in Washington D.C. region to institute a body-worn camera program.

2016 – Montgomery County Family Justice Center, Inspiring Leader Award

Oct. 12, 2015 – Conflict Resolution Center of Montgomery County award for "Peacemaker of the Year"

2014 – Sentinel Newspaper, 2014 Excellence in Government Award

Jan. 2014 – Montgomery County Victim Rights Foundation, Public Safety Award

May 6, 2013 – Youth Leadership Foundation, Community Champion Award

Oct. 28, 2012 – Inducted into the Montgomery County Human Rights Hall of Fame

4

CONFIDENTIAL

2002-2013 – In-person interviews on CBS, local Ch.9 News over 130 times discussing police, crime and safety issues

2012 – Started an annual event put on by the Mont. Co. Police Dept. – Autism Night Out

2009 – Bethesda-Chevy Chase Chamber of Commerce, Public Safety Award

April 30, 2006 – Maryland Muslim Council, 2006 Public Safety Award

2004 – Established racial and ethnic outreach meetings (monthly).  Attended over 400 of these meetings between 2004-2019.

2004 – Fairfax County NAACP Branch, Community Service Award

2001 – Fairfax County Human Rights Commission's Award for "Work in preventing hate crimes"

April 22, 1993 – Silver Medal of Valor, Fairfax County Chamber of Commerce, Public Safety Awards

## NATIONAL MEDIA INTERVIEWS, WHITE HOUSE, DEPT. OF JUSTICE, AND CONGRESSIONAL APPEARANCES

Inside Washington – Interview on Police Reform (July 2020)

Speaker, U.S. Senate Democratic Steering Committee, Gun Violence Prevention (March 27, 2019)

Meeting with DHS Secretary Neilsen in Immigration issues (Feb. 14, 2019)

Meeting with Congressman David Trone on Opioid Addiction Crisis  (Feb. 11, 2019)

Testified before the Senate Judiciary Committee on Gun Violence (Dec. 6, 2017)

Speaker at U.S. Attorney General's Advisory Committee, on crime and prosecution issues (Sept. 26, 2018)

Heavy.com News, "Tom Manger: 5 Fast Facts You Need to Know"  Sept. 22, 2018

National Press Briefing on Autonomous (Driverless) Vehicles (July 23, 2018)

Mother Jones magazine interview on Gun Violence and Arming School Teachers (March 8, 2018)

Speaker, U.S. Congressional Hearing on Immigration Issues for Local Police  (July 24, 2017)

Testified before Senate Committee on Homeland Security, Gangs and Transnational Criminal Organizations (May 25, 2017)

Panelist, Senate Democratic Caucus on Law Enforcement Issues (May 17, 2017)

BBC interview on Gangs (May 8, 2017)

Presenter, U.S. Dept. of Justice, Hate Crime Prevention Forum (May 1, 2017)

5

Law Enforcement presenter for the U.S. Conference of Mayors at meeting with the U.S. Attorney General (April 25, 2017)

Law Enforcement presenter for the U.S. Conference of Mayors at meeting with DHS Secretary (April 24, 2017)

Briefing to U.S. Senate Staff, on behalf of Tahirih Justice Center on Human Trafficking (April 5, 2017)

Speaker, on behalf of the U.S. Conference of Mayors, in meeting with DHS Secretary  (March 29, 2017)

Speaker, House Congressional Hearing in support of domestic violence victims, sex assault victims and victims of human trafficking. (March 17, 2017)

Meeting with Senator Jeff Sessions regarding nomination as Attorney General (Dec. 20, 2016)

Meeting with Vice President Joe Biden on Policing Issues  (Aug. 3, 2016)

Keynote Speaker at Bureau of Justice Assistance (DOJ) conference on body-worn cameras (May 14, 2016)

Law Enforcement Leaders breakfast meeting, Naval Observatory, with Vice Pres. Biden (May 13, 2016)

Testimony before Senate Judiciary Committee on the Impacts of U.S. Immigration Policy on local Police (July 21, 2015)

Presenter, House Judiciary Committee, Senate President and House Speaker, Public Safety Workgroup (June 8, 2015)

Guest on CNN's "State of the Union" program, on effects of Ferguson on policing (Nov. 30, 2014)

CNN interview on National Policing issues, (Aug. 6, 2011)

