IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| HISPANIC NATIONAL LAW ENFORCEMENT ASSOCIATION NCR, et al.,    )<br>)<br>)<br>)<br>Plaintiffs,    )<br>)<br>v.    )<br>)<br>PRINCE GEORGE'S COUNTY, et al.,    )<br>)<br>Defendants.    )<br>) | Civil Action No. 8:18-cv-3821 |

**Rebuttal Report of Janet R. Thornton, Ph.D.**

## Table of Contents

I.      Background ............................................................................................................ 1

II.     Findings ................................................................................................................. 3

III.    Mr. Graham's Workforce Composition Comparison is Incorrect and Misleading .......... 10

IV.     Impact of Disciplinary Actions on Promotions is Limited and Does Not
Disproportionately Impact Black or Hispanic Officers ............................................... 15

V.     Impact of Disciplinary Actions on Terminations / Retirements Do Not Disproportionately
Impact Black or Hispanic Officers ...................................................................... 16

VI.     Mr. Graham Distorts the Use of Force Reviews and His Conclusions are Faulty............ 21

VII.    Mr. Graham's and Mr. Simon's Examination of IAPro Matters are Inappropriate and
Misleading.......................................................................................................... 36

   A.      Mr. Graham Mischaracterizes Matters and Fails to Provide Complete Information ..... 40

      1.      Plaintiffs Chambers and Smith (134.a): ...................................................... 40

      2.      Officer Beale (134.d):................................................................................ 43

      3.      Officers ██████████ and ██████████ (134.e):................................................ 44

   B.      Mr. Simon's Analyses Do Not Differentiate Matters ................................................ 45

VIII.   More Comprehensive Examination of Each Type of Matter Does Not Find a
Racial/Ethnic Pattern .......................................................................................... 51

   A.     Departmental Accidents (DA Matters) .................................................................. 52

   B.     Field Case Inquiries (FCIQ Matters)...................................................................... 55

   C.     Police Supervisor Investigations (PS Matters)......................................................... 57

   D.     Internal Affairs Inquiry (IAQ)............................................................................. 65

   E.     Internal Affairs Investigation (IA) ....................................................................... 67

   F.     SIRT Inquiry (SIQ) .......................................................................................... 71

   G.     SIRT Investigation (SI) ..................................................................................... 74

      1.      Police Officer ██████████ .......................................................................... 75

      2.      Corporal ██████████ ................................................................................ 81

      3.      Police Officer Eric Beale: SI Matters ......................................................... 86

      4.      POFC ██████████ .................................................................................... 88

IX.     Conclusions....................................................................................................... 96

CONFIDENTIAL

# List of Figures

Figure 1-Average and Median Number of Yearly Use of Force Reviews Per Officer ................ 23
Figure 2-Total Crime by District, 2016 Through August 2020 ................................... 26
Figure 3-Total Violent Crime by District, 2016 Through August 2020 ..................... 27
Figure 4-Total Property Crime by District, 2016 Through August 2020 ................... 28
Figure 5-Map of PGPD Districts Before Splitting District III ................................ 31
Figure 6-Map of PGPD Districts After District VIII ............................................ 32
Figure 7-Percentage Minority in PGC by Census Tract .......................................... 33
Figure 8-Percentage Black by Census Tract in PGC ............................................. 34
Figure 9-Percentage Below the Poverty Level by Census Tract in PGC ................... 35

CONFIDENTIAL

# List of Tables

Table 1—Racial/Ethnic Composition of New Hires by Year........................................................ 12
Table 2—Workforce Composition of Sworn Officers by Pay Grade............................................ 13
Table 3—Racial/Ethnic Composition of Executive Command Team by Year ............................ 14
Table 4—Analysis of Involuntary Terminations by Rank of Sworn Officers............................. 20
Table 5—Sectors within Each District ........................................................................................ 29
Table 6—Details of Officer Beale's Matter (SI2016-11) ............................................................ 43
Table 7—Action Taken by Offense Number................................................................................ 53
Table 8—Comparison of Action Taken Compared to Number of Offenses in 24 Months.......... 54
Table 9—Racial/Ethnic Composition of Allegations from FCIQ Matters Opened and Closed
Between 2016 and March 2020 .................................................................................................... 55
Table 10—Analysis of the Number of FCIQ Allegations by the Race of the Respondent
Compared to the Demographic Composition of the Workforce* ................................................. 56
Table 11—Distribution of PS Investigations by Type of Allegation .......................................... 60
Table 12—Number and Distribution by Race/Ethnicity of PS Investigations by Type of
Allegation..................................................................................................................................... 61
Table 13—Action Taken by Offense Number Among Sustained ................................................ 62
Table 14—Number by Race/Ethnicity of Sustained FTA Investigations by Discipline and
Number of Offenses in 24 Month Period..................................................................................... 63
Table 15—Racial/Ethnic Composition of Allegations from IAQ Matters Opened and Closed
Between 2016 and March 2020 .................................................................................................... 66
Table 16—Analysis of the Number of IAQ Allegations by the Race of the Respondent Compared
to the Demographic Composition of the Workforce*.................................................................. 66
Table 17—Racial/Ethnic Composition of the Allegations in IA Matters.................................... 69
Table 18—Racial/Ethnic Composition of SIQ Matters Opened and Closed Between 2016 and
March 2020 ................................................................................................................................... 72
Table 19—Analysis of the Number of SIQ Allegations by the Race of the Respondent Compared
to the Demographic Composition of the Workforce*.................................................................. 72
Table 20—SI Matters for PO ████████ ................................................................................. 78
Table 21—SI Matters for Corp ████████ .............................................................................. 82
Table 22—SI Matters for PO Eric Beale ..................................................................................... 87
Table 23—SI Matters for POFC ████████ ........................................................................... 89
Table 24—Distribution of SI Investigations by Type of Allegation ........................................... 91
Table 25—Racial/Ethnic Composition of SI Matters Open and Closed ..................................... 92
Table 26—Description of SI Types of Allegations From Summary of Directives ...................... 94

CONFIDENTIAL

### Glossary of Terms

**Administrative Hearing Board (AHB):**   An administrative body that conducts hearings concerning charges that have been sustained against sworn employees, determines findings of fact, and makes recommendations of discipline to the Chief of Police.

**Citizen Complaint Oversight Panel (CCOP):**   A board of citizens that reviews internal investigations (excluding Departmental Accidents) and submits comments and recommendations to the Chief of Police.

**CBA**:  Collective Bargaining Agreement

**Complainant**:  Citizen, Officer, or other jurisdiction who prompts an inquiry or investigation

**Complaint:**  A statement or communication alleging misconduct by an employee.  Complaint sources are either:

> **External:**  Initiated by individuals not affiliated with the Department.
> **Internal:**  Initiated within the Department which include those that are Self-Reported

**DAR**:  Disciplinary Action Recommendation

**Field Investigation:**  Complaints forwarded by the Commander, IAD, to a District or Division Commander for investigation

**Forms of Separation**:

> **Termination:**  An officer is involuntarily terminated from the Department for reason such as unsatisfactory performance, insubordination, false statement.
> **Resignation:**  An officer voluntarily resigns from the Department for reasons such as relocation or job opportunity.
> **Retirement:**  An officer retires from the Department under the terms of the pension plan.

**Internal Affairs Division (IAD):** Consists of IAD, Administrative Investigations Section (AIS) and the Special Investigative Response Team (SIRT)

> **IAD:** Conducts or monitors internal investigations and has authority and control over all complaints regarding the conduct of employees
> **AIS:** Responsible for quality assurance of all Department operations, inspects organizational components, and gathers intelligence as assigned by the Commander, AIS
> **SIRT:** Investigates all intentional discharges of firearms by Prince George's County Police Department (PGPD), Prince George's County Fire Department (PGFD), and Prince George's County Department of Corrections (PGDOC) officers; accidental discharges of firearms; in custody deaths; serious use of force incidents; and certain criminal cases. SIRT also monitors all canine apprehensions and destruction of animal cases caused by the discharge of a firearm

**Investigative Findings:** All investigative conclusions shall be reported in one of the following classifications:

CONFIDENTIAL

**Exonerated:** The investigation found the alleged acts did occur, but they were justified, lawful, and proper

**Non-sustained:** The investigation did not discover sufficient evidence to prove or disprove the allegations

**Sustained:** The investigation found sufficient evidence to prove the allegations

**Unfounded:** The investigation found the alleged acts did not occur or did not involve Departmental employees

**Law Enforcement Officers' Bill of Rights (LEOBR):** Maryland Law that provides certain rights to law enforcement officers who are facing internal investigation.

**Matter/Case:** An IAD inquiry or investigation results in an IA number. Each IA number may have more than one allegation.

**MPTC**: Maryland Police and Correctional Training Commissions

**NPA:** Notice of Personnel Action

**PGPD:** Prince George's Police Department

**POFC:** Police Officer First Class

**Respondent:** An employee who is the subject of an internal investigation or inquiry.

**ROI**: Report of Investigation

**Types of Matters**:

> **DA:** Departmental Accidents
> **FCIQ:** Field Case Inquiry
> **IA:** Internal Affairs Investigation
> **IAQ:** Internal Affairs Inquiry
> **PS:** Police Supervisor Investigation
> **SI:** Special Investigation Response Team (SIRT) Investigation
> **SIQ:** Special Investigation Response Team Inquiry

v

CONFIDENTIAL

## I.     Background

1.      I am a Managing Director at Berkeley Research Group (BRG), a consulting firm specializing in the application of economic, econometric, and statistical analysis for litigation, regulatory compliance, and risk assessment matters.  BRG experts have analyzed data for matters involving firms in many sectors, government entities, as well as institutions of higher education and research.  My fields of special interest include computer analysis of large databases, applied econometrics and statistical analysis.

2.      I received doctoral and master's degrees in economics from The Florida State University, and a bachelor's degree from the University of Central Florida in economics and political science.  I am a member of the American Economic Association and the National Association of Forensic Economics.

3.      Prior to my employment at BRG, I was employed at ERS Group for nearly 30 years and held the title of Managing Director.  Over the past 35 years, I have prepared analyses for both plaintiffs and defendants, as well as for risk assessment.  In the field of labor economics, I have performed research and analyzed data in matters involving allegations of gender, race, ethnicity, religious, and age discrimination in a variety of employment practices including selection, discipline, termination, and compensation, and have prepared analyses regarding Fair Labor Standards Act compliance.  I have also studied borrower characteristics as they relate to the ability to obtain credit and their effect on the terms of credit transactions.

4.      I have designed legally defensible sampling/survey methodologies and served as an expert witness to critique the validity of samples prepared by others including use of margins of error, sample size, and stratification methods.  I have also prepared numerous estimates of economic damages.

CONFIDENTIAL

5.      I have extensive experience working with the decennial Census data to address issues raised in credit, insurance, housing, voting/election, and employment discrimination matters.  My knowledge of Census data has resulted in expert testimony regarding the strengths and weaknesses of these data.

6.      I have provided expert testimony in arbitration hearings and before federal and state courts and regulatory agencies.  No court has rejected me as an expert qualified to testify in my fields.

7.      I have been an adjunct professor of quantitative methods and statistics at The Florida State University and am a presenter at seminars on the topics of statistical techniques, data and modeling, compensation analysis, and calculating damages.  I have published articles in the *Journal of Legal Economics* and the *Journal of Forensic Economics*, and co-authored a chapter in the anthology *Developments in Litigation Economics*, which discusses equal business opportunity programs, among other topics.

8.      I have been retained by Counsel for Prince George's County to provide expert testimony in the above captioned matter.  I manage a team of professionals who have assisted me with this matter and worked under my direction and supervision.  All work was vetted and verified by me and my team.  My time is billed at the rate of $505 per hour for this matter.  My updated curriculum vitae and list of testimony in the past four years are contained in Appendix A.

9.      Appendix B lists the materials that I relied upon in preparation of this report.  I also relied upon information from public sources as referenced throughout this report.[1]

---

[1] If additional information is obtained that is relevant to this report, it may need to be modified or supplemented.

**CONFIDENTIAL**

## II.    Findings

10.    Counsel for Prince George's County in the above captioned matter asked BRG to review the reports of Plaintiffs' Experts, Mr. Michael E. Graham and Mr. Marc Simon,[2] to determine if their assertions regarding Prince George's County's Police Department (hereafter "PGPD") are accurate and reliable with respect to the workforce composition, discipline, and terminations of its sworn officers.

11.    It is my understanding that the Amended Complaint in this matter alleges that "Defendants have engaged in or perpetuated a long-standing pattern and practice of discrimination against Officers of Color on the basis of color and race," by "maintaining and allowing a hostile work environment," "engaging in a pattern of retaliatory actions against Officers of Color who complain about or otherwise oppose racially hostile acts or other misconduct by White police officers," "maintaining centralized disciplinary policies and procedures that disparately treat Officers of Color by facilitating the imposition of unfounded, unwarranted, and overly severe and disparate penalties," and "intentionally discriminating against Officers of Color through disparate treatment of these officers through denial of promotions and other employment opportunities."[3]

---

[2] Expert Report of Michael E. Graham, dated August 28, 2020 (hereafter, "Graham Report") and Expert Report of Marc Simon, CPA, CFE dated August, 25, 2020 (hereafter, "Simon Report").
[3] First Amended Complaint, dated May 28, 2019, pages 5-6.

CONFIDENTIAL

12.     Mr. Graham and Mr. Simon both provide misleading and inappropriate comparisons and analyses.  Mr. Graham cherry-picked examples and left out important pieces of information thereby misleading the Court.  Mr. Graham also failed to identify the Minority officers who were given the identical discipline as the white officers that he used as comparators.  Mr. Graham also mischaracterized the Use of Force Review data by merely counting the number of rows in a spreadsheet by officer.  After removing duplicates and considering the number of years for which officers had a Review, there is no pattern of higher Use of Force Reviews among white officers.  He also failed to consider the Districts with a higher concentration of Reviews and the possible reasons for the higher concentration.

13.     Both Mr. Graham and Mr. Simon's "analysis" of the Internal Affairs investigations and inquiries are also flawed and misleading for several reasons.  Mr. Graham and Mr. Simon simply compared the racial composition of the officer workforce without adjusting for rank to the number of Internal Affairs investigations and inquiries.  Additionally, Mr. Graham and Mr. Simon did not consider the severity of the complaint; thus, for example, comparing Domestic Abuse to killing a deer that was hit by a vehicle.  Instead, they totaled the number of allegations and compared the racial composition of the officers for whom there was an inquiry or investigation to the racial composition of the workforce.

14.     Furthermore, Mr. Simon did not consider factors influencing inquiries and investigations including but not limited to the source of the complaint (i.e., external complainant such as a victim or an arrested individual), if the incident was self-reported, prior offenses of the respondent officer, if there was video, audio, or other forms of evidence, and if the officer requested an Administrative Hearing Board.  Mr. Simon and Mr. Graham also did not analyze the

4

incidence of officers waiving their right to an administrative hearing board and thus accepting the discipline imposed.

15.     In summary, my review and analysis show that that there is *not a pattern* in which Officers of Color have consistently higher rates of discipline.  Instead, there is great variation with white officers having a greater proportion of allegations in some instances and in other instances a lower proportion.  A review of the case documents shows that the cases are not cookie-cutter and aggregating across different types with different case details is not appropriate.  Mr. Graham and Mr. Simon have failed to consider the process used by the Internal Affairs Division (IAD) to investigate allegations of PGPD police officers.  Their approaches aggregated statistics to distort the reality of the investigative and inquiry processes of IAD.  When a more appropriate review of the process is prepared, there is not a pattern of officers of color being disciplined at consistently higher rates.

16.     My key findings are as follows and are described more fully in the subsequent sections:

*Composition of PGPD:*

- Mr. Graham *in*appropriately compares the composition of the population to the Prince George's County's Police Department's workforce.  The population includes individuals who are 1) not in the workforce and 2) are not qualified, interested, and available to become sworn officers.  The job requirements for police officers at PGPD would remove individuals within the Prince George's County population from consideration.  Thus, Mr. Graham's comparison is incorrect and misleading and leads him to falsely conclude that minorities are underrepresented in the Department.

- An examination of the more recent hiring at PGPD, between 2015 through August 2020, shows that while the number of hires has declined, Minority representation among new hires has increased substantially from 50.77% in 2015 to 71.88% in 2019.  These statistics do not support the erroneous conclusions drawn by Mr. Graham regarding the PGPD's workforce.

5

**CONFIDENTIAL**

*Impact of Disciplinary Actions on Promotions*

- Contrary to Plaintiffs' assertions, disciplinary actions did not disproportionately impact the promotion of Minority officers; there is no pattern of racial or ethnic differences.

- The racial/ethnic breakdown of the 17 officers whose promotions were held in abeyance due to disciplinary actions from 2016-2019 finds that there is not a racial or ethnic difference.
  o None of the promotions held in abeyance were to Hispanic officers.
  o The 1 promotion to Sergeant held in abeyance was to a white officer.
  o Among the 9 promotions to Corporal held in abeyance, 1 (11.1%) was Asian, 4 (44.4%) were Black, and 4 (44.4%) were white.
  o Among the 7 promotions to Police Officer First Class held in abeyance, 4 were Black (57.1%) and 3 (42.9%) were white.
  o Only 5 of the 17 promotions held in abeyance were during Major Mills' tenure as IAD Commander; 1 of the 5 was a white Sergeant and among the 4 remaining, 50% were Black and 50% were white.

*Impact of Disciplinary Actions on Terminations, Resignations, Retirements*

- There are no statistically significant differences in the number of Minority, Black, or Hispanic terminations, resignations or retirements resulting from disciplinary actions in the period from 2016 to August 2020. Thus, based on my statistical analysis there is no pattern of differences by race/ethnicity regarding terminations, resignations or retirements based on disciplinary actions during the time period analyzed.

- The majority of the terminations reported by Mr. Graham and Mr. Simon are for cases prior to 2016.

*Use of Force Reviews*

- Mr. Graham's comparisons from the Use of Force Review data are faulty and unreliable as Mr. Graham has grossly inflated and made inappropriate comparisons from these data. As a consequence, he incorrectly concludes the "use of force data also shows significant racial disparities in the use of force against civilians."[4]

- It is important to note that Use of Force Review incidents are required to be self-reported and do not arise from citizen complaints and most incidents involve an arrest.

---

[4] Graham Report, page 85, paragraph 85.

CONFIDENTIAL

- Mr. Graham examined the Use of Force Review data in the aggregate (i.e., total numbers), without considering key factors such as the district of the incident and its crime rate/Minority population.  Use of Force Review incidents are concentrated in the Districts with higher crime rates and more calls for service; therefore, Districts should be considered when making Use of Force Review comparisons.  Mr. Graham does not make such a consideration and therefore his conclusion is misleading.

- The higher crime areas are those with a higher Minority representation; therefore, the citizens involved in the Use of Force Reviews in these areas are also expected to be a higher percentage Minority, regardless of the race of the officer.  Mr. Graham does not take this critical aspect into consideration when evaluating the Use of Force Review data, leading him to draw misleading conclusions.

- Officers average 2 Use of Force Reviews per year, regardless of race/ethnicity; thus, there is not a pattern of white officers having more Use of Force Reviews.

*A More Comprehensive Review of Internal Affairs Investigations and Inquiries*

- Mr. Graham and Mr. Simon failed to distinguish the types of matters and neither accounted for key factors such as if the incident was self-reported, there was evidence, or the officer accepted the discipline.  They also did not analyze if the complainant was internal (PGPD) or external, or the racial/ethnic composition of the complainant.  Thus, the conclusions reported by Mr. Graham and Mr. Simon are incorrect.

- There are 7 types of inquiries and investigations for which Mr. Graham and Mr. Simon were provided data:
  - Departmental Accidents (DA) resulting from a PGPD vehicle
  - Field Case Inquiry (FCIQ) which are inquiries undertaken in the field
  - Police Supervisor Investigations (PS) which are investigations undertaken in the field by the supervisor
  - Internal Affairs Inquiry (IAQ) which are inquiries undertaken by Internal Affairs
  - Internal Affairs Investigation (IA) which are investigations undertaken by Internal Affairs
  - Special Investigative Response Team Inquiry (SIQ) which are inquiries undertaken by SIRT
  - Special Investigative Response Team Investigations (SI) which are investigations undertaken by SIRT

- A large portion of the inquiries and investigations are from external citizen complaints which are required to be investigated.

- When the race of the external complainant is known, the majority are Black.

7

**CONFIDENTIAL**

<u>Departmental Accidents</u>:
- Among departmental accident (DA) investigations, the discipline imposed is consistent with the respondent's number of offenses within a 24 month period. PGPD did not deviate from the matrix in the Collective Bargaining Agreement (CBA).[5]

<u>FCIQ Inquiries</u>:
- Regarding FCIQ inquiries, there are no statistically significant differences in the number of inquiries involving Black, Asian, and white respondents. Among FCIQ inquiries involving Hispanic respondents, there are *fewer* Protocol inquiries than predicted and this outcome is statistically significant. Thus, there is no pattern of differences by race/ethnicity regarding the incidence of FCIQ inquiries.

<u>IAQ and SIQ Inquiries</u>:
- For IAQ and SIQ inquiries, there are no statistically significant differences in the number of inquiries involving Black, Hispanic, Asian and white respondents. Thus, there is no pattern of differences by race/ethnicity regarding the incidence of IAQ and SIQ inquiries.

- Contrary to Mr. Graham's claims, white officers were not investigated through an SIQ inquiry rather than through an investigation at a higher rate. The higher incidence of an SIQ inquiry for white officers is due to the Discharge of Firearms related to the shooting of animals resulting from a vehicle accident.

<u>PS Investigations</u>:
- Most PS investigations resulted from the Failure to Appear in Court and the discipline received was consistent with the respondent's FTA offense number. PGPD did not deviate from the Failure to Appear discipline matrix in the CBA.

- The remaining (non-FTA) PS investigations were primarily Procedural Violations in which the discipline received was not appealed by the officers.

- While the discipline varies by the circumstances of each allegation, the most common discipline among officers with a Sustained finding was Written Reprimand among the PS investigations.

- Among the PS investigations, nearly all of the officers waived their right to a hearing, thereby accepting the finding and the discipline.

---

[5] Collective Bargaining Agreement between Prince George's County and Fraternal Order of Police, Prince George's County Lodge 89, Inc., July 1, 2018 – June 30, 2020.

8

CONFIDENTIAL

IA Investigations:
- White officers were investigated at a higher rate among the IA investigations which is contrary to the assertion that they were more likely to be investigated through an inquiry.

- While the discipline varies by the circumstances of each allegation, the most common discipline among officers with an IA Sustained finding was a Written Reprimand.

- Among the IA investigations, nearly all the officers waived their right to a hearing, thereby accepting the Sustained finding and the resulting discipline. Thus, these officers did not ask for a hearing to dispute the finding.

SI Investigations:
- The number of SI allegations by race/ethnicity are greatly impacted by officers with a few cases that resulted in numerous allegations. For example, Black Officer ▇▇▇▇▇▇ had 33 allegations from one matter, of which 22 were Sustained under the current IAD Commander, Major McCreary.

- I found that 34% of the SI allegations that I examined from 2016 through March 2020 were from 21 SI matters. These 21 accounted for 179 allegations, 33 of which are those of Officer ▇▇▇.

- Four officers account for nearly 40% of the Sustained SI investigations. These four officers had 74 Sustained allegations from 188 SI cases.

- Among the SI investigations, the majority of the officers waived their right to a hearing, thereby accepting the Sustained finding and the resulting discipline. Thus, these officers did not ask for a hearing to dispute the finding.

17.     In summary, my review and analyses find that Mr. Graham and Mr. Simon have failed to consider the process used by IAD to investigate allegations against PGPD police officers. Their approaches aggregated statistics to distort the reality of the decisions by IAD, and the decisions of the respondent officers in accepting the finding and discipline. When more appropriate comparisons are made, and the details of the data are considered, I find that there is *not a pattern* of consistent, disproportionate disciplinary actions against Black, Hispanic, or other Officers of Color.

CONFIDENTIAL

### III.   Mr. Graham's Workforce Composition Comparison is Incorrect and Misleading

18.   Mr. Graham compares the racial and ethnic composition of the Prince George's County (hereafter "PGC") population to the composition of the PGPD and concludes that minorities are underrepresented in the Department.  This comparison is improper, however, as the PGC population includes individuals who are 1) not in the workforce and 2) are not qualified, interested, and available to become sworn officers.  Inclusion of people who could not be considered for hire inflates Mr. Graham's benchmark for estimating Minority representation at PGPD.

19.   The qualifications listed in a current PGPD job bulletin[6] for police officers illustrates that individuals within the general PGC population would necessarily be removed from consideration for hire.

Minimum Qualifications:
- U.S. Citizen
- High School graduate (60+ college credit hours preferred)
- 21 years old at time of graduation from the Police Academy (20 years and 6 months old at time of application)
- Possess a valid driver's license and at least 6 months driving experience
- Pass all of the additional qualification factors listed

20.   To be considered for the class, the applicants must complete the following steps:

1) Submit an online application
2) Preliminary Application and Applicant History Review
3) Download and complete the Doctor's Waiver to participate in the Applicant Physical Requirement Test (APRT)
4) Self-schedule (online) and pass the APRT (must pass APRT in order to take the Written Examination)
5) Pass the Written Examination
6) Preliminary Documents and Records Check

---

[6] https://www.governmentjobs.com/careers/pgc/jobs/2794890/police-officer-50-po1-2101

CONFIDENTIAL

21.    The job bulletin states that if sufficient vacancies exist, applicants would be contacted to continue into the Background Investigation process which includes the following:

1) Download, complete and submit the Personal History Statement (PHS)
2) Participate in Background Investigation & PHS Orientation
3) Initial Interview
4) Background Investigation
5) Oral Board
6) Polygraph Examination
7) Psychological Screening
8) Pass the APRT again
9) Medical Examination & Drug Screening Test
10) Hiring Consideration
11) Final Offer of Employment
12) Graduation from the Prince George's County Police Academy

22.    Serious applicants are encouraged to complete the APRT waiver, obtain a copy of their credit report, and obtain a certified copy of their driving record before applying.  Male applicants are also required to register with Selective Service.

23.    The general population of PGC includes individuals who are not citizens, are under the age of 21, and/or do not meet the minimum requirements.  These individuals, however, were included in Mr. Graham's comparison statistics.  In addition, the PGC population used by Mr. Graham includes individuals with poor driving records, suspended licenses, DWI/DUI violations, poor credit history, history of criminal activity, or physical limitations; again, groups who would not be qualified as PGPD sworn officers.  Consequently, Mr. Graham's review of the workforce composition is flawed and uninformative because it is based on an unreliable measure of the "expected" percentage of Minority representation at PGPD.

24.    Mr. Graham's use of the "population" also does not reflect the group of individuals who are interested and available to become PGPD sworn officers.  As Chief Velez testified, "When

11

we have our academy class that comes through, we try to make it as diverse as possible.  But we have so little people that are applying to be police officers."[7]

25.     An examination of the more recent hiring at PGPD, between 2015 through August 2020, shows an increasing Minority representation among new hires.  Consistent with Chief Velez's testimony, the number of hires has declined since 2015.[8]  However, compared to 2015, the percentage Minority has increased substantially from 50.77% in 2015 to 71.88% in 2019.

| Table 1—Racial/Ethnic Composition of New Hires by Year | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hire Year | Number of Hires | Number with Race/ Ethnicity Known | Percentage Minority | Percentage White | Percentage Black | Percentage Hispanic/ Latino | Percentage Asian |
| 2015 | 65 | 65 | 50.77% | 49.23% | 44.62% | 6.15% | 0.00% |
| 2016 | 91 | 90 | 55.56% | 44.44% | 45.56% | 10.00% | 0.00% |
| 2017 | 82 | 82 | 71.95% | 28.05% | 48.78% | 18.29% | 4.88% |
| 2018 | 38 | 38 | 68.42% | 31.58% | 39.47% | 23.68% | 5.26% |
| 2019 | 32 | 32 | 71.88% | 28.13% | 43.75% | 25.00% | 3.13% |
| 2020 | 13 | 13 | 61.54% | 38.46% | 30.77% | 23.08% | 7.69% |

*Source:  Copy of Roster Retirements Separations 10419 1004 am updated 9120 raj.xlsx*

26.     With respect to the overall workforce composition, Mr. Graham focuses in part on the movement of officers.  However, workforce composition is greatly influenced by the hiring of available, qualified and interested individuals historically.  Regarding the upward movement of officers, Mr. Graham fails to consider the choices of officers.  As Chief Velez testified,[9] the ranks of Sergeant, Lieutenant and Captain result from competitive exams, which officers must register for and pass.  Promotions are based on the ranking of the numeric test scores (i.e., highest to lowest

[7] Deposition of Hector Velez, July 15, 2020, page 107, lines 21-25.
[8] The number of hires includes those who were hired by PGPD during this time period, some of whom are Student Officers reflecting those who were hired to become sworn officers after graduating from the Academy.
[9] Deposition of Hector Velez, July 15, 2020, page 108, line 22 – page 109, line 9.

CONFIDENTIAL

score) which is independent of race/ethnicity; it is based on how well one performs on the test after choosing to register and sit for the exam.

27.    The following table compares the percentage Minority among sworn officers as of January 2016 to January 2020.  It reflects the growing percentage Minority among new hires, resulting in increasing Minority representation overall as well as within the Corporal, Sergeant, and Captain ranks.  As one can see from the table, the rank of Major has a higher Minority representation than both Lieutenant and Captain, which is based on demand, interest and score results.

| | | January 2016 | | January 2020 | |
|---|---|---|---|---|---|
| **Pay Grade** | **Rank** | **Known Race** | **Percent Minority** | **Known Race** | **Percent Minority** |
| L01 | Police Officer | 283 | 56.9% | 147 | 68.0% |
| L02 | Police Officer First Class | 255 | 63.5% | 169 | 60.9% |
| L03 | Police Corporal | 767 | 56.7% | 865 | 59.9% |
| L04 | Police Sergeant | 193 | 44.6% | 204 | 49.5% |
| L05 | Police Lieutenant | 77 | 39.0% | 93 | 36.6% |
| L06 | Police Captain | 29 | 13.8% | 33 | 18.2% |
| L07 | Police Major | 22 | 54.5% | 26 | 50.0% |

**Table 2—Workforce Composition of Sworn Officers by Pay Grade**

*Source:  Copy of Roster Retirements Separations 10419 1004 am updated 9120 raj.xlsx* and *Copy of Roster Retirements Separations 10419 1004 am updated 92220 raj pz.xlsx.*
*Note: Student Officers were removed from the counts to reflect Sworn Officers.*

28.    The Executive Command Team, which includes the Chief, Assistant Chief, Deputy Chief Patrol, Deputy Chief Bureau of Investigation (BOI), Deputy Chief Bureau of Forensic Science and Intelligence (BOFSI), and Deputy Chief Bureau of Administration and Homeland Security (BOAHS) is reflective of the workforce composition of sworn officers, with at least 60% of the members in a given year being Minority.[10]   All terminations and demotions of rank are

---

[10] See Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 34; Deposition of James McCreary, June 15, 2020, page 37, lines 20-24.

CONFIDENTIAL

reviewed and voted on by the Executive Command Team.  In 2017 and 2018 all but one of the
Executive Command Team was Minority.

| As of January of Each Year | Total Number | Percentage Minority | Percentage White | Percentage Black | Percentage Hispanic/ Latino | Percentage Asian |
|---|---|---|---|---|---|---|
| 2016 | 3 | 66.7% | 33.3% | 33.3% | 33.3% | 0.0% |
| 2017 | 5 | 80.0% | 20.0% | 40.0% | 20.0% | 20.0% |
| 2018 | 5 | 80.0% | 20.0% | 40.0% | 20.0% | 20.0% |
| 2019 | 5 | 60.0% | 40.0% | 40.0% | 20.0% | 0.0% |
| 2020 | 5 | 60.0% | 40.0% | 40.0% | 20.0% | 0.0% |

**Table 3—Racial/Ethnic Composition of Executive Command Team by Year**

Source:  Copy of Roster Retirements Separations 10419 1004 am updated 9120 raj.xlsx and Copy of Roster Retirements Separations 10419 1004 am updated 92220 raj pz.xlsx.

29.     This section illustrates the faulty assumption by Mr. Graham that the PGPD should
reflect the racial/ethnic composition of the county's population.  While this may be the ideal
situation, as Chief Velez testified,[11] the entirety of the population of PGC is not qualified,
interested, or available to become sworn officers.  The Department has increased its Minority
representation from 2016 to 2019.  Further, for the rank of Sergeant, Lieutenant, and Captain, just
as with becoming a sworn officer, the officer must register for and pass a test.  In addition, there
needs to be demand for these positions, factors that were not considered by Mr. Graham when he
used the population of PGC for his comparisons.

---

[11] Deposition of Hector Velez, July 15, 2020, page 104, lines 11-20.

CONFIDENTIAL

IV.    **Impact of Disciplinary Actions on Promotions is Limited and Does Not Disproportionately Impact Black or Hispanic Officers**

30.    Plaintiffs assert that disciplinary actions prohibit Black and Hispanic officers from being promoted.  Most of the disciplinary actions involve the ranks of Police Officer and Police Officer First Class, and not the Sergeant, Lieutenant or Captain ranks.

31.    I was provided data identifying officers whose promotions were held in abeyance resulting from disciplinary actions.  For the period from 2016 through 2019, there are a total of 17 promotions held in abeyance, 7 of which are promotions from Police Officer to Police Officer First Class; 9 are promotions from Police Officer First Class to Corporal; and 1 is a promotion from Corporal to Sergeant.

32.    Most of the 17 promotions were not suspended during Major Mills' tenure as IAD Commander.  Two of the 17 (12%) were suspended prior to August 21, 2016 and 10 (59%) were suspended after May 25, 2019.  Consequently, 71% of the promotions held in abeyance during this time period occurred during Major Grant's or Major McCreary's tenure as IAD Commander.

33.    The only promotion from Corporal to Sergeant that was held in abeyance during Major Mills' tenure as IAD commander was that of a white Corporal.  Among the 9 promotions to Corporal held in abeyance, 1 (11.1%) was Asian, 4 (44.4%) were Black, and 4 (44.4%) were white Police Officers First Class.  Finally, among the 7 promotions to Police Officer First Class held in abeyance, 4 were Black (57.1%) and 3 (42.9%) were white Police Officers.  Among the promotions to either Corporal or Police Officer First Class during Major Mills' IAD command, 50% were Black and 50% were white officers.

34.    These statistics do not reflect a pattern of disciplinary actions resulting in a disproportionate number of promotions being held in abeyance impacting Black or Hispanic

15

officers.  None of the promotions held in abeyance during this time period were among Hispanic officers.

## V.   Impact of Disciplinary Actions on Terminations / Retirements Do Not Disproportionately Impact Black or Hispanic Officers

35.     Plaintiffs assert that disciplinary actions result in a disproportionate number of Black and Hispanic officer terminations.  Further, Plaintiffs assert that white officers were able to retire to avoid disciplinary action, while Black and Hispanic officers were terminated.  In order to assess these allegations, I compared the racial/ethnic composition of the terminations to the composition of the workforce each year by the rank of the officer at the time of the termination.

36.     To perform these analyses, I used the information regarding employment separations that PGPD reported to the Maryland Police and Correctional Training Commissions (MPCTC) focusing on the period from 2016 through 2019.  The information identifies the condition of the separation such as "Administrative investigation or charge" and the type of separation (i.e., Resignation, Retirement, Termination).[12]  Officers who are facing discipline may choose to resign or retire in lieu of termination (i.e., Resignation with the condition of Administrative investigation or Charge).  Officers who were convicted of a felony or misdemeanor and terminated are also delineated.  I examined the racial composition of the resignations, retirements, and terminations of officers identifying those who were separated with an "Administrative investigation or charge" and those who were convicted of a felony or misdemeanor and reported to MPCTC for the period 2016 through 2019.

---

[12] See Letter from Courtney A. Sullivan of Venable to Kunti D. Salazar of the Department of Justice, dated December 20, 2019.

CONFIDENTIAL

37.     I then compared the racial composition of the terminations and retirements resulting from an Administrative investigation/felony charge to the racial/ethnic composition of the workforce at the beginning of the year of the separation by the rank of the officer.

38.     I calculated the difference between the actual number of Black/Hispanic separations to the number predicted based on their respective composition in the workforce in the year and rank of the separation.  For example, if 50% of those in the Police Officer rank are Black then statistically we would expect 50% to be Black among the separations.  I then determined the number of standard deviations associated with the difference between the actual and predicted number of Black/Hispanic separations by type and condition of separation.

39.     Generally, social scientists and the courts conclude that differences between two groups (e.g., Black and white) are statistically similar when the difference, in terms of the number of standard deviations, is less than approximately two (or three) standard deviations.[13]   A difference that is less than two (or three) standard deviations is consistent with a greater than 5% (or 1%) probability of that difference occurring by chance.  When the differences are smaller than two (or three) standard deviations, then they are typically considered to be "statistically insignificant."  Conversely, social scientists and the courts typically conclude that differences are statistically dissimilar when the number of standard deviations of the difference is greater than approximately two (or three) standard deviations [or the probability of chance occurrence is less

---

[13] Social scientists and statisticians have used criteria of less than 5% or less than 1% probability of occurring by chance ("greater than two or three standard deviations") to categorize a result as "statistically significant" for over 75 years.  See, for example, Statistics by Freedman, Pisani, and Purves.  Courts adopted this standard in voting rights cases (e.g., Castaneda v. Partida) and carried the standard over to equal employment issues in such cases as Hazelwood School District v. U.S., 433 U.S. 299, 308 n.14 (1977) and Teamsters v. U.S., 431 U.S. 324; 97 S. Ct. 1843 (1977). See also EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633 (4th Cir. 1983), where the Court indicated that only a difference greater than 3 standard deviations confirms an inference of adverse disparity.

