## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

HISPANIC NATIONAL LAW
ENFORCEMENT ASSOCIATION NCR,
UNITED BLACK POLICE OFFICERS
ASSOCIATION,
MICHAEL ANIS,
MICHAEL BROWN,
THOMAS BOONE,
PAUL MACK,
JOSEPH PEREZ,
TASHA OATIS,
CLARENCE RUCKER,
CHRIS SMITH,
RICHARD TORRES,
SONYA L. ZOLLICOFFER,
PATRICK MCCLAM,
SHARON CHAMBERS and
ADRIAN CRUDUP,

     Plaintiffs,

     v.

PRINCE GEORGE'S COUNTY,
HENRY P. STAWINSKI, III, *individually*,
MARK A. MAGAW, *individually*,
CHRISTOPHER MURTHA, *individually*, and
MAJOR KATHLEEN MILLS, *individually*,

     Defendants.

Civil Action No. TDC-18-3821

## MEMORANDUM OPINION

Plaintiffs Hispanic National Law Enforcement Association NCR ("HNLEA") and United

Black Police Officers Association ("UBPOA") (collectively, "the Organizational Plaintiffs"),

along with 13 of their members ("the Individual Plaintiffs") who are or were employed by the

Prince George's County Police Department ("PGCPD"), have brought this civil rights action

against Prince George's County, Maryland ("the County") and four PGCPD officials in their individual capacities, alleging discrimination and retaliation against Black and Hispanic officers perpetrated pursuant to County customs and practices of discrimination and retaliation. Plaintiffs have filed a Motion for a Preliminary Injunction seeking to enjoin further administration of PGCPD promotion tests until the PGCPD can replace the existing promotion system with one that reduces or eliminates its discriminatory effect and complies with United States Equal Employment Opportunity Commission ("EEOC") and professional standards. Also pending before the Court is Defendants' Motion to Strike All or Portions of Plaintiffs' Declarations filed in support of the Motion for a Preliminary Injunction. The Court held a hearing on the Motion for a Preliminary Injunction on March 26, 2021. For the reasons set forth below, Defendants' Motion to Strike will be DENIED, and Plaintiffs' Motion for a Preliminary Injunction will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The claims in this case and relevant background information are described in the Court's previous opinions on Defendants' Motion to Dismiss, *Hisp. Nat'l Law Enf't Ass'n NCR v. Prince George's Cty.* ("*HNLEA I*"), No. TDC-18-3821, 2019 WL 2929025, at *1-2 (D. Md. July 8, 2019), and Defendants' Motion for Partial Dismissal of Plaintiffs' Amended Complaint, *Hisp. Nat'l Law Enf't Ass'n NCR v. Prince George's Cty.*, No. TDC-18-3821, 2020 WL 903205, at *1-2 (D. Md. Feb. 25, 2020), both of which are incorporated herein by reference.

## I.   PGCPD Leadership Ranks

Prince George's County, Maryland, located adjacent to Washington, D.C., has an estimated population of over 909,000 that is 64 percent Black, 12 percent non-Hispanic white ("white"), 20 percent Hispanic, and 4 percent Asian American. Within PGCPD, as of July 2020, 43 percent of officers are white, 43 percent are Black, 11 percent are Hispanic, 4 percent are Asian American or

Pacific Islander, and 0.1 percent are Native American. It is undisputed that white officers are disproportionately represented in the higher ranks of PGCPD, with the percentage of white officers within a rank generally increasing with each higher rank. As set forth below in Table 1, addressing the demographic groups at issue in this case, as of July 2020, 51 percent of Sergeants, 61 percent of Lieutenants, and 81 percent of Captains were white, while only 41 percent of Sergeants, 27 percent of Lieutenants, and 19 percent of Captains were Black, and only 5 percent of Sergeants and 5 percent of Lieutenants were Hispanic. PGCPD does not currently have any Hispanic Captains. At the lower ranks of Police Officer, Police Officer First Class ("POFC"), and Corporal, Black and Hispanic officers are represented in percentages comparable to, or greater than, their overall numbers in the PGCPD. Notably, these disparities have remained in place over time, and in the case of Captains the disparity has even increased, with the percentage of white Captains rising from 77 percent to 81 percent from 2015 to 2020.

**Table 1: Percentage of PGCPD Officers by Race and National Origin**

| Rank | 2015 | | | 2020 | | |
|---|---|---|---|---|---|---|
| | White | Black | Hispanic | White | Black | Hispanic |
| Captain | 76.7% | 16.7% | 3.3% | 80.7% | 19.4% | 0.0% |
| Lieutenant | 61.2% | 34.1% | 3.5% | 60.9% | 27.2% | 5.4% |
| Sergeant | 53.1% | 39.1% | 4.7% | 51.2% | 41.4% | 5.4% |
| Corporal | 43.1% | 44.4% | 8.6% | 39.5% | 44.5% | 11.1% |
| POFC | 40.3% | 49.1% | 7.9% | 40.2% | 47.9% | 9.5% |
| Police Officer | 42.5% | 40.4% | 11.5% | 31.2% | 46.5% | 19.1% |
| Overall Force | 45.5% | 42.2% | 8.4% | 42.5% | 43.0% | 10.5% |

*See* Joint Record ("J.R.") 712-713, J.R. 882, ECF Nos. 482-3, 482-4, 482-5, 483-1, 483-2, 483-3, 483-4, 483-5.

Related but different data shows that as of 2017, 27 percent of white PGCPD officers were in the top five ranks (Chief, Major, Captain, Lieutenant, and Sergeant), while only 17 percent of Black officers and 14 percent of Hispanic officers were among those ranks. By 2019, these disparities had grown, with 31 percent of all white officers in the top five ranks, but only 18 percent

of Black officers and 12 percent of Hispanic officers in the top five ranks. Analysis conducted by Marc Simon, a certified public accountant retained by Plaintiffs as an expert witness, revealed that these differences are statistically significant, in this instance meaning that there is a less than .01 percent probability that they are due to chance. Thus, available data establishes that at least from 2015 to the present, there have been substantial disparities between the number of white officers in leadership ranks at PGCPD and the number of Black and Hispanic officers in those same ranks.

## II.    Promotion System

Based on current PGCPD policy, promotions from Police Officer to POFC, and then from POFC to Corporal, are based on a written test consisting of 50 multiple-choice questions, administered twice a year, on which a passing score is 70 percent. An officer's test score is the sole factor in promotions to POFC or Corporal. Moreover, a promotion to POFC or Corporal is a "non-competitive" promotion in that there is no limit to the number of such promotions that may be granted in any promotion cycle. J.R. 493. Accordingly, any officer who receives a 70 percent score or higher on the test generally will be promoted.

Under PGCPD policy, candidates for promotion to Sergeant, Lieutenant, and Captain must first take a written test given once every two years that consists of 100 multiple-choice questions. Candidates must obtain a score of 70 percent or higher to move to the second part of the promotion process, a scored "skills assessment" in which candidates must engage in certain simulated exercises during which they produce written or video-recorded products evaluated by designated assessors. J.R. 495. The scores from both components are then combined with predetermined weights assigned to each part to form an overall score. Scores of the candidates who completed both assessments are then rank-ordered on an eligibility list, and individuals are promoted from the top of the list to fill open positions at the higher rank across the PGCPD. Because promotions

4

to Sergeant, Lieutenant, and Captain are limited by the number of open positions at each rank and are based on an officer's relative position on the eligibility list, promotions to these three ranks are considered "competitive." J.R. 495.

PGCPD retained a contractor, Fields Consulting Group, Inc. ("Fields Consulting"), to develop and administer the written tests and skills assessments used as part of the promotion system. In 2015 and 2016, Fields Consulting conducted a "job analysis" through which it gathered information about the positions in question, including through ride-alongs, station visits, and collaboration with PGCPD officers deemed to be subject matter experts ("SMEs") in order to identify the relevant knowledge, skills, abilities, and other characteristics ("KSAOs") required to complete the job successfully. J.R. 503. Fields Consulting then identified the knowledge areas most suitable to address in a written test, developed test questions on those topics, and vetted them with the SMEs for suitability, difficulty, and job relevance. Fields Consulting developed the test with a level of difficulty designed to have a passing score of 70 percent correspond to the score that a "minimally competent examinee" would attain. J.R. 505.

Likewise, for the skills assessment component of the competitive promotion processes, Fields Consulting used the same 2015-2016 job analysis to identify the skills and abilities necessary to perform well on the job and, in consultation with SMEs, designed "assessment center exercises" to simulate common situations expected to be faced by officers of the rank in question. J.R. 507. According to Dr. Toni Locklear, an Industrial-Organizational Psychologist and Defendants' expert witness, this process confirmed that the PGCPD promotion tests had "content validity," in that they appropriately relate to the KSAOs required to complete successfully the work of an officer of the designated rank. J.R. 501.

### III.     Promotion Disparities

#### A.     Initial Analysis

The first analysis of promotion data relevant to this case was conducted by Simon, who analyzed the differences in the pass rates among white, Black, and Hispanic officers who took the tests for promotion to POFC and Corporal between 2012 and 2019. Simon combined the results for the two test administrations occurring each year and applied a statistical calculation known as the "P-Test," which evaluates the probability that differences in pass rates are statistically significant, in this case meaning that there is less than a five percent probability that the difference is due to chance. In this instance, a p-value of less than 0.05 signifies that a difference in pass rates is statistically significant.

As set forth below in Table 2, during this time frame, Black and Hispanic officers had lower pass rates on the POFC promotion tests than white officers in all eight years, often by substantial margins. Black officers had pass rates of between 13 to 39 percentage points lower than white officers, with the lower pass rates being statistically significant in six out of eight test years. For Hispanic officers, the pass rates ranged from 4 to 40 percentage points lower than for white officers, with the lower rates being statistically significant in two of the test years. When Black and Hispanic officers are combined together, their lower pass rates as compared to the pass rates for white officers were statistically significant in all eight years.

**Table 2:  POFC Promotion Rates by Year (2012-2019)**

| Year | Promotion Rate | | | | P-Test (Statistical Significance) | | |
|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Black or Hispanic | Black | Hispanic | Black or Hispanic |
| 2012 | 87% | 48% | 47% | 48% | **0.0010** | **0.0086** | **0.0008** |
| 2013 | 59% | 22% | 38% | 25% | **<0.0001** | 0.1022 | **<0.0001** |
| 2014 | 42% | 29% | 6% | 25% | 0.0863 | **0.0045** | **0.0173** |
| 2015 | 70% | 46% | 52% | 47% | **0.0018** | 0.1178 | **0.0019** |
| 2016 | 77% | 59% | 73% | 63% | **0.0121** | 0.6470 | **0.0326** |
| 2017 | 47% | 27% | 25% | 27% | 0.0514 | 0.2588 | **0.0439** |
| 2018 | 82% | 63% | 50% | 61% | **0.0464** | 0.0552 | **0.0266** |
| 2019 | 84% | 57% | 57% | 57% | **0.0101** | 0.0517 | **0.0081** |
| 2012-2019 | 66% | 43% | 47% | 43% | **<0.0001** | **0.0001** | **<0.0001** |

*Bold text represents differences in promotion rates that are of statistical significance.*

*See* J.R. 456.

As set forth below in Table 3, for promotions to Corporal from 2012 to 2019, the data shows that the annual promotion rate for Black officers was between 5 to 45 percentage points lower than white officers, with the lower promotion rates being statistically significant in five out of eight test years.  For Hispanic officers, the promotion rate in 2013 exceeded the rate for white officers, but for the remaining seven years, the promotion rate for Hispanic officers was between 4 to 61 percentage points lower, with those lower promotion rates also being statistically significant in five of the test years.  When Black and Hispanic officers are considered together, their promotion rate was lower than the rate for white officers, and was statistically significant, for five straight years beginning in 2015.

**Table 3:  Corporal Promotion Rates by Year (2012-2019)**

| Year | Promotion Rate | | | | P-Test (Statistical Significance) | | |
|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Black or Hispanic | Black | Hispanic | Black or Hispanic |
| 2012 | 84% | 72% | 67% | 72% | 0.1459 | 0.3092 | 0.1380 |
| 2013 | 91% | 86% | 92% | 87% | 0.4669 | 0.9144 | 0.5330 |
| 2014 | 45% | 32% | 41% | 34% | 0.1161 | 0.7201 | 0.1647 |
| 2015 | 90% | 45% | 29% | 42% | **<0.0001** | **<0.0001** | **<0.0001** |
| 2016 | 88% | 47% | 58% | 49% | **0.0003** | **0.0226** | **0.0004** |
| 2017 | 83% | 38% | 20% | 36% | **<0.0001** | **0.0001** | **<0.0001** |
| 2018 | 71% | 58% | 41% | 54% | 0.1039 | **0.0118** | **0.0278** |
| 2019 | 98% | 74% | 81% | 76% | **0.0002** | **0.0056** | **0.0003** |
| 2012-2019 | 80% | 53% | 53% | 53% | **<0.0001** | **<0.0001** | **<0.0001** |

*Bold text represents differences in promotion rates that are of statistical significance*

*See* J.R. 457.