Testified before Senate Judiciary Subcommittee on Immigration Reform (April 30, 2009)

Testified before Senate Judiciary Committee on "Protecting National Security and Civil Liberties" (April 21, 2009)

Participant in Attorney General Eric Holder's Law Enforcement Summit (April 20, 2009)

## SELECTED PRESENTATIONS AND COMMISSION WORK

Jan. 2020 - Responsible Hospitality Institute – Instructor for Bar and Restaurant Owners on alcohol enforcement and regulatory compliance

Jan. 2020 – Member, National Police Foundation's workgroup on Body-worn cameras

2004-2019 – Instructor at more that 60 Citizen Academy classes on crime and safety in Montgomery County

6

CONFIDENTIAL

March 14, 2019 – Guest Lecturer, on police/media issues, Georgetown University

2015-2019 – Guest Lecturer at American University, current policing issues

Jan. 25, 2019 – Speaker at U.S. Conference of Mayors meeting on Hate Crime investigations

Jan. 17, 2019 – Keynote speaker at Montgomery Co. Chapter of Md. Municipal League on crime and policing

2018-2019 – Member of Dept. of Justice's (COPS) National School Safety Consortium

May 31, 2018 – Participant, DOJ/ Major Cities Chiefs Assoc., Executive Workshop to create a Violent Crime Operations Guide (Published by Bureau of Justice Assistance)

May 8, 2018 – Speaker, Migration Policy Institute, "Changing Landscape of Immigration"

2013-2018 – Selected as a Mentor for (5) newly appointed Police Chiefs, Major Cities Chiefs Association's Police Executive Leadership Institute

Nov. 13, 2017 – Presentation at 50-State summit on Public Safety in Wash. D.C. on policing

Oct. 18, 2017 – Panelist at CATO Institute – Project on Criminal Justice

Sept. 25, 2017 – Speaker, Georgetown Law Center's 14th Annual Immigration Law and Police Conference

April 21-23, 2017 – Panelist, Harvard University, Public Safety Summit

April 12, 2017 – Lecturer at America Trauma Society Conference (PA)

March 9, 2017 – Featured guest/ speaker at Montgomery College President's series "Civility in Action, Dialogues Across Differences"

Dec. 12, 2016 – Host with NAACP and Human Rights Commission at Town Hall Meeting on police and race issues

June 14, 2016 – Speaker at World Elder Abuse Awareness event, on Crimes against Seniors

May 14, 2016 – Keynote Speaker at National Law Enforcement Memorial's Wreath Laying Ceremony

Nov. 10-14, 2015 – Executive Session on Innovative Approaches to Minimizing Use of Force – Police Scotland

2004-2019 - Introductory speaker at more than 75 sessions of Montgomery County Crisis Intervention Training. Dealing with people experiencing mental health issues.

July 20, 2015 – Panelist, National Black Prosecutors Association Conference

July 14, 2015 – Panelist, Maryland Commission on Civil Rights, Baltimore

June 18, 2015 – Major Cities Chiefs Roundtable on Emerging Police Issues

7

CONFIDENTIAL

March 12, 2015 – Interview with Washington Post Editorial Staff on Police issues

## PUBLICATIONS

Contributing Author, Maryland Innovations to Address Opioid Epidemic, (Feb. 2019)

Author of Major Cities Chiefs Association position paper on Immigration Policy

Author of Major Cities Chiefs Association position paper on Marijuana

"New Strategies for Countering Homegrown Violent Extremism: Preventive Community Policing" Nov. 13, 2013. Washington Institute for Near East Policy

8

# APPENDIX B

CONFIDENTIAL

### Appendix B - Documents Considered for this Report

- Export report of Michael E. Graham in this matter (August 28, 2020)

- Documents, correspondence, and deposition testimony cited by Mr. Graham in his Report dated August 28, 2020

- Pleadings and other case filings, including the Plaintiffs' First Amended Complaint (ECF 54) and Defendants' Answer (ECF 142)

- Written discovery responses from both Plaintiffs and Defendants

- Maryland State Constitution, Maryland Annotated Code, and Prince George's County Maryland Code of Ordinances

- The Department's General Order Manual ("GOM")

- IAD Standard Operating Procedures

- Prince George's County Police Department equal employment opportunity and diversity training materials

- Equal employment opportunity and diversity training materials from other local and/or major jurisdictions