CONFIDENTIAL

than or equal to 5% (or 1%)].  When the differences are as large as two (or three) standard deviations or larger they are considered to be "statistically significant."[14]

40.      As shown at Appendix C, Table 1, there are no statistically significant differences in the number of Minority, Black, or Hispanic terminations, resignations or retirements resulting from "Administrative investigation or charge" or "Felony or misdemeanor conviction."[15]  This outcome indicates that Plaintiffs' allegations that Black and Hispanic officers were terminated at a higher rate due to disciplinary actions is statistically inaccurate.  In addition, of these separations, 30% did not occur during Major Mills' tenure as IAD Commander.  Again, focusing on the separations during Major Mills' tenure, there are no statistically significant differences in the number of Minority, Black, or Hispanic separations resulting from "Administrative investigation or charge" or "Felony or misdemeanor conviction" among terminations, resignations, or retirements.

41.      I also examined the separations from 2016 through August 2020 based on personnel rosters to determine if there was a difference by the race/ethnicity of the officers.  I compared the demographic composition of the separations by year and rank of the officer.  I included those with "termination" and not "resignation" in the description as well as the resignations with a reason of "Resn-Note/Prejudice."[16]  I determined that among the terminations, the officers had 16 or fewer years of service and, consequently, it is possible that they did not meet the retirement guidelines.[17]

---

[14] Statistical significance cannot provide a cause for a difference as there may be other factors that explain the difference.  Ramona L. Paetzold and Steven L. Willborn (2016).  The Statistics of Discrimination, Using Statistical Evidence in Discrimination Cases.  Thomson Reuters, pages 70-72.

[15] Appendix C, Table 1 provides the results of the analyses summarizing across years, Appendix C, Table 2 provides the results by year, Appendix C, Table 3 summarizes the result across years during the period Major Mills was IAD Commander, and Appendix C, Table 4 provides the results by year during Major Mills' tenure as IAD Commander.

[16] PGDOJ_NO1_0000000089:  Separation recorded as resignation with written notice accepted with prejudice due to investigation or charge.

[17] "Normal Retirement Date means the first day of the month coinciding with or immediately following the earlier of the date on which a Participant has attained age 55 or the date on which he has completed 20 years of Actual Service, provided that service of a Participant prior to July 1, 1990, which is transferred to the Plan pursuant to Article

CONFIDENTIAL

42.     The table below reports the results of my analysis by rank of officer comparing the predicted race/ethnic composition of the terminations, based on the workforce composition of the percentage Minority, Black, and Hispanic at the beginning of each year, to the actual number of terminations by race/ethnicity.   I then summarized the results by year as reported below.   The demographic composition percentage is the percentage Minority, Black and Hispanic at each snapshot for the rank that is weighted by the number of terminations in the year.  I prepared the analyses by rank comparing Black and Hispanic officers to all other officers and then to white officers.   Again, I found that there were no statistically significant differences in the number of terminations among Minority, Black, or Hispanic officers compared to all other officers or to white officers during this time period.  Appendix C, Table 5 contains the results by rank and year which also reports the same conclusion of no statistically significant differences by rank/year.

---

73B, Section 32 or Section 32B of the Maryland Annotated Code, or which could have been so transferred but for the fact it is already included under a "Purchased Service" rule of Section 3.1, shall be considered as Actual Service for the purpose of determining his/her Normal Retirement Date." See The Prince George's County Police Pension Plan Document, July 1, 2002, page 8, available at:
https://www.princegeorgescountymd.gov/DocumentCenter/View/2662/Police-Pension-Plan-established-May-1-1962-PDF.

CONFIDENTIAL

| Rank | Percentage in the Demographic Group in Rank* | Number Terminated | Number in the Demographic Group Terminated (e.g. Minority) | Predicted Number in Demographic Group Terminated | Difference Between Actual and Predicted Number | Number of Standard Deviations |
|---|---|---|---|---|---|---|
| **Table 4—Analysis of Involuntary Terminations by Rank of Sworn Officers Summarized Across Years 2016 – August 2020** | | | | | | |
| *Minority (Demographic Group of Interest) Compared to White* | | | | | | |
| Police Officer | 60.97% | 11 | 7 | 6.71 | 0.29 | 0.00 |
| POFC | 58.81% | 6 | 6 | 3.53 | 2.47 | 1.64 |
| Police Corporal | 58.29% | 6 | 5 | 3.50 | 1.50 | 0.83 |
| *Black (Demographic Group of Interest) Compared to Others* | | | | | | |
| Police Officer | 46.64% | 11 | 6 | 5.13 | 0.87 | 0.22 |
| POFC | 41.37% | 6 | 5 | 2.48 | 2.52 | 1.68 |
| Police Corporal | 44.85% | 6 | 5 | 2.69 | 2.31 | 1.49 |
| *Hispanic/Latino (Demographic Group of Interest) Compared to Others* | | | | | | |
| Police Officer | 11.14% | 11 | 1 | 1.23 | -0.23 | 0.00 |
| POFC | 11.31% | 6 | 1 | 0.68 | 0.32 | 0.00 |
| Police Corporal | 9.46% | 6 | 0 | 0.57 | -0.57 | -0.09 |
| *Black (Demographic Group of Interest) Compared to White* | | | | | | |
| Police Officer | 53.99% | 10 | 6 | 5.40 | 0.60 | 0.06 |
| POFC | 50.26% | 5 | 5 | 2.51 | 2.49 | 1.78 |
| Police Corporal | 51.82% | 6 | 5 | 3.11 | 1.89 | 1.14 |
| *Hispanic/Latino (Demographic Group of Interest) Compared to White* | | | | | | |
| Police Officer | 23.06% | 5 | 1 | 1.15 | -0.15 | 0.00 |
| POFC | 21.91% | 1 | 1 | 0.22 | 0.78 | 0.68 |
| Police Corporal | 18.61% | 1 | 0 | 0.19 | -0.19 | 0.00 |

*Benchmark for comparison is the percentage in each demographic group (e.g., percentage Minority) at the beginning of the year in the rank from which the termination occurred based on the snapshot data. The percentage in the chart is the percentage weighted by the number of terminations each year. Student Officers are excluded from the analysis.

43.     In conclusion, contrary to Plaintiffs' assertions, there are *no* statistically significant differences by race or ethnicity in the number of terminations, resignations, or terminations resulting from disciplinary actions. These findings are also contrary to those reported by Mr. Simon.

CONFIDENTIAL

**VI.    Mr. Graham Distorts the Use of Force Reviews and His Conclusions are Faulty**

44.    Mr. Graham asserts that white officers have a preponderance of the Use of Force Reviews in the Use of Force Review database.  However, Mr. Graham mischaracterizes the data and does not consider the geographic make-up of PGC and the differences in the crime rate within the county.

45.    First, Mr. Graham is misleading in his characterization of the Use of Force Review data.  PGPD provided data containing Use of Force Review entries by officers for the period 2016 through 2019.  The data lists the Use of Force Review IA Number, the identification of the officer, his/her district and supervisor, as well as a description of the event.  In addition, the entry includes a description of the citizen involved in the incident.  For a given IA Number there can be more than one officer and more than one citizen involved.  According to Major McCreary, current IAD Commander, and Ms. Linda Washington, Statistician of IAD, the information does not always reflect which officer was truly involved with which citizen.  To determine the officers and citizens who interacted would require a review of the actual files.[18]

46.    Moreover, a review of the data shows that an officer will be listed multiple times for a given IA Number if there is more than one citizen involved.  Consequently, the numbers are further inflated by multiple entries for a given officer and IA Number related to the use of force. While there are 6,805 entries in the Use of Force Review data produced by PGPD, there are 2,651 unique IA Numbers and 5,768 unique IA Number/officer entries, which illustrates the multiple officers/citizens associated with an IA Number.  Consequently, Mr. Graham's assessment of the Use of Force Review data is faulty.  In some instances, he is counting an officer and a citizen multiple times for the same incident.

---

[18] Phone call with Major McCreary and Ms. Washington regarding the Use of Force data, September 8, 2020.

CONFIDENTIAL

47.      At Exhibit C of his report Mr. Graham's lists 61 officers with 20 or more incidents based solely on counting the number of rows in the data.  To arrive at the 61 officers, he counted the same officer multiple times for the same IA Number.  Among the officers included in the Use of Force Review data, there are 1,131 officers with at least 1 Use of Force Review.  Among the 1,131 officers there are 37 with 20 or more Use of Force Review entries, a limited number, after removing the multiple entries for an officer and IA Number.  There were three officers with the highest number (39), one of whom was Black (Cedric Heyward) and two white (Troy Sumner and Grant Galing).

48.      In addition, Mr. Graham fails to quantify that for 59% of the Use of Force Reviews (i.e., IA Numbers) in which a white officer is listed, the Review also included a Black, Hispanic, or Asian officer; 55% of Reviews involving a white officer also involved a Black and/or Hispanic officer.  Thus, there was substantial diversity in the Reviews involving a white officer, a fact that is ignored by Mr. Graham.  Among those officers with at least 20 incidents, all had some portion of their Reviews that included another officer of a different race/ethnicity.  For example, both Officer Sumner and Officer Galing had 39 unique Reviews of which 44% involved another officer whose race/ethnicity was not white.

49.      Mr. Graham also fails to consider the number of years in which an officer appears in the Use of Force Review data.  Some officers have a Use of Force Review in one year while other officers have Reviews in all four years.  Mr. Graham fails to weight the number of Reviews by the years an officer appears.  When the number of unique officer/IA Number Reviews is adjusted for the number of years that an officer appears, the average number of yearly Reviews is similar by the race of the officer.  As shown below, regardless of the racial/ethnic group of the

22

officer, the average number of Reviews is 2 per year and the median number is identical among Black and white officers, 1.5.

**Figure 1-Average and Median Number of Yearly Use of Force Reviews Per Officer**



50.     I also determined that among the officers with 20 or more entries, all had entries spread across 3 or 4 years.  Thus, none had entries concentrated in 1 or 2 years.  Officer Heyward had 3 years with a Review while Officers Sumner and Galing had 4 years with a Review, thus Officer Heyward had a higher annual Review rate.   Mr. Graham's gross comparisons are misleading because they merely count entries, double counting the same entry multiple times for a given officer, and then are aggregated across four years.

51.     Further, Mr. Graham misleadingly suggests that all Use of Force Reviews are equivalent and thus, all would warrant a Special Investigation Response Team (SIRT) review.

23

However, per the General Order Manual, SIRT would become involved with a serious use of force, which is described as an incident in which the officer's action resulted in:

- Death, or the likelihood of death
- Hospitalization
- A broken bone
- Loss of consciousness
- Serious disfigurement
- Disability
- All incidents where a person receives a bite from a Departmental canine
- Firearms discharge directed at a person
- All Critical Firearm Discharges[19]

52.     The Use of Force entries that are contained in the Use of Force Review data file prepared by PGPD are independent of these serious use of force activities.  The Use of Force policy requires that "each incident involving the application of any degree of physical force upon the person of another must be evaluated based on the facts known to the officer at the time of the incident."[20]  Consequently, if the officer touches a citizen in any form, there would be an incident reported by the officer.[21]  According to former Chief Stawinski, the vast majority of Use of Force Reviews are passive resistance in which the officer(s) detained the person, and do not involve the use of a taser or baton.  Consistent with Major McCreary's statements, Chief Stawinski stated that one would need to read each Review in order to determine what actually happened during each incident.[22]

53.     There are very few occasions in which a Use of Force Review is not required. However, as Sergeant Gleason described, PGPD has been more aggressive relative to other

---

[19] PGPD 2019 General Order Manual; Volume II, Chapter 58; PGDOJ_NO2_0000000826.
[20] PGPD 2019 General Order Manual; Volume II, Chapter 58; PGDOJ_NO2_0000000825.
[21] Phone call with Major McCreary and Ms. Washington, September 8, 2020 and phone call with former Chief Stawinski, September 13, 2020.
[22] Phone call with former Chief Stawinski, September 13, 2020.

CONFIDENTIAL

jurisdictions in its Use of Force reviews; consequently, we would expect to find several entries in the Use of Force file, yet Mr. Graham suggests that this is unusual.[23]

54.      In July 2019, the PGPD instituted the BlueTeam software module, which provided a more automated method for processing a Use of Force Review.  The information could be entered into the system at the time of the incident.  The data produced by PGPD for the entries prior to July 2019 provide a brief narrative describing the event with the notation to "*** See Use of Force Report for complete narrative ***".   However, I did look for key words within these brief narratives programmatically.  During the period (i.e., pre July 2019) in which a brief narrative is provided in the data, I determined that at least 90% appear to have involved an arrest as 90% included the word "arrest" or "arrested."

55.      Mr. Graham also does not distinguish the District or unit of the officer.  He assumes that each officer has an equal probability of having a Use of Force Review.  But each District, squad, and beat does not have the same probability of crime and calls for service.  A review of the Use of Force incidents finds that they are not uniformly distributed by District.  Among the entries, counting each IA Number once, 17% are from District I, 9% from District II, 24.5% from District III (plus District VIII), 23% from District IV, 4.6% from District V, 4% from District VI, and 2% from District VII.  This is consistent with the levels of crime in each of these Districts.

56.      The following charts report the total number of crimes, property crimes, and violent crimes for the period 2016 through August 2020 by District.  In 2019, District III was split into two districts, District III and District VIII, given the volume of crime, but for illustrative purposes and consistency in comparison are combined for 2019 and 2020 in the charts below.[24]   These

---

[23] Phone call with Sergeant Gleason, who helps lead the Department's use of force training and testifies as an expert on use of force, September 22, 2020.
[24] Phone call with Major McCreary and Ms. Washington, September 8, 2020.

25

CONFIDENTIAL

figures show that the districts with the highest volume of Use of Force Reviews, also have the highest volume of crime.

**Figure 2-Total Crime by District, 2016 Through August 2020**



26

**Figure 3-Total Violent Crime by District, 2016 Through August 2020**



**CONFIDENTIAL**

**Figure 4-Total Property Crime by District, 2016 Through August 2020**



28

57.     Mr. Graham clearly did not consider the level of crime in the area when he counted the number of Reviews by officer.  In addition, he did not consider the District or the racial/ethnic makeup of the Districts when he counted the entries by the race/ethnicity of the citizen.  The following maps show where each of the Districts is located within PGC.  The two maps reflect the districts before and after District III was divided into III and VIII.  The alpha numbering reflects the sectors.  Districts with more activity have more than one sector.  The following provides the sector letters that identify the area of each district.

| Table 5—Sectors within Each District | |
| --- | --- |
| **District** | **Sector** |
| District I—Hyattsville | A (Adam Sector); B (Barker Sector) |
| District II—Bowie | D (David Sector) E (Edward Sector) |
| District III—Landover | G (George Sector); H (Henry Sector) |
| District IV—Oxon Hill | J (John Sector); K (King Sector) |
| District V—Clinton | F (Frank Sector) |
| District VI—Beltsville | C (Charlie Sector) |
| District VII—Ft. Washington | W (William Sector) |
| District VIII—Wesphalia | H (Henry Sector) |

58.     A review of the map shows that Districts I, III, and IV are adjacent to the District of Columbia and as shown above in Figures 2-4, are the areas with the highest crime levels.  This is consistent with my conversation with Major McCreary, who stated that these districts have more crime and thus higher staffing and more arrests and consequently, more Use of Force Reviews (i.e., more arrests lead to more Use of Force entries).  Certain teams (Special Assignment Teams, or "SAT" teams) will have more entries because the nature of their job entails the investigations related to activities such as robberies, thus leading to arrests.  District III was divided into Districts III and VIII in 2019 because the level of crime became too much to handle in one district.[25]  Among

---

[25] Phone call with Major McCreary and Ms. Washington, September 8, 2020.

29

the 37 officers whom I identified as having 20 or more incidents after counting an officer once per IA Number, at least 13 were part of SAT teams[26] and nearly all of the 37 were in Districts I, III, and IV.

59.     This is also consistent with the testimony of Plaintiff Christopher Smith, who was part of SAT in District II which, as noted, was charged with investigating activities that often result in arrests.  As Mr. Smith testified that SAT is "like patrol, but patrol magnified to specifically focus on guns, drugs, and hot zones."[27]  He defined hot zones as "areas that repeat calls go out often for the same thing:  guns, drugs, or disorderly conduct."[28]

60.     In addition, as shown in Figures 7 and 8,  Districts I, III, and IV are also the districts with census tracts that have a higher concentration of Minorities and Blacks in the population.[29] Consequently, if the area being patrolled is also a higher percentage Minority, then the citizens involved in the Use of Force Reviews are also expected to be a higher percentage Minority, regardless of the race of the officer.  For example, according to the rosters, Officer Sumner worked in District III, squad 34H, an area that is over 80%, 90%, or 100% Minority (particularly Black) depending on the census tract and, consequently, it would be expected that the citizens involved in Use of Force Reviews in this District would have a higher Minority concentration.

---

[26] A few of the rosters at different points in time for these districts were reviewed to determine if any of the 37 was listed as part of a SAT team.  The 13 of the 37 is a minimum as only a small number of the rosters were reviewed. PG0000092871;   PG0000092906;   PG0000093617;   PG0000093624;   PG0000093769;   PG0000093805; PG0000087054;   PG0000093858;   PG0000092899;   PG0000090939;   PG0000091149;   PG0000087036; PG0000091144;   PG0000090288;   PG0000090318;   PG0000090339;   PG0000087783;   PG0000088157; PG0000088217; PG0000088256; PG0000087041; PG0000087720.

[27] Deposition of Christopher Smith, July 29, 2020, page 53, line 16 – page 54, line 12.

[28] Deposition of Christopher Smith, July 29, 2020, page 54, lines 18-20.

[29] U.S. Census Bureau (2018). ACS Demographic and Housing Estimates, 2018 American Community Survey 5-year estimates for each census tract retrieved from:
https://data.census.gov/cedsci/table?q=DP05&g=0500000US24033,24033.140000&tid=ACSDP5Y2018.DP05&hidePreview=false
Shape files for the PGPD Districts available on the PGC planning website at:
https://gisdata.pgplanning.org/opendata/
The Census data and the district shape files were overlaid using R code.

CONFIDENTIAL

**Figure 5-Map of PGPD Districts Before Splitting District III**



31

CONFIDENTIAL

**Figure 6-Map of PGPD Districts After District VIII**



**CONFIDENTIAL**

**Figure 7-Percentage Minority in PGC by Census Tract**



33

CONFIDENTIAL

**Figure 8-Percentage Black by Census Tract in PGC**



61.     Former Chief Stawinski and Plaintiff Christopher Smith both indicated that there is a relationship between crime and poverty.  Mr. Smith testified that in the suburbs it is rare to find guns and drugs unless you're looking for them, in contrast to the Beltway, where guns are easier to find as the area is impoverished and the way of life more harsh.[30]  An overlay of the districts with the percentage below the poverty level in each census tract, shows that Districts I, III, and IV have a higher percentage below the poverty level which would correlate with the higher levels of crime also found in these districts and thus, more arrests.  Mr. Graham failed to consider each of these factors when he provided statistics on the race/ethnicity of the citizen.  Given the

---

[30] Phone call with former Chief Stawinski, September 13, 2020 and deposition of Christopher Smith, July 29, 2020, page 94, line 20 – page 95, line 13.

CONFIDENTIAL

demographic characteristics of the areas in which most of the arrests were made, a disproportionate percentage Minority is expected among the citizens identified in the Use of Force Reviews.

**Figure 9-Percentage Below the Poverty Level by Census Tract in PGC**



62.     Finally, Mr. Graham questions the high percentage of the Use of Force incidents that were found to be justified and suggests that the justification is conferred automatically, while failing to consider that nearly all incidents involving Use of Force Reviews are associated with an arrest and each was reported by the officer.

63.     He also fails to acknowledge the Use of Force Review process.  Each supervisor is responsible to review, evaluate and document each use of force incident and prepare a Use of Force Review.  Any supervisor who approves the involved officer's use of force is not allowed to conduct the Use of Force Review; instead, a supervisor of equal rank or above must do so.  A final review

35

CONFIDENTIAL

is then conducted by the appropriate District/Division Commander/Manager and if there is agreement with the findings, the Report is forwarded to the IAD Commander, Office of the Chief, Affected Deputy Chief, and Commander of the Training and Education Division (TED).[31]   I reviewed a few of the Review files and found that each contained the information regarding each level of review.[32]

64.     As described above, Mr. Graham has grossly inflated and made inappropriate comparisons from the Use of Force data.  He failed to consider the number of years in which an officer reported a Use of Force incident and failed to consider the geographic area and role of each officer as well as the level of crime and the demographics of those areas.   In conclusion, Mr. Graham's comparisons from the Use of Force data are faulty and unreliable.

## VII.   Mr. Graham's and Mr. Simon's Examination of IAPro Matters are Inappropriate and Misleading

65.     Mr. Graham and Mr. Simon compare the racial composition of the IAPro matters and the findings from these matters to the average racial/ethnic composition of the PGPD officer workforce.  Each are assuming that all matters of a particular type (e.g., IA) are the same, which is contrary to IAD Commander McCreary's testimony that "each of these cases are unique and complex and have their own set of factors."[33]   Additionally, Mr. Graham and Mr. Simon failed to consider key factors such as whether the complainant is internal or external, the existence of evidence and the officer's acceptance of the finding and discipline.  Mr. Simon's analyses start with the assumption that the only factor to consider is the race or ethnicity of the officer.  Yet, for an inquiry or investigation to be conducted there had to have been a complaint regardless of race

---

[31] PGPD 2017 General Orders Manual, Volume II, Chapter 55; PG0000962000-962002.
[32] For example, PG0000452629-PG0000452642.
[33] Deposition of James McCreary, June 15, 2020, page 45, lines 6-7.

CONFIDENTIAL

or ethnicity.  Statistical significance cannot provide a cause for a difference as there may be other factors that explain the difference.[34]

66.　　Further, 68% of the cases that are included in their respective analyses are for cases that pre-date 2016.  Former Chief Stawinski became Chief in January 2016[35] and Major Mills became the IAD Commander in August 2016.[36]  Consequently, the analyses of Mr. Graham and Mr. Simon are influenced by matters that pre-date Chief Stawinski's and Major Mills' leadership.

67.　　I was asked to review the IAPro information for matters that opened and closed from 2016 forward.  I was provided with information through March 31, 2020.  The IAPro query prepared by PGPD generated a file and to this file I matched, if available, the source (e.g., internal/external) of the complaint from another IAPro data pull.  Unfortunately, IAPro has limitations regarding the ability to pull information from within the system consistently or accurately.  The order in which a query is run will impact the resulting output from the query and one cannot track the review process/decisioning of a case.[37]

68.　　Consequently, the file that was pulled was limited to a few key fields:

- IA Number
- Last name of Respondent
- First name of Respondent
- Respondent Badge Number
- Race of Respondent
- Received date
- Last name of Complainant
- First name of Complainant
- Race of Complainant
- Sex of Complainant
- Allegation
- Directive

---

[34] Ramona L. Paetzold and Steven L. Willborn (2016).  The Statistics of Discrimination, Using Statistical Evidence in Discrimination Cases.  Thomson Reuters, pages 70-72.
[35] Deposition of Henry P. Stawinski, III, July 31, 2020, page 11, lines 5-8.
[36] Deposition of  Kathleen Mills, August 6, 2020, page 27, lines 17-21.
[37] See for example, Deposition of Joseph Ghattas, October 6, 2019, page 48, line 8 – page 49, line 15; page 116, line 15 – page 117, line 1; page 124, lines 4-12; page 179, lines 3-21.

37

CONFIDENTIAL

- Finding
- Action taken
- Investigator
- Investigative unit
- Comment Field

69.     I was then provided with the electronic versions of the hard copy case files for each of these matters in order to collect additional information for each of the matters and to verify the information that was pulled from IAPro.  The information was collected to give a more complete picture of the allegation, directive, and the review process including those who were involved with each matter.  Employees on my staff at Berkeley Research Group reviewed each of the files to collect the additional information from the hardcopy files[38] and to verify the information contained in the IAPro spreadsheets that were prepared by Captain Ghattas of PGPD.  I did not include allegations from matters that were complaints of individuals who were not sworn officers.

70.     As previously stated, the fields from the IAPro data were verified against the documents we received for the following case types that were opened and closed between 2016 and March 2020:

- DA: Departmental Accidents
- FCIQ:  Field Case Inquiries
- PS:  Police Supervisor Investigations
- IA:  Internal Affairs Inquiries
- IA:  Internal Affairs Investigations
- SIQ:  SIRT Inquiries
- SI:  SIRT Investigations

71.     A review of the documents for these finds that the types of inquiries and investigations are different among the seven types of cases including the types of documents that are part of the case files.

---

[38] Appendix D contains a description of the information collected by type of matter.

38

CONFIDENTIAL

72.     As part of the verification, we recorded additions (e.g., a missing complainant last name in the IAPro data could be populated from the documents provided) and corrections (e.g., the complainant last name was incorrect in the IAPro data).[39]  For example, for the 10 allegations against officer Eric Beale in SI2016-011, the IAPro data list ███████████ as the complainant. Based on a review of the documents, ████████ was not the complainant, but instead was Sergeant Stephen Nichols.[40]  If the complainant name is incorrect in the IAPro data, then the complainant source (i.e., internal versus external) and race may also be incorrect, as was the case in Officer Beale's matter.

73.     For example, across all allegations/types of matters, approximately 2.7% of the allegation information and 2% of the action taken information was added compared to the information in the IAPro data, and 1.3% of the allegation information and 2.2% of the action taken information was corrected.  Allegation and action taken information additions included updates in which an allegation and the corresponding action taken were added.  Additionally, included among the action taken additions are instances in which an existing allegation's action taken was not populated in the data and we were able to fill it in in based on reviewing the documents.

74.     Mr. Graham and Mr. Simon failed to review the IAPro data in detail and compare it to the documents.  Instead, they accepted the data "as is" and did not perform quality control checks.  In addition, without actually reviewing the files, Mr. Graham and Mr. Simon simply assume that they are of equal weight, with equal circumstances.  As a result, their conclusions drawn from the IAPro are flawed and unreliable.

---

[39] Across all allegations/types of matters, approximately 45% of complainant last name information was added compared to the information in the IAPro data, and 3.3% of complainant last name information was corrected.
[40] See SI2016-011 (PGIAD0000113736-114269); in particular, the Report of Investigation, PGIAD0000113781-113790. Sergeant Nichols contacted the Anne Arundel County Police, the Captain of District IV, and Captain of SIRT. ████████ was the subject of a criminal investigation for impersonating a police officer.

CONFIDENTIAL

A.   **Mr. Graham Mischaracterizes Matters and Fails to Provide Complete Information**

75.    With the information collected, I have been able to assess some of the case examples provided by Mr. Graham at paragraph 134 of his report.  A number of his examples are comparative assessments of fairness but compare matters that occurred, for example, in 2016/2017 to matters that occurred prior to Chief Stawinski's tenure as Chief or Major Mills' tenure as IAD Commander.  Thus, he repeatedly is comparing apples and oranges.  In addition, Mr. Graham fails to include important information from the case file and distorts the actual circumstances of each case.

### *1.  Plaintiffs Chambers and Smith (134.a):*

76.    The first example that Mr. Graham describes at paragraph 134.a illustrates his mischaracterization of the matters, omission of matters with similar allegations, and distortion of the facts.  First, referencing PS2017-090, Mr. Graham states that "While on duty, [Plaintiff Chambers] returned to her vehicle and found that her firearm had been stolen.  She was suspended pending investigation, fined $500 and received a written reprimand."[41]  In doing so, Mr. Graham misleadingly commingles two matters associated with Plaintiff Chambers' missing firearm (SI2017-060 and PS2017-090), and a review of both files is necessary for an accurate understanding of what actually occurred.

77.    PS2017-090 concerns Plaintiff Chambers' initial reporting that her firearm was missing.  Contrary to Mr. Graham's account, Plaintiff Chambers was *not* on duty when her firearm was allegedly stolen from her vehicle on May 31, 2017; instead, she reported that she had left her firearm under the driver's seat of her personally-owned vehicle while inside a retail store and was

---

[41] Graham Report, page 117.

CONFIDENTIAL

unable to locate it thereafter.[42]  This was a Procedural Violation, for which she was fined $500 and given a written reprimand.[43]  Plaintiff Chambers neither disputed the finding nor asked for an administrative hearing regarding the missing firearm.[44]  This and the resulting fine were *consistent* with those rendered for other white officers identified by Mr. Graham who reported their firearms lost or stolen.

78.     Plaintiff Chambers' later suspension, associated with SI2017-060, was related to the *recovery* of the missing firearm.  While her vehicle had been searched by several police officers from the Charles County Sheriff's Office in May 2017, Plaintiff Chambers reported to a supervising officer on October 17, 2017 that she found her firearm between the seat of her vehicle and the center console.  While she initially indicated that she had found it the night before, she ultimately admitted that she had failed to report her recovery of the firearm for over a month.[45]  As the investigation progressed, Plaintiff Chambers also claimed that she had in fact located her firearm in a different location in her vehicle.[46]  Following its investigation, PGPD recommended that Plaintiff Chambers be terminated for the following reasons:[47]

- Failure to immediately notify her supervisor and the Charles County Sheriff's Office when she located her stolen firearm
- False statements regarding the location in which she recovered her firearm
- False statement to her superior officer regarding when she recovered her firearm
- False statement regarding the thoroughness of her search for her firearm in her vehicle

79.     Thus, based on PS2017-090 and SI2017-060, Plaintiff Chambers was *not* suspended while the investigation into her missing gun was on-going.  Her eventual suspension did not result from her missing firearm, but from integrity and false statement charges in

---

[42] PS2017-090, PG0000023428-23429.
[43] PS2017-090, PG0000023410-23412.
[44] PS2017-090, PG0000023413.
[45] SI2017-060, PGIAD0000097810-97811.
[46] SI2017-060, PGIAD0000097816.
[47] SI2017-060, PGIAD0000097766; PGIAD0000097734-97736.

CONFIDENTIAL

connection with its recovery.[48]  Mr. Graham's representation of the facts for Plaintiff Chambers is therefore incorrect, and he failed to link the SI2017-060 matter with the PS2017-090 matter.  Mr. Graham also failed to reveal that the CCOP approved the findings in connection with Plaintiff Chambers' integrity and false statements charges consistent with IAD's recommendation.[49] Additionally, Plaintiff Chambers elected to retire prior to her requested Administrative Hearing Board (AHB),[50] and PGPD accepted that retirement, which also counters Mr. Graham's assertion that Black and Hispanic officers under investigation were not allowed to retire.

80.    With respect to Corporal Christopher Smith (PS2017-084), the original recommendation based on the Disciplinary Action Recommendation (DAR)[51] was a fine of $500 consistent with the other officers identified by Mr. Graham.  Again, it was because of what occurred before the AHB[52] and not the review by IAD that resulted in the suspension for 20 hours rather than the fine of $500.  If he had accepted his original discipline recommendation, he would have been fined consistent with the other officers mentioned by Mr. Graham.

81.    Mr. Graham fails to identify the Black and Hispanic officers who, like the other white officers he cites, were similarly fined $500 for a missing firearm including Corporal ███ (PS2016-159),[53] Corporal ███ (PS2016-133),[54] Corporal ███ (PS2017-155)[55] and Lieutenant ███ (PS2019-142).[56]  Further, three of the white officers to whom Mr. Graham refers had reported missing weapons in 2013 and 2014, predating Major Mills' tenure as IAD Commander

---

[48] SI2017-060, PGIAD0000097734-97738.
[49] SI2017-060, PGIAD0000097794.
[50] Ms. Chambers' retirement is listed as a 2019 retirement in the file "Copy of Roster Retirements Separations 10419 1004 am updated 9120 raj.xlsx".
[51] PS2017-084, PG0000016510-16512.
[52] PS2017-084, PG0000016534-16538.
[53] PS2016-159, PGIAD0000095757.
[54] PS2016-133, PGIAD0000094587.
[55] PS2017-155, PGIAD0000053895.
[56] PS2019-142, PGIAD0000128356.

42

CONFIDENTIAL

and significantly predating the matters involving Plaintiff Chambers and Corporal Smith.  Thus, Mr. Graham's assessment and comparisons are clearly misleading to the Court.

### 2. *Officer Beale (134.d):*

82.      Mr. Graham makes a comparison between Officer Beale and Lieutenant Denault. However, Lieutenant Denault's matter is from a 2015 matter and, consequently, not part of my study.  However, Mr. Graham's summary of Officer Beale's matter suggests that his termination was based on one allegation.  However, the matter involved 10 allegations against Officer Beale, listed below, only one of which was not Sustained.[57]  The findings of IAD were approved by CCOP.[58]  Mr. Beale appealed the finding on the DAR and requested an Administrative Hearing Board hearing, which included a Black peer.[59]  While the original DAR from IAD recommended $250 fines for three of the allegations, the AHB changed the original recommendations from fines to termination.[60]  None of this information, nor Mr. Beale's appeal of the AHB decision to a PGC Circuit Court judge who upheld the AHB decision,[61] is discussed by Mr. Graham.

| Table 6—Details of Officer Beale's Matter (SI2016-11) | | |
|---|---|---|
| **Allegation** | **Directive with Details** | **Finding and Action Taken** |
| 1. Ethics Violation | Failed to Disclose Relationship:  Failed to disclose Involved Citizen ███████ was Beale's roommate | Sustained: Termination |
| 2. False Statement | Regarding Involved Citizen Address:  Intentionally provided false address of ███████ | Sustained: Termination |
| 3. Integrity | Failed to Disclose Relationship:  Failed to disclose Involved Citizen ███████ was Beale's roommate to Sgt ██ | Sustained: Termination |

[57] SI2016-011, PGIAD0000113769-113770.
[58] SI2016-011, PGIAD0000113748.
[59] SI2016-011, PGIAD0000114069.
[60] SI2016-011, PGIAD0000114120.
[61] Letter from Courtney A. Sullivan to Kunti D. Salazar, Department of Justice, November 27, 2019 (PG0000852476-852478).

43

| Table 6—Details of Officer Beale's Matter (SI2016-11) | | |
|---|---|---|
| **Allegation** | **Directive with Details** | **Finding and Action Taken** |
| 4. Integrity | Regarding Involved Citizen Address: Intentionally provided false address of ███████ to Sgt ███ | Sustained: Termination |
| 5. Loyalty | Violated Oath of Service:  Lied to protect Involved Citizen ███ over the PD | Sustained: Termination |
| 6. Misrepresentation of Facts | Failed to Disclose Relationship:  Intentionally omitted to Sgt. █████ that he was roommate of Involved Citizen ██████ | Sustained: Termination |
| 7. Misrepresentation of Facts | Regarding Involved Citizen Address: Willfully misled Sgt. █████ regarding the address of Involved Citizen ████████ | Sustained: Termination |
| 8. Misrepresentation of Facts | Willfully Misled:  Willfully misled investigation by Sgt. █████ regarding Involved Citizen ██████ | Sustained: Termination |
| 9. Policy-Equipment | Equipment Policy:  Gave PD hat/badge to Involved Citizen ██████ | Non-Sustained: None |
| 10. Unbecoming Conduct | Willfully Withheld Information:  Withheld relationship, address, complete information regarding Involved Citizen ██████ | Sustained: Termination |

###### *3.  Officers ████████ and ████████ (134.e):*

83.     The matters involving Officers ████ and ████ also occurred prior to 2016 and

therefore, the files were not part of my review.  With regard to Officer ████, Mr. Graham fails

to discuss Officer ██████ appeal of the termination decision by AHB to a PGC Circuit Court

judge, who upheld the AHB decision.[62]  With regard to the comparator selected by Mr. Graham,

Officer ██████ was from a 2017 matter (SI2017-069) three years after the matter of Officer

████  In Officer ██████ matter there were 6 allegations, 3 of which were Sustained.[63]

Officer ██████ signed the DAR and, thus, accepted the discipline in contrast to Officer

---

[62] Letter from Courtney A. Sullivan to Kunti D. Salazar, Department of Justice, November 27, 2019 (PG0000852476- 852478).
[63] SI2017-069, PGIAD0000135473-135477.

44

███[64]  CCOP disagreed with one of the 6 findings of IAD,[65] contrary to Mr. Graham's assertion

that CCOP merely accepted the recommendations of IAD.  Finally, comparator Officer ███

matter was in 2014, again prior to the time period of the files that we reviewed.