When the data on POFC promotions across the entire eight-year time period are combined, Black officers had a promotion rate that was 23 percentage points lower than white officers, while Hispanic officers had a promotion rate that was 19 percentage points lower than white officers, with both differences being statistically significant.  For Corporal promotions covering this full time period, Black officers had a promotion rate that was 27 percentage points lower than the rate white officers, while Hispanic officers had a promotion rate that was 19 percentage points lower than the rate for white officers, and these differences were both statistically significant.

## B.    4/5ths Rule and Z-Test Analyses

Following Simon's work, both Dr. Locklear and Plaintiffs' expert witness, Dr. John Hausknecht, a Professor of Human Resource Studies at the Cornell University School of Industrial and Labor Relations, analyzed available data on each specific PGCPD promotion test using two different methodologies.  The first methodology, sometimes referred to as the "four-fifths rule" ("4/5ths Rule"), uses the "adverse impact ratio," a concept grounded in a federal regulation which applies a presumption that a selection process has an "adverse impact" when the data shows that

individuals of a particular race or other protected class are hired, promoted, or otherwise selected at a rate that is below four-fifths, or 80 percent, of the rate at which members of the comparison group—in this case, white officers—are selected. *See* 29 C.F.R. 1607.4(D) (2020). As relevant here, if under this methodology the promotion rate of Black or Hispanic officers is less than 80 percent of the promotion rate of white officers, the difference in promotion rates is deemed to be of "practical significance." J.R. 498, 569.

The second methodology is a general statistical calculation known as a "Z-Test" which evaluates the probability that observed differences between groups occurred by chance alone. As relevant here, if the Z-Test results in a figure with an absolute value above 1.96—either below -1.96 or above +1.96—there is less than a five percent chance that the difference in promotion rates between white officers and Black officers, or between White officers and Hispanic officers, is due to chance, and the difference is deemed to be of "statistical significance." J.R. 573. Because the "pairing [of] a statistical significance test with a practical significance measure is the contemporary standard" for demonstrating disparate impact, J.R. 572, the Court will consider both practical and statistical significance in assessing whether disparities in promotion rates at PGCPD provide evidence of discrimination.

### 1.    Non-Competitive Promotions

For the POFC promotion tests between 2016 and 2019, the data on the individual test administrations are set forth below in Table 4:

9

Table 4: POFC Promotion Rates by Test (2016-2019)

| Year | Promotion Rate | | | Black/White Difference | | Hispanic/White Difference | |
|------|-------|-------|----------|-------------------------------------------------|----------------------------------|-------------------------------------------------|----------------------------------|
| | White | Black | Hispanic | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) |
| 2016 (Spring) | 70.2% | 57.5% | 46.7% | 81.9% | -1.21 | 66.5% | -1.62 |
| 2016 (Fall) | 83.7% | 61.5% | 94.4% | **73.5%** | **-2.44** | 112.8% | 0.93 |
| 2017 (Spring) | 52.2% | 34.5% | 0.0% | 66.1% | -1.31 | Insuff. Data | Insuff. Data |
| 2017 (Fall) | 40.0% | 17.4% | 50.0% | 43.5% | -1.53 | Insuff. Data | Insuff. Data |
| 2018 (Spring) | 100.0% | 69.7% | 60.0% | **69.7%** | **-2.69** | **60.0%** | **-2.01** |
| 2018 (Fall) | 61.1% | 53.8% | 33.3% | 88.1% | -0.48 | Insuff. Data | Insuff. Data |
| 2019 (Spring) | 90.5% | 53.6% | 50.0% | **59.2%** | **-2.71** | **55.3%** | **-2.07** |
| 2019 (Fall) | 72.7% | 60.7% | 66.7% | 83.5% | -0.71 | 91.7% | -0.25 |

*Bold text represents differences in promotion rates that are of practical or statistical significance. "Insuff. Data" refers to test administrations with less than five Hispanic candidates, where there was insufficient data to apply the 4/5ths Rule or conduct the Z-Test.*

*See* J.R. 572-573.

This data reveals that for every POFC promotion test from 2016 to 2019, Black officers had a lower rate of promotion than white officers, with their promotion rates ranging from 7 to 36 percent lower. In five out of the eight tests, the lower promotion rate for Black officers was of practical significance, in that their promotion rate was less than 80 percent of the rate for white officers, with three of those five also being of statistical significance. For Hispanic officers, of the five tests for which there was sufficient data to conduct valid analysis, three had a lower promotion rate for Hispanic officers that was of practical significance, two of which were also of statistical significance.

On the Corporal promotion tests between 2016 and 2019, the data as set forth below in Table 5 revealed that Black and Hispanic officers had substantially lower rates of promotion than white officers on each test, with Black officers passing the test and gaining promotion at rates 16 to 47 percent lower than for white officers and Hispanics gaining promotion at rates ranging from 13 to 62 percent lower that for white officers:

**Table 5:  Corporal Promotion Rates by Test (2016-2019)**

| Year | Promotion Rate | | | Black/White Difference | | Hispanic/White Difference | |
|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) |
| 2016 (Spring) | 94.1% | 47.4% | 61.5% | **50.3%** | **-3.31** | **65.4%** | -1.82 |
| 2016 (Fall) | 77.8% | 47.1% | 50.0% | **60.5%** | -1.64 | **64.3%** | -1.06 |
| 2017 (Spring) | 95.2% | 41.9% | 33.3% | **44.0%** | **-3.89** | Insuff. Data | Insuff. Data |
| 2017 (Fall) | 73.1% | 34.9% | 14.3% | **47.7%** | **-3.09** | **19.5%** | **-2.77** |
| 2018 (Spring) | 93.3% | 75.0% | 58.3% | **80.4%** | **-1.97** | **62.5%** | **-2.56** |
| 2018 (Fall) | 52.8% | 33.3% | 20.0% | **63.2%** | -1.64 | **37.9%** | -1.86 |
| 2019 (Spring) | 100.0% | 83.7% | 87.0% | **83.7%** | **-2.59** | 87.0% | -1.72 |
| 2019 (Fall) | 91.7% | 50.0% | 50.0% | **54.5%** | **-2.33** | Insuff. Data | Insuff. Data |

*Bold text represents differences in promotion rates that are of practical or statistical significance.  "Insuff. Data" refers to test administrations with less than five Hispanic candidates, where there was insufficient data to apply the 4/5ths Rule or conduct the Z-Test.*

*See* J.R. 572-573.

For Black officers, all eight tests resulted in lower rates of promotion that were of practical significance or statistical significance, with four meeting both standards.  For Hispanic officers, of the tests that had sufficient data to conduct valid analysis, five out of six resulted in lower promotion rates than for white officers that were of practical significance, and in two of those five tests the differences were also statistically significant.

The data demonstrates that whether for POFC or Corporal promotions, there are notable disparities in the test passage rate, and thus promotion rate, between white officers on the one hand and Black and Hispanic officers on the other.

### 2.      Competitive Promotions

Both Plaintiffs' and Defendants' expert witnesses analyzed the differences in the rates at which white, Black, and Hispanic officers were actually promoted to these competitive ranks for practical significance and statistical significance in order to determine whether the promotion rate for a particular group is meaningfully different.  This analysis set forth below in Table 6, referred

11

to by Dr. Hausknecht as the "bottom line analysis," was conducted for the 2016 and 2018 promotion processes to select Sergeants, Lieutenants, and Captains.  J.R. 574.

**Table 6:  Competitive Promotion Rates:  Bottom Line Analysis**

| Position/ Year | Promotion Rate | | | Black/White Difference | | Hispanic/White Difference | |
|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) |
| **Sergeant** | | | | | | | |
| 2016 | 22.7% | 11.5% | 7.1% | **50.8%** | **-2.71** | **31.5%** | **-2.05** |
| 2018 | 25.8% | 11.8% | 11.8% | **45.7%** | **-3.22** | **45.7%** | -1.94 |
| **Lieutenant** | | | | | | | |
| 2016 | 49.0% | 20.0% | 0.0% | **40.8%** | **-3.20** | **0.0%** | **-2.24** |
| 2018 | 34.5% | 20.0% | 33.3% | **57.9%** | -1.64 | **96.5%** | -0.07 |
| **Captain** | | | | | | | |
| 2016 | 56.0% | 66.7% | -- | 119.0% | 0.67 | -- | -- |
| 2018 | 45.5% | 40.0% | 50.0% | 88.0% | -0.35 | Insuff. Data | Insuff. Data |

*Bold text represents differences in promotion rates that are of practical or statistical significance. "Insuff. Data" refers to test administrations with less than five Hispanic candidates, where there was insufficient data to apply the 4/5ths Rule or conduct the Z-Test. No Hispanic candidates participated in the 2016 Captain exam, as annotated by the "--".*

*See* J.R. 575-576.

For promotions to Sergeant, the data shows that in both years, both Black and Hispanic candidates were promoted at substantially lower rates than white candidates, ranging from approximately one-third to one-half the promotion rate for white candidates.  For Black officers, the lower promotion rates were of both practical and statistical significance in both 2016 and 2018. For Hispanic officers, their lower promotion rate was of practical significance in both 2016 and 2018 and of statistical significance in 2016 only.

For promotion to Lieutenant, the promotion rates for both Black and Hispanic officers were lower than for white officers in both 2016 and 2018.  The lower rates for Black officers were of practical significance in both cycles and of statistical significance in 2016 only.  Thus, for Black officers, across the two Sergeant and two Lieutenant promotion processes, all four of the promotion cycles either failed the 4/5ths Rule, showed statistically significant results, or both.  As for Hispanic officers, their lower promotion rate was of both practical and statistical significance

12

in 2016, a year in which no Hispanic officers were promoted to Lieutenant, but not in 2018. Thus, across the two Sergeant and two Lieutenant promotion processes, three out of four of the promotion processes resulted in promotion rates for Hispanic officers that either failed the 4/5ths Rule, were statistically significant, or both.

In the 2016 and 2018 Captain promotion processes, however, the promotion rate for Black officers was higher than that of white officers in 2016 and lower in 2018, and in neither instance was the difference of either practical or statistical significance. For Hispanic officers, there were no candidates who entered the 2016 Captain promotion process, and in 2018, the data was insufficient to conduct any meaningful analysis.

The EEOC Uniform Guidelines, which are codified as federal regulations, "incorporate a single set of principles which are designed to assist employers . . . to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin" and "are designed to provide a framework for determining the proper use of tests and other selection procedures." 29 C.F.R. § 1607.1(B). If a bottom line analysis reveals that a hiring or promotion process has an adverse impact on a protected class, the separate components of the process should be assessed individually to determine how each component is affecting the final outcomes. 29 C.F.R. § 1607.4(C). In this instance, this approach, known as a "step analysis," first evaluates how the written test component affected the advancement of officers of different backgrounds to the skills assessment phase, and second analyzes how the skills assessment, when combined with the written test results, affected promotion rates for Black and Hispanic officers as a proportion of the candidates who had passed the written test. J.R. 576.

As set forth below in Table 7, on the written test component, Black officers seeking promotion to Sergeant had lower passage rates than white officers in both 2016 and 2018, but the adverse impact ratio was above 80 percent in both years, such that the differences were not of practical significance. The difference in 2018, in which 83 percent of white officers passed the test and only 67 percent of Black officers passed, was statistically significant. For Hispanic officers, the pass rate was slightly higher than for white officers in 2016, but in 2018 their pass rate of 65 percent was 18 percent lower than for white officers and was of both practical and statistical significance.