- Prince George's Police Department Rosters, Promotion Lists, and Transfer Lists

- Selected deposition testimony in this matter and related exhibits, including:

  - Adrian Crudup
  - Art'z Watkins
  - Carlos Acosta
  - Christopher Murtha
  - Christopher Smith
  - Hector Velez
  - Henry Stawinski
  - Jacqueline Rafterry
  - James McCreary
  - Jennifer Flaig (ESCI/Fields Consulting)
  - Jewell Graves
  - Joseph Ghattas
  - Joseph Perez
  - Kathleen Mills
  - Linda Washington
  - Mark Magaw
  - Melvin Powell
  - Michael Anis
  - Michael Brown
  - Paul Mack
  - Raphael Grant
  - Richard Torres
  - Robert Harvin, Jr.
  - Sharon Chambers
  - Sonya Zollicoffer
  - Tasha Oatis
  - Thomas Boone

CONFIDENTIAL

- Interviews I conducted with the following individuals: IAD Commander Major James McCreary, 1 Sgt. William Gleason, former Deputy Chief Murtha, and Inspector General Donnell Turner, Kathleen Mills, Henry Stawinski

- Correspondence between Defendants and the Department of Justice dated December 20, 2019; January 23, 2020; February 6, 2020; and February 14, 2020

- IAD Complaint Process PowerPoint by IAD Commander James McCreary

- Early Warning System (EWS) reports and EWS memoranda

- Selected Prince George's County Police Department arrest, crime, and traffic stop data

- Selected articles, websites, and press conferences, as cited in the report

- Video Recording: Panel for Equality Meeting (April 17, 2017)

- Video Recording: Panel for Equality Meeting (July 13, 2017)

- Prince George's County Police Department Select Leadership Assignments Roster

- Citizen Complaint Oversight Panel, Prince George's County 2019 Annual Report

- Declaration of Dr. Kris Marsh

- DISCIPLINARY ACTION – Captain ████████ #1396 *(CORRECTION)* (December 5, 2019)

- DISCPLINARY ACTION – Major ████████ #2083 *(CORRECTION)* (December 5, 2019)

- Email from Adam Popielarcheck to John Teletchea (October 9, 2018) at 4:46 p.m.

- Email from Adam Popielarcheck to Kevin McSwain (June 29, 2018) at 10:35 a.m.

- Email from Kevin McSwain to Rayshawn Ray (June 10, 2018) at 3:47 p.m.

- Email from Marcus Jenkins to Kevin McSwain (June 6, 2018) at 4:22 p.m.

- Emails from Adam Popielarcheck to 37 Implicit Bias Training class attendees (October 9, 2018)

- Excel Workbook, "2016-2019 Countywide Arrests and Traffic Stops."

- Excel Workbook, "Data regarding Crime Statistics"

CONFIDENTIAL

- Excel Workbook, "███████ Suspension Without Pay"

- Excel Workbook, "Retirements and Separations Roster" (2016-2020).

- Excel Workbook, "███████ Suspension Without Pay"

- IA2015-006

- In-Service Implicit Bias Training Classroom Participation Sign-In Sheets (2018)

- Transcript of July 31, 2020 Motions Hearing, *Joseph Perez v. Prince George's County Police Department*, Civil Action 19-36458, (Circuit Court for Prince George's County, Maryland)

- Transfer to Personnel (August 11, 2019)

- Use of Force Training Guide 2015 (updated)

- Documents produced in discovery in this matter, including:

| | |
|---|---|
| ESCI000856-000860 | PG0000012153-0000012155 |
| PG0000000344 | PG0000012157-0000012163 |
| PG0000000370 | PG0000012402-0000012404 |
| PG0000000397 | PG0000012429 |
| PG0000000399-403 | PG0000012933 |
| PG0000000406 | PG0000012939-0000129340 |
| PG0000000409 | PG0000013412-0000013423 |
| PG0000000410 | PG0000013427-0000013432 |
| PG0000000433 | PG0000013433-0000013434 |
| PG0000000442-000000496 | PG0000013436-0000013443 |
| PG0000000497-000000530 | PG0000016500-0000162502 |
| PG0000000531 | PG0000020415 |
| PG0000000580-000000581 | PG0000020426 |
| PG0000002232-0000002269 | PG0000020472 |
| PG0000006277 | PG0000020504 |
| PG0000006862-0000006863 | PG0000020526-0000020554 |
| PG0000006866-0000006870 | PG0000020674 |
| PG0000006912 | PG0000020698-0000020994 |
| PG0000012123 | PG0000020707 |
| PG0000012134 | PG0000020738-0000020739 |
| PG0000012141-0000012142 | PG0000020745-0000020748 |
| PG0000012147-0000012158 | PG0000020753-0000020754 |