### B.   Mr. Simon's Analyses Do Not Differentiate Matters

84.   Plaintiffs' expert, Marc Simon, a CPA, provided a report of his statistical analyses

of the IAPro data.  The report was provided pro bono by Mr. Simon and BDO USA, LLP.[66]  With

his report, Mr. Simon provided a database that was ostensibly a combination of the "Version 1"

data provided by PGPD[67] and the "Version 3" and "Version 4" datasets.[68]  From these databases,

Mr. Simon had a Mr. Joe Sremack compile a combined database.  To do so, Mr. Sremack used

both SQL and Python scripts.[69]  To date, no scripts have been provided; therefore, I am unable to

determine the accuracy of the database upon which Mr. Simon relied.[70]  Nevertheless, I have

reviewed the combined database in light of the statements made by Mr. Simon.

85.   At page 8 of his report, Mr. Simon purports to report the percentage of sworn

officers in Prince George's County by race in July 2017.  Mr. Simon does not state where he

obtained that information and has no reference to any database or outside source from which he

derived the information.  In addition, he appears to include all officers when most of the allegations

are officers in the lower ranks and at different rates depending on the type of matter.  Yet, it appears

---

[64] SI2017-069, PGIAD0000135467.
[65] SI2017-069, PGIAD0000135470-135471.
[66] Simon Report, page 2, "This engagement is being performed pro bono. BDO is not being compensated for the services performed, either on an hourly or contingent basis."
[67] Files named "Cases closed  01-01-19 through 08-31-19_CONFIDENTIAL.xlsx" and "Cases closed 6-30-13 through 12-31-18_CONFIDENTIAL.xlsx."
[68] Files named "Third IAPro report of cases closed  6-30-13 through 9-30-19 CONFIDENTIAL.xlsx" and "Version 4 Closed Cases 6-30-13 through 11-6-19 (includes DAs) - CONFIDENTIAL.xlsx."
[69] Simon Report, page 5.
[70] File named "ATTACHMENT C – DATASET, SREMACK REFORMAT OF VERSIONS 3 & 4.xlsx."

45

that he includes all officers when he makes his comparisons.  As such, he is making an inaccurate and inappropriate comparison.

86.     Then, Mr. Simon provides tables of statistical results where he is comparing the results of each of his questions based on the combined database.  Mr. Simon's results are unreliable for a number of reasons.  First, Mr. Simon has included IA matters dating back to 2003, a period that did not include Chief Stawinski or Major Mills in their leadership positions.[71]  The majority (over 68%) of the data that Mr. Simon analyzed predates 2016.  In addition, it is unclear if Mr. Simon removed matters that were filed against civilian employees (designated with a "CP" in the IAPro data) or included the CP matters.[72]  I compared the raw counts provided by Mr. Simon in his Exhibit 3 and determined that in some of his analyses contained at Exhibit 3 he included CP matters and in others he did not.  Because I do not have the scripts upon which Mr. Simon relied, I cannot verify the reliability of his analyses.

87.     Regardless of his inclusion of matters back to 2003 and inclusion of CP matters in some analyses, Mr. Simon's analyses combine dissimilar matters and do not provide sufficient detail.  He does not consider the number of prior offenses for matters that influence the finding and action taken.  For example, with Failure to Appear for Court (FTA) matters and Departmental Accidents (DA), the collective bargaining agreement dictates the finding with regards to the discipline imposed.  The following are the matrices[73] associated with the discipline imposed for each incident where to be considered a second or more offense, the offense must have occurred within 24 months of the prior offense.

---

[71] See PS2003-00127.
[72] Simon Report, page 4.
[73] PG0000150225.

CONFIDENTIAL

**Preventable Departmental Accidents Discipline Matrix (**Remedial driver training is also required within 12 months of the accident):

- 1st accident - Written Reprimand
- 2nd accident - $100 fine
- 3rd accident - $250 fine
- 4th accident - $400 fine
- 5th accident - suspended 2 days without pay
- 6th accident - suspended 4 days without pay
- 7th accident - suspended 6 days without pay
- 8th accident - suspended 8 days without pay

**Failure to Appear for Court Discipline Matrix:**

- 1st FTA - Written Reprimand
- 2nd FTA - $100 fine
- 3rd FTA - $250 fine
- 4th FTA - $400 fine
- 5th FTA - $500
- 6th FTA - $600
- 7th FTA - suspended 1 day without pay
- 8th FTA - suspended 2 days without pay
- 9th FTA - recommended termination

88.     Mr. Simon and Mr. Graham also fail to consider what the actual allegation and matter entailed.  All the SIQ matters involving Discharge of a Firearm involved either the shooting of a raccoon or deer; thus, they did not involve a human being, clearly different from SI investigations for the Discharge of a Firearm.  The discharge of a firearm to shoot an animal after the animal was hit by a vehicle is a different set of circumstances or facts from shooting a human being. Again, the testimony of Major McCreary clearly states that each matter is unique and consists of different facts.

89.     Mr. Simon also fails to consider if the officer self-reported the incident, which is generally the case with Use of Force allegations and neither Mr. Graham nor Mr. Simon consider whether the officer agreed with a discipline recommendation.  I found that in most cases, the officer

47

**CONFIDENTIAL**

accepted the discipline recommendation; thus, they accepted the allegation and the resulting discipline as they did not question the facts.

90.     In addition, Mr. Graham and Mr. Simon appear to assume that each officer is *not* guilty, yet as described below most of the complainants are external citizens or self-reported.  In addition, among those with known race most of the external complainants are Black.

91.     Mr. Graham and Mr. Simon consider each offense to be equal in facts, contrary to the testimony of Major McCreary that each matter is unique with its own facts.  They merely count the allegations assuming that each is of equal weight and each with the same circumstances and then compare their measure of the racial composition of the workforce to the composition of the allegations.  However, some cases may involve one allegation such as a Failure to Appear at Court while others may involve several allegations of Domestic Assault.  A Domestic Assault case that resulted in a discipline of Termination may have several allegations for which each could have a finding of Termination.  Obviously, the officer is not terminated five times, yet the IAPro data will report a discipline of Termination for all 5 allegations if Sustained.

92.     Mr. Graham and Mr. Simon also imply that there is no external oversight of the investigative process of the PGPD.  However, the Citizen Complaint Oversight Panel (CCOP) reviews the investigative reports of the IAD, "for every investigation alleging that a law enforcement officer discharged a firearm in an attempt to strike or control another person regardless of whether injury occurs, accidentally discharged a firearm, a person dies during a law enforcement officer's use of force or while in the custody of a law enforcement officer, or a law enforcement officer or other person has filed a complaint with the Prince George's County Police Department or the Citizen Complaint Oversight Panel regarding the conduct of a law enforcement

48

CONFIDENTIAL

officer."[74]  The CCOP reviews the IAD reports "for completeness and impartiality," submitting comments and recommendations to the Chief of Police within 30 working days.[75]  Additionally, the CCOP may conduct its own investigation independent of the IAD investigation.[76]  The Panel consists of seven members appointed by the County Executive and confirmed by the County Council.[77]  It is my understanding that the CCOP members are a diverse group of citizens.[78]

93.     During the time period from 2016 to 2020, Dale Crowell and Florence Felix-Lawson served as the Chairpersons of the CCOP.  Members of the CCOP cannot be municipal, bicounty, County, or State employees, municipal, County or State elected officials, or employed by any law enforcement organization.[79]  The CCOP's findings consist of concurring with the investigation, findings, and allegations, or non-concurring with any part of the investigation, findings and allegations.[80]  If the CCOP does not concur, the CCOP will "submit a letter advising as to why they do not concur."[81]  The Department is required to respond to the CCOP's letter; example responses include the Department clarifying how they reached their findings or "the investigator missed collecting a piece of evidence or did not ask all pertinent questions during an

---

[74] Sec. 18-186.08 of the Prince George's County,  Maryland, Code of Ordinances, available at: https://library.municode.com/md/prince_george's_county/codes/code_of_ordinances?nodeId=PTIITI17PULOLAPRGECOMA_SUBTITLE_18PO_DIV5PODE_SD3CICOOVPA_S18-186.08DUPA
[75] Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 36.
[76] Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 36.
[77] Sec. 18-186.03 of the Prince George's County,  Maryland, Code of Ordinances, available at: https://library.municode.com/md/prince_george's_county/codes/code_of_ordinances?nodeId=PTIITI17PULOLAPRGECOMA_SUBTITLE_18PO_DIV5PODE_SD3CICOOVPA_S18-186.03CICOOVPACRCOAPCO
[78] The annual reports list the members:
**2016-2017:**  Dale A. Crowell (Chair); Mary Godfrey (Vice-Chair); Michael Doaks; Andrew Ellis (resigned 2017); Blanco High; Cardell Montague; Florence Felix-Lawson (appointed 2017); Kimberlei Richardson (appointed 2017)
**2018:**  Dale A. Crowell (Chair); Mary Godfrey (Vice-Chair); Michael Doaks (resigned 9/18); Florence Felix-Lawson; Blanco High; Cardell Montague; Kimberlei Richardson
**2019:**   Florence Felix-Lawson (Chair); Kimberlei Richardson (Vice-Chair); Cardell Montague; Kelvin Davall (appointed 10/19); Marsha Ridley (appointed 10/19); Daniel Vergamini (appointed 10/19); Dale A. Crowell (resigned 6/19); Mary Godfrey (resigned 6/19); Blanco High (replaced 10/19)
[79] Sec. 18-186.03 of the Prince George's County,  Maryland, Code of Ordinances.
[80] Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 37.
[81] Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 38.

CONFIDENTIAL

interview."[82]   The CCOP publishes annual (and quarterly) reports summarizing the matters they have reviewed.[83]

94.      Mr. Graham assumes that the CCOP is not independent of PGPD.   However, a review of their annual reports suggests that the CCOP provided recommendations to improve the PGPD and did not consistently agree with the PGPD investigation findings.   For example, the 2018 annual report provided a summary of each of the IAD cases that included a description of the matter, the disposition, and CCOP's recommendation for the year.[84]   A review of these reports finds that CCOP did not rubber-stamp the recommendations of IAD and importantly, the deviations were limited during this year.   Neither Mr. Graham nor Mr. Simon appear to have reviewed the CCOP statistics.   Also, consistent with the Use of Force Review statistics, the CCOP found in 2016-2017 that Districts III and IV were the source of a larger portion of the investigations.[85]

95.      The statistics provided by Mr. Graham and Mr. Simon are also heavily influenced by investigations in which there are multiple allegations against an officer.   SI2016-011 is an example of this occurring, in which Mr. Beale had 10 allegations.   In SI2018-064, Officer ██████ had 33 allegations involving sexual misconduct.   Thus, these outliers influence the outcomes reported by Mr. Graham and Mr. Simon.   For example, of the 527 SI allegations that I examined between the period of January 2016 through March 2020, 179 of the allegations are associated with 21 SI matters.   These 21 matters influence the outcomes because the same respondents are included repeatedly.

---

[82] Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 38.
[83] See the CCOP Annual Reports available on the Prince George's County website at:
 https://md-princegeorgescounty.civicplus.com/Archive.aspx?AMID=46
[84] See the 2018 CCOP Annual Report available on the Prince George's County website at: https://md-princegeorgescounty.civicplus.com/Archive.aspx?AMID=46
[85] See the 2016-2017 CCOP Annual Report (at page 11) available on the Prince George's County website at: https://md-princegeorgescounty.civicplus.com/Archive.aspx?AMID=46

CONFIDENTIAL

96.     Finally, Mr. Simon provides an analysis of terminations (Simon Question 6) and receiving severe punishment (Simon Question 7).  For each of these analyses, he states, "Duplicate offenses removed for Terminations and Resignations/Retirements."[86]  Yet, Mr. Simon does not state which offenses he determined were duplicative or for whom, and he failed to provide his scripts for processing the data; therefore, given the above problems with Mr. Simon's data, the analyses for Questions 6 and 7 are also unreliable.  My statistical analyses of terminations, resignations, and retirements show that there are no statistically significant differences regardless of race or ethnicity after controlling for the rank of the officer.

97.     In conclusion, Mr. Graham and Mr. Simon provide misleading comparisons.  Mr. Graham cherry-picked examples and failed to include key information in his comparisons thereby misleading the Court.  Further, their aggregated statistics are uninformative because they do not consider the severity of each of the allegations, the circumstances of each, or whether or not the officer accepted the discipline.

## VIII.   More Comprehensive Examination of Each Type of Matter Does Not Find a Racial/Ethnic Pattern

98.     In order to assess the findings of Mr. Graham and Mr. Simon, I examined IAPro matters that were opened and closed between 2016 and March 2020.  Chief Stawinski held his role during this time period and Major Mills' tenure as IAD Commander is encompassed within this timeframe.  As described above I collected information from each of the 7 matter types to follow the investigative or inquiry process for each matter.  Three of the seven types are inquiries for which there is not a disciplinary action.  However, an inquiry may lead to an investigation.  An investigation may be Sustained which would lead to a disciplinary action ranging from a Written

---

[86] Simon Report, pages 11-12.

CONFIDENTIAL

Reprimand to Termination.  Alternatively, an officer may be Exonerated or an allegation may be found to be Non-Sustained or Unfounded.  Among the 7 matter types are also Departmental Accidents which may lead to a disciplinary action based on the collective bargaining agreement.

99.     It is important to recognize that an IA case such as Mr. Beale's SI2016-011 may have more than one allegation.  Each allegation may be Sustained, Unfounded, Exonerated, or Non-sustained.  In addition, a case number may have more than one complainant and/or more than one respondent.  For example, a case could involve two citizens filing a complaint against two officers.  The complaints could result in multiple allegations against both officers for the same case number.  Suppose, hypothetically, that the allegations were Sustained against the officers and the resulting discipline was Termination.  Both officers would have multiple counts of allegations with Termination even though each officer would be terminated once or in the case of a demotion in rank, there would be one demotion in rank.  Consequently, simply counting allegations, findings, and disciplinary actions can be misleading.

## A.     Departmental Accidents (DA Matters)

100.     There are 614 cases of Departmental Accident ("DA") matters during the relevant time period examined, all but one of which was self-reported.  Of these 614 DA matters, there are 611 that were considered to be a "Preventable Departmental Accident," two were considered to have been "Careless Operation of a Police Vehicle," and one was considered to be a "Non-preventable Departmental Accident."

101.     Regardless of race/ethnicity, nearly 100% of DAs were deemed preventable and had a finding of "Sustained."[87]  The demographic groups of Asian, Hispanic, Hawaiian, and White

---

[87] Departmental accidents that are found to be nonpreventable are not assigned case numbers.  Thus, it is not surprising that nearly all DAs are Sustained because, as mentioned above, almost all were deemed preventable.

CONFIDENTIAL

officers had 100% of the accidents deemed to be preventable, while for Black officers, 98.9% of the accidents were deemed to be preventable, 0.7% (two instances) were deemed to be "Careless Operation of a Police Vehicle" and 0.4% (one instance) was deemed a "Non-preventable Departmental Accident."

102.    Given that the DA incidents are self-reported, one would not expect that the officer would appeal the finding or discipline because the discipline is tied to the number of offenses in the prior 24 months.  Consequently, among those that were self-reported, three decisions were appealed, two of which were Sustained (both Black) and one was exonerated (white).

103.    Among the decisions that were Sustained, the following shows that the discipline imposed is consistent with the officer's prior number of offenses within a 24-month period. Consistent with the collective bargaining agreement, the discipline is aligned with the action taken, with two exceptions.

| Table 7—Action Taken by Offense Number Sustained Departmental Accidents | | |
|---|---|---|
| Offense Number | Action Taken | Number of DA Matters |
| 1st | Written Reprimand | 455 |
| 2nd | Fine - $100 | 119 |
| | Written Reprimand | 2 |
| 3rd | Fine - $250 | 26 |
| 4th | Fine - $400 | 5 |
| 5th | Fine - $500 | 1 |

104.    The table[88] below summarizes the actions taken by offense number with the race/ethnicity of the officers with the departmental accident.  The two exceptions involve a Black and a white officer each with two offenses and with disciplines of Written Reprimand when a $100 fine would have been expected given the matrix.  It is possible that this occurred due to the timing

---

[88] The totals included in this section of the report include a few officers with unknown or other race.

CONFIDENTIAL

of the accidents.  For example, even though the documentation in the file indicates a prior accident, the close date for the incident involving the white officer was December 2018 and the prior preventable accidents were in 2016, which would have been outside of the 24-month period. Therefore, if the December 2018 date was used then the Written Reprimand rather than the $100 fine would have been applicable.  Two officers had no discipline as a consequence of the investigation exceeding the one year statute of limitations of the Law Enforcement Officers' Bill of Rights (LEOBR), one Black and the other white.

| Table 8—Comparison of Action Taken Compared to Number of Offenses in 24 Months Departmental Accidents | | | | | |
|---|---|---|---|---|---|
| Action Taken | Number and Distribution by Race/Ethnicity Group | | | | |
| | Asian | Black | Hispanic | White | Total |
| **1 DA Offense** | | | | | |
| LEOBR | 0 | 0 | 0 | 1 | 1 |
| Written Reprimand | 14 | 198 | 52 | 189 | 455 |
| **2 DA Offenses** | | | | | |
| Fine - $100 | 7 | 55 | 7 | 49 | 119 |
| LEOBR | 0 | 1 | 0 | 0 | 1 |
| Written Reprimand | 0 | 1 | 0 | 1 | 2 |
| **3 DA Offenses** | | | | | |
| Fine - $250 | 2 | 15 | 2 | 7 | 26 |
| **4 DA Offenses** | | | | | |
| Fine - $400 | 0 | 4 | 0 | 1 | 5 |
| **5 DA Offenses** | | | | | |
| Fine - $500 | 0 | 1 | 0 | 0 | 1 |

105.    The review of the details of the departmental accidents finds that they are self-reported and the officer rarely disputes the finding.  In addition, the discipline imposed is consistent with the number of preventable accidents, as imposed by the collective bargaining agreement with a few exceptions which may be due to the timing of the incidents.  Therefore, there is no difference by race/ethnicity in the discipline imposed on officers for departmental accidents.

CONFIDENTIAL

## B.      Field Case Inquiries (FCIQ Matters)

106.      Particular types of matters are inquiries for complaints that do not require, at least initially, an IAD or SIRT inquiry or investigation.  These inquiries are sent from IAD to the supervisor of the respondent officer to review.  Additionally, some inquiries came directly from the complainant to the police station according to Major Art'z Watkins, who had oversight regarding Administrative Investigation Section (AIS) matters.  Inquiry matters typically do not involve discipline, but based on the findings of the inquiry, an investigation can be opened.[89]  For example, FCIQ2017-115 involved a white respondent that resulted in an investigation under PS2018-092.    Similarly, FCIQ2017-058 involved a Black respondent that resulted in an investigation under IA2017-040.

107.      As with investigations, an inquiry matter may have more than one allegation.  There were 425 unique FCIQ inquiry numbers that resulted in 686 allegations.  The table below shows the distribution of the 686 allegations by race/ethnicity over the time period.  The number of Black and white FC inquiries is nearly identical.

| Table 9—Racial/Ethnic Composition of Allegations from FCIQ Matters Opened and Closed Between 2016 and March 2020 | | | | | |
|---|---|---|---|---|---|
|  | Race of Respondent | | | | |
| Allegation | Asian | Black | Hispanic | White | Total |
| Procedural Violation | 1 | 37 | 11 | 49 | 101 |
| Protocol | 22 | 233 | 38 | 236 | 538 |
| Unbecoming Conduct | 2 | 19 | 1 | 24 | 47 |

108.      I determined that the numbers of standard deviations associated with these counts indicate that the number of Black, Asian, and white FCIQ inquiries is not statistically significantly different from the expected when compared to the proportion of officers who were Black or white

---

[89] Deposition of Art'z Watkins, July 10, 2020, page 27, lines 11-18; page 29, lines 6-19.

CONFIDENTIAL

among officers among those in the rank of those with allegations.  The number of Hispanic FC inquiries suggests that there are fewer Protocol inquiries than predicted and this outcome is statistically significant.  However, there are no other differences that are statistically significant.

| Allegation | Percentage in Demographic Group 2016-2020* | Number of FCIQ Allegations | Number in Racial/Ethnic Group | Number Predicted in Racial/Ethnic Group | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|
| **Table 10—Analysis of the Number of FCIQ Allegations by the Race of the Respondent Compared to the Demographic Composition of the Workforce*** | | | | | | |
| *Demographic Group Compared:  Black* | | | | | | |
| Procedural Violation | 44.50% | 101 | 37 | 44.94 | -7.94 | -1.49 |
| Protocol | 44.50% | 538 | 233 | 239.40 | -6.40 | -0.51 |
| Unbecoming Conduct | 44.50% | 47 | 19 | 20.91 | -1.91 | -0.41 |
| *Demographic Group Compared:  White* | | | | | | |
| Procedural Violation | 41.55% | 101 | 49 | 41.96 | 7.04 | 1.32 |
| Protocol | 41.55% | 538 | 236 | 223.53 | 12.47 | 1.05 |
| Unbecoming Conduct | 41.55% | 47 | 24 | 19.53 | 4.47 | 1.18 |
| *Demographic Group Compared:  Hispanic* | | | | | | |
| Procedural Violation | 10.17% | 101 | 11 | 10.27 | 0.73 | 0.08 |
| Protocol | 10.17% | 538 | 38 | 54.69 | -16.69 | -2.31 |
| Unbecoming Conduct | 10.17% | 47 | 1 | 4.78 | -3.78 | -1.58 |
| *Demographic Group Compared:  Asian* | | | | | | |
| Procedural Violation | 3.49% | 101 | 1 | 3.53 | -2.53 | -1.10 |
| Protocol | 3.49% | 538 | 22 | 18.78 | 3.22 | 0.64 |
| Unbecoming Conduct | 3.49% | 47 | 2 | 1.64 | 0.36 | 0.00 |

* PGPD workforce based on the percentage in each rank from the January 1, 2016, 2017, 2018, 2019, and 2020 snapshots weighted by the percentage of allegations from each rank.

109.    Importantly, of the 686 inquiries, nearly 99% resulted from external citizen complaints.  Complaints from individuals outside of the force are required to have an inquiry conducted[90] and an inquiry can lead to a full investigation if warranted.[91]  A review of the details of the external matters suggests that many involved a traffic stop in which the complainant thought

[90] PGPD 2017 General Orders Manual, Volume I, Chapter 4; PG0000961317.
[91] Major Art'z Watkins testified that "If wrongdoing is discovered during an inquiry, during an FCIQ, then the supervisor who is doing the inquiry will request case numbers and it will turn into a PS case, an investigation." Deposition of Art'z Watkins, July 10, 2020, page 24, lines 18-22.

56

CONFIDENTIAL

that the officer was rude or discourteous or other matters in which the complainants were not pleased with the manner in which the officer handled a service call. Additionally, to the extent that the race of the complainant was identified, nearly all were Black.

## C.    Police Supervisor Investigations (PS Matters)

110.    Complaints resulting in Police Supervisor Investigations (PS) can come from either an internal or external source. There is a request for case numbers when there is notification of the matter for investigation. Like FC inquiries and DA matters which were previously discussed, the supervisory investigations involve less serious violations such as Failure to Appear in Court (FTA), minor courtesy violations such as those described above in the FCIQ inquiry section, and tardiness. The PS review process includes the investigator, Lieutenant, Captain, Major, and Deputy Chief, followed by IAD review and then back to the Bureau for final discipline if the allegation is Sustained.[92] This review process is ignored by both Mr. Graham and Mr. Simon. They assume that an allegation occurs, it is Sustained or not, and a discipline is imposed without review or input by the supervisors or respondent.

111.    If an inquiry progresses to an investigation, the supervisor conducting the inquiry makes a request for a case number. If the incident does not have an inquiry stage, the request for case numbers is typically submitted by the individual who will be conducting the investigation. The IAD Commander approves the request for case numbers. During the period examined, there were 814 PS case numbers resulting in 914 allegations.

112.    Among these PS matters, 78% of the request for case numbers were approved by a Black Commander, and 20% were approved by an Hispanic Commander. Plaintiff Joe Perez was one of the Commanders who approved requests.

---

[92] See Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slides 13-14.

CONFIDENTIAL

113.     One of the first steps in the investigation process is the completion of the Report of Investigation (ROI) which provides details and key information regarding the incident, including the respondent(s), witnesses, evidence, complaint details, statements from the respondent and witnesses, and a summary of the investigation.[93]   The completed ROI is signed by the investigator and the approving supervisor.   Of the PS allegations for which ROI information was contained among the documents, 43% were signed by a Minority officer (29% Black, 7% Hispanic, and 8% Asian).   Plaintiff Joe Perez was also one of the officers who approved the ROI.

114.     If necessary, the Disciplinary Action Recommendation (DAR) is prepared after the investigative report is reviewed.   The DAR outlines the Sustained charges against the respondent, the finding, and the disciplinary action that is proposed.   Of the PS allegations with a DAR, nearly 48% were signed by a Minority officer (29% Black, 8% Hispanic, and 10% Asian).   These three important documents, the Request for Case Numbers, ROI, and DAR, show a relatively large percentage Minority approving the documents, ranging from 43% to 98% Minority.

115.     Importantly, when an allegation is Sustained, the DAR is served to the respondent officer.   At that time, the officer may waive his/her right to a hearing and accept the discipline. The officer has the right to request an Administrative Hearing Board (AHB) which is a "quasi-judicial process similar to a criminal trial."   The AHB considers all evidence and testimony gathered, then votes on each allegation.[94]

116.     Lesser charges, such as a discipline that is a fine of $150 or less, will have a one (1) person hearing board consisting of a Captain or above chosen by the Chief or the Chief's representative.   Three-person boards are comprised of a Major and a Captain as well as a third

---

[93] As noted earlier, the complainant listed on the ROI may not reflect the actual complainant.  For example, in SI2016-011, the complainant is listed as Captain Michael Smith on the ROI (PGIAD0000113781) when based on a review of the documents, the actual complainant is Sergeant Nichols.  See PGIAD0000113736-114269.
[94] See Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slides 14-22.

CONFIDENTIAL

member who is of peer rank to the respondent and randomly chosen in the presence of the respondent with four alternatives.  The respondent has the right to strike one of the individuals.  If the respondent is found guilty then he/she has the right to a Character Hearing after which the AHB will arrive at a discipline recommendation if Sustained.  The respondent also has the right to submit a letter to the Office of the Chief to request leniency after the final discipline is imposed. The Respondent still has the right to appeal to the Circuit Court for PGC within 30 days.[95]

117.    Understanding this process, which is also the process for Internal Affairs (IA) and SIRT (SI) investigations, is important because in many instances the officer waived his/her right to a hearing and accepted the discipline.  Few investigations resulted in an AHB hearing regardless of the type of matter.  Mr. Graham and Mr. Simon assume that each officer has an equal probability of having a Sustained allegation by race or ethnicity, even though regardless of the race or ethnicity of the officer, some officers self-reported the incident, a complaint was filed, and in most instances accepted the discipline.

118.    As shown below, most (72%) of the PS investigations were the result of the officer's Failure to Appear in Court (FTA).  The other concentration of PS investigations is Procedural Violations (17%).  Within the Procedural Violations are also some Red Light Violations, AWOL, and other allegations that were included in this category rather than in their separate groupings.  Mr. Graham and Mr. Simon's comparisons are influenced by the volume of FTA investigations which come from the Court Liaison and are not from an external citizen or a co-worker.

---

[95] See Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slides 14-22.

CONFIDENTIAL

**Table 11—Distribution of PS Investigations by Type of Allegation**

| Allegation | Number of Investigations | Percentage of PS Investigations |
|---|---|---|
| AWOL | 25 | 2.74% |
| Attention to Duty | 2 | 0.22% |
| FTA Court | 654 | 71.55% |
| Insubordination | 10 | 1.09% |
| Misrepresentation of Facts | 1 | 0.11% |
| Procedural Violation | 154 | 16.85% |
| Protocol | 35 | 3.83% |
| Red Light Violation | 27 | 2.95% |
| Unbecoming Conduct | 6 | 0.66% |
| Total | 914 | 100.00% |

119.    Between 69% and 100%, depending on the demographic group, of the allegations for PS matters concerned failing to appear in court.  Among those who failed to appear in Court, Black officers have a higher proportion thereby influencing the racial composition of the PS investigations even though these are reported by the Court Liaison.  Major Mills testified that she would receive FTA reports when she was Acting Commander of District V and when she would follow-up with officers to learn how they were keeping their court schedules, she recommended to the officers to maintain a paper calendar of their schedule in addition to an electronic calendar.[96] The only other area with a relatively high number of Minority officers is among the Procedural Violations which represent 17% of PS investigations which as noted above included a range of allegations.

---

[96] Deposition of Kathleen Mills August 6, 2020, page 36, lines 1-5; page 62, line 11 – page 63, line 21.

CONFIDENTIAL

| Table 12—Number and Distribution by Race/Ethnicity of PS Investigations by Type of Allegation | | | | | |
|---|---|---|---|---|---|
| **Allegation** | **Number and Percentage by Race/Ethnicity** | | | | |
| | **Asian** | **Black** | **Hispanic** | **White** | **Total** |
| **Number by Race/Ethnicity** | | | | | |
| AWOL | 0 | 13 | 4 | 8 | 25 |
| Attention to Duty | 0 | 1 | 0 | 1 | 2 |
| FTA Court | 29 | 345 | 91 | 189 | 654 |
| Insubordination | 0 | 8 | 0 | 2 | 10 |
| Misrepresentation of Facts | 0 | 0 | 0 | 1 | 1 |
| Procedural Violation | 0 | 89 | 21 | 44 | 154 |
| Protocol | 0 | 22 | 1 | 12 | 35 |
| Red Light Violation | 0 | 17 | 2 | 8 | 27 |
| Unbecoming Conduct | 0 | 5 | 0 | 1 | 6 |
| **Total** | **29** | **500** | **119** | **266** | **914** |
| **Percent within Each Race/Ethnic Group** | | | | | |
| AWOL | 0.00% | 2.60% | 3.36% | 3.01% | 2.74% |
| Attention to Duty | 0.00% | 0.20% | 0.00% | 0.38% | 0.22% |
| FTA Court | 100.00% | 69.00% | 76.47% | 71.05% | 71.55% |
| Insubordination | 0.00% | 1.60% | 0.00% | 0.75% | 1.09% |
| Misrepresentation of Facts | 0.00% | 0.00% | 0.00% | 0.38% | 0.11% |
| Procedural Violation | 0.00% | 17.80% | 17.65% | 16.54% | 16.85% |
| Protocol | 0.00% | 4.40% | 0.84% | 4.51% | 3.83% |
| Red Light Violation | 0.00% | 3.40% | 1.68% | 3.01% | 2.95% |
| Unbecoming Conduct | 0.00% | 1.00% | 0.00% | 0.38% | 0.66% |

120.    Among the Failure to Appear in Court investigations, the following shows that the discipline imposed is consistent with the prior number of offenses within a 24-month period. Consistent with the CBA, the offense number is aligned with the action taken.[97]

---

[97] Collective Bargaining Agreement between Prince George's County and Fraternal Order of Police, Prince George's County Lodge 89, Inc., July 1, 2018 – June 30, 2020.

CONFIDENTIAL

| Table 13—Action Taken by Offense Number Among Sustained Failure to Appear In Court (FTA) Allegations | | |
|---|---|---|
| **Offense Number** | **Action Taken** | **Number of FTA Matters** |
| 1st | Written Reprimand | 283 |
| 2nd | Fine - $100 | 177 |
| 3rd | Fine - $250 | 82 |
| 4th | Fine - $400 | 48 |
| 5th | Fine - $500 | 22 |
| 6th | Fine - $600 | 12 |
| 7th | Suspended Ten (10) Hours / 1 day Without Pay | 9 |
| 8th | Suspension - 2 days W/O Pay | 4 |

121.    Blacks have more FTA investigations, regardless of the offense number.  Again, the FTA investigations are reported by the Court Liaison resulting in the investigation.  Further, 54% of FTAs by white officers are for their first offense, compared to 42% of FTAs by Black officers and 37% of Hispanic officers.  Thus, Black and Hispanic officers were more likely to have repeat FTA offenses in a 24-month period during the 2016-March 2020 time period, but again the reporting was by the Court Liaison and the officers accepted the discipline.  Additionally, there is not a pattern of a difference by race/ethnicity in the discipline imposed as it is consistent with the collective bargaining agreement.

CONFIDENTIAL

| Discipline | Number of Disciplines by Race/Ethnicity | | | | |
|---|---|---|---|---|---|
| | Asian | Black | Hispanic | White | Total |
| **FTA Court 1 Offense** | | | | | |
| Written Reprimand | 9 | 143 | 33 | 98 | 283 |
| **FTA Court 2 Offenses** | | | | | |
| Fine - $100 | 13 | 102 | 20 | 42 | 177 |
| **FTA Court 3 Offenses** | | | | | |
| Fine - $250 | 3 | 48 | 11 | 20 | 82 |
| **FTA Court 4 Offenses** | | | | | |
| Fine - $400 | 2 | 23 | 11 | 12 | 48 |
| **FTA Court 5 Offenses** | | | | | |
| Fine - $500 | 1 | 11 | 4 | 6 | 22 |
| **FTA Court 6 Offenses** | | | | | |
| Fine - $600 | 1 | 4 | 6 | 1 | 12 |
| **FTA Court 7 Offenses** | | | | | |
| Suspended Ten (10)/ 1 Day Hours Without Pay | 0 | 5 | 3 | 1 | 9 |
| **FTA Court 8 Offenses** | | | | | |
| Suspension 2 Days Without Pay | 0 | 2 | 1 | 1 | 4 |

Table 14—Number by Race/Ethnicity of Sustained FTA Investigations by Discipline and Number of Offenses in 24 Month Period

122.    Some of the PS allegations have an external source, such as Procedural Violation and Protocol.  Combined among these two allegations, the percentage of the Black respondent officers with an external source is greater than the percentage of white respondent officers. Allegations from *external complainants* must be reviewed;[98] therefore, the higher percentage of external sources for Black respondent officers would imply that more of the allegations would be investigated.

123.    There were 231 non-FTA Court allegations that were Sustained of which 144 (62%) were for an allegation of "Procedural Violation."  The outcomes for Police Supervisor (PS) actions reflect that these allegations are individualized.  The discipline imposed is consistent between the

---

[98] PGPD 2017 General Orders Manual, Volume I, Chapter 4; PG0000961317.

CONFIDENTIAL

demographic groupings with most officers receiving a Written Reprimand. The most common (over 45%) discipline imposed for Sustained findings was a Written Reprimand (105 allegations out of the 231 allegations). The other typical disciplines included fines up to $500, removal of the car program for up to 30 days or a one day suspension.

124.    Regardless of the allegation and the discipline, few officers disputed the findings and discipline imposed for the PS matters. There are 14 total officers that filed a dispute, none of whom were Asian or Hispanic, by indicating on the DAR that they did not waive their right to an administrative hearing. Both Mr. Graham and Mr. Simon ignored the officer's actions regarding the DAR and assume that uniformly each officer is denying the allegation. The key piece through the process is determining the proportion who did not waive their right, and whether it is different by race/ethnicity. In most instances, among the PS investigations, the officer waived his/her rights, thereby accepting the finding and discipline.

125.    Additionally, contrary to Mr. Graham, among the non-FTA allegations white investigators had Sustained findings for 90% of the Black respondent officers compared to Minority investigators who have Sustained findings for 92% of Black respondent officers. Likewise, the white investigators had Sustained findings for 86% of the white respondent officers while Minority investigators had Sustained findings for 79% of the white respondent officers. Therefore, the Minority investigators were slightly more likely to have a finding of Sustained for Black respondent officers.

126.    This review shows that the majority of PS investigations were the result of the failure of the officer to appear in Court, which would have been received from the Court Liaison. FTAs are disproportionately Black and are influencing the findings of Mr. Graham and Mr. Simon. Among the Procedural Violations, the other allegation that comprised most of the remaining

64

Sustained findings, many were Red Light violations that were not grouped in the Red Light Violation category.  Further, the most common discipline among officers with a Sustained finding was a Written Reprimand.  In nearly all cases with Sustained findings, the officer accepted the finding and waived their right to an administrative hearing.  Mr. Graham and Mr. Simon failed to consider the details of each matter and the process which shows that ultimately, there are few instances in which the officer did not dispute the findings and discipline.

### D.    Internal Affairs Inquiry (IAQ)

127.    Inquiries that are conducted by IAD are distinguished from those that are conducted by Police Supervisors.  IA inquiries involve more complex administrative requests.[99]  A review of the types of complaints finds that they are similar to FC inquiries, but in these instances, IAD conducted the inquiry.  In some instances, it was the arrested individual who filed the complaint and a number involve traffic stops.  As with an FC inquiry, an IA inquiry may result in an investigation.  For example, the IAQ2019-005 documents indicate that it became IA2019-077 based on the citizen complaint that the respondents "refused to assist her after being in a physical altercation with her child's father."[100]

128.    There were 54 IA inquiry case numbers resulting in 118 allegations..  Importantly, most of these inquiries are from complaints of external citizens.  Of the 118 allegations, all but six were from complaints raised by external citizens.  Thus, these allegations stem from individuals outside of the force.  External citizen complaints are required to be investigated,[101] and an inquiry can lead to a full investigation if warranted.[102]  A review of the details of the external allegations

---

[99] See Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 25.
[100] IAQ2019-005, PGIAD0000127384.
[101] PGPD 2017 General Orders Manual, Volume I, Chapter 4; PG0000961317.
[102] Major Art'z Watkins testified that "If wrongdoing is discovered during an inquiry, during an FCIQ, then the supervisor who is doing the inquiry will request case numbers and it will turn into a PS case, an investigation. Deposition of Art'z Watkins, July 10, 2020, page 24, lines 18-22.