**Table 7: Competitive Promotion Rates: Step Analysis of Written Tests**

| Position/Year | Promotion Rate | | | Black/White Difference | | Hispanic/White Difference | |
|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) |
| **Sergeant** | | | | | | | |
| 2016 | 68.8% | 59.3% | 71.4% | 86.3% | -1.76 | 103.8% | 0.27 |
| 2018 | 82.6% | 67.1% | 64.7% | 81.2% | **-3.01** | **78.4%** | **-2.09** |
| **Lieutenant** | | | | | | | |
| 2016 | 70.6% | 63.6% | 60.0% | 90.2% | -0.76 | 85.0% | -0.48 |
| 2018 | 92.7% | 100.0% | 100.0% | 107.8% | **2.07** | 107.8% | 1.13 |
| **Captain** | | | | | | | |
| 2016 | 76.0% | 93.3% | -- | 122.8% | 1.40 | -- | -- |
| 2018 | 84.8% | 100.0% | 100.0% | 117.9% | 1.64 | Insuff. Data | Insuff. Data |

*Bold text represents differences in promotion rates that are of practical or statistical significance. "Insuff. Data" refers to test administrations with less than five Hispanic candidates, where there was insufficient data to apply the 4/5ths Rule or conduct the Z-Test. No Hispanic candidates participated in the 2016 Captain exam, as annotated by the "--".*

*See* J.R. 577.

For the written test for promotion to Lieutenant, the differences between the passage rates for white officers and for Black or Hispanic officers were not of practical or statistical significance, with the exception of for Black officers in 2018, when they had a statistically significant higher passage rate than for white officers. For Captains, the test passage rates for Black and Hispanic officers were actually higher than for white officers, but not of practical or statistical significance.

As set forth below in Table 8, the data related to the skills assessment component of these competitive promotion processes reveals a significant, adverse impact on the promotion rates of Black and Hispanic officers. Among the officers who passed the written tests for promotion to Sergeant and Lieutenant, Black and Hispanic officers were promoted at a markedly lower rate than white officers in both 2016 and 2018. For example, in 2018, 39 percent of white officers who passed the written Sergeant's exam were promoted after consideration of the skills assessment, while only 19 percent of such Black officers and 20 percent of Hispanic officers were promoted.

**Table 8:  Competitive Promotion Rates:  Step Analysis for the Skills Assessments**

| Position/ Year | Promotion Rate | | | Black/White Difference | | Hispanic/White Difference | |
|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) | Adverse Impact Ratio (Practical Significance) | Z-Test (Statistical Significance) |
| **Sergeant** | | | | | | | |
| 2016 | 34.4% | 20.2% | 10.0% | **58.7%** | **-2.28** | 29.1% | -2.27 |
| 2018 | 38.6% | 18.7% | 20.0% | **48.4%** | **-3.15** | 51.8% | -1.71 |
| **Lieutenant** | | | | | | | |
| 2016 | 69.4% | 31.4% | 0.0% | **45.3%** | **-3.20** | Insuff. Data | Insuff. Data |
| 2018 | 38.8% | 20.4% | 33.3% | **52.6%** | **-1.97** | 86.0% | -0.32 |
| **Captain** | | | | | | | |
| 2016 | 73.7% | 71.4% | -- | 96.9% | -0.14 | -- | -- |
| 2018 | 53.6% | 40.0% | 50.0% | 74.7% | -0.85 | Insuff. Data | Insuff. Data |

*Bold text represents differences in promotion rates that are of practical or statistical significance. "Insuff. Data" refers to test administrations with less than five Hispanic candidates, where there was insufficient data to apply the 4/5ths Rule or conduct the Z-Test. No Hispanic candidates participated in the 2016 Captain exam, as annotated by the "--".*

*See* J.R. 578.

In both 2016 and 2018, these disparities for Black officers were of both practical and statistical significance. For Hispanic officers seeking promotion to Sergeant, the lower promotion rates were of practical significance in both 2016 and 2018 and also of statistical significance in 2016.

For promotion to Captain, though the promotion rate for Black officers who passed the written test were lower in both 2016 and 2018, the differences were of practical significance in

15

2018 only and were not of statistical significance. The data relating to Hispanic officers was insufficient to draw any meaningful conclusions.

## IV.    PGCPD Response to Disparities

### A.    Reports

Since at least 2012, PGCPD generated reports showing racial disparities at the various ranks.  According to Jewell Graves, the manager of the PGCPD Office of Personnel, the Deputy Chief requested such reports, which showed both numerical and percentage data for every rank from Chief of Police down to Student Officer based on gender and race, including for white, Black, Hispanic, Asian American, and Native American officers.  These reports were generated at least once a year for every year from 2012 to 2017.

As for test-specific data, according to Jennifer Flaig of Fields Consulting, since approximately 2008, a report is produced at the end of every test administration that includes the percentage and number of candidates who were white, Black, Hispanic, and Asian American; the mean test scores for each category for both the written tests and the skills assessments, if applicable; data showing whether the differences in test scores among these demographic groups were statistically significant; and the final demographic composition of the promotion eligibility list resulting from a test administration.  These reports are sent to the Office of Human Resource Management ("OHRM") and the Police Personnel Division.  Though PGCPD Chief Mark Magaw was aware of this reporting process, he has stated that he does not recall receiving briefings on those reports.  In 2017, however, after HNLEA and UBPOA filed a complaint in October 2016 with the United States Department of Justice ("the DOJ Complaint"), the Deputy Chief requested that the Police Personnel Division compile the last five years of reports, from 2012 to 2017.

The data contained in these reports, which cover each promotion test administered from 2012 through October 2019, show that the mean test score for white candidates for POFC and Corporal was higher than the mean test scores for Black and Hispanic candidates on every single test. For 44 percent (7 out of 16) of the POFC tests and 81 percent (13 out of 16) of the Corporal tests, the differences between white and Black mean test scores were statistically significant, and the differences between white and Hispanic mean test scores were statistically significant in three of the eight POFC tests, and one of the eight Corporal tests, for which there were large enough sample sizes to conduct meaningful calculations.

While the PGCPD promotion system was generating these results, PGCPD leadership was already aware of the disparities in promotion rates and the underrepresentation of Black and Hispanic officers in leadership positions. In 2014 and 2015, Chief Magaw engaged in several discussions with Rushern Baker, the County Executive of Prince George's County, about whether to move the Captain promotion process out of the existing promotion system using a written test and skills assessment and converting it to a system of discretionary appointments, in order to increase diversity in the higher ranks of the PGCPD. Such a change would have required an amendment to the County Code or personnel law. According to Magaw, the Fraternal Order of Police ("FOP"), the police officers' union, objected to the change, and there was insufficient "political will" to proceed, so no proposal was ever made to the County Council. J.R. 383.

### B.    2017 Equity Panel

In October 2016, HNLEA and UBPOA filed the DOJ Complaint, which requested that the DOJ Civil Rights Division conduct a "thorough, impartial, and independent 'Compliance Review'" of the PGCPD's handling of allegations of misconduct made by minority citizens, disparate discipline of officers based on race, and other problems of "rampant discrimination,"

including "denial of promotions." J.R. 818. The DOJ Complaint referenced the fact that both in 1997 and 2010, HNLEA had filed complaints with DOJ on issues that included denial or delay of promotions. Following the DOJ Complaint, in February 2017, PGCPD Chief Henry Stawinski convened a panel known as the "Equality in Practices, Promotions and Discipline Panel" ("the 2017 Panel") led by co-chair PGCPD Inspector General Carlos Acosta, who was appointed by Chief Stawinski, and retired PGCPD Sgt. Jerry Moore, who was appointed by the FOP. The first topic the 2017 Panel sought to examine was promotions. On April 7, 2017, the 2017 Panel held the first of several public hearings on this topic, which continued into the summer of 2017. During these proceedings, the 2017 Panel heard from several subject matter experts on the issue of promotions, including Graves and Flaig.

According to Acosta, during these proceedings, the 2017 Panel identified several possible problems with the existing promotion system. One was PGCPD's practice of using officers as SMEs to assist in vetting the promotion tests and the concern raised by some officers that these SMEs may have been sharing inside information about the content of the tests with their friends on the police force before they took the written tests. The 2017 Panel learned that these officers were appointed by the Deputy Chief, and there was no limit on how many times someone could be appointed as an SME, so the same SMEs could continue to pass information to certain members of the police force and give them an unfair advantage on promotion exams. Where these SMEs were reported to be predominantly white, such sharing of information may have disproportionately advantaged white officers.

Another potential problem identified by the 2017 Panel was that officers in specialty units, as opposed to patrol units, may have certain advantages in the promotion process. At a 2017 Panel meeting on June 14, 2017, after the Panel heard a presentation on data showing that there was

significantly lower Black and Hispanic representation at the command ranks, PGCPD Major Victoria Brock, who is Black, told the Panel that one "significant issue" that she believed was creating this underrepresentation was that more white officers are assigned to specialty units, and officers in specialty units have an unfair advantage in the promotion process because they have more time to study for the promotion tests, and the specialty units provide skills, training, and experience on specific topics more likely to be assessed during the promotion process. J.R. 956. During that same session, one of the panelists stated that certain specialty units were disproportionately white, including the Criminal Investigation Division, the Narcotics Enforcement Division, the Regional Investigation Division, the Special Investigation Division, and the Special Operations Division. On July 14, 2017, after the 2017 Panel had finished its hearings on promotions, Corporal Thomas Hilligoss, a member of the 2017 Panel, sent an email to the co-chairs of the 2017 Panel summarizing the information gained from the sessions about promotions. Cpl. Hilligoss stated that "there was a very valid concern brought up in regards to the candidate's opportunities to prepare for that test," "[t]here absolutely seems to be an advantage that goes to those who are not in a 'patrol' capacity when it comes to study and test preparation," officers in specialty units receive "much more specific training," and in certain specialty units "the difference was pretty glaring" in that they had "significantly fewer minority members." J.R. 65-66. Corporal Hilligoss characterized this potential problem as "one of the biggest concerns" expressed in the meetings and an "issue that I just don't feel can be ignored." J.R. 66.

Nevertheless, after Acosta left PGCPD in January 2018, Chief Stawinski did not appoint a new Co-Chair, and the 2017 Panel never met again. As noted by Acosta, the 2017 Panel never issued a report or list of recommendations as a result of its work, and it "never finished their job, their work." J.R. 79.

### C.    2020 Police Reform Work Group

No other panels reviewed race-related issues, including possible discrimination in the promotion process, until July 2020, when Prince George's County Executive Angela Alsobrooks issued an Executive Order establishing the 2020 Police Reform Work Group ("2020 Work Group") to study and review PGCPD policies across the "full spectrum of operations, including hiring, training and use of force policies." J.R. 823.

On July 23, 2020, Plaintiffs Joseph Perez and Thomas Boone, on behalf of HNLEA and UBPOA, sent a letter to the 2020 Work Group with several recommendations, including that the promotion system should be "overhauled to eliminate bias." J.R. 948.  The letter specifically described the potential problems identified to the 2017 Panel of predominantly white SMEs potentially sharing information or answers with test-takers and the members of disproportionately white specialty units having an advantage in the promotion process, and it recommended that PGCPD engage outside SMEs to vet tests, conduct the skills assessment component of competitive promotions using audio rather than video recording, and increase diversity in specialty units so as to minimize the effects of such assignments on promotion opportunities.  On July 30, 2020, Acting PGCPD Chief Hector Velez presented information to the 2020 Work Group on the issue of promotions, including the data that over 80 percent of Captains and 60 percent of Lieutenants are white.  When it issued its recommendations in December 2020, however, the 2020 Work Group did not propose any reforms to address discrimination in promotions.

### V.    Impact on Plaintiffs

The results of the implementation of the promotion system have had an impact on Individual Plaintiffs and members of the Organizational Plaintiffs. In the 2016 Sergeant promotion cycle, after PGCPD promoted 58 candidates, three Black or Hispanic officers were within the next

five candidates on the list, including a member of HNLEA. For the 2018 Sergeant promotion cycle, after 37 promotions were made, four Black and Hispanic officers were within five spots of the cut-off, including a HNLEA member. In the 2016 Lieutenant promotion cycle, after 36 candidates were promoted, the next five officers on the eligibility list were Black or Hispanic, including Plaintiff Sgt. Paul Mack. For the 2018 Lieutenant promotion cycle, after 41 candidates were elevated, three of the next five officers on the eligibility list were Black or Hispanic officers, including a member of UBPOA who signed the DOJ Complaint. Finally, as to the two most recent Captain promotion cycles, there were two Black or Hispanic officers who were within five places of the cut-off for promotion in the 2016 cycle, and one Black or Hispanic officer who was within five places of the cut-off for promotion in the 2018 cycle.

Sgt. Mack took the 2016 promotion tests for Lieutenant and ended up as the third officer below the cut-off for promotion. Toward the end of that promotion cycle, three Lieutenants retired, but no additional promotions were made. Instead, three white officers who had not taken the promotion tests were named as Acting Lieutenants for periods of more than 90 days. The positions were ultimately filled in the 2018 promotion cycle. In addition, three white officers with notable disciplinary issues, but who were higher on the eligibility list, were promoted to Lieutenant in the 2016 promotion cycle. These officers included one who had a personal vehicle license plate with an acronym for "Go F*** Yourself Obama," and another officer who had referred to his Black commanding officer as a "baboon," had described a senior Black civilian employee as an "African Queen," and had made false statements while testifying in court. Am. Compl. ¶ 61(a), (d), ECF No. 54.