PG0000020754-0000020755
PG0000020767-0000020772
PG0000020776
PG0000020782
PG00000209599
PG0000020993-0000020994
PG0000023828
PG0000023833-2000003835
PG0000023840
PG0000023844-0000023846
PG0000023858-0000023879
PG0000023867
PG0000024330-0000024331
PG0000024869
PG0000024873
PG0000024874-0000024877
PG0000024878-0000024879
PG0000024879-0000024880
PG0000024882
PG0000024886-0000024887
PG0000024905-0000024909
PG0000024911-0000025086
PG0000025020
PG0000025023
PG0000025080
PG0000025094
PG0000025095
PG0000025286-0000025415
PG0000025297-0000025299
PG0000025303-0000025308
PG000002764
PG0000027646-0000027647
PG00000335688
PG0000034963-0000034966
PG0000034965
PG0000043394-0000043396
PG0000045100
PG0000045105
PG0000045108
PG0000069307
PG0000070001

PG0000070008-0000070009
PG0000070021-0000070033
PG0000070039
PG0000070049-0000070050
PG0000070346-0000070350
PG0000070894
PG0000070896-0000070902
PG0000070916-0000070926
PG0000071313-0000071484
PG0000071525-0000071562
PG0000071563-0000071610
PG0000071611-0000071663
PG0000071664-0000071751
PG00000787026
PG00000787059
PG00000787069
PG0000080041
PG0000080463
PG0000080474-0000080476
PG0000080480-0000080481
PG0000080533
PG0000080760
PG0000080771
PG0000080777-0000080778
PG0000080783
PG0000080790
PG0000080790
PG0000080911
PG0000087035-0000087039
PG0000090287-0000090291
PG0000090339
PG0000090938-0000090942
PG0000091148-0000091153
PG0000095157-0000095159
PG0000095172
PG0000095198-0000095202
PG0000095217
PG0000095242
PG0000095245
PG0000095250-0000095251
PG0000095254-0000095256

CONFIDENTIAL

PG0000095270-0000095278
PG0000095299-0000952301
PG0000103651
PG0000103774-0000103777
PG0000103846
PG0000104622
PG0000104622-0000104623
PG0000107666
PG0000113816-0000113819
PG0000113952-0000113955
PG0000114435-000011448
PG0000114450-000014451
PG0000114464
PG0000114469-0000114473
PG0000121755
PG0000127808
PG0000127831
PG0000144779
PG0000145106
PG0000152721
PG0000153768
PG0000153829
PG0000154090-0000154092
PG0000155489
PG0000155728
PG0000155772
PG0000158525-0000158528
PG0000158533-0000158534
PG0000159211
PG0000159212
PG0000159224
PG0000161455-0000161465
PG0000161564
PG0000162691-0000162711
PG0000162845-0000162846
PG0000162977
PG0000163044-0000163047
PG0000165000-0000016502
PG0000165875-0000168576
PG0000169211-0000169213
PG0000169924-0000169926

PG0000171546
PG0000171622
PG0000171629-0000171631
PG0000179481-0000179482
PG0000209599
PG0000329248-0000329249
PG0000329749-0000329750
PG0000335688
PG0000425817
PG0000432807-0000432810
PG0000432824
PG0000447427-0000447430
PG0000447445-0000447453
PG0000588980
PG0000606204
PG0000606204
PG0000783353
PG0000783498
PG0000785700-0000785752
PG0000785918-0000785919
PG0000787026
PG0000787038-0000787039
PG0000787059
PG0000787069
PG0000852384-0000852394
PG0000907898-0000907939
PG0000908227
PG0000928316-0000928618
PG0000928319-0000928620
PG0000928400
PG0000938022
PG0000938025
PG0000938031-0000938042
PG0000939361-0000939362
PG0000939374-0000939379
PG0000939401-0000939402
PG0000939403-0000939404
PG0000940132-0000940144
PG0000940143
PG0000944536-0000945397
PG0000944646