CONFIDENTIAL

suggests that many involved an arrested individual or, similar to FC inquiries, complaints about the officer during traffic stops or service calls.  Additionally, to the extent that the race of the complainant was identified, nearly all were Black.

129.     Approximately 95% of the allegations involved respondent officers who were at the rank of Police Officer, POFC, Corporal, or Sergeant.  The table below shows the distribution of the 118 allegations by race/ethnicity over the time period.  The number of allegations involving Black and white respondents is nearly identical.

| Table 15—Racial/Ethnic Composition of Allegations from IAQ Matters Opened and Closed Between 2016 and March 2020 | | | | | |
|---|---|---|---|---|---|
| | Race of Respondent | | | | |
| Allegation | Asian | Black | Hispanic | White | Total |
| Ethics Violation | 0 | 0 | 0 | 1 | 1 |
| Procedural Violation | 0 | 2 | 0 | 1 | 3 |
| Protocol | 5 | 37 | 5 | 33 | 85 |
| Unbecoming Conduct | 2 | 12 | 2 | 11 | 29 |
| Total includes other minority and unknown race. | | | | | |

130.     I determined that the number of Black, Hispanic, Asian, and white IA inquiries are not statistically significantly different from the expected when compared to the proportion of officers who were Black, Asian, Hispanic, or white among officers at the ranks from which the allegations occurred.

| Table 16—Analysis of the Number of IAQ Allegations by the Race of the Respondent Compared to the Demographic Composition of the Workforce* | | | | | | |
|---|---|---|---|---|---|---|
| Allegation | Percentage in Demographic Group 2016-2020* | Number of IAQ Allegations | Number in Racial/ Ethnic Group | Number Predicted in Racial/ Ethnic Group | Difference Between Actual and Predicted | Number of Standard Deviations |
| Demographic Group Compared:  Black | | | | | | |
| Ethics Violation | 43.93% | 1 | 0 | 0.44 | -0.44 | 0.00 |
| Procedural Violation | 43.93% | 3 | 2 | 1.32 | 0.68 | 0.21 |
| Protocol | 43.93% | 85 | 37 | 37.34 | -0.34 | 0.00 |
| Unbecoming Conduct | 43.93% | 29 | 12 | 12.74 | -0.74 | -0.09 |

66

| Allegation | Percentage in Demographic Group 2016-2020* | Number of IAQ Allegations | Number in Racial/ Ethnic Group | Number Predicted in Racial/ Ethnic Group | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|
| **Table 16—Analysis of the Number of IAQ Allegations by the Race of the Respondent Compared to the Demographic Composition of the Workforce***| | | | | | |
| *Demographic Group Compared:  White* | | | | | | |
| Ethics Violation | 43.24% | 1 | 1 | 0.43 | 0.57 | 0.14 |
| Procedural Violation | 43.24% | 3 | 1 | 1.30 | -0.30 | 0.00 |
| Protocol | 43.24% | 85 | 33 | 36.76 | -3.76 | -0.71 |
| Unbecoming Conduct | 43.24% | 29 | 11 | 12.54 | -1.54 | -0.39 |
| *Demographic Group Compared:  Hispanic* | | | | | | |
| Ethics Violation | 9.52% | 1 | 0 | 0.10 | -0.10 | 0.00 |
| Procedural Violation | 9.52% | 3 | 0 | 0.29 | -0.29 | 0.00 |
| Protocol | 9.52% | 85 | 5 | 8.09 | -3.09 | -0.96 |
| Unbecoming Conduct | 9.52% | 29 | 2 | 2.76 | -0.76 | -0.17 |
| *Demographic Group Compared:  Asian* | | | | | | |
| Ethics Violation | 3.06% | 1 | 0 | 0.03 | -0.03 | 0.00 |
| Procedural Violation | 3.06% | 3 | 0 | 0.09 | -0.09 | 0.00 |
| Protocol | 3.06% | 85 | 5 | 2.60 | 2.40 | 1.19 |
| Unbecoming Conduct | 3.06% | 29 | 2 | 0.89 | 1.11 | 0.66 |

\* PGPD workforce based on the percentage in each rank from the January 1, 2016, 2017, 2018, 2019, and 2020 snapshots weighted by the percentage of allegations from each rank.

131.     Overall, there is not a pattern of differences by race/ethnicity among IA inquiries. Mr. Graham and Mr. Simon fail to consider the process for the inquiries and the source of the complaints.

## E.     Internal Affairs Investigation (IA)

132.     The IA matters are comprised of a wide range of allegations and specific alleged acts that are not comparable from one matter to another. For example, there are IA matters that deal with allegations of theft by a respondent police officer, physical altercations with citizens in the course of duty, use of foul language, and being unshaven, among other allegations.  IA matters

CONFIDENTIAL

do not have a typical allegation and each file should be reviewed for the witness statements, investigator statements and reports, and the final reports.[103]

133.    During the period examined there were 176 IA matters resulting in 748 allegations. Importantly, the majority (85%) of the allegations were from an external source and among the external sources in which the race of the complainant is known, 89% are Black.  Among the allegations in which the source is identified as internal, a much lower percentage are Black among those with a known race at 70%.

134.    Among the IA allegations, a Minority officer approved 97% of the ROIs (83% Black and 14.5% Hispanic).  More Disciplinary Action Recommendations were approved by Black officers than whites, with 72% of DARs being approved by Blacks officers, 16% by white officers, and 11.5% by Hispanic officers.

135.    Over 80% of the IA allegations that were Sustained had evidence indicated in the case file, such as pictures, videos, etc.  As Chief of Police Hector Velez testified, "it should be based on what the allegations are, what the officer did, what the investigation showed, and it should be based on the evidence.  And that officer's actions supported by evidence should be what is determined to move forward with discipline."[104]  Chief Velez's testimony repeated the importance of evidence, "but, again, it's all based on the evidence that's produced based on the investigation."[105]  He testified that "each case is different, each case has to be looked at differently, individually, and be based solely on what the evidence is in that particular case."[106]

---

[103] Examples of the disparate types of situations that are included in the IA matters are IA2016-054 for failing to conduct a field sobriety test on complainant (Non-sustained), IA2016-037 for "Allowing citizens to drive/operate an assigned police cruiser" (Non-sustained), or IA2018-031 for being unshaven (Exonerated).
[104] Deposition of Hector Velez, July 15, 2020, page 129, lines 10-15.
[105] Deposition of Hector Velez, July 15, 2020, page 130, lines 4-6.
[106] Deposition of Hector Velez, July 15, 2020, page 138, lines 20-24.

CONFIDENTIAL

136.    The following table shows the number and percentage of each demographic group by allegation.   There are 16 different types of allegations.   The majority of allegations are comprised of Excessive/Unnecessary Force (192), Use of Language (146), Unbecoming Conduct (138), Procedural Violation (106) and Protocol Violation (105).   For Black respondent officers, 25.0% of the allegations were for Excessive/Unnecessary Force with the next largest category being Use of Language (17.7%).   Likewise, for white respondent officers, 25.3% of the allegations were for Excessive/Unnecessary Force and 21.3% were for Use of Language.   Overall, contrary to Mr. Graham and Mr. Simon's assertions, Minority officers did *not* have more IA investigations.

| Table 17—Racial/Ethnic Composition of the Allegations in IA Matters | | | | | |
|---|---|---|---|---|---|
| **Allegation** | **Number and Distribution by Race/Ethnicity Group** | | | | |
| | **Asian** | **Black** | **Hispanic** | **White** | **Total** |
| **Total** | **22** | **300** | **42** | **376** | **748** |
| Attention to Duty | 0 | 0 | 0 | 1 | 1 |
| Bias-Based Profiling | 0 | 1 | 1 | 6 | 8 |
| Criminal Misconduct | 0 | 4 | 0 | 2 | 6 |
| Ethics Violation | 1 | 6 | 1 | 8 | 16 |
| Excessive/Unnecessary Force | 3 | 75 | 18 | 95 | 192 |
| FTA Court | 0 | 1 | 0 | 1 | 2 |
| Harassment | 0 | 5 | 0 | 7 | 13 |
| Insubordination | 0 | 3 | 0 | 2 | 5 |
| Integrity | 0 | 1 | 0 | 1 | 2 |
| Misrepresentation of Facts | 0 | 5 | 0 | 1 | 6 |
| Procedural Violation | 5 | 51 | 3 | 46 | 106 |
| Protocol | 4 | 42 | 7 | 51 | 105 |
| Retaliatory Acts Against Complainant | 0 | 1 | 0 | 0 | 1 |
| Unbecoming Conduct | 6 | 52 | 4 | 74 | 138 |
| Use of Force | 0 | 0 | 0 | 1 | 1 |
| Use of Language | 3 | 53 | 8 | 80 | 146 |
| **Distribution by Demographic Group** | | | | | |
| Attention to Duty | 0.00% | 0.00% | 0.00% | 0.27% | 0.13% |
| Bias-Based Profiling | 0.00% | 0.33% | 2.38% | 1.60% | 1.07% |
| Criminal Misconduct | 0.00% | 1.33% | 0.00% | 0.53% | 0.80% |
| Ethics Violation | 4.55% | 2.00% | 2.38% | 2.13% | 2.14% |
| Excessive/Unnecessary Force | 13.64% | 25.00% | 42.86% | 25.27% | 25.67% |

69

CONFIDENTIAL

| Table 17—Racial/Ethnic Composition of the Allegations in IA Matters | | | | | |
|---|---|---|---|---|---|
| **Allegation** | **Number and Distribution by Race/Ethnicity Group** | | | | |
| | **Asian** | **Black** | **Hispanic** | **White** | **Total** |
| FTA Court | 0.00% | 0.33% | 0.00% | 0.27% | 0.27% |
| Harassment | 0.00% | 1.67% | 0.00% | 1.86% | 1.74% |
| Insubordination | 0.00% | 1.00% | 0.00% | 0.53% | 0.67% |
| Integrity | 0.00% | 0.33% | 0.00% | 0.27% | 0.27% |
| Misrepresentation of Facts | 0.00% | 1.67% | 0.00% | 0.27% | 0.80% |
| Procedural Violation | 22.73% | 17.00% | 7.14% | 12.23% | 14.17% |
| Protocol | 18.18% | 14.00% | 16.67% | 13.56% | 14.04% |
| Retaliatory Acts Against Complainant | 0.00% | 0.33% | 0.00% | 0.00% | 0.13% |
| Unbecoming Conduct | 27.27% | 17.33% | 9.52% | 19.68% | 18.45% |
| Use of Force | 0.00% | 0.00% | 0.00% | 0.27% | 0.13% |
| Use of Language | 13.64% | 17.67% | 19.05% | 21.28% | 19.52% |
| Note: Officers of unknown or other race are included in the total count. | | | | | |

137.     Further, contrary to Mr. Graham and Mr. Simon, I found that among the IA Sustained allegations, white officers comprised half of the allegations.  Again, the most common category of discipline among IA allegations is a Written Reprimand.  There is variation in the Sustained finding and discipline imposed among the allegations consistent with Chief Velez's testimony that the evidence of each is considered and the discipline imposed is dependent upon the unique circumstances of each matter as well as the prior discipline imposed on the respondent officer.

138.     Most officers with a recommendation for discipline waived their right to a hearing and thus, accepted the finding of Sustained and the resulting discipline.  Among the IA matters, there were 12 allegations with decisions that were appealed: 10 from white respondent officers, 1 from a Hispanic respondent officer, and 1 from a Black respondent officer.  Therefore, less than 10% of the findings were disputed by the officers, regardless of demographic group.

139.     In conclusion, Minority officers did *not* have more IA investigations.  Mr. Graham and Mr. Simon again failed to consider the process of each investigation, the diversity of the review

CONFIDENTIAL

process, and the failure of the officers to appeal the Sustained findings in which the most common discipline that was imposed regardless of race was a Written Reprimand although the incidence of Written Reprimands varies from one type of allegation to another. Because of the differences among IA matters, the discipline imposed must be assessed by a review of the circumstances of each allegation.

## F.    SIRT Inquiry (SIQ)

140.    Similar to FC and IA inquiries, SIRT may also conduct inquiries. SIRT is part of Internal Affairs and investigates more serious allegations including criminal misconduct, firearm discharges, in custody deaths, and serious use of force.[107] An SIQ may also move from being an inquiry to an investigation. For example, SIQ2016-001 involved a white respondent that resulted in an investigation under SI2016-001.

141.    There were 39 SIQ inquiries resulting in 39 allegations taking into account the SIQ case number, respondent, and allegation. Of the 39, there were 19 that were a self-reported discharge of a firearm resulting from the shooting of a deer or raccoon. The shooting of the deer typically occurred when the deer was hit by a vehicle. Thus, there is a clear distinction between an SI investigation of a Discharge of Firearm involving a person and an SIQ inquiry involving an animal that was hit by a vehicle.

142.    Over 95% of the SIQ matters were among officers who were at the rank of Police Officer, POFC, Corporal, Sergeant, or Lieutenant. The table below shows the distribution of the 39 by race/ethnicity over the time period. Contrary to the assertions of Mr. Graham, white officers did not have an inquiry conducted at a higher rate. The higher incidence of an SI inquiry is with

---

[107] See Internal Affairs Division PowerPoint presentation prepared by Major McCreary, slide 25.

CONFIDENTIAL

respect to the Discharge of Firearms which as described above are related to the shooting of deer or a racoon.  There is one Use of Force SIQ matter (SIQ2017-004) which is related to the pursuit of an individual who stole a vehicle and broke his arm.  During the pursuit the assailant attempted to scale a wall and was apprehended, but the broken arm does not appear to be related to the officer touching the arrested.

| Table 18—Racial/Ethnic Composition of SIQ Matters Opened and Closed Between 2016 and March 2020 | | | | | |
|---|---|---|---|---|---|
| | Race of Respondent | | | | |
| Allegation | Asian | Black | Hispanic | White | Total |
| Canine Seizure | 0 | 0 | 0 | 2 | 2 |
| Discharge of Firearm | 1 | 7 | 1 | 10 | 19 |
| Ethics Violation | 0 | 1 | 0 | 0 | 1 |
| Excessive/Unnecessary Force | 0 | 1 | 0 | 3 | 4 |
| Secondary Employment Violation | 0 | 0 | 0 | 1 | 1 |
| Unbecoming Conduct | 0 | 7 | 0 | 3 | 11 |
| Use of Force | 0 | 1 | 0 | 0 | 1 |
| Officers with unknown race are included in the total. | | | | | |

143.    I determined that the numbers of standard deviations associated with these counts indicate that the number of Black, Asian, Hispanic, and white SI inquiries are not statistically significantly different from the expected when compared to the demographic group composition among officers at the rank from which the allegations occurred.

| Table 19—Analysis of the Number of SIQ Allegations by the Race of the Respondent Compared to the Demographic Composition of the Workforce* | | | | | | |
|---|---|---|---|---|---|---|
| Allegation | Percentage in Demographic Group 2016-2020* | Number of SIQ Allegations | Number in Racial/ Ethnic Group | Number Predicted in Racial/ Ethnic Group | Difference Between Actual and Predicted | Number of Standard Deviations |
| Demographic Group Compared:  Black | | | | | | |
| Canine Seizure | 42.06% | 2 | 0 | 0.84 | -0.84 | -0.49 |
| Discharge of Firearm | 42.06% | 19 | 7 | 7.99 | -0.99 | -0.23 |
| Ethics | 42.06% | 1 | 1 | 0.42 | 0.58 | 0.16 |
| Excessive/Unnecessary Force | 42.06% | 4 | 1 | 1.68 | -0.68 | -0.18 |

72

| Allegation | Percentage in Demographic Group 2016-2020* | Number of SIQ Allegations | Number in Racial/ Ethnic Group | Number Predicted in Racial/ Ethnic Group | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|
| **Table 19—Analysis of the Number of SIQ Allegations by the Race of the Respondent Compared to the Demographic Composition of the Workforce*** | | | | | | |
| Secondary Employment Violation | 42.06% | 1 | 0 | 0.42 | -0.42 | 0.00 |
| Unbecoming Conduct | 42.06% | 11 | 7 | 4.63 | 2.37 | 1.14 |
| Use of Force | 42.06% | 1 | 1 | 0.42 | 0.58 | 0.16 |
| *Demographic Group Compared:  White* | | | | | | |
| Canine Seizure | 45.36% | 2 | 2 | 0.91 | 1.09 | 0.84 |
| Discharge of Firearm | 45.36% | 19 | 10 | 8.62 | 1.38 | 0.41 |
| Ethics | 45.36% | 1 | 0 | 0.45 | -0.45 | 0.00 |
| Excessive/Unnecessary Force | 45.36% | 4 | 3 | 1.81 | 1.19 | 0.69 |
| Secondary Employment Violation | 45.36% | 1 | 1 | 0.45 | 0.55 | 0.09 |
| Unbecoming Conduct | 45.36% | 11 | 3 | 4.99 | -1.99 | -0.90 |
| Use of Force | 45.36% | 1 | 0 | 0.45 | -0.45 | 0.00 |
| *Demographic Group Compared:  Hispanic* | | | | | | |
| Canine Seizure | 8.91% | 2 | 0 | 0.18 | -0.18 | 0.00 |
| Discharge of Firearm | 8.91% | 19 | 1 | 1.69 | -0.69 | -0.15 |
| Ethics | 8.91% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| Excessive/Unnecessary Force | 8.91% | 4 | 0 | 0.36 | -0.36 | 0.00 |
| Secondary Employment Violation | 8.91% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| Unbecoming Conduct | 8.91% | 11 | 0 | 0.98 | -0.98 | -0.51 |
| Use of Force | 8.91% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| *Demographic Group Compared:  Asian* | | | | | | |
| Canine Seizure | 3.43% | 2 | 0 | 0.07 | -0.07 | 0.00 |
| Discharge of Firearm | 3.43% | 19 | 1 | 0.65 | 0.35 | 0.00 |
| Ethics | 3.43% | 1 | 0 | 0.03 | -0.03 | 0.00 |
| Excessive/Unnecessary Force | 3.43% | 4 | 0 | 0.14 | -0.14 | 0.00 |
| Secondary Employment Violation | 3.43% | 1 | 0 | 0.03 | -0.03 | 0.00 |
| Unbecoming Conduct | 3.43% | 11 | 0 | 0.38 | -0.38 | 0.00 |
| Use of Force | 3.43% | 1 | 0 | 0.03 | -0.03 | 0.00 |

* PGPD workforce based on the percentage in each rank from the January 1, 2016, 2017, 2018, 2019, and 2020 snapshots weighted by the percentage of allegations from each rank.

CONFIDENTIAL

144.     Aside from the self-reported allegations, there are four SI inquiries resulting from an internal complaint, of which two had a Black respondent and two had a white respondent. Overall, there is not a pattern of more or fewer SI inquiries by race/ethnicity.

## G.     SIRT Investigation (SI)

145.     The SI matters are comprised of a wide range of allegations and specific alleged acts that are not comparable from one matter to another.  As Major McCreary testified, each investigation is unique and it is difficult to handle the cases in a cookie-cutter way.[108]  For example, there are SI matters that deal with alleged domestic abuse by a respondent police officer, allegations of driving under the influence, physical altercations with citizens when not on duty, physical altercations with citizens in the course of duty, accidental discharge of a firearm in the pursuit of a robbery suspect, and discharge of a firearm where an officer has been killed in the line of duty, among other allegations.  SI matters do not have a typical allegation and each file should be reviewed for the witness statements, investigator statements and reports, and the final reports.[109]

146.     There were 164 SI matters resulting in 527 allegations.  Approximately 25% of the Request for Case Numbers for SI matters were approved by a Minority officer.  Six percent of ROIs were approved by a Minority officer.  Approximately 27% of DARs were approved by a Minority officer.  Importantly, nearly 95% (94.15) of the SI allegations that were sustained noted evidence in the case documents, typically, video and/or photographic evidence.

147.     The majority of the allegations were from an external source (56%), while 18.0% were from an internal source and 26% were from a self-report.  Among the external complainants with race/ethnicity identified, the majority (73%) were Black.  Mr. Graham and Mr. Simon fail to

---

[108] Deposition of James McCreary, June 15, 2020, page 51, lines 18-20.
[109] Examples of the disparate types of situations that are included in the SI matters are SI2016-006 for domestic abuse allegations (Sustained), SI2017-032 for Discharge of Firearm/Vicious Dog (Exonerated), or SI2017-066 where the respondent was found guilty of Reckless Driving exceeding 124 mph in the State of Virginia (Sustained).

CONFIDENTIAL

consider the higher proportion of allegations that stem from a self-reported incident. These are often the result of a Use of Force Review which is self-reported, as discussed above. If the Use of Force results in a broken bone, for example, an SI investigation will occur. Further, Mr. Graham and Mr. Simon fail to consider that external (i.e., citizen) allegations are required to be investigated.

148.    A simple comparison of a workforce composition to the SI matters is uninformative and misleading. A review of the case documents and files finds that many involve multiple allegations. For example, a Domestic Assault case may involve 10 allegations. If all are Sustained, then for a single matter the officer will appear to have 10 Sustained findings and treated the same as 10 officers each with one Sustained finding. Consequently, officers with multiple allegations for a matter may skew the findings.

149.    I found that this did occur among the SI matters that opened and closed during 2016 through March 2020. Among the 527 allegations, there are 188 Sustained. Among the 188 Sustained, nearly 40% (74) of the Sustained allegations are attributed to four Black officers with a total of 10 SI cases:　　　　　　　(6 cases);　　　　　　　(1 case), Eric Beale (2 cases), and　　　　　(1 case). The following describes the SI matters for each of the four during the period from 2016 through March 2020 and illustrates how multiple allegations for a matter influences any analysis of the rate of allegations and rate of Sustained findings as well as the action taken.

### 1. Police Officer ▮▮▮▮▮

150.    ▮▮▮▮▮ has 6 SI cases resulting in 33 allegations of various types of misconduct and ranging in time from February 26, 2016 through December 5, 2017 of which 29 were Sustained. The table below contains the details for each matter including the matter number,

CONFIDENTIAL

allegation/directive (if any), additional information about the allegation, the finding, and the discipline (i.e., the action taken).[110] Many of the allegations stem from domestic assault and/or violence followed by theft and insurance fraud. PO ███ was terminated in February 2018 after the finding of Guilty by the hearing board for several domestic abuse allegations from his first SI matter, SI2016-006, with an action taken of Termination. Depending on the findings and action taken, Mr. Graham and Mr. Simon, may have inflated their counts.

151.    PO ███ first SI matter, SI2016-006, occurred in February 2016 where there are 10 allegations including Criminal Misconduct (1), False Statement (1), and Unbecoming Conduct (8) all of which are related to domestic assault of the involved citizen/victim. After the investigative process conducted by Corp. Brett Shapiro was completed and reviewed by Capt. Michael Smith and Maj. Kathleen Mills, the findings were that the allegation of Criminal Misconduct was Exonerated, the allegation of False Statement was Sustained, the Unbecoming Conduct allegations for Protective/Peace Order (1), Domestic Assault (3), Pushing Complainant (1), Tripping (1), and being Disrespectful (1) were all Sustained.   One allegation of Protective/Peace order had a finding of Non-Sustained.[111]

152.    A Citizen Complaint Oversight Panel was conducted and the CCOP agreed with the findings from the investigation. PO ███ appealed the findings and a hearing board was convened on February 5, 2018 under coordinator Sgt. Richard Pippin. The hearing board participants were Maj. Irene Burks, Capt. Cynthia Ruff, and PO Christopher Carvalho (Officer of Equal Rank) and found that PO ███ was guilty of all but two of the allegations which he had

---

[110] SI2016-006, PGIAD0000099627-100602; SI2016-036, PG0000159071-159209; SI2017-006, PGIAD0000067714-68001; SI2017-039, PGIAD0000072294-72476; SI2017-059, PGIAD0000135227-135295; and SI2017-075, PGIAD0000135665-135976.
[111] See SI2016-006, PGIAD0000099627-100602.

CONFIDENTIAL

appealed. PO ███████ was terminated as a result of the guilty determination from the hearing board.

153.    PO ███████ second SI matter (SI2016-036) occurred in June 2016 and had an allegation of Secondary Employment Violation. After the investigative process conducted by Corp. Brett Shapiro was completed and reviewed by Capt. Michael Smith and Maj. Kathleen Mills, the findings were that the allegation was Sustained. PO ███████ did *not* appeal the finding and the action taken was Suspended 20 Hours Without Pay.[112]

154.    PO ███████ third SI matter, SI2017-006, occurred in January 2017 and has the following allegations: False Statements (2), Insubordination (4), Procedural Violation (1), and Unbecoming Conduct (1). As in SI2016-006, the allegations stemmed from a domestic dispute with the same involved citizen. The investigation was conducted by Sgt. Kyle Bodenhorn with review by Capt. Michael Smith and Maj. Kathleen Mills. All but one of the allegations for Unbecoming Conduct were Sustained and the action taken was to note that PO ███████ had already been terminated. The CCOP agreed with the findings.[113]

155.    The fourth SI matter, SI2017-039, occurred in August 2017 and has the following allegations: Ethics (3) and Unbecoming Conduct (4). As in SI2016-006 and SI2017-006, the allegations stem from complaints of domestic abuse by the same involved citizen and this time on behalf of their child. The investigation was conducted by Sgt. Steven Cobb, Sgt. Tina Blackistone and Corp. Ja'Net Pettus with review by Capt. Michael Smith and Maj. Kathleen Mills. All 7 allegations have findings of Sustained with approval from the CCOP. Again, PO ███████ did *not* appeal the findings.[114]

---

[112] See SI2016-036, PG0000159071-159209.
[113] See SI2017-006, PGIAD0000067714-68001.
[114] See SI2017-039, PGIAD0000072294-72476.

77

156.    The fifth SI matter, SI2017-059, occurred in October 2017 and has a single allegation of Unbecoming Conduct for Theft. The allegation was made by an officer with the Metropolitan Police Department.  The investigation was conducted by Corp. Brett Shapiro.  This matter was administratively closed because of the prior termination of PO ███████ from matter SI2016-006.[115]

157.    The sixth and final SI matter for PO ██████ SI2017-075, occurred in December 2017 and has 5 allegations: Unbecoming Conduct (2) and False Statement (3).  PO █████ is alleged to have filed a fraudulent insurance claim and to have filed a fraudulent police report as well as making false statements.  The investigation was conducted by Corp. Bryan Medina.  This matter was administratively closed because of the prior termination of PO ███████ from matter SI2016-006.[116]

| | | | |
|---|---|---|---|
| **Table 20—SI Matters for PO Bashua ██████** | | | |
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| **SI2016-006** | | | |
| Unbecoming Conduct: Protective Order/Peace Order | Entered the home of ██████████ and took their child after being advised that she had a protective order against him. | Sustained | Fine - $1500 |
| Unbecoming Conduct: Domestic Assault | Pushed and punched ████████, in an attempt to get her out of the vehicle he was operating as he tried to drive off with their child | Sustained | Termination |
| Unbecoming Conduct: Pushing Complainant | Pushed █████████████ out of the car causing her to fall to the ground while she was holding their child | Sustained | Termination |
| Unbecoming Conduct: Tripping | Chased after ████████████ as she ran away holding their child and tripped her causing her to fall to the ground | Sustained | Termination |
| Unbecoming Conduct: Disrespectful | Disrespectful and uncooperative while speaking with ██████████ via text messages and phone conversations | Sustained | Termination |

[115] See SI2017-059, PGIAD0000135227-135295.
[116] See SI2017-075, PGIAD0000135665-135976.

78

| Allegation/Directive | More Detailed Information | Finding | Action taken (i.e., Discipline) |
|---|---|---|---|
| **Table 20—SI Matters for PO** ███ | | | |
| False Statement: False Statement | Provided a false statement to Lieutenant Hugh Darden #2171, when he denied that he tripped ███ | Sustained | Termination |
| Unbecoming Conduct: Domestic Assault | Intentionally drove the vehicle he was operating into a fire hydrant in an attempt to knock ███, off of the vehicle | Sustained | AHB-Not Guilty |
| Unbecoming Conduct: Domestic Assault | Stood over Involved Citizen ███ while she was on the ground holding their son pushing and hitting her attempting to gain control of their son | Sustained | AHB-Not Guilty |
| Unbecoming Conduct: Protective Order/Peace Order | Involved Citizen ███ obtained a Temporary Protective Order against Respondent ███ | Non-Sustained | None |
| Criminal Misconduct: Charged criminally | Was charged criminally for assaulting Involved Citizen ███ | Exonerated | None |
| **SI2016-036** | | | |
| Secondary Employment Violation | Was working secondary employment while suspended | Sustained | Suspended (20) Hours Without Pay |
| **SI2017-006** | | | |
| Unbecoming Conduct | Harassing and intimidating Involved Citizen ███ when at ███ on January 30-31, 2017 | Sustained | Terminated prior to final discipline |
| Unbecoming Conduct: Protective Order/Peace Order | Receiving a final order of protection as requested by ███ | Unfounded | None |
| False Statement | Making a false statement to Sgt. Bodenhorn when ordered to provide a current address | Sustained | Terminated prior to final discipline |
| Insubordination | Failed to comply with direct order from Sgt. Bodenhorn, to provide current address | Sustained | Terminated prior to final discipline |
| Procedural Violation | Failure to comply with General Order Vol., I, Ch. 32, Protocol Section 27, Employee personal information, changes in information. | Sustained | Terminated prior to final discipline |
| False Statement | Making a false statement to Sgt. Blackistone and Cpl. Shapiro when asked about his current address | Sustained | Terminated prior to final discipline |

79

**CONFIDENTIAL**

| Table 20—SI Matters for PO ██████ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| Insubordination | Failed to comply with direct order given by A/Sgt. Caradori, to exchange child custody only at a police station | Sustained | Terminated prior to final discipline |
| Insubordination | Failed to comply with direct order from Sgt. Bodenhorn, to provide documentation and proof of the sale and transfer of personally owned firearms | Sustained | Terminated prior to final discipline |
| Insubordination | Refusing to comply with direct order from Sgt. Bodenhorn, to attend Psychological counseling at one of the recommended private providers or the Employee Assistance Program and provide documentation of attendance to Sgt. Bodenhorn | Sustained | Terminated prior to final discipline |
| **SI2017-039** | | | |
| Unbecoming Conduct: Protective Order/Peace Order | Received a Final Order of Protection as requested by ████████ on behalf of ████ | Sustained | Termination |
| Unbecoming Conduct | Transported 2 year old ████ in a motor vehicle while the child was not secured in a child safety seat) | Sustained | Written Reprimand |
| Unbecoming Conduct | Operated a motor vehicle in a reckless and unsafe manner. | Sustained | Fine - $100 |
| Unbecoming Conduct | Operated a motor vehicle while not in possession of a valid driver's license | Sustained | Written Reprimand |
| Ethics: False Statement | Told Sergeant Blackistone #2053 during a recorded interrogation that he transported ████ in a child safety seat) | Sustained | Termination |
| Ethics: False Statement | Told Sergeant Blackistone #2053 during a recorded interrogation that his sister removed ████ and a child safety seat from his vehicle | Sustained | Termination |
| Ethics: False Statement | Told Sergeant Blackistone #2053 during a recorded interrogation that ████ had been a front seat passenger in his vehicle | Sustained | Termination |
| **SI2017-075** | | | |
| Unbecoming Conduct: Theft | | Administrative Closure | None |
| Unbecoming Conduct: Insurance Fraud | Filed a fraudulent insurance claim | Sustained | Administratively Closed |

80

**CONFIDENTIAL**

| Allegation/Directive | More Detailed Information | Finding | Action taken (i.e., Discipline) |
|---|---|---|---|
| Table 20—SI Matters for PO ████████ | | | |
| | | | (Terminated on March 14, 2018) |
| Unbecoming Conduct: False Report | Filed a fraudulent police report | Sustained | Administratively Closed (Terminated on March 14, 2018) |
| False Statement | Made a false statement to witness ██████ regarding travel to North Carolina | Sustained | Administratively Closed (Terminated on March 14, 2018) |
| False Statement | Made a false statement to witness ██████ regarding where he lives | Sustained | Administratively Closed (Terminated on March 14, 2018) |
| False Statement | Made a false statement to Sgt. Judd regarding his whereabouts during shift | Sustained | Administratively Closed (Terminated on March 14, 2018) |

### 2. Corporal ████████

158.    Corp. ████████ has one (1) SI matter resulting in 33 allegations of which 22 were Sustained.  The table below contains the details for the matter (SI2018-064) including the allegation/directive (if any), additional information describing the allegation, the finding, and the action taken.[117]  In the reports of Mr. Graham and Mr. Simon, these allegations would have been included without regard to the fact that there are, for example, multiple allegations of Unbecoming Conduct for a single matter. Therefore, the analyses of Mr. Graham and Mr. Simon are inflating the extent of allegations/discipline due to SI matters.

159.    Corp. ████ SI matter, SI2018-064, occurred during 2017 and 2018 where the 33 allegations include Criminal Misconduct (4), Procedural Violation (7), and Unbecoming Conduct

---

[117] See SI2018-064, PGIAD0000125163-125719

81

(22).  It is alleged that Corp. ███ sexually assaulted a fellow officer multiple times and harassed her.  After the investigative process conducted by Corp. Tovonia Brown was completed and reviewed by Capt. David Robinson and A/Maj. McCreary, the findings were that the allegations of Criminal Misconduct were Unfounded, the allegations of Procedural Violations for the Unauthorized Dissemination of Police Records were all Sustained and had a punishment of a Written Reprimand.  The allegations of Unbecoming Conduct for "Sexual Misconduct" were Non-sustained (3), Unfounded (3); and Sustained for all 15 allegations with a Directive of  "Sexual Contact while on-duty" with a resulting discipline of "Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year"; the allegation of Unbecoming Conduct for "Protective/Peace Order" was determined to be Unfounded.  He also had 7 Sustained allegations for Procedural Violations.