Most recently, during the 2020 competitive promotion cycle delayed by the COVID-19 pandemic, four Organizational Plaintiff members who took one of the written promotion tests in

September 2020 did not achieve a passing score and thus were not eligible to take the skills assessment component. One Plaintiff, Christopher Smith, passed the written test for promotion to Sergeant and was invited to take skills assessment. Although the skills assessments were not scheduled at the time that the Motion was filed, Plaintiffs reported at the hearing that they would be conducted in early April 2021.

## DISCUSSION

### I.    Motion to Strike

The Court first addresses Defendants' Motion to Strike, in which Defendants request that the Court strike certain declarations submitted by Plaintiffs in support of their Motion for a Preliminary Injunction on the grounds that the declarations are not based on personal knowledge and contain hearsay, opinions, and legal conclusions. Pursuant to Federal Rule of Civil Procedure 12(f), a court may, on its own or on a party's motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The Court has inherent authority to strike documents even if they are not pleadings, *Anusie-Howard v. Todd*, 920 F. Supp. 2d 623, 627 (D. Md. 2013), but such "[i]nherent powers must be exercised with restraint and discretion," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

Defendants' argument is premised on the claim that Plaintiffs' declarations contain information not admissible under the Federal Rules of Evidence. Motions for a preliminary injunction, however, are "governed by less strict rules of evidence." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725 (4th Cir. 2016). Because "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* (quoting *Univ. of Tex.*

22

*v. Camenisch*, 451 U.S. 390, 395 (1981)). So "although admissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context," a district court may not "summarily reject . . . proffered evidence because it may have been inadmissible at a subsequent trial." *Id.* Accordingly, where the declarations and statements at issue here were filed in support of Plaintiffs' Motion for a Preliminary Injunction, the Court finds that it may consider them even if they contain certain information that may not be admissible at trial. *See United States ex rel. Taxpayers Against Fraud v. Link Flight Simulation Corp.*, 722 F. Supp. 1248, 1252 (D. Md. 1989) ("[T]he Court may consider inadmissible affidavits in a preliminary injunction proceeding."); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2949 (3d ed. 2020) (stating that "inasmuch as the grant of a preliminary injunction is discretionary, the trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be had").

Defendants separately argue that several of Plaintiffs' declarations should be struck due to procedural defects where the declarations were unsworn. Plaintiffs, however, submitted corrected declarations that include the proper attestations and signatures. Because the procedural defects have been resolved, the Court will not strike Plaintiffs' declarations on this basis. *See Machie v. Manger*, No. AW-09-cv-2196, 2013 WL 3353740, at *4 (D. Md. July 2, 2013) (holding that "[i]t would not be in the interest of justice to exclude highly relevant and probative information . . . merely because of an alleged technical error in the initial filing"). The Court will deny Defendants' Motion to Strike.

## II.   Motion for a Preliminary Injunction

Plaintiffs seek a preliminary injunction enjoining the April 2021 administration of promotion tests within the PGCPD.  In order to obtain a preliminary injunction, moving parties must establish that:  (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A moving party must satisfy each requirement as articulated. *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).  Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

### A.   Procedural Issues

As two threshold issues, Defendants argue that the Court should not grant Plaintiffs' Motion because:  (1) the requested injunctive relief is based on "wholly new claims and factual allegations" that were not pleaded in the operative complaint in this case; and (2) Plaintiffs do not have standing for the relief requested because Plaintiffs have failed to identify any real and immediate threat of a continuing harm.  Opp'n Mot. PI at 10-13, ECF No. 483.

#### 1.   Pleadings

Defendants first argue that the Motion should be denied for lack of "jurisdiction" because it seeks preliminary relief on a claim not actually alleged in the First Amended Complaint ("the Complaint"). *Id.* at 12.  Specifically, Defendants assert that Plaintiffs are improperly seeking relief under an "entirely new claim and legal theory, alleging that [PGCPD's] facially neutral promotion exams have an adverse impact on Black and Hispanic officers and the exams are insufficiently job

24

related," which is effectively an unpled "disparate impact claim under" Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018).  Opp'n Mot. PI at 12.

Broadly speaking, "[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," but such relief should not be granted as to matters "which in no circumstances can be dealt with in any final injunction that may be entered."  *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945).  On the question of how related the request for injunctive relief must be to the allegations in the complaint, the United States Court of Appeals for the Fourth Circuit has stated that because "[t]he purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the illegality alleged in the complaint . . . a preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action."  *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997).  Thus, the "party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint."  *Id.* (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)); *see also Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (holding that there must be a "sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself," and "[a]bsent that relationship or nexus, the district court lacks authority to grant the relief requested").

In the Complaint, Plaintiffs have alleged that Defendants have "engaged in or perpetuated a long-standing pattern and practice of discrimination against Officers of Color," including through "disparate treatment of [such] officers through denial of promotions."  Am. Compl. ¶ 7.  They also

allege that the individual Defendants have "presided over PGCPD at a time when Officers of Color are denied professional opportunities (both promotions and desirable assignments) without justification." *Id.* ¶ 4.

In a section of the Complaint entitled, "Discrimination in the Promotions Process," Plaintiffs have alleged that the composition of the PGCPD does not reflect the diversity of Prince George's County, which is approximately 67 percent Black, 17 percent Hispanic, and 14 percent white, while PGCPD officers are 43 percent Black, 9 percent Hispanic, but 47 percent white. *See Id.* ¶¶ 91-92. Plaintiffs further assert that the disparity is "even more pronounced in the leadership" of PGCPD, in which 64 percent of Majors and 72 percent of Captains are White, but only 28 percent of Majors and 25 percent of Captains are Black, and there is only one Hispanic Major and one Hispanic Captain. *Id.* ¶ 93. The Complaint also includes allegations that Sgt. Mack was not promoted to Lieutenant in 2016 after taking the promotions test and receiving a "high ranking," that in 2018 three white officers who ranked lower than him were promoted to Lieutenant, and Sgt. Mack was not promoted even though there remained a vacant Lieutenant position. *Id.* ¶¶ 131-132. Within their First Claim for Relief for violations of the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983, Plaintiffs include the claim that "[b]y the acts and omissions described [in the Complaint], Defendants, while acting under color of state law, have engaged in a longstanding pattern and practice of discrimination against Officers of Color by," among other acts, "denying promotion to Officers of Color based on race and/or color." *Id.* ¶ 260. As relief, Plaintiffs seek "declaratory and injunctive relief" including the "issuance of a judgment declaring that the policies, practices, and/or customs" described in the Complaint "violate federal, state, and/or local laws." *Id.* ¶ 8.

Where the Complaint has specifically alleged a pattern and practice of discrimination at PGCPD that specifically includes "Discrimination in the Promotions Process," has referenced statistics illustrating underrepresentation of officers of color in leadership positions at PGCPD, and has identified at least one example of an alleged discriminatory failure to promote an officer of color involving the testing process, the Court finds that the requirement of a "relationship" between the conduct asserted in the Complaint and the injury claimed in the Motion has been satisfied. *See Omega World Travel*, 111 F.3d at 16. Likewise, where the Complaint seeks declaratory and injunctive relief relating to the described discriminatory policies and practices, which include those relating to the promotion system, the injunctive relief sought in the Motion is "of the same character" as the final relief requested in the Complaint. *De Beers*, 325 U.S. at 220. The fact that Plaintiffs' current Motion seeks injunctive relief that is more narrowly focused on one aspect of the many forms of Defendants' allegedly discriminatory conduct described in the Complaint, specifically an injunction against only the PGCPD promotion tests and processes, does not alter this conclusion. As for Defendants' argument that the Complaint does not include a specific disparate impact claim challenging the PGCPD's promotion tests, Plaintiffs confirmed at the hearing on the Motion that their discrimination claim relating to the promotion system, both in the Complaint and as referenced in the Motion, is a § 1983 claim of intentional discrimination in violation of the Equal Protection Clause, not a disparate impact claim under Title VII. *Compare* Am. Compl. ¶ 260 *with* Mot. PI at 20-21, ECF No. 482-1.

Finally, Defendants' claim that the allegations of discrimination in the promotion process referenced in the Motion are wholly unrelated to the allegations in the Complaint is belied by PGCPD's conduct during the course of this litigation. In response to Plaintiffs' retention of Simon as an expert witness on the statistical analysis of data on the demographic composition of PGCPD's

27

leadership ranks and on PGCPD's promotion test results, Defendants did not argue that such topics are outside the scope of this case and instead hired their own expert witness, Dr. Locklear, who produced an expert report on September 28, 2020 analyzing statistics on promotion test results and promotion rates at PGCPD. Similarly, Defendants produced in discovery materials relating to the 2017 Panel's consideration of disparities in promotion rates, including materials from Fields Consulting. Thus, Defendants' actions during the course of this case have reflected an understanding that discrimination in the promotion process is an issue raised by the Complaint.

For these reasons, the Court finds that there is a "relationship between the injury claimed in the [Motion] and the conduct asserted in the complaint," in that the Motion seeks an injunction to "prevent an injury or harm" that Plaintiffs contend was caused by a "wrong claimed in the underlying action," specifically, "Discrimination in the Promotions Process." *Omega World Travel*, 111 F.3d at 16; Am. Compl. ¶¶ 91-93. The Court may therefore consider the Motion.

### 2.    Standing

Defendants also argue that Plaintiffs lack standing to pursue a preliminary injunction relating to the promotion tests because: (1) there is no "real and immediate threat" of a continuing harm; and (2) Plaintiffs have failed to identify any specific Plaintiff who is actually registered to take one of the April 2021 promotion examinations. Opp'n Mot. PI at 12-13. Defendants rely on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), in which the United States Supreme Court held that a plaintiff with a valid § 1983 claim for prior police misconduct consisting of the use of a chokehold against him lacked standing to pursue injunctive relief to bar the police department from future use of chokeholds because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-495 (1974)).

28

Where the plaintiff had "made no showing that he is realistically threatened by a repetition" of the use of a chokehold against him, and that such an event was a matter of "no more than speculation," there was no showing of a "real and immediate, and not "conjectural" or "hypothetical" threat of future injury. *Id.* at 102, 108-09.

In *Wiley v. Mayor & City Council of Baltimore*, 48 F.3d 773 (4th Cir. 1995), however, the Fourth Circuit held that plaintiffs bringing a § 1983 claim against the Baltimore City Police Department had standing to seek an injunction against the department's policy of using polygraph tests in violation of officers' constitutional rights because even if the individual officer plaintiffs who had been required to take polygraph tests were not likely to be asked to do so again, one of the plaintiffs was the Baltimore City Lodge of the Fraternal Order of Police, and there was a "sufficient likelihood . . . that some members of the local Fraternal Order of Police will, in the future, be affected by this policy." *Id.* at 775-76 (distinguishing *Lyons*).

As the Court held in its earlier opinion, the Organizational Plaintiffs have standing in this case to seek "specific forms of injunctive relief." *HNLEA I*, 2019 WL 2929025, at *4-6. Unlike the citizen plaintiff in *Lyons*, HNLEA and UBPOA officers have an entirely realistic threat of future injury from any discriminatory aspects of the PGCPD promotion tests and system. As to the present request for injunctive relief specifically focused on the April 2021 promotion tests, in the declarations of Joseph Perez and Thomas Boone, and in Plaintiffs' post-hearing filing, Plaintiffs have confirmed that HNLEA and UBPOA have members who are at the rank of Police Officer or POFC who may seek promotion to higher ranks, which necessarily would require taking the POFC and Corporal examinations, and have identified several members who are presently eligible to take one of the promotion tests. J.R. 978, 986; Pls.' Suppl. Filing at 2, ECF No. 492. Where, as in *Wiley*, there is a "sufficient likelihood" that members of HNLEA and UBPOA "will,

in the future, be affected by" the allegedly discriminatory promotion system, the Organizational Plaintiffs have standing to seek injunctive relief relating to the policies underlying that system, including the policy to use the present forms of the POFC and Corporal written tests. *See* 48 F.3d 775-76; *see also Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 342-43 (1977) (stating that to establish associational standing, a membership organization must allege that at least one of its members may suffer an injury as a result of the challenged action so as to be entitled to invoke the court's jurisdiction). In light of *Wiley*, the fact that Plaintiffs have not identified a specific individual HNLEA or UBPOA officer who has signed up to take the April 2021 POFC or Corporal promotion test is not necessary to establish standing, but it is a factor to be considered in assessing whether the specific injunction sought is warranted, including on the issue of whether the balance of the equities would support such an injunction, as discussed below. *See infra* parts II.C.-D.