CONFIDENTIAL

PG0000944649
PG0000944650
PG0000944680
PG0000944716-0000944719
PG0000944847
PG0000944868
PG0000944871
PG0000944877
PG0000944882
PG0000945310
PG0000945352
PG0000950937
PG0000956324-0000956325
PG0000956406-0000956407
PG0000958841
PG0000958909-0000958910
PG0000959013
PG0000959648
PG0000960546
PG0000960546
PG0000960608
PG0000963932
PG0000966028-0000966030
PG0000966820-0000966830
PG0000967037
PG0000967249-0000967290
PG0000967291
PG0000968054
PG0000968412-0000968413
PG0000968590
PG0000968861-0000968863
PG0000968868-0000968869
PG0000968875-0000968887
PG0000968885-0000968886
PG0000968893-0000968894
PG0000968914-0000968916
PG0000968917-0000968933
PG0000968934-0000968964
PG0000968947-0000968962
PG0000968965-0000968979
PG0000968980-0000969025

PG0000969026-0000969036
PG0000969037-0000969042
PG0000969043-0000969045
PG0000969046-0000969090
PG0000969091-0000969100
PG0000969101-0000969118
PG0000969101-0000969118
PG0000969119-0000969164
PG0000969137
PG0000969158-0000969164
PG0000969165-0000969175
PG0000969221-0000969223
PG0000969224-0000969225
PG0000969226-0000969230
PG0000969229-0000969231
PG0000969232-0000969252
PG0000969238-0000969239
PG0000969249-0000969252
PG0000969743-0000969750
PG0000969751-0000969761
PG0000969762-0000969777
PG0000970292-0000970356
PG0000971480-0000971484
PG0000971542
PG0000971924
PG0000971926-0000971948
PG0000971948
PG0000971992
PG0000972018
PG0000974179
PG0000975424-0000975466
PG0000977423-0000977433
PG0000978140
PG0000978816
PG0000980240
PG0000980259
PG0000980271
PG0000980336-0000980358
PG0000980426-0000980432
PG0000982883-0000982898
PG0000984011-0000980414

CONFIDENTIAL

PG0000984414-0000984956
PG0000984668-0000984669
PG0000984909
PG0000984910
PG0000985307
PG0000985666-0000985669
PG0000985668-0000985669
PG0000986142
PG0000986195-0000986196
PG0000987395
PG0000988460-0000988670
PG0000988686
PG0000988687-0000988983
PG0000988984-0000989152
PG0000989153-0000989213
PG0000989214-0000989349
PG0000989350-0000989623
PG0000989624-0000989877
PG0000989878-0000989980
PG0000990232
PG0000990240-0000990241
PG0000990252
PG0000990255-0000990534
PG0000990535-0000990562
PG0000990563-0000990839
PG0000990840-00009990907
PG0000990987
PG0000991930
PG0002020767-0002020768
PGDOJ_NO9_00000000056
PGDOJ_NO9_00000000057
PGDOJ_NO9_00000000058
PGDOJ_NO9_00000000059
PGDOJ_NO9_00000000060
PGDOJ_NO9_00000000061
PGDOJ_NO9_00000000062

PGDOJ_NO9_00000000064
PGDOJ_NO9_00000000065
PGDOJ_NO9_00000000066
PGPD-PER-0146458-0146459
PGIAD000002956
PGIAD0000032967-32968
PGIAD0000032972-32974
PGIAD0000032990
PGIAD0000072294-72303
PGIAD0000072311
PGIAD0000099627-99643
PGIAD0000103604-103612
PGIAD0000127801-127802
PGIAD0000127806
PGIAD0000127812
PGIAD0000127816-127817
PGIAD0000127820-127822
PGIAD0000127822
PGIAD0000127824
PGIAD0000135380
PGPD-CHA-0000384-385
PGPD-CHA-0000389
PGPD-CHA-0000396
PGPD-CHA-0000944
PGPD-OAT-0000021-0000027
PGPD-PER-0067452
PGPD-PER-0069140
PGPD-PER-0069986
PGPD-PER-0069987
PGPD-PER-0098783
PGPD-PER-0122769-122770
PGPD-PER-0146458-0146459
PGPD-SMI-0000003-0000004
PGPD-SMI-0003951-0003952
PGPD-ZOL-0005594-95

CONFIDENTIAL