160.    A Citizen Complaint Oversight Panel was conducted and the CCOP agreed with the findings from the investigation.   Corp. ███ did *not* appeal the findings and resulting discipline.

| Table 21—SI Matters for Corp ███ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| **SI2018-064** | | | |
| Criminal Misconduct: Protective/Peace Order | Sexually assaulted Involved Citizen ███ the Aviation Unit hangar | Unfounded | None |
| Criminal Misconduct: Protective/Peace Order | Sexually assaulted Involved Citizen ███ at her home, on March 21, 2018. | Unfounded | None |
| Criminal Misconduct: Protective/Peace Order | Sexually assaulted Involved Citizen ███ at her home on June 29, 2018. | Unfounded | None |
| Criminal Misconduct: Protective/Peace Order | Threaten Involved Citizen ███ with a gun at her home in Charles County on September 24, 2018 | Unfounded | None |
| Unbecoming Conduct: Sexual Misconduct | Forced Involved Citizen ███ to perform fellatio on | Non-Sustained | None |

82

CONFIDENTIAL

| Table 21—SI Matters for Corp ███████ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| | him while he was on duty in Prince George's County on July 10, 2017 | | |
| Unbecoming Conduct: Sexual Misconduct | Video recorded himself clinching his anal sphincter muscle at the Aviation Unit hangar while on duty and sent it to Involved Citizen ███ | Non-Sustained | None |
| Unbecoming Conduct: Sexual Misconduct | Was on duty at the Aviation Unit hangar when he took a picture of his penis in the common area wearing his flight suit, black underwear on November 17, 2017 and sent it to Involved Citizen ███ | Non-Sustained | None |
| Unbecoming Conduct: Sexual Misconduct | Engaged in non-consensual vaginal intercourse with Involved Citizen ███ at her home in Charles County, March 21, 2018 | Unfounded | None |
| Unbecoming Conduct: Sexual Misconduct | Engaged in non-consensual anal intercourse with Involved Citizen ███ at her home in Charles County on June 29, 2018 | Unfounded | None |
| Unbecoming Conduct: Protective Order/Peace Order | On September 24, 2018, pointed a gun at Involved Citizen ███ and stated "Stay the fuck away from my family or I will kill you, you fucking Bitch." | Unfounded | None |
| Unbecoming Conduct: Sexual Misconduct | Performed Cunnilingus on Involved Citizen ███ at the Aviation Unit hangar while on duty in May 2018 | Unfounded | None |
| Unbecoming Conduct: Sexual Contact while on-duty | Engaged in sexual intercourse with Involved Citizen ███ at the Aviation Unit hangar in October 2016 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Engaged in sexual intercourse with Involved Citizen ███ in his marked police cruiser in Cedarville State Park on November 22, 2016. | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |

83

CONFIDENTIAL

| Table 21—SI Matters for Corp ████████ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| Unbecoming Conduct: Sexual Contact while on-duty | Engaged in sexual intercourse with Involved Citizen ████ at the Aviation Unit hangar while on duty on March 12, 2017 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Engaged in sexual intercourse with Involved Citizen ████ at the Aviation Unit hangar while on duty on June 18, 2017. | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Engaged in sexual intercourse on video with Involved Citizen ████ at the Aviation Unit hangar while on duty on December 4, 2016. | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Video recorded himself masturbating in the Aviation Unit hangar bathroom while on duty and sent the recording to Involved Citizen ████ | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Engaged in sexual intercourse with Involved Citizen ████ at the Aviation Unit hangar while on duty on June 04, 2018 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Engaged in sexual intercourse with Involved Citizen ████ at the Aviation Unit hangar while on duty on June 10, 2018 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Was on duty in the Aviation Unit hangar bathroom, took a nude photograph of himself and sent the picture to Involved Citizen ████ March 2017 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Was on duty in the Aviation Unit hangar bathroom, took a photograph of his penis, black underwear and sent the picture to Involved Citizen ████, between February 5 & 28, 2018 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Was on duty at the Aviation Unit hangar when he took a picture of his penis sitting | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the |

84

| Table 21—SI Matters for Corp ▮▮▮▮▮▮ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| | inside the hangar with the helicopter in the background area and sent it to Involved Citizen ▮▮▮ on July 23, 2016 | | Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Was on duty at the Aviation Unit hangar when he took a picture of him wearing his flight suit on December 05, 2016 and sent it to Involved Citizen ▮▮▮ | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Was on duty at the Aviation Unit hangar when he took a picture exposing his penis and buttocks and sent it to Involved Citizen ▮▮▮ on November 23, 2017 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Was on duty at the Aviation Unit hangar when he took a picture of his penis showing red underwear and sent it to Involved Citizen ▮▮▮ on March 2017 | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Unbecoming Conduct: Sexual Contact while on-duty | Was on duty at the Aviation Unit hangar on June 18, 2017, when he engaged in sexual intercourse with Involved Citizen ▮▮▮ outside of the building | Sustained | Reduction in Rank & Salary to Police Officer and be removed from the Promotional Cycle for Police Officer First Class for one (1) year |
| Procedural Violation: Unauthorized Dissemination of Police Records | Sent two Helicopter Unit Incident Summary Report to Involved Citizen ▮▮▮ dated November 8, 2016 | Sustained | Written Reprimand |
| Procedural Violation: Unauthorized Dissemination of Police Records | Sent a Helicopter Unit Incident Summary Report to Involved Citizen ▮▮▮ dated December 28, 2016 | Sustained | Written Reprimand |
| Procedural Violation: Unauthorized Dissemination of Police Records | Sent a Helicopter Unit Incident Summary Report to Involved Citizen ▮▮▮ dated January 4, 2017 | Sustained | Written Reprimand |
| Procedural Violation: Unauthorized Dissemination of Police Records | Sent a Helicopter Unit Incident Summary Report to Involved Citizen ▮▮▮ dated January 6, 2017 | Sustained | Written Reprimand |

85

CONFIDENTIAL

| Table 21—SI Matters for Corp ███████ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| Procedural Violation: Unauthorized Dissemination of Police Records | Sent a Helicopter Unit Incident Summary Report to Involved Citizen ███ dated January 7, 2017 | Sustained | Written Reprimand |
| Procedural Violation: Unauthorized Dissemination of Police Records | Sent a Helicopter Unit Incident Summary Report to Involved Citizen ███ dated March 17, 2018 | Sustained | Written Reprimand |
| Procedural Violation: Unauthorized Dissemination of Police Records | Sent a Helicopter Unit Incident Summary Report to Involved Citizen ███ dated April 30, 2018 | Sustained | Written Reprimand |

161.    Again, Mr. Graham and Mr. Simon would have counted all the allegations as unique allegations and Sustained findings when they all involve one complainant.    The 33 allegations again stem from a Black external complainant.

### 3.  Police Officer Eric Beale: SI Matters

162.    As discussed above Plaintiff Eric Beale has 2 SI matters resulting in 11 total allegations of which 9 were Sustained.    The table below contains the details for each matter including the matter number, allegation/ directive (if any), additional information describing the allegation, the finding, and the action taken.    Ten of Mr. Beale's 11 allegations are from matter SI2016-011 for False Statements, Misrepresentation of Facts, Integrity and Loyalty.    PO Beale was terminated in December 2017 after the hearing board recommended/agreed with the recommendation of Termination.    In the reports of Mr. Graham and Mr. Simon, these allegations would have been included without regard to the fact that there are, for example, multiple allegations of Unbecoming Conduct for a single matter.    Therefore, the analyses of Mr. Graham and Mr. Simon are inflating the extent of allegations/discipline due to SI matters.

86

CONFIDENTIAL

163.     PO Beale's first SI matter, SI2016-011, occurred in March 2016 where there are 10 allegations including Ethics Violation (1), False Statement (1), Integrity (2), Loyalty (1), Misrepresentation of Facts (3), Policy-Equipment (1), and Unbecoming Conduct (1).   After the investigative process conducted by Corp. Bryan Medina was completed and reviewed by Capt. Michael Smith and Maj. Kathleen Mills, the findings were that the allegation of Policy Equipment was Non-sustained and the remaining allegations were all Sustained.[118]

164.     A Citizen Complaint Oversight Panel was conducted and the CCOP agreed with the findings from the investigation.   PO Beale appealed the findings and a hearing board was convened on October 5, 2017 under coordinator Lt. Joseph Ghattas.   The hearing board participants were Maj. Irene Burks, Capt. Cynthia Ruff, and PO Harold Nichols (Officer of Equal Rank) and found that PO Beale was guilty of the allegations which he had appealed and further changed the action taken for 3 of the allegations from a $250 fine to Termination.

165.     The second SI matter for PO Beale is SI2016-016, also in March 2016.   The single allegation of Attention to Duty with a Directive of Unbecoming Conduct was administratively closed.[119]

| Table 22—SI Matters for PO Eric Beale | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action Taken (i.e., Discipline)** |
| SI2016-011 | | | |
| Ethics Violation | Failed to disclose Involved Citizen ███ was his roommate to Witness ███ | Sustained | Termination |
| False Statement | Made a false statement about Involved Citizen ███ address | Sustained | Termination |
| Integrity | Failed to disclose Involved Citizen ███ was his roommate to Sgt ███ | Sustained | Termination |
| Integrity | Withheld from Witness ███ that he knew Involved Citizen ███ address | Sustained | Termination |

---

[118] See SI2016-011, PGIAD0000113736-114269.
[119] See SI2016-016, PGIAD0000101255-101343.

CONFIDENTIAL

| Table 22—SI Matters for PO Eric Beale | | | |
|---|---|---|---|
| Allegation/Directive | More Detailed Information | Finding | Action Taken (i.e., Discipline) |
| Loyalty | Lied to protect Involved Citizen ████ over the PD | Sustained | Termination |
| Misrepresentation of Facts | Intentionally omitted to ████████ that he was roommate of Involved Citizen | Sustained | Termination |
| Misrepresentation of Facts | Willfully misled Sgt. ████████ regarding the address of Involved Citizen ████████ | Sustained | Termination |
| Misrepresentation of Facts | Intentionally provided false information about Involved Citizen ████ to Witness ████ | Sustained | Termination |
| Policy Equipment | Gave PD hat badge to Involved Citizen ████ | Non-Sustained | None |
| Unbecoming Conduct | Engaged in conduct that reflects poorly on the Department by failing to provide complete information about Involved Citizen ████ to Witness ████ | Sustained | Termination |
| SI2016-016 | | | |
| Attention to Duty: Unbecoming Conduct | The Charge was re-classified | Administrative Closure | None |

### 4. POFC ████████

166.     POFC ████ ████ has one (1) SI matter resulting in 14 allegations all of which were Sustained.  The table below contains the details for the matter, SI2016-031, including the allegation/directive (if any), additional information describing each allegation, and the action taken.[120]  In the reports of Mr. Graham and Mr. Simon, these allegations would have been included without regard to the fact that there are, for example, multiple allegations of Unbecoming Conduct for a single matter.  Therefore, the analyses of Mr. Graham and Mr. Simon are inflating the extent of allegations/discipline due to SI matters.

167.     POFC ████ SI matter, SI2016-031, occurred in June 2016 where the 14 allegations include Criminal Misconduct (5), Ethics Violation (1), False Statement (1), Misconduct in Office

---

[120] See SI2016-031, PGIAD0000103560-104275.

CONFIDENTIAL

(1), and Unbecoming Conduct (6). It is alleged that POFC ███ conducted visual surveillance of multiple citizens with prurient intent. He confessed to recording over 20 women. In SI2016-031, there are 3 named citizens who made allegations of the recording and an anonymous complaint. After the investigative process conducted by Corp. Bryan Medina was completed and reviewed by Capt. Michael Smith and Maj. Kathleen Mills, all allegations had a finding of Sustained.

168.     A Citizen Complaint Oversight Panel was conducted and the CCOP agreed with the findings from the investigation. POFC ███ resigned prior to action being taken; however, the recommended action was Termination.

| Table 23—SI Matters for POFC ███ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| **SI2016-031** | | | |
| Criminal Misconduct | Did with prurient intent conduct visual surveillance of Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |
| Criminal Misconduct | Misconduct in Office in reference to his contact with Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |
| Criminal Misconduct | Misconduct in Office in reference to his contact with Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |
| Criminal Misconduct | Did with prurient intent conduct visual surveillance of Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |
| Criminal Misconduct | Did with prurient intent conduct visual surveillance of an Involved Citizen Unknown | Sustained | Resigned Prior to Final Discipline |
| Ethics Violation | Did confess to recording over 20 women | Sustained | Resigned Prior to Final Discipline |
| False Statement | Did make a false statement to Cpl. Medina and Sgt. Blackistone | Sustained | Resigned Prior to Final Discipline |
| Misconduct in Office | Did with prurient intent conduct visual surveillance of Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |
| Unbecoming Conduct | Did with prurient intent conduct visual surveillance of Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |
| Unbecoming Conduct | Misconduct in Office in reference to his contact with Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |
| Unbecoming Conduct | Misconduct in Office in reference to his contact with Involved Citizen ███ | Sustained | Resigned Prior to Final Discipline |

89

| Table 23—SI Matters for POFC ███ | | | |
|---|---|---|---|
| **Allegation/Directive** | **More Detailed Information** | **Finding** | **Action taken (i.e., Discipline)** |
| Unbecoming Conduct | Did with prurient intent conduct visual surveillance of Involved Citizen ████ | Sustained | Resigned Prior to Final Discipline |
| Unbecoming Conduct | Did with prurient intent conduct visual surveillance of an Involved Citizen Unknown | Sustained | Resigned Prior to Final Discipline |
| Unbecoming Conduct | Did with prurient intent conduct visual surveillance of Involved Citizen ████ | Sustained | Resigned Prior to Final Discipline |

169.    These four officers comprise nearly 40% of the Sustained SI allegations, therefore influencing any analyses conducted by either Mr. Graham or Mr. Simon.  Both Mr. Graham and Mr. Simon fails to account for the fact that the same officer could be in the data multiple times and in the data multiple times for the same allegation thereby influencing his results.  If one officer has 33 allegations such as Corporal ████, then this one officer for one case may account for a large portion of the allegations.  In this example, it is not 33 different Black officers, but 33 allegations associated with one (1) matter for one (1) officer.

170.    A review also shows the unique nature of each of these allegations consistent with the testimony of Chief Velez and Major McCreary.  The table below lists the 28 different types of allegations among the SI investigations.  The largest allegation type is Unbecoming Conduct, which can encompass a myriad of different types of conduct that are not directly comparable to one another absent a review of the circumstances of each allegation.[121]  The same is true for the other allegation categories.

---

[121] Examples of Unbecoming Conduct can be found in SI2018-032 for an Interim Protection Order being filed (Non-sustained), SI2016-031 with one allegation described as "Did with prurient intent conduct visual surveillance of Involved Citizen" (Sustained), or SI2017-026 with an allegation described as "Unjustified behavior that reflected poorly on themselves and the agency surrounding the interactions with individual that resulted in damage to a payment terminal in a taxi cab" (Sustained).

90

CONFIDENTIAL

| Table 24—Distribution of SI Investigations by Type of Allegation | | |
|---|---|---|
| **Allegation** | **Number of Investigations** | **Percentage of SI Investigations** |
| Accidental Discharge | 6 | 1.14% |
| Attention to Duty | 9 | 1.71% |
| County Code Violation | 1 | 0.19% |
| Criminal Misconduct | 41 | 7.78% |
| Departmental Accident | 1 | 0.19% |
| Discharge of Firearm | 6 | 1.14% |
| Equipment Policy | 1 | 0.19% |
| Ethics Violation | 16 | 3.04% |
| Excessive/Unnecessary Force | 88 | 16.70% |
| False Statement | 17 | 3.23% |
| Firearms Violation | 4 | 0.76% |
| Firearms and Intoxicants | 2 | 0.38% |
| Harassment | 3 | 0.57% |
| Insubordination | 5 | 0.95% |
| Integrity | 5 | 0.95% |
| Lethal Force | 1 | 0.19% |
| Loyalty | 1 | 0.19% |
| MVS (Required Use) | 1 | 0.19% |
| Misconduct in Office | 1 | 0.19% |
| Misrepresentation of Facts | 3 | 0.57% |
| Policy | 1 | 0.19% |
| Procedural Violation | 70 | 13.28% |
| Protocol | 9 | 1.71% |
| Secondary Employment Violation | 1 | 0.19% |
| Unbecoming Conduct | 183 | 34.72% |
| Use of Force | 19 | 3.61% |
| Use of Language | 28 | 5.31% |
| Violation of Laws | 4 | 0.76% |
| Total | 527 | 100.00% |

171.     The following table shows the number and percent of each demographic group by allegation.  The table below displays the number and percent within each demographic group across the SI allegations.  While there are categories with differences by race/ethnicity, as the discussion above illustrated, such a summary for SI is not useful given the unique circumstances of each complaint, the resulting allegations, and repeated findings.

91

| Table 25—Racial/Ethnic Composition of SI Matters Open and Closed Between 2016 and March 2020 By Allegation | | | | | |
|---|---|---|---|---|---|
| **Allegation** | **Number and Distribution by Race/Ethnicity Group** | | | | |
| | **Asian** | **Black** | **Hispanic** | **White** | **Total** |
| Accidental Discharge | 1 | 1 | 0 | 4 | 6 |
| Attention to Duty | 0 | 5 | 0 | 4 | 9 |
| County Code Violation | 0 | 1 | 0 | 0 | 1 |
| Criminal Misconduct | 1 | 33 | 1 | 6 | 41 |
| Departmental Accident | 0 | 0 | 1 | 0 | 1 |
| Discharge of Firearm | 0 | 4 | 0 | 2 | 6 |
| Equipment Policy | 0 | 1 | 0 | 0 | 1 |
| Ethics Violation | 0 | 10 | 1 | 5 | 16 |
| Excessive/Unnecessary Force | 2 | 38 | 6 | 42 | 88 |
| False Statement | 0 | 13 | 0 | 4 | 17 |
| Firearms Violation | 0 | 2 | 0 | 2 | 4 |
| Firearms and Intoxicants | 0 | 2 | 0 | 0 | 2 |
| Harassment | 0 | 3 | 0 | 0 | 3 |
| Insubordination | 0 | 5 | 0 | 0 | 5 |
| Integrity | 0 | 4 | 0 | 1 | 5 |
| Lethal Force | 0 | 0 | 0 | 1 | 1 |
| Loyalty | 0 | 1 | 0 | 0 | 1 |
| MVS (Required Use) | 0 | 0 | 0 | 1 | 1 |
| Misconduct in Office | 0 | 1 | 0 | 0 | 1 |
| Misrepresentation of Facts | 0 | 3 | 0 | 0 | 3 |
| Policy | 0 | 1 | 0 | 0 | 1 |
| Procedural Violation | 11 | 31 | 8 | 20 | 70 |
| Protocol | 0 | 3 | 2 | 4 | 9 |
| Secondary Employment Violation | 0 | 1 | 0 | 0 | 1 |
| Unbecoming Conduct | 2 | 123 | 7 | 49 | 183 |
| Use of Force | 2 | 8 | 0 | 9 | 19 |
| Use of Language | 2 | 8 | 0 | 18 | 28 |
| Violation of Laws | 1 | 1 | 1 | 1 | 4 |
| **Total** | **22** | **303** | **27** | **173** | **527** |
| **Distribution by Demographic Group** | | | | | |
| Accidental Discharge | 4.55% | 0.33% | 0.00% | 2.31% | 1.14% |
| Attention to Duty | 0.00% | 1.65% | 0.00% | 2.31% | 1.71% |
| County Code Violation | 0.00% | 0.33% | 0.00% | 0.00% | 0.19% |
| Criminal Misconduct | 4.55% | 10.89% | 3.70% | 3.47% | 7.78% |
| Departmental Accident | 0.00% | 0.00% | 3.70% | 0.00% | 0.19% |
| Discharge of Firearm | 0.00% | 1.32% | 0.00% | 1.16% | 1.14% |

92

CONFIDENTIAL

| Table 25—Racial/Ethnic Composition of SI Matters Open and Closed Between 2016 and March 2020 By Allegation | | | | | |
|---|---|---|---|---|---|
| **Allegation** | **Number and Distribution by Race/Ethnicity Group** | | | | |
| | **Asian** | **Black** | **Hispanic** | **White** | **Total** |
| Equipment Policy | 0.00% | 0.33% | 0.00% | 0.00% | 0.19% |
| Ethics Violation | 0.00% | 3.30% | 3.70% | 2.89% | 3.04% |
| Excessive/Unnecessary Force | 9.09% | 12.54% | 22.22% | 24.28% | 16.70% |
| False Statement | 0.00% | 4.29% | 0.00% | 2.31% | 3.23% |
| Firearms Violation | 0.00% | 0.66% | 0.00% | 1.16% | 0.76% |
| Firearms and Intoxicants | 0.00% | 0.66% | 0.00% | 0.00% | 0.38% |
| Harassment | 0.00% | 0.99% | 0.00% | 0.00% | 0.57% |
| Insubordination | 0.00% | 1.65% | 0.00% | 0.00% | 0.95% |
| Integrity | 0.00% | 1.32% | 0.00% | 0.58% | 0.95% |
| Lethal Force | 0.00% | 0.00% | 0.00% | 0.58% | 0.19% |
| Loyalty | 0.00% | 0.33% | 0.00% | 0.00% | 0.19% |
| MVS (Required Use) | 0.00% | 0.00% | 0.00% | 0.58% | 0.19% |
| Misconduct in Office | 0.00% | 0.33% | 0.00% | 0.00% | 0.19% |
| Misrepresentation of Facts | 0.00% | 0.99% | 0.00% | 0.00% | 0.57% |
| Policy | 0.00% | 0.33% | 0.00% | 0.00% | 0.19% |
| Procedural Violation | 50.00% | 10.23% | 29.63% | 11.56% | 13.28% |
| Protocol | 0.00% | 0.99% | 7.41% | 2.31% | 1.71% |
| Secondary Employment Violation | 0.00% | 0.33% | 0.00% | 0.00% | 0.19% |
| Unbecoming Conduct | 9.09% | 40.59% | 25.93% | 28.32% | 34.72% |
| Use of Force | 9.09% | 2.64% | 0.00% | 5.20% | 3.61% |
| Use of Language | 9.09% | 2.64% | 0.00% | 10.40% | 5.31% |
| Violation of Laws | 4.55% | 0.33% | 3.70% | 0.58% | 0.76% |

Note: Officers with unknown race are included in the total number.

172.   With regard to the Sustained outcomes, as discussed, the multiple allegations are influencing the outcomes.  Given the unique nature of these allegations, the discipline imposed is also not comparable and must be reviewed on a case by case basis

173.   With regards to the finding of Sustained among the allegations, when there is at least one Black investigator involved, Black respondents are more likely to have a Sustained finding among their allegations.  For investigations with at least one Minority investigator, the allegations were Sustained for 44.4% of Black respondent officers and 28.9% of white respondent

93

CONFIDENTIAL

officers.  For investigations only white investigators, the allegations were Sustained for 39.9% of Black respondent officers and 24.8% of white respondent officers.  Among the allegations of Unbecoming Conduct, which is the largest group of allegations for both Black and white officers, investigations with a Minority investigator had Sustained findings Black officers with 56.9% Sustained among Black officers and 40% among white officers.  For investigations with only white investigators there are Sustained findings for 37.9% of Black officers and 28.2% for white officers.

174.    The categories of allegations do not adequately describe the severity of the allegations among the SI case.  The following chart categorizes the allegations to categorize the type of alleged action(s).  The chart shows that a disproportionate number of SI allegations are for domestic abuse, sexual assault, and assault among respondent Black officers.  Both Black and white respondent officers have the majority of Use of Force allegations which are typically self-report.  Neither Mr. Graham nor Mr. Simon considered the severity of each of the SI allegations in their comparisons or analyses.

| Table 26—Description of SI Types of Allegations From Summary of Directives | | | | |
|---|---|---|---|---|
| **Category of Directive** | **Number Asian** | **Number Black** | **Number Hispanic** | **Number White** | **Total** |
| Abuse of Power/Intimidation | 0 | 6 | 0 | 2 | 8 |
| Alcohol/Intoxication | 0 | 11 | 3 | 5 | 19 |
| Assault | 0 | 12 | 3 | 6 | 21 |
| Attention to Duty | 1 | 5 | 3 | 4 | 13 |
| Criminal Misconduct | 0 | 4 | 0 | 1 | 5 |
| Departmental Accident | 0 | 2 | 5 | 0 | 7 |
| Departmental Vehicle Use | 0 | 0 | 0 | 5 | 5 |
| Destruction of Property | 0 | 0 | 0 | 4 | 4 |
| Domestic Assault/Violence | 0 | 44 | 2 | 15 | 61 |
| Equipment/Attire | 2 | 5 | 0 | 0 | 7 |
| Ethics/Unbecoming Conduct | 0 | 21 | 2 | 5 | 30 |
| Failure to Notify | 0 | 2 | 0 | 1 | 3 |
| False Statement/Report | 1 | 30 | 0 | 7 | 38 |
| Firearm | 1 | 14 | 1 | 10 | 26 |
| Firearm & Alcohol | 0 | 3 | 1 | 1 | 5 |

94

CONFIDENTIAL

| Table 26—Description of SI Types of Allegations From Summary of Directives | | | | |
|---|---|---|---|---|
| Category of Directive | Number Asian | Number Black | Number Hispanic | Number White | Total |
| Harassment | 0 | 4 | 0 | 0 | 4 |
| Insubordination | 0 | 5 | 0 | 0 | 5 |
| Language/Courtesy | 2 | 11 | 0 | 22 | 35 |
| NCIC Violation | 1 | 2 | 0 | 0 | 3 |
| Perjury | 0 | 1 | 0 | 4 | 5 |
| Radio/MVS | 0 | 0 | 0 | 5 | 5 |
| Reckless Driving | 0 | 5 | 0 | 2 | 7 |
| Recording/Surveillance | 0 | 11 | 0 | 1 | 12 |
| Secondary Employment | 6 | 2 | 0 | 0 | 8 |
| Sex Assault/Misconduct | 0 | 31 | 0 | 5 | 36 |
| Social Media | 0 | 2 | 0 | 1 | 3 |
| Solicit Prostitution | 0 | 3 | 1 | 0 | 4 |
| Theft | 3 | 6 | 0 | 8 | 17 |
| Unauthorized Dissemination | 0 | 10 | 0 | 0 | 10 |
| Unauthorized Pursuit | 1 | 4 | 0 | 4 | 9 |
| Use of Force | 4 | 46 | 6 | 52 | 108 |
| Use of Force Reporting | 0 | 1 | 0 | 3 | 4 |

175.   Documentation in the SI files could be found regarding CCOP's review of each of the SI matters.  Of the 527 SI matters/allegations, documentation could be found in the files providing CCOP's assessment for 492.  Of the 492 with documentation provided, the CCOP disagreed with the findings in 12 instances which is less than 3% of the reviews.  Mr. Graham and Mr. Simon failed to account for the differences in the types of allegations and the unique circumstances of each.  In addition, both fail to consider CCOP's review of the SI matters and its concurrence in the majority of SI cases.

176.   There were 87 discipline recommendations from the DAR for which the officer did not waive his/her right to a hearing board, of which 34 (39%) are from allegations resulting from the SI cases involving the four Black officers who account for nearly 40% of the Sustained findings described above.  Thus, these four are not similar to the majority of the officers who accepted the allegation and discipline.

95

177.    SI matters are disparate in their allegations, findings, and actions taken.  Each SI matter must be considered individually because the circumstances for each allegation and each matter are dissimilar to each other SI matter.  As shown in the tables above, the CCOP reviewed the majority of the decisions on findings and disagreed with very few of the findings.

178.    Importantly, a few officers are influencing the Black numbers of SI allegations and Sustained findings.   In addition, few of the officers disputed the findings and requested a hearing board review.  Therefore, the officers generally accepted the action taken.

## IX.    Conclusions

179.    In conclusion, the findings of Mr. Graham and Mr. Simon are flawed for several reasons.  I have addressed their misleading comparisons and reach different conclusions, conclusions which do not support the allegations made by the Plaintiffs.

180.    Mr. Graham's assessment of the PGPD workforce is incorrect and misleading as he inappropriately compares the PGC population to the composition of the PGPD workforce.   An examination of the more recent hiring at PGPD, between 2015 through August 2020, shows while the number of hires has declined, Minority representation among new hires has increased substantially from 50.77% in 2015 to 71.88% in 2019.   These statistics do not support the erroneous conclusions drawn by Mr. Graham regarding the PGPD workforce.

181.    There is no pattern of racial/ethnic differences regarding promotions held in abeyance due to disciplinary actions.  The impact of disciplinary actions on promotions is limited and does not disproportionately impact Black and Hispanic officers.  None of the promotions held in abeyance were among Hispanic officers based on examining the racial/ethnic breakdown of the 17 officers whose promotions were held in abeyance due to disciplinary actions from 2016-2019.  Only 5 of the 17 promotions held in abeyance were during Major Mills' tenure as IAD

96

Commander; one of the 5 was a white Sergeant and among the 4 remaining, 50% were Black and 50% were white.

182.    My analyses of disciplinary actions on terminations, resignations, and retirements shows that Black and Hispanic officers are not disproportionately impacted.   There are no statistically significant differences in the number of Minority, Black, or Hispanic terminations, resignations, or retirements resulting from disciplinary actions in the period 2016 to August 2020.

183.    There is no racial/ethnic difference in the Use of Force Review when properly analyzed.  Mr. Graham's comparisons from the Use of Force Review data are faulty and unreliable as Mr. Graham has grossly inflated and made inappropriate comparisons from the Use of Force Review data.  Use of Force incidents are self-reported and not from a citizen complaint.  Districts with higher crime rates and more calls for service are the areas in which Use of Force Reviews are concentrated.  When taking into account the number of years in which an officer has a Use of Force Review, officers average 2 Use of Force Reviews per year regardless of race/ethnicity.

184.    The conclusions reached by Mr. Graham and Mr. Simon regarding IAD inquiries and investigations are incorrect for several reasons. Mr. Graham and Mr. Simon failed to distinguish types of matters and they did not take into account key factors such as if the incident was self-reported, there was evidence, or the officer accepted the discipline.  They also did not analyze if the complainant was internal (PGPD) or external, or the racial/ethnic composition of the complainant.  Mr. Simon included IAD matters pre-2016, and he did not consider the nature of the incident of each matter which is critical as, for example, "PS" matters differ from "SI" matters. My review of the IAD matters opened and closed between 2016 and March 2020 shows that:

CONFIDENTIAL

- Among departmental accidents, the discipline is consistent with the matrix associated with the number of offenses within a 24 month period.  PGPD did not deviate from the matrix in the CBA.

- A large portion of the inquiries and investigations are from external citizen complaints which are required to be investigated and when the race of the complainant is known the majority of the complainants are Black.

- For FC Inquiries, there are no statistically significant differences in the number of Black, Asian, and white inquiries.  The number of Hispanic FC inquiries suggests that there are *fewer* Protocol inquiries than predicted and this outcome is statistically significant.  Thus, there is no pattern of differences by race/ethnicity regarding the incidence of FCIQ inquiries.

- For IAQ and SIQ Inquiries, there are no statistically significant differences in the number of Black, Hispanic, Asian and white inquiries.  For FCIQ and IAQ inquiries, most of these inquiries are from complaints of external citizens   Contrary to Mr. Graham's claims, white officers were not investigated through an SI inquiry at a higher rate.  The higher incidence of an SI inquiry is with respect to the Discharge of Firearms which are related to the shooting of animals.  Thus, there is no pattern of differences by race/ethnicity regarding the incidence of IAQ and SIQ inquiries

- Most PS investigations resulted from the Failure to Appear in Court and the discipline received was consistent with the offense number.  PGPD did not deviate from the matrix of offenses as agreed upon in the collective bargaining agreement.  Mr. Graham and Mr. Simon failed to make this comparison.  The remaining PS investigations were primarily Procedural Violations in which the discipline received was not appealed by the officers.

CONFIDENTIAL

Among the PS investigations, nearly all of the officers waived their right to a hearing, thereby accepting the finding and the most common discipline of a Written Reprimand.

- White officers were investigated at a higher rate among the IA investigations which is contrary to the assertion that they were more likely to be investigated through an inquiry or not at all.  Among the IA investigations, nearly all of the officers waived their right to a hearing, thereby accepting the Sustained finding and the resulting discipline.  Thus, these officers did not ask for a hearing to dispute the finding.  While the discipline varies by the circumstances of each allegation, the most common discipline officers with a Sustained finding was a Written Reprimand.

- While Black officers were investigated at a higher rate among the SI investigations this is, in part, because the investigations of a few cases resulted in several allegations.  For example, Black Officer, ██████████ had 33 allegations from one matter, of which 22 were Sustained under the current IAD Commander, Major McCreary.  Among the SI investigations, the majority of the officers waived their right to a hearing, thereby accepting the Sustained finding and the resulting discipline.  Thus, these officers did not ask for a hearing to dispute the finding.

185.     In summary, my review and analysis show that that there is *not a pattern* in which Officers of Color consistently received disciplinary actions.  There is variation in which some categories have white officers with more disciplinary actions and in other, a different race/ethnic group.  A review of the case documents shows that the cases are not cookie-cutter and aggregating across different types with different case details is not appropriate.  Mr. Graham and Mr. Simon have failed to consider the process used by IAD to investigate allegations of PGPD police officers.  Their approaches aggregated statistics to distort the reality of the decisions of allegations regarding

CONFIDENTIAL

of respondent officers and IAD.  When a more appropriate review of the process is prepared, there

is not a pattern of Officers of Color being adversely disciplined.

*Janet R. Thornton*

Janet R. Thornton, Ph.D.

September 28, 2020

CONFIDENTIAL

**Appendix A**

**Curriculum Vitae and Testimony List**

CONFIDENTIAL

# Curriculum Vitae



**Janet R. Thornton, Ph.D.**
BERKELEY RESEARCH GROUP, LLC
2457 Care Drive, Suite A-200, Tallahassee, FL 32308

Direct: 850-402-5105
jthornton@thinkbrg.com

## EDUCATION

Ph.D., Florida State University, Economics, 1992.
M.S., Florida State University, Economics, 1985.
B.A., University of Central Florida, Economics and Political Science, 1981

## ACADEMIC EXPERIENCE

**FLORIDA STATE UNIVERSITY**
Instructor, Quantitative Methods for Business Decisions (2010)
Instructor, Quantitative Methods and Statistics (2000-2001)
Instructor, Economics (1984-1985)
Instructor and Teaching Assistant, Economics (1982-1984)

**GEORGIA SOUTHWESTERN COLLEGE**
Part-time Instructor (1985-1986)

**UNIVERSITY OF CENTRAL FLORIDA**
Research Assistant (1981)

## PRESENT EMPLOYMENT

Managing Director, Berkeley Research Group, LLC (2015)

Dr. Thornton specializes in analyzing employment, insurance, and credit decisions. She has testified as an expert witness in federal court, state court, and administrative hearings regarding allegations of discrimination and the calculation of economic damages, and has been retained by both plaintiffs and defendants.

Dr. Thornton has prepared economic and statistical analyses involving allegations of gender, race, ethnicity, religious, and age discrimination in a variety of employment practices including selection, termination, and compensation. She has prepared analyses for employers both proactively and in response to litigation and OFCCP audits.

Dr. Thornton estimates economic damages and provides analysis of wage and hour claims as they relate to overtime (including misclassification), calculation of the regular rate of pay, and off-the-clock work issues including donning and doffing time. She has provided expert

Updated April 30, 2018



witness testimony in wage and hour matters including a class action involving a large restaurant/retail chain.

Dr. Thornton has provided expert witness testimony regarding simple and complex random sampling designs, has analyzed survey data, and has calculated and incorporated statistical error rates associated with sampling designs. This expertise and her knowledge of complex databases has been used to help organize, manage, and process data for litigation including the use of sampling to identify anomalies in the organizations data processes.

Dr. Thornton's expertise in the analysis of lending practices has led her to design monitoring software specifically tailored to meet her clients' needs. She has prepared several reports and testified in class action lawsuits related to credit pricing issues.

Dr. Thornton has provided expert witness testimony regarding voting rights issues including the analysis of voter ID match rates and voting patterns among demographic groups.


## PREVIOUS POSITIONS

Managing Director, ERS Group (2011 – 2015)
Director, ERS Group (2004-2011)
Vice President and Senior Research Economist, ERS Group (1998-2004)
Senior Research Economist, ERS Group (1997-1998)
Research Economist, ERS Group (1986-1997)
Research Assistant, ERS Group (Summer 1985)
Research Assistant, ERS Group (Summer 1984)


## HONORS AND AWARDS

Omicron Delta Epsilon (Economics)
Omicron Delta Kappa (National Leadership)
Pi Sigma Alpha (Political Science)
Phi Kappa Phi Honor Society
Scholarship to attend the Conference on Public Choice at the Center for Public Choice in Blacksburg, Virginia, 1983


## SPECIALIZATION

Labor and Natural Resource Economics

CONFIDENTIAL



**PUBLICATIONS AND PRESENTATIONS**

### *ARTICLES*

"A Labor Economist's View of the Pay Gap: Approaches for Identifying Firm-Specific Wage Disparities and Enhancing Diversity in Light of Fair Pay Laws."  Prepared for the American Employment Law Council's Twenty-Third Annual Conference, October 2015.

"New Tools for the Calculation of Infringement Damages," (with Roy Weinstein and Paul White). Prepared for The Center of American and International Law, Plano, TX, October 2010.

"Weathering the Economic Downturn: Economic and Statistical Analysis for Layoffs," (with Fredrick Holt), EEO Insight, Vol. 1, Issue 3, 2009.

"Recent Developments in the Analysis of Employment Practices," (with Joan Haworth and Paul White), Developments in Litigation Economics, Eds. Patrick Gaughan and Robert Thornton. Vol. 87 of Contemporary Studies in Economic and Financial Analysis. Amsterdam: Elsevier, 2005.

"Minority and Female Owned Business Opportunity in Atlanta," (with Joan G. Haworth). Prepared for the City of Atlanta, October 2000.

"Cohort Analysis and the Determination of Economic Damages Resulting from Employment Discrimination," (with Michael J. Piette). Journal of Forensic Economics, Vol. VIII, No. 1, Winter 1995.

"Using New Labor Force Participation Rates When Computing Economic Damage and Loss: A Methodological Note," (with Michael J. Piette). Journal of Legal Economics, Vol. 4, No. 2, Summer 1994.

"A Human Capital Approach to School Retention," Ph.D. Dissertation, Department of Economics, Florida State University, April 1992.

"The Use of Cohort Analysis in the Litigation Context," (with Michael J. Piette). Presented at the American Economic Association Meeting, New Orleans, LA, January 1992.

"Changes in Labor Force Participation Rates Over Time: Some New Evidence from Census Data," (with Michael J. Piette). Presented at the Southern Economic Association Meeting, Washington, D.C., November 1992.

### *PRESENTATION AND TRAINING ENGAGEMENTS*

"Equal Pay for Comparable Work: How to Make It Work in Massachusetts" (with Ellen Kearns), a webinar for Constangy, Brooks, Smith & Prophete, LLP, April 2018.

"Pay Equity" (panel with Lori Bowman, Zev J. Eigen, Ph.D., Genie Harrison and Susannah Howard), presented at the Daily Journal Employment Law Forum, July 2017.

**CONFIDENTIAL**



"Deep Diving Pay Equity" (panel with Hon. Charlotte A. Burrows, Adam T. Klein and Nancy E. Rafuse), presented at the American Bar Association National Conference on Equal Employment Opportunity Law, March 2016.

"From the Labor Economists' Perspective – Class Certification Statistical Modeling Post-Walmart and How the Employer May Improve its Chances of Prevailing in Discrimination Cases," presented with Mary Baker, Ph.D. at the American Employment Law Council's Twenty-Third Annual Conference, October 2015.

"Economic and Statistical Analyses of Common Employment Issues" (with Bo Shippen, Ph.D.), presented at Fisher & Phillips, November 2014.

"Shoot First, Ask Questions Later: Managing through the EEOC's Strategic Priorities" (with Shay Hable and Nancy Rafuse), presented at the Corporate Counsel Institute Program, December 2013.

"How to Prepare for an OFCCP Compensation Audit" (with Steve Greene), a webinar for World at Work, September 2013.

"Compensation Analysis for Federal Contractors/Sub-Contractors," presented at the Jacksonville, Florida, Industry Liaison Group Conference, July 2012.

"WHO SAID LIFE WAS FAIR: Successfully Analyzing and Defending Fair Lending Claims" (with Eric Taylor), presented at the American Conference Institute's 13th National Forum on Consumer Finance Class Actions & Litigation, January 2012.