### B.      Likelihood of Success on the Merits

A plaintiff seeking a preliminary injunction must first show that there is a likelihood of success on the merits. *Winter*, 555 U.S. at 20. As the Supreme Court has recognized, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In this case, both Plaintiffs and Defendants declined the opportunity to present witnesses at an evidentiary hearing and instead requested that the Court decide whether there is a likelihood of success on the merits based on the documentary evidence submitted with the briefs, including declarations by witnesses. Thus, the Court will assess the likelihood of success on the merits based on the present record.

30

### 1.   Section 1983 Standard

Defendants' primary argument in opposing the Motion is that Plaintiffs have, at most, shown that the promotion system has a disparate impact on Black and Hispanic officers, and that while disparate impact may be a basis for liability under Title VII, Plaintiffs have asserted no disparate impact claim. In their briefs and at the hearing, however, Plaintiffs have confirmed that in challenging the promotion tests and system, they are not pursuing a Title VII disparate impact theory but are instead pursuing a constitutional claim under § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment. To establish such a claim, a plaintiff must demonstrate that the plaintiff was "treated differently" by a state actor from similarly situated individuals and "that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

Plaintiffs also acknowledge that for an equal protection claim, evidence of disparate impact is not sufficient, and that to succeed on their claim they must show discriminatory intent. *Washington v. Davis*, 426 U.S. 229, 239 (1976); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (stating that "even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose); *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (reiterating that "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"). However, in order to establish that Defendants have acted with discriminatory intent in implementing the PGCPD promotion tests and processes, Plaintiffs may rely in part on evidence that shows disparate impact. Evidence that facially neutral governmental action has resulted in a disparate impact "provide[s] an important starting point" because "[s]ometimes a clear pattern, unexplainable on grounds other than race,

31

emerges from the effect of the [government] action," even when the action "appears neutral on its face." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see Feeney*, 442 U.S. at 274; *Castaneda v. Partida*, 430 U.S. 482, 493 (1977).

In the context of claims of an equal protection violation arising from allegedly discriminatory hiring or promotion tests, discriminatory intent may be inferred from the combination of statistical disparities reflecting underrepresentation of employees of a particular race or national origin among those hired or promoted, coupled with some other indicia of discriminatory intent. In *N.A.A.C.P. v. City of Mansfield*, 866 F.2d 162 (6th Cir. 1989), for example, the plaintiffs asserted claims that police and fire department hiring examinations were racially discriminatory in violation of § 1983 and 42 U.S.C. § 1981, both of which require discriminatory intent in order to establish liability, and sought a preliminary injunction to halt the hiring of new police officers or firefighters using eligibility lists based on the test results. *Id.* at 163-64. In assessing whether the plaintiffs had demonstrated the requisite discriminatory intent to show a likelihood of success on the merits, the court first considered whether the available numerical indicators provided by expert witnesses demonstrated that the testing procedures had a statistically significant disparate impact on Black applicants. *Id.* at 167-71. Recognizing that "proof of a disparate racial impact in the composition" of a police or fire department "alone is insufficient" to establish discriminatory intent, the court also considered "a variety of circumstantial evidence." *Id.* at 171. As to the police department, the court found that the data showed only "marginally statistically significant evidence" that the hiring test had a disparate impact on Black officers, and when combined with the proffered circumstantial evidence that seven officers were listed on the police eligibility list who had not passed the written test, that the mayor had made a racially derogatory comment, and that when a Black city official took the

written test, she received no extra credit for her education experience, the court found that the plaintiffs had not shown a likelihood of success on the merits as required to grant a preliminary injunction. *Id.* at 169. As for the fire department, however, where the evidence showed statistically significant disparities between the test passage rates of white and Black applicants, and also included circumstantial evidence of discriminatory intent in that the discretionary agility test was not properly supervised, the only Black applicant to pass the written test received the lowest score of all applicants who completed the agility test, and three white applicants who did not complete the agility test were inexplicably included on the eligibility list, the court affirmed the district court's finding of a likelihood of success on the merits on the § 1981 claim, which required a finding of discriminatory intent, and its grant of a limited preliminary injunction. *Id.* at 171.

Other courts have likewise analyzed the question of whether hiring or promotion tests reflect discriminatory intent by considering the combination of statistical evidence of disparate impact and other available circumstantial evidence. *See Vanguard Just. Soc. Inc. v. Hughes*, 471 F. Supp. 670, 742-43 (D. Md. 1979) (in assessing a claim of intentional discrimination in police department testing under the Equal Protection Clause, considering test results showing disparate impact based on race but finding no intentional discrimination in light of affirmative steps taken by the police department to increase the number of Black officers to be promoted and to eliminate race discrimination in the department); *Richardson v. City of New York*, No. 17-cv-9447-JPO, 2018 WL 4682224, at *6-8 (S.D.N.Y. Sept. 28, 2018) (denying a motion to dismiss claims of intentional discrimination under § 1983 and § 1981 in job placement and compensation within the Fire Department of New York City based on a combination of statistical and anecdotal evidence). Thus, in assessing whether Plaintiffs have shown a likelihood of success on the merits of its § 1983

claim asserting discrimination in PGCPD's promotion tests and processes, the Court will consider whether a combination of statistical disparities relating to the promotion of Black and Hispanic police officers and other evidence is sufficient to establish discriminatory intent.

Plaintiffs assert that they have established discriminatory intent underlying the PGCPD's promotion tests and processes based on (1) the adverse impact as shown through statistically and practically significant differences in the promotion rates for Black and Hispanic officers as compared to the promotion rates for white officers; (2) circumstantial evidence supporting an inference of discriminatory intent; and (3) evidence of deliberate indifference to the potential discrimination in the promotion tests and processes.

### 2.    Adverse Impact

Based on the data described above, the Court finds that the PGCPD promotion tests and processes have an adverse impact on Black and Hispanic officers seeking promotion, which has resulted in significant underrepresentation of such officers at the higher ranks of the PGCPD. According to Simon's analysis of the annual promotion data for the years from 2012 to 2019 for POFC, Black and Hispanic officers, whether considered separately or together, were promoted at a lower rates than white officers in all eight years, with the lower rates for Black officers being statistically significant rates in six out of the eight test years; the lower rates for Hispanic officers being statistically significant in two out of the eight test years; and the lower rates for the combined group of Black and Hispanic officers statistically significant across eight straight years. Although Dr. Locklear has criticized Simon's analysis of aggregated data, such an approach is permitted when the data sets are otherwise small. *See Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 336 n.17 (4th Cir. 1983) (stating that "[i]f possible, it is highly preferable to examine the statistical data for the time period in combined form, rather than year by year," where "[c]ombined data is more

likely to demonstrate the pattern or practice of defendant's policies and "by increasing the absolute numbers in the data, chance will more readily be excluded as a cause of any disparities found"); *Vulcan Pioneers, Inc. v. N.J. Dep't of Civ. Serv.*, 625 F. Supp. 527, 544–45 (D.N.J. 1985) (finding that aggregation of test data is "entirely appropriate" even where there are different administrations of different tests because the tests were "extremely similar" in that they "[a]ll resulted from the same job analysis," were all administered as multiple-choice exams, and were utilized by the same employer).

The analysis of individual POFC promotion tests from 2016 to 2019 conducted by Dr. Locklear and Dr. Hausknecht similarly reveals that in all eight of the tests administered from 2016 to 2019, Black officers passed the test and were thus promoted at a lower rate than white officers, and in six of those eight tests, Hispanic officers were promoted at a lower rate. In one administered test, no Hispanic officers were promoted. For Black officers, the promotion rates ranged from only 44 percent to 84 percent of the promotion rate for whites; for Hispanic officers, the promotion rates were at or below 67 percent of the promotion rate for whites on three of the five occasions when there was sufficient data to conduct meaningful analysis.

For annual Corporal promotions from 2012 to 2019, Black officers had lower rates of promotion than white officers in all eight years, and Hispanic officers had lower rates in seven of the eight years, with the differences, whether considering Black and Hispanic officers separately or together, statistically significant in the five years from 2015 to 2019. Focusing on the individual tests administered from 2016 to 2019, in all eight of the tests for promotion to Corporal, Black and Hispanic officers both had a lower rate of promotion than white officers. For Black officers, the promotion rate ranged from 44 percent to 84 percent of the white promotion rate for any given test cycle; for Hispanic officers it ranged from 20 percent to 87 percent of the promotion rate for white

35

officers in any given test cycle.  In all eight tests, the lower promotion rates for Black officers were of practical significance, statistical significance, or both.  For Hispanic officers, the lower rates of promotion were of practical significance, statistical significance, or both for five of the six administered tests for which there was sufficient data to conduct meaningful analysis.

For the competitive ranks, based on the data referenced above, Black and Hispanic officers had lower rates of promotion to Sergeant and Lieutenant in both 2016 and 2018.  In those two years, Black officers were promoted to Sergeant at only 51 percent and 46 percent, respectively, of the promotion rate for white officers and were promoted to Lieutenant at only 41 percent and 58 percent, respectively, of the promotion rate for white officers, differences which were of practical significance, statistical significance, or both.  In those two years, Hispanic officers were promoted to Sergeant at only 32 percent and 46 percent, respectively, of the promotion rate for white officers, differences which were of practical significance, statistical significance, or both. In 2016, no Hispanic officers were promoted to Lieutenant, as compared to 49 percent of white candidates, a difference that was both of practical significance and statistical significance.  Only in 2018, as to Lieutenants, was the lower rate of promotion for Hispanic officers as compared to white officers not deemed to be of practical or statistical significance.  Taken together, these bottom-line promotion statistics reveal that Black officers had practically or statistically significant lower rate of promotions as compared to white officers in the 2016 and 2018 Sergeant and Lieutenant promotion cycles, while Hispanic officers had such rates of promotion in both years for Sergeant and in 2016 for Lieutenant.

The statistical analysis also shows that while there are some practically or statistically significant differences in the passage rate on the written test component of the process for promotion to Sergeant and Lieutenant, such as on the 2018 Sergeant test for both Black and

Hispanic officers, the driver of the adverse impact on promotion to these ranks is the skills assessment component, which resulted in notably lower promotion rates for Black and Hispanic officers who passed the written test, as compared to white officers who passed the written test, in both 2016 and 2018. For Black officers, these lower rates ranged from 45 to 59 percent of the white promotion rate and were of both practical and statistical significance for both years and both ranks. For Hispanic officers, the lower rates for promotion to Sergeant among candidates who passed the written exam—29 percent and 52 percent of the white promotion rate in 2016 and 2018, respectively—were of practical significance, statistical significance, or both. As for promotion to Lieutenant, in 2016, zero Hispanic officers who passed the written test were promoted, but the data was insufficient to allow for meaningful analysis, while in 2018, the lower promotion rate was not practically or statistically significant. Overall, these data reflect that the skills assessment has the greater influence on the adverse impact of the competitive promotion processes on Black and Hispanic officers.

Based on these statistical results, the Court finds that there are sufficient disparities to conclude that the PGCPD promotion process has an adverse impact on Black and Hispanic officers seeking promotion to the ranks from POFC to Lieutenant. Notably, the data shows no practically or statistically significant differences in promotion rates to Captain for either 2016 or 2018, and some promotion cycles in which Black or Hispanic officers were promoted at a higher rate than white candidates. However, the data reflects that in 2018, the 40 percent rate of promotion of Black officers who passed the written test, as compared to the 54 percent rate of promotion of such white officers, was of practical significance, suggesting that as with the Sergeant and Lieutenant promotion processes, the skills assessment component may have an adverse impact on Black officers seeking promotion to Captain.

The Court further finds that the adverse impacts on the various promotion processes are interconnected in that the results of the tests for promotion to POFC and Corporal have a direct impact on promotion rates to the competitive ranks because they result in a lower number of Black and Hispanic officers eligible to be considered for Sergeant, Lieutenant, and Captain. In turn, the results of the promotion processes for Sergeant and Lieutenant serve to reduce the number of Black and Hispanic officers eligible for promotion to Lieutenant, Captain, and higher ranks. Therefore, the notable adverse impact on Black and Hispanic officers at each identified promotion level contributes to underrepresentation at higher ranks as the universe of officers eligible for promotions becomes less and less diverse, with the result that PGCPD has significant underrepresentation of Black and Hispanic officers at the more senior positions that has been found to be statistically significant. The Court therefore finds that the promotion processes have an adverse impact as to all ranks up to and including Captain.