"Compensation Analyses," presented at the Space Coast Florida Industry Liaison Group Conference, October 2011.

"Compensation Analyses and Pay Equity," presented at the Central/Space Coast Florida Industry Liaison Group Conference, March 2010.

"Basic Statistics and Applications in AA Plan Development, Adverse Impact and Compensation," a course for the American Association for Affirmative Action's PDTI training 2010, February 2010.

"Demystifying Compensation Analysis: Concepts & Challenges, Part II," a webinar for the American Association for Affirmative Action's PDTI 2009 Webinar Series, September 2009.

"Tools for Analyzing and Monitoring Compensation," presented at the Jacksonville Industry Liaison Group Conference, May 2009.

"Tools for Analyzing and Monitoring Compensation," presented at the Central/Space Coast Florida Industry Liaison Group Conference, April 2009.

"Demystifying Compensation Analysis: Concepts & Challenges," a webinar for the American Association for Affirmative Action's PDTI 2009 Webinar Series, March 2009.

"Weathering the Economic Downturn: Economic and Statistical Analysis for Layoffs," presented at the Jacksonville Industry Liaison Group Conference, "Preparing for Change: Hot Topics for 2009 and Beyond," February 2009.

4



"Tools for Analyzing and Monitoring Compensation," presented at the Southwest and Rocky Mountain Regional Industry Liaison Group Conference, "Fairness and Inclusion in a Changing Workforce," November 2008.

Presented at the Proskauer Rose LLP seminar "Navigating Wage and Hour Issues in California," April 2008.

### *SEMINAR PRESENTATIONS*

"Employment Discrimination: Economic and Statistical Evidence," an ERS Group seminar. Presented the following topics: "Commonly Used Statistical Techniques" and/or "Advanced Statistical Techniques: Compensation Analysis" and/or "Statistical Concepts: Modeling & Data Issues" and/or "Exposure and Liability: Calculating Damages." Orlando, 2012 and 2014; Washington, D.C. and New York, 2009; Washington, D.C. and New York, 2006; Washington, D.C. and New York, 2004; Washington, D.C. and New York, 2003; Chicago and New York, 2002; Dallas, 2001; New York and Los Angeles, 2000; Atlanta, Chicago, San Francisco, 1999; and Los Angeles, 1998.

"2010 Compensation Tune-up: Are Your Pay Practices Ready for Challenges?" an ERS Group webinar, January 2010.

"Weathering the Economic Downturn: Economic and Statistical Analysis for Layoffs," an ERS Group webinar, January 2009 and December 2008.

"Compensation Tune-Up for 2007: Tools for Analyzing and Monitoring Compensation," an ERS Group webinar, February 2007.

"Analyzing and Monitoring Compensation in Today's Regulatory Environment," an ERS Group seminar, Washington, D.C. and San Francisco, 2005.

## PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS

American Economic Association
National Association of Forensic Economics
North Florida Committee on Foreign Relations

5



**Janet R. Thornton, Ph.D.**
BERKELEY RESEARCH GROUP, LLC
2457 Care Drive, Suite A-200, Tallahassee, FL 32308

Johnny Reynolds, et al. v. Alabama Department of Transportation, et al.; Case No. CV-85-T-665-N, U.S. District Court, Middle District of Alabama, Northern Division.   [affidavits, depositions]

Roxie Sibley, et al. v.  Sprint Nextel Corporation and Sprint/United Management Company; Case No. 02:08-CV-02063-KHV/JPO, U.S. District Court, District of Kansas. [affidavits, deposition]

North Carolina State Conference of the NAACP, et al. v. Patrick Lloyd McCrory, in his official capacity as Governor of North Carolina, et al. (Case No. 1:13CV658); League of Women Voters of North Carolina, et al. and Louis M. Duke, et al. v. The State of North Carolina, et al. (Case No. 1:13CV660); and United States of America v. The State of North Carolina, et al. (Case No. 1:13CV861), U.S. District Court, Middle District of North Carolina. [declarations, depositions, trial testimony]

Charles M. Bingham v.  Raytheon Technical Services Co., LLC; Case No. 1:13-CV-00211-TWP-DKL, U.S. District Court, Southern District of Indiana, Indianapolis Division. [declaration]

Alberta Currie, et al. v. The State of North Carolina and the North Carolina State Board of Elections; Case No. 13-CVS-1419, State of North Carolina General Court of Justice, Superior Court Division, County of Orange. [affidavit]

Barbara H. Lee, et al. v. Virginia State Board of Elections, et al.; Case No. 3:15-CV-357, U.S. District Court, Eastern District of Virginia. [deposition, declaration, trial testimony]

Sheree Steele and Momina Ansoralli, et al. v. CVS Pharmacy, Inc.; Case No. 15-CV-04261, U.S. District Court, Southern District of New York. [deposition]

United States of America v. South Dakota Department of Social Services; Case No. 5:15-cv-05079-JLV, U.S. District Court, District of South Dakota, Western Division. [deposition]

Arizona Democratic Party, et al. v. Michele Reagan, et al.; Case No. CV-16-01065-PHX-DLR, U.S. District Court, District of Arizona. [deposition, trial testimony]

Stacy Tebo v. City of DeBary, Florida, and Leo Daniel Parrott; Case No. 6:16-cv-01599-31-DAB, U.S. District Court, Middle District of Florida, Orlando Division. [deposition]

Updated June 1, 2020

CONFIDENTIAL

Betsy Ackerson v. The Rector and Visitors of the University of Virginia; Case No. 3:17-cv-00011-GEC, U.S. District Court, Western District of Virginia, Charlottesville Division. [deposition]

Cherie Noelle Maness v. City of High Point, North Carolina; Case No. 1:17-cv-384, U.S. District Court, Middle District of North Carolina. [deposition]

Nial Benton and Hutton Graham, et al. v. Deli Management, Inc. d/b/a Jason's Deli; Case No. 1:17-cv-00296-WSD, U.S. District Court, Northern District of Georgia, Atlanta Division. [deposition]

Ohio A. Philip Randolph Institute, et al. v. Ryan Smith, Speaker of the Ohio House of Representatives, et al.; Case No. 1:18-cv-00357-TSB-KNM-MHW, U.S. District Court, Southern District of Ohio. [deposition, trial testimony]

Common Cause, et al. v. Representative David R. Lewis, et al.; Case No. 18-CVS-014001, North Carolina General Court of Justice, Superior Court Division, County of Wake. [affidavits, deposition, trial testimony]

Jabari Holmes, et al. v. Timothy K. Moore, Speaker of the North Carolina House of Representatives, et al.; Case No. 18-CVS-15292, State of North Carolina General Court of Justice, Superior Court Division, County of Wake. [affidavit, deposition]

Rebecca Harper, et al. v. David Lewis, Senior Chairman of the House Select Committee on Redistricting, et al.; Case No. 19-CV-012667, North Carolina General Court of Justice, Superior Court Division, County of Wake. [affidavit]

Equal Employment Opportunity Commission v. R&L Carriers, Inc. and R&L Carriers Shared Services, LLC; Case No. 1:17-cv-00515-DRC, U.S. District Court, Southern District of Ohio, Western Division at Cincinnati. [deposition]

Fair Fight Action, Inc., et al. v. Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia, et al.; Case No. 1:18-cv-05391-SCJ, U.S. District Court, Northern District of Georgia, Atlanta Division. [declaration, deposition]

2

**Appendix B**

**Materials Relied Upon**

CONFIDENTIAL

**Materials Relied On**

- Expert Report of Michael E. Graham, June 18, 2020
- Updated Expert Report of Michael E. Graham, August 28, 2020
- Expert Report of Marc Simon, CPA, CFE: Statistical Analysis of Disciplinary Data, August 25, 2020
- Expert Report of Thomas Terranova, CPA, CFE, CFF: Economic Damages, August 28, 2020
- Complaint for Declaratory and Injunctive Relief and Damages, December 12, 2018
- First Amended Complaint, May 28, 2019
- Stipulated Order Regarding Confidentiality of Discovery Material, July 1, 2019
- Plaintiffs' Collected Requests for Admission to Defendant Prince George's County, August 21, 2020
- Deposition transcripts of:
  - Michael A. Brown, July 21, 2020
  - Joseph Ghattas, October 6, 2019
  - Joseph Ghattas, July 8, 2020
  - Raphael Grant, March 16, 2020
  - James McCreary, June 15, 2020
  - Kathleen Mills, August 6, 2020
  - Joseph Perez, July 30, 2020
  - Richard Pippin, December 20, 2019
  - Christopher Smith, July 29, 2020
  - Henry P. Stawinski, III, July 31, 2020
  - Hector Velez, July 15, 2020
  - Linda Washington, October 6, 2019
  - Art'z Watkins, July 10, 2020
- Declarations of:
  - Michael Anis, June 15, 2020
  - Sanghamitra Baral, May 6, 2020
  - Eric Beale, March 19, 2020
  - Winston D. Chatman, April 22, 2020
  - John Doe #1, April 3, 2020
  - Arvester Horner, May 25, 2020
  - Sean Miller, March 11, 2020
  - Lynett Redhead, June 4, 2020
  - Earl Sharpe, March 12, 2020
  - Chris Smith, June 15, 2020
  - Marc Snoddy, May 30, 2020
- Corrected Declaration of John A. Freedman, June 18, 2020, with Exhibits 1 – 167

1

- Collective Bargaining Agreement between Prince George's County and Fraternal Order of Police, Prince George's County Lodge 89, Inc., July 1, 2018 – June 30, 2020
- Various materials produced to the U.S. Department of Justice by PGPD in December 2017
- Letter from Venable to Department of Justice regarding production of discipline closure reports and termination spreadsheets, November 27, 2019 (PG0000852476-852478)
- Letter from Venable to Department of Justice with information regarding why and how PGPD reports employment separations to the Maryland Police and Correctional Training Commissions ("MPCTC"), December 20, 2019
- PGPD General Order Manual, 2017 (PG0000961211-962038)
- PGPD General Order Manual, 2019 (PGDOLN02_0000000009-890)
- Internal Affairs Standard Operating Procedure, January 2011 (PG0000000497-530)
- PGPD Internal Investigation Manual, July 2005
- Discipline matrices for Departmental Accidents, Failure to Appear and Redlight violations (PG0000150225-150226)
- Discipline Protocol flowchart (PG0000652641-652642)
- Complaint Process PowerPoint by James McCreary of IAD
- PGPD Internal Affairs Annual Reports for 2013, 2014, and 2015
- IAD breakdown of complaints 2010-2017
- IAD Charging Language April 2016
- IAD Charging Language April 2018
- Description of IAPro created by PGPD and sent to the U.S. Department of Justice in 2017
- Key for officer separations (PGDOLN01_0000000089-91)
- Number of violent and property crimes countywide and by district, 2016-August 2020
- Map: Prince George's County Police Department Joint Analysis Intelligence Center Countywide Before District VIII
- Map: Prince George's County Police Department Joint Analysis Intelligence Center Countywide
- Suspension notice for PO Sharon Chambers in reference to SI2017-060 (PGPD-CHA-0000911)
- Use of Force Reviews:
  PG0000161332- PG0000161338; PG0000161386- PG0000161395; PG0000161406-PG0000161413; PG0000161455- PG0000161465; PG0000452531- PG0000452533; PG0000452629- PG0000452642.
- Personnel rosters:
  PG0000086329-PG0000086333; PG0000087035-PG0000087039; PG0000087040-PG0000087044; PG0000087053-PG0000087057; PG0000087719-PG0000087724; PG0000087782-PG0000087786; PG0000088156-PG0000088161; PG0000088216-PG0000088221; PG0000088255-PG0000088260; PG0000090208-PG0000090212;

CONFIDENTIAL

PG0000090287-PG0000090291; PG0000090317-PG0000090321; PG0000090338-
PG0000090342; PG0000090938-PG0000090942; PG0000091076-PG0000091080;
PG0000091143-PG0000091147; PG0000091148-PG0000091153; PG0000092869-
PG0000092875; PG0000092897-PG0000092903; PG0000092904-PG0000092910;
PG0000093615-PG0000093621; PG0000093622-PG0000093628; PG0000093767-
PG0000093773; PG0000093804-PG0000093808; PG0000093857-PG0000093860.

- DA Files:

DA2016-001; DA2016-002; DA2016-003; DA2016-004; DA2016-005; DA2016-006;
DA2016-007; DA2016-008; DA2016-009; DA2016-010; DA2016-011; DA2016-012;
DA2016-013; DA2016-014; DA2016-015; DA2016-016; DA2016-017; DA2016-018;
DA2016-019; DA2016-020; DA2016-021; DA2016-022; DA2016-023; DA2016-024;
DA2016-025; DA2016-026; DA2016-027; DA2016-028; DA2016-029; DA2016-030;
DA2016-031; DA2016-032; DA2016-034; DA2016-035; DA2016-036; DA2016-037;
DA2016-038; DA2016-039; DA2016-040; DA2016-041; DA2016-042; DA2016-043;
DA2016-044; DA2016-045; DA2016-046; DA2016-047; DA2016-048; DA2016-049;
DA2016-050; DA2016-051; DA2016-052; DA2016-053; DA2016-054; DA2016-055;
DA2016-056; DA2016-057; DA2016-058; DA2016-059; DA2016-060; DA2016-061;
DA2016-062; DA2016-063; DA2016-064; DA2016-065; DA2016-066; DA2016-067;
DA2016-068; DA2016-069; DA2016-070; DA2016-071; DA2016-072; DA2016-073;
DA2016-074; DA2016-075; DA2016-076; DA2016-077; DA2016-078; DA2016-079;
DA2016-080; DA2016-081; DA2016-082; DA2016-083; DA2016-084; DA2016-085;
DA2016-086; DA2016-087; DA2016-088; DA2016-089; DA2016-090; DA2016-091;
DA2016-092; DA2016-093; DA2016-094; DA2016-095; DA2016-096; DA2016-098;
DA2016-099; DA2016-100; DA2016-101; DA2016-102; DA2016-103; DA2016-104;
DA2016-105; DA2016-106; DA2016-107; DA2016-108; DA2016-109; DA2016-110;
DA2016-111; DA2016-112; DA2016-113; DA2016-114; DA2016-115; DA2016-116;
DA2016-117; DA2016-118; DA2016-119; DA2016-120; DA2016-121; DA2016-122;
DA2016-123; DA2016-124; DA2016-125; DA2016-126; DA2016-127; DA2016-128;
DA2016-129; DA2016-130; DA2016-131; DA2016-132; DA2016-133; DA2016-134;
DA2016-135; DA2016-136; DA2016-137; DA2016-138; DA2016-139; DA2016-140;
DA2016-141; DA2016-142; DA2016-143; DA2016-144; DA2016-145; DA2017-001;
DA2017-002; DA2017-003; DA2017-004; DA2017-005; DA2017-006; DA2017-007;
DA2017-008; DA2017-009; DA2017-010; DA2017-011; DA2017-012; DA2017-013;
DA2017-014; DA2017-015; DA2017-016; DA2017-017; DA2017-018; DA2017-019;
DA2017-020; DA2017-021; DA2017-022; DA2017-023; DA2017-024; DA2017-025;
DA2017-026; DA2017-027; DA2017-028; DA2017-029; DA2017-030; DA2017-031;
DA2017-032; DA2017-033; DA2017-034; DA2017-035; DA2017-036; DA2017-037;
DA2017-038; DA2017-039; DA2017-040; DA2017-041; DA2017-042; DA2017-044;
DA2017-045; DA2017-046; DA2017-047; DA2017-048; DA2017-049; DA2017-050;
DA2017-051; DA2017-052; DA2017-053; DA2017-054; DA2017-055; DA2017-056;
DA2017-057; DA2017-058; DA2017-059; DA2017-060; DA2017-061; DA2017-062;
DA2017-063; DA2017-064; DA2017-065; DA2017-066; DA2017-067; DA2017-068;
DA2017-069; DA2017-070; DA2017-071; DA2017-072; DA2017-073; DA2017-074;
DA2017-075; DA2017-076; DA2017-077; DA2017-078; DA2017-079; DA2017-081;
DA2017-082; DA2017-083; DA2017-084; DA2017-085; DA2017-086; DA2017-087;
DA2017-088; DA2017-089; DA2017-090; DA2017-091; DA2017-092; DA2017-093;

3

**CONFIDENTIAL**

DA2017-094; DA2017-095; DA2017-096; DA2017-097; DA2017-098; DA2017-099;
DA2017-100; DA2017-101; DA2017-102; DA2017-103; DA2017-104; DA2017-105;
DA2017-106; DA2017-107; DA2017-108; DA2017-109; DA2017-110; DA2017-111;
DA2017-112; DA2017-113; DA2017-114; DA2017-115; DA2017-116; DA2017-117;
DA2017-118; DA2017-119; DA2017-120; DA2017-121; DA2017-122; DA2017-123;
DA2017-124; DA2017-125; DA2017-126; DA2017-127; DA2017-128; DA2017-129;
DA2017-131; DA2017-133; DA2017-134; DA2017-135; DA2017-136; DA2017-137;
DA2017-138; DA2017-139; DA2017-140; DA2017-141; DA2017-142; DA2017-143;
DA2017-144; DA2017-146; DA2017-147; DA2017-148; DA2017-149; DA2017-150;
DA2017-151; DA2017-152; DA2017-153; DA2017-154; DA2017-155; DA2017-156;
DA2017-157; DA2017-158; DA2017-159; DA2017-160; DA2017-161; DA2017-162;
DA2017-163; DA2017-164; DA2017-165; DA2017-166; DA2017-167; DA2017-168;
DA2017-169; DA2017-170; DA2017-171; DA2017-172; DA2017-173; DA2017-174;
DA2017-175; DA2017-176; DA2017-177; DA2017-178; DA2017-179; DA2017-180;
DA2017-181; DA2017-182; DA2018-001; DA2018-002; DA2018-003; DA2018-004;
DA2018-005; DA2018-006; DA2018-007; DA2018-008; DA2018-009; DA2018-010;
DA2018-011; DA2018-012; DA2018-013; DA2018-014; DA2018-015; DA2018-016;
DA2018-017; DA2018-018; DA2018-019; DA2018-020; DA2018-021; DA2018-023;
DA2018-024; DA2018-025; DA2018-026; DA2018-027; DA2018-028; DA2018-029;
DA2018-030; DA2018-031; DA2018-032; DA2018-033; DA2018-034; DA2018-035;
DA2018-036; DA2018-037; DA2018-038; DA2018-039; DA2018-040; DA2018-041;
DA2018-042; DA2018-043; DA2018-044; DA2018-045; DA2018-046; DA2018-047;
DA2018-048; DA2018-049; DA2018-050; DA2018-051; DA2018-053; DA2018-054;
DA2018-055; DA2018-056; DA2018-057; DA2018-058; DA2018-061; DA2018-062;
DA2018-063; DA2018-064; DA2018-065; DA2018-066; DA2018-067; DA2018-068;
DA2018-069; DA2018-070; DA2018-071; DA2018-072; DA2018-073; DA2018-074;
DA2018-075; DA2018-076; DA2018-077; DA2018-078; DA2018-079; DA2018-080;
DA2018-082; DA2018-083; DA2018-084; DA2018-085; DA2018-086; DA2018-087;
DA2018-088; DA2018-089; DA2018-090; DA2018-091; DA2018-092; DA2018-093;
DA2018-094; DA2018-095; DA2018-096; DA2018-097; DA2018-098; DA2018-099;
DA2018-100; DA2018-101; DA2018-102; DA2018-103; DA2018-104; DA2018-106;
DA2018-107; DA2018-108; DA2018-109; DA2018-110; DA2018-111; DA2018-112;
DA2018-113; DA2018-114; DA2018-115; DA2018-116; DA2018-118; DA2018-119;
DA2018-120; DA2018-121; DA2018-122; DA2018-123; DA2018-124; DA2018-125;
DA2018-126; DA2018-127; DA2018-128; DA2018-129; DA2018-130; DA2018-131;
DA2018-132; DA2018-133; DA2018-134; DA2018-135; DA2018-136; DA2018-137;
DA2018-138; DA2018-139; DA2018-140; DA2018-141; DA2018-142; DA2018-143;
DA2018-145; DA2018-146; DA2018-147; DA2018-149; DA2018-150; DA2019-001;
DA2019-002; DA2019-003; DA2019-005; DA2019-006; DA2019-007; DA2019-008;
DA2019-009; DA2019-010; DA2019-011; DA2019-012; DA2019-013; DA2019-014;
DA2019-015; DA2019-016; DA2019-017; DA2019-018; DA2019-019; DA2019-020;
DA2019-021; DA2019-022; DA2019-023; DA2019-024; DA2019-025; DA2019-026;
DA2019-027; DA2019-028; DA2019-029; DA2019-030; DA2019-031; DA2019-032;
DA2019-033; DA2019-034; DA2019-035; DA2019-036; DA2019-037; DA2019-038;
DA2019-039; DA2019-040; DA2019-041; DA2019-042; DA2019-043; DA2019-044;
DA2019-045; DA2019-046; DA2019-047; DA2019-048; DA2019-049; DA2019-050;

4

CONFIDENTIAL

DA2019-051; DA2019-052; DA2019-053; DA2019-054; DA2019-055; DA2019-056;
DA2019-057; DA2019-058; DA2019-059; DA2019-060; DA2019-061; DA2019-062;
DA2019-064; DA2019-065; DA2019-066; DA2019-067; DA2019-068; DA2019-069;
DA2019-070; DA2019-071; DA2019-072; DA2019-073; DA2019-074; DA2019-075;
DA2019-076; DA2019-077; DA2019-079; DA2019-080; DA2019-081; DA2019-082;
DA2019-083; DA2019-084; DA2019-085; DA2019-086; DA2019-087; DA2019-088;
DA2019-089; DA2019-090; DA2019-091; DA2019-092; DA2019-093; DA2019-094;
DA2019-095; DA2019-096; DA2019-097; DA2019-099; DA2019-100; DA2019-101;
DA2019-102; DA2019-103; DA2019-105; DA2019-106; DA2019-107; DA2019-108;
DA2019-109; DA2019-110; DA2019-111; DA2019-112; DA2019-113; DA2019-114;
DA2019-115; DA2019-116; DA2019-117; DA2019-118; DA2019-119; DA2019-120;
DA2019-121; DA2019-122; DA2019-125; DA2019-126; DA2019-127; DA2019-128;
DA2019-129; DA2019-130; DA2019-132; DA2019-133; DA2019-134; DA2019-135;
DA2019-136; DA2019-137; DA2019-138; DA2019-139; DA2019-140; DA2019-141;
DA2019-142; DA2019-143; DA2019-144; DA2019-145; DA2019-146; DA2019-147;
DA2019-149; DA2019-150; DA2019-152; DA2019-155; DA2019-156; DA2019-157;
DA2019-158; DA2019-159; DA2019-160; DA2019-161; DA2020-002; DA2020-004;
DA2020-005; DA2020-008; DA2020-009; DA2020-010.

- FCIQ Files:

FCIQ2016-001; FCIQ2016-002; FCIQ2016-003; FCIQ2016-004; FCIQ2016-005;
FCIQ2016-006; FCIQ2016-007; FCIQ2016-008; FCIQ2016-009; FCIQ2016-010;
FCIQ2016-011; FCIQ2016-012; FCIQ2016-013; FCIQ2016-014; FCIQ2016-015;
FCIQ2016-016; FCIQ2016-017; FCIQ2016-018; FCIQ2016-019; FCIQ2016-020;
FCIQ2016-021; FCIQ2016-022; FCIQ2016-023; FCIQ2016-024; FCIQ2016-025;
FCIQ2016-026; FCIQ2016-027; FCIQ2016-028; FCIQ2016-029; FCIQ2016-030;
FCIQ2016-031; FCIQ2016-032; FCIQ2016-034; FCIQ2016-035; FCIQ2016-036;
FCIQ2016-038; FCIQ2016-039; FCIQ2016-040; FCIQ2016-041; FCIQ2016-042;
FCIQ2016-043; FCIQ2016-044; FCIQ2016-045; FCIQ2016-046; FCIQ2016-047;
FCIQ2016-051; FCIQ2016-052; FCIQ2016-053; FCIQ2016-054; FCIQ2016-055;
FCIQ2016-056; FCIQ2016-057; FCIQ2016-058; FCIQ2016-059; FCIQ2016-060;
FCIQ2016-061; FCIQ2016-062; FCIQ2016-064; FCIQ2016-065; FCIQ2016-066;
FCIQ2016-067; FCIQ2016-068; FCIQ2016-069; FCIQ2016-070; FCIQ2016-071;
FCIQ2016-072; FCIQ2016-073; FCIQ2016-074; FCIQ2016-075; FCIQ2016-076;
FCIQ2016-077; FCIQ2016-078; FCIQ2016-079; FCIQ2016-080; FCIQ2016-081;
FCIQ2016-082; FCIQ2016-083; FCIQ2016-084; FCIQ2016-085; FCIQ2016-086;
FCIQ2016-087; FCIQ2016-088; FCIQ2016-089; FCIQ2016-090; FCIQ2016-091;
FCIQ2016-092; FCIQ2016-094; FCIQ2016-095; FCIQ2016-096; FCIQ2017-001;
FCIQ2017-002; FCIQ2017-003; FCIQ2017-004; FCIQ2017-005; FCIQ2017-006;
FCIQ2017-007; FCIQ2017-008; FCIQ2017-009; FCIQ2017-010; FCIQ2017-011;
FCIQ2017-012; FCIQ2017-013; FCIQ2017-014; FCIQ2017-015; FCIQ2017-016;
FCIQ2017-017; FCIQ2017-018; FCIQ2017-019; FCIQ2017-020; FCIQ2017-021;
FCIQ2017-022; FCIQ2017-023; FCIQ2017-024; FCIQ2017-025; FCIQ2017-026;
FCIQ2017-027; FCIQ2017-028; FCIQ2017-029; FCIQ2017-030; FCIQ2017-031;
FCIQ2017-032; FCIQ2017-033; FCIQ2017-034; FCIQ2017-035; FCIQ2017-036;
FCIQ2017-037; FCIQ2017-038; FCIQ2017-039; FCIQ2017-040; FCIQ2017-041;
FCIQ2017-042; FCIQ2017-043; FCIQ2017-045; FCIQ2017-046; FCIQ2017-047;

5

FCIQ2017-048; FCIQ2017-049; FCIQ2017-050; FCIQ2017-051; FCIQ2017-052;
FCIQ2017-053; FCIQ2017-054; FCIQ2017-055; FCIQ2017-057; FCIQ2017-058;
FCIQ2017-059; FCIQ2017-060; FCIQ2017-061; FCIQ2017-062; FCIQ2017-063;
FCIQ2017-064; FCIQ2017-065; FCIQ2017-066; FCIQ2017-067; FCIQ2017-068;
FCIQ2017-069; FCIQ2017-070; FCIQ2017-071; FCIQ2017-072; FCIQ2017-073;
FCIQ2017-074; FCIQ2017-075; FCIQ2017-076; FCIQ2017-077; FCIQ2017-078;
FCIQ2017-079; FCIQ2017-080; FCIQ2017-081; FCIQ2017-082; FCIQ2017-083;
FCIQ2017-084; FCIQ2017-085; FCIQ2017-086; FCIQ2017-087; FCIQ2017-088;
FCIQ2017-089; FCIQ2017-090; FCIQ2017-091; FCIQ2017-092; FCIQ2017-093;
FCIQ2017-094; FCIQ2017-095; FCIQ2017-096; FCIQ2017-097; FCIQ2017-098;
FCIQ2017-099; FCIQ2017-100; FCIQ2017-101; FCIQ2017-102; FCIQ2017-103;
FCIQ2017-104; FCIQ2017-105; FCIQ2017-106; FCIQ2017-107; FCIQ2017-108;
FCIQ2017-109; FCIQ2017-110; FCIQ2017-111; FCIQ2017-112; FCIQ2017-113;
FCIQ2017-114; FCIQ2017-115; FCIQ2018-001; FCIQ2018-002; FCIQ2018-003;
FCIQ2018-004; FCIQ2018-005; FCIQ2018-006; FCIQ2018-007; FCIQ2018-008;
FCIQ2018-009; FCIQ2018-010; FCIQ2018-011; FCIQ2018-012; FCIQ2018-013;
FCIQ2018-014; FCIQ2018-015; FCIQ2018-016; FCIQ2018-017; FCIQ2018-019;
FCIQ2018-020; FCIQ2018-022; FCIQ2018-023; FCIQ2018-024; FCIQ2018-025;
FCIQ2018-026; FCIQ2018-027; FCIQ2018-028; FCIQ2018-029; FCIQ2018-030;
FCIQ2018-031; FCIQ2018-032; FCIQ2018-033; FCIQ2018-034; FCIQ2018-035;
FCIQ2018-036; FCIQ2018-037; FCIQ2018-038; FCIQ2018-039; FCIQ2018-040;
FCIQ2018-041; FCIQ2018-043; FCIQ2018-044; FCIQ2018-045; FCIQ2018-046;
FCIQ2018-047; FCIQ2018-048; FCIQ2018-049; FCIQ2018-050; FCIQ2018-051;
FCIQ2018-052; FCIQ2018-053; FCIQ2018-054; FCIQ2018-055; FCIQ2018-057;
FCIQ2018-059; FCIQ2018-060; FCIQ2018-061; FCIQ2018-062; FCIQ2018-063;
FCIQ2018-064; FCIQ2018-065; FCIQ2018-066; FCIQ2018-067; FCIQ2018-068;
FCIQ2018-069; FCIQ2018-070; FCIQ2018-071; FCIQ2018-072; FCIQ2018-073;
FCIQ2018-074; FCIQ2018-075; FCIQ2018-076; FCIQ2018-077; FCIQ2018-078;
FCIQ2018-079; FCIQ2018-080; FCIQ2018-081; FCIQ2018-082; FCIQ2018-083;
FCIQ2018-084; FCIQ2018-085; FCIQ2018-086; FCIQ2018-087; FCIQ2018-088;
FCIQ2018-089; FCIQ2018-090; FCIQ2018-091; FCIQ2018-092; FCIQ2018-093;
FCIQ2018-094; FCIQ2018-095; FCIQ2018-096; FCIQ2018-097; FCIQ2018-099;
FCIQ2018-100; FCIQ2018-101; FCIQ2018-102; FCIQ2018-103; FCIQ2018-104;
FCIQ2018-105; FCIQ2018-106; FCIQ2018-107; FCIQ2018-108; FCIQ2018-109;
FCIQ2018-110; FCIQ2018-111; FCIQ2018-112; FCIQ2018-113; FCIQ2018-114;
FCIQ2019-002; FCIQ2019-003; FCIQ2019-004; FCIQ2019-005; FCIQ2019-006;
FCIQ2019-007; FCIQ2019-008; FCIQ2019-009; FCIQ2019-010; FCIQ2019-011;
FCIQ2019-012; FCIQ2019-013; FCIQ2019-014; FCIQ2019-015; FCIQ2019-016;
FCIQ2019-017; FCIQ2019-018; FCIQ2019-019; FCIQ2019-020; FCIQ2019-021;
FCIQ2019-022; FCIQ2019-023; FCIQ2019-024; FCIQ2019-025; FCIQ2019-026;
FCIQ2019-027; FCIQ2019-028; FCIQ2019-029; FCIQ2019-030; FCIQ2019-031;
FCIQ2019-032; FCIQ2019-033; FCIQ2019-034; FCIQ2019-035; FCIQ2019-036;
FCIQ2019-037; FCIQ2019-038; FCIQ2019-039; FCIQ2019-040; FCIQ2019-041;
FCIQ2019-042; FCIQ2019-043; FCIQ2019-044; FCIQ2019-045; FCIQ2019-046;
FCIQ2019-047; FCIQ2019-048; FCIQ2019-049; FCIQ2019-050; FCIQ2019-051;
FCIQ2019-052; FCIQ2019-053; FCIQ2019-054; FCIQ2019-055; FCIQ2019-056;

CONFIDENTIAL

FCIQ2019-058; FCIQ2019-059; FCIQ2019-060; FCIQ2019-061; FCIQ2019-062;
FCIQ2019-063; FCIQ2019-064; FCIQ2019-065; FCIQ2019-066; FCIQ2019-067;
FCIQ2019-069; FCIQ2019-070; FCIQ2019-071; FCIQ2019-072; FCIQ2019-073;
FCIQ2019-074; FCIQ2019-075; FCIQ2019-076; FCIQ2019-077; FCIQ2019-078;
FCIQ2019-079; FCIQ2019-080; FCIQ2019-081; FCIQ2019-082; FCIQ2019-083;
FCIQ2019-084; FCIQ2019-085; FCIQ2019-086; FCIQ2019-087; FCIQ2019-088;
FCIQ2019-089; FCIQ2019-090; FCIQ2019-091; FCIQ2019-092; FCIQ2019-093;
FCIQ2019-094; FCIQ2019-095; FCIQ2019-096; FCIQ2019-097; FCIQ2019-098;
FCIQ2019-099; FCIQ2019-100; FCIQ2019-101; FCIQ2019-102; FCIQ2019-103;
FCIQ2019-104; FCIQ2019-105; FCIQ2019-106; FCIQ2019-109; FCIQ2019-110;
FCIQ2019-111; FCIQ2019-112; FCIQ2019-113; FCIQ2019-114; FCIQ2019-115;
FCIQ2019-116; FCIQ2019-117; FCIQ2019-119; FCIQ2019-120; FCIQ2020-001;
FCIQ2020-003; FCIQ2020-005; FCIQ2020-006; FCIQ2020-011; FCIQ2020-017.

- IA Files:
IA2016-001; IA2016-002; IA2016-003; IA2016-004; IA2016-005; IA2016-006;
IA2016-007; IA2016-008; IA2016-009; IA2016-010; IA2016-011; IA2016-012;
IA2016-013; IA2016-014; IA2016-015; IA2016-016; IA2016-017; IA2016-018;
IA2016-019; IA2016-021; IA2016-022; IA2016-023; IA2016-025; IA2016-026;
IA2016-027; IA2016-028; IA2016-029; IA2016-030; IA2016-031; IA2016-032;
IA2016-033; IA2016-034; IA2016-035; IA2016-036; IA2016-037; IA2016-038;
IA2016-039; IA2016-040; IA2016-041; IA2016-042; IA2016-043; IA2016-044;
IA2016-045; IA2016-046; IA2016-048; IA2016-049; IA2016-050; IA2016-051;
IA2016-052; IA2016-053; IA2016-054; IA2016-055; IA2016-056; IA2016-057;
IA2016-061; IA2016-062; IA2016-063; IA2016-064; IA2016-065; IA2016-066;
IA2016-067; IA2016-068; IA2016-069; IA2016-070; IA2016-071; IA2016-072;
IA2016-073; IA2016-074; IA2016-075; IA2016-076; IA2017-001; IA2017-002;
IA2017-003; IA2017-004; IA2017-005; IA2017-006; IA2017-007; IA2017-008;
IA2017-009; IA2017-010; IA2017-011; IA2017-012; IA2017-013; IA2017-014;
IA2017-015; IA2017-016; IA2017-017; IA2017-018; IA2017-019; IA2017-020;
IA2017-021; IA2017-022; IA2017-023; IA2017-024; IA2017-025; IA2017-026;
IA2017-027; IA2017-028; IA2017-029; IA2017-030; IA2017-031; IA2017-032;
IA2017-033; IA2017-034; IA2017-035; IA2017-036; IA2017-037; IA2017-038;
IA2017-039; IA2017-040; IA2017-041; IA2017-042; IA2017-043; IA2017-044;
IA2017-045; IA2017-046; IA2017-047; IA2017-048; IA2017-049; IA2017-050;
IA2017-051; IA2017-052; IA2017-053; IA2017-054; IA2017-055; IA2017-056;
IA2017-057; IA2017-058; IA2017-059; IA2017-060; IA2017-061; IA2017-062;
IA2017-063; IA2017-064; IA2017-067; IA2017-068; IA2017-070; IA2017-071;
IA2018-001; IA2018-002; IA2018-003; IA2018-005; IA2018-007; IA2018-008;
IA2018-009; IA2018-010; IA2018-011; IA2018-012; IA2018-013; IA2018-014;
IA2018-015; IA2018-016; IA2018-017; IA2018-018; IA2018-019; IA2018-020;
IA2018-021; IA2018-022; IA2018-023; IA2018-024; IA2018-025; IA2018-026;
IA2018-027; IA2018-028; IA2018-029; IA2018-031; IA2018-032; IA2018-034;
IA2018-035; IA2018-038; IA2018-041; IA2018-042; IA2018-044; IA2018-045;
IA2018-046; IA2018-048; IA2018-051; IA2018-054; IA2018-055; IA2018-057;
IA2018-060; IA2018-061; IA2019-012; IA2019-018.