### 3.      Circumstantial Evidence

As noted above, because discriminatory intent is necessary to support a § 1983 equal protection claim, disparate impact alone is insufficient to establish such a claim. *See Washington*, 426 U.S. at 239; *Feeney*, 442 U.S. at 272. However, a likelihood of success on a § 1983 or comparable claim can be established through a combination of statistical evidence and other circumstantial evidence of discriminatory intent. *See Mansfield*, 866 F.2d at 171. Beyond the statistical evidence, Plaintiffs have identified some alleged irregularities in the promotion process, particularly relating to the experience of Sgt. Mack. In the 2016 promotion cycle for Lieutenant, Sgt. Mack was ranked three places below the last candidate who was promoted. Beyond the overall claim about the discriminatory nature of the promotion process itself, Sgt. Mack has identified three white Sergeants who had not even taken the Lieutenant promotion exam, but were

nevertheless appointed as Acting Lieutenants ahead of him and the two other officers above him on the eligibility list, both of whom were Black. Where Defendants have admitted that these officers served as Acting Lieutenants for more than 90 days but did not serve during the time period when promotions were being made from the 2016 eligibility list, they appear to have been placed in these roles after February 26, 2018, the designated expiration date for the eligibility list. The record is unclear, however, on when the predecessor Lieutenants retired and whether they did so before the expiration of the eligibility lists. Plaintiffs also argue that PGCPD retired the 2020 eligibility lists for Sergeant, Lieutenant, and Captain in "early 2020" and stopped making promotions from that list, even though the written tests did not take place until September 2020, presumably because of delays relating to the COVID-19 pandemic. Pls.' Suppl. Filing ¶ 2(h).

In *Mansfield*, the Court found that irregularities in the execution of the promotion process, such as adding officers to an eligibility list who had not qualified through the testing process, could provide additional circumstantial evidence of discriminatory intent. 866 F.2d at 169. As the record does not establish how firm the expiration dates for the use of eligibility lists must be or the appropriate procedures for appointing officers to acting positions, and the COVID-19 pandemic posed unique circumstances for which it is likely that no firm rule applied, these circumstances do not present clear evidence of discriminatory intent. Nevertheless, particularly where the next nine officers on the 2016 Lieutenant eligibility list were Black, and six of the next seven officers on the 2018 Sergeant eligibility list were Black or Hispanic, the fact that PGCPD declined to fill certain Lieutenant and Sergeant positions that potentially could have been filled with Black officers next on the eligibility lists, and in 2016 appointed three white officers as Acting Lieutenants who had not taken the promotion tests rather than the three Black officers next on the eligibility list, provides some additional evidence to support an inference of discriminatory intent. *See id.*;

39

*Richardson*, 2018 WL 4682224, at *8 (in denying a motion to dismiss an intentional discrimination claim against a fire department, considering both statistical and anecdotal evidence that was "perhaps insufficient on [its] own to create a plausible inference" of "a pattern or practice of racial discrimination").

As for Sgt. Mack's complaint that three white officers who were above him on the eligibility list had disciplinary records that, in his view, should have disqualified them for promotion, Defendants argue that these officers were not promoted in contravention of the formal rules of eligibility for promotions. Even if true, however, the fact that PGCPD's promotion process apparently does not consider in any way, whether through the written test, skills assessment, or otherwise, whether an officer with a discriminatory animus should be placed in a command position in a police department, particularly one serving a majority-minority community, is relevant on the issue of discriminatory intent. The fact that PGCPD has actually promoted officers who have exhibited egregious racially discriminatory animus raises additional concerns, as discussed below. *See infra* part II.B.5.

### 4.      **Deliberate Indifference**

Plaintiffs also argue that where the adverse impact of the PGCPD promotion process was known to PGCPD leadership as far back as 2012, yet PGCPD took no action to even attempt to rectify it, such "deliberate indifference" to potential discrimination provides further evidence in support of a finding of discriminatory intent. Mot. PI at 21. In a § 1983 equal protection case, deliberate indifference in the face of likely discrimination can provide the requisite intent to establish a violation. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689-90, 702-03 (4th Cir. 2018) (finding that an equal protection claim under § 1983 against a public university official for failing to stop student-on-student sexual harassment could be predicated on the official's

"deliberate indifference to such harassment" that was "motivated by a discriminatory intent"); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir. 2003) (in a case alleging an equal protection violation arising from a failure to stop student-on-student harassment and discrimination based on sexual orientation, stating that such a § 1983 claim requires a showing that "the discrimination was intentional" and holding that "plaintiffs must show either that the defendants intentionally discriminated or acted with deliberate indifference").

In *Hurley*, in which university administrators took only "limited steps" to address multiple allegations of sexual harassment over months, such as merely listening to complainants, and "made no real effort to investigate or end the harassment and threats," the court found that allegations of inaction in the face of discrimination, including the fact that an administrator "had the authority to address and curtail the harassment but failed to do so over a period of months," "sought to downplay the harassment and threats," and "made no effort to stop them," were sufficient to state the element of discriminatory intent. 911 F.3d at 690, 703. In *Flores*, the court found sufficient evidence of intentional discrimination in violation of the Equal Protection Clause based on school officials' failure to investigate and take adequate remedial measures to stop sexual harassment, which amounted to deliberate indifference. 324 F.3d at 1135-36, 1138. Deliberate indifference can consist of a "policy of inaction" that is the "functional equivalent" of a decision to violate the Constitution. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011); *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 326, 331 (2d Cir 1986) (finding that deliberate indifference can be based on responding to possible constitutional violations in a manner that is "uninterested and superficial").

As evidence of such deliberate indifference, Plaintiffs point to a series of events demonstrating that PGCPD leadership was fully aware of the adverse impact of the promotion

processes on Black and Hispanic officers, yet took no meaningful action over a period of years. First, the evidence establishes that PGCPD regularly compiled reports on the racial makeup of each rank within PGCPD, at least as far back as 2012. These reports were requested by and thus provided to the Deputy Chief. They show significant underrepresentation of Black and Hispanic officers at the higher ranks of PGCPD and are consistent with the statistical analysis discussed above. *See supra* part II.B.2. The fact that PGCPD leadership was fully aware of these disparities is demonstrated by Chief Magaw's multiple conversations in 2014 and 2015 with the County Executive about whether the promotion process for Captains should be changed to a discretionary appointment system to improve diversity in the leadership ranks. Although PGCPD identified the problem and at least one potential means to mitigate it, it took no action, as the FOP opposed any change to the Captain promotion process and the Chief decided that there was a lack of "political will" to make a change. J.R. 383.

Second, after HNLEA and UBPOA filed the DOJ Complaint in October 2016 about "rampant discrimination" at PGCPD, including in the "denial of promotions," J.R. 818, the Deputy Chief requested a compilation of the last five years of the Field Consulting reports on the promotions process, which showed statistically significant differences in test scores in many of the test cycles. The 2017 Panel, convened by Chief Stawinski, began its work by holding several hearings in the first half of 2017 on the issue of promotions, and identified several potential problems with the promotions process that may have factored into the adverse impact on Black and Hispanic officers. These issues included a concern that PGCPD officers serving as SMEs to vet the promotion tests may be leaking information about the tests to friends scheduled to take the tests, which could unfairly advantage white officers if the SMEs were predominantly white. The 2017 Panel also heard that the disproportionate assignment of white officers to specialty units,

likely the result of the fact that predominately white leaders of those units have significant input into the selection of officers for specialty units, was a "significant issue" that could be adversely impacting Black and Hispanic officers in the promotion process, J.R. 956, both because such assignments may afford officers more time and flexibility in their schedule to study for promotion exams, and because such assignments may provide particular skills, training, and experience on specific topics more likely to be assessed during the promotion process. Although Defendants have downplayed this discussion as only "the musings of a single officer . . . in a single public meeting, in a discussion that lasted minutes at most," Opp'n Mot. PI at 30, Cpl. Hilligoss, one of the panel members, characterized this issue as "one of the biggest concerns I heard in the meetings" and as an "issue that I just don't feel can be ignored." J.R. 66. Thus, although the 2017 Panel was aware of the adverse impact of the promotion process on Black and Hispanic officers and identified several different problems that could be addressed in order to alleviate that adverse impact, PGCPD took no action in response. Rather, once Co-Chair Acosta left PGCPD, Chief Stawinski never appointed anyone to fill his position, and the 2017 Panel never produced a report or list of recommendations. Chief Stawinski took no further steps to examine or address the adverse impact of the promotion process.

Third, Plaintiffs note that although the Prince George's County Executive convened the 2020 Work Group and directed it to study and review a range of PGCPD policies, the Acting Chief presented it with certain information on the underrepresentation of Black and Hispanic officers at the senior ranks, and HNLEA and UBPOA sent to it a detailed letter requesting, among other actions, that the promotions system be "overhauled to eliminate bias" and recommending steps to address the problems with the promotion process identified by the 2017 Panel, J.R. 948, the 2020 Work Group did not address the issue of discrimination in promotions at PGCPD in its December

2020 report.  Defendants argue, without citation to the record, that the County and the 2020 Work Group chose not to address the promotion system in order "not to invade the jurisdiction of this Court or make any decisions regarding County policies or practices at issue in this litigation." Defs.' Suppl. Filing at 8, ECF No. 494.  The 2020 Work Group itself, however, in discussing the ongoing litigation stated only that it "was not created to decide the merits of any pending or potential litigation" and that it would not "make any factual determinations regarding any lawsuits or controversies," limitations that in no way would prevent it from making recommendations on potential changes to the promotion system.  J.R. 835.  The Court finds no reason that during this litigation, which has extended for over two years to date, the County could not, through the 2020 Work Group or otherwise, review its promotion policies and implement remedial changes to mitigate any potential discrimination.  *See* Fed. R. Evid. 407 (stating that subsequent remedial measures are inadmissible as evidence).

This evidence demonstrates that PGCPD has been aware of the significant disparities in promotion rates based on race dating back at least to 2012 but has done virtually nothing to address them.  Even when the 2017 Panel identified specific issues that could be examined in order to address the adverse impact of the promotion process, it did nothing.  Rather, Chief Stawinski effectively let the 2017 Panel die without issuing a report and did not task anyone else to address the issues.  Conspicuously, the County's 2020 Work Group, even when confronted with the issue of discrimination in the promotion process, did nothing to address it.  The evidence thus supports the conclusion that PGCPD's efforts to address such possible constitutional violations were "uninterested and superficial," *Fiacco*, 783 F.2d at 331, and that PGCPD effectively engaged in a "policy of inaction" to address possible discrimination in the promotion process, *Connick*, 563

U.S. at 61. Such deliberate indifference provides additional evidence of discriminatory intent under § 1983. *See Hurley*, 911 F.3d at 703; *Flores*, 324 F.3d at 1135-36.

In the face of their glaring failure to address the adverse impact of the promotion system on Black and Hispanic officers, Defendants argue that evidence that the promotion tests were developed in a manner consistent with industry standards and had content validity refutes the claim that they acted with discriminatory intent or deliberate indifference. *See Griggs v. Duke Power Co.*, 401 U.S. 430, 432 (1971) (noting, in a disparate impact case, that a plaintiff must show that an employment condition such as a test requirement has a "manifest relationship to the employment in question"); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (holding that employer may refute a *prima facie* case of discrimination if it can "articulate some legitimate, nondiscriminatory reason" for the employment action). Defendants focus on the facts that Fields Consulting, in conjunction with the PGCPD, engaged in a job analysis in 2015-2016 to identify the relevant KSAOs and then, in consultation with SMEs within PGCPD, developed test questions and exercises that assessed the relevant knowledge or skills needed for the rank in question.

Defendants' argument is not persuasive. First, as noted by Dr. Hausknecht, there are flaws in the claim that the promotion tests have been fully validated. In particular, on the non-competitive written tests, Fields Consulting focused only on testing for knowledge, not for the over 40 skills, abilities, and other characteristics identified in the job analysis as relevant to the work of a POFC or Corporal. *See Vanguard Just. Soc., Inc. v. Hughes*, 592 F. Supp. 245, 257-58, 260 (D. Md. 1984) (finding that a test for Maryland police officers was invalid in part because the test "omitted important work behaviors and overemphasized the relative weights of certain work behaviors which were tested for"); *United States v. City of New York*, 637 F. Supp. 2d 77, 119

(E.D.N.Y. 2009) (finding the city's testing process for firefighters deficient in part because only 9 of the 18 abilities identified in the job analysis were tested). Defendants' argument that the skills and abilities are evaluated through the requirement that an officer have at least a satisfactory performance rating in order to be eligible to take the written test is unconvincing, among other reasons, because the officer's performance rating is not part of the actual test and because it addresses the ability to perform at the officer's current rank, not the rank sought through promotion.