- IAQ Files:

7

**CONFIDENTIAL**

IAQ2016-001; IAQ2016-002; IAQ2016-003; IAQ2016-004; IAQ2016-005;
IAQ2016-006; IAQ2016-007; IAQ2016-008; IAQ2016-009; IAQ2016-010;
IAQ2016-011; IAQ2016-012; IAQ2016-013; IAQ2016-014; IAQ2016-015;
IAQ2016-016; IAQ2016-018; IAQ2016-019; IAQ2016-020; IAQ2016-021;
IAQ2016-022; IAQ2016-023; IAQ2016-024; IAQ2016-025; IAQ2016-026;
IAQ2017-001; IAQ2017-003; IAQ2017-004; IAQ2017-005; IAQ2017-006;
IAQ2017-007; IAQ2017-008; IAQ2017-009; IAQ2017-010; IAQ2018-001;
IAQ2018-002; IAQ2018-003; IAQ2018-004; IAQ2018-005; IAQ2018-006;
IAQ2018-007; IAQ2018-008; IAQ2018-009; IAQ2018-010; IAQ2018-011;
IAQ2018-012; IAQ2018-013; IAQ2018-014; IAQ2018-015; IAQ2019-001;
IAQ2019-002; IAQ2019-003; IAQ2019-004; IAQ2019-005; IAQ2019-006;
IAQ2020-001.

- PS Files:

PS2016-001; PS2016-002; PS2016-003; PS2016-004; PS2016-005; PS2016-006;
PS2016-007; PS2016-008; PS2016-009; PS2016-010; PS2016-011; PS2016-012;
PS2016-013; PS2016-014; PS2016-015; PS2016-016; PS2016-017; PS2016-018;
PS2016-019; PS2016-020; PS2016-021; PS2016-022; PS2016-023; PS2016-024;
PS2016-025; PS2016-026; PS2016-027; PS2016-028; PS2016-029; PS2016-030;
PS2016-031; PS2016-032; PS2016-033; PS2016-034; PS2016-035; PS2016-036;
PS2016-037; PS2016-038; PS2016-039; PS2016-040; PS2016-041; PS2016-042;
PS2016-043; PS2016-044; PS2016-045; PS2016-046; PS2016-047; PS2016-048;
PS2016-049; PS2016-050; PS2016-051; PS2016-052; PS2016-053; PS2016-054;
PS2016-055; PS2016-056; PS2016-057; PS2016-058; PS2016-059; PS2016-060;
PS2016-061; PS2016-062; PS2016-063; PS2016-064; PS2016-065; PS2016-066;
PS2016-067; PS2016-068; PS2016-069; PS2016-070; PS2016-071; PS2016-072;
PS2016-073; PS2016-074; PS2016-075; PS2016-076; PS2016-077; PS2016-078;
PS2016-079; PS2016-080; PS2016-081; PS2016-082; PS2016-083; PS2016-084;
PS2016-085; PS2016-086; PS2016-087; PS2016-088; PS2016-089; PS2016-090;
PS2016-091; PS2016-092; PS2016-093; PS2016-094; PS2016-095; PS2016-096;
PS2016-097; PS2016-098; PS2016-099; PS2016-100; PS2016-101; PS2016-102;
PS2016-103; PS2016-104; PS2016-105; PS2016-106; PS2016-107; PS2016-108;
PS2016-109; PS2016-110; PS2016-111; PS2016-112; PS2016-113; PS2016-114;
PS2016-115; PS2016-116; PS2016-117; PS2016-118; PS2016-119; PS2016-120;
PS2016-121; PS2016-122; PS2016-123; PS2016-124; PS2016-125; PS2016-126;
PS2016-127; PS2016-128; PS2016-129; PS2016-130; PS2016-131; PS2016-132;
PS2016-133; PS2016-134; PS2016-135; PS2016-136; PS2016-137; PS2016-138;
PS2016-139; PS2016-140; PS2016-141; PS2016-142; PS2016-143; PS2016-144;
PS2016-145; PS2016-146; PS2016-147; PS2016-148; PS2016-149; PS2016-150;
PS2016-151; PS2016-152; PS2016-153; PS2016-154; PS2016-155; PS2016-156;
PS2016-157; PS2016-158; PS2016-159; PS2016-160; PS2016-161; PS2016-162;
PS2016-163; PS2016-164; PS2016-165; PS2016-166; PS2016-167; PS2016-168;
PS2016-169; PS2016-170; PS2016-171; PS2016-172; PS2016-173; PS2016-174;
PS2016-175; PS2016-176; PS2016-177; PS2016-178; PS2016-179; PS2016-180;
PS2016-181; PS2016-182; PS2016-183; PS2016-184; PS2016-185; PS2016-186;
PS2016-187; PS2016-188; PS2016-189; PS2016-190; PS2016-191; PS2016-192;
PS2016-193; PS2016-194; PS2017-001; PS2017-002; PS2017-003; PS2017-004;

8

PS2017-005; PS2017-006; PS2017-007; PS2017-008; PS2017-009; PS2017-010;
PS2017-011; PS2017-012; PS2017-013; PS2017-014; PS2017-015; PS2017-016;
PS2017-017; PS2017-018; PS2017-019; PS2017-020; PS2017-021; PS2017-022;
PS2017-023; PS2017-024; PS2017-025; PS2017-026; PS2017-027; PS2017-028;
PS2017-029; PS2017-030; PS2017-031; PS2017-032; PS2017-033; PS2017-034;
PS2017-035; PS2017-036; PS2017-037; PS2017-038; PS2017-039; PS2017-040;
PS2017-041; PS2017-042; PS2017-043; PS2017-044; PS2017-045; PS2017-046;
PS2017-047; PS2017-048; PS2017-049; PS2017-050; PS2017-051; PS2017-052;
PS2017-053; PS2017-054; PS2017-055; PS2017-056; PS2017-057; PS2017-058;
PS2017-059; PS2017-060; PS2017-061; PS2017-062; PS2017-063; PS2017-064;
PS2017-065; PS2017-066; PS2017-067; PS2017-068; PS2017-069; PS2017-070;
PS2017-071; PS2017-072; PS2017-073; PS2017-074; PS2017-075; PS2017-076;
PS2017-077; PS2017-078; PS2017-079; PS2017-080; PS2017-081; PS2017-082;
PS2017-083; PS2017-084; PS2017-085; PS2017-086; PS2017-087; PS2017-088;
PS2017-089; PS2017-090; PS2017-091; PS2017-092; PS2017-093; PS2017-094;
PS2017-095; PS2017-096; PS2017-097; PS2017-098; PS2017-099; PS2017-100;
PS2017-101; PS2017-102; PS2017-103; PS2017-104; PS2017-105; PS2017-106;
PS2017-107; PS2017-108; PS2017-109; PS2017-110; PS2017-111; PS2017-112;
PS2017-113; PS2017-114; PS2017-115; PS2017-116; PS2017-117; PS2017-118;
PS2017-119; PS2017-120; PS2017-121; PS2017-122; PS2017-123; PS2017-124;
PS2017-125; PS2017-126; PS2017-127; PS2017-128; PS2017-129; PS2017-130;
PS2017-131; PS2017-132; PS2017-133; PS2017-134; PS2017-135; PS2017-136;
PS2017-137; PS2017-138; PS2017-139; PS2017-140; PS2017-141; PS2017-142;
PS2017-143; PS2017-144; PS2017-145; PS2017-146; PS2017-147; PS2017-148;
PS2017-149; PS2017-150; PS2017-151; PS2017-152; PS2017-153; PS2017-154;
PS2017-155; PS2017-156; PS2017-157; PS2017-158; PS2017-159; PS2017-160;
PS2017-161; PS2017-162; PS2017-163; PS2017-164; PS2017-165; PS2017-166;
PS2017-167; PS2017-168; PS2017-169; PS2017-170; PS2017-171; PS2017-172;
PS2017-173; PS2017-174; PS2017-175; PS2017-176; PS2017-177; PS2017-178;
PS2017-179; PS2017-180; PS2017-181; PS2017-182; PS2017-183; PS2017-184;
PS2017-185; PS2017-186; PS2017-187; PS2017-188; PS2017-189; PS2017-190;
PS2017-191; PS2017-192; PS2017-193; PS2017-194; PS2017-195; PS2017-196;
PS2017-197; PS2017-198; PS2017-199; PS2017-200; PS2017-201; PS2017-202;
PS2017-203; PS2017-204; PS2017-205; PS2017-206; PS2017-207; PS2017-208;
PS2017-209; PS2017-210; PS2017-211; PS2017-212; PS2018-001; PS2018-002;
PS2018-003; PS2018-004; PS2018-005; PS2018-006; PS2018-007; PS2018-008;
PS2018-009; PS2018-010; PS2018-011; PS2018-012; PS2018-013; PS2018-014;
PS2018-015; PS2018-016; PS2018-017; PS2018-018; PS2018-019; PS2018-020;
PS2018-021; PS2018-022; PS2018-023; PS2018-024; PS2018-025; PS2018-026;
PS2018-027; PS2018-028; PS2018-029; PS2018-030; PS2018-031; PS2018-032;
PS2018-033; PS2018-035; PS2018-036; PS2018-037; PS2018-038; PS2018-039;
PS2018-040; PS2018-041; PS2018-042; PS2018-043; PS2018-044; PS2018-045;
PS2018-046; PS2018-047; PS2018-048; PS2018-049; PS2018-050; PS2018-051;
PS2018-052; PS2018-053; PS2018-054; PS2018-055; PS2018-056; PS2018-057;
PS2018-058; PS2018-059; PS2018-060; PS2018-061; PS2018-062; PS2018-063;
PS2018-064; PS2018-065; PS2018-066; PS2018-067; PS2018-068; PS2018-069;

9

PS2018-070; PS2018-071; PS2018-072; PS2018-073; PS2018-074; PS2018-075;
PS2018-076; PS2018-077; PS2018-078; PS2018-079; PS2018-080; PS2018-081;
PS2018-082; PS2018-083; PS2018-084; PS2018-085; PS2018-086; PS2018-087;
PS2018-088; PS2018-089; PS2018-090; PS2018-091; PS2018-092; PS2018-093;
PS2018-094; PS2018-095; PS2018-096; PS2018-097; PS2018-098; PS2018-099;
PS2018-100; PS2018-101; PS2018-102; PS2018-103; PS2018-104; PS2018-106;
PS2018-107; PS2018-108; PS2018-109; PS2018-110; PS2018-111; PS2018-112;
PS2018-113; PS2018-114; PS2018-115; PS2018-116; PS2018-117; PS2018-118;
PS2018-119; PS2018-120; PS2018-121; PS2018-122; PS2018-123; PS2018-124;
PS2018-125; PS2018-126; PS2018-127; PS2018-128; PS2018-129; PS2018-130;
PS2018-131; PS2018-132; PS2018-133; PS2018-134; PS2018-135; PS2018-136;
PS2018-137; PS2018-138; PS2018-139; PS2018-140; PS2018-141; PS2018-142;
PS2018-143; PS2018-144; PS2018-145; PS2018-146; PS2018-147; PS2018-148;
PS2018-149; PS2018-150; PS2018-151; PS2018-152; PS2018-153; PS2018-154;
PS2018-155; PS2018-156; PS2018-157; PS2018-158; PS2018-159; PS2018-160;
PS2018-161; PS2018-162; PS2018-163; PS2018-164; PS2018-165; PS2018-166;
PS2018-167; PS2018-168; PS2018-169; PS2018-170; PS2018-171; PS2018-172;
PS2018-173; PS2018-174; PS2018-175; PS2018-176; PS2018-177; PS2018-178;
PS2018-179; PS2018-180; PS2018-181; PS2018-182; PS2018-183; PS2018-184;
PS2018-185; PS2018-186; PS2018-187; PS2018-188; PS2018-189; PS2018-190;
PS2018-191; PS2018-192; PS2018-193; PS2018-194; PS2018-195; PS2018-196;
PS2018-197; PS2018-198; PS2018-199; PS2018-200; PS2019-001; PS2019-002;
PS2019-003; PS2019-004; PS2019-005; PS2019-006; PS2019-007; PS2019-008;
PS2019-009; PS2019-010; PS2019-011; PS2019-012; PS2019-013; PS2019-014;
PS2019-015; PS2019-016; PS2019-017; PS2019-018; PS2019-019; PS2019-021;
PS2019-022; PS2019-023; PS2019-024; PS2019-025; PS2019-026; PS2019-027;
PS2019-028; PS2019-029; PS2019-030; PS2019-031; PS2019-032; PS2019-033;
PS2019-034; PS2019-035; PS2019-036; PS2019-037; PS2019-038; PS2019-039;
PS2019-040; PS2019-041; PS2019-042; PS2019-043; PS2019-044; PS2019-045;
PS2019-046; PS2019-047; PS2019-048; PS2019-049; PS2019-050; PS2019-051;
PS2019-052; PS2019-053; PS2019-054; PS2019-055; PS2019-056; PS2019-057;
PS2019-058; PS2019-059; PS2019-061; PS2019-062; PS2019-063; PS2019-064;
PS2019-065; PS2019-066; PS2019-067; PS2019-068; PS2019-069; PS2019-070;
PS2019-071; PS2019-072; PS2019-073; PS2019-074; PS2019-075; PS2019-076;
PS2019-077; PS2019-078; PS2019-079; PS2019-080; PS2019-081; PS2019-082;
PS2019-083; PS2019-084; PS2019-085; PS2019-086; PS2019-087; PS2019-088;
PS2019-089; PS2019-090; PS2019-091; PS2019-092; PS2019-093; PS2019-094;
PS2019-095; PS2019-096; PS2019-097; PS2019-098; PS2019-099; PS2019-100;
PS2019-101; PS2019-102; PS2019-103; PS2019-104; PS2019-106; PS2019-107;
PS2019-108; PS2019-109; PS2019-110; PS2019-111; PS2019-112; PS2019-113;
PS2019-114; PS2019-115; PS2019-116; PS2019-117; PS2019-118; PS2019-120;
PS2019-121; PS2019-122; PS2019-123; PS2019-124; PS2019-125; PS2019-126;
PS2019-127; PS2019-128; PS2019-129; PS2019-130; PS2019-131; PS2019-132;
PS2019-133; PS2019-134; PS2019-135; PS2019-137; PS2019-138; PS2019-139;
PS2019-141; PS2019-142; PS2019-143; PS2019-144; PS2019-146; PS2019-148;
PS2019-149; PS2019-150; PS2019-151; PS2019-152; PS2019-153; PS2019-154;

CONFIDENTIAL

PS2019-155; PS2019-156; PS2019-157; PS2019-158; PS2019-159; PS2019-160; PS2019-162; PS2019-163; PS2019-164; PS2019-165; PS2019-166; PS2019-168; PS2019-170; PS2019-171; PS2019-172; PS2019-173; PS2019-174; PS2019-176; PS2019-177; PS2019-178; PS2019-179; PS2019-180; PS2019-182; PS2019-183; PS2019-184; PS2019-186; PS2019-187; PS2019-188; PS2019-190; PS2019-192; PS2019-193; PS2019-194; PS2019-195; PS2019-196; PS2019-197; PS2019-198; PS2019-199; PS2019-200; PS2019-201; PS2019-202; PS2019-203; PS2019-204; PS2019-205; PS2019-206; PS2019-207; PS2019-209; PS2019-212; PS2019-213; PS2019-214; PS2019-215; PS2019-216; PS2019-217; PS2019-219; PS2019-220; PS2019-221; PS2019-222; PS2019-223; PS2020-002; PS2020-005; PS2020-006; PS2020-007; PS2020-009; PS2020-011; PS2020-013; PS2020-017; PS2020-018.

- SI Files:

  SI2016-001; SI2016-002; SI2016-003; SI2016-004; SI2016-005; SI2016-006; SI2016-007; SI2016-009; SI2016-010; SI2016-011; SI2016-012; SI2016-013; SI2016-014; SI2016-015; SI2016-016; SI2016-017; SI2016-018; SI2016-019; SI2016-020; SI2016-022; SI2016-023; SI2016-024; SI2016-025; SI2016-026; SI2016-027; SI2016-028; SI2016-029; SI2016-030; SI2016-031; SI2016-032; SI2016-033; SI2016-034; SI2016-035; SI2016-036; SI2016-037; SI2016-038; SI2016-039; SI2016-040; SI2016-041; SI2016-042; SI2016-043; SI2016-044; SI2016-045; SI2016-046; SI2016-048; SI2016-049; SI2016-050; SI2016-051; SI2016-052; SI2016-053; SI2016-054; SI2016-055; SI2016-056; SI2016-057; SI2016-058; SI2016-059; SI2016-060; SI2016-062; SI2016-063; SI2016-064; SI2016-065; SI2016-066; SI2016-067; SI2016-068; SI2016-069; SI2016-070; SI2016-071; SI2016-072; SI2016-073; SI2016-074; SI2016-075; SI2016-076; SI2016-077; SI2017-002; SI2017-003; SI2017-004; SI2017-005; SI2017-006; SI2017-007; SI2017-008; SI2017-009; SI2017-010; SI2017-012; SI2017-013; SI2017-015; SI2017-017; SI2017-018; SI2017-020; SI2017-021; SI2017-022; SI2017-023; SI2017-024; SI2017-025; SI2017-026; SI2017-027; SI2017-030; SI2017-031; SI2017-032; SI2017-033; SI2017-034; SI2017-035; SI2017-036; SI2017-037; SI2017-038; SI2017-039; SI2017-040; SI2017-043; SI2017-044; SI2017-045; SI2017-046; SI2017-047; SI2017-048; SI2017-049; SI2017-051; SI2017-052; SI2017-054; SI2017-055; SI2017-056; SI2017-057; SI2017-059; SI2017-060; SI2017-061; SI2017-062; SI2017-063; SI2017-064; SI2017-066; SI2017-067; SI2017-068; SI2017-069; SI2017-070; SI2017-072; SI2017-074; SI2017-075; SI2017-076; SI2017-077; SI2017-078; SI2018-001; SI2018-002; SI2018-004; SI2018-005; SI2018-006; SI2018-008; SI2018-010; SI2018-011; SI2018-012; SI2018-015; SI2018-017; SI2018-019; SI2018-020; SI2018-021; SI2018-022; SI2018-023; SI2018-025; SI2018-026; SI2018-028; SI2018-029; SI2018-030; SI2018-031; SI2018-032; SI2018-038; SI2018-039; SI2018-040; SI2018-041; SI2018-043; SI2018-048; SI2018-051; SI2018-052; SI2018-054; SI2018-057; SI2018-061; SI2018-062; SI2018-064; SI2018-073; SI2019-012.

- SIQ Files:

  SIQ2016-001; SIQ2016-002; SIQ2016-003; SIQ2016-004; SIQ2016-005; SIQ2016-006; SIQ2016-007; SIQ2016-009; SIQ2016-010; SIQ2016-013; SIQ2016-014; SIQ2016-015; SIQ2016-016; SIQ2017-001; SIQ2017-002; SIQ2017-004; SIQ2017-005; SIQ2017-006; SIQ2017-007; SIQ2017-008; SIQ2018-001; SIQ2018-005; SIQ2018-006; SIQ2018-007;

11

**CONFIDENTIAL**

SIQ2018-008; SIQ2018-009; SIQ2018-010; SIQ2018-011; SIQ2019-001; SIQ2019-002; SIQ2019-003; SIQ2019-004; SIQ2019-005; SIQ2019-006; SIQ2019-007; SIQ2019-008; SIQ2019-010; SIQ2019-011; SIQ2019-013; SIQ2019-015

- IAPro Data Pull of files open and closed 2016 – March 2020:  Copy of Query from 01-01-2016 through 3-31-2020.xlsx and Corrected - Feb 11-2020 statistical query.xlsx
- SAP Files:
  - SAP_Labor Report_Police_L_PO_1.xlsx
  - SAP_Labor Report_Police_L_PO_2.xlsx
  - SAP_Additional Info_4.xlsx
  - SAP_Tables and LookupKeys_3.xlsx
- Roster of sworn officers, retirements, and separations:
  - Copy of Roster Retirements Separations 10419 1004 am updated 9120 raj.xlsx
  - Copy of Roster Retirements Separations 10419 1004 am updated 92220 raj pz.xlsx
- MPCTC Separations: PPD RN-7 MPCTC NPA - Separations.xlsx
- Promotions Held in abeyance: PPD RN-2 Held in Abeyance Promotions 2015 to Present.xls
- Use of Force data:
  - PG985307 - UOFDataSupervisorRPT.xlsx
  - Use of Force with Standardization Amendments.xlsx
- Missing Badge Numbers: Copy of Confidential_Missing Badge Numbers 1.xlsx

CONFIDENTIAL

**Appendix C**

**Separation Analyses**

| Rank | Separation Type | Condition of Separation | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|
| **Table 1—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge" or "Felony or Misdemeanor Conviction" 2016-2019 Summarized Across Years** | | | | | | | | |
| *Minority Compared to White* | | | | | | | | |
| Police Officer | Resignation | AI/CH | 56.89% | 1 | 1 | 0.57 | 0.43 | 0.00 |
| Police Officer | Termination | AI/CH | 58.37% | 5 | 4 | 2.92 | 1.08 | 0.53 |
| Police Officer | Termination | Conviction | 60.60% | 2 | 1 | 1.21 | -0.21 | 0.00 |
| POFC | Resignation | AI/CH | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| POFC | Retirement | AI/CH | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| POFC | Termination | AI/CH | 58.38% | 2 | 2 | 1.17 | 0.83 | 0.48 |
| Police Corporal | Resignation | AI/CH | 57.55% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| Police Corporal | Retirement | AI/CH | 57.12% | 4 | 4 | 2.28 | 1.72 | 1.23 |
| Police Corporal | Termination | AI/CH | 57.48% | 3 | 2 | 1.72 | 0.28 | 0.00 |
| Police Sergeant | Retirement | AI/CH | 47.44% | 3 | 1 | 1.42 | -0.42 | 0.00 |
| *Black Compared to Others* | | | | | | | | |
| Police Officer | Resignation | AI/CH | 39.93% | 1 | 1 | 0.40 | 0.60 | 0.21 |
| Police Officer | Termination | AI/CH | 44.32% | 5 | 4 | 2.22 | 1.78 | 1.16 |
| Police Officer | Termination | Conviction | 50.90% | 2 | 0 | 1.02 | -1.02 | -0.73 |
| POFC | Resignation | AI/CH | 39.82% | 1 | 1 | 0.40 | 0.60 | 0.21 |
| POFC | Retirement | AI/CH | 39.82% | 1 | 0 | 0.40 | -0.40 | 0.00 |
| POFC | Termination | AI/CH | 39.82% | 2 | 2 | 0.80 | 1.20 | 1.02 |
| Police Corporal | Resignation | AI/CH | 45.42% | 1 | 1 | 0.45 | 0.55 | 0.09 |
| Police Corporal | Retirement | AI/CH | 44.67% | 4 | 2 | 1.79 | 0.21 | 0.00 |
| Police Corporal | Termination | AI/CH | 44.80% | 3 | 2 | 1.34 | 0.66 | 0.18 |
| Police Sergeant | Retirement | AI/CH | 38.35% | 3 | 1 | 1.15 | -0.15 | 0.00 |

CONFIDENTIAL

| Rank | Separation Type | Condition of Separation | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|
|  | **Table 1—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge" or "Felony or Misdemeanor Conviction"** **2016-2019 Summarized Across Years** |||||||||
|  | *Hispanic/Latino Compared to Others* |
| Police Officer | Resignation | AI/CH | 11.66% | 1 | 0 | 0.12 | -0.12 | 0.00 |
| Police Officer | Termination | AI/CH | 10.22% | 5 | 0 | 0.51 | -0.51 | -0.02 |
| Police Officer | Termination | Conviction | 8.07% | 2 | 1 | 0.16 | 0.84 | 0.88 |
| POFC | Resignation | AI/CH | 11.68% | 1 | 0 | 0.12 | -0.12 | 0.00 |
| POFC | Retirement | AI/CH | 11.68% | 1 | 1 | 0.12 | 0.88 | 1.19 |
| POFC | Termination | AI/CH | 11.68% | 2 | 0 | 0.23 | -0.23 | 0.00 |
| Police Corporal | Resignation | AI/CH | 8.90% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| Police Corporal | Retirement | AI/CH | 8.87% | 4 | 1 | 0.35 | 0.65 | 0.26 |
| Police Corporal | Termination | AI/CH | 8.86% | 3 | 0 | 0.27 | -0.27 | 0.00 |
| Police Sergeant | Retirement | AI/CH | 5.45% | 3 | 0 | 0.16 | -0.16 | 0.00 |
|  | *Black Compared to White* |
| Police Officer | Resignation | AI/CH | 48.09% | 1 | 1 | 0.48 | 0.52 | 0.04 |
| Police Officer | Termination | AI/CH | 51.41% | 5 | 4 | 2.57 | 1.43 | 0.83 |
| Police Officer | Termination | Conviction | 54.36% | 1 | 0 | 0.54 | -0.54 | -0.09 |
| POFC | Resignation | AI/CH | 48.90% | 1 | 1 | 0.49 | 0.51 | 0.02 |
| POFC | Termination | AI/CH | 48.90% | 2 | 2 | 0.98 | 1.02 | 0.74 |
| Police Corporal | Resignation | AI/CH | 51.69% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| Police Corporal | Retirement | AI/CH | 51.45% | 2 | 2 | 1.03 | 0.97 | 0.67 |
| Police Corporal | Termination | AI/CH | 51.31% | 3 | 2 | 1.54 | 0.46 | 0.00 |
| Police Sergeant | Retirement | AI/CH | 42.18% | 3 | 1 | 1.27 | -0.27 | 0.00 |
|  | *Hispanic/Latino Compared to White* |
| Police Officer | Termination | Conviction | 20.20% | 1 | 1 | 0.20 | 0.80 | 0.74 |
| POFC | Retirement | AI/CH | 21.91% | 1 | 1 | 0.22 | 0.78 | 0.68 |

2

CONFIDENTIAL

| Table 1—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge" or "Felony or Misdemeanor Conviction" 2016-2019 Summarized Across Years | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Rank | Separation Type | Condition of Separation | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
| Police Corporal | Retirement | AI/CH | 16.58% | 1 | 1 | 0.17 | 0.83 | 0.90 |

3

**CONFIDENTIAL**

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **Table 2—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" By Year 2016-2019** |
|  | *Minority Compared to White* |
| 2016 | Police Officer | Resignation | AI/CH | 283 | 161 | 56.89% | 1 | 1 | 0.57 | 0.43 | 0.00 |
| 2016 | Police Officer | Termination | AI/CH | 283 | 161 | 56.89% | 3 | 2 | 1.71 | 0.29 | 0.00 |
| 2017 | Police Officer | Termination | AI/CH | 163 | 95 | 58.28% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | Police Officer | Termination | Conviction | 163 | 95 | 58.28% | 1 | 0 | 0.58 | -0.58 | -0.17 |
| 2018 | Police Officer | Termination | AI/CH | 213 | 134 | 62.91% | 1 | 1 | 0.63 | 0.37 | 0.00 |
| 2018 | Police Officer | Termination | Conviction | 213 | 134 | 62.91% | 1 | 1 | 0.63 | 0.37 | 0.00 |
| 2017 | POFC | Resignation | AI/CH | 334 | 195 | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | POFC | Retirement | AI/CH | 334 | 195 | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | POFC | Termination | AI/CH | 334 | 195 | 58.38% | 2 | 2 | 1.17 | 0.83 | 0.48 |
| 2016 | Police Corporal | Retirement | AI/CH | 767 | 435 | 56.71% | 3 | 3 | 1.70 | 1.30 | 0.93 |
| 2016 | Police Corporal | Termination | AI/CH | 767 | 435 | 56.71% | 2 | 2 | 1.13 | 0.87 | 0.52 |
| 2017 | Police Corporal | Retirement | AI/CH | 744 | 434 | 58.33% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2018 | Police Corporal | Resignation | AI/CH | 775 | 446 | 57.55% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2019 | Police Corporal | Termination | AI/CH | 800 | 472 | 59.00% | 1 | 0 | 0.59 | -0.59 | -0.18 |
| 2017 | Police Sergeant | Retirement | AI/CH | 203 | 97 | 47.78% | 1 | 1 | 0.48 | 0.52 | 0.04 |
| 2019 | Police Sergeant | Retirement | AI/CH | 201 | 95 | 47.26% | 2 | 0 | 0.95 | -0.95 | -0.63 |
|  | *Black Compared to Others* |
| 2016 | Police Officer | Resignation | AI/CH | 283 | 113 | 39.93% | 1 | 1 | 0.40 | 0.60 | 0.21 |
| 2016 | Police Officer | Termination | AI/CH | 283 | 113 | 39.93% | 3 | 2 | 1.20 | 0.80 | 0.36 |
| 2017 | Police Officer | Termination | AI/CH | 163 | 81 | 49.69% | 1 | 1 | 0.50 | 0.50 | 0.01 |
| 2017 | Police Officer | Termination | Conviction | 163 | 81 | 49.69% | 1 | 0 | 0.50 | -0.50 | 0.00 |

4

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Table 2—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" By Year 2016-2019 ||||||||||||
| 2018 | Police Officer | Termination | AI/CH | 213 | 111 | 52.11% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| 2018 | Police Officer | Termination | Conviction | 213 | 111 | 52.11% | 1 | 0 | 0.52 | -0.52 | -0.04 |
| 2017 | POFC | Resignation | AI/CH | 334 | 133 | 39.82% | 1 | 1 | 0.40 | 0.60 | 0.21 |
| 2017 | POFC | Retirement | AI/CH | 334 | 133 | 39.82% | 1 | 0 | 0.40 | -0.40 | 0.00 |
| 2017 | POFC | Termination | AI/CH | 334 | 133 | 39.82% | 2 | 2 | 0.80 | 1.20 | 1.02 |
| 2016 | Police Corporal | Retirement | AI/CH | 767 | 340 | 44.33% | 3 | 1 | 1.33 | -0.33 | 0.00 |
| 2016 | Police Corporal | Termination | AI/CH | 767 | 340 | 44.33% | 2 | 2 | 0.89 | 1.11 | 0.87 |
| 2017 | Police Corporal | Retirement | AI/CH | 744 | 340 | 45.70% | 1 | 1 | 0.46 | 0.54 | 0.09 |
| 2018 | Police Corporal | Resignation | AI/CH | 775 | 352 | 45.42% | 1 | 1 | 0.45 | 0.55 | 0.09 |
| 2019 | Police Corporal | Termination | AI/CH | 800 | 366 | 45.75% | 1 | 0 | 0.46 | -0.46 | 0.00 |
| 2017 | Police Sergeant | Retirement | AI/CH | 203 | 78 | 38.42% | 1 | 1 | 0.38 | 0.62 | 0.24 |
| 2019 | Police Sergeant | Retirement | AI/CH | 201 | 77 | 38.31% | 2 | 0 | 0.77 | -0.77 | -0.39 |
| *Hispanic/Latino Compared to Others* ||||||||||||
| 2016 | Police Officer | Resignation | AI/CH | 283 | 33 | 11.66% | 1 | 0 | 0.12 | -0.12 | 0.00 |
| 2016 | Police Officer | Termination | AI/CH | 283 | 33 | 11.66% | 3 | 0 | 0.35 | -0.35 | 0.00 |
| 2017 | Police Officer | Termination | AI/CH | 163 | 11 | 6.75% | 1 | 0 | 0.07 | -0.07 | 0.00 |
| 2017 | Police Officer | Termination | Conviction | 163 | 11 | 6.75% | 1 | 0 | 0.07 | -0.07 | 0.00 |
| 2018 | Police Officer | Termination | AI/CH | 213 | 20 | 9.39% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2018 | Police Officer | Termination | Conviction | 213 | 20 | 9.39% | 1 | 1 | 0.09 | 0.91 | 1.39 |
| 2017 | POFC | Resignation | AI/CH | 334 | 39 | 11.68% | 1 | 0 | 0.12 | -0.12 | 0.00 |
| 2017 | POFC | Retirement | AI/CH | 334 | 39 | 11.68% | 1 | 1 | 0.12 | 0.88 | 1.19 |
| 2017 | POFC | Termination | AI/CH | 334 | 39 | 11.68% | 2 | 0 | 0.23 | -0.23 | 0.00 |

5

CONFIDENTIAL

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table 2—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" By Year 2016-2019** | | | | | | | | | | | |
| 2016 | Police Corporal | Retirement | AI/CH | 767 | 66 | 8.60% | 3 | 1 | 0.26 | 0.74 | 0.50 |
| 2016 | Police Corporal | Termination | AI/CH | 767 | 66 | 8.60% | 2 | 0 | 0.17 | -0.17 | 0.00 |
| 2017 | Police Corporal | Retirement | AI/CH | 744 | 72 | 9.68% | 1 | 0 | 0.10 | -0.10 | 0.00 |
| 2018 | Police Corporal | Resignation | AI/CH | 775 | 69 | 8.90% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2019 | Police Corporal | Termination | AI/CH | 800 | 75 | 9.38% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2017 | Police Sergeant | Retirement | AI/CH | 203 | 11 | 5.42% | 1 | 0 | 0.05 | -0.05 | 0.00 |
| 2019 | Police Sergeant | Retirement | AI/CH | 201 | 11 | 5.47% | 2 | 0 | 0.11 | -0.11 | 0.00 |
| *Black Compared to White* | | | | | | | | | | | |
| 2016 | Police Officer | Resignation | AI/CH | 235 | 113 | 48.09% | 1 | 1 | 0.48 | 0.52 | 0.04 |
| 2016 | Police Officer | Termination | AI/CH | 235 | 113 | 48.09% | 3 | 2 | 1.44 | 0.56 | 0.07 |
| 2017 | Police Officer | Termination | AI/CH | 149 | 81 | 54.36% | 1 | 1 | 0.54 | 0.46 | 0.00 |
| 2017 | Police Officer | Termination | Conviction | 149 | 81 | 54.36% | 1 | 0 | 0.54 | -0.54 | -0.09 |
| 2018 | Police Officer | Termination | AI/CH | 190 | 111 | 58.42% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | POFC | Resignation | AI/CH | 272 | 133 | 48.90% | 1 | 1 | 0.49 | 0.51 | 0.02 |
| 2017 | POFC | Termination | AI/CH | 272 | 133 | 48.90% | 2 | 2 | 0.98 | 1.02 | 0.74 |
| 2016 | Police Corporal | Retirement | AI/CH | 672 | 340 | 50.60% | 1 | 1 | 0.51 | 0.49 | 0.00 |
| 2016 | Police Corporal | Termination | AI/CH | 672 | 340 | 50.60% | 2 | 2 | 1.01 | 0.99 | 0.69 |
| 2017 | Police Corporal | Retirement | AI/CH | 650 | 340 | 52.31% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| 2018 | Police Corporal | Resignation | AI/CH | 681 | 352 | 51.69% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| 2019 | Police Corporal | Termination | AI/CH | 694 | 366 | 52.74% | 1 | 0 | 0.53 | -0.53 | -0.05 |
| 2017 | Police Sergeant | Retirement | AI/CH | 184 | 78 | 42.39% | 1 | 1 | 0.42 | 0.58 | 0.15 |
| 2019 | Police Sergeant | Retirement | AI/CH | 183 | 77 | 42.08% | 2 | 0 | 0.84 | -0.84 | -0.49 |

6

CONFIDENTIAL

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table 2—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" By Year 2016-2019** | | | | | | | | | | | |
| *Hispanic/Latino Compared to White* | | | | | | | | | | | |
| 2018 | Police Officer | Termination | Conviction | 99 | 20 | 20.20% | 1 | 1 | 0.20 | 0.80 | 0.74 |
| 2017 | POFC | Retirement | AI/CH | 178 | 39 | 21.91% | 1 | 1 | 0.22 | 0.78 | 0.68 |
| 2016 | Police Corporal | Retirement | AI/CH | 398 | 66 | 16.58% | 1 | 1 | 0.17 | 0.83 | 0.90 |

7

**CONFIDENTIAL**

| Rank | Separation Type | Condition of Separation | Percentage in Group Examined | Number Separated | Predicted Number in Group Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|
| **Table 3—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" During Major Mills' Tenure as IAD Commander** | | | | | | | | |
| *Minority Compared to White* | | | | | | | | |
| Police Officer | Termination | AI/CH | 60.60% | 2 | 1.21 | 0.79 | | 0.42 |
| Police Officer | Termination | Conviction | 60.60% | 2 | 1 | 1.21 | -0.21 | 0.00 |
| POFC | Resignation | AI/CH | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| POFC | Retirement | AI/CH | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| POFC | Termination | AI/CH | 58.38% | 2 | 2 | 1.17 | 0.83 | 0.48 |
| Police Corporal | Resignation | AI/CH | 57.55% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| Police Corporal | Retirement | AI/CH | 57.12% | 4 | 4 | 2.28 | 1.72 | 1.23 |
| Police Corporal | Termination | AI/CH | 57.86% | 2 | 1 | 1.16 | -0.16 | 0.00 |
| Police Sergeant | Retirement | AI/CH | 47.78% | 1 | 1 | 0.48 | 0.52 | 0.04 |
| *Black Compared to Others* | | | | | | | | |
| Police Officer | Termination | AI/CH | 50.90% | 2 | 2 | 1.02 | 0.98 | 0.68 |
| Police Officer | Termination | Conviction | 50.90% | 2 | 0 | 1.02 | -1.02 | -0.73 |
| POFC | Resignation | AI/CH | 39.82% | 1 | 1 | 0.40 | 0.60 | 0.21 |
| POFC | Retirement | AI/CH | 39.82% | 1 | 0 | 0.40 | -0.40 | 0.00 |
| POFC | Termination | AI/CH | 39.82% | 2 | 2 | 0.80 | 1.20 | 1.02 |
| Police Corporal | Resignation | AI/CH | 45.42% | 1 | 1 | 0.45 | 0.55 | 0.09 |
| Police Corporal | Retirement | AI/CH | 44.67% | 4 | 2 | 1.79 | 0.21 | 0.00 |
| Police Corporal | Termination | AI/CH | 45.04% | 2 | 1 | 0.90 | 0.10 | 0.00 |
| Police Sergeant | Retirement | AI/CH | 38.42% | 1 | 1 | 0.38 | 0.62 | 0.24 |
| *Hispanic/Latino Compared to Others* | | | | | | | | |
| Police Officer | Termination | AI/CH | 8.07% | 2 | 0 | 0.16 | -0.16 | 0.00 |
| Police Officer | Termination | Conviction | 8.07% | 2 | 1 | 0.16 | 0.84 | 0.88 |
| POFC | Resignation | AI/CH | 11.68% | 1 | 0 | 0.12 | -0.12 | 0.00 |