More importantly, beyond questions about the content validity of the promotion tests, in the face of the demonstrated adverse impact of both the written tests and skills assessments, a validity study should include the investigation of suitable alternative selection procedures, yet the County has taken no meaningful steps to consider modifications or alternatives that would reduce or eliminate that impact. Under the EEOC Uniform Guidelines, which the Supreme Court has stated are entitled to "great deference," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975) (*quoting Griggs*, 401 U.S. at 433-434), an employer should "as part of [a] validity study" include an "investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines." 29 C.F.R. 1607.3(B).

Although Defendants' expert witness, Dr. Locklear, has acknowledged this requirement, PGCPD and Fields Consulting did not take such action. While PGCPD updated the promotion tests each cycle using the same process discussed above, Flaig has acknowledged that even with all of the data compiled showing that Black and Hispanic officers test scores were consistently lower, Fields Consulting has never applied the 4/5ths Rule to evaluate the degree of adverse impact, and it was never asked by PGCPD, and therefore has never done, a statistical analysis

46

based on race beyond what was included in each report after each test administration.  PGCPD, whether through Fields Consulting or otherwise, has not analyzed whether changes to the cut-off score on the written test for promotion to POFC or Corporal, or to advance to the skills assessment component for competitive promotions, would reduce the adverse impact, even where the data showing significant volatility in the passage rate of all applicants suggests that the established 70 percent cut-off score is not actually calibrated to the score of a minimally competent examinee.  It has not investigated whether changing the relative weighting between the written test and the skills assessment, or altering the skills assessment grading process, such as by converting from video recording to audio recording of certain exercises as proposed to the 2020 Work Group, could reduce adverse impact in the competitive promotion process.  Nor has PGCPD requested or conducted any analysis on whether any of the issues identified through the 2017 Panel, such as whether service in specialty units or contact with SMEs has an adverse impact that could be mitigated.

Although Dr. Locklear has identified a number of steps taken by Fields Consulting that she asserts are designed to minimize adverse impact, such as adopting standardized examination formatting, administration, and scoring procedures; allowing generous time limits, recruiting diverse scorers, and rotating assessors; and providing coaching and practice opportunities through orientation sessions, sample tests, and sample exercises, she does not assert, and there is no evidence establishing, that these actions were adopted in response to and in order to mitigate the demonstrated adverse impact, as opposed to being standard best practices that existed alongside, and thus cannot now be expected to mitigate, the ongoing adverse impact.  Thus, even if the promotion tests could be deemed to have content validity, the failure of PGCPD to follow the EEOC Uniform Guidelines and to investigate actual alternatives that would mitigate the adverse

47

impact advances, rather than undermines, the claim of discriminatory intent. The Court therefore finds that the evidence supports a finding that Defendants acted with deliberate indifference to the clear evidence that the PGCPD promotion system was causing an adverse impact, and thus potential discrimination against, Black and Hispanic officers.

### 5.    Discriminatory Intent

Considered together, Plaintiffs' evidence that there is intentional discrimination in violation of the Equal Protection Clause consists of (1) statistical evidence showing that the promotion tests and processes have a significant adverse impact on Black and Hispanic officers; (2) some evidence of irregularities in the administration of the promotion system; and (3) evidence that Defendants have acted with deliberate indifference to possible discrimination arising from the promotion system. In *Mansfield*, the Court found a likelihood of success on the merits of claim of intentional discrimination arising from a fire department's hiring test based on statistical evidence of a disparate impact based on race as well certain evidence of irregularities, including the facts that the agility test portion of the hiring process was not properly supervised, the only Black applicant to pass the written test received the lowest score of all applicants, and certain white applicants who had not taken agility test ended up on the eligibility list. *See Mansfield*, 866 F.3d at 171. Here, the statistical evidence of an adverse impact is convincing, and it notably includes the fact that in the competitive promotion processes, Black and Hispanic applicants have had distinctly less success on the skills assessment component. Plaintiffs have also identified some possible irregularities in the conduct of certain promotion processes, though unlike in *Mansfield*, Plaintiffs have not identified specific problems with the conduct of the skills assessments, and the evidence is not yet clear whether the failure to appoint additional Lieutenants off of the 2016 eligibility list, who would have been Black, and the decision instead to appoint Acting Lieutenants

who were white and then fill the permanent positions in the next cycle, ran contrary to rules of the promotion process. Ultimately, however, the Court finds a likelihood of success on the merits based on this evidence and for three additional reasons.

First, as the Supreme Court has recognized, "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect" of a governmental action. *Castaneda*, 430 U.S. at 493 (quoting *Arlington Heights*, 429 U.S. at 266). Here, the significance of the evidence of adverse impact is magnified by the fact that Defendants have acknowledged that the lower promotion rates for Black and Hispanic officers cannot be readily explained based on other factors. In its Answers to Plaintiffs' Requests for Admissions, Defendants admit that "neither the Department, the County, or Fields/ESCI possesses, or is aware of, any data, study, or analysis that indicates that, as compared to white promotion candidates, Black [and Hispanic] promotion candidates, are less intelligent, were not as well trained at the Police Academy, are less motivated to work towards promotions, or study less for the tests." J.R. 474-475. Moreover, as noted in the presentations to the 2017 Panel, Black and Hispanic officers are taking the promotion exams at the same rate or higher than white officers.

Second, unlike in other cases in which hiring or promotion tests were challenged based on discriminatory intent, this case includes evidence of deliberate indifference to possible discrimination in that PGCPD had awareness of the adverse impact for years, was aware that steps could be taken to at least investigate possible solutions, but took no meaningful action. Inaction in the face of clear evidence of adverse impact, even inaction that rises to the level of deliberate indifference, may not always be enough to demonstrate discriminatory intent. *See Vanguard*, 471 F. Supp. at 742 (finding that a failure to "have more vigorously inquired about certain of the tests" such that defendants would have "discovered the extent of their racially discriminatory impact"

was not sufficient, without more, to establish intentional discrimination). But "[p]ersistent use of exams with disparate racial effects would support an inference of intentional discrimination if proper test construction were not even attempted." *Guardians Ass'n of N.Y.C. v. Civil Serv. Comm'n of the City of New York*, 630 F.2d 79, 112 (2d Cir. 1980). Here, where PGCPD, fully aware of the significant adverse impact of the tests as presently constructed, has gone right on with its same process for developing and administering tests that it always has, such an inference of discriminatory intent could fairly be drawn, particularly where PGCPD, even if it makes efforts to develop proper tests, has failed to take any affirmative steps in response to the data and the complaints of discrimination to identify alternative selection procedures, as required by the EEOC Uniform Guidelines. This failure is further magnified by PGCPD's decision, during the pendency of the Motion and without notice to the Court, to move forward with the 2020 skills assessments that were already indefinitely delayed due to the COVID-19 pandemic and therefore had no set scheduled date, without any known changes to the methodology.

Finally, in assessing whether there is discriminatory intent underlying the PGCPD's promotion practices, it is appropriate, as acknowledged by defense counsel at the hearing on the Motion, for the Court to consider the other evidence in this case. In *Vanguard*, the court considered statistical evidence of adverse impact, as well as evidence that the police department was aware of that impact but took no action, but ultimately concluded that the plaintiffs had not demonstrated intentional discrimination based on consideration of other affirmative steps taken by the police department that refuted the claim of discriminatory intent, including evidence of an "overall good faith determination by the Commissioner and other top-ranking Department officials to increase black Police Department employment at all levels and to eliminate racial discrimination." 471 F. Supp. at 742-43.

This case stands in stark contrast. Within this case, Plaintiffs have presented, through the expert report of Sheriff Michael Graham, evidence that during the same time period that the promotion tests and processes have been in effect, PGCPD has had numerous incidents in which police officers, including captains and sergeants, have made serious, racially derogatory statements and received what appears to be inadequate discipline, even accounting for the explanations offered by PGCPD's expert witness, Chief Thomas Manger. These incidents include Sgt. Thomas Denault posting numerous racially charged statements in a group chat, including referring to members of the command staff as "baboons,"[1] for which the Internal Affairs Division recommended termination but Denault was ultimately retained but demoted; a similar series of racist postings by a Captain[2] that did not result in a charge of discriminatory language and, in addition to other allegations of misconduct, resulted in a reduction of rank rather than termination; an incident in which a Corporal told a Hispanic civilian employee "you are lucky to be in this

---

[1]  These postings included (1) "Unless you're in with the ghetto-fide, butt-slappin, high-fivin, incompetent retard that runs D4, you will always be wrong....and especially if you don't speak Ebonics"; (2) a photo of a Black female officer behind a dog that had to be shot with a caption stating "You never gonna believe this girl-friend, I was just getting my hairz dun . . . . I aintz gotz time to mess with this sh*t, I got's to get my babies off the bus"; and (3) a separate photo with a Black male subject in handcuffs bleeding from his head and face with a caption that read "As I woke up this day at 6pm, I thought to myself: 'Self, what can I do today to be a productive member of society.' So as I sat about in my section-8 free housing, eating chicken nuggets and Hennessey, paid for with my WIC card, and playing my X-Box that I stole from a B&E, it came to me: 'Self, I think I am gonna finish this bottle of Hennessey, smoke some PCP, and pick a fight with Squad 46.' Wrong Squad Sucka!!!!!"  Graham Report at 70, ECF No. 445-13.

[2]  Posts and exchanges made on the Captain's Facebook page included: (1) references to Reverend Al Sharpton as a "race hustling asshole"; (2) a picture of several Black individuals with the caption "line out the door of the liquor store in da hood!!! . . . only three murders in the parking lot in 4 years"; (3) a posting that "he comes the white peivedge [sic] bozos . . . I'm going to return my white skin for a darker complexion.. sue to my priviledge [sic]... so tired of the cupcake Obama supporters blaming race for everything..."; (4) a reference to another Facebook user as "frito frank . . . the good news is it's a long weekend those chip shelves, we be empty and ready to be stocked"; (5) a statement telling a Hispanic person to "go outside and mow your moms lawn"; and (6) a posting that he was "Black from the waist down."  Graham Report at 71.

country"; and an incident in which a Police Officer referred to a photograph used in a training session as "Blacks Live Matter crap" and then filed a false charge that an officer of color had attempted to attack her over the comment.  Graham Report at 66-67, 70-73, ECF No. 445-13. Graham has also identified numerous other incidents of discriminatory statements and actions by police officers in which no investigation was conducted, or the investigation resulted in no meaningful charges, including incidents in which a sergeant emphasized the word "nigga" four times in reading a suspect's text message, told another officer that his wife was cheating on him because she is Latina and "all Latino women are whores," and said, "I can't wait to see Donald Trump check these Hispanics," then arranged for the transfer of the officer who filed a complaint about these statements ; a Corporal, during a K-9 demonstration to students, used the example of "if a black bad guy is running"; a Corporal made a series of negative comments about Black people, including that "at least slaves had food and a place to live," referred to President Obama as a "coon," and referred to a Black officer as a "signal 7," referring to a suspect; and a white officer posted derogatory images of a senior Hispanic officer with a caption, "I want to wish everyone Cinco de Mayo," and a white sergeant later circulated the images by email. *Id.* at 48-50, 59-60.

Even if one or more of these and other similar incidents identified by Sheriff Graham could be deemed to have been adequately addressed, there has been no persuasive showing that PGCPD has taken effective steps to address broadly this highly troubling pattern of discriminatory animus among officers within the PGCPD.  Rather, Sheriff Graham has also identified a series of incidents in which officers who have complained of discrimination appear to have been subjected to retaliation through involuntary transfers to less favorable assignments or removals from informal supervisory assignments, including Officer Terrence Brown and Plaintiffs Cpl. Richard Torres, Lt. Thomas Boone, and Cpl. Chris Smith.  Tellingly, although PGCPD appears to have held training

sessions on implicit bias, in another incident identified by Sheriff Graham, when a group of predominantly white officers walked out of a 2018 implicit bias training workshop, senior command officers decided there should be no investigation or discipline.

This evidence suggesting that PGCPD management has not meaningfully addressed a pattern of discriminatory animus within the PGCPD provides important context for the lack of any action to address the disparities in promotion rates and bolsters the argument that this failure is based not just on negligence or oversight, but on deliberate indifference to discrimination and, ultimately, discriminatory intent. Such a conclusion is reinforced by the fact that an officer such as Denault, who was found to have engaged in misconduct based on egregious racially derogatory statements, has continued to be promoted, at this point beyond Sergeant to the rank of Lieutenant, while PGCPD has taken no meaningful steps to assess why many officers of color are not able to advance through the current promotions system.