8

CONFIDENTIAL

| Rank | Separation Type | Condition of Separation | Percentage in Group Examined | Number Separated | Predicted Number in Group Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|
|  | **Table 3—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" During Major Mills' Tenure as IAD Commander** |||||||||
| POFC | Retirement | AI/CH | 11.68% | 1 | 1 | 0.12 | 0.88 | 1.19 |
| POFC | Termination | AI/CH | 11.68% | 2 | 0 | 0.23 | -0.23 | 0.00 |
| Police Corporal | Resignation | AI/CH | 8.90% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| Police Corporal | Retirement | AI/CH | 8.87% | 4 | 1 | 0.35 | 0.65 | 0.26 |
| Police Corporal | Termination | AI/CH | 8.99% | 2 | 0 | 0.18 | -0.18 | 0.00 |
| Police Sergeant | Retirement | AI/CH | 5.42% | 1 | 0 | 0.05 | -0.05 | 0.00 |
|  | ***Black Compared to White*** |||||||||
| Police Officer | Termination | AI/CH | 56.39% | 2 | 2 | 1.13 | 0.87 | 0.53 |
| Police Officer | Termination | Conviction | 54.36% | 1 | 0 | 0.54 | -0.54 | -0.09 |
| POFC | Resignation | AI/CH | 48.90% | 1 | 1 | 0.49 | 0.51 | 0.02 |
| POFC | Termination | AI/CH | 48.90% | 2 | 2 | 0.98 | 1.02 | 0.74 |
| Police Corporal | Resignation | AI/CH | 51.69% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| Police Corporal | Retirement | AI/CH | 51.45% | 2 | 2 | 1.03 | 0.97 | 0.67 |
| Police Corporal | Termination | AI/CH | 51.67% | 2 | 2 | 1.03 | -0.03 | 0.00 |
| Police Sergeant | Retirement | AI/CH | 42.39% | 1 | 1 | 0.42 | 0.58 | 0.15 |
|  | ***Hispanic/Latino Compared to White*** |||||||||
| Police Officer | Termination | Conviction | 20.20% | 1 | 1 | 0.20 | 0.80 | 0.74 |
| POFC | Retirement | AI/CH | 21.91% | 1 | 1 | 0.22 | 0.78 | 0.68 |
| Police Corporal | Retirement | AI/CH | 16.58% | 1 | 1 | 0.17 | 0.83 | 0.90 |

9

**CONFIDENTIAL**

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|------|------|----------------|------------------------|--------------------------------------|--------------------------------------------------------|------------------------------|------------------|------------------------------------------|----------------------------------------------|------------------------------------------|-------------------------------|
| Table 4—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" During Major Mills' Tenure as IAD Commander, by Year | | | | | | | | | | | |
| *Minority Compared to White* | | | | | | | | | | | |
| 2017 | Police Officer | Termination | AI/CH | 163 | 95 | 58.28% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | Police Officer | Termination | Conviction | 163 | 95 | 58.28% | 1 | 0 | 0.58 | -0.58 | -0.17 |
| 2018 | Police Officer | Termination | AI/CH | 213 | 134 | 62.91% | 1 | 1 | 0.63 | 0.37 | 0.00 |
| 2018 | Police Officer | Termination | Conviction | 213 | 134 | 62.91% | 1 | 1 | 0.63 | 0.37 | 0.00 |
| 2017 | POFC | Resignation | AI/CH | 334 | 195 | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | POFC | Retirement | AI/CH | 334 | 195 | 58.38% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | POFC | Termination | AI/CH | 334 | 195 | 58.38% | 2 | 2 | 1.17 | 0.83 | 0.48 |
| 2016 | Police Corporal | Retirement | AI/CH | 767 | 435 | 56.71% | 3 | 3 | 1.70 | 1.30 | 0.93 |
| 2016 | Police Corporal | Termination | AI/CH | 767 | 435 | 56.71% | 1 | 1 | 0.57 | 0.43 | 0.00 |
| 2017 | Police Corporal | Retirement | AI/CH | 744 | 434 | 58.33% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2018 | Police Corporal | Resignation | AI/CH | 775 | 446 | 57.55% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2019 | Police Corporal | Termination | AI/CH | 800 | 472 | 59.00% | 1 | 0 | 0.59 | -0.59 | -0.18 |
| 2017 | Police Sergeant | Retirement | AI/CH | 203 | 97 | 47.78% | 1 | 1 | 0.48 | 0.52 | 0.04 |
| *Black Compared to Others* | | | | | | | | | | | |
| 2017 | Police Officer | Termination | AI/CH | 163 | 81 | 49.69% | 1 | 1 | 0.50 | 0.50 | 0.01 |
| 2017 | Police Officer | Termination | Conviction | 163 | 81 | 49.69% | 1 | 0 | 0.50 | -0.50 | 0.00 |
| 2018 | Police Officer | Termination | AI/CH | 213 | 111 | 52.11% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| 2018 | Police Officer | Termination | Conviction | 213 | 111 | 52.11% | 1 | 0 | 0.52 | -0.52 | -0.04 |
| 2017 | POFC | Resignation | AI/CH | 334 | 133 | 39.82% | 1 | 1 | 0.40 | 0.60 | 0.21 |
| 2017 | POFC | Retirement | AI/CH | 334 | 133 | 39.82% | 1 | 0 | 0.40 | -0.40 | 0.00 |
| 2017 | POFC | Termination | AI/CH | 334 | 133 | 39.82% | 2 | 2 | 0.80 | 1.20 | 1.02 |

10

CONFIDENTIAL

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

**Table 4—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" During Major Mills' Tenure as IAD Commander, by Year**

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | Police Corporal | Retirement | AI/CH | 767 | 340 | 44.33% | 3 | 1 | 1.33 | -0.33 | 0.00 |
| 2016 | Police Corporal | Termination | AI/CH | 767 | 340 | 44.33% | 1 | 1 | 0.44 | 0.56 | 0.11 |
| 2017 | Police Corporal | Retirement | AI/CH | 744 | 340 | 45.70% | 1 | 1 | 0.46 | 0.54 | 0.09 |
| 2018 | Police Corporal | Resignation | AI/CH | 775 | 352 | 45.42% | 1 | 1 | 0.45 | 0.55 | 0.09 |
| 2019 | Police Corporal | Termination | AI/CH | 800 | 366 | 45.75% | 1 | 0 | 0.46 | -0.46 | 0.00 |
| 2017 | Police Sergeant | Retirement | AI/CH | 203 | 78 | 38.42% | 1 | 1 | 0.38 | 0.62 | 0.24 |
| *Hispanic/Latino Compared to Others* | | | | | | | | | | | |
| 2017 | Police Officer | Termination | AI/CH | 163 | 11 | 6.75% | 1 | 0 | 0.07 | -0.07 | 0.00 |
| 2017 | Police Officer | Termination | Conviction | 163 | 11 | 6.75% | 1 | 0 | 0.07 | -0.07 | 0.00 |
| 2018 | Police Officer | Termination | AI/CH | 213 | 20 | 9.39% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2018 | Police Officer | Termination | Conviction | 213 | 20 | 9.39% | 1 | 1 | 0.09 | 0.91 | 1.39 |
| 2017 | POFC | Resignation | AI/CH | 334 | 39 | 11.68% | 1 | 0 | 0.12 | -0.12 | 0.00 |
| 2017 | POFC | Retirement | AI/CH | 334 | 39 | 11.68% | 1 | 1 | 0.12 | 0.88 | 1.19 |
| 2017 | POFC | Termination | AI/CH | 334 | 39 | 11.68% | 2 | 0 | 0.23 | -0.23 | 0.00 |
| 2016 | Police Corporal | Retirement | AI/CH | 767 | 66 | 8.60% | 3 | 1 | 0.26 | 0.74 | 0.50 |
| 2016 | Police Corporal | Termination | AI/CH | 767 | 66 | 8.60% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2017 | Police Corporal | Retirement | AI/CH | 744 | 72 | 9.68% | 1 | 0 | 0.10 | -0.10 | 0.00 |
| 2018 | Police Corporal | Resignation | AI/CH | 775 | 69 | 8.90% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2019 | Police Corporal | Termination | AI/CH | 800 | 75 | 9.38% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2017 | Police Sergeant | Retirement | AI/CH | 203 | 11 | 5.42% | 1 | 0 | 0.05 | -0.05 | 0.00 |
| *Black Compared to White* | | | | | | | | | | | |
| 2017 | Police Officer | Termination | AI/CH | 149 | 81 | 54.36% | 1 | 1 | 0.54 | 0.46 | 0.00 |

11

CONFIDENTIAL

| Year | Rank | Separation Type | Condition of Separation | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|------|------|------|------|------|------|------|------|------|------|------|------|
| | | | | **Table 4—Analysis of NPA Resignations, Retirements and Terminations Resulting from an "Administrative Investigation or Charge (AI/CH)" or "Felony or Misdemeanor Conviction (Conviction)" During Major Mills' Tenure as IAD Commander, by Year** | | | | | | | | |
| 2017 | Police Officer | Termination | Conviction | 149 | 81 | 54.36% | 1 | 0 | 0.54 | -0.54 | -0.09 |
| 2018 | Police Officer | Termination | AI/CH | 190 | 111 | 58.42% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2017 | POFC | Resignation | AI/CH | 272 | 133 | 48.90% | 1 | 1 | 0.49 | 0.51 | 0.02 |
| 2017 | POFC | Termination | AI/CH | 272 | 133 | 48.90% | 2 | 2 | 0.98 | 1.02 | 0.74 |
| 2016 | Police Corporal | Retirement | AI/CH | 672 | 340 | 50.60% | 1 | 1 | 0.51 | 0.49 | 0.00 |
| 2016 | Police Corporal | Termination | AI/CH | 672 | 340 | 50.60% | 1 | 1 | 0.51 | 0.49 | 0.00 |
| 2017 | Police Corporal | Retirement | AI/CH | 650 | 340 | 52.31% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| 2018 | Police Corporal | Resignation | AI/CH | 681 | 352 | 51.69% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| 2019 | Police Corporal | Termination | AI/CH | 694 | 366 | 52.74% | 1 | 0 | 0.53 | -0.53 | -0.05 |
| 2017 | Police Sergeant | Retirement | AI/CH | 184 | 78 | 42.39% | 1 | 1 | 0.42 | 0.58 | 0.15 |
| | | | | ***Hispanic/Latino Compared to White*** | | | | | | | |
| 2018 | Police Officer | Termination | Conviction | 99 | 20 | 20.20% | 1 | 1 | 0.20 | 0.80 | 0.74 |
| 2017 | POFC | Retirement | AI/CH | 178 | 39 | 21.91% | 1 | 1 | 0.22 | 0.78 | 0.68 |
| 2016 | Police Corporal | Retirement | AI/CH | 398 | 66 | 16.58% | 1 | 1 | 0.17 | 0.83 | 0.90 |

12

CONFIDENTIAL

| Year | Rank | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|
| | | | **Table 5—Analysis of Terminations Based on Rosters by Year 2016-August 2020** | | | | | | |
| | | | | | | | | | |
| | | | | *Minority Compared to White* | | | | | |
| 2016 | Police Officer | 283 | 161 | 56.89% | 4 | 3 | 2.28 | 0.72 | 0.23 |
| 2017 | Police Officer | 163 | 95 | 58.28% | 2 | 1 | 1.17 | -0.17 | 0.00 |
| 2018 | Police Officer | 213 | 134 | 62.91% | 2 | 2 | 1.26 | 0.74 | 0.35 |
| 2019 | Police Officer | 204 | 132 | 64.71% | 1 | 0 | 0.65 | -0.65 | -0.31 |
| 2020 | Police Officer | 147 | 100 | 68.03% | 2 | 1 | 1.36 | -0.36 | 0.00 |
| 2017 | POFC | 334 | 195 | 58.38% | 5 | 5 | 2.92 | 2.08 | 1.43 |
| 2020 | POFC | 169 | 103 | 60.95% | 1 | 1 | 0.61 | 0.39 | 0.00 |
| 2016 | Police Corporal | 767 | 435 | 56.71% | 2 | 2 | 1.13 | 0.87 | 0.52 |
| 2018 | Police Corporal | 775 | 446 | 57.55% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2019 | Police Corporal | 800 | 472 | 59.00% | 1 | 0 | 0.59 | -0.59 | -0.18 |
| 2020 | Police Corporal | 865 | 518 | 59.88% | 2 | 2 | 1.20 | 0.80 | 0.44 |
| | | | | *Black Compared to White* | | | | | |
| 2016 | Police Officer | 283 | 113 | 39.93% | 4 | 3 | 1.60 | 1.40 | 0.92 |
| 2017 | Police Officer | 163 | 81 | 49.69% | 2 | 1 | 0.99 | 0.01 | 0.00 |
| 2018 | Police Officer | 213 | 111 | 52.11% | 2 | 1 | 1.04 | -0.04 | 0.00 |
| 2019 | Police Officer | 204 | 100 | 49.02% | 1 | 0 | 0.49 | -0.49 | 0.00 |
| 2020 | Police Officer | 147 | 74 | 50.34% | 2 | 1 | 1.01 | -0.01 | 0.00 |
| 2017 | POFC | 334 | 133 | 39.82% | 5 | 4 | 1.99 | 2.01 | 1.38 |
| 2020 | POFC | 169 | 83 | 49.11% | 1 | 1 | 0.49 | 0.51 | 0.02 |
| 2016 | Police Corporal | 767 | 340 | 44.33% | 2 | 2 | 0.89 | 1.11 | 0.87 |
| 2018 | Police Corporal | 775 | 352 | 45.42% | 1 | 1 | 0.45 | 0.55 | 0.09 |

13

CONFIDENTIAL

| Year | Rank | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Table 5—Analysis of Terminations Based on Rosters by Year 2016-August 2020** | | | | | |
| 2019 | Police Corporal | 800 | 366 | 45.75% | 1 | 0 | 0.46 | -0.46 | 0.00 |
| 2020 | Police Corporal | 865 | 386 | 44.62% | 2 | 2 | 0.89 | 1.11 | 0.86 |
| | | | | *Hispanic/Latino Compared to Others* | | | | | |
| 2016 | Police Officer | 283 | 33 | 11.66% | 4 | 0 | 0.47 | -0.47 | 0.00 |
| 2017 | Police Officer | 163 | 11 | 6.75% | 2 | 0 | 0.13 | -0.13 | 0.00 |
| 2018 | Police Officer | 213 | 20 | 9.39% | 2 | 1 | 0.19 | 0.81 | 0.76 |
| 2019 | Police Officer | 204 | 28 | 13.73% | 1 | 0 | 0.14 | -0.14 | 0.00 |
| 2020 | Police Officer | 147 | 22 | 14.97% | 2 | 0 | 0.30 | -0.30 | 0.00 |
| 2017 | POFC | 334 | 39 | 11.68% | 5 | 1 | 0.58 | 0.42 | 0.00 |
| 2020 | POFC | 169 | 16 | 9.47% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2016 | Police Corporal | 767 | 66 | 8.60% | 2 | 0 | 0.17 | -0.17 | 0.00 |
| 2018 | Police Corporal | 775 | 69 | 8.90% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2019 | Police Corporal | 800 | 75 | 9.38% | 1 | 0 | 0.09 | -0.09 | 0.00 |
| 2020 | Police Corporal | 865 | 92 | 10.64% | 2 | 0 | 0.21 | -0.21 | 0.00 |
| | | | | *Black Compared to White* | | | | | |
| 2016 | Police Officer | 235 | 113 | 48.09% | 4 | 3 | 1.92 | 1.08 | 0.58 |
| 2017 | Police Officer | 149 | 81 | 54.36% | 2 | 1 | 1.09 | -0.09 | 0.00 |
| 2018 | Police Officer | 190 | 111 | 58.42% | 1 | 1 | 0.58 | 0.42 | 0.00 |
| 2019 | Police Officer | 172 | 100 | 58.14% | 1 | 0 | 0.58 | -0.58 | -0.16 |
| 2020 | Police Officer | 121 | 74 | 61.16% | 2 | 1 | 1.22 | -0.22 | 0.00 |
| 2017 | POFC | 272 | 133 | 48.90% | 4 | 4 | 1.96 | 2.04 | 1.54 |
| 2020 | POFC | 149 | 83 | 55.70% | 1 | 1 | 0.56 | 0.44 | 0.00 |

14

**CONFIDENTIAL**

| Year | Rank | Number in Rank at Beginning of Year | Number in Group Examined at Beginning of Year in Rank | Percentage in Group Examined | Number Separated | Number in Group Being Examined Separated | Predicted Number in Group Examined Separated | Difference Between Actual and Predicted | Number of Standard Deviations |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| 2016 | Police Corporal | 672 | 340 | 50.60% | 2 | 2 | 1.01 | 0.99 | 0.69 |
| 2018 | Police Corporal | 681 | 352 | 51.69% | 1 | 1 | 0.52 | 0.48 | 0.00 |
| 2019 | Police Corporal | 694 | 366 | 52.74% | 1 | 0 | 0.53 | -0.53 | -0.05 |
| 2020 | Police Corporal | 733 | 386 | 52.66% | 2 | 2 | 1.05 | 0.95 | 0.63 |
| *Hispanic/Latino Compared to White* | | | | | | | | | |
| 2016 | Police Officer | 155 | 33 | 21.29% | 1 | 0 | 0.21 | -0.21 | 0.00 |
| 2017 | Police Officer | 79 | 11 | 13.92% | 1 | 0 | 0.14 | -0.14 | 0.00 |
| 2018 | Police Officer | 99 | 20 | 20.20% | 1 | 1 | 0.20 | 0.80 | 0.74 |
| 2019 | Police Officer | 100 | 28 | 28.00% | 1 | 0 | 0.28 | -0.28 | 0.00 |
| 2020 | Police Officer | 69 | 22 | 31.88% | 1 | 0 | 0.32 | -0.32 | 0.00 |
| 2017 | POFC | 178 | 39 | 21.91% | 1 | 1 | 0.22 | 0.78 | 0.68 |
| 2019 | Police Corporal | 403 | 75 | 18.61% | 1 | 0 | 0.19 | -0.19 | 0.00 |

**Table 5—Analysis of Terminations Based on Rosters by Year 2016-August 2020**

15

**CONFIDENTIAL**

**Appendix D**

**Description of IAPro Data Collection**

CONFIDENTIAL

Documents were received for the DA, IA, IAQ, SI, SIQ, FCIQ, and PS cases that were opened and closed from 2016 through March 2020. The information collected from each was dependent on the type of file as the documents are specific to the type of file. For example, in some types of files, there is the possibility of a review by the Administrative Hearing Board which may contain differences in the findings from the original IAD findings. Key documents differ by file type, but generally include information to verify the data in IAPro about the parties involved (respondents, complainants, and investigators), the dates of the investigation, the allegations, findings, and the disciplinary action taken. We also collected additional information from the documents to build a more complete picture of the investigation. The information collected and documents used vary by file type but, in general, we collected information about additional parties involved (additional investigators, involved citizens, and witnesses) and information about the progression and outcome of the investigation. There are instances in which a type of document was not available for a particular file, consequently, some fields are not always or consistently populated.

My team also compared the race of the respondent and investigators to the SAP information to determine if there were discrepancies and updated the information accordingly. The information in the body of the report is after matching the race of the officer from the SAP data and rosters.

Given the volume of documents that my team reviewed and information entered for each matter, there will be some error. However, to minimize the error, I had a different staff member review a statistical sampling of the entries for each type.

**SI Files:**

In general, the key documents when entering SI files are:
- Request for Case Numbers
- Report of Investigation (ROI)
- Case Closure Summary (Confidential Personnel Record)
- Letter from the CCOP regarding the findings of IA
- Disciplinary Action Recommendation (DAR)
- Letters which may detail the date at which the discipline (if any) was imposed

The date at which IAD is notified or became aware of the allegation is generally consistent between the IAPro data and the Request for Case Numbers document. The Request for Case Numbers also contains:
- The officer who is the original investigator
- The unit with which the respondent officer was working at the time of the incident
- The date of the incident
- High-level notation of the category of allegation (Unbecoming Conduct, Criminal Mischief, etc.)

The Request for Case Numbers does not always list each of the allegations being made. However, the Request for Case Numbers starts the process of the investigation into the allegations.

After the information from the Request for Case Numbers is entered or used to verify the start of the investigation, a review of the Report of Investigation (ROI) is required. The ROI contains:

1

- Information about the officer(s) involved including the unit with which the officer(s) worked,
- Race of the officer(s),
- Involved citizen(s) (often the complainant is the involved citizen even though not listed as such)
- the Race of the involved citizen(s)
- Details of the complaint, including other officers involved (if any), other involved citizens (if any), and witnesses to the incident (if any).
- Narrative of the allegation, including a synopsis of the statements of the complainants(s)/involved citizens(s), and any witnesses, as well as an overview of the evidence available during the investigation which may include notations of the existence of evidence including videos, MVS information, statements, audio recordings, pictures, etc.[122]

The information from the ROI is entered into the ROI columns and, if applicable, used to populate the columns regarding witnesses to the incident and whether or not there is evidence of the incident.[123]  The ROI is also reviewed to determine whether the investigator on the ROI is the same as the investigator on the Request for Case Numbers.  If the investigator is not the same, then the additional investigator columns are to be filled in with the additional investigator information.

The Case Closure Summary (also labeled the Confidential Personnel Record) is then reviewed to obtain the information, at a high level, regarding the allegation(s).  This document also contains the findings regarding the allegation(s) such as Sustained, Unfounded, Exonerated, etc. The findings and the detailed findings from the Case Closure Summary are also entered in the appropriate columns that are relevant to the Case Closure Summary.[124]

If the Case Closure Summary contains findings of "Sustained" then generally there is a DAR document which will list the allegations with "Sustained" and the discipline associated with the allegation.  Any non-sustained or exonerated allegations will not appear on the DAR because there is no discipline associated with these findings.  The DAR contains additional information on the reason for the finding of Sustained and the details of the discipline imposed (a fine, termination, suspension for a set number of hours, etc.).  The discipline is specific to each sustained allegation such that a file could have various types of discipline being imposed.  The DAR is used to populate the fields that are relevant to the DAR and to verify the discipline being imposed.

---

[122] The existence of evidence and the type of evidence is entered in the column labeled "Is there evidence of the respondent accused event? (i.e., Video, Audio,CD)." The ROI columns are labeled "Report of Investigation (ROI): Who Signed/Approved: Last Name", "Report of Investigation (ROI): Who Signed/Approved: First Name", "Report of Investigation (ROI): Who Signed/Approved: Badge Number", and "Admission by Respondent (e.g., in ROI; Letter to Chief; or other)."

[123] The witness columns are labeled "Police/Other Witness 1: Last Name", "Police/Other Witness 1: First Name", "Police/Other Witness 1: Rank", "Police/Other Witness 1: Race", and "Police/Other Witness 1: Badge." The number of Police/Other Witness columns are numbered from one to 23 to record up to 23 witnesses.

[124] The Case Closure Summary is the source of the columns labeled "Date of Case Closure Summary/Confidential Personnel Record (IA/SI)", "Name of Commander on Case Closure Summary/Confidential Personnel Record (IA/SI)", "Finding from Case Closure Summary/Confidential Personnel Record  (IA/SI) (Sustained, etc.)", "Details of Finding from Case Closure Summary/Confidential Personnel Record  (IA/SI)," and "More Detailed Directive Information."

2

After the DAR is issued to the respondent officer, the officer is asked to complete the final page of the DAR.  The final page of the DAR is the opportunity for the respondent officer to "Accept Discipline" and sign the top half of the DAR, or "Do Not Accept Discipline" and sign the bottom half of the final page.  If the officer does not accept the discipline, the signing of the final page of the DAR to that effect includes a request that the matter be heard by the Administrative Hearing Board.[125]

The Citizen Complaint Oversight Panel (CCOP) provides a letter regarding the outcome of an investigation which includes a statement as to whether the CCOP agreed or disagreed with each finding. The CCOP letter may, in some selected cases, also contain further explanation regarding the matter and their assessment of the findings.[126]

If the respondent officer requests that the matter be moved to a hearing by the Administrative Hearing Board, there will be documentation of the date of the hearing, members of the hearing board, the hearing board coordinator, and whether there were witnesses and lawyers involved. The final report of the hearing board may contain findings and discipline for the respondent officer that deviates from the DAR.[127]

**IA Files:**

In general, the key documents are:
- Internal Affairs Case Disposition Memo
- ROI
- Case Closure Summary
- CCOP letter regarding the findings of IAD (if available)
- DAR (if relevant)
- Letters which may detail the date at which the discipline (if any) was imposed

The IA Case Disposition memo is reviewed to verify:
- Respondent
- Complainant
- Allegations
- Findings
- Disciplinary action

---

[125] The columns relevant to the DAR are labeled "Date Disciplinary Action Recommendation (DAR/MDADR) Issued (On top of Document)", "Finding on Disciplinary Action Recommendation (DAR/MDADR)", "Details of Finding on Disciplinary Action Recommendation (DAR/MDADR)", "Details of Discipline on Disciplinary Action Recommendation (DAR/MDADR)", "Did Officer dispute or appeal the finding?", "Did Officer sign the waiver of right to a hearing?", and "Did Officer resign?."

[126] The letter from the CCOP is the source of the columns labeled "Was a Citizen Complaint Oversight Panel (CCOP) conducted?", "If yes, did the CCOP approve the recommended findings?", "Date of CCOP Recommendation", and "Chairperson of CCOP."

[127] Deviations in discipline are noted in the columns labeled "Indication if Hearing Board Outcome deviated from IA recommendation (see DAR)", "AHB Deviation in Finding (Y/N)", "AHB Finding Deviation", "AHB Deviation in Detailed Discipline (Y/N)", and "AHB Deviation in Discipline Details."

3

The dates at which IAD is notified or became aware of the allegation is generally consistent between the IAPro data and the Case Tracking Log.

The process for entering the ROI, Case Closure Summary, and DAR documents in IA files follows that of the SI files.  Like SI files, the IA files generally include a statement as to whether the CCOP agreed or disagreed with each finding. If the respondent officer requests that the matter be moved to a hearing by the Administrative Hearing Board, documentation of the date of the hearing, members of the hearing board, the hearing board coordinator, and whether there were witnesses and lawyers involved. The final report of the hearing board may contain findings and discipline for the respondent officer that deviates from the Disciplinary Action Recommendation form.

**PS Files:**

In general, the key documents are:
- Request for Case Numbers
- ROI
- DAR
- Internal Affairs Case Disposition Letter
- Evaluation of Investigation Letter
- Approval to Serve email
- Any letters which detail the date at which the discipline (if any) was imposed

The date at which IAD is notified or became aware of the allegation is generally consistent between the IAPro data and the Request for Case Numbers document. The process to enter the information contained in the Request for Case Numbers for PS files follows that of the SI files.

After the information from the Request for Case Numbers is entered or used to verify the start of the investigation, a review of the ROI is required. Again, the process for entering the ROI for PS follows that of SI and IA files.  In the absence of an ROI, the Evaluation of Investigation letter can be used to obtain the recommendation of the investigator.

The Approval to Serve email is reviewed next, as it may provide information regarding the offense number and the result of the IAPro Check for Like Priors, followed by a review of the IA Case Disposition letter.  If the IA Case Disposition letter contains findings of "Sustained" then there is a DAR document which will list the allegations with "Sustained" and the discipline associated with the allegation.  Entry of the DAR and any AHB documents for PS files follow the process described for SI and IA files.

**DA Files:**

In general, the key documents are:
- Request for Case Numbers
- Motor Vehicle Fleet Safety Report of Investigation (FSROI)
- Commander's Information Report

4

**CONFIDENTIAL**

- DAR (if relevant)
- Duress Statement
- Witness statements
- Letters which detail the date at which the discipline (if any) was imposed
- The date at which IA is notified or became aware of the allegation is generally consistent between the IAPro data and the Request for Case Numbers document.  The process to enter the information contained in the Request for Case Numbers for DA files follows that of the PS and SI files.

After the information from the Request for Case Numbers is entered or used to verify the start of the investigation, a review of the Motor Vehicle Fleet Safety Report of Investigation (FSROI) is required. The FSROI contains the information about the officer(s) involved including the unit with which the officer(s) worked, and details of the incident.  There may be a second FSROI if there was another officer involved in the accident. The FSROI also contains:

- Overview of the police vehicle's actions
- Other vehicles' actions
- Location of the accident, road conditions, weather, light conditions
- Investigator's findings

The investigator's findings are summarized as to whether the accident was employee error and if the accident was preventable.  The information from the FSROI is entered in the ROI columns[128] and, if applicable, used to populate the columns regarding the involvement of another officer. Like the ROI in other types of files, the FSROI is also be reviewed to determine whether the investigator on the FSROI is the same as the investigator on the Request for Case Numbers.  If the investigator is not the same, then the additional investigator columns are to be filled in with the additional investigator information.

The Commander's Information Report is then reviewed to obtain information regarding all individuals involved in the accident.  This document also contains the race of the officers, and the race of the involved citizens.

The Duress Statement is reviewed to get an account of what happened from the respondent's point of view. The respondent will usually indicate whether they were at fault in the accident and provide more information from their point of view about the circumstances surrounding the accident.

If the Motor Vehicle Fleet Safety Report of Investigation indicates that the accident was "Preventable" then there generally is a DAR or Notice of Intent (for probationary officers) document which may list the allegations with "Sustained" and the discipline associated with the allegation.  Entry of the DAR and any AHB documents for DA files generally follow the process described for SI, IA, and PS files.

---

[128] The ROI columns are labeled "Report of Investigation (ROI):  Who Signed/Approved:  Last Name", "Report of Investigation (ROI):  Who Signed/Approved:  First Name", "Report of Investigation (ROI):  Who Signed/Approved: Badge Number", and "Admission by Respondent (e.g., in ROI; Letter to Chief; or other)."

CONFIDENTIAL

If the accident involved other vehicles or individuals, we will also use the provided witness statements to fill in the witness columns. The witness statements generally provide information regarding name, race, badge number (if applicable), and rank (if applicable).

**SIQ Files:**

In general, the key documents are the:
- Incident Review Checklist
- Supervisor's Use of Force Review
- Incident Report
- Incident Details
- Summary of Investigative Activity
- Interview scripts, evidence, and any emails, letters/inter-office memorandums which detail more information of the inquiry and the discipline (if any) imposed

The date at which IAD is notified or became aware of the allegation is generally consistent between the IAPro data and Incident Review Checklist, Summary of Investigative Activity, or Supervisor's Use of Force Review. The Incident Review Checklist typically contains:
- Incident date
- Inquiry dates
- Involved officer(s)
- Demographic information about the involved officer(s)
- Unit with which the responding officer(s) was working at the time of the incident
- Complainant name
- Narrative summary

Within the Checklist's narrative summary, detailed directive information is given, along with the findings of the inquiry and action taken. The narrative may also include mention of other officers involved (if any), involved citizens (if any), and witnesses (if any), as well as descriptions of any evidence reviewed during the inquiry, such as video, MVS information, interview statements, audio recordings, pictures, etc.

The Summary of Investigative Activity outlines the steps taken to investigate the inquiry by date. The Supervisor's Use of Force Review similarly provides information about the involved officer(s), witnesses/victims, allegation information, and a narrative summary.

After the information from the Incident Review Checklist, Supervisor's Use of Force Review, Summary of Investigative Activity are entered or used to verify the details of the inquiry, the additional documents are reviewed. These documents include:
- Incident Report
- Incident Details
- Any other emails, letters/inter-office memorandums deemed useful

6

**CONFIDENTIAL**

These documents often contain a narrative of the allegation, a synopsis of the statements of the complainants(s)/involved citizens(s), and any witnesses, as well as an overview of the evidence available during the investigation which may include notations of the existence of videos, MVS information, statements, audio recordings, pictures, etc. The information from the documents are entered into the respondent, complainant, allegation, investigation and recommendation columns.

**IAQ Files:**

In general, key documents include:
- Complaint Against Police Practices form filled out by the complainant or, alternatively, a letter or email containing the complaint
- Internal Affairs Assignment Sheet
- Incident Review Checklist

When present, Incident Reports, court case listings, arrest reports, and interviews provide further description of the incident including dates, charges, and parties involved.

The complaint (in form, letter, or email format) generally contains:
- Complainant name
- Complaint date
- Incident date
- Involved officer(s)
- Narrative summary of the incident

The complaint will sometimes include descriptions of the officers, such as badge number or race, which can be used to verify the IAPro data, and the names of witnesses.  The text of the complaint may also note the existence of pictures or video of the incident in possession of the complainant.

The Assignment Sheet begins the inquiry process and generally contains:
- Involved officer(s) and unit
- High-level notation of the category of the allegation
- To whom the investigation is assigned
- Date of assignment
- Brief summary of the complaint
- Complainant name
- Incident date

All the above information (when available) from the complaint and assignment sheet may be entered or used to verify the IAPro data.  The process to enter the information contained in the Incident Review Checklist for IAQ files follows that of the SIQ files.  Involved citizen and witness information may also be in Incident Reports or interviews, if present.

The date that IAD first became aware of the allegation ("Received Date") is generally consistent between the IAPro data, the assignment date on the Assignment Sheet, and the assignment date on

7

**CONFIDENTIAL**

the Incident Review Checklist.  When the complaint is received via email, the date the email was acknowledged by IAD is also used for verification.

The date of the complaint itself is entered from the complaint form or from the letter/email sent by the complainant.  The date of the incident is entered from the complaint and verified from the Incident Review Checklist, Assignment Sheet, and letter from IAD to the complainant.  Arrest Reports, Incident Reports, and Incident Details, if present, can also be used for verification of the Incident Date field.  The Date Investigation Complete and Action Date fields are entered from the Incident Review Checklist ("Date Completed") and Date of Investigator's Recommendation is also entered from the Incident Review Checklist but uses the signature date of the investigator.

If available, the race of the officers may be on the complaint form or in the complainant's narrative of the incident, which may also contain race information for the complainant and other involved citizens/witnesses.  Race information for the complainant and involved citizens/witnesses may also be located in court case listings, arrest reports, interviews, or Incident Reports.

**FCIQ Files:**
In general, key documents include:
- Complaint Against Police Practices form filled out by the complainant or, alternatively, a letter or email containing the complaint
- Internal Affairs Assignment Sheet
- Field investigator's memo describing the progression and outcome of the inquiry

Inter-office routing slips and letters may also be used to verify dates, and, when present, Incident Details, Incident Reports, Vehicle Crash Reports, court case listings, arrest reports, and traffic citations which provide further description of the incident including dates, charges, and parties involved.

The process to enter information from the complaint and assignment sheet for FCIQ files follows that of IAQ files, except that FCIQ assignment sheets generally do not include an assignment date.

The investigator's memo generally contains:
- Date of the findings
- Name, unit, and badge number of the investigator
- Names and badge numbers of the officers involved
- Narrative summary of the complaint, a description of the inquiry, the findings, and recommended actions (if any)

The narrative of the memo may include mention of other officers involved (if any), involved citizens (if any), and witnesses (if any), as well as descriptions of any evidence reviewed during the inquiry, such as video, MVS information, interview statements, audio recordings, pictures, etc. Involved citizen and witness information may also be located in Incident Reports or Vehicle Crash Reports, if present.

8

The date that IAD first became aware of the allegation ("Received Date") is generally consistent between the IAPro data, the date of the inter-office routing slip from IAD to the field investigator attaching the complaint (or in some cases, from the field to IAD, depending on where the complaint was received), the acknowledgement letter from IAD to the complainant, and the letter from IAD to CCOP giving an inquiry open date.  When the complaint is routed via email, the date the email was acknowledged by IAD is also used for verification.  Time stamps are not to be relied upon.

The date of the complaint itself is entered from the complaint form or from the letter/email sent by the complainant.  The date of the incident is entered from the complaint and verified from the investigator's memo and Assignment Sheet.  Traffic citations, arrest reports, Incident Reports, Incident Details, and Vehicle Crash reports can also be used for incident date verification, if present. The columns containing the Date Investigation Complete, Action Date, and Date of Investigator's Recommendation are all taken from the date of the investigator's memo.

Like IAQ files, race for the officer(s) may be on the complaint form or in the complainant's narrative of the incident, which may also contain race information for the complainant and other involved citizens/witnesses.  Race information for the complainant and involved citizens/witnesses may also be located on court case listings, arrest reports, traffic citations, or Incident Reports.

CONFIDENTIAL