Accordingly, when the evidence is viewed in this context, the Court finds that the statistical evidence of longstanding adverse impact, the evidence of deliberate indifference to those disparities, and the additional evidence on both the operation of the promotion process and the broader operations of PGCPD establish that Plaintiffs have satisfied the requirement of demonstrating a likelihood of success on the merits of their claim.

## C.    Irreparable Harm

The second requirement for a preliminary injunction is that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief. *See Winter*, 555 U.S. at 20. Plaintiffs assert that they have satisfied this prong because the denial of a constitutional right necessarily constitutes irreparable harm. They also argue that allowing the next round of promotions to move forward will harm Black and Hispanic officers who will be unfairly denied promotions and thus

be excluded from more senior, prestigious position and a fair opportunity for a higher salary, both in the immediate and long term.

"[T]he denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). Where the Court has found a likelihood of success on Plaintiffs' equal protection claim, the deprivation of such a constitutional right alone would constitute irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (finding that infringement on a First Amendment right, even for "minimal periods of time, unquestionably constitutes irreparable injury"); *Hernandez v. Sessions*, 872 F.3d 976, 982, 994 (9th Cir. 2017) (in considering an equal protection claim, stating that "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury").

Beyond the harm from the likely denial of a constitutional right, the Court also finds irreparable harm from the ongoing effects of the promotion system, because delays in promotion affect officers' professional and leadership opportunities, as well as their long-term career trajectories. Although some aspects of delayed promotions could be remedied with back pay and retroactive promotions, such remedies would be incomplete. Courts have found irreparable harm arising from challenges to promotion processes because in addition to lost income, plaintiffs also face "the loss of experience and chances to compete for promotions," harms which "are not easily valued." *Johnson v. City of Memphis*, 444 F. App'x 856, 860 (6th Cir. 2011). Particularly when eligibility for promotion to the next level requires a certain amount of time in service at the preceding rank, discriminatory promotion processes create a cascading effect that cause officers to fall further and further behind in career advancement in a manner that constitutes irreparable harm. *See Firefighters Inst. for Racial Equal. v. City of St. Louis*, 616 F.2d 350, 362 n.21 (8th Cir.

1980) (in a challenge to a firefighters' promotion test, finding irreparable harm in part because the promotion test was given "fairly infrequently," and an additional five years of service was required to be eligible for the next rank, so the "delay in promotions of blacks will adversely affect their chances of further advancement in the department"); *Mansfield*, 866 F.2d at 171 n.6 (finding irreparable harm in part because even if positions at higher ranks become available, "plaintiffs would not have the seniority they might have earned" that would be needed to be eligible for those positions); *see also Howe v. City of Akron*, 723 F.3d 651, 662 (6th Cir. 2013) (finding irreparable harm in part based on the conclusion that without court-ordered promotions, "Plaintiffs will be unable to gain experience and unable to seek the next rank during the following round of testing").

Within PGCPD, particular specialty unit assignments are available only to officers of certain ranks, and within a patrol squad, the position of "9-Car," which functions as second-in-command of a squad, is available only to officers who have obtained the rank of Corporal. J.R. 938. Because PGCPD officers are eligible to seek promotion only after serving in a role for a specified amount of time, the failure to address discrimination in the promotion system would have the kind of cascading, adverse impact on future promotions and career advancement that has been deemed to be irreparable harm. *See, e.g.*, *Firefighters Inst. for Racial Equal.*, 616 F.2d at 362 n.21. The likelihood of such harm is illustrated by the fact that in each of the 2016 and 2018 competitive promotion cycles, Black and Hispanic officers, including members of the Organizational Plaintiffs, received test scores and rankings on the eligibility lists that placed them within five places below the cut-offs for promotion.

Defendants argue that Plaintiffs cannot demonstrate irreparable harm arising from the upcoming April 2021 non-competitive promotion tests because Plaintiffs have not identified a specific Individual Plaintiff or member of one of the Organizational Plaintiffs who is actually

seeking promotion in this cycle. Where, however, Plaintiffs have identified four Organizational Plaintiff members who are already are eligible to seek promotion in April 2021, the Court finds that the continued operation of the non-competitive promotion tests imposes irreparable harm, not only because it will likely delay the promotion of these eligible officers, with the cascading effect on subsequent promotions, but also because it will allow other officers with whom these eligible officers will be competing for assignments and promotions to move ahead of them in the promotion process, including through the April 2021 promotion tests.

Nevertheless, the fact that Plaintiffs have not been able to point to any Individual Plaintiff or Organizational Plaintiff member who is seeking, and thus may be denied, a promotion through the April 2021 promotion tests for POFC or Corporal may affect the balance of the equities, the public interest in an injunction, and the form and scope of any preliminary injunction ordered, to be discussed below.

### D. Balance of Equities and the Public Interest

The remaining requirements for a preliminary injunction are that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest. *See Winter*, 555 U.S. at 20. When one party is the Government, these two factors merge and are properly considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In general, the Government and the public interest are not harmed by a preliminary injunction temporarily enjoining policies that are likely to be unconstitutional under the present circumstances. *See Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (stating that the Government "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing [policies] likely to be found unconstitutional. If anything, the system is improved by such an injunction.") (citations omitted).

56

*Giovani Carandola, Ltd. v. Bason*, 303 F. 3d. 507, 521 (4th Cir. 2002) (stating that "upholding constitutional rights surely serves the public interest").

Defendants argue that the balance of equities should tip in their favor because Plaintiffs' request that the Defendants not administer any further promotion tests "until such a time as the County can replace the promotional policies and testing program with one that reduces . . . [alleged] discriminatory effects," Mot. PI at 32, is harmful to protecting public safety because of a need to maintain appropriate staffing levels and continue to promote qualified officers to leadership positions. *See Black L. Enf't Officers Ass'n v. City of Akron*, 824 F.2d 475, 482 (6th Cir. 1987) (noting that to have no promotions in a police department for up to three years would cause "potential harm"); *see also Booth v. Prince George's Cty.*, 66 F.R.D. 466, 474 (D. Md. 1975) (recognizing a public interest in filling vacancies on the police force to respond to an increase in crime). Defendants have not provided specific evidence to show an adverse impact on police operations arising from a limited delay in promotions to higher ranks. Rather, the evidence has shown that PGCPD can and does designate officers to acting roles, such as Acting Lieutenants, to fulfill certain functions before the promotion system produces permanent officers of that rank. Moreover, because of the COVID-19 pandemic, competitive promotions to Sergeant, Lieutenant, and Captain did not occur in April 2020, the written tests were delayed until September 2020, and the skills assessments were not conducted until April 2021, without any evidence presented of a specific adverse impact on police operations. *See Johnson*, 444 F. App'x at 860 (rejecting a city's argument that potential understaffing at the sergeant level of its police department posed a safety threat that should preclude a preliminary injunction). Thus, although the length of any delay must be considered, this interest does not preclude the grant of a preliminary injunction.

The Court also considers the equities as to the individual officers involved. For Plaintiffs and members of the Organizational Plaintiffs, the ongoing, indefinite failure of PGCPD to take any meaningful steps to analyze and address the adverse impact of the promotion tests on them has a substantial adverse impact, because with each promotion cycle in which white officers are promoted and they are not, they will not obtain the salary increases and higher level experience that would come with promotions, and they will fall behind in attaining eligibility for promotion to higher levels. Notably, Defendants, in explaining the inaction of the 2020 Work Group, have effectively acknowledged that the County will not review the promotion system in order to identify possible changes to lessen the adverse impact while this litigation is pending. As discussed above, the Court finds no reason that the County and PGCPD could not identify and implement reforms to its promotion processes before the resolution of this case, but taking Defendants at their word, the Court finds that absent a preliminary injunction, no action will be taken until 2022 or beyond, as this case has yet to proceed to summary judgment motions, which will likely not be fully briefed until late 2021, much less to trial. Under such a timeline, it is likely that at least three more non-competitive promotion cycles, including April 2021, October 2021, and April 2022, and at least two competitive promotion cycles, including the delayed 2020 cycle and the 2022 cycle, will pass without any consideration of changes to the promotion system.

On the other side, there are numerous officers of all backgrounds, including some who have submitted declarations in opposition to the Motion, who have registered for and prepared to take one of the April 2021 promotion tests for POFC or Corporal, or who have already taken the 2020 written test and skills assessment for promotion to Sergeant, Lieutenant, or Captain. These officers would face the harm of having prepared for tests that do not occur, or having taken tests that do not count. Those who would take the promotion test for POFC or Corporal would also be

unable to be promoted for another six months, which would include the inability to receive the salary increase that would come with promotion to POFC or Corporal. For those who have already taken the 2020 competitive promotion tests, they potentially would not be able to be promoted for another year, until April 2022.

Considering these factors together, the Court finds that the balance of the equities and the public interest favors a preliminary injunction, but not necessarily the specific injunction sought by Plaintiffs, as discussed below. Additional equities that factor into the specific preliminary injunction to be imposed will be discussed in the following section.

### E.     Remedy

Upon consideration of all four *Winter* factors, and particularly because inaction on the promotion system will cause undue hardship to Plaintiffs, the Court will grant a preliminary injunction barring the continued use of the existing promotion system after the 2020 competitive promotion cycle and the April 2021 non-competitive promotion tests and requiring the appointment of an independent expert, selected with the agreement of the parties, to review the promotion system—including but not limited to the written tests, the skills assessments, and the selection processes—and to recommend changes to reduce or eliminate adverse impact and discrimination against Black and Hispanic officers. A revised promotion system, adopting all reasonable recommendations of the independent expert, must be adopted in time to conduct new promotion cycles in October 2021.

The Court will not, however, enjoin the administration or use of the 2020 competitive promotion tests and skills assessments already completed or the April 2021 POFC and Corporal promotion tests that are about to occur. As to the 2020 competitive promotion process, Plaintiffs' belated request to enjoin it comes too late. The reliance interest of those who have participated in

59

that process is strong, as the written tests were administered back in September 2020, well before Plaintiffs filed the Motion, and even when they filed the Motion, Plaintiffs did not specifically request a preliminary injunction against using those written tests in granting promotions or otherwise request a halt to the 2020 competitive promotion process; it was only at the hearing on the Motion that Plaintiffs sought such limitations. Though Plaintiffs have complained about the conduct of that process during the COVID-19 pandemic, they have offered no legal argument for why that was impermissible. Rather, the Court notes that but for the pandemic, the 2020 competitive promotion processes would have been completed a year ago, long before any challenge to the promotion system had been made. Significantly, an injunction against the use of the 2020 competitive promotion process would further extend an already three-year period—from 2018 to the present—during which no officers would have been able to apply for and receive a promotion to Sergeant, Lieutenant, or Captain—which is likely too long a time both for purposes of the impact on officers seeking to progress through their careers and the effect on PGCPD operations.

As to the POFC and Corporal promotion tests, Plaintiffs have not identified any Individual Plaintiff or member of one of the Organizational Plaintiffs who is scheduled to take the April 2021 POFC or Corporal promotion test and thus faces the specific harm of being passed over for promotion during the April 2021 cycle based on discrimination in the testing process. In contrast, cancellation of the April 2021 promotion tests would significantly prejudice those officers of all backgrounds who have invested time and energy in recent months preparing for the test and who will have to wait another six months to be considered for promotion. Notably, because there is no limit to the number of officers who may be promoted to POFC or Corporal, any officers who take and pass one of the April 2021 promotion tests would not be taking one of a finite number of

positions and thus limiting the ability of members of the Organizational Plaintiffs to be promoted when they actually seek promotion in October 2021 or later. When these factors are considered together, the Court concludes that an injunction against the April 2021 promotion tests is not warranted.

The Court will therefore limit the preliminary injunction to enjoining future use of the present promotion processes and to require the appointment of an independent expert to review and recommend changes to the PGCPD promotion tests and processes as needed to eliminate any discrimination. In recognition of the harm that a delay of another full year would cause to those Plaintiffs seeking competitive promotions, the Court will require that PGCPD conduct the next competitive promotion cycle, pursuant to the revised promotion system, in October 2021, six months earlier than usual, and that any use of the 2020 competitive promotion eligibility lists generated under the existing promotion system end no later than the standard 60 days before this October 2021 promotion cycle begins. *See* J.R. 998.

## CONCLUSION

For the foregoing reasons, the Motion to Strike will be DENIED, and the Motion for a Preliminary Injunction will be GRANTED IN PART and DENIED IN PART, as set forth in accompanying Order.

Date: April 21, 2021

THEODORE D. CHUANG
United States District Judge